# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 00-CV-3542
### JUDGE JAMES LAWRENCE KING

NIGHT BOX
FILED

JAN 04 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

THOMAS JOHNSON, *et al.*,                )
                                         )
                        Plaintiffs,      )
                                         )
v.                                       )
                                         )
JEB BUSH, Governor of Florida, *et al.*, )
                                         )
                        Defendants.      )
_____)

## EXHIBITS TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### VOLUME 1

Paul Hancock
Florida Bar No. 0140619
Deputy Attorney General
  for Southern Florida
Office of the Attorney General
110 Southeast 6th St., 10th Floor
Fort Lauderdale, FL 33301
(954) 712-4670
(954) 712-4707
Paul_Hancock@oag.state.fl.us

George Waas
Florida Bar No. 129967
Assistant Attorney General
The Capitol
Tallahassee, FL 32399
(850) 414-3300
(850) 487-0997
George_Waas@oag.state.fl.us

Charles J. Cooper
David H. Thompson
Hamish P.M. Hume
Derek L. Shaffer
COOPER & KIRK, PLLC
1500 K Street, N.W., Suite 200
Washington, D.C. 20005
(202) 220-9600
(202) 220-9601
dthompson@cooperkirk.com



January 4, 2002

# INDEX

**Page**

## VOLUME 1

Expert Report of Professor Richard K. Scher, Ph.D. (June 14, 2001)............... 1

Expert Report of Professor Theodore Chiricos, Ph.D. (June 21, 2001)............. 11

Letter from J. Allen (Brennan Center) to H. Hume (C&K) re enclosure
of supplemental responses to Florida Clemency Board Defendants' Second
Set of Requests for Production of Documents related to Theodore Chiricos
(Dec. 10, 2001) ............................................................................................. 58

Expert Report of Richard L. Engstrom, Ph.D. (July 1, 2001)............................ 63

Expert Report of Joseph L. Katz, Ph.D. (August 31, 2001)................................ 116

Expert Report of Lance deHaven-Smith, Ph.D., The Origins and Impacts
of Felon Disenfranchisement in Florida (Sept. 2001)........................................ 168

Addendum to Expert Report of Lance deHaven-Smith, Ph.D., The Origins
and Impacts of Felon Disenfranchisement in Florida (Nov. 28, 2001) ............. 207

## VOLUME 2

Expert Report of Professor Ronald E. Weber, A Report on Vote Dilution
Issues for the Case of *Johnson v. Bush* (Oct. 16, 2001)..................................... 226

Expert Report of Professor Jerrell Shofner, Ph.D. (Oct. 24, 2001) ................... 426

Addendum to Expert Report of Professor Jerrell Shofner, Ph.D.
(June 20, 2001)................................................................................................... 463

Supplemental Expert Report of Joseph L. Katz, Ph.D. (Nov. 9, 2001) ............. 467

Expert Report of Christopher Uggen, Ph.D. (Dec. 16, 2001)............................ 488

Christopher Uggen, Memo: Race and Automatic Restoration of Civil
Rights (ARCR) in Florida (Oct. 17, 2001) ........................................................ 537

Letter from N. Northup (Brennan Center) to H. Hume (C&K) re enclosure
of supplemental responses to Florida Clemency Board Defendants' Second
Set of Requests for Production of Documents related to Christopher Uggen

(Dec. 6, 2001) ............................................................................... 545

FLA. CONST. 1838 ......................................................................... 552

FLA. CONST. 1865 ......................................................................... 570

FLA. CONST. 1868 ......................................................................... 588

**VOLUME 3**

FLA. CONST. 1885 ......................................................................... 615

FLA. CONST. 1968 ......................................................................... 645

Florida Rules of Executive Clemency .............................................. 714

Florida Rules of Executive Clemency prior to June 14, 2001 .......... 732
Plaintiffs; Response to Florida Clemency Board Defendants' First Set of
Interrogatories and First Request for Production of Documents
(July 3, 2001) .............................................................................. 739

JERRELL H. SHOFNER, NOR IS IT OVER YET: FLORIDA IN THE ERA OF
RECONSTRUCTION 1863-1877 (1974) (excerpt) ................................ 769

Jerrell H. Shofner, *The Constitution of 1868*, FLORIDA HISTORICAL
QUARTERLY (1963) ........................................................................ 782

Deposition of Professor Richard Scher (Dec. 5, 2001)...................... 792

Deposition of Jerrell H. Shofer (Oct. 25, 2001)................................ 854

Deposition of Theodore G. Chiricos (Dec. 11, 2001) (excerpts)....... 941

Deposition of Richard L. Engstrom (Dec. 11, 2001) (excerpts) ........ 951

Deposition of Christopher Uggen (Dec. 8, 2001) (excerpts) ............. 955

Questions and Responses to Katz's Supplemental Report (Nov. 19, 2001) ...... 958

Order Granting Defendants' Motion for Summary Judgment and Denying
Plaintiffs' Motion for Summary Judgment, *Farrakhan v. Locke*,
No. CS-96-76-RHW (E.D. Wash. Dec. 1, 2000)............................... 960

FLA. STAT. § 921.0021 ................................................................... 973

FLA. STAT. §921.0011 .................................................................... 975

**Expert Report**
**June 14, 2001**

by

Professor Richard K. Scher, Ph.D.

Case:        Johnson v. Bush
             No. 00-CV-3542
             U.S. District Court
             Southern District of Florida
             Judge James Lawrence King

**1.   Introduction and Professional Qualifications**

I have been retained as an expert for by counsel for the Plaintiffs in the above captioned litigation. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

I am Professor of Political Science at the University of Florida, where I have been a full-time member of the Department of Political Science since 1979. My research interests include state and local politics, southern and Florida politics, campaigns and elections, and voting rights. I have published extensively in these areas, teach both undergraduate and graduate courses in them, and am an internationally recognized expert in them.

Attached is a curriculum vitae setting forth my professional background, which includes a list of all publications I authored within the last ten years.

**2.   Opinions**

- The 1968 Florida Constitution altered the old language of Article VI, §§ 4-5, of the 1885 Florida Constitution concerning felons' voting rights. However, the 1968 Constitution did not remove the blanket disenfranchisement of convicted felons, nor did it provide for automatic restoration of voting rights upon completion of the sentence.
- The public record reveals that no proposal to change previous practice concerning felons' disenfranchisement or voting rights was ever brought forward to the Revision Commission or the Legislature. The reasons why the 1968 Constitution continued the past practice of blanket disenfranchisement and non-automatic restoration of rights can be summed up as follows:
  - Political inertia, insofar as there was no public demand or outcry to change previous practices or constitutional language on felons' voting rights;
  - There were no political pressures on the Commission or Legislature to make modifications, as neither felons nor any allies they may have had submitted proposals for

> change, and indeed the political climate in Tallahassee was such that there was no reason to alter past practices or constitutional language;

- There was no evidence from the record that the public, Commissioners, or members of the legislature ever even thought about or entertained the idea of changing past practice or language on felons' voting rights. As far as they were concerned, it was a non-issue.

The public record reveals no evidence that members of the 1965-1967 Constitution Revision Commission or the 1967 legislature gave any consideration to the possible racial implications and consequences of the original 1885 constitutional language concerning blanket disenfranchisement of felons or denying them automatic restoration of their voting rights upon completion of their sentence. They never addressed what the intent or consequences – including racial ones - of that original language was.

## 3. Basis and Reasons for Opinions

### A. Toward Constitutional Revision

When the Florida Constitution of 1885 was written and adopted, the Sunshine State was populated by only slightly more than 300,000 persons.[1] The state was overwhelmingly rural, and the constitution that was written ensured that rural interests would dominate state politics. More ominously, as the late eminent Florida scholar Manning J. Dauer pointed out, the Constitution contained provisions that were not sympathetic to African-Americans, or civil rights generally.[2]

By the end of World War II, it was clear that population growth and demographic changes had made the 1885 Constitution obsolete. Shortly after hostilities ceased, a number of Florida civic and interest groups began to promote constitutional reform, even to the point of preparing and distributing proposed constitutions for public consideration. Chief among these were The Florida Bar and the League of Women Voters.[3] In the 1950s, these efforts were joined by the Citizens Constitution Committee of Florida.[4] However, none of the proposals made by these groups were adopted.

---

[1] U.S. Bureau of the Census, HISTORICAL STATISTICS OF THE UNITED STATES, COLONIAL TIMES TO 1970, Part 1, Series A 195-209, Population of States by Sex, Race, Urban-Rural Residence, and Age, 1790-1970 (Washington, D.C.: Bureau of the Census, 1975).

[2] Manning J. Dauer, ed., FLORIDA'S POLITICS AND GOVERNMENT, 2d ed. (Gainesville: University Presses of Florida, 1984) p. 95.

[3] See, for example, Constitution Committee, Florida State Bar Association, "Proposed Constitution for Florida," The Florida Bar, 1946 and 1947; see also D. H. Redfearn, "A Proposed Constitution for Florida," FLORIDA LAW JOURNAL, vol. 21 (1947), pp. 2-13.

[4] See the publications of the Citizens Constitution of Florida entitled, "Three Recommendations for Constitutional Revision in Florida, 1951; "Florida: 1954 and the Constitution of 1885." In a broader context, see Albert Sturm, "Selected Bibliography on State Constitutional Revision," prepared for the Florida Constitutional Revision Commission (Tallahassee: Florida State University Institute of Government, 1966) and Sturm, THIRTY YEARS OF STATE CONSTITUTION-MAKING 1938-1968 (New York: National Municipal League, 1970); and Sturm, "Bibliography on State Constitutions and

By the mid-1960s the Florida Constitution had been amended more than 150 times.[5] According to Dauer and Havard, by that time the Constitution was filled with excessive detail, contained obsolete material, was poorly organized and drafted, and was filled with inconsistencies, contradictions, and errors.[6] In 1965 the legislature created a Constitution Revision Commission designed to completely overhaul the state constitution. It held numerous meetings in addition to extensive statewide hearings, the records of which the present author examined. In January, 1967, it formally reported its recommendations to the legislature. Just as it did so, the U.S. Supreme Court announced its decision of *Swann v. Adams*,[7] holding the legislature illegally apportioned.

This last development was significant for constitutional revision in Florida. As a result of the decision, the sitting legislature was forced to dissolve and hold new elections based on freshly-created districts drawn in conjunction with recently announced legal principles. When the new legislature convened, it held many new members from central and south Florida. However, it had no African-American members. The first black representative in modern times, Joe Lang Kershaw of Miami, was not elected until November, 1968, the same election in which the new Constitution was adopted.[8] When the newly-constituted 1967 legislature considered the work of the Constitution Revision Commission, it was very favorably disposed towards it. After a few additional changes were made in special session during the late summer,[9] the legislature approved the document and it was placed on the 1968 ballot. The voters approved it, and Florida finally had a new constitution.

## B. Florida's Race Relations in the mid-1960s:  The Context of Constitutional Revision

As the Florida Constitution Revision Commission carried out its task during the mid-1960s, it did so within a context of tense race relations in the state. The often-violent 1963-1964 civil rights campaign in St. Augustine, led in part by Dr. Martin Luther King, Jr., had exacerbated

---

Constitutional Revision, 1945-1975" (Englewood, CO:  Citizens Conference on State Legislatures, 1975). The Sturm sources included additional references on proposals for constitutional revision in Florida and other states.

[5] Dauer (1984), p. 95.

[6] Manning J. Dauer and William C. Havard, THE FLORIDA CONSTITUTION OF 1885, A CRITIQUE, reprinted from THE UNIVERSITY OF FLORIDA LAW REVIEW, vol. VIII (spring, 1955), Public Administration Clearing Service, University of Florida Studies in Public Administration No. 12 (Gainesville:  University of Florida Clearing Service no. 12), pp. 11-25.

[7] 385 U.S. 440 (1967).

[8] Allan Morris, ed., THE FLORIDA HANDBOOK, 1997-1998, 26th biennial edition, (Tallahassee: Peninsular Publishing Company, 1997), p. 160.

[9] A search of print media records and the archives of the Constitution Revision Commission (which include those of the special legislative session) gave no indication that the legislature considered or re-wrote the language of Article VI, §4 during its deliberations in special session.

3

racial tensions in Florida.[10]  While nothing of a similar magnitude happened again for three years, in the summer of 1967 racial riots occurred in seven Florida cities:  Tampa, Clearwater, St. Petersburg, West Palm Beach, Deerfield Beach, Lakeland, and Riviera Beach.  The National Advisory Commission on Civil Disorders described the riot in Tampa as one of the nation's most intense during that period.[11]  During the 1966 gubernatorial campaign, Republican candidate Claude Kirk had inflamed racial tensions through public exploitation of race riots occurring outside of Florida.  In addition, his campaign rhetoric on the need for "law and order" preceded that of the presidential contest of 1968, widely regarded as a code phrase aimed at fanning white fears of black crime and violence.[12]  The impact of the 1964 Civil Rights Act and 1965 Voting Rights Act, the goals of which were in part designed to rid Florida of the last remaining vestiges of Jim Crow laws and practices, was still being nervously anticipated by many white Floridians.  In addition, a number of counties were experiencing racial tensions because of busing and other school desegregation plans imposed by federal courts.   In short, it was a time when Floridians were experiencing considerable racial turmoil and uncertainty.

## C. The 1968 Constitutional Revision Commission and Felons' Voting Rights

Article VI, §§ 4 and 5 of the 1885 Florida Constitution regarding felons' voting rights read as follows:

§4  No person under guardianship, *non compos mentis*, or insane shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights.

§5  The Legislature shall have the power to, and shall, enact the necessary laws to exclude from every office of honor, power, trust or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime, or who shall make, or become directly or indirectly interested in, any bet or wager, the result of which shall depend upon any election; or that shall hereafter fight a duel or send or accept a challenge to fight, or that shall be a second to either party, or that shall be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after the trial and conviction by due form of law.

For the 1968 Florida Constitution, however, the earlier §5 was eliminated entirely, and Article VI, §4 was altered as follows:

---

[10] David R. Colburn, RACIAL CHANGE AND COMMUNITY CRISIS:  ST. AUGUSTINE, FLORIDA, 1877-1980 (New York:  Columbia University Press, 1985).

[11] David R. Colburn and Richard K. Scher, FLORIDA'S GUBERNATORIAL POLITICS IN THE TWENTIETH CENTURY (Tallahassee:  University Presses of Florida, a Florida State University Book, 1980), p. 234.

[12] Colburn and Scher (1980), pp. 83, 264-265.

4

§4.  Disqualifications. – (a)  No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.

When the Revision Commission submitted this portion of the proposed constitution to the 1967 legislature, it was accepted in full.  In its reworking of the proposed document, the legislature made no changes in Article VI, §4, and there was no evidence that it attempted to restore any part of Article VI, §5 of the 1885 Constitution.

A careful review of the available public record on the proceedings and public hearings of the 1965-1967 Constitution Revision Commission, and subsequent action by the 1967 Florida Legislature, reveals no discussion or consideration of the issues involved with felons' voting rights – either their blanket disenfranchisement or automatic restoration upon completion of sentence.[13]  Of special relevance are the records of the Committee on Suffrage and Elections, consisting of the following five Commissioners:  George Stallings (Jacksonville); Bill Young (St. Petersburg); Dick Pettigrew (Miami); Warren Goodrich (Bradenton); and Richard Earle (St. Petersburg).  The Committee did entertain a few minor variations on the language of §4, but no proposal was sufficiently different from the final language as to have altered its meaning or thrust; in any case, none of the variants proposed were adopted.  Nor is there evidence that the Committee considered placing all or any part of Article VI, §5, of the 1885 Constitution back into the proposed constitution, including any portion of the listing of crimes constituting grounds for disenfranchisement.[14]

In no other place in the Commission archives is there any reference to consideration of the blanket disenfranchisement of felons or automatic restoration of their voting rights.  Indeed, the matter seems to have surfaced only once, at a public hearing held in Pensacola.  But it was only to the extent that one individual thought that felons whose voting rights were restored ought to be given a certificate by the state so they would be allowed to vote.[15]  Finally, the records of the Legislature's special session of August 21-September 1, 1967 reveal no

---

[13] The complete archives of the 1965-1967 Constitution Revision Commission are housed in the R.H. Gray state archives building, Tallahassee.  They are catalogued as Record Group 005, Series 719-724, and organized as follows:  S 719-Correspondence; S720-Organizational Meeting and Committee Records; S721-Public Hearing Records; S722-Constitutional Convention Proceedings; S723-Amendment Records; S724-Reference and Administrative Files; S727-Legislative Proceedings Regarding Constitutional Revision, 1965-1968.  Each of these archives was examined.

[14] Constitution Revision Commission Records, 1965-1967, Organization and Committee Records, RG 005, Series 720, Box 8 – Committee 10, Suffrage and Elections, folder 3.  Folders 5, 6, and 8-11 contain the various drafts of language on §4 mentioned in the text.

[15] See Constitutional Revision Commission Records 1965-1967, RG 005, Series 721 Public Hearings, Box 3, p. 8.

5

mention of any consideration of restoration of voting rights to felons, nor did members review the list of crimes causing disqualification of voting rights as enumerated in the 1885 Constitution.[16]

The question arises, since members of the Constitution Revision Commission spent so little time on the issues of felons' voting rights, what did they talk about? The answer is that the preponderance of the discussions and work focused on Article V on the Judiciary and Article VIII on Local Government. Lesser, but still substantial, amounts of time were spent on Article III, the Legislature (especially § 19, State Budgeting, Planning, and Appropriations Processes), and Article VII, Finance and Taxation. Other Articles received considerably less attention than these. Once the 1967 Legislature received and considered the proposed document, the proportion of time it spent on its revisions of various Articles was roughly comparable to that of the Commission.

Why did the Constitution Revision Commission and subsequent special session of the Florida Legislature pay so little attention to the matters of blanket disenfranchisement of felons and restoration of voting rights after completion of sentence? There are three likely explanations:

Political inertia alone can account for the paucity of attention given these matters. Florida had had blanket disenfranchisement in its Constitution at least since 1885, and it had never provided for automatic restoration of voting rights upon completion of felons' sentences. There is no evidence from the public record that Floridians wished to change traditional practice in 1968. Further examination of media accounts and public opinion surveys reveals no indication of public outcry over past practices in these areas, nor any emerging consensus or mandate to change them.

No evidence could be found of political pressures brought to bear on Commissioners or members of the Legislature to change past practices. There was no indication that felons, or possible political allies they may have had, appealed to the Revision Commission or Legislature for new language removing the blanket disenfranchisement or permitting automatic restoration of rights. In addition, as one former public official consulted in conjunction with this report indicated, elimination of the blanket disenfranchisement or restoration of felons' rights were very low priority items for governors. They were generally handled in a pro-forma manner, attracted little public or media attention, and had no political payoff for anyone in the Governor's office or Cabinet. Thus, from a purely political standpoint, as other major constitutional issues loomed and public debate went forward, the blanket disenfranchisement of felons and automatic restoration of voting rights were never on the agenda, and were never considered.

Finally, Commissioners, legislators, and probably the general public never thought much about felons' voting rights. To use the modern phrase, it was on no one's radar screen. No evidence could be found that anyone, or any group, even brought it before the Commission or legislature. As a result, there was no compelling reason for either body to change previous practices on these matters.

---

[16] Extraordinary Legislative Session, August 21-September 1, 1967, Committee of the Whole House Minutes, August 28-30, 1967, S727 Box 4. Folder 10 contains the discussion of Article VI – Suffrage and Elections.

**D. Constitutional Revision in Florida**

Seen in broad outline, the 1965-1967 revisions to the Florida Constitution showed some similarity to developments in other states. As John Burns and the American Assembly have documented,[17] the mid-1960s were a period of intense state governmental reform and "reinvention."[18] As Burns and Sturm (cited earlier) further noted, these efforts had a constitutional corollary. This can best be described as a movement to simplify and streamline state constitutions, and remove from them excessive detail best left to legislative action. Dauer and Havard, in their masterful critique of Florida's 1885 Constitution, note that one of its greatest weaknesses was "excessive detail," among other major defects.[19]

It is within this context that the work of Florida's Constitution Revision Commission and state legislative activity must be seen. Efforts to modernize, streamline, and even simplify the Florida Constitution were similar to what was happening elsewhere. "Reinventing" state government – a recurring theme in American politics – was very much a part of the "spirit of the times."[20]

There were some parallels to these national trends in Florida. In particular, as the Revision Commission met to do its work, background papers were available to members on the importance of writing broad, general language into the document, and on the undesirability of encumbering and burdening it with unnecessary specifics better left to legislative action.[21]

In fact, Commissioners appeared to take this advice to heart as they re-wrote the document. Indeed, another explanation for the jettison of the old §5 of the 1885 Constitution, or the shortening of §4, is that Commissioners and legislators sought to streamline the language of the new document.

But it appears that at least as far as felons' voting rights are concerned, constitutional "revision" did not extend to "reform" as it did in other states. The distinction in meanings of the words is not purely academic. "Revision" refers simply to modifications or changes made. "Reform" means questioning the assumptions and intent of previous language or practice in an effort to redress past wrongs or harms or inadequacies or omissions. In the sense meant here, changes made in Article VI, §4 and the elimination of §5 from the old Constitution were

---

[17] Alexander Heard, STATE LEGISLATURES IN AMERICAN POLITICS (New York: The American Assembly, Columbia University, 1966); and John Burns, THE SOMETIME GOVERNMENTS (Citizens Conference on State Legislatures, New York: Bantam, 1971).

[18] The term comes from David Osborne and Ted Gaebler, REINVENTING GOVERNMENT (Reading, MA: Addison-Wesley, 1992).

[19] Dauer and Havard (1955), pp. 11-25, esp. pp. 12-14.

[20] Similar efforts can be seen with the Progressives around the turn of the twentieth century, during the 1920s, immediately after World War II, and again in the late 1980s-early 1990s.

[21] See for example, the background papers by David Dickson on constitutional drafting, and Professor Elston E. Roady of Florida State University. These can be found in Constitution Revision Commission Records, 1965-1967, Background Papers, Series 724, Boxes 1-3; and Constitution Revision Commission Records, 1965-1967, Organization and Committee Records, RG 005, Series 720, Box 8 – Committee 10, Suffrage and Elections, folder 7, p. 5.

revisions, not reforms. Since there is no evidence that either the Commission or the Legislature ever gave any attention to issues concerning felons' blanket disenfranchisement or restoration of voting rights, or questioned what possible racial consequences may have been involved in past language and practices on these topics, it can hardly be said that they made "reforms" in Article VI for the 1968 document.

Thus the efforts Florida made to modernize its constitution in the mid-1960s did not fully parallel what was happening in other states, or extend as far as what other states were doing on issues of felons' voting rights. This point is underscored by the neglect Commissioners and Legislators gave to materials available to them on the constitutional language of other states. For example, Box 4 includes materials and examples of constitutional language in other states, including a reference to the Illinois constitution which is directly on point:

> Article III, Sec. 2 Voter Disqualifications: "A person convicted of a felony, or otherwise under sentence in a correctional institution or jail, shall lose the right to vote, which shall be restored not later than upon completion of his sentence."[22]

The Revision Commission and Legislature chose not to copy the Illinois language as it revised Article VI, §4, even though the language was available to them. Whatever other states were doing on the issues involved in felons' voting rights, Florida instead continued to follow its past practices.

## E. The National Municipal League

These considerations are supported by an examination of recommendations which the prestigious National Municipal League in New York City made on constitutional reform in the post-World War II era. In 1948, the League, through its Committee on State Government, published the fifth revised version of its "Model State Constitution."[23] These documents were influential as states went about the process of constitution-building after the War.[24] Article II of the 1948 Model State Constitution deals with suffrage and elections, and its section 202 on disqualifications reads as follows:

> Section 202. Disqualifications from Voting. No person who shall receive, accept, or offer to receive, or pay, offer or promise to pay, or withdraw or withhold or threaten to withdraw or withhold any money or other valuable consideration as a compensation or reward for the giving or withholding of a vote at an election shall vote at such election. No person under conviction of bribery or of any infamous crime shall exercise the privilege of the suffrage.

---

[22] Background papers, Box 4, Series 724.

[23] National Municipal League, "Model State Constitution with Explanatory Articles," 5th revised ed. (New York: National Municipal League, 1948).

[24] Sturm (1970). See also the citations in his bibliographies published in 1966 and again in 1975.

8

By the early 1960s, the National Municipal League had altered its views on its Model State Constitution. In particular, in its 6th revised version,[25] the League advocated no constitutional language on the question of disqualification of voters or restoration of the voting rights of convicted felons. Its Article III, Section 3.01 limits such action to legislative activity, not constitutional stipulation:

> Section 3.01. Qualifications for Voting. ...the legislature may by law establish ... (3) disqualifications for voting for mental incompetency or conviction of felony.

In an accompanying commentary, the League noted that its new approach to the constitutional language of suffrage was derived from a proposal of the Temporary Commission on the Revision and Simplification of the Constitution of the State of New York in 1959.[26] It went on to note briefly that "The legislature also has the discretionary power to disqualify otherwise qualified voters if they are mentally incompetent or have been convicted of felonies."[27]

Although the members of the 1965-1967 Revision Commission had access to this Model State Constitution, they chose not to follow its recommendations on the question of felons' voting rights. Instead, they chose to continue the state's past practices. This is further evidence that the changes made in the new document on these issues were relatively minor revisions only, not full-blown constitutional reform. At least as far as what the National Municipal League proposed, Florida was out of step with the direction of change elsewhere.

## F. Conclusion

As Florida revised its constitution during the mid-1960s, there was no effort to examine the question of felons' voting rights. Elimination of the old §5 can be explained by the desire of members of the Revision Commission and Legislature to streamline constitutional language, and eliminate excessive detail from the document.

There is no evidence that either Commissioners or members of the Legislature examined the issue of felons' voting rights from a racial perspective. That is, no consideration of the racial effects or consequences of either the old language of §4 from the 1885 Constitution or the new §4 took place. But then, this statement follows naturally from the fact that there is no evidence from the public record that members of the Revision Commission or Legislature gave any thought or attention to issues of felons' voting rights from any perspective whatsoever.

Why this happened can be summed up by three points:
- Political inertia, insofar as there was no public demand or outcry to change previous practices or constitutional language on felons' voting rights;

---

[25] National Municipal League, "Model State Constitution," 6th edition (New York: National Municipal League, 1963).

[26] National Municipal League (1963), p. 38.

[27] National Municipal League (1963), p. 40.

- There were no political pressures on the Commission or Legislature to make changes, as neither felons nor any allies they may have had submitted no proposals for change, and indeed the political climate in Tallahassee was such that there was no reason to change past practices or constitutional language;
- There was no evidence from the record that the public, Commissioners, or members of the legislature ever even thought about or entertained the idea of changing past practice or language. As far as they were concerned, it was a non-issue.

### 4.    Data and Other Information Considered in Forming Opinion

In forming my opinion I have considered the following materials:
- Archival data of The Florida Bar
- Archives of The Constitution Revision Commission, 1965-1967
- Historical and political scholarly literatures (all cited fully in text)
- Microfilms of The Miami Herald and St. Petersburg Times, 1946-1947, 1965-1968
- Interviews with scholars and public officials knowledgeable about this period in Florida history (anonymity guaranteed)

### 5.    Compensation

I am being compensated at $100 per hour for my work in connection with this litigation.

### 6.    Other Expert Testimony Given in Last Four Years

Expert witness, defendants, *Florida Right to Life, Inc. v. Mortham et. al.*, Federal District Court, 1999
Expert witness, plaintiff, *Burton v. City of Belle Glade*, ACLU (Atlanta), Federal District Court, 1997.

Date: _____, 2001

Richard K. Scher

June 21, 2001

## Expert Report

by
Professor Theodore Chiricos, Ph.D.

Case:      Johnson v. Bush
           No. 00-CV-3542
           U.S. District Court
           Southern District of Florida
           Judge James Lawrence King

1.    Introduction and Professional Qualifications

I have been retained as an expert by counsel for the Plaintiffs in the above captioned litigation. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

I am a Professor in the School of Criminology and Criminal Justice at Florida State University, where I have been employed since receiving my Ph.D. in Sociology from the University of Massachusetts. My published research includes several articles examining the role of race in criminal justice outcomes. The first of these articles reports the results of a 1972 study of the withholding of adjudication for those sentenced to probation in Florida. Others include a 1995 review and meta-analysis of all published research on the effect of race on criminal sentencing and a 1996 study of the role of race in the sentencing of habitual offenders in Florida.

In 1999, I was invited to address a panel of the National Research Council in Washington, D.C., on the question of racial disparity in the juvenile justice system. In 1993, I gave an invited plenary session address on the topic of race and punishment at the annual joint conference of the Bureau of Justice Statistics and the Justice Research Statistics Association. In 1991, I was one of 24 scholars from the U.S., Canada, and Europe invited to make a presentation at the "State of the Art Conference" on inequality, crime and social control, jointly sponsored by the University of Washington and the University of Georgia.

In 1993, I testified on the question of racial disparity in the prosecution and sentencing of habitual offenders in Florida in hearings conducted separately in Polk and Leon counties.

In 1998, I was recognized as the 11th most frequently cited criminology professor in the United States based on citations in six major criminology and criminal justice journals for the period of 1991-1995 (Cohn and Farrington, 1998: 203). I currently serve as an advisory editor for *Criminology*, the foremost journal in our field, and for *Social Problems*, the foremost sociology journal with a specific focus on problems related to crime and justice.

1

June 21, 2001

Attached is a curriculum vitae setting forth my professional background, which includes a list of all publications I authored within the last ten years.

2.   Opinions

I have reached the following opinions:

Blacks in Florida are disproportionately represented among those convicted of felony crimes.  This is true whether the standard of disproportionality is (1) the proportion of Florida's population that is black or (2) racial differences in criminal involvement.

When arrest is used as a proxy for criminal involvement and taken as the basis for *expected* conviction outcomes, the racial disproportionality in felony convictions for all crimes combined that is "unexplained" by arrests ranges from 25% to 36%.

Unexplained racial disproportionality in felony convictions varies considerably by type of crime.  Blacks are *under represented* among those convicted of murder and, by some measures, among those convicted of sex offenses.  Blacks are *over represented* among those convicted of drug offenses, weapon offenses and most other crimes.

Unexplained racial disproportionality in felony convictions varies substantially across Florida counties.  Among the sixty-two counties where blacks are *over represented* at conviction, the degree of disproportionality ranges from 9% to 451%. The median level of unexplained disproportionality is 51% and for twelve counties it exceeds 100%.

Using arrest as a proxy for criminal involvement and as a basis for estimating *expected* levels of conviction most likely *underestimates* the degree of unexplained racial disproportionality in conviction.

Black-white differences in socio-economic conditions, prior record and residence in counties with high overall conviction rates, are unrelated to conviction disproportionality and are unlikely sources of explanation for the racial differences observed therein.

2

June 21, 2001

3.    Data and Other Information Considered in Forming Opinions

In forming my opinions, I have considered the following materials:

For most of my analyses the principal data examined are 1998 race-specific *felony convictions* in Florida. These data were compiled from three sources.  The first is the Florida Department of Corrections' Offender Based Information System (OBIS) which can produce race specific counts, by crime type and by county, of all felony convictions that resulted in a sentence to prison or to state supervision.  Only those offenders who did *not* have adjudication withheld were counted as felony convictions.

To the OBIS counts were added similar totals for felony convictions that resulted in a jail sentence; again *without* adjudication being withheld. Jail sentence data come from two sources: (1) the Computerized Criminal History (CCH) files which are received and maintained by the Florida Department of Law Enforcement, and (2) the Florida Sentencing Guideline Scoresheet, which is received and maintained by the Florida Department of Corrections. Both are sent to the State from individual courts. Submission rates vary by county and, in some instances, is less than 100%.  For each county, we took the larger of the two felony conviction totals from the available sources of jail sentence data (CCH, Guidelines) on the presumption that it was the most complete.

The CCH data include adjudication status – adjudication applied or withheld -- and was used for 22 of Florida's 67 counties.[1]  For the remaining 45 counties,  the Guidelines Scoresheet

---

[1]. These counties are Alachua, Bay, Brevard, Calhoun, Charlotte, Citrus, Clay, Columbia, DeSoto, Franklin, Leon, Levy, Liberty, Madison, Marion, Martin, Okeechobee, Orange, St. Johns, Sarasota, Suwannee and Wakulla.

3

**13**

was used for the felony jail count. Since the Scoresheets do not provide information concerning whether adjudication is withheld, the proportions of blacks and whites with adjudication withheld had to be estimated. For 41 counties, the adjudication rate for the *judicial circuit* in which the county is located was assigned. Circuit rates were calculated by computing the mean of the CCH based rates that were available for the twenty-two counties noted above. When it was not possible to compute such a mean for the judicial circuit, the adjudication rate of an adjacent and demographically similar circuit was assigned. This was done for Palm Beach county. For Hardee, Highlands and Polk counties, the adjacent circuit was considered too dissimilar (urban v. rural); for these I used the mean adjudication rate for the state, based on the twenty-two counties with CCH adjudication data.

Felony arrest data were provided by the Florida Department of Law Enforcement. Arrest counts are for crimes matching those specified in the Department of Corrections data base, and are offense and race specific by county. Combined, the data from OBIS, CCH and Guidelines Scoresheets produced the following totals for 1998 felony convictions:

|  | Black | White | Other | Total |
|---|---|---|---|---|
| Sentenced to Prison | 12,309 | 10,446 | 328 | 23,083 |
| Sentenced to Supervision | 14,126 | 20,198 | 491 | 34,815 |
| Sentenced to Jail | 14,185 | 11,843 | 148 | 26,176 |
| Total | 40,620 | 42,487 | 967 | 84,074 |

For the analyses that employ arrests as part of the standard for assessing racial disproportionality in convictions, most use arrest and conviction data for calendar year 1998.

4

Because the racial proportions of arrests and convictions are quite stable from year to year, it is

not unreasonable to use arrest and conviction data for the same year, despite the obvious time lag

that exists between arrest and conviction. As a check for this assumed stability, I replicated a

portion of the analysis using 1997 arrests and 1998 convictions, and again, with 1998 arrests and

fiscal year 1998 (July 1, 1998-June 30, 1999) convictions. It will be shown that the choice of

time periods or lags has little effect on the results obtained.

Because racial disproportionality varies considerably by type of crime, most of the analysis

is done for the nine crime categories used by the Department of Corrections for its reports.[2] In

the interest of brevity, and because of data limitations, county level results are shown either for

total crime or for the three broad categories of violent, property and drug offenses.

Assessing Racial Disproportionality

To assess racial disproportionality in the likelihood of being convicted as a felon in

Florida, I use four different standards for calculating disproportionality. These are well recognized

standards used by researchers to assess racial disproportionality in *imprisonment*. Each of these

approaches is described in research that has been published in peer reviewed journals. The first,

patterned after Christianson (1980), compares the proportion of convicted felons who are black to

the proportion of the Florida population that is black. The second uses the proportion of those

arrested who are black, considered a proxy for criminal involvement, as the comparative frame of

---

[2]. See Appendix A for a complete listing of the specific crimes included in each of the
general crime categories.

5

reference (Blumstein, 1982, 1993). The third uses the proportion of whites who are convicted, given arrest, as the standard for assessing black convictions, given arrest. This method parallels that developed by Langan (1985). The fourth uses the ratio of blacks to whites at the point of arrest as the basis for assessing racial disproportionality at the point of conviction (Crutchfield, et al., 1994). Each methodology using black and white arrest data attempts to estimate the amount of racial disproportionality in convictions that is "unexplained" by racial disparities at arrest.[3]

There are merits to each of the approaches, though the first is probably the weakest because it fails to take even a proxy for criminal involvement into account. The Blumstein approach has the virtue of being the first to systematically take criminal involvement (arrest) into account in assessing the racial disproportionality of imprisonment. It has the disadvantage of being somewhat cumbersome in its application. The Langan approach has the merit of using both putative involvement in crime and the experience of whites as bases for judging disproportionality in the conviction of blacks.

---

[3]. While there is a substantial research literature concerned with estimating the racial disproportion in imprisonment, I am aware of no study in the past twenty-five years that has had disproportionality in *conviction* as its primary focus. Two studies using 1980 data addressed racial disparity at a number of criminal justice decision points, including conviction and imprisonment. Both used individual case data which are presently unavailable for Florida. Petersilia (1980, 1983) reported that for all crimes combined, equal proportions of blacks and whites who had been arrested in California received "felony convictions." Wilbanks (1987) calculated race specific rates at six decision points for California and nine decision points for Pennsylvania. A black to white ratio, similar to the Crutchfield, et al. (1994) approach described herein, was reported for each decision point. No direct attempt was made to assess "unexplained" disproportionality in convictions, but it is apparent that while varying for specific offenses, the black to white ratios at arrest and conviction were not substantially different. Since 1980, there has been a vast increase in popular and political concern about drugs and weapons related crimes and comparisons of justice outcomes for 1980 and the late 1990s are problematic at best.

6

June 21, 2001

The Crutchfield approach also uses those two standards. It has the added benefit of being straightforward, easy to describe, and employing race-specific rates based on population data which has become the most frequently used approach to the assessment of racial disproportionality. Moreover, a similar method was used by Wilbanks (1987) to argue that the "racial gap" between blacks and whites did *not* consistently increase between arrest and either conviction or incarceration using 1980 data for California and Pennsylvania. In choosing this approach, I engage a methodology that has been used to argue *against* the presumption of "unexplained" racial disproportionality. In its application here, I show that the "racial gap" in Florida does increase, often substantially, between arrest and conviction. Each standard for assessing racial disproportionality is described more fully in the context of the Tables which show the results of their application to Florida data for 1998.

4.     Basis and Reasons for Opinion

My opinions are based on the following:

**RESEARCH FINDINGS**

**Table 1** (see attached Exhibits) shows the racial disproportionality in felony convictions, using the relative size of the black population as the standard for assessing disproportion. Race specific population estimates for Florida in 1998 are taken from the *Florida Statistical Abstract 1999,* published by the Bureau of Economic and Business Research at the University of Florida. Table 1 compares the percent of Florida's *population* that is black with the percent of Florida's

7

**17**

June 21, 2001

*felony convictions* that involve black offenders for nine categories of crime. The measure of disproportionality (last column) shows how many times higher the proportion of black convictions is than the proportion of the black population in Florida. It is achieved by dividing the second column by the first (convictions / population).

For all crimes combined, blacks in Florida are convicted of felonies 3.5 times as often as their numbers in the population would predict. This over representation is greatest for drug offenses (4.4), robbery (4.3) and weapons offenses (4.0) and is least for sex offenses (2.0), burglary (2.7), and other crimes (2.6).

If the question is whether blacks are disproportionately represented among felony convictions in Florida, relative to their numbers in the population, the obvious answer is yes. Any policy -- such as disenfranchisement -- that is predicated on the condition of being convicted of a felony is shown to be clearly disadvantageous to blacks in Florida. However, research concerned with differential criminal justice outcomes customarily asks whether or not those differences can be accounted for by differences in criminal activity. The question posed here, and for the rest of this report, is whether the disproportionality of black felony convictions can be attributed to disproportionate black involvement in crime, and conversely, how much of it is "unexplained" by criminal involvement.

To address this question, I take several approaches that make use of race specific arrest data as a proxy for involvement in criminal behavior. The use of arrest data for this purpose has a long and well established history (Hindelang, 1978) and has been the course chosen by most of

8

**18**

those concerned with racial disproportionality in justice outcomes, especially incarceration. While arrest is the most available and widely used proxy for criminal involvement, it should be remembered that arrests are the product of a series of interactions involving victims, the police and suspected offenders and do not precisely reflect criminal activity. Moreover, there is some evidence, which I address in a later section of this report, that using arrests as a proxy for criminal involvement may overstate the relative level of criminal activity by blacks and thereby understate whatever "unexplained" conviction disparity may be found.

My objective here is to determine how much of the racial disproportionality in convictions is "explained" by differential involvement in crime, as indicated by arrests. To do this, I use three approaches that have been developed in prominent research efforts designed to estimate how much of the racial disproportionality in *imprisonment* can and cannot be accounted for by criminal involvement. For each of these approaches, I apply the precise methodology developed to assess racial disproportionality, substituting conviction for incarceration.

The first of these methodologies was developed by Blumstein (1982, 1993) who computed the "disproportionality explained by crime" as follows:

Disproportionality explained by crime   =   $\dfrac{\text{ratio of expected black-to-white incarceration rates based only on arrest}}{\text{ratio of black-to-white incarceration rates actually observed}}$

9

**19**

June 21, 2001

This approach[4] to the estimation of "explained" and "unexplained" racial disproportionality has also been used by Austin and Allen (2000).

Table 2 summarizes the results of applying this methodology to Florida arrests and convictions. Using the complete Blumstein formula described in footnote #4, it is possible to compute the disproportionality in conviction explained by criminal involvement (arrest). When this "explained" proportion is subtracted from 100, it provides the percent of racial disproportionality in conviction that is "unexplained" by arrest. The results of this last computation are shown in the final column of Table 2.

Using the Blumstein methodology, 25% of the racial disproportionality in convictions for all crimes combined is not accounted for by racial differences at arrest. Said otherwise, 75% of the racial disparity in convictions can be "explained" by differential involvement in crime as estimated by arrests. It is clear, however, that the "explained" portion of conviction differences varies considerably by the type of crime. The greatest amount of "unexplained" racial disproportionality over representing blacks is found for weapons (39%), drug (38%), and other violent (20%) offenses. The least disproportionality is found for robbery (3%) and burglary (7%). We find also that blacks are actually *under represented* among those convicted for murder, sex offenses, and other crimes, given their criminal involvement as measured by arrests.

_____

[4]The Blumstein methodology estimates the disproportionality accounted for by arrest using the following formula: $100*(R(100-Q)/(100-R)Q)$, where $Q$ = actual black percentage incarcerated and $R$ = expected black percentage incarcerated based on arrest which for each crime type is the product of the percent black of arrests and the percent of the prison population associated with that crime type, divided by 100. In my use of this formula, I have substituted *conviction* for Blumstein's use of *incarceration*.

10

20

A second approach to assessing "unexplained" racial disproportionality in justice outcomes was developed by Langan (1985) who was concerned with racial patterns of admissions to prison. The basic idea of Langan's approach is to use the rate of white incarceration, given involvement in criminal activity, as the basis for calculating *expected* black incarceration levels. Differences between *expected* and *observed* levels of black incarceration are taken as indicators of the racial disproportionality "unexplained" by criminal involvement.

Unlike Blumstein and others, Langan used race specific rates of victim identified offenders in place of arrest as a proxy for criminal involvement.[5] We use Langan's methodology exactly as developed, substituting arrests for victim identified offenders (unavailable for individual states) and conviction for incarceration.

**Table 3** displays the relevant data needed for computing the "unexplained" disproportionality in black convictions using the Langan methodology. Taking drug offenses as an example, we see that there were 50,572 white arrests and 10,605 white convictions, which produces a white conviction rate (convictions / arrests) of .2097 (rounded to .21 in table). Applying that rate to the number of black arrests (.2097 x 50,932) yields an *expected* total -- based on the white conviction rate -- of 10,680 black convictions. There were actually 17,481 blacks convicted for drug offenses. The difference between the *expected* and *observed* numbers of blacks convicted for drug offenses is 6,801, or 64%.

_____

[5]. The National Crime Victim Survey (NCVS) conducted by the Bureau of Justice Statistics asks victims of crimes to identify the race of the offender if they are able. This is seldom possible for property crimes. Langan did make use of the 5% of property crime victims who did identify race in the national survey he used to include them in his analysis.

11

**21**

When this methodology is applied to all crimes combined, it is estimated that blacks are over represented at the point of conviction by 36%. Put otherwise, 36% of the racial disproportionality in Florida convictions during 1968 is "unexplained" by criminal involvement as measured by arrests. As found using the Blumstein method, the Langan approach shows that the "unexplained" disproportionality over representing blacks is greatest for weapons (67%), drugs (64%), and other violent (27%) crimes. It is least for robbery (6%) and burglary (10%). Again, for murder, sex offenses, and other crimes, blacks are under represented among those convicted.

The third approach I took to estimating the "unexplained" racial disparity in conviction uses a methodology that is most prominently associated with Crutchfield and has been the most frequently used by those estimating racial disparity in imprisonment (Bridges, et al., 1995; Crutchfield, et al., 1994; Bridges and Crutchfield, 1988; Myers and Sabol, 1987; Wilbanks, 1987). It is also the most straightforward. Using arrest as a proxy for criminal involvement, this approach compares the black/white ratio at the point of arrest with the black/white ratio at the point of conviction. The difference is taken to represent the percent of conviction disparity that is "unexplained" by black and white differences in criminal involvement.

**Table 4** shows the ratio of black to white arrest rates for felonies in Florida during 1998, the ratio of black/white felony conviction rates and the percent difference, or disproportionality "unexplained." Arrest rates and conviction rates are determined by dividing race specific arrest or conviction totals by the number of blacks or whites in the Florida population (black arrests / black population; white arrests / white population) etc. In Table 4 we can see that the black arrest rate

12

22

June 21, 2001

for murder is six times higher than that for whites, but the conviction rate is only 4.7 times greater. Thus, given criminal involvement as indicated by arrest, and when compared directly to whites, blacks are, by this measure, under represented among those convicted for murder.

However, for all crimes combined, Table 4 shows the disproportionality in conviction that is "unexplained" by criminal involvement using the Crutchfield methodology is 35%. As with the Blumstein and Langan approaches, this method shows that "unexplained" racial disproportionality over representing blacks is again highest for weapons (67%), drug (64%) and other violent (29%) offenses; and lowest for robbery (7%) and burglary (9%). These results again show that for murder, sex offenses, and other crimes, blacks are not over represented at conviction.

To this point, I have shown that the racial disproportionality in convictions that is "unexplained" by criminal involvement (arrests) is, for all crimes combined, between 25% and 36%, depending on the methodology used. I have also shown that this disproportionality varies substantially by type of crime. Over representation of blacks is consistently highest for weapons, drugs and other violent crimes, which comprise 59% of all black convictions, and it is consistently lowest for robbery and burglary. I have also shown that blacks are consistently under represented among those convicted of murder, sex offenses and other crimes.

The consistency of these results, given the diversity of methodologies involved, suggests a degree of reliability in the findings that clearly warrants the conclusion that blacks are disadvantaged at the point of felony conviction, at a level that is not fully "explained" by differential criminal involvement, and in a manner that varies considerably by type of crime.

13

Case 1:00-cv-03542-JLK   Document 120   Entered on FLSD Docket 01/08/2002   Page 27 of 230

June 21, 2001

## Variation of Conviction Disproportionality Across Counties

An important contribution to the study of racial disproportionality in imprisonment has been the finding that different geographical units (usually states) have widely disparate rates of "unexplained" disproportionality (Bridges and Crutchfield, 1988; Crutchfield, et al., 1994; Hawkins and Hardy, 1989; Sabol, 1989). Using this insight, I applied the method used in Table 4 to compute the ratio of black to white arrest and conviction rates for the 67 Florida counties in 1998. Again, the difference between the ratio of black/white arrest and conviction rates is taken as a measure of the "unexplained" racial disproportionality in felony convictions.

**Table 5** shows the ratio of black/white arrest rates, the ratio of black/white conviction rates, and the percent difference for all crimes combined and for individual counties. The counties are displayed in order of *increasing* "unexplained" disproportionality. Five counties have negative or zero disproportionality, indicating there is no black disadvantage in convictions beyond what is accounted for by arrests as a proxy for criminal involvement. The range of "unexplained" disproportionality in convictions is from 9% (DeSoto) to 451% (Santa Rosa). The median level of "unexplained" disproportionality is 51%. This means that half of Florida's 67 counties have a level of racial disproportionality in conviction that is at least 51% higher than what would be accounted for by race differences at arrest. Twelve counties have a conviction disproportionality that is at least 100% greater than what arrest differences by race would predict.

**Table 6** repeats the county-level estimates of "unexplained" disproportionality for three broad crime categories -- drugs, violent and property. The counties are displayed in order of

14

24

June 21, 2001

*increasing* conviction disproportionality for drug crimes.  It is not possible to examine the nine crime types previously considered because for many small counties the numbers of arrests and convictions were too low or non-existent for meaningful analysis.  Also, because the numbers of felons sentenced to jail is quite small in a number of counties and the proportion "adjudicated" among those sentenced to jail is estimated for some counties, it was determined that the calculation of felony convictions with adjudication applied for specific crimes and counties was not a reliable undertaking at the jail level.  For this analysis then, we consider only those convicted felons sentenced to prison or state supervision. These comprise 69% of our conviction population

Table 6 shows that the percent of disproportionality "unexplained" by arrests varies substantially not only by county, but by crime type as well -- often within the same county. For example, in Walton county, blacks are convicted of violent crimes 139% less often than might be expected by race differences in arrest rates.  But for drug crimes in the same county, blacks are convicted at a level that is 289% higher than would be expected by black/white arrest rates.  Not surprisingly, the "unexplained" racial disproportionality is greatest for drug crimes in all but seven counties where comparison with violent and property crimes can be made.  Nineteen counties have a racial disproportionality in drug convictions that is at least 200% higher than would be expected by racial differences in arrest rates.   Conversely, seventeen counties have black/white conviction ratios for violent crime that under represent blacks in relation to what arrest ratios would predict.

15

25

June 21, 2001

In sum, there is extraordinary variation between and within counties in the amount of "unexplained" racial disproportionality that exists at the point of conviction. It is difficult to imagine a scenario in which the characteristics of offenders themselves would be so variable as to account for differences of this magnitude between counties and between crimes within counties.

Alternative Timing of Arrest and Conviction Measures

Before addressing the question of whether arrests *overstate* black involvement in crime and thereby *understate* the degree of "unexplained" racial disproportionality in conviction that has been described, I will first raise a methodological question concerning the use of 1998 arrests and convictions in the analyses just presented. There is obviously a lag between arrest and conviction that may vary by jurisdiction and by crime seriousness, among other things. An issue in research that uses aggregate as opposed to individual case data is how best to account for this lag. I have chosen to use 1998 arrests and convictions even though some 1998 convictions will be the consequence of 1997 arrests and some 1998 arrests will not be resolved until 1999. Given the substantial stability in the relative proportions of blacks and whites in both arrest and convictions over time, this is not likely a problem. However, to test for the possibility that our results may be an artifact of using the same calendar year for both arrests and convictions, I have done the analysis using two alternative time formats.

**Table 7** reproduces the results from Table 4, using the ratio of black/white arrest rates for 1997 and the ratio of black/white conviction rates for 1998. Obviously, some 1997 arrests will

16

26

have been resolved in 1997 and some 1998 convictions will be the result of 1998 arrests. Any choice of dates has some variant of this problem. With convictions lagged by one year, the "unexplained" racial disproportionality for all crimes is slightly higher (38%) than was found using 1998 data for both arrests and convictions (35%). Similar minimal differences between the two approaches are found for the separate crime categories. However, the results were identical for sex offenses, theft and other violent and weapons offenses. Using 1997-1998 data, "unexplained" disproportionality was slightly higher for drug offenses, and slightly lower for murder, robbery, burglary and other crimes.

Under both conditions, the greatest conviction disproportionality over representing blacks is found for drugs, weapons, and other violent crimes and the smallest disproportionality for murder, sex offenses, robbery, and other crimes. The largest differences between the two approaches are produced for murder and robbery. These crime types have the smallest numbers of individuals involved, and percentages computed for them are more easily changed by the small differences produced using the two dating strategies.

**Table 8** also reproduces the results from Table 4, this time using arrests from calendar year 1998 and convictions from fiscal year 1998/99. This means the arrests covered January 1998 through December 1998 and convictions from July of 1998 through June of 1999. Again, the differences between this approach and that relying on calendar year 1998 for both arrests and convictions are minimal. For all crimes combined, the "unexplained" disproportionality was 33% using fiscal year convictions compared to 35% with calendar year. Again, weapons, drugs, and

17

June 21, 2001

other violent crimes show the greatest levels of "unexplained" disproportionality over representing blacks and murder, sex offenses, robbery, and other crimes show the least.

The bottom line in this regard is that no matter which time frame is chosen, the results are essentially the same. "Unexplained" racial disproportionality in convictions is found at a level of one-third or higher for all crimes combined. Regardless of which approach is taken, the highest levels of disproportionality over representing blacks and the lowest levels of disproportionality are found for the same crimes types. When combined with the consistency of results found using several different methodologies to estimate disproportionality in felony convictions "unexplained" by racial disparities in arrest, these results underscore the reliability and robustness of our basic findings.

Using Arrest as the Measure of Criminal Involvement

In this report I have taken what could be described as a conservative approach to the estimation of "unexplained" disproportionality. It is an approach that likely *understates* the true level of disproportionality unexplained by criminal activity. While I have used well established and diverse methodologies, developed by respected scholars concerned with similar questions dealing with imprisonment instead of conviction, the use of arrests as a proxy for criminal activity clearly overstates the relative involvement of blacks in crime.

Consider the disparate estimates of black involvement in criminal activity that are presented in **Table 9**. These are national  (not Florida) data for 1997.  For rape, robbery, and both aggravated and simple assault, the percent of "offenders" who are presumed to be black is

18

taken from the 1997 National Crime Victimization Survey (U.S. Department of Justice, 2000).

These survey results are not available for individual states. As noted above, that survey asks

victims of crime if they can identify the race of the person who victimized them. So, for example,

Table 9 reports that 21% of rape victims identified the race of their assailant as black; 43% of

robbery victims did the same. Though a less than perfect measure of racial involvement in

offending,[6] victim reports are closer to the criminal event than are arrests and, as noted above,

NCVS figures have been used previously as a proxy for criminal involvement in the assessment of

racial disproportionality in imprisonment (Langan, 1984). The estimate of black drug offending

comes from the well established National Household Survey on Drug Abuse.[7] That survey asks

respondents about their use of specific illegal drugs in the past year. It also asks whether the

respondent has used "any" illicit drugs in the past year. Responses to the latter question are

reflected in Table 9.

    The second column in Table 9 shows the proportion of those arrested in 1997 who were

black. Again, these are national level data reported to the F.B.I. through the Uniform Crime

_____

[6].Victim surveys do not address white collar crimes that typically have a higher proportion
of white offenders than is found for the "street crimes" that victim surveys do address. In
addition, victims may not know the race of the offender, but could nevertheless make a
designation. Alternatively, they could deliberately lie and identify the wrong race. It is impossible
to determine whether either of these possibilities "should" lead to more blacks or whites being
identified. But, it is important to remember that whites typically at least 80% of those
victimized in what victim surveys call "personal crimes" and it is difficult to imagine how this
would result in an *underestimate* of black involvement in criminal activity.

[7]. The proportion of admitted drug users (not dealers or traffickers) who are black is only
slightly higher than the proportion of blacks in the population.

19

Reporting program.  Comparing black arrest proportions with victim or self identified (drugs)

black offending proportions indicates the extent to which arrests as a proxy for criminal

involvement may overstate that reality for blacks. The difference in the percent of black offenders

identified by victims and blacks arrested is substantial for each crime. Excluding drugs,  the

average increase from offending to arrest is 56%.  This is, necessarily,  an imprecise measure. But

it suggests that if offending levels for blacks are closer to those identified by victims, then the

"unexplained" racial disparity in felony convictions described earlier is likely an underestimate.

To illustrate how much the "unexplained" racial disproportionality in convictions may be

understimated using arrest as a proxy for criminal involvement, I have recalculated several of the

values in Table 4,  using victim identified offenders in place of arrest.[8]  For robbery, the

"unexplained" disproportionality increases from 7% using arrests to 48% using victim identified

offenders.  For sex offenses, the increase is from 0% to 39% and for other violent crimes it is

from 29% to 106%.[9]  Thus, it is not unreasonable to assume that levels of "unexplained" racial

disproportionality described herein, that are based on the use of arrest as a proxy for criminal

involvement, underestimate the true disproportionality, perhaps substantially, for some crimes.

-------------------------------------------

[8]. This same procedure was used by Austin and Allen (2000) in their study of the racial
disproportionality in imprisonment.  This illustration must assume that the race proportions in
offending as identified by victims in a national survey, would apply as well to Florida if such
survey results were available at the state level.

[9]The estimate for robbery is unambiguous and straightforward.  Those for sex offenses and
for other violent crimes, though illustrative, should be regarded as rough approximations.  This is
because the victim survey asks specifically about sexual assault in the first instance and aggravated
assault in the second, while the corresponding conviction data, though primarily capturing these
assaults, necessarily includes some other related offenses.

20

Alternative Approaches to the Interpretation of Conviction Disproportionality

Here, I address several possible approaches that might be taken to account for the "unexplained" racial disproportionality described in the foregoing analyses. I am particularly interested in explanations that would account for that disproportionality in ways that mitigate the apparent relevance of race *per se*. The approaches taken here parallel those developed by Blumstein (1982) and by Austin and Allen (2000) in their discussion of "unexplained" racial disproportionality in imprisonment.

First, it is possible that the apparent disadvantage of blacks at the point of conviction is really a socio-economic disadvantage, which affects whites and blacks alike but is experienced by a higher proportion of African Americans. Second, it may be the case that blacks in Florida are disproportionately convicted because they more often live in places with higher overall rates of conviction for whites and blacks alike. If a higher proportion of blacks lived in places with higher conviction rates, they would be disproportionately convicted simply as a matter of geographical fact. Third, it is possible that blacks in Florida have more substantial criminal records which, if they took the stand at trial, could influence the judgement to convict.

The first two possibilities are addressed in **Table 10**. There, I show the results of product-moment (Pearson *r*) correlations between levels of "unexplained" racial disproportionality for Florida counties (Table 5) and measures of socio-economic disadvantage as well as overall rates of conviction for those counties. The estimates of socio-economic disadvantage are computed from data provided in the *Florida Statistical Abstract 1999*, published by the Bureau of Economic

21

**31**

June 21, 2001

and Business Research at the University of Florida.  Because the estimates of racial disproportionality in conviction are based on black/white ratios of arrest and conviction, I have similarly computed black/white ratios for  poverty, unemployment and white/black ratios for *per capita* income and high school graduation.[10]  Conviction rates for individual counties are computed two ways.  The first is a *per capita* rate, based on county population, and the second considers convictions as a proportion of arrests.  Both are for blacks and whites combined.

If the "unexplained" racial disproportionality in Florida convictions is at least partially attributable to blacks being more socio-economically disadvantaged or more often living in places with higher overall conviction rates, we would expect the correlations in Table 10 to be positive, strong and statistically significant.[11]  Instead, three of the four socio-economic measures show a negative[12] relationship with "unexplained" racial disproportionality, and that which is positive is scarcely above zero.  The relationship between overall conviction rates and "unexplained" disproportionality, while positive, is quite weak.  None of the correlations reported in Table 10 is statistically significant. What these data clearly suggest is that the "unexplained" racial disproportionality in Florida convictions cannot be accounted for by racial differences in socio-economic circumstances nor by the geographic pattern of overall conviction rates.

---

[10]. White/black ratios are used for income and graduation to reflect black disadvantage.

[11]. These are product-moment (Pearson *r*) correlations.  A positive value means that as measures of socio-economic disadvantage or conviction rates increase, so too do measures of "unexplained" racial disproportionality.  These values may range from -1.0 to +1.0.

[12]. A negative relationship means that the two measures being correlated move in opposite directions.  For example, as one increases, the other decreases.

22

June 21, 2001

The issue of racial difference in prior record is addressed by use of data for "prior sentencing events" and "prior convicted charges" for blacks and whites convicted of felonies and sentenced to prison or state supervision in Florida during 1998. These data were provided for each of the nine crime categories used throughout this report.[13] The mean values for blacks and whites and detailed data definitions for both prior record measures are described in Appendix B. For both prior sentencing events and prior convicted charges, blacks are higher than whites in each crime category. This is not surprising in light of the evidence provided above concerning the racial disproportionality in felony convictions (Tables 2-6).

The question raised here is whether the pattern of racial disparity in prior record is consistent with or related to the pattern of racial disproportionality in convictions described previously. To assess that question, we have computed rank-order correlations (Spearman's rho) between the *percent* of "unexplained" racial disproportionality in convictions (Table 4) and two measures of racial disparity in prior record: (1) the percentage by which the mean number of *prior sentencing events* for blacks exceeds that for whites; (2) the percentage by which the mean number of *prior convicted charges* for blacks exceeds that for whites.

Because the only prior record data currently available are for the nine crime types using convictions for the entire state, my analysis uses the nine crime types as the basis of rank-ordering. In effect, I am asking whether the crimes for which the "unexplained" racial disproportionality in convictions are highest are also the crimes for which the racial disparity in

---

[13]. These data were prepared by the Florida Department of Corrections, Bureau of Research and Data Analysis, and do not include felons sentenced to jail in 1998.

23

prior record is highest. To do this a correlation is computed between the ranking of crime types on one measure ("unexplained" conviction disproportionality) and the ranking of crime types on another (racial disparity in prior record).

**Table 11** ranks the nine crime types (1 = highest) first in terms of "unexplained" racial disproportionality in conviction based on results described in Table 4 and then in terms of the two measures of racial disparity in prior record noted above. We can see, for example, that weapons offenses rank first in terms of "unexplained" conviction disproportionality, but rank ninth and ninth respectively, in terms of racial disparity in prior record. At the other end of the rankings, murder ranks ninth in conviction disproportionality but first and second on the two measures of prior record disparity.

The correlation between the rank ordering of crimes on the several measures are presented at the bottom of Table 11. To simplify discussion, "unexplained" disproportionality is designated as "U" and the measures of racial disparity in prior record are designated as "A" and "B," as indicated by the notation at the top of each column of rankings. Thus, the rank order correlation between "unexplained" conviction disproportionality (U) and the percent difference in mean prior sentencing events for blacks and whites (A) will be referred to as U-A. If prior record disparities have the potential to help account for conviction disproportionalities, there should be strong positive correlations for U-A, and U-B.

In fact, as Table 11 shows, each of those correlations is negative, meaning that as prior record disparity between races *decreases*, racial disproportionality in convictions *increases*.

24

34

June 21, 2001

Moreover, for both measures, U-A (-.38), U-C (-.48) the negative correlations are relatively strong. There is nothing in these data to suggest that the levels of racial disproportionality in conviction described previously can be attributed to racial differences in prior record.

In sum, the levels of "unexplained" disproportionality documented in this report are apparently not related to racial differences in socio-economic conditions, residence in counties with high conviction rates, nor prior record.  These three factors have been suggested as possible contributors to observed differences in black and white incarceration rates (Blumstein, 1982; Austin and Allen, 2000).  Though plausibly related to *sentencing* outcomes that could lead to incarceration there is nothing in the analyses conducted by Blumstein (1982) and by Austin and Allen (2000) that actually demonstrates their relevance for observed incarceration disparities. As well, the present data suggest that whatever their plausible relevance for convictions these factors have either a negligible or negative relationship to "unexplained" conviction disproportionality and are unlikely candidates to account for the observed differences between blacks and whites.

North Florida and the Concentration of Conviction Disproportionality

Finally, there is a pattern to the distribution of "unexplained" racial disproportionality throughout Florida that is worth noting and may provide some insight into the observed differences in conviction.  Specifically, this disproportionality is consistently higher in north Florida than elsewhere in the state.   **Table 12** shows the median[14] levels of "unexplained"

---

[14]. Medians are such that half of the counties have higher, and half have a lower value of conviction disproportionality.  They are better than means for this comparison because means and observed differences between means can be inflated by extreme values or "outliers."

25

June 21, 2001

disproportionality that are found in north Florida[15] counties and in the state's other counties.  For

violent crimes, the "unexplained" disproportionality in felony convictions is 23% higher in north

Florida than elsewhere in the state.  For drugs, this difference is 87% and for property crimes, it is

almost 200%. Since property and drug crimes account for 66% of all convictions and 69% of

black convictions,  these indicators of regional variation suggest differences in conviction

disproportionality that are both real and substantial.

It is beyond the scope of this report to interpret or explain these regional differences. My

principal point is to show that racial disproportionality in felony convictions not only exists in

Florida, but that it varies considerably by county.  Moreover, while conviction disproportionality

is clearly an issue in all regions of Florida, it appears to have a pattern of heightened concentration

in that part of Florida that is most closely associated with the culture, economy and politics of the

"old South" (Tebeau, 1971).

**Table 13** offers brief insight into some of the socio-demographic characteristics that

currently distinguish north Florida from the rest of the state. These data are obtained from the

*Florida Statistical Abstract 1999*, published by the Bureau of Economic and Business Research at

the University of Florida.  They show that in comparison with the rest of the state, north Florida

counties have a smaller and more rural (less densely populated) population that is younger and

---

[15]. The counties designated as "north Florida" include: Alachua, Baker, Bay, Bradford,
Calhoun, Clay, Columbia, Dixie, Duval, Escambia, Flagler, Franklin, Gadsden, Gilchrist, Gulf,
Hamilton, Holmes, Jackson, Jefferson, Lafayette, Leon, Levy, Liberty, Madison, Nassau,
Okaloosa, Putnam, St. Johns, Santa Rosa, Suwannee, Taylor, Union, Wakulla, Walton,
Washington.

26

**36**

June 21, 2001

contains a higher proportion of blacks.  It is also apparent that residents of north Florida counties are poorer overall.  However, the relative poverty of north Florida is more pronounced for whites than for blacks.

Whether rural, relatively impovershed whites are more "threatened" by the presence of larger numbers of blacks is something the present data cannot address.  But there is a substantial research literature suggesting that various means of social control, including executions, incarceration, arrests, and police department funding  may be more frequently mobilized under conditions such as those described for north Florida.[16] The potential for that mobilization to adversely impact African Americans has been one implication of that body of research.

---

[16]. See Blalock, 1967 for an introduction to this issue and Liska, 1992 and Tolnay, et al., 1992 for more current discussions of research  examining race, "social threat" and social control.

27

37

June 21, 2001

5.    Exhibits

Attached are tables 1-13 which summarize the bases and support for my opinions.

6.    References

Austin, Roy L. and Mark D. Allen
    2000              Racial disparity in arrest rates as an explanation of racial
                      disparity in commitment to Pennsylvania prisons.   Journal
                      of Research in Crime and Delinquency 37:200-220.

Blalock, Hubert M.
    1967              Toward a Theory of Minority Group Relations.  New York: Wiley.

Blumstein, Alfred
    1982              On the racial disproportionality of United States prison populations. The
                      Journal of Criminal Law and Criminology 73:1259-1281.

    1993              Racial disproportionality of U.S. prison populations revisited.  University
                      of Colorado Law Review 64: 743-760.

Bridges, George S. And Robert D. Crutchfield
    1988              Law, social standing and racial disparities in imprisonment.  Social Forces
                      66:699-724

Bridges, George S., Darlene Conley, Rodney Engen and Townsand Price-Spratlen
    1995              Racial disparities in the confinement of Juveniles: Effects of crime and
                      community structure on punishment.  Pp. 128-52 in Minorities in Juvenile
                      Justice, edited by Kimberly Kempf-Leonard, Carl Pope and William
                      Feyenherm.  Thousand Oaks, CA: Sage.

Cohn, Ellen G. and David P. Farrington
    1998              Assessing the quality of American doctoral program faculty in criminology
                      and criminal justice.  Journal of Criminal Justice Education 9:187-210.

Crutchfield, Robert D, George S. Bridges and Susan R. Pitchford
    1994              Analytical and aggregation biases in analyses of imprisonment: Reconciling
                      discrepancies in studies of racial disparity.  Journal of Research in Crime
                      and Delinquency 31:166-182.

28

June 21, 2001

Hawkins, Darnell F. And Kenneth A. Hardy
1989       Justice and the African American experience.  Social Justice 16:75-94.

Hindelang, Michael J.
1978       Race and involvement in common law personal crimes.  American Sociological Review 46:461-474.

Langan, Patrick A.
1985       Racism on trial: new evidence to explain the racial composition of prisons in the United States.  The Journal of Criminal Law and Criminology 76:666-683.

Liska, Allen E.
1992       Social Threat and Social Control.  Albany, N.Y.: SUNY Press.

Myers, Samuel L. And William J. Sabol
1987       Business cycles and racial disparities in punishment.  Contemporary Policy Issues 5:46-58.

Petersilia, Joan
1983       Racial Disparities in the Criminal Justice System.  Santa Monica, CA: Rand Corporation.

1985       Racial disparities in the criminal justice system: A summary.  Crime and Delinquency 31:15-34.

Sabol, William J.
1989       Racially disproportionate prison populations in the United States: An overview of historical patterns and review of contemporary issues.  Contemporary Crises 13:405-432.

Tebeau, Charlton W.
1971       A History of Florida.  Coral Gables, FL: University of Miami Press.

Tolnay, Stewart E. E.M. Beck and James L. Massey
1992       Black competition and white vengeance: Legal execution of Blacks as social control in the cotton south, 1890-1929.  Social Science Quarterly 73:627-644.

29

June 21, 2001

U.S. Department of Justice
   2000          Criminal Victimization in the United States, 1997.  Washington, D.C.:
                       Bureau of Justice Statistics.


Wilbanks, William
   1987          The Myth of a Racist Criminal Justice System.  Monterey, CA:
                       Brooks/Cole Publishing Company.



6.          Compensation

         I am being compensated at a rate of $100 per hour for my pre-trial work in connection
with this litigation and $200 per hour for my in court time.


7.          Other Expert Testimony Given in Last Four Years

         None



Date: June 21 , 2001

Theodore Chiricos

30

40

June 21, 2001

**Appendix A**

**Specific crimes within Department of Corrections crime categories used in this report**

<u>Murder</u>
1st Degree Murder
2nd Degree Murder
3rd Degree Murder
Homicide, Other
Manslaughter
DUI Manslaughter

<u>Sex Offenses</u>
Capital Sexual Battery
Life Sexual Battery
1st Degree Sexual Battery
2nd Degree Sexual Battery
Sexual Assault, Other
Lewd, Lascivious Behavior

<u>Robbery</u>
Robbery With Weapon
Robbery Without Weapon
Home Invasion, Robbery

<u>Other Violent</u>
Home Invasion, Other
Carjacking
Aggravated Assault
Aggravated Battery
Assault and Battery on LEO
Assault/Battery, Other
Aggravated Stalking
Resisting Arrest With Violence
Kidnaping
Arson
Abuse of Children
Leaving Accident, Injury/Death
DUI, Injury
Other Violent Offenses

31

June 21, 2001

**Burglary**
Burglary of Structure
Burglary of Dwelling
Armed Burglary
Burglary With Assault
Burglary/Trespass, Other

**Theft**
Grand Theft, Other
Grand Theft, Automobile
Stolen Property
Forgery, Uttering & Counterfeiting
Worthless Checks
Fraudulent Practices
Other Theft, Property Damage

**Drugs**
Drugs, Sale/Purchase/Manufacturing
Drugs, Trafficking
Drugs, Possession/Other

**Weapons**
Weapons, Discharging
Weapons, Possession
Weapons, Other

**Other**
Escape
DUI, No Injury
Traffic, Other
Racketeering
Pollution/Hazardous Materials
Other Offenses

32

**42**

## Means and Standard Deviations of the Number Prior Sentencing Events
### By Race and Primary Offense:
### Offenders Sentenced to State Prison or Supervision in 1998
### (See Explanatory Notes and Data Qualifications Below)

| Primary Offense | White: Mean | White: Standard Deviation | Black: Mean | Black: Standard Deviation |
|---|---|---|---|---|
| Murder/Manslaughter | .72 | 1.25 | 1.13 | 1.53 |
| Sex Offenses | 1.06 | 1.42 | 1.63 | 1.80 |
| Robbery | 1.48 | 1.80 | 1.77 | 2.04 |
| Other Violent Offenses | 1.41 | 1.69 | 1.95 | 2.00 |
| Burglary | 1.79 | 1.95 | 2.59 | 2.46 |
| Theft, Forgery, Fraud | 2.05 | 2.15 | 2.71 | 2.51 |
| Drug Offenses | 1.95 | 1.99 | 2.83 | 2.48 |
| Weapon Offenses | 2.05 | 1.96 | 2.39 | 2.03 |
| Other | 1.76 | 1.99 | 2.28 | 2.18 |

## Notes and Data Qualifications:

### 1998 Prison and Supervision Admissions Included and Not Included in These Figures:

1. Only sentences that occurred in Florida are included. Offenders sentenced in other states who are serving time in Florida prisons or under supervision in Florida are not included.
2. Pretrial Intervention cases are not included (no prosecution or conviction occurs in these cases). Prosecution is withheld is withheld and the case is nolle prossed if the offender successfully completes a term of supervision.
3. If all the conviction charges in the sentencing event had adjudication withheld, the admission was not included.
4. If the all the convictions in the sentencing event were for misdemeanors the admission was not included (i.e., only felony convictions were included).
5. If the supervision admission was the result of "split sentence" in which the offender was sentenced to a term of prison followed by a term of supervision, the case was not included.
6. If the supervision admission involved a "post-prison" supervision term it was not included. These are offenders who were sentenced to prison and are statutorily required to serve a supervision term equal to the amount of time their prison sentence was reduced as a result of gain time earned while in prison.

### Prior Sentencing Events Were Defined as Follows:

1. Only Felony convictions were included (i.e., Misdemeanors convictions were excluded).
2. Does not include felony sentences that resulted in a local jail sentence Florida (data not available on Department of Correction's database).
3. Does not include felony sentences that occurred outside of Florida Florida (data not available on Department of Correction's database).
4. Includes only sentencing events recorded on the Florida Department of Correction's database. All prior commitments to the department are not counted for admissions in 1998. The reason for this is as follows. The department's database was developed in the late 1970's. Data relating to offenders under the department's jurisdiction at that time was entered. Only in some cases were prior sentences that resulted in a prison or supervision sentence for those offenders were also entered into the database. Each time an offender enters prison or supervision, they retain the same inmate identifier and a sequential counter of the number of supervision and prison sentences. There are numerous cases in which offenders have a sequential number that indicates they have been to prison one or more times, however, there is no data on these prior sentences. These sentences are not counted in these figures because there is no information about these events.

**Prepared By:**
Florida Department of Corrections
Bureau of Research and Data Analysis
May 25, 2001

PRIVELEGED AND CONFIDENTIAL-
SUBJECT TO PROTECTIVE ORDER
ENTERED IN Johnson, et al v. Bush,
Case No. 00-CV-3542

## Means and Standard Deviations of the Number Prior Convicted Charges
### By Race and Primary Offense:
### Offenders Sentenced to State Prison or Supervision in 1998
### (See Explanatory Notes and Data Qualifications Below)

| Primary Offense | White: Mean | White: Standard Deviation | Black: Mean | Black: Standard Deviation |
|---|---|---|---|---|
| Murder/Manslaughter | 1.21 | 4.08 | 1.81 | 3.67 |
| Sex Offenses | 1.38 | 2.34 | 2.22 | 2.80 |
| Robbery | 2.35 | 3.57 | 2.76 | 3.88 |
| Other Violent Offenses | 2.14 | 3.21 | 3.05 | 3.78 |
| Burglary | 3.58 | 5.08 | 4.46 | 4.87 |
| Theft, Forgery, Fraud | 4.34 | 6.66 | 4.93 | 5.83 |
| Drug Offenses | 3.35 | 4.71 | 4.51 | 4.49 |
| Weapon Offenses | 3.59 | 4.53 | 3.86 | 4.17 |
| Other | 3.27 | 4.75 | 4.15 | 4.60 |

### Notes and Data Qualifications:

Convicted charges include offenses in which adjudication was withheld or not withheld. Also, convicted charges that had the same offense date but were included in multiple sentencing events were counted one time. For example, if an offenders was convicted of burglary and placed on supervision and then was re-sentenced on the same burglary to a new term of supervision, resulting from a revocation of the original supervision term, only the first burglary conviction was counted.

### 1998 Prison and Supervision Admissions Included and Not Included in These Figures:

1. Only sentences that occurred in Florida are included. Offenders sentenced in other states who are serving time in Florida prisons or under supervision in Florida are not included.
2. Pretrial Intervention cases are not included (no prosecution or conviction occurs in these cases). Prosecution is withheld is withheld and the case is nolle prossed if the offender successfully completes a term of supervision.
3. If all the conviction charges in the sentencing event had adjudication withheld, the admission was not included.
4. If the all the convictions in the sentencing event were for misdemeanors the admission was not included (i.e., only felony convictions were included).
5. If the supervision admission was the result of "split sentence" in which the offender was sentenced to a term of prison followed by a term of supervision, the case was not included.
6. If the supervision admission involved a "post-prison" supervision term it was not included. These are offenders who were sentenced to prison and are statutorily required to serve a supervision term equal to the amount of time their prison sentence was reduced as a result of gain time earned while in prison.

### Prior Convicted Charges Were Defined as Follows:

1. Only Felony convictions were included (i.e., Misdemeanor convictions were excluded).
2. Does not include felony sentences that resulted in a local jail sentence (data not available on Department of Correction's database).
3. Does not include felony sentences that occurred outside of Florida (data not available on Department of Correction's database).
4. Includes only sentencing events recorded on the Florida Department of Correction's database. All prior commitments to the department are not counted for admissions in 1998. The reason for this is as follows. The department's database was developed in the late 1970's. Data relating to offenders under the department's jurisdiction at that time was entered. Only in some cases were prior sentences that resulted in a prison or supervision sentence for those offenders were also entered into the database. Each time an offender enters prison or supervision, they retain the same inmate identifier and a sequential counter of the number of supervision and prison sentences. There are numerous cases in which offenders have a sequential number that indicates they have been to prison one or more times, however, there is no data on these prior sentences. These sentences are not counted in these figures because there is no information about these vents.

**Prepared By:**
Florida Department of Corrections
Bureau of Research and Data Analysis
May 25, 2001

44          FDC02208

PRIVELEGED AND CONFIDENTIAL. SUBJECT TO PROTECTIVE ORDER ENTERED IN *Johnson, et al v. Bush.* Case No. 00-CV-3542

June 21, 2001

Table 1.     Racial Disproportionality of 1998 Felony Convictions in Florida Using the
             Black Population Proportion as Expected Levels of Conviction

| | Percent of Total that is Black | | Disproportionality (convictions/ population) |
|---|---|---|---|
| Crime Type | Population | Convictions | |
| Murder | 14 | 42.7 | 3.1 |
| Sex Offenses | 14 | 28.6 | 2.0 |
| Robbery | 14 | 60.5 | 4.3 |
| Other Violent | 14 | 44.0 | 3.1 |
| Burglary | 14 | 37.5 | 2.7 |
| Theft | 14 | 40.4 | 2.9 |
| Drug Offenses | 14 | 61.8 | 4.4 |
| Weapon Offenses | 14 | 56.5 | 4.0 |
| Other | 14 | 35.9 | 2.6 |
| Total | 14 | 48.3 | 3.5 |

June 21, 2001

Table 2. Racial Disproportionality of 1998 Felony Convictions in Florida, Using Arrests and the Blumstein (1993) Methodology for Computing Expected Levels of Conviction

| Crime Type | Convictions | | | Arrests | | | Black Percentage | | Percent Disproportionality Unexplained |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | black | white | total[a] | black | white | total | Convictions (Actual) | Arrests[b] (Expected) | |
| Murder | 532 | 688 | 1,245 | 1,242 | 1,249 | 2,501 | 42.7 | 49.7 | -32 |
| Sex Offenses | 797 | 1,945 | 2,790 | 2,063 | 4,988 | 7,064 | 28.6 | 29.2 | -3 |
| Robbery | 2,093 | 1,322 | 3,462 | 5,868 | 3,942 | 9,828 | 60.5 | 59.7 | 3 |
| Other Violent | 4,789 | 5,933 | 10,876 | 55,241 | 87,119 | 142,664 | 44.0 | 38.7 | 20 |
| Burglary | 3,704 | 5,989 | 9,880 | 16,117 | 28,751 | 44,951 | 37.5 | 35.9 | 7 |
| Theft | 6,963 | 10,089 | 17,249 | 34,720 | 57,584 | 92,481 | 40.4 | 37.5 | 11 |
| Drug Offenses | 17,481 | 10,605 | 28,270 | 50,932 | 50,572 | 101,612 | 61.8 | 50.1 | 38 |
| Weapon Offenses | 1,549 | 1,166 | 2,743 | 3,204 | 4,035 | 7,255 | 56.5 | 44.2 | 39 |
| Other | 2,712 | 4,750 | 7,559 | 13,347 | 21,918 | 35,338 | 35.9 | 37.8 | -8 |
| total | 40,620 | 42,487 | 84,074 | 182,734 | 260,158 | 443,694 | 48.3 | 41.2 | 25 |

[a] Totals for convictions and arrests are greater than the sum of black/white convictions/arrests because offenders of "other" race are included.

[b] Differences between actual (observed) and expected convictions are statistically significant for all crime types.

46

June 21, 2001

Table 3.    Racial Disproportionality of 1998 Felony Convictions in Florida, Using Black and White Arrests and the Langan (1985) Methodology for Computing Expected Levels of Conviction

| Crime Type | White Arrests | White Convictions | White Probability Of Conviction[1] | Black Arrests | Expected Black Convictions[a] | Observed Black Convictions | Percent Disproportionality Unexplained |
|---|---|---|---|---|---|---|---|
| Murder | 1,249 | 688 | 0.55 | 1,242 | 684 | 532 | -22 |
| Sex Offenses | 4,988 | 1,945 | 0.39 | 2,063 | 804 | 797 | -1 |
| Robbery | 3,942 | 1,322 | 0.34 | 5,868 | 1,968 | 2,093 | +6 |
| Other Violent | 87,119 | 5,933 | 0.07 | 55,241 | 3,762 | 4,789 | +27 |
| Burglary | 28,751 | 5,989 | 0.21 | 16,117 | 3,357 | 3,704 | +10 |
| Theft | 57,584 | 10,089 | 0.18 | 34,720 | 6,083 | 6,963 | +15 |
| Drug Offenses | 50,572 | 10,605 | 0.21 | 50,932 | 10,680 | 17,481 | +64 |
| Weapon Offenses | 4,035 | 1,166 | 0.29 | 3,204 | 926 | 1,549 | +67 |
| Other | 21,918 | 4,750 | 0.22 | 13,347 | 2,893 | 2,712 | -6 |
| Total | 260,158 | 42,487 | 0.16 | 182,734 | 29,843 | 40,620 | +36 |

[a] Differences between actual (observed) and expected convictions are statistically significant for all crime types except sex offenses.

[1] Values in this column are "rounded off" for White Convictions/White Arrests. The exact values for the rates, rather than the "rounded off" values entered in the "Probability" column, are the values applied to obtain the values in the column "Expected Black Convictions."

47

Table 4.    Racial Disproportionality of 1998 Felony Convictions in Florida, Using Black and
            White Arrests and the Crutchfield, et al., (1994) Methodology for Computing
            Expected Levels of Conviction

| | B/W Ratio of Race-Specific Rates | | Percent Disproportionality Unexplained[a] |
| | Arrest 98 | Conviction 98 | |
|---|---|---|---|
| Murder | 6.0 | 4.7 | -22 |
| Sex Offenses | 2.5 | 2.5 | 0 |
| Robbery | 9.0 | 9.6 | +7 |
| Other Violent | 3.8 | 4.9 | +29 |
| Burglary | 3.4 | 3.7 | +9 |
| Theft | 3.7 | 4.2 | +14 |
| Drug Offenses | 6.1 | 10.0 | +64 |
| Weapon Offenses | 4.8 | 8.0 | +67 |
| Other | 3.7 | 3.5 | -5 |
| Total | 4.3 | 5.8 | +35 |

[a]Differences between actual (observed) and expected convictions are statistically significant for
all crime types except sex offenses.

48

June 21, 2001

Table 5. Racial Disproportionality of 1998 Felony Convictions in Florida Counties Using Black and White Arrests and the Crutchfield, et al., (1994) Methodology for Computing Expected Levels of Conviction

| County | B/W Ratio of Race-Specific Rates | | % Dif | County | B/W Ratio of Race-Specific Rates | | % Dif |
|---|---|---|---|---|---|---|---|
| | Arrest | Conviction | | | Arrest | Conviction | |
| Lafayette | 2.03 | 1.79 | -12 | Levy | 3.46 | 5.26 | 52 |
| Saint Lucie | 4.03 | 3.60 | -11 | Palm Beach | 5.60 | 8.51 | 52 |
| Highlands | 6.07 | 5.73 | -6 | Martin | 7.39 | 11.40 | 54 |
| Saint Johns | 6.23 | 5.98 | -4 | Marion | 3.46 | 5.36 | 55 |
| Hamilton | 2.36 | 2.36 | 0 | Pinellas | 5.37 | 8.36 | 56 |
| DeSoto | 3.12 | 3.40 | 9 | Brevard | 5.48 | 8.69 | 59 |
| Gadsden | 3.90 | 4.45 | 14 | Nassau | 4.18 | 6.63 | 59 |
| Madison | 3.65 | 4.21 | 15 | Hendry | 2.97 | 4.76 | 60 |
| Okeechobee | 3.79 | 4.40 | 16 | Baker | 2.24 | 3.60 | 61 |
| Putnam | 4.08 | 4.81 | 18 | Gilchrist | 1.64 | 2.67 | 63 |
| Polk | 3.34 | 4.00 | 20 | Duval | 4.10 | 6.73 | 64 |
| Orange | 4.53 | 5.47 | 21 | Indian River | 6.41 | 10.67 | 66 |
| Pasco | 4.74 | 5.73 | 21 | Manatee | 6.43 | 10.75 | 67 |
| Dade | 3.42 | 4.42 | 29 | Leon | 5.31 | 9.23 | 74 |
| Walton | 2.38 | 3.11 | 31 | Okaloosa | 3.40 | 5.92 | 74 |
| Hernando | 5.75 | 7.57 | 32 | Lee | 4.95 | 8.90 | 80 |
| Osceola | 4.85 | 6.42 | 32 | Monroe | 3.25 | 5.90 | 81 |
| Jefferson | 3.35 | 4.45 | 33 | Wakulla | 2.43 | 4.45 | 83 |
| Suwannee | 3.65 | 4.86 | 33 | Citrus | 4.38 | 8.05 | 84 |
| Hardee | 2.21 | 2.96 | 34 | Gulf | 1.65 | 3.09 | 87 |
| Clay | 5.43 | 7.33 | 35 | Flagler | 5.29 | 10.04 | 90 |
| Broward | 4.57 | 6.20 | 36 | Volusia | 4.70 | 9.45 | 101 |
| Escambia | 3.61 | 4.90 | 36 | Glades | 1.40 | 2.87 | 105 |
| Columbia | 2.22 | 3.06 | 38 | Sarasota | 9.25 | 18.91 | 105 |
| Collier | 4.98 | 6.91 | 39 | Dixie | 1.55 | 3.20 | 106 |
| Hillsborough | 4.58 | 6.41 | 40 | Seminole | 5.59 | 11.64 | 108 |
| Sumter | 2.33 | 3.26 | 40 | Liberty | 1.11 | 2.34 | 110 |
| Calhoun | 2.59 | 3.73 | 44 | Franklin | 2.13 | 4.64 | 118 |
| Charlotte | 4.08 | 5.91 | 45 | Holmes | 1.43 | 3.30 | 130 |
| Taylor | 2.33 | 3.42 | 47 | Washington | 2.14 | 4.98 | 133 |
| Jackson | 1.71 | 2.54 | 48 | Bradford | 2.66 | 7.00 | 163 |
| Lake | 5.41 | 8.03 | 48 | Union | 2.22 | 5.88 | 165 |
| Bay | 2.74 | 4.11 | 50 | Santa Rosa | 3.37 | 18.58 | 452 |
| Alachua | 6.70 | 10.11 | 51 | | | | |

Table 6. Racial Disproportionality of 1998 Felony Convictions in Florida Counties Using Black and White Arrests and the Crutchfield, et al., (1994) Methodology for Computing Expected Levels of Conviction – Violent, Property, and Drug Crime (Excludes Felons Sentenced to Jail)

| County | Percent Difference Black/White Arrest and Conviction Rate Ratios | | | County | Percent Difference Black/White Arrest and Conviction Rate Ratios | | |
|---|---|---|---|---|---|---|---|
| | Drug | Violent | Property | | Drug | Violent | Property |
| Nassau | -7 | 57 | 77 | Palm Beach | 134 | 68 | 14 |
| Hardee | -6 | 23 | 12 | Volusia | 134 | 73 | 23 |
| Wakulla | -3 | 97 | 263 | Bay | 140 | -6 | 3 |
| Dade | 14 | 25 | 9 | Duval | 145 | 11 | 28 |
| Polk | 17 | 4 | 17 | Okaloosa | 146 | 40 | 39 |
| Pasco | 29 | 23 | 2 | Lee | 154 | 29 | 39 |
| DeSoto | 31 | 43 | 7 | Leon | 155 | 25 | 83 |
| Okeechobee | 31 | 40 | -28 | Columbia | 159 | -2 | 58 |
| Highlands | 34 | -37 | 2 | Lake | 160 | 11 | 11 |
| Hamilton | 40 | 41 | -28 | Monroe | 160 | 33 | -3 |
| Putnam | 52 | -48 | 14 | Taylor | 160 | 96 | 109 |
| Saint Lucie | 53 | -33 | -67 | Glades | 194 | 26 | 104 |
| Orange | 53 | -6 | 13 | Union | 200 | 75 | 96 |
| Osceola | 54 | -29 | -5 | Martin | 211 | -20 | 63 |
| Saint Johns | 54 | -60 | -65 | Madison | 213 | -38 | 47 |
| Clay | 55 | -3 | -26 | Liberty | 215 | 76 | 29 |
| Pinellas | 60 | 41 | 37 | Marion | 225 | 79 | 26 |
| Broward | 61 | 38 | 17 | Washington | 225 | 71 | 205 |
| Manatee | 63 | 24 | 19 | Baker | 231 | -29 | -167 |
| Hillsborough | 68 | 14 | 13 | Jefferson | 231 | -60 | 17 |
| Collier | 70 | 38 | -3 | Flagler | 289 | 128 | -19 |
| Jackson | 73 | 40 | 56 | Walton | 289 | -139 | 99 |
| Escambia | 82 | -3 | 19 | Suwannee | 290 | 16 | 61 |
| Charlotte | 85 | 50 | 14 | Citrus | 318 | 47 | 185 |
| Brevard | 86 | 52 | 25 | Gadsden | 357 | 32 | 13 |
| Gulf | 88 | 20 | 8 | Santa Rosa | 377 | 428 | 304 |
| Indian River | 89 | 27 | 25 | Franklin | 382 | -22 | 56 |
| Calhoun | 106 | 96 | 65 | Dixie | 453 | 58 | 172 |
| Hernando | 106 | 8 | 10 | Levy | 464 | 27 | 112 |
| Hendry | 107 | 6 | 165 | Holmes | 570 | 95 | 291 |
| Alachua | 115 | 1 | 48 | Bradford | 921 | 192 | -14 |
| Seminole | 123 | 98 | 96 | Gilchrist | ** | 213 | * |
| Sumter | 128 | -6 | 51 | Lafayette | *** | 138 | -7 |
| Sarasota | 129 | 114 | 81 | | | | |

*no blacks convicted; 7 whites    **no blacks convicted; 1 white    ***no blacks convicted; 2 whites

50

June 21, 2001

Table 7.    Racial Disproportionality of 1998 Felony Convictions in Florida, Using 1997
            Black and White Arrests and the Crutchfield, et al., (1994) Methodology for
            Computing Expected Levels of Conviction

| | B/W Ratio of Race-Specific Rates | | Percent Disproportionality Unexplained[a] |
|---|---|---|---|
| | Arrest 97 | Conviction 98 | |
| Murder | 5.4 | 4.7 | -13 |
| Sex Offenses | 2.5 | 2.5 | 0 |
| Robbery | 10.0 | 9.6 | -4 |
| Other Violent | 3.8 | 4.9 | +29 |
| Burglary | 3.5 | 3.7 | +6 |
| Theft | 3.7 | 4.2 | +14 |
| Drug Offenses | 5.8 | 10.0 | +72 |
| Weapon Offenses | 4.8 | 8.0 | +67 |
| Other | 3.6 | 3.5 | -3 |
| Total | 4.2 | 5.8 | +38 |

[a]Differences between actual (observed) and expected convictions are statistically significant for
all crime types except sex offenses.

June 21, 2001

Table 8.    Racial Disproportionality of Fiscal Year 1998 Felony Convictions in Florida
            Using Black and White Arrests and the Crutchfield, et al., (1994) Methodology
            for Computing Expected Levels of Conviction

| | B/W Ratio of Race-Specific Rates | | Percent Disproportionality Unexplained[a] |
| | Arrest 98 | Conviction FY98-99 | |
| --- | --- | --- | --- |
| Murder | 6.0 | 5.1 | -15 |
| Sex Offenses | 2.5 | 2.7 | +8 |
| Robbery | 9.0 | 9.2 | +2 |
| Other Violent | 3.8 | 4.8 | +26 |
| Burglary | 3.4 | 3.7 | +9 |
| Theft | 3.7 | 4.1 | +11 |
| Drug Offenses | 6.1 | 9.1 | +49 |
| Weapon Offenses | 4.8 | 7.9 | +65 |
| Other | 3.7 | 3.7 | 0 |
| Total | 4.3 | 5.7 | +33 |

[a]Differences between actual (observed) and expected convictions are statistically significant for all crime types except sex offenses.

June 21, 2001

Table 9.        Percent Difference from Offending to Arrest in the U.S.

| Crime Type | Percent of Total that is Black | | |
| | Offenders 1997[a] | Arrestees 1997[b] | Percent Difference: Offenders→Arrest |
|---|---|---|---|
| Rape/Sexual Assault [c] | 21 | 40 | +90 |
| Robbery | 43 | 57 | +33 |
| Aggravated Assault | 24 | 37 | +54 |
| Simple Assault | 24 | 35 | +46 |
| Drugs[d] | 15 | 37 | +147 |

[a] Sources: U.S. Department of Justice, Bureau of Justice Statistics, *Criminal Victimization in the United States, 1997*, NCJ-174446 (Washington, DC: U.S. Department of Justice, 2000), Table 40.  U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA), *National Household Survey on Drug Abuse: Summary Findings 1998* (Washington, DC, 1999), p. 13.

[b] Source: U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States, 1997* (Washington, DC: USGPO, 1998), pp. 240-242.

[a] Aggregated data for rape/sexual assault vary considerably by data source. Within the category of rape/sexual assault, the NCVS (offender data) includes verbal threats of rape and threats of sexual assault. The UCR (arrest data) includes only the charge of forcible rape.

[d] Percent of drug users that are black (use in past year) for specific drug types:

| | |
|---|---|
| marijuana | 15 |
| cocaine | 13 |
| crack | 34 |
| inhalants | 4 |
| hallucinogens | 3 |
| stimulants | 10 |
| sedatives | 18 |
| tranquilizers | 8 |
| LSD | 2 |
| heroin | 2 |

53

June 21, 2001

Table 10.    Pearson-*r* Correlations: Socio-Demographic Characteristics and Conviction Rates of Florida Counties with Unexplained Disproportionality

|  | Correlation with Unexplained Disproportionality |
|---|---|
| Socio-Demographic Characteristics | |
| *Black-White Ratio* | |
| Per Capita Income | .004 |
| Poverty | -.180 |
| Unemployment[a] | -.097 |
| High School Graduation[b] | -.193 |
|  | |
| Conviction Rate | |
| Convictions/Population | .079 |
| Convictions/Arrests | .064 |

[a]ratio of rates per 10,000 employable persons
[b]ratio of rates per 10,000 population aged 15-19

June 21, 2001

Table 11.    Ranking of Crime Types on "Unexplained" Conviction Disproportionality and
Two Measures of Black-White Prior Record Disparity for 1998 Admissions to
Prison or State Supervision

| Crime Type | Percent Difference | | |
| --- | --- | --- | --- |
| | Unexplained Conviction Disproportionality | Black-White Prior Sentencing Events | Black-White Prior Convicted Charges |
| | U | A | B |
| Murder | 9 | 1 | 2 |
| Sex Offenses | 7 | 2 | 1 |
| Robbery | 6 | 8 | 7 |
| Other Violent | 3 | 5 | 3 |
| Burglary | 5 | 4 | 6 |
| Theft | 4 | 6 | 8 |
| Drug Offenses | 2 | 3 | 4 |
| Weapon Offenses | 1 | 9 | 9 |
| Other | 8 | 7 | 5 |
| | | U-A | U-B |
| Spearman's Rho Correlations | | -0.38 | -0.48 |

55

June 21, 2001

Table 12.      Median Percent Disproportionality Unexplained for North Florida and Other
               Florida Counties by Crime Type Category

| Crime Type Category | Median Percent Disproportionality Unexplained | | Percent Difference North - Other |
|---|---|---|---|
| | North Florida Counties[a] (N=35) | Other Florida Counties (N=32) | |
| Violent | 32 | 26 | 23 |
| Property | 47 | 16 | 194 |
| Drug | 159 | 85 | 87 |

[a]North Florida counties include: Alachua, Baker, Bay, Bradford, Calhoun, Clay, Columbia, Dixie, Duval, Escambia, Flagler, Franklin, Gadsden, Gilchrist, Gulf, Hamilton, Holmes, Jackson, Jefferson, Lafayette, Leon, Levy, Liberty, Madison, Nassau, Okaloosa, Putnam, St. Johns, Santa Rosa, Suwanee, Taylor, Union, Wakulla, Walton, Washington.

Table 13.      Socio-demographic Characteristics of North Florida and Other Florida Counties

| Socio-Demographic Characteristics | Mean Values | |
|---|---|---|
| | North Florida Counties | Other Florida Counties |
| total population** | 81,871 | 379,219 |
| population density** | 115.44 | 443.82 |
| Percent of Population Black** | 17.84 | 9.62 |
| percent of population Hispanic*** | 2.17 | 9.79 |
| percent population aged 15-24*** | 14.81 | 10.87 |
| percent population aged 65+*** | 13.86 | 22.74 |
| crime rate** | 4,297 | 6,008 |
| white income per capita*** | 11,677 | 14,477 |
| black income per capita* | 4,898 | 6,095 |
| percent whites in poverty*** | 13.63 | 9.50 |
| percent blacks in poverty | 32.84 | 31.55 |

*$p<.05$
**$p<.01$
***$p<.001$

# BRENNAN CENTER FOR JUSTICE

### AT NYU SCHOOL OF LAW

December 10, 2001

By Hand/Tribeca Grand Hotel

Hamish Hume, Esq.
Cooper & Kirk
Suite 200
1500 K Street, NW
Washington, D.C. 20005

  Re: *Johnson v. Bush*, Docket No. 00-C.V.-3542 (S.D. Fla.)

Dear Hamish:

  Enclosed please find the following documents, which supplement our prior response on October 15, 2001 to Florida Clemency Board Defendants' Second Set of Requests for Production of Documents, dated September 19, 2001 ("Document Requests") to the extent such Document Requests are applicable to Plaintiffs' expert witness, Theodore Chiricos:

- Email from Ted Chiricos to Philip Gallagher, dated May 1, 2001 (Bates-stamped P003434);
- Table 4A, entitled "Racial Disproportionality of 1998 Felony Convictions in Florida, Using Black and White Arrests and the Crutchfield, et al., (1994) Methodology for Computing Expected Levels of Conviction," dated December 10, 2001 (Bates-stamped P003435);
- Table 5A, entitled "Racial Disproportionality of 1998 Felony Convictions in Florida Counties Using Black and White Arrests Designated "Felony" in the FDLE Database and the Crutchfield, et al., (1994) Methodology," dated December 10, 2001 (Bates-stamped P003436); and
- Table 5B, entitled "Racial Disproportionality of 1998 Felony Convictions in Florida Counties Using Black and White Arrests Designated "Felony" & "Unknown" in the FDLE Database and the Crutchfield, et al., (1994) Methodology," dated December 10, 2001(Bates-stamped P003437).

  In addition, we have provided to Professor Chiricos, for his review, copies of the following documents:

- Florida Clemency Board Defendants' Response to Plaintiffs' Fifth (Sixth) Set of Document Requests and Third Set of Interrogatories, dated November 21, 2001;
- Transcript of Deposition of Sue Burton, taken on November 9, 2001;
- Transcript of Deposition of Debra Livingston, taken on November 9, 2001; and

**58**

- Transcript of Deposition of William Bales, taken on December 3 and December 4, 2001.

Further, in our review of the documents that we previously produced, we discovered that we inadvertently omitted the second page of the document Bates-stamped P001514, entitled "Table 2. Racial Disproportionality of Convictions by Florida County, 1998." We enclose a copy of that document with the second page, which is Bates-stamped P001514A.

Finally, it has come to our attention that the last page of the documents produced on October 15, 2001 in relation to Professor Chiricos is Bates-stamped P001723, which is also the Bates number assigned to the first page of the documents produced on October18, 2001 in relation to Professor Uggen. Since the document relating to Professor Uggen was marked as an exhibit during his deposition, we propose designating the duplicate page number relating to Professor Chiricos as P001723A. We apologize for this unfortunate duplication.

Sincerely,

Jessie Allen

Enclosures

**59**

12/10/01

Table 4A.    Racial Disproportionality of 1998 Felony Convictions in Florida, Using
Black and White Arrests and the Crutchfield, et al., (1994) Methodology for
Computing Expected Levels of Conviction

| | B/W Ratio of Race-Specific Rates | | | | | | |
| | Arrest 98 | | | Felony Conviction | Percent Disproportionality Unexpained | | |
| | All[1] | Felony & Unknown[2] | Felony[3] | | All[1] | Felony & Unknown[2] | Felony[3] |
|---|---|---|---|---|---|---|---|
| Murder | 6.0 | 6.0 | 6.0 | 4.7 | -22 | -22 | -21 |
| Sex Offenses | 2.5 | 2.8 | 2.8 | 2.5 | 0 | -12 | -12 |
| Robbery | 9.6 | 9.0 | 8.9 | 9.6 | +7 | +7 | +8 |
| Other Violent | 3.8 | 4.8 | 5.1 | 4.9 | +28 | +1 | -5 |
| Burglary | 3.4 | 3.3 | 3.2 | 3.7 | +9 | +13 | +15 |
| Theft | 3.6 | 3.6 | 3.7 | 4.2 | +15 | +17 | +13 |
| Drug Offenses | 6.1 | 7.0 | 8.2 | 10.0 | +64 | +44 | +23 |
| Weapon Offenses | 4.8 | 5.0 | 5.4 | 8.0 | +67 | +58 | +49 |
| Other | 3.7 | 4.0 | 4.2 | 3.5 | -5 | -13 | -16 |
| Total | 4.3 | 4.8 | 5.2 | 5.8 | +36 | +21 | +11 |

[1] Includes arrests in Florida Department of Law Enforcement ("FDLE") database, which contains a field that labels arrests as either "felony," "unknown," or "misdemeanor."

[2] Includes only arrests designated "felony" and "unknown" in FDLE database.

[3] Includes only arrests designated "felony" in FDLE database.

[4] Source: FDLE individual arrest data prepared for Joseph Katz on 8/7/01.

[5] Source: FDLE Computerized Criminal History (CCH) files, Florida Department of Corrections' "DOC" Offender Based Information System (OBIS) and DOC records of the Florida Sentencing Guideline Scoresheet.

P003435

Table 5A.  Racial Disproportionality of 1998 Felony Convictions in Florida Counties Using Black and White Arrests Designated "Felony" in the FDLE database[1] and the Crutchfield et al., (1994) Methodology

| County | B/W Ratio of Race-Specific Rates | | % Dif | County | B/W Ratio of Race-Specific Rates | | % Dif |
|---|---|---|---|---|---|---|---|
| | Arrest | Conviction | | | Arrest | Conviction | |
| St Lucie | 18.47 | 3.60 | -80.51 | Brevard | 7.02 | 8.69 | 23.77 |
| St Johns | 11.81 | 5.98 | -49.34 | Manatee | 8.46 | 10.75 | 27.10 |
| Hamilton | 3.35 | 2.36 | -29.51 | Monroe | 4.56 | 5.90 | 29.45 |
| Calhoun | 4.89 | 3.73 | -23.76 | Gulf | 2.39 | 3.09 | 29.50 |
| Walton | 3.86 | 3.11 | -19.41 | Suwannee | 3.74 | 4.86 | 30.06 |
| Highlands | 6.77 | 5.73 | -15.33 | Martin | 8.76 | 11.40 | 30.19 |
| Desoto | 3.84 | 3.40 | -11.38 | Duval | 5.16 | 6.73 | 30.43 |
| Okeechobee | 4.83 | 4.40 | -8.81 | Franklin | 3.56 | 4.64 | 30.51 |
| Sumter | 3.51 | 3.26 | -7.04 | Jefferson | 3.37 | 4.45 | 31.86 |
| Clay | 7.47 | 7.33 | -1.82 | Nassau | 5.01 | 6.63 | 32.43 |
| Orange | 5.45 | 5.47 | 0.32 | Jackson | 1.89 | 2.54 | 34.07 |
| Pasco | 5.71 | 5.73 | 0.41 | Henry | 3.50 | 4.76 | 35.95 |
| Polk | 3.97 | 4.00 | 0.66 | Baker | 2.62 | 3.60 | 37.38 |
| Hernando | 7.36 | 7.57 | 2.90 | Okaloosa | 4.30 | 5.92 | 37.56 |
| Putnam | 4.60 | 4.81 | 4.63 | Alachua | 7.30 | 10.11 | 38.49 |
| Taylor | 3.17 | 3.42 | 7.94 | Lee | 6.41 | 8.90 | 38.90 |
| Hardee | 2.73 | 2.96 | 8.30 | Indian Riv. | 7.53 | 10.67 | 41.62 |
| Collier | 6.38 | 6.91 | 8.39 | Citrus | 5.63 | 8.05 | 42.87 |
| Osceola | 5.81 | 6.42 | 10.52 | Liberty | 1.63 | 2.34 | 43.28 |
| Gilchrist | 2.41 | 2.67 | 10.97 | Volusia | 6.58 | 9.45 | 43.53 |
| Hillsborough | 5.77 | 6.41 | 11.13 | Leon | 6.30 | 9.23 | 46.53 |
| Charlotte | 5.27 | 5.91 | 12.06 | Flagler | 6.58 | 10.04 | 52.52 |
| Gadsden | 3.92 | 4.45 | 13.41 | Lafayette | 1.14 | 1.79 | 56.42 |
| Bay | 3.62 | 4.11 | 13.60 | Glades | 1.83 | 2.87 | 57.06 |
| Columbia | 2.66 | 3.06 | 15.01 | Wakulla | 2.67 | 4.45 | 66.51 |
| Escambia | 4.23 | 4.90 | 15.85 | Holmes | 1.94 | 3.30 | 69.82 |
| Broward | 5.28 | 6.20 | 17.41 | Washington | 2.73 | 4.98 | 82.45 |
| Lake | 6.82 | 8.03 | 17.72 | Dixie | 1.57 | 3.20 | 104.45 |
| Dade | 3.75 | 4.42 | 18.00 | Bradford | 3.36 | 7.00 | 108.47 |
| Marion | 4.45 | 5.36 | 20.55 | Sarasota | 7.72 | 18.91 | 144.85 |
| Pinellas | 6.93 | 8.36 | 20.66 | Union | 2.21 | 5.88 | 166.13 |
| Madison | 3.49 | 4.21 | 20.69 | Seminole | 3.45 | 11.64 | 237.23 |
| Palm Beach | 7.03 | 8.51 | 21.10 | Santa Rosa | 2.16 | 18.58 | 761.83 |
| Levy | 4.31 | 5.26 | 22.09 | | | | |

[1]The FDLE database contains a field that labels arrests as either "felony," "unknown," or "misdemeanor."

61

Table 5B. Racial Disproportionality of 1998 Felony Convictions in Florida Counties Using Black and White Arrests Designated "Felony" & "Unknown" in the FDLE database[1] and the Crutchfield et al., (1994) Methodology

| County | B/W Ratio of Race-Specific Rates | | | County | B/W Ratio of Race-Specific Rates | | |
|---|---|---|---|---|---|---|---|
| | Arrest | Conviction | % Dif | | Arrest | Conviction | % Dif |
| St Lucie | 17.44 | 3.60 | -79.36 | Pinellas | 6.12 | 8.36 | 36.51 |
| St Johns | 11.45 | 5.98 | -47.78 | Suwannee | 3.52 | 4.86 | 38.11 |
| Highlands | 6.75 | 5.73 | -15.13 | Palm Beach | 6.15 | 8.51 | 38.48 |
| Lafayette | 2.08 | 1.79 | -13.97 | Brevard | 6.27 | 8.69 | 38.60 |
| Pasco | 5.86 | 5.73 | -2.14 | Lake | 5.78 | 8.03 | 38.86 |
| Hamilton | 2.39 | 2.36 | -1.34 | Alachua | 7.24 | 10.11 | 39.70 |
| Polk | 3.95 | 4.00 | 1.35 | Lee | 6.27 | 8.90 | 41.98 |
| Orange | 5.36 | 5.47 | 1.97 | Okaloosa | 4.12 | 5.92 | 43.56 |
| Desoto | 3.27 | 3.40 | 3.85 | Baker | 2.48 | 3.60 | 45.17 |
| Okeechobee | 4.23 | 4.40 | 4.13 | Taylor | 2.34 | 3.42 | 46.44 |
| Walton | 2.79 | 3.11 | 11.40 | Citrus | 5.49 | 8.05 | 46.59 |
| Gadsden | 3.97 | 4.45 | 12.10 | Manatee | 7.32 | 10.75 | 46.82 |
| Hernando | 6.74 | 7.57 | 12.38 | Nassau | 4.50 | 6.63 | 47.27 |
| Putnam | 4.28 | 4.81 | 12.46 | Jackson | 1.71 | 2.54 | 48.73 |
| Collier | 6.11 | 6.91 | 13.10 | Volusia | 6.32 | 9.45 | 49.64 |
| Bay | 3.61 | 4.11 | 13.73 | Duval | 4.48 | 6.73 | 50.08 |
| Hardee | 2.60 | 2.96 | 13.97 | Flagler | 6.60 | 10.04 | 52.12 |
| Osceola | 5.59 | 6.42 | 14.94 | Indian River | 6.78 | 10.67 | 57.45 |
| Madison | 3.59 | 4.21 | 17.15 | Monroe | 3.66 | 5.90 | 61.12 |
| Clay | 5.90 | 7.33 | 24.27 | Wakulla | 2.69 | 4.45 | 65.21 |
| Sumter | 2.62 | 3.26 | 24.42 | Leon | 5.46 | 9.23 | 69.01 |
| Broward | 4.98 | 6.20 | 24.57 | Gulf | 1.79 | 3.09 | 72.59 |
| Dade | 3.52 | 4.42 | 25.69 | Liberty | 1.30 | 2.34 | 80.37 |
| Marion | 4.24 | 5.36 | 26.40 | Dixie | 1.70 | 3.20 | 87.85 |
| Escambia | 3.87 | 4.90 | 26.76 | Franklin | 2.43 | 4.64 | 90.94 |
| Hillsborough | 5.02 | 6.41 | 27.64 | Glades | 1.49 | 2.87 | 92.78 |
| Jefferson | 3.45 | 4.45 | 28.85 | Washington | 2.20 | 4.98 | 126.17 |
| Charlotte | 4.57 | 5.91 | 29.38 | Bradford | 3.04 | 7.00 | 130.26 |
| Gilchrist | 2.06 | 2.67 | 29.92 | Holmes | 1.43 | 3.30 | 131.00 |
| Columbia | 2.35 | 3.06 | 30.40 | Union | 2.13 | 5.88 | 176.27 |
| Calhoun | 2.86 | 3.73 | 30.51 | Sarasota | 6.12 | 18.91 | 209.01 |
| Levy | 4.02 | 5.26 | 30.94 | Seminole | 3.15 | 11.64 | 269.58 |
| Martin | 8.67 | 11.40 | 31.54 | Santa Rosa | 2.06 | 18.58 | 801.49 |
| Henry | 3.50 | 4.76 | 36.09 | | | | |

---

[1]The FDLE database contains a field that labels arrests as either "felony," "unknown," or "misdemeanor."

P003437

<u>**Expert Report**</u>

by

Richard L. Engstrom, Ph.D.

Case       <u>Johnson v. Bush</u>
               No. 00-CV-3542
               U.S. District Court
               Southern District of Florida
               Judge James Lawrence King

1.      <u>Introduction</u>

I have been retained as an expert by counsel for the Plaintiffs in the above captioned litigation. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

I have been asked to express opinions on racially polarized voting in Florida, the racial disparity in voter registration in Florida, and the racial disparities in the socioeconomic characteristics of the residents of Florida.

2.      <u>Professional Qualifications</u>

I am a Research Professor of Political Science and Coordinator of Graduate Studies in the Department of Political Science at the University of New Orleans, in New Orleans, LA. I recently served two terms as the Chairperson of the Representation and Electoral Systems Section of the American Political Science Association and continue to serve as a member of the Executive Council for that section.

I have done extensive research into the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. The results of my research have been published in the <u>American Political Science Review</u>, <u>Journal of Politics</u>, <u>Western Political Quarterly</u>, <u>Legislative Studies Quarterly</u>, <u>Social Science Quarterly</u>, <u>Journal of Law and Politics</u>, <u>Electoral Studies</u>, <u>Representation</u>, and other journals and books. Three articles authored or co-authored by me were cited with approval in <u>Thornburg v. Gingles</u>, 478 U.S. 30, at 46 n.11, 49 n.15, 53 n.20, 55, and 71 (1986), the Supreme Court decision interpreting amended section 2 of the Voting Rights Act.

Attached as Exhibit 4 to this report is a curriculum vita setting forth my professional background, which includes a list of all publications authored or co-authored by me, including forthcoming publications.

1

3.     Opinions

I have reached the following opinions:

Voting in the State of Florida in statewide and congressional elections from 1990 through 2000 involving a choice between or among African American and non-African American candidates has been "racially polarized," in that African American voters in these elections have expressed a clear preference for African American candidates and this preference was not shared, except in one instance, by the non-African American voters.

African Americans of voting age in Florida are registered to vote at a lower rate than non-African Americans of voting age.

Data from the 1990 U.S. Census of Population reveal that there have been disparities in the socioeconomic conditions of Florida's African American and non-African residents on measures of educational attainment and income. African Americans are shown to have been less educated, to have less per capita and household income, and to be more likely to have incomes below the poverty level.

4.     Basis and Reasons for Opinions.

My opinion regarding polarized voting is based on the following:

The plaintiffs in this case have made a statewide claim, and therefore I have analyzed all of the statewide elections of which I am aware, from 1990 through 2000, in which voters had a choice between or among African American and non-African American candidates.[1]  These are the 1990 Democratic primary and runoff elections for Secretary of State, in which the African American candidate was Alcee L. Hastings, and the 1994 Democratic primary and the general election for Commissioner of Education, in which the African American candidate was Doug Jamerson.

Given the limited number of statewide elections that satisfy these criteria, I have supplemented these analyses with analyses of elections to the United States House of Representative in Florida that also satisfy these criteria.  Congressional elections have been chosen for this purpose because they are the second largest election units, in terms of population, into which the entire state is divided.  These include seven contests in 1992; the Democratic primaries in Districts 3, 7, and 23, in which the African American candidates were Corrine Brown and Arnette Girardeau, Adrienne Perry, and Alcee Hastings, Bill Clark, and William Bill Washington, respectively, and the subsequent

---

[1] Excluded from these analyses are elections in which every African American candidate or every non-African American candidate was a minor candidate.  These include the 2000 general election for a seat in the United States Senate, in which the only African American candidate was Willie Logan, who ran without party affiliation and received only 1.4 percent of the votes, the 2000 Republican presidential preference primary, in which the only African American candidate was Alan Keyes, who received only 4.6 percent of the votes, and the 1990 Republican primary for Commission of Education, in which the only African American candidate, Amefika D. Geuka, received only 8.9 percent of the votes.

2

runoff primaries and general elections involving Ms. Brown in District 3 and Mr. Hastings in District 23. The other congressional elections are the 1996 Democratic primary and runoff in District 2, in which Anita L. Davis was the African American candidate, and the 1996 and 2000 general elections in Districts 3 and 23, involving Ms. Brown and Mr. Hastings.[2]

The data utilized in the analyses of these elections are the votes cast for the various candidates in each precinct in these respective elections and measures of the racial composition of the electorates in these precincts. The measure of the latter was, for all of the general elections, the percentage of registered voters that was African American. For the Democratic primaries and runoffs, the percentage of Democratic registered voters that was African American was used when it was available. When not available, the percentage of all registered voters that was African American was used. All of the analyses result in estimates of the percentages of those casting a vote in the specific election that voted for an African American candidate.[3]

---

[2] The Republican primary and runoff in 1996 for U.S. House District 2 also included an African American candidate, Carole Griffin. These contests were not analyzed. Only 22, 988 and 15,362 people cast votes in these Republican contests, respectively, compared to 141,665 and 117,264 in the respective Democratic primary and runoff in that district that year. Given that participation in the Democratic primary and runoff was over six and seven times more than in the respective Republican contests, analyses of the Republican primary and runoff would provide little information about polarized voting in the area covered by the district.

[3] The race of registered voters is recorded in Florida. These data are employed as the measure of the racial composition of the precincts rather than census data reflecting the race of the voting age population (VAP) within geographical units that are approximations of precincts. The registration data are preferable to VAP figures because voter registration is a more accurate measure of the potential electorate, and because these data reflect changes in the potential electorate over time, as well as any possible changes in precinct boundaries, whereas the census data are a reflection of the population as of April 1, 1990 or April 1, 2000.

The registration data are complete for all five of the general elections that have been analyzed. However, the registration data have not been maintained, or made available, by the Supervisor of Elections in all counties for primary and runoff elections. The analyses of these elections are based on all of the counties for which registration data were made available as of the date of this report. When the votes cast in precincts in a particular election cannot be matched to racial registration data for those precincts, those precincts have been excluded from the analysis of that election. The analyses of primary and runoff elections reflect the behavior of the voters across the reporting counties, not the behavior of all of the voters in the state or in the particular district. Information concerning the counties that provided registration data, for each primary or runoff, is provided in Exhibit 2. The resulting estimates are of the racial divisions in candidate preferences for voters around the State of Florida, based on the best available data reflecting the racial composition of the precinct electorates.

Congressional districts in Florida may contain parts of a particular precinct. Registration data reflecting the racial composition of the registered voters within the split portions of precincts are not available. In the 1992 general election, data are available from the Economic and Demographic Research Division of the Joint Legislative Management Committee reflecting the number of precincts in which votes were cast in more than one congressional election. In District 23 this occurred in only 5 of the 268 precincts (1.9 percent) and in District 7 it occurred in only 10 of 213 (4.7 percent). In District 3 it occurred in 132 of the 337 precincts (39.1 percent). For the 1996 general elections, this same source identifies the fraction of the total voting age population (as of 1990) within a 1996 precinct that is within the district (or if there were no voting age residents in that area in 1990, the proportion of the total area of the precinct contained in the split portion). Based on these date, only nine of the 392 precincts (2.3 percent) in District 2 were split and 116 of the 366 precincts (31.7 percent) in District 3. No such precinct match to districts is available for 2000, so comparable figures cannot be provided for District 23 for that year.

3

In assessing the extent to which the candidate preferences of African American voters differed from those of the non-African American voters in these elections, I have derived estimates of group support for candidates through three different methods. These include the two analytic procedures approved by the Supreme Court for this purpose in Thornburg v. Gingles [478 U.S. 30, at 52-53 (1986)], which are ecological regression analysis and homogeneous precinct (or extreme case) analysis. Homogeneous precinct analyses simply report the percentage of the votes cast received by a particular candidate or group of candidates within the precincts in which over 90 percent of the people registered to vote, or 90 percent of the Democratic registrants when that information is available for Democratic primaries or runoffs, is African American.[4] Regression analyses provide estimates of the support for the various candidates among both African American and non-African American voters based on the votes cast in all of the precincts in an election.[5] I have also applied a third, alternative methodology for ecological inference that was developed by Professor Gary King subsequent to the Thornburg decision. King's procedure is also based on the votes cast in all of the precincts.[6] The results of these analyses are summarized in the table identified as Exhibit 1 in this report.

The estimated divisions in the candidate preferences that result from each of the methodologies are generally similar, and they consistently agree on which candidates are preferred by the respective groups of voters, African Americans and non-African Americans. As revealed in Exhibit 1, African American voters, in all 15 of these election contests, preferred African American candidates.[7] This preference was shared only once across these 15 elections by non-African American voters, in the 2000 general election for the District 23 seat in the U.S. House of Representatives. Voting in Florida, therefore,

---

[4] There were no homogeneously African American precincts in one of the elections analyzed, the 1992 Democratic primary for District 7.

[5] The regression results are derived through what is commonly referred to as "double regression," the type of regression analysis relied on in Thornburg. These analyses are weighted to reflect the different numbers of registered voters in each precinct. Correlation coefficients reflecting how consistently the vote for a candidate varies with the relative presence of African Americans in the precincts are reported in Exhibit 1 along with the results of the regression analyses. The correlation coefficient can achieve values ranging from 1.0 to −1.0. A value of 1.0 indicates a perfectly consistent increase in the percentage of votes received by a candidate or group of candidates for each percentage point increase in African American registration across the precincts, while a value of −1.0 indicates a perfectly consistent decrease. All of the correlation coefficients reported for these elections are statistically significant at least at the standard .05 level. Scatterplots depicting the relationship between the percentage of the votes that African American candidates received within each precinct and the respective African American percentage of registered voters are provided in Exhibit 3 to this report.

[6] See Gary King, A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data (Princeton University Press, 1997). I have been unable to derive estimates through King's procedure for the four statewide elections.

[7] The homogeneous precinct analysis identifies Ms. Davis to be a plurality preference of the African American voters (49.7 percent) in the 1996 Democratic primary in District 2. This figure is based on only two precincts however. The estimation methods that rely on all of the precincts, regression and King's procedure, estimate Ms. Davis' African American support at 73.5 percent and 68.8 percent, respectively.

4

has been "racially polarized," as that term has been defined by the Supreme Court in Thornburg v. Gingles, (478 U.S. 30, at 53 n.21).

My opinion regarding the racial disparity in voter registration is based on the following:

The number of African Americans of voting age residing in Florida as of April 1, 2000, according to the U.S. Census of Population for that year, was 1,560,928. Voter registration figures for the State of Florida, provided by the Division of Elections within the Florida Secretary of State's office, show that on February 14, 2000, only a few weeks prior to the census, there were 875,135 African Americans registered to vote within the state. (February 14 is the closest date to April 1 for which the defendants' in this matter have provided registration figures.) This results in a registration rate for African Americans of 56.1 percent.

In contrast, the number of non-African Americans of voting age residing in Florida on April 1, 2000, according to the census, is 10, 775, 110. The number of non-African Americans registered to vote as of February 14 that year, according to the Division of Elections, was 7,407,006. This results in a voter registration rate of 68.7 percent.

My opinion regarding the racial disparities in socioeconomic characteristics is based on the following:

Socioeconomic characteristics of people, especially their education and income levels, have long been associated with participation in elections. This association begins with the first step in that process, registering to vote. One of the most venerable empirical generalizations in political science is that those with less education and less income are less likely to be registered [see, e.g., Raymond Wolfinger and Steven Rosenstone, Who Votes? (1980) and Steven Rosenstone and John Mark Hansen, Mobilization, Participation, and Democracy in America (1993)]. Data reflecting the socioeconomic characteristics of Florida's residents, by race, are not yet available for the 2000 Census. I have therefore examined the data for the 1990 Census. These data reveal that 43.6 percent of the African Americans aged 25 or over had not graduated from high school or achieved the equivalent. The comparable percentage of the non-African Americans was over 20 percentage points less, 23.4. The percentage of African Americans 25 or over that had received a college degree or a graduate or professional degree was 9.8, while that for the non-African Americans was almost twice as high, 19.3.

African Americans had the lowest average per capita income for 1989 of all census groups, $7,550. The per capita income of whites was $16, 052, for American Indians, Eskimos, and Aleuts, $11,090, for Asians and Pacific Islanders, $12,514, and for those classified as "others," $8,102.

The percentage of African American households in which the household income in 1989 was less than $15,000 was 42.5, close to twice that for non-African American households, 22.9. The percentage of African American households in which the household income was $50,000 or more was 9.3, less than half of that for non-African American households, 22.2.

The percentage of African Americans aged 18 or older determined to be living below the poverty level was 26.3. This was close to three times higher than the percentage for non-African Americans, which was 9.1.

5.    Data and Other Information Considered in Forming Opinions.

In forming my opinions, I have considered the following materials:

(1)  The votes cast for candidates, by precinct, for the elections held from 1992 through 1998, which were obtained from the Economic and Demographic Research Division of the Joint Legislative Management Committee. The votes cast in the 1990 and 2000 elections, which were obtained through county websites or through public records requests to the Supervisors of Elections in the counties.

(2)  The race of the registered voters, by precinct, which for the general election in 1992, 1994, and 1996 was obtained through the Economic and Development Research Division of the Joint Legislative Management Committee. For all of the primary elections, and the 2000 general election, this information was obtained through either the websites of the counties or through public record requests to the Supervisors of Elections in the counties. Vote totals for candidates in statewide elections, such as the Republican presidential preference primary in 2000 and the Republican primary for Commissioner of Education in 1990, have been obtained through the website of the Division of Elections of the Office of the Florida Secretary of State.

(3)  The information on split precincts within congressional districts, which was obtained through the Economic and Demographic Research Division of the Joint Legislative Management Committee.

(4)  The statewide registration data, by race, for February 14, 2000, which was compiled by the Division of Elections of the Office of the Florida Secretary of State, and obtained through the defendants in this matter.

(5)  The voting age population, by race, of the State of Florida for April 1, 2000, which was obtained from the 2000 Census of Population.

(6)  The socioeconomic data, by race, which were obtained from the 1990 Census of Population.

6.    Exhibits

Exhibit 1 contains the results of the analyses of racial divisions in candidate preferences.

Exhibit 2 identifies the counties providing precinct-level registration data, by race, for the primary elections, and whether these data were for all voter registrants or for those registered to vote as Democrats.

Exhibit 3 contains the scatterplots displaying the relationship between the racial composition of precincts and the votes cast for the African American candidates.

Exhibit 4 is my curriculum vita.

6

7.    <u>Compensation</u>

I am being compensated $150 per hour for my work in connection with this litigation.

<u>8.</u>    <u>Other Expert Testimony Given in Last Four Years</u>

I have also testified as an expert witness in a number of voting rights cases in federal courts across the United States.  Since 1996 I have testified at trial and/or been deposed in the following cases: Davis v. Chiles (N.D. Fla. 1996), Johnson v. Mortham (N.D. Fla. 1996), Milwaukee Branch, NAACP v. Thompson (E.D. Wisc. 1996), Barnett v. Daley (N.D. Ill. 1996), Smith v. Able (D.C. S.C. 1996), Theriot v. Parish of Jefferson (E.D. La. 1997), Johnson v. Hamrick (N.D. Ga. 1997), United States of America v. City of Baton Rouge (M.D. La. 1998), Stovall v. City of Cocoa (M.D. Fla. 1998), Prejean v. Foster (M.D. La. 1998), Barnett v. Daley (N.D. Ill. 1998), Packingham v. Metropolitan Dade County (S.D. Fla. 1998), Maxwell v. Foster  (W.D. La. 1999), Sanders v. Dooly County (M.D. Ga. 2000), Ruiz v. City of Santa Maria (C.D. Ca. 2000), and Johnson v. Hamrick (N.D. Ga. 2001).

Date: July 1, 2001

Richard L. Engstrom

EXHIBIT 1
Estimated Divisions in Support for African American Candidates

Reported in the following order:
Regression Analysis
King's Procedure
Homogeneous Precincts

|  | % of non-African American voters | % of African American voters | Correlation Coefficient |
|---|---|---|---|
| *Statewide Elections* | | | |
| Secretary of State | | | |
| Demo. Primary | | | |
| BC* = Hastings | 24.0 | 80.7 | .913 |
|  | N.A. | N.A. | |
|  | 26.2 | 87.3 | |
| Demo. Runoff | | | |
| BC = Hastings | 15.4 | 88.8 | .930 |
|  | N.A. | N.A. | |
|  | 20.6 | 95.3 | |
| Commissioner of Education | | | |
| Demo. Primary, 1994 | | | |
| BC = Jamerson | 49.0 | 61.4 | .314 |
|  | N.A. | N.A. | |
|  | 49.8 | 63.3 | |
| General Election | | | |
| BC = Jamerson (Dem.) | 42.9 | 104.8 | .657 |
|  | N.A. | N.A. | |
|  | 43.7 | 96.9 | |

8

*Congressional Elections*

Demo. Primary, 1992

District 3
  BCs = Brown +

| | | | |
|---|---|---|---|
| Girardeau + | 38.7 | 91.4 | .870 |
| Mills | 43.8 | 90.2 | |
| | 44.4 | 90.9 | |

| | | | |
|---|---|---|---|
| BC = Brown | 24.2 | 64.9 | .761 |
| | 26.9 | 64.5 | |
| | 28.3 | 66.1 | |

District 7

| | | | |
|---|---|---|---|
| BC = Perry | 36.3 | 106.0 | .375 |
| | 37.1 | 77.0 | |
| | 37.5. | N.A. | |

District 23
  BCs = Hastings + Clark +

| | | | |
|---|---|---|---|
| Washington | 26.1 | 91.9 | .876 |
| | 33.3 | 85.7 | |
| | 29.0 | 87.8 | |

| | | | |
|---|---|---|---|
| BC = Hastings | 2.4 | 51.7 | .890 |
| | 7.5 | 47.5 | |
| | 4.3 | 47.7 | |

Demo. Runoff, 1992

District 3

| | | | |
|---|---|---|---|
| BC = Brown | 18.8 | 92.9 | .901 |
| | 31.8 | 88.4 | |
| | 31.0 | 95.3 | |

District 23

| | | | |
|---|---|---|---|
| BC = Hastings | -3.8 | 98.2 | .986 |
| | 10.1 | 87.6 | |
| | 5.8 | 93.2 | |

General Election, 1992

District 3

| | | | |
|---|---|---|---|
| BC = Brown (Dem.) | 18.1 | 91.9 | .921 |
| | 29.7 | 90.8 | |

9

|  | 26.1 | 94.7 |  |
|---|---|---|---|
| **District 23** | | | |
| BC = Hastings (Demo) | 30.9 | 97.6 | .972 |
| | 33.3 | 97.0 | |
| | 33.5 | 96.9 | |

**Democratic Primary, 1996**

|  |  |  |  |
|---|---|---|---|
| **District 2** | | | |
| BC = Davis | 8.1 | 73.5 | .901 |
| | 8.8 | 68.8 | |
| | 9.6 | 49.7 (plurality) | |

**Democratic Runoff, 1996**

|  |  |  |  |
|---|---|---|---|
| **District 2** | | | |
| BC = Davis | 18.0 | 87.9 | .917 |
| | 19.3 | 84.0 | |
| | 20.6 | 81.5 | |

**General Election, 1996**

|  |  |  |  |
|---|---|---|---|
| **District 3** | | | |
| BC = Brown | 30.9 | 102.6 | .960 |
| | 37.3 | 95.8 | |
| | 34.9 | 97.5 | |

**General Election, 2000**

|  |  |  |  |
|---|---|---|---|
| **District 23** | | | |
| BC = Hastings | 52.2 | 106.8 | .933 |
| | 57.9 | 98.5 | |
| | 51.6 | 98.2 | |

BC = Black candidate(s).

EXHIBIT 2

Coverage of Counties for Elections Analyzed

*Statewide Elections*

Democratic Primary, 1990

Secretary of State

The analysis includes data from the following 50 counties: Alachua, Baker, Bradford, Brevard, Calhoun, Citrus, Clay, Collier, Columbia, DeSoto, Dixie, Escambia, Flagler, Gadsden, Gilchrist, Gulf, Hardee, Hendry, Hillsborough, Indian River, Jackson, Lake, Levy, Liberty, Madison, Marion, Martin, Mimi-Dade, Nassau, Okaloosa, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Taylor, Union, Volusia, Wakulla, Walton, and Washington.

The voter registration data for these counties are based on total voter registration within the precincts.

Data were not available to perform the analyses from Bay, Broward, Charlotte, Duval, Franklin, Glades, Hamilton, Hernando, Highlands Holmes, Jefferson, Lafayette, Lee, Leon, Manatee, Monroe, and Okeechobee.

Democratic Runoff, 1990

Secretary of State

The analysis includes data from the following 50 counties: Alachua, Baker, Bradford, Brevard, Calhoun, Clay, Collier, Columbia, DeSoto, Dixie, Escambia, Flagler, Franklin, Gadsden, Gilchrist, Gulf, Hardee, Hendry, Hillsborough, Indian River, Jackson, Lake, Levy, Liberty, Madison, Marion, Martin, Miami-Dade, Nassau, Okaloosa, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Suwannee, Taylor, Union, Volusia, Wakulla, Walton, and Washington.

The voter registration data for these counties are based on total voter registration within the precincts.

Data were not available to perform the analyses from Bay, Broward, Charlotte, Citrus, Duval, Glades, Hamilton, Hernando, Highlands, Holmes, Jefferson, Lafayette, Lee, Leon, Manatee, Monroe, and Okeechobee.

11

Democratic Primary, 1994

Commissioner of Education

> The analysis includes the following 51 counties:  Alachua, Baker, Bay, Bradford, Broward, Calhoun, Citrus, Clay, Columbia, DeSoto, Dixie, Escambia, Flagler, Franklin, Gadsden, Gulf, Hamilton, Hardee, Hendry, Hillsborough, Indian River, Jackson, Lake, Lee, Levy, Liberty, Madison, Marion, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Putnam, Santa Rosa, Sarasota, Seminole, St. Johns, St. Lucie, Sumter, Taylor, Union, Volusia, Wakulla, and Walton.

> The voter registration data for these counties are based on total voter registration within the precincts.

> Data were not available to perform the analyses from Brevard, Charlotte, Collier, Duval, Gadsden, Glades, Hernando, Highlands, Holmes, Jefferson, Lafayette, Leon, Manatee, Okeechobee, Suwannee, and Washington.

General Election, 1994

Commissioner of Education

> All of the counties in Florida are included in the analysis of this election.

> The voter registration data for these counties are based on total voter registration within the precincts.

*Congressional Elections*

Democratic Primary, 1992

District 3

> The analysis includes the following 11 counties:  Alachua, Clay, Columbia, Lake, Levy, Marion, Orange, Putnam, Seminole, St. Johns, Volusia.

> The voter registration data for these counties are based on Democratic voter registration within precincts, except those for Putnam, which concern total voter registration.

> Data were not available to perform the analyses from Baker (due to split precincts in the district), Duval, and Flagler (also due to split precincts).

12

District 7

All three counties (Orange, Seminole, and Volusia) in this district are included in the analysis of this election.

The voter registration data for these counties are based on Democratic voter registration within precincts.

District 23

The following six counties are included in the analysis of this election:  Broward, Henry, Martin, Miami-Dade, Palm Beach, and St. Lucie.

The voter registration data for Broward, Miami-Dade, and Palm Beach are based on Democratic registration, while those for Hendry, Martin, and St. Lucie are based on total registration within precincts.

Data were not available to include Okeechobee in the analysis.

Democratic Runoff, 1992

District 3

The following eleven counties are included in the analysis of this election: Alachua, Clay, Columbia, Lake, Levy, Marion, Orange, Putnam, Seminole, St. Johns, Volusia.

The voter registration data for these counties are based on Democratic registration within precincts, except those for Putnam, which concern total voter registration.

Data were not available to perform the analyses from Baker (due to split precincts) Duval, and Flagler (due to split precincts).

District 23

The following six counties are included in the analysis of this election:  Broward, Hendry, Martin, Miami-Dade, Palm Beach, and St. Lucia.

The voter registration data for Broward, Miami-Dade, and Palm Beach are based on Democratic registration within precincts, while those for Hendry, Martin, and St. Lucie, are based on total voter registration.

Data were not available to include Okeechobee in the analysis.

13

<u>General Election, 1992</u>

District 3

All of the counties in this district Florida are included in the analysis of this election.

The voter registration data for these counties are based on total voter registration within the precincts.

District 23

All of the counties in this district Florida are included in the analysis of this election.

The voter registration data for these counties are based on total voter registration within the precincts.

<u>Democratic Primary, 1996</u>

District 2

The following 15 counties are included in the analysis of this election:  Bay, Calhoun, Dixie, Franklin, Gadsden, Gilchrist, Gulf, Jackson, Jefferson, Lafayette, Liberty, Madison, Taylor, Wakulla, and Washington.

The voter registration data for these counties are based on Democratic registration within precincts, except those for Jackson, which concern total voter registration.

The following four counties did not provide the necessary data:  Columbia, Hamilton, Leon, and Suwannee.

<u>Democratic Runoff, 1996</u>

District 2

The following 15 counties are included in the analysis of this election:  Bay, Calhoun, Dixie, Franklin, Gadsden, Gilchrist, Gulf, Jackson, Jefferson, Lafayette, Liberty, Madison, Taylor, Wakulla, and Washington.

The voter registration data for these counties are based on Democratic registration within precincts, except those for Jackson, which concern total voter registration.

The following four counties did not provide the necessary data:  Columbia, Hamilton, Leon, and Suwannee.

14

General Election, 1996

District 3

All of the counties in this district are included in the analysis of this election.

The voter registration data for these counties are based on total voter registration within the precincts.

General Election, 2000

District 23

All of the counties in this district are included in the analysis of this election.

The voter registration data for these counties are based on total voter registration within the precincts.

15

**EXHIBIT 3**

Scatterplots



**Secretary of State, Democratic Primary, 1990**



## Secretary of State, Democratic Runoff, 1990



# Commissioner of Education, Democratic Primary, 1994



## Commissioner of Education, General Election, 1994



**Dist. 3, Democratic Primary, 1992**



# Dist. 3, Democratic Primary, 1992



Dist. 7, Democratic Primary, 1992



Dist. 23, Democratic Primary, 1992



**Dist. 23, Democratic Primary, 1992**



## Dist. 3, Democratic Runoff, 1992



## Dist. 23, Democratic Runoff, 1992



Dist. 3, General Election, 1992



Dist. 23, General Election, 1992

# Dist. 2, Democratic Primary, 1996





Dist. 2, Democratic Runoff, 1996



Dist. 3, General Election, 1996



Dist. 23, General Election, 2000

EXHIBIT 4

VITA
June, 2001

RICHARD L. ENGSTROM
Research Professor of Political Science
University of New Orleans

OFFICE                                            HOME

Department of Political Science                   6126 Perlita St.
University of New Orleans                          New Orleans, LA 70122
Lakefront
New Orleans, LA 70148                              Phone: (504) 286-0881
Phone:(504)-280-6671  Fax:(504)-280-3838
E-Mail Address = richard.engstrom@uno.edu

## PERSONAL AND EMPLOYMENT INFORMATION

Born May 23, 1946.  Married to former Carol L. Verheek.  Four children: Richard Neal, born
3/10/70; Mark Andrew, born 1/14/73; Brad Alan, born 3/31/77; and Amy Min, born 8/18/84.

Assistant Professor of Political Science, University of New Orleans, 1971-74; Associate Professor,
1974-1979; Professor, 1979-present; Research Professor, 1987-present.

Chairperson, Department of Political Science, University of New Orleans, 1976-1979.  Coordinator
of Graduate Studies, 1990-1992, 1993-present.

Fulbright-Hays Professor, National Taiwan University and National Chengchi University, and
Visiting Research Fellow, Institute of American Culture, Academic Sinica, Taipei, Taiwan, R.O.C.,
1981-82.

Fulbright-Hays Professor, University College, Galway, Ireland, 1985-86.

Senior Research Fellow, Institute of Irish Studies, the Queen's University of Belfast, 1990.

David Bruce Fellow, Bruce Centre for American Studies, University of Keele, England, 1993.

Visiting Fellow, School of Politics, Australian Defence Force Academy, Canberra, Australia, 1998.

1

Recipient, UNO Alumni Association's Career Distinction Award for Excellence in Research, December 1985.

Recipient, George W. Lucas Community Service Award, New Orleans NAACP, 1993.

FORMAL EDUCATION

Ph.D., University of Kentucky, 1971

M.A., University of Kentucky, 1969

A.B., Hope College (Holland, Michigan), 1968.
   (recipient of Class of '65 Political Science Award, 1968.

PRIMARY TEACHING FIELDS

Election Systems, Urban and Minority Politics, Legislative Process, American Politics.

PROFESSIONAL ACTIVITIES

Chair, Section on Representation and Electoral Systems, American Political Science Association, 1993-95, 95-97.  Section Board, 1993-present.

Book review editor, American Review of Politics, 1995-present.

Lecture tour, under sponsorship of United States Information Agency, of Tanzania, Ethiopia, Kenya, Malawi, and Liberia, January, 1994. Topics include, among others, comparative election systems, legislatures within democratic regimes, and race and gender in contemporary politics.

Associate Member, Centre for the Study of Irish Elections, University College Galway.

Member, Board of Editors, Public Administration Quarterly 1977- present.

Member, Editorial Board, Journal of Politics, 1988-1993.

Member, Board of Editors, State and Local Government Review, 1988- 1990.

Member, Committee on the Status of Blacks, Southern Political Science Association, 1991-1996.

Treasurer, Southwestern Political Science Association, 1981 (position resigned during term due to Fulbright Lectureship).

2

Chair, Harold D. Lasswell Award Committee, American Political Science Association, 1995-1996 (best dissertation in public policy).

Chair, Ted Robinson Award Committee, Southwestern Political Science Association, 1995-1996 (best research project in minority politics by a graduate student).

Member, Nominating Committees, Southern Political Science Association, 1980; Louisiana Political Science Association, 1981, Study Group on Comparative Representation and Electoral Systems, International Political Science Association, 1988, Section on Representation and Electoral Systems, American Political Science Association, 1999.

Member, Chastain Award Committee, Southern Political Science Association, 1978. V.O. Key Award Committee, Southern Political Science Association, 1990. Ted Robinson Memorial Award Committee, Southwestern Political Science Association, 1995, 1996 (chair). Hallett Award Committee, Section on Representation and Electoral Systems, American Political Science Association, 1999, 2000.

Member, Program Committee (Urban Politics Section), 1976 Annual Meeting of the Southern Political Science Association. Program Committee (Urban Politics Section), 1992 Annual Meeting of the Midwest Political Science Association. Program Committee (Representation and Electoral Systems Section), 1994 Annual Meeting of the American Political Science Association. Program Committee (Representation and Electoral Systems Section), 2002 Annual Meeting of the American Political Science Association.

Member, Membership Committee, Southwestern Social Science Association, 1973-74.

Presented papers at meetings of the American Political Science Association, International Political Science Association, Midwest Political Science Association, Southern Political Science Association, Southwestern Political Science Association, Louisiana Political Science Association, Citadel Symposium on Southern Politics, International Society of Political Psychology, Harvard University Computer Graphics Week, Australian-New Zealand Academy for the Advancement of Science. Formal papers also presented at programs at Tulane University, Sangamon State University, University of Keele (England), and Rice University.

Chaired panels at meetings of the American Political Science Association, Southern Political Science Association, Midwest Political Science Association, and Southwestern Political Science Association.

Served as discussant for panels at meetings of the American Political Science Association, the Southern Political Science Association; Southwestern Social Science Association; Louisiana Political Science Association; Institute of American Culture, Academic Sinica (Taiwan).

3

Reviewed manuscripts for the <u>American Political Science Review</u>, <u>American Journal of Political Science</u>, <u>Journal of Politics</u>, <u>Political Research Quarterly</u>, <u>Polity</u>, <u>Social Science Quarterly</u>, <u>Legislative Studies Quarterly</u>, <u>American Politics Quarterly</u>, <u>Urban Affairs Review</u>, <u>Electoral Studies</u>, <u>National Political Science Review</u>, <u>Women and Politics</u>, <u>Southeastern Political Review</u>, <u>State and Local Government Review</u>, <u>Public Administration Quarterly</u>, <u>American Review of Politics</u>, <u>Presidential Studies Quarterly</u>, and <u>Journal of Policy History</u>, and Howard University Press.

Recipient of grant from Pacific Cultural Foundation, Taipei, Taiwan to support project entitled "The Legislative Yuan: A Study of Legislative Adaptation" (1982).

Recipient of grant from private sources, New Orleans, to support a study of mayoral tenure in large American cities (1983).

Recipient of grant from Southern Regional Council, Atlanta, Georgia, to conduct exit poll of cumulative voting election in Chilton County, Alabama (1992).

Recipient of grants from Louisiana Education Quality Support Fund, Fellowship Funding for Superior Graduate Students, 1992 (1993-1997) $48,000; 1996 (1997-2001) $64,000; 1997 (1998-2002) $48,000; 1998 (1999-2003) $56,000.

Reviewed grant proposals for National Science Foundation programs in Political Science and Law and Social Sciences, and National Science Foundation graduate fellowship applications for the National Research Council.

Served as mentor in Southern Regional Council's Voting Rights Fellowship Program to Jason F. Kirksey, 1992-1993, and Dr. Olethia Davis, 1993-1994.

<u>COMMUNITY AND UNIVERSITY SERVICE</u>

Consultant, Charter Task Force Committee, New Orleans, 2000.  Preparation of <u>Term Limits: A Report to the Charter Task Force Committee</u>, February, 2000.

Interviewed on term limits issue on "Crescent City Close Up," public affairs program on three radio stations, WNOE, KKND, and KUMX, March 19, 2000.

Participant, Roundtable on At-Large Elections for the Internet Corporation for Assigned Names and Numbers (ICANN), sponsored by Common Cause, the Center for Democracy and Technology, and the Markle Foundation, at the Kennedy School of Government, Harvard University, February 9, 2000.

Member, Board of Directors, Concern International Charities, 1998-present.

4

Chairperson, Taskforce on Civil Service, Mayor-Elect Ernest Morial's Transition Office (New Orleans), 1977-78.

Member, Graduate Council, UNO, 1975-76, 1994-95.

Member, Research Council, UNO, 1995-97.

Member, International Student Recruitment Committee, UNO, 1993-96.

Chairperson, Search Committee for Vice Chancellor for Research and Graduate Studies and Dean of the Graduate School, UNO, 1987-88.

Chairperson, Search Committee for Graduate Dean, UNO, 1978-79.

Member, University Budget Committee, UNO, 1983-84.

Member, Liberal Arts Advisory Committee, UNO, 1975-76, 1982-84.

Member, Academic Planning Committee, UNO, 1982-1988.

Member, Faculty Council Committee on Faculty Honors, UNO, 1985-1990.

Member, Committee on Research, UNO Self-Study, 1972-73; 1982-83.

Member, Dean's Advisory Committee on Academic Planning, College of Liberal Arts, UNO, 1983-84.

Member, University Senate, UNO, 1975-77; 1980-81; 83-85; 87-91.

Member, Steering Committee, Legal Division, New Orleans Chapter, American Foundation for Negro Affairs, 1977-79.

Service as expert witness in numerous vote dilution cases in federal courts. Employed by the United States Department of Justice, Lawyers' Committee for Civil Rights Under Law, NAACP Legal Defense and Educational Fund, Center for Constitutional Rights, Mexican-American Legal Defense and Educational Fund; Native American Rights Fund, and other organizations. Served as court-appointed expert for the remedial portion of Williams v. City of Dallas, United States District Court for the Northern District of Texas, Dallas Division, 1991.

5

**100**

<u>INVITED LECTURES</u> (Since 1986)

<u>1986</u>:   McGee College, University of Ulster - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

The Queen's University of Belfast - "The Reagan Elections:  Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

University of Keele - "The Contemporary Voting Rights Issue in American Politics"

University College Dublin - "The Contemporary Voting Rights Issue in American Politics" (4/30/86).

University College Galway - "The Reagan Elections: Realignment or Dealignment?"

<u>1987</u>:  Southern University -"The Equal Protection Clause and Electoral Reapportionment" (4/8/87).

APSA Summer Institute for Black Students, Louisiana State University - "The Political Scientist as Expert Witness" (7/26/87).

NAACP Legal Defense Fund, Conference on Voting Rights, San Antonio, Texas - "Cumulative and Limited Voting as Remedies for Minority Vote Dilution."

<u>1988</u>:   College of William and Mary - "The Contemporary Voting Rights Issue" and "The Role of Social Scientists in Voting Rights Litigation"

University of Queensland - "One Vote,, One Value:  The U.S. Experience After 25 Years" (5/24/88).

Griffith University (Brisbane) - "One Vote, One Value: The U.S. Experience After 25 Years" (5/25/88).

<u>1989</u>:  Tulane University - "Frontiers of Voting Rights: Vote Dilution in Judicial Elections" (3/9/89).
Lamar University - "Voting Rights:  A Retrospective" (10/30/89).

Oklahoma State University -  "Frontiers of Voting Rights" (November/10/89).

Prairie View A and M University - "Reapportionment and Black Political Power" (11/16/89).

6

**101**

1990:  The Queen's University of Belfast-Institute of Irish Studies, "The Irish Election System: Manipulation and Reform" (3/13/90); Department of Politics, "The Reagan Presidency: An Assessment" (3/8/90).

Brookings Institution - "Social Scientists and the Voting Rights Act" (10/19/90).

Lyndon Baines Johnson Library (Austin, Texas) - "The Evolution of the Voting Rights Act of 1965" (10/29/90).

1991:  University of Texas at Dallas - "Redistricting the Dallas City Council" (3/8/91).
United States Department of Justice, Voting Section - "Alternative Election Systems" (3/15/91).
Stetson University School of Law - "Alternative Election Systems as Remedies for Minority Vote Dilution" (4/27/91).

Norfolk State University - "Election Analyses in Voting Rights Litigation" (6/15/91).

1992:  University of Colorado, Summer Workshop in Urban Politics - "Race and Voting in Judicial Elections: New Orleans as a Case Study Setting" (7/9/91).

Harold Washington College, Chicago - "Political Science Research and Testimony in the Miami-Dade County Core" (9/5/92 - not presented to illness).

Southern Regional Council, Atlanta, Georgia - "Exit Polls and Voting Rights Litigation" (10/2/92).

1994:  Lecture tour of Tanzania, Ethiopia, Malawi, and Liberia for United States Information Agency, January, 1994.

National Conference of State Legislators, Annual Meeting, New Orleans - "Redistricting and the Courts" (7/26/94)

1995:  Department of International Politics, Peking University, "Constitutional Law, Comparative Electoral Systems, and the Politics of Race and Gender" (10/17/95).

1997:  John D. Lees Memorial Lecture, Keynote Address, 1997 Annual Meeting of the American Politics Group, (United Kingdom) Political Science Association, Keele, England, "Affirmative Action: The Election and the Election System" (1/3/97).

Alumni College, College of Liberal Arts, University of New Orleans, "Racial Gerrymandering in the 1990s: The Issues and the Alternatives" (2/1/97).

Commission on Governmental Reorganization, City of New Orleans, "Principles for Governmental Organization" (9/23/97).

7

Civil Rights Training Institute (Airlie Conference), NAACP Legal Defense and Educational Fund, "Alternative Election Systems in the Post-<u>Shaw</u> Era" (11/8/97).

1998

School of Politics, Australian Defence Force Academy, Canberra, "Racial Gerrymandering in the United States" (4/1/98) and "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (5/29/98).

School of Political Science, University of New South Wales, Sydney, "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (4/8/98).

Illinois Secretary of State's Commission on Redistricting, Chicago, IL, "Computer Generated Districting Plans: Necessary Conditions and Tie Breaking Criteria" (12/16/98).

2001

Carinthian Institute of Minority Affairs, Villach, Austria, "Spiders, Earmuffs, and the Mark of Zorro:   Creating Electoral Opportunities for Minorities in America's Single Member District System" (5/5/01)

Numerous other presentations before groups such as the Louisiana Municipal Association; New Orleans League of Women Voters; Public Policy Forums at Southern University in Baton Rouge; Louisiana Municipal Clerks Institute; (La.) Black Legislative Caucus Institute; Robert A. Taft Institute of Government Seminars, Southern University; Special Committee on Elective Law and Voter Participation, American Bar Association; Subcommittee on Civil and Constitutional Law, United States House of Representatives Committee on the Judiciary; Institute of American Culture, Academic Sinica (Taiwan), Foundation for Scholarly Exchange (Taiwan), and Tulane University College of Law.

8

## REFERENCES

Dr. Charles Barrilleaux, Department of Political Science, Florida State University, Tallahassee, FL 32306  904-644-7643

Dr. Robert E. Darcy, Department of Political Science, Oklahoma State University, Stillwater, OK 74074  405-744-5641

Dr. Charles D. Hadley, Department of Political Science, University of New Orleans, New Orleans, LA 70148  504-280-6456

Dr. Susan Howell, Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148  504-280-6467

Dr. Michael D. McDonald, Department of Political Science, State University of New York at Binghamton, Binghamton, NY 13901  607-777-4563

Dr. Jewel Prestage, Benjamin Banneker Honors College, Prairie View A and M University, Prairie View, TX 77446.  409-857-2916

Dr. Robert B. Thigpen, Department of Political Science, University of New Orleans, New Orleans, LA  70148  504-280-6455

9

**104**

CURRENT RESEARCH

"Districting by Independent Commissions: Lessons from Australia."

A comparison of voting behavior in actual cumulative voting elections and simulated STV elections in 15 Texas local governmental jurisdictions (with Robert Brischetto).

"The Politics of PR: Electoral Manipulation and Reform in Ireland."

Preparation of a chapter on identity politics in the United States for Mark Baimbridge and Darren Darcy (eds.), World Politics since 1945: Themes and Thinkers (England)

Preparation of review of Katheleen L. Barber, The Right to Representation: Proportional Representation Systems in the Twenty-First Century, for Representation.

10

**105**

PUBLICATIONS

BOOKS

Fair and Effective Representation? Debating Electoral Reform and Minority Rights (Lanham, MD: Rowman and Littlefield, 2001) (with Mark A. Rush).

MONOGRAPHS

Home Rule for Louisiana Parishes (Baton Rouge: Police Jury Association of Louisiana and Governmental Services Institute, Louisiana State University, 1974).

Municipal Home Rule in Louisiana (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1974).

Municipal Government Within the 1974 Louisiana Constitution: A Reference Guide for Municipal Officials (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1975).

Louisiana Mayor's Handbook (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1977), (with Edward Clynch and Konrad Kressley).

Mayoral Tenure in Large American Cities (New Orleans: School of Urban and Regional Studies, University of New Orleans, 1983).

ARTICLES, RESEARCH NOTES, AND BOOK CHAPTERS

"Statutory Restraints on Administrative Lobbying -- 'Legal Fiction'", Journal of Public Law, Vol. 19, No. 1 (1970), 90-103 (with Thomas G. Walker). Reprinted in Dennis Ippolito and Thomas Walker (eds.), Reform and Responsiveness: Readings in American Politics (New York: St. Martin's Press, Inc., 1972), pp. 428-438.

"Race and Compliance: Differential Political Socialization," Polity, 3 (Fall 1970), 100-111. Reprinted in Charles S. Bullock, III, and Harrell Rogers, Jr. (eds.), Black Political Attitudes: Implications for Political Support (Chicago: Markham Publishing Co., 1972), pp. 33-44.

"Political Ambitions and the Prosecutorial Office," Journal of Politics, 33 (February 1971), 190-194.

11

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments," <u>Midwest Journal of Political Science</u> 15 (August 1971), 475-494 (with W.E. Lyons).

"Expectations and Images: A Note on Diffuse Support for Legal Institutions," <u>Law and Society Review</u>, 6 (May 1972), 631-636 (with Michael W. Giles).

"Black Control or Consolidation: The Fringe Response," <u>Social Science Quarterly</u>, 53 (June 1972), 161-167 (with W.E. Lyons).

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments: A Comparison of Survey Findings," <u>American Journal of Political Science</u>, 17 (February 1973), 182-188 (with W. W. E. Lyons).

"Racial Gerrymandering and Southern State Legislative Redistricting: Attorney General Determinations Under the Voting Rights Act," <u>Journal of Public Law</u>, Vol. 22, No. 1 (1973), 37-66 (with Stanley A. Halpin, Jr.).

"Socio-Political Cross Pressures and Attitudes Toward Political Integration of Urban Governments," <u>Journal of Politics</u>, 35 (August 1973), 682-711 (with W.E. Lyons).

"Candidate Attraction to the Politicized Councilmanic Office: A Note on New Orleans," <u>Social Science Quarterly</u>, 55 (March 1975), 975-982 (with James N. Pezant).

"Home Rule in Louisiana -- Could This Be The Promised Land?," <u>Louisiana History</u>, 17 (Fall 1976), 431-455.

"Judicial Activism and the Problem of Gerrymandering," in Randall B. Ripley and Grace A. Franklin (eds.), <u>National Government and Public Policy in the United States</u> (Itasca, IL: Peacock Publishers, Inc., 1977), pp. 239-244.

"The Supreme Court and Equi-Populous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation," <u>Arizona State Law Journal</u>, Vol. 1976, No. 2 (1977), 277-319. Cited extensively in <u>Karcher</u> v. <u>Daggett</u>, _____ U.S. _____ (1983) (by J. Stevens, concurring, and J. White, dissenting).

"State Centralization Versus Home Rule: A Note on Ambition Theory's Powers Proposition," <u>Western Political Quarterly</u> 30 (June 1977), 288-294 (with Patrick F. O'Connor).

"Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering," <u>Legislative Studies Quarterly</u>, 2 (November 1977) 465-479 (with John K. Wildgen). Cited extensively in <u>Thornburg</u> v. <u>Gingles</u>, _____ U.S. _____ (1986) (by J. Brennan).

12

"Racial Vote Dilution: Supreme Court Interpretations of Section 5 of the Voting Rights Act," Southern University Law Review, 4 (Spring 1978), 139-164.

"The Political Behavior of Lawyers in the Louisiana House of Representatives," Louisiana Law Review 39 (Fall 1978), 43-79 (with Patrick F. O'Connor, Justin J. Green, and Chong Lim Kim).

"Restructuring the Regime: Support for Change Within the Louisiana Constitutional Convention," Polity 11 (Spring 1979), 440-451 with Patrick F. O'Connor).

"The Hale Boggs Gerrymander: Congressional Redistricting, 1969," Louisiana History, 21 (Winter 1980), 59-66.

"Lawyer-Legislators and Support for State Legislative Reform," Journal of Politics, 42 (February 1980), 267-276 (with Patrick F. O'Connor).

"Racial Discrimination in the Electoral Process: The Voting Rights Act and the Vote Dilution Issue," in Robert P. Steed, Lawrence W. Moreland, and Tod A. Baker, (eds.), Party Politics in the South (New York: Praeger Publishing, 1980), pp. 197-213.

"Spatial Distribution of Partisan Support and the Seats/Votes Relationship," Legislative Studies Quarterly, 5 (August 1980), 423- 435 (with John K. Wildgen).

"Computer Graphics and Political Cartography: ASPEX of Gerrymandering," in Computer Mapping Applications in Urban, State, and Federal Government, Plus Computer Graphics in Education, Vol. 16, Harvard Library of Computer Graphics, 1981 Mapping Collection (Cambridge, Mass.: Laboratory for Computer Graphics and Spatial Analysis, Harvard University, 1981), pp. 51-57 (with John K. Wildgen).

"The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship," American Political Science Review, 75 (June 1981), 344-354 (with Michael D. McDonald).

"Post-Census Representational Districting: The Supreme Court, 'One Person, One Vote,' and the Gerrymandering Issue," Southern University Law Review, 7 (Spring 1981), 173-226.

"Municipal Government," in James Bolner (ed.), Louisiana Politics: Festival in a Labyrinth (Baton Rouge: Louisiana State University Press, 1982), pp. 181-219.

"The 1980 Election and the Realignment Thesis: A Note of Caution," American Studies (Mei-kuo-Yen-chiu), 12 (June 1982), 107-132.

13

"Racial Vote Dilution and the 'New' Equal Protection Clause: <u>City of Mobile</u> v. <u>Bolden</u>," <u>American Studies (Mei-kuo-Yen-chiu)</u> 12 (September 1982), 25-72.

"The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Non-South Differences," <u>Journal of Politics</u>, 44 (November 1982), 1088-1099 (with Michael D. McDonald).

"The Impact of the 1980 Supplementary Election on Nationalist China's Legislative Yuan," <u>Asian Survey</u>, 24 (April 1984), 447-458 (with Chu Chi-hung).

"The Marginality Hypothesis and the State Legislative Salary Issue," <u>Southeastern Political Review</u>, 13 (Spring 1985), 169-182 (with Patrick F. O'Connor).

"Racial Vote Dilution: The Concept and the Court," in Lorn Foster (ed.), <u>The Voting Rights Act: Consequences and Implications</u> (New York: Praeger Publishers, 1985), pp. 13-43.

"Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting," <u>The Urban Lawyer</u>, 17 (Summer 1985), 369-377 (with Michael D. McDonald). Cited in <u>Thornburg</u> v. <u>Gingles</u>, _____ U.S. _____ (1986) (by J. Brennan).

"The Reincarnation of the Intent Standard: Federal Judges and At- Large Election Cases," <u>Howard Law Journal</u> 28 (No 2, 1985), 495-513. Cited in <u>Thornburg</u> v. <u>Gingles</u>, _____ U.S. _____ (1986) (by J. Brennan). Abbreviated version appeared in <u>Focus</u> (June, 1985). (<u>Focus</u> is a monthly publication of the Joint Center for Political Studies in Washington, D.C.).

"The Effect of At-Large Versus District Elections on Racial Representation in U.S. Municipalities," in Bernard Grofman and Arend Lijphart (eds.), <u>Electoral Laws and Their Political Consequences</u> (New York: Agathon Press, Inc., 1986), pp. 203-225 (with Michael D. McDonald).

"Repairing the Crack in New Orleans' Black Vote: VRA's Results Test Nullifies 'Gerryduck'," <u>Publius</u> 16 (Fall 1986), 109-121. Reprinted in Glenn R. Conrad (ed.), <u>The African American Experience in Louisiana: From Jim Crow to Civil Rights</u> (Lafayette, LA: Center for Louisiana Studies, forthcoming).

"Quantitative Evidence in Vote Dilution Litigation, Part II: Minority Coalitions and Multivariate Analysis," <u>Urban Lawyer</u> 19 (Winter 1987), 65-75 (with Michael D. McDonald).

"District Magnitudes and the Election of Women to the Irish Dail," <u>Electoral Studies</u>, 6 (August 1987), 123-132.

14

"The Election of Blacks to Southern City Councils: The Dominant Impact of Electoral Arrangements," in Robert P. Steed, Laurence W. Moreland, and Tod A. Baker (eds.) <u>Blacks in Southern Politics</u> (New York: Praeger Publishers, 1987), pp. 245-258 (with Michael D. McDonald).

"Race, Referendums, and Rolloff," <u>Journal of Politics</u> (49 November 1987), 1081-1092 (with Jim M. Vanderleeuw).

"Definitions, Measurements, and Statistics: Weeding Wildgen's Thicket," <u>Urban Lawyer</u> 20 (Winter 1988), 175-191 (with Michael D. McDonald).

"The Desirability Hypotheses and the Election of Women to City Councils," <u>State and Local Government Review</u> 20 (Winter 1988), 38-40 (with Michael D. McDonald and Bih-Er Chou).

"Black Politics and the Voting Rights Act(s): 1965-1982," in James Lea (ed.), <u>Contemporary Southern Politics: Continuity and Change</u> (Baton Rouge: Louisiana State University Press, 1988), pp. 83-106.

"Race and Representational Districting: Protections Against Delineational and Institutional Gerrymandering," <u>Comparative State Politics Newsletter</u> 9 (October 1988), 15-24.

"Cumulative Voting as a Remedy for Minority Vote Dilution: The Case of Alamogordo, New Mexico," <u>Journal of Law and Politics</u> 5 (Spring 1989), 469-497 (with Delbert A. Taebel and Richard L. Cole). Reprinted in Roger L. Kemp, (ed.), <u>Local Government Election Practices: A Handbook for Public Officials and Citizens</u> (Jefferson, N.C.: McFarland & Co., 1999), 372-391.

"When Blacks Run for Judge: Racial Divisions in the Candidate Preferences of Louisiana Voters," <u>Judicature</u> 73 (August-September 1989), 87-89.

"Detecting Gerrymandering," in Bernard Grofman (ed.), <u>Political Gerrymandering and the Courts</u> (New York: Agathon Press, Inc., 1990), pp. 178-202 (with Michael D. McDonald).

"Cumulative Voting in a Municipal Election: A Note on Voter Reactions and Electoral Consequences," <u>Western Political Quarterly</u>, 43 (March 1990), 191-199 (with Richard L. Cole and Delbert A. Taebel).

"Alternative Electoral Systems as Remedies for Minority Vote Dilution," <u>Hamline Journal of Public Law and Policy</u> 11 (Spring 1990), 19-29 (with Delbert A. Taebel and Richard L. Cole). Cited in <u>Holder</u> v. <u>Hall</u>, _____ U.S. _____ (1994), (by J. Thomas, concurring).

"Cincinnati's 1988 Proportional Representation Initiative," <u>Electoral Studies</u> 9 (September 1990), 217-225.

15

"Getting the Numbers Right: A Response to Wildgen," Urban Lawyer 22 (Summer 1990), 495-502.

"Native Americans and Cumulative Voting: The Sisseton-Wahpeton Sioux," Social Science Quarterly 72 (June 1991), 388-393 (with Charles J. Barrilleaux).

"Proportional Representation Considered in Cincinnati," Representation 30 (Spring 1991), 3-5.

"Voting for Judges: Race and Roll-Off in Judicial Elections," in William Crotty (ed.), Political Participation and Democratic Politics (New York: Greenwood Press, 1991), pp. 171-191 (with Victoria M. Caridas).

"Minority Representation and Councilmanic Election Systems: A Black and Hispanic Comparison," in Anthony Messina, Laurie Rhodebeck, Frederick Wright, and Luis R. Fraga, (eds.), Ethnic and Racial Minorities in Advanced Industrial Democracies, (New York: Greenwood Press, 1992), pp. 127-142 (with Michael D. McDonald).

"Alternative Judicial Election Systems: Solving the Minority Vote Dilution Problem," in Wilma Rule and Joseph F. Zimmerman (eds.), United States Electoral Systems: Their Impact on Women and Minorities (New York: Greenwood Press, 1992), pp. 129-139.

"Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution," Stetson Law Review 21 (Summer 1992), 743-770.

"Councilmanic Redistricting Conflicts: The Dallas Experience," Urban News 6 (Fall 1992), 1, 4-8.

"The Single Transferable Vote: An Alternative Remedy for Minority Vote Dilution," University of San Francisco Law Review 27 (Summer, 1993), 781-813. Excerpt reprinted in Voting and Democracy Report, 1993 (Washington, D.C.: Center for Voting and Democracy, 1993).

"'Enhancing' Factors in At-Large Plurality and Majority Systems:  A Reconsideration," Electoral Studies 12 (December 1993), 385-401 (with Michael D. McDonald).

"Louisiana," in Chandler Davidson and Bernard Grofman (eds.), The Quiet Revolution: Minority Voting Rights and Representation in the South (Princeton: Princeton University Press, 1994), pp. 103-135, 413-417 (with Stanley A. Halpin, Jean A. Hill, and Victoria M. Caridas-Butterworth).

"The Voting Rights Act: Disfranchisement, Dilution, and Alternative Election Systems," PS: Political Science and Politics 27 (December 1994), 685-688.

"The 1994 New Orleans Mayoral Election: Racial Divisions Continue," Urban News 9 (Spring 1995), 6-9 (with Willie D. Kirkland).

16

**111**

"Shaw v. Reno and New Election Systems: The Cumulative Voting Alternative," <u>Voting Rights Review</u> (Spring 1995), 10, 12 (with Jason F. Kirksey and Edward Still) [excerpt reprinted in <u>Voting and Democracy Report, 1995</u> (Washington, D.C.: Center for Voting and Democracy, 1995), 67-68].

"Voting Rights Districts: Debunking the Myths," <u>Campaigns and Elections</u> (April 1995), 24, 46.

"<u>Shaw</u>, <u>Miller</u>, and the Districting Thicket," <u>National Civic Review</u>, 84 (Fall-Winter 1995), 323-336. Reprinted as "The Supreme Court on Redistricting" in Roger L. Kemp, (ed.), <u>Local Government Election Practices: A Handbook for Public Officials and Citizens</u> (Jefferson, N.C.: McFarland & Co., Inc., 1999), 80-92.

"Local Redistricting Under the Voting Rights Act," <u>Communities and the Voting Rights Act: A Guide to Compliance in These Changing Times</u> (Denver: National Civic League, Inc., 1996), 69-82.

"One Person, Seven Votes: The Cumulative Voting Experience in Chilton County, Alabama," in Anthony Peacock, (ed.), <u>Affirmative Action and Representation: Shaw v. Reno and the Future of Voting Rights</u> (Durham, N.C.: Carolina Academic Press, 1997), pp. 285-313 (with Jason Kirksey and Edward Still).

"Limited and Cumulative Voting in Alabama: An Assessment After Two Rounds of Elections," <u>National Political Science Review,</u> Vol. 6 <u>Race and Representation</u> (New Brunswick: Transaction Publishers, 1997), 180-191 (with Jason F. Kirksey and Ed Still).

"Cumulative Voting and Latino Representation: Exit Surveys in Fifteen Texas Communities," <u>Social Science Quarterly</u> 78 (December 1997), 973-991 (with Robert R. Brischetto).

"Is Cumulative Voting Too Complex? Evidence from Exit Polls," <u>Stetson Law Review</u> 27 (Winter 1998), 813-833 (with Robert R. Brischetto).

"Affirmative Action and the Politics of Race," in Gillian Peele, Christopher J. Bailey, Bruce Cain, and B. Guy Peters, (eds.), <u>Developments in American Politics 3</u> (London: MacMillan Press Ltd. and New York: Chatham House Publishers, 1998), pp. 292-306.

"Race and Representational Districting in Louisiana," in Bernard Grofman, (ed.), <u>Race and Redistricting in the 1990s</u> (New York: Agathon Press, 1998), pp. 229-268 (with Jason F. Kirksey).

"Minority Electoral Opportunities and Alternative Election Systems in the United States," in Mark Rush, (ed.), <u>Voting Rights and Redistricting in the United States</u> (New York: Greenwood Publishing, 1998), pp. 227-243.

"Electoral Arrangements and Minority Political Incorporation," in Richard Kaiser and Katherine Underwood, (eds.), <u>Minority Politics at the Millennium</u> (New York: Garland Publishing, Inc., 2000), pp. 19-50.

"Louisiana," in Dale Krane, Platon R. Rigos, and Melvin Hill, (eds.), <u>Home Rule in America: A Fifty-State Handbook</u> (Washington, D.C.: Congressional Quarterly Press, 2001), 173-182 (with Robert K. Whelan).

BOOK REVIEWS

Review of John Wilson Lewis (ed.), THE CITY IN COMMUNIST CHINA, in <u>Journal of Politics</u>, 34 (February 1972), 310-311.

Review of Arthur I. Blaustein and Geoffrey Faux, THE STAR-SPANGLED HUSTLE: WHITE POWER AND BLACK CAPITALISM in <u>Wall Street Review of Books</u>, 1 (June 1973), 215-229.

Review of Carroll Smith Rosenberg, RELIGION AND THE RISE OF THE AMERICAN CITY: THE NEW YORK CITY MISSION MOVEMENT, 1812-1870, in <u>Christian Scholar's Review</u>, Vol. 4, No. 1 (1974), 73-75.

Review of Robert Higgs, COMPETITION AND COERCION, BLACKS IN THE AMERICAN ECONOMY, 1865-1914, in <u>Wall Street Review of Books</u>, 6 (Spring 1978), 117-119.

Review of Herbert E. Alexander, MONEY IN POLITICS, and Herbert E. Alexander, FINANCING POLITICS: MONEY, ELECTIONS, AND POLITICAL REFORM, in <u>Wall Street Review of Books</u>, 6 (Summer 1978), 209-211.

Review of James M. Buchanan and Richard E. Wagner, DEMOCRACY IN DEFICIT: THE POLITICAL LEGACY OF LORD KEYNES, in <u>Wall Street Review of Books</u>, 6 (Fall 1978), 319-320.

Review of American Enterprise Institute for Public Policy Research, ZERO-BASE BUDGETING AND SUNSET LEGISLATION, in <u>Wall Street Review of Books</u>, 7 (Winter 1979), 53-55.

Review of David Rogers, CAN BUSINESS MANAGEMENT SAVE THE CITIES? THE CASE OF NEW YORK, in <u>Wall Street Review of Books</u>, 7 (Spring 1979), 75-77.

Review of Kevin R. Cox and R. J. Johnston (eds.), CONFLICT, POLITICS AND THE URBAN SCENE, in <u>American Political Science Review</u>, 78 (June 1984), 531-532.

Review of Manuel Carballo and Mary Jo Bane (eds.), THE STATE AND THE POOR IN THE 1980s, in <u>American Political Science Review</u>, 79 (June 1985), 523-524.

18

Review of Terry Sanford, A DANGER TO DEMOCRACY: THE PRESIDENTIAL NOMINATING PROCESS, in Presidential Studies Quarterly, 16 (Winter 1986), 153-155.

Review of Charles W. Whalen, Jr., THE HOUSE AND FOREIGN POLICY: THE IRONY OF CONGRESSIONAL REFORM, in Presidential Studies Quarterly, 16 (Spring 1986), 369-371.

Review of Arend Lijphart and Bernard Grofman (eds.), CHOOSING AN ELECTORAL SYSTEM: ISSUES AND ALTERNATIVES, in Irish Political Studies, 1 (1986), 125-127.

Review of David McKay, AMERICAN POLITICS AND SOCIETY, in Presidential Studies Quarterly, 17 (Fall 1987), 784-785.

Review of Sheila D. Collins, THE RAINBOW CHALLENGE: THE JACKSON CAMPAIGN AND THE FUTURE OF AMERICAN POLITICS, in Presidential Studies Quarterly, 19 (Fall 1988), 874-875.

Review of Abigail M. Thernstrom, WHOSE VOTES COUNT? AFFIRMATIVE ACTION AND MINORITY VOTING RIGHTS, in Policy Studies Review 8 (Autumn 1988), 191-194.

Review of Herbert H. Haines, BLACK RADICALS AND THE CIVIL RIGHTS MAINSTREAM, 1954-1970, in Journal of Southern History, 56 (February 1990): 155-157.

Review of Harlan Hahn and Sheldon Kamienieki, PREFERENDUM VOTING: SOCIAL STATUS AND POLICY PREFERENCES, in Presidential Studies Quarterly 20 (Fall 1990): 828-830.

Review of Michael Gallagher and Michael Marsh (eds.), CANDIDATE SELECTION IN COMPARATIVE PERSPECTIVE: THE SECRET GARDEN OF POLITICS, in Presidential Studies Quarterly 21 (Winter 1991): 167- 168.

Review of Thomas Cronin, DIRECT DEMOCRACY: THE POLITICS OF INITIATIVE, REFERENDUM, AND RECALL, in Presidential Studies Quarterly, 22 (Fall 1992): 786-788.

Review of F. Leslie Seidle, (ed.), COMPARATIVE ISSUES IN PARTY AND ELECTION FINANCE, in British Journal of Canadian Studies, (1993).

Review of John Dittmer, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI, in Annals of the American Academy of Political and Social Science, 540 (July 1995): 170-171.

Review of Michael J. Glennon, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION, in National Political Science Review, 6 (1997): 323-325.

Review of George E. Reedy, FROM THE WARD TO THE WHITE HOUSE: THE IRISH IN AMERICAN POLITICS, in Presidential Studies Quarterly, forthcoming.

Review of Frederick M. Wirt, "WE AIN'T WHAT WE WAS": CIVIL RIGHTS IN THE NEW SOUTH, in American Political Science Review, 92 (June 1998): 474-475.

Review of David T. Canon, RACE, REDISTRICTING, AND REPRESENTATION: THE UNINTENDED CONSEQUENCES OF BLACK MAJORITY DISTRICTS, in The Law and Politics Book Review, 9 (October 1999): 467-471.

Review of Christopher M. Burke, THE APPEARANCE OF EQUALITY: RACIAL GERRYMANDERING, REDISTRICTING, AND THE SUPREME COURT, in The Law and Politics Book Review, 9 (November 1999): 506-508.

Review of J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION, in Journal of Politics, 62 (August 2000): 934-937.

Review of Shaun Bowler and Bernard Grofman, (eds.), ELECTIONS IN AUSTRALIA, IRELAND, AND MALTA UNDER THE SINGLE TRANSFERABLE VOTE: REFLECTIONS ON AN EMBEDDED INSTITUTION, in American Political Science Review, forthcoming (December 2001).

Review of Kathleen L. Barber, A RIGHT TO REPRESENTATION: PROPORTIONAL ELECTION SYSTEMS FOR THE TWENTIETH-FIRST CENTURY, in Representation, forthcoming.

20

**115**

**Expert Report**
by
Joseph L. Katz, Ph.D.

Case:     Johnson v. Bush
          No. 00-CV-3542
          U.S. District Court
          Southern District of Florida

## I.    INTRODUCTION AND PROFESSIONAL QUALIFICATIONS

### A.    Overview

Cooper & Kirk, PLLC have retained me as an expert consultant in Johnson v. Bush. I am being compensated at the rate of $200 per hour. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). I have been asked by Cooper & Kirk to evaluate the accuracy and reliability of the findings described by Dr. Theodore Chiricos in his Expert Report that was filed in this case.

I have reviewed Dr. Chiricos' research methodology and I have examined both the data on which Dr. Chiricos relied and other relevant data. My principal findings and a detailed discussion of my work are set forth below.

### B.    Professional Qualifications

I am a statistician and faculty member in the College of Business Administration at Georgia State University. I teach courses in statistics at all levels: undergraduate, graduate, and doctorate. I have a B.S. in Mathematics, a B.S. in Computer Science, an M.S. in Mathematics and a Ph.D. in Quantitative Methods, all from Louisiana State University.  The following is a brief summary of my experience that highlights my work on the issue of racial bias in sentencing.

1

I have testified five times as a statistical expert witness in Federal Court and three times in Georgia Superior Court. I have testified in court as an expert witness in three cases that dealt with the issue of racial bias in sentencing. In 1983, I testified in U.S. District Court for the Northern District of Georgia in the case <u>McCleskey v. Zant</u>, later renamed <u>McCleskey v. Kemp</u>. I examined a statistical study that alleged that the Georgia capital sentencing system was racially biased. I testified at the evidentiary hearing concerning the reliability of the study. In 1990, I testified for the State of Georgia in a pre-trial hearing to the death penalty trial for William Anthony Brooks that was held in Georgia Superior Court. Mr. Brooks contended, based upon a statistical study, that the charging and sentencing practices of the Chattahoochee Judicial Circuit in Georgia were racially biased. I testified concerning the reliability of the study and the limitation of statistics to infer racial bias. In 1994, I testified in Georgia Superior Court in the case <u>Stephens v. State</u>.  The issue was whether prosecutors in Georgia's Northeastern Judicial Circuit are racially biased in seeking mandatory life sentences against offenders convicted of a second or subsequent offense for the sale, or possession with intent to sell, Schedule I controlled substances or Schedule II narcotics. I testified as to the limited value of aggregate racial sentencing percentages to infer racial bias in prosecutorial decisions.

I have also testified before legislative bodies concerning the limitation of statistics to infer racial bias in capital sentencing. In 1989, I testified before the United States Senate Committee on the Judiciary to oppose an early version of the "Racial Justice Act." I testified regarding the limitation of statistics to determine racial bias in capital cases. In 2000, I testified before the Florida Capital Cases Task Force regarding the use of statistics to infer racial bias in capital sentencing.

I have not testified as an expert witness at trial or by deposition in the last four years.

2

**117**

I have attached my curriculum vitae, which provides a more detailed description of my background and experience in statistics and in the analysis of large databases.

## II.   MY PRINCIPAL FINDINGS

Dr. Chiricos' principal finding is that blacks are disproportionately represented among those convicted of felony crimes in Florida. This conclusion is based on his study of Florida offenders that purportedly compares the racial pattern of felony arrests in 1998 to felony convictions in 1998, both overall and subdivided into nine offense crime types.

After a careful examination of Dr. Chiricos' report, and after conducting my own analysis of additional data sets, I have reached the following major conclusions:

1.     Although Dr. Chiricos claims to compare felony arrests to felony convictions, Dr. Chiricos included individuals in his population of arrests who are not properly characterized as felony arrests. The 1998 arrest data used by Dr. Chiricos includes misdemeanor arrests and arrests whose charge level is unknown. Dr. Chiricos' unexplained racial disproportionality is substantially diminished after limiting the arrest population to felony arrests.

2.     Dr. Chiricos also omitted individuals from his population of convicted felons who must be included if his population is to represent all convictions and all criminal punishments imposed on felons. Specifically, Dr. Chiricos did not include in his study offenders who were convicted and sentenced on a felony charge but had adjudication withheld. These offenders represent a possible sentencing outcome for a felony charge that is a common form of punishment imposed by Florida's judges. Of the 36,972 black and white offenders who were sentenced to supervision on a felony charge with adjudication withheld and began their sentence in 1998, 65.7% (24,287/36,972) are white.

3

**118**

3.      I recalculated the racial disproportionality after (a) limiting Dr. Chiricos' 1998 arrest population to felony arrests and (b) adding to Dr. Chiricos' 1998 population of convicted felons those offenders, who were sentenced on a felony charge with adjudication withheld. Using these populations, the overall unexplained racial disproportionality against black offenders reported by Dr. Chiricos disappears entirely and becomes a small disproportionality against white offenders.

4.      Using the total sentence scores derived from the sentencing guideline data as a proxy for the severity of a case, I compared the population of white offenders who were sentenced to supervision on a felony charge with adjudication withheld to the similarly sentenced population of black offenders. Based on this comparison, there is no evidence of any unexplained racial disproportionality against black offenders in the administration of the adjudication withheld disposition.

5.      Thus, the "unexplained racial disproportionality" alleged in Dr. Chiricos' report is explained by the fact that Dr. Chiricos did not limit the arrest population to felony arrests and did not include in his convicted felon population those offenders who were sentenced on a felony charge with adjudication withheld.

## III.      EVALUATION OF DR. CHIRICOS' RESEARCH METHODOLOGY

### A.      The Problem of Interpretation of Racial Disproportionalities

It is extremely difficult to prove either the existence or the non-existence of system-wide racial discrimination in Florida's charging and sentencing system using statistics alone.  Indeed, Dr. Chiricos did not state his conclusions in terms of racial discrimination, but describes his findings in terms of unexplained racial disproportionality. This term is more appropriate because Dr. Chiricos does not analyze the extent to which legitimate, non-race-based factors, might account for racial differences in the conviction rates of certain offenses.  The gravity of an

4

119

offense, the strength of the evidence, a suspect's prior record, the number of different offenses with which a suspect is charged, and many other factors are not controlled for in Dr. Chiricos' analysis.[1] Admittedly, it is not easy to obtain the detailed data on every person arrested to attempt to control for all of these factors, but the failure to control for them undermines the interpretation of a statistical disparity as racial bias.

Because the broad general comparison between black and white conviction rates does not consider legitimate crime related factors that affect the likelihood that a person arrested on a felony charge is convicted, statistically significant differences in conviction rates by race do not by themselves demonstrate either the presence or absence of racial bias in the Florida criminal justice system. Indeed, for any given set of conviction rates for white and black offenders, there are three possible realities: (a) the system may be biased against whites, (b) the system may be fair, or (c) the system may be biased against blacks. For example, suppose that 60% of whites arrested on a felony charge are convicted of a felony compared to 50% of blacks. If the population of white and blacks arrested is perfectly homogeneous in terms of all of the numerous legitimate crime factors that affect the likelihood of conviction, then the system is biased against whites. If the population of whites arrested tend to commit somewhat more aggravated crimes with somewhat stronger evidence supporting their guilt than the population of blacks arrested,

---

[1] The Florida Department of Corrections conducted a study of all felony offenders (221,351), who were sentenced under the 1994 or 1995 sentencing guidelines from July 1, 1994 to December 31, 1996, to determine if sentencing is neutral with respect to race. One of the findings of the study was that "black offenders consistently exhibited higher rates of characteristics generally associated with judicial decisions toward more punitive sanctions." The report showed that, compared to white offenders, black offenders had a higher average overall sentencing points, a higher average primary offense points, more serious prior records, and were more likely to have violated conditions of supervision. "The Impact of the 1994 and 1995 Structured Sentencing Policies in Florida," Sentencing Guidelines 1996-97 Annual Report, prepared by the Florida Department of Corrections for The Florida Sentencing Commission, Harry K. Singletary, Jr., Secretary, July 1998, pages 36-38.

5

then the system may be fair and the 10% disparity in conviction rates may reflect the differences between the white and black cases. Finally, if the population of whites arrested tend to commit much more serious outrageous crimes with more extensive irrefutable evidence supporting their guilt than the population of blacks arrested, then the system may be unfair to blacks because the 10% disparity in conviction rates would understate the differences in the severity of the cases. By similar reasoning, it follows that equal conviction rates for black and white offenders would not prove that Florida's charging and sentencing system is necessarily fair.

**B.    Evaluation of Dr. Chiricos' Basic Research Design**

Dr. Chiricos employs a basic research model that compares the racial pattern of felony arrests in 1998 to felony convictions in 1998. There are several problems with this basic design.

First, Dr. Chiricos excludes offenders who were sentenced on a felony charge but received a disposition of adjudication withheld. The disposition of adjudication withheld is a standard disposition for felony cases in the state of Florida.[2]  By statute, this disposition is generally available for first-time offenders who are charged with committing a non-violent offense.[3] It generally involves a sentence of probation or a community control program,[4] and therefore constitutes a standard form of criminal punishment. It represents the successful completion of a criminal prosecution, and therefore is one possible disposition after a criminal

---

[2]  "If it appears to the court upon a hearing of the matter that the defendant is not likely again to engage in a criminal course of conduct and that the ends of justice and the welfare of society do not require that the defendant presently suffer the penalty imposed by law, the court, in its discretion, may either adjudge the defendant to be guilty or stay and withhold the adjudication of guilt...." Fla. Stat. § 948.01(2).

[3]  The Florida statutes § 775.087(2)(b) and § 775.087(3)(b) provide that adjudication may not be withheld if a person is convicted of committing certain violent felony crimes with a firearm (e.g., murder, robbery, kidnapping, aggravated assault, aggravated battery, etc.). See generally Fla. Stat. § 775.087.

[4]  Fla. Stat. § 948.10(2).

6

121

conviction.[5]   Thus, an analysis that attempts to determine whether Florida's charging and sentencing system applies criminal penalties in a racially disproportionate way must include the population of individuals who receive a disposition of adjudication withheld.

Second, Dr. Chiricos calculates felony conviction rates using the number of felony *arrests* as his base population, rather than the number of people *charged* by prosecutors with a felony.[6] The prosecutor can reduce a felony arrest charge to a misdemeanor or dismiss the charge altogether, based upon additional information that is obtained after the arrest event. Furthermore, a misdemeanor arrest charge could be elevated to a felony charge.

Third, the study does not follow the same cohort of individuals from arrest to conviction. Not all offenders who were convicted on a felony charge in 1998 were arrested in 1998, and some offenders, who were arrested in 1998, were convicted in 1999 or later. Furthermore, the same person could be arrested or sentenced more than once in 1998.

**C.    Dr. Chiricos' Measures of Racial Disproportionality**

Dr. Chiricos defines and considers four measures that purport to indicate the degree of racial disproportionality in conviction rates.

The first measure, attributed by Dr. Chiricos to Christianson, compares the proportion of blacks convicted of a felony to the proportion of the population in Florida that is black.[7] Dr. Chiricos concedes that this measure is "probably the weakest because it fails to take even a proxy for criminal involvement into account."[8]  This measure does not control for differential levels of

---

[5] Chapter 921 (Sentence) of the Florida Statutes defines a "conviction" as "a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld." Fla. Stat. § 921.0011(2), and § 921.0021(2).

[6] This problem with Dr. Chiricos' research design is independent from the problem with Dr. Chiricos' felony arrest data – i.e., that his data set for felony arrests incorrectly includes non-felonious arrests.

[7] See Dr. Chiricos report, Table 1.

[8] Dr. Chiricos Report, page 6.

criminal activity by race, nor does the measure account for the socioeconomic and demographic diversity between Florida's white and black population. For example, Florida's white population is older and therefore less likely to engage in criminal activity. In 1998, 20.57% of white Floridians were 65 or older compared to 7.11% of Florida's black population.[9] Thus, especially in light of the fact that Dr. Chiricos effectively concedes that this first measure is "weak" and uses it only in Table 1 of his report, this measure will be disregarded as irrelevant to the analysis.

To examine whether there is any unexplained racial disproportionality in criminal conviction rates, Dr. Chiricos defines three other measures of racial disproportionality, which he attributes to Blumstein, Langan, and Crutchfield, et al.[10] Two of these measures, the Langan and Crutchfield measures, are algebraically equivalent,[11] while the third, Blumstein, uses a different algebraic construct that is slightly different. The Crutchfield measure is Dr. Chiricos' principal measure of racial disproportionality,[12] and is the measure that produces the largest overall amount of unexplained racial disproportionality at +35.[13]

The Crutchfield measure is biased. It will always show a larger disproportionality when blacks are convicted at a higher rate than whites than it would if the reverse were true. To illustrate the bias of this measure, consider the following example.[14] Suppose that the conviction rate for blacks is 40% and the conviction rate for whites is 20%. In this case, the Crutchfield measure is +100%. Now, consider the impact of switching the black and white conviction rates.

[9] See Table 1.30, page 18. Florida Statistical Abstract 1999, Bureau of Economic and Business Research, Warrington College of Business Administration, University of Florida.
[10] See Dr. Chiricos' report, pages 5-6.
[11] The derivation of the equivalence between the Langan and Crutchfield measures is provided in Appendix A.
[12] The Crutchfield measure is used in Tables 4, 5, 6, 7, 8, 9, 10, 11, and 12.
[13] Dr. Chiricos' Report, Table 4. Although Dr. Chiricos reports the overall value for the Langan measure at +36% in Table 3, the Langan measure is equal to the Crutchfield measure.
[14] The calculations of the Crutchfield measures for this example are provided in Appendix B.

Suppose that the conviction rate for whites is 40% and the conviction rate for blacks is 20%. Under these conditions, the Crutchfield measure is only –50%. Generally, if the black conviction rate exceeds the white conviction rate, then the Crutchfield measure will be a number between 0% and plus infinity. However, if the black conviction rate is lower than the white conviction rate, then the Crutchfield measure is limited to the range of 0% to –100%.

Thus, when Dr. Chiricos concludes in Table 4 of his report that, based on the Crutchfield method, the overall unexplained racial disproportionality in Florida for all crimes types is +35%, he is using a formula that, if the identical white and black numbers were swapped, would show an unexplained racial disproportionality of –26%.[15]

The Blumstein measure is also biased but it shows a lower disproportionality when blacks are convicted at a higher rate than whites.[16]

## D.    The Percent Difference Measure of Racial Disproportionality

In order to present an unbiased measure, I will report the percent difference between black and white conviction rates.[17] For example, suppose that the conviction rate is 40% for blacks and 45% for whites. Then the difference between the black and white conviction rates is – 5% (40% - 45%). On the other hand, if 45% of blacks and 40% of whites are convicted, then the difference is +5% (45% - 40%).   Accordingly, this measure is straightforward, easy to understand, and most importantly reflects no inherent bias. The percentage difference is the same

---

[15] The overall Crutchfield measure of -26% is calculated by switching the white arrests with black arrests and white convictions with black convictions in the formula (Appendix B). Using the data from Table 4 of Dr. Chiricos' report, the calculation is equivalent to [(Arrest98/Conviction98) - 1] x 100% = [(4.3/5.8) - 1] x 100% = -25.86%.

[16] An example that demonstrates the bias of the Blumstein measure is provided in Appendix C.

[17] This "percent difference" measure is simply intended to provide a simple and unbiased measure. Obviously, while other unbiased measures could also be used, in this report it is not necessary to employ any more sophisticated measures. The ultimate purpose of the report is simply to analyze Dr. Chiricos' conclusions, and the ultimate finding of the report is that the

9

whether it is blacks being convicted at a higher rate than whites, or vice versa. Applying the percentage difference measure to the same overall arrest and conviction numbers from Table 2 of Dr. Chiricos' report, blacks have a 5.90% higher conviction rate.[18]

Table 1 of my report lists all of the percentage difference disparities that would be found by completely accepting Dr. Chiricos' arrest and conviction data that are found on Table 2 of his report. Table 1 shows that, using Dr. Chiricos' data, blacks are convicted at a higher rate for Robbery (black = 35.67%, white = 33.54%), Other Violent Offenses (black = 8.67%, white = 6.81%), Burglary (black = 22.98%, white = 20.83%), Theft (black = 20.05%, white = 17.52%), Drug Offenses (black = 34.32%, white = 20.97%), and Weapon Offenses (black = 48.35%, white = 28.90%), and that whites are convicted at a higher rate for Murder (white = 55.08%, black = 42.83%), Sex Offenses (white = 38.99%, black = 38.63%), and Other Offenses (white = 21.67%, black = 20.32%).

## IV.    THE 1998 FLORIDA ARREST DATA FILE

Dr. Chiricos purports to compare 1998 felony arrests with 1998 felony convictions in order to determine any unexplained racial disparity. Indeed, he explicitly claims that the arrest population for his study is 1998 felony arrests.[19] After reviewing the data that Dr. Chiricos relied upon, I found that the 1998 arrest data set is not, in fact, limited to felony arrests, but includes misdemeanor arrests and arrests whose charge level is unknown.

---

correct use of felony arrests and adjudication withheld dispositions yields no unexplained disproportionality against blacks.

[18] The black conviction rate is 22.23% (40,620/182,734) and the white conviction rate is 16.33% (42,487/260,158). The percent difference is 22.23% - 16.33% = 5.90%.

[19] Dr. Chiricos' report states, on page 4, that "Felony arrest data were provided by the Florida Department of Law Enforcement."

10

## A.    The CCH Database

Dr. Chiricos obtained "primary arrests" data from the Florida Department of Law Enforcement (FDLE), an agency that is charged with maintaining the Computerized Criminal History File (CCH), a database that records arrests by state and local law enforcement agencies in Florida.[20] The CCH database is periodically updated and arrest records can be added, modified, or deleted as additional information is collected and entered into the system over time.

The CCH database records each arrest event and stores numerous pieces of information pertaining to the individual arrested and the specific offenses that were charged at the time of the arrest. Every arrest offense is identified by a four-digit numeric code.[21] Generally, the lower the offense code, the more aggravated the offense. If a person is arrested and charged with multiple offenses, the CCH database would contain multiple records, one for each offense.  An arrest record is designated a "primary arrest" if the four-digit arrest offense code is the lowest for all offenses charged to the person for the arrest event.[22]

## B.    The 1998 Primary Arrest File Used By Dr. Chiricos

Dr. Chiricos claims that the arrest population for his study is 1998 felony arrests.[23] The Computerized Criminal History database has an arrest charge level variable that identifies the arrest charge for each offense as a misdemeanor charge, a felony charge, or an unknown charge.

---

[20] Ms. Sue Burton of the Florida Statistical Analysis Center for the Florida Department of Law Enforcement, and her Associates, Debra Livingston and Keith Vossburg, provided me with background information regarding the CCH database.

[21] For example, the four-digit arrest offense code 0900 refers to "homicide," and 1000 to "kidnap." The four-digit arrest offense codes follow the standard adopted by the National Crime Information Center (NCIC) and are not specific to Florida.

[22] For example, if a person is arrested and charged with a homicide (offense code 0900) and kidnapping (offense code 1000), two arrest records would be generated, one for each charge. The arrest record with the homicide charge would be designated as the primary arrest.

[23] Dr. Chiricos' report, page 4, "Felony arrest data were provide by the Florida Department of Law Enforcement."

11

Of the 442,892[24] primary arrests relied upon by Dr. Chiricos, only 225,729 are identified as felony arrests. Whites comprise 53.7% (121,187/225,729) of the felony arrests, [25] which is 5% less than their 58.7% (260,158/442,892) percentage representation in the larger population of primary arrests. Moreover, I found that 40.4% (42,180/104,542) of blacks arrested on a felony charge had one or more prior felony convictions compared to 23.2% (28,162/121,187) of whites.

## C. Recalculation of Disproportionality Measures Using Primary Arrests With Felony Charge Level

Limiting the 1998 primary arrest population to felony arrests by excluding misdemeanor and unknown charge level arrests makes a sizeable difference in the results of the analysis of racial disparities. Indeed, using the corrected felony arrest data explains away more than two-thirds of the "unexplained" racial disproportionality alleged by Dr. Chiricos in his report. I have recalculated the Blumstein and Crutchfield racial disproportionality measures,[26] and present the results in Tables 2 and 3, respectively. The Blumstein measure of unexplained racial disproportionality for all crime types drops from the +25% in Dr. Chiricos' report to +8.00%. The Crutchfield measure shows a greater reduction from +35% to +10.83%.

In Table 4, I calculate the percent difference in conviction rates by race. Overall, the difference in conviction rates between blacks and whites drops from 5.90% (Table 1) to 3.80% (black = 38.86%, white = 35.06%). However, these conviction rates are not uniform among the nine crime groups. Whites are convicted at a higher rate in four of the offense categories, Murder (white = 56.30%, black = 44.00%), Sex Offenses (white = 51.83%, black = 45.26%), Other Violent Offenses (white = 21.58%, black = 20.52%), and Other Offenses (white = 148.76%, black = 122.60%), and blacks are convicted at a higher rate in five categories, Robbery (black =

---

[24] The 442,892 primary arrests include arrestees who are identified as either white or black.
[25] Of the total of 442,892 whites and blacks arrested, 147,658 were misdemeanor arrests. Whites comprised 64.5% of the misdemeanor arrests (95,253/147,658).

37.56%, white = 34.74%), Burglary (black = 35.63%, white = 30.66%), Theft (black = 36.53%, white = 32.50%), Drug Offenses (black = 44.73%, white = 36.60%), and Weapon Offenses (black = 80.72%, white = 53.83%).

Table 4 reveals some obvious inconsistencies in the data. The Other Offense category shows that 148.76% of white offenders and 122.60% of black offenders arrested were convicted of a felony. There are several reasons for these impossible results, which are a direct consequence of defects in the research design that Dr. Chiricos employed for his study. These defects also affect the reliability of the racial comparisons in the nine offense groups. First, the study does not track the same cohort of individuals from arrest to conviction. Second, an offender who is arrested on several different felony offenses could be convicted for a lesser felony offense that is in a different offense category than the primary arrest offense. Third, there are a large number of primary arrests that were classified into one of the nine offense categories but which had an unknown charge level. Some of these arrests could be felony arrests. Fourth, since the date on which Dr. Chiricos' data was extracted, the total number of primary arrest records contained in CCH has increased due to the fact that the CCH database is periodically updated.

Two of the nine crime type categories in which blacks have a higher conviction rate than whites are Theft (black = 36.53%, white = 32.50%) and Drug Offenses (black = 44.73%, white = 36.60%). Together, these two offense groups account for 52.35% (118,158/225,729) of all felony arrests. Because theft and drug crimes are typically non-violent minor felony offenses, many offenders are sentenced to supervision, such as probation or community control, with adjudication withheld. In the next section, I revise Dr. Chiricos' analysis to include offenders sentenced on a felony charge with adjudication withheld.

---

[26] See Tables 2 and 4 of Dr. Chiricos' Report.

1

## V.   ANALYSIS THAT INCLUDES OFFENDERS SENTENCED ON A FELONY CHARGE BUT WITH ADJUDICATION WITHHELD

### A.   Data Files From The Florida Department of Corrections

The Florida Department of Corrections provided me with computer files for felony offenders who were sentenced to county jail in 1998 or who were sentenced to state prison or supervision and began their sentence in calendar year 1998.[27] The four files[28] contain records for offenders divided up by four types of sentences: state prison, county jail, supervision with adjudication applied, and supervision with adjudication withheld.

Because the Offender Based Information System is regularly updated and corrected, the number of offenders in each sentence category can change over time. Table 5 compares the number of offenders, by race and sentence type, from the four computer files with the number of offenders that Dr. Chiricos used for his study. There is only a slight discrepancy in the number of offenders sentenced to state prison. However, I obtained a higher number of offenders sentenced to county jail because Dr. Chiricos reduced his county jail population to eliminate those cases which he believed had adjudication withheld.[29] I identified a higher number of offenders sentenced to supervision with adjudication applied, because Dr. Chiricos used an incorrect count.[30] Finally, Dr. Chiricos omitted from his study 24,291 white and 12,687 black felony

---

[27] Dr. Chiricos identifies his population of convicted offenders as offenders with a felony conviction in 1998 (Dr. Chiricos Report, page 4). Dr. William D. Bales is Bureau Chief for the Bureau of Research and Data Analysis for the Florida Department of Corrections. He oversaw the creation of the files that the Department of Corrections provided to Dr. Chiricos. Dr. Bales informed me that, for offenders sentenced to state prison or supervision, the population was in fact offenders with a felony conviction who began their sentence in 1998.

[28] The files contain information such as the offender's race, primary offense, prior felony convictions, date of birth, Department of Corrections number, county of conviction, and date of primary offense.

[29] The county jail computer file is somewhat incomplete because not all county jail admissions are reported to the Department of Corrections.

[30] According to Ms. Stacey Anderson, Community Supervision Section Manager at the Bureau of Research and Data Analysis under Dr. Bales, she had initially provided Dr. Chiricos with a

14

offenders who were sentenced to supervision with adjudication withheld. All told, Dr. Chiricos excluded approximately 37,000 who were sentenced to supervision with adjudication withheld, 4,800 who were sentenced to supervision with adjudication applied, and 4,000 who were sentenced to county jails.

**B.     Recalculation of Disproportionality Measures Including Felony Offenders With Adjudication Withheld**

The inclusion of offenders with adjudication withheld into the analysis causes the unexplained racial disproportionality against blacks to disappear entirely. In Tables 6 and 7, I revise the Crutchfield and the Percent Difference measures that were obtained in Tables 3 and 4 to include felony offenders with adjudication withheld. According to Table 6, the Crutchfield measure of racial disproportionality is –5.13% for all crime types combined. This means that, even using Dr. Chiricos' principal measure of racial disproportionality, the result is a finding that an unexplained racial disparity exists whereby *white* offenders are punished disproportionately more frequently than black offenders.

Likewise, the percent difference measure in Table 7 shows that overall there is a 3.00% higher percentage of white offenders (58.50%) who began their sentence in 1998 compared to black offenders (55.50%). Whites are sentenced at a higher rate for Murder (white = 57.86%, black = 45.74%), Sex Offenses (white = 60.38%, black = 53.21%), Other Violent Offenses (white = 36.33%, black = 29.71%), Drug Offenses (white = 72.36%, black = 64.71%) and Other Offense (white = 222.14%, black = 182.37%). Blacks are sentenced at a higher rate for Robbery

---

spreadsheet containing the number of supervision cases with adjudication applied. Later, Ms. Anderson found an error with her computer program. She corrected her mistake, reran the program and provided the updated corrected results to Dr. Chiricos. Dr. Chiricos declined to use them in his report.

15

**130**

(black = 43.41%, white = 42.86%), Burglary (black = 45.16%, white = 44.60%), Theft (black = 57.33%, white = 56.72%), and Weapon Offenses (black = 116.36%, white = 88.69%).

The Drug Offense and Theft categories have been dramatically affected by the inclusion of felony offenders with adjudication withheld. Without them, blacks were sentenced at a higher rate for Drug Offenses (black = 44.73%, white = 36.60%) and Theft (black = 36.53%, white = 32.50%). Including these cases, whites are sentenced at a higher rate than blacks for Drug Offenses (white = 72.36%, black = 64.71%) and at a slightly lower rate for Theft Offenses (white = 56.72%, black = 57.33%).

## VI.     RACIAL COMPARISON OF SENTENCING GUIDELINE SCORES FOR OFFENDERS SENTENCED TO SUPERVISION

### A.     Guideline Score Data Files For Supervision Cases

White offenders who were sentenced to supervision received the disposition of adjudication withheld at a higher rate than black offenders.  It is for precisely this reason that when the population of felony cases with adjudication withheld is added to Dr. Chiricos' analysis, his unexplained racial disparity disappears. The obvious question triggered by the racial disparity in the adjudication withheld population, however, is whether there is an explanation for why more whites received adjudication withheld than blacks.

To examine the reasons behind this disparity, I obtained two more computer files from the Florida Department of Corrections that contain sentencing guideline score data for the felony offenders in the study who were sentenced to supervision. One computer file contains the guideline score data for offenders with adjudication applied, and the second computer file contains the data for offenders with adjudication withheld.[31] The guideline score data are

---

[31] The files contain an offender's Department of Corrections number, date sentence began, total points (no 15% enhancement), primary offense points, additional offense total points, victim injury total points, prior record total points, legal status violation points, release program

16

incomplete because the compliance rate for submitting the score sheets to the Department of Corrections is less than 100%. Table 8 indicates that 67.28% of offenders with adjudication applied and 77.29% of offenders with adjudication withheld have guideline scores. Although my analysis is limited to a comparison of cases where the guideline scores are present, I have no reason to suspect that these cases are unrepresentative of their larger populations.

**B.      Analysis of Guideline Scores**

In Florida, offenders are sentenced according to the guideline score. The score or total sentence points is equal to the sum of the points accumulated over the specific guideline categories (e.g., primary offense, victim injury, and prior record), and serve as a proxy for the severity of the case. Over time, the Florida Legislature has modified the sentencing guideline score formula. Consequently, the total sentence points assigned to an offender can vary depending upon the sentencing guideline formula that was in effect on the date the primary offense was committed.

Table 8 classifies offenders sentenced to supervision according to the sentencing guideline formula that was in effect on the date that their primary offense was committed. The 1995 sentencing guidelines were applied to 93.7% (24,670/26,335) of offenders with adjudication applied and to 95.8% (27,362/28,569) of offenders with adjudication withheld.[32] Consequently, my analysis will focus on these offenders because they represent the bulk of all cases with guideline scores and they were scored using the same formula.[33]  The results of my analysis are displayed in Table 9, by race and disposition.

---

violation points, firearm or destructive device points, semi-automatic weapon points, most serious sanction points, and enhanced subtotal points.

[32] A copy of the 1995 Sentencing Guidelines Scoresheet is provided in Appendix D.

[33] The 1995 sentencing guidelines are the 1994 sentencing guidelines as amended by Chapter Law 95-184. The Florida Supreme Court ruled in <u>Curtis Leon Heggs v. State,</u> 759 So. 2d 620 (FLA 2000) that Chapter Law 95-184 violates the single subject rule contained in article III,

17

132

According to Table 9, white and black offenders have sentence scores that are comparable within the same disposition. White offenders, sentenced to supervision with adjudication applied, have a lower average of total sentence points (white = 37.29, black = 38.18), and a lower average number of prior record points (white = 6.37, black = 9.23). Offenders sentenced to supervision and had adjudication withheld, show a similar pattern by race. White offenders have a lower average number of total sentence points (white = 25.44, black = 26.78) and a lower average number of prior record points (white = 1.01, black = 1.45). Due to the fact that the total sentence points and prior record points distributions are not symmetric but skewed to the right,[34] I also report the median, 75th percentile, 90th percentile, 95th percentile, and 99th percentile scores. These results are also consistent with the conclusion that the population of white offenders is not worse than the population of black offenders within each disposition. For offenders sentenced to supervision with adjudication withheld, black offenders have a higher median score than white offenders (black = 22.2, white = 21.2), a higher 75th percentile score (black = 33.4, white = 31.2), a higher 90th percentile score (black = 46.8, white = 43.4), a higher 95th percentile score (black = 60.4, white = 60) and a higher 99th percentile score (black = 120,

---

section 6 of the Florida Constitution, and threw out chapter 95-184 in its entirety. Furthermore, the Court held that "only those persons adversely affected by the amendments made by Chapter Law 95-184 may rely on the decision here to obtain relief. Stated another way, in the guidelines context, we determine that if a person's sentence imposed under the 1995 Guidelines could have been imposed under the 1994 Guidelines (without a departure), then that person shall not be entitled to relief." Clearly, because the Florida Supreme Court decided Heggs in 2000, offenders who began their sentence in 1998 and committed their primary offense between October 1, 1995 and September 30, 1998, were sentenced to supervision under the 1995 guidelines. These sentences should not be reconsidered because supervision is a non state prison sanction under the guidelines.

[34] The total sentence points are "skewed to the right" because a number of offenders have a very high amount of total sentence points relative to the median (50th percentile). These high scores inflate the average as the usual measure of central tendency. For example, the average total sentence points for white offenders with the disposition of adjudication withheld is 25.44, which is higher than the median value of 21.2.

white = 111.2).[35] Accordingly, I conclude that the population of white offenders who were sentenced to supervision with adjudication withheld is not more culpable than the corresponding population of black offenders.[36]

Table 9 confirms that many of the black and white offenders who are sentenced to supervision with adjudication withheld are first time offenders or have minor prior records. More than half of these cases have no prior offense points at all. Black offenders averaged 1.45 prior offense points compared to 1.01 for white offenders. Furthermore, 95.95% of the black offenders and 95.98% of the white offenders have no legal status violation points, 95.56% of blacks and 95.54% of the whites have no community sanction violation points imposed, and 100% of whites and blacks have no prior serious felony points. In a separate analysis of all supervision cases with adjudication withheld, I found that 95.54% of whites and 93.73% of blacks had no prior felony conviction.[37]

Moreover, offenders sentenced to supervision with adjudication withheld tend to commit non-violent offenses. The data in Table 9 indicate that 93.45% of blacks and 93.83% of whites have no victim injury points, and 99.48% of blacks and 99.54% of whites have no enhancement points applied.

---

[35] For example, the 75th percentile for total sentence points is 33.4 for black offenders with adjudication withheld. This means that 75% of black offenders with adjudication withheld had 33.4 total sentence points or less.

[36] I performed the same analysis for all offenders with guideline scores who were sentenced to supervision, regardless of the sentencing guideline formula that was in effect for the case. Overall, the results are very similar to those reported in Table 9. For example, the average total sentence points for white offenders who were sentenced to supervision with adjudication withheld is 25.36, which is lower than the average score of 26.43 for black offenders. Furthermore, the average total sentence score for white offenders who were sentenced to supervision with adjudication applied is 37.52, which is also lower than the average score of 38.21 for black offenders.

[37] The percentage of cases with no prior felony convictions does not appear on Table 9. This analysis is based upon all offenders sentenced to supervision with adjudication withheld and is

19

## VII. THE IMPORTANCE OF CONTROLLING FOR VARIABLES: THE EXAMPLE OF PRIOR FELONY CONVICTION

### A. Prior Felony Conviction Explains Some of Dr. Chiricos' Unexplained Racial Disproportionality

In Section III of this report, I noted that any attempt to use statistics to prove the existence or non-existence of system-wide racial discrimination in Florida's criminal justice system is inherently problematic. Specifically, there are numerous race-neutral variables that might explain what might otherwise be described as an "unexplained" racial disproportionality. In his report, Dr. Chiricos did consider whether two particular prior record variables, an offender's (1) number of prior sentencing events and (2) number of prior convicted charges, might account for some or all of the "unexplained" racial disproportionality that he found in conviction rates. Based upon the results of his Spearman Rank correlation analysis on the nine offense groups,[38] Dr. Chiricos concluded "[t]here is nothing in these data to suggest that the levels of racial disproportionality in conviction described previously can be attributed to racial differences in prior record."[39] The problem with this conclusion is that there are more than two different ways of defining the prior record variable, and that, in any event, Dr. Chiricos' summary analysis failed to "control" for either of the two prior record variables that he analyzed.

In this section, I show that some of the "unexplained" racial disproportionality that Dr. Chiricos found in his report could be explained by controlling for prior felony record.[40] I divide the arrest population into two subgroups based upon whether or not there is a prior felony conviction and calculate the racial disproportionality within each subgroup. In Table 10, I have

---

not limited to only the cases with sentencing guideline scores. A prior felony sentence with adjudication withheld is not counted as a prior felony conviction.

[38] See Table 11 of Dr. Chiricos' report. The results are discussed on pages 23-25.

[39] Dr. Chiricos' Report, page 25.

[40] The prior felony record variable is defined as two categories: no prior felony conviction and one or more prior felony convictions.

20

analyzed the effect of controlling for prior felony convictions on Dr. Chiricos' arrest data and a data set of felony convictions that closely approximates the data set of felony convictions used by Dr. Chiricos.[41] Table 10 shows that, using this data, blacks are convicted at a higher rate than whites on an overall basis (black = 24.05%, white = 17.48%, difference = 6.57%). For suspects with no prior felony record, while blacks are convicted at a higher rate than whites, the margin is less than it is for the overall population (black = 18.54%, white = 13.51%, difference = 5.02%), and for suspects with a prior felony record, whites are convicted at a higher rate (black = 32.91%, white = 33.12%, difference = -0.21%). Controlling for prior felony record has therefore reduced the racial disproportionality in conviction rates for the population with no prior felony record, and completely reversed the racial disproportionality for the population with a prior felony record.

Tables 10 is intended simply to illustrate the importance of controlling for variables that might explain any given outcome in an analysis of different conviction rates between the races. As shown in Table 10, controlling for variables in this manner has the ability to "explain" what might otherwise be an "unexplained" racial disproportionality. Accordingly, a full understanding of the significance of the overall disproportionality is not possible unless the analysis is controlled for potentially explanatory variables that, like recidivism, may provide race-neutral explanations for the data.

---

[41] The arrest data is from the CCH data file and is very close to the data from Table 2 of Dr. Chiricos' report. It was not possible to obtain prior felony conviction data for the population of convicted felons used by Dr. Chiricos. The felony conviction data shown in Table 10 is taken from the Katz Reanalysis portion of Table 5 and counts only offenders sentenced to state prison, county jail, or supervision with adjudication applied. Furthermore, the prior felony record status is unknown for 2,516 offenders (white = 1,132, black = 1,384) who were sentenced to county jail. These cases are not included. This data is very similar to the data used by Dr. Chiricos, as shown by the fact that the total conviction rate yielded by this data is 24.05% for blacks (compared with 22.23% under Chiricos' analysis, Table 1) and 17.48% for whites (compared with 16.33% under Chiricos' analysis, Table 1).

21

## B.    Controlling for One Race-Neutral Variable: An Example

If an arrestee who has a prior felony conviction ("recidivist suspect") is more likely to be

convicted than an arrestee who does not have any prior felony convictions ("no-record suspect"),

and if a higher percentage of one race's arrestee population have prior felony convictions than

does the arrestee population for the other race, then these two facts will inevitably produce some

level of "explained" racial disproportionality in the conviction rates between the two races.

Indeed, if these two facts are true, there will be some level of racial disproportionality in the

conviction rates between the two races even if there is no difference at all in the conviction rates

of arrestees within the population of "recidivist suspects" and even if there is no difference at all

in the conviction rates between the races within the population of "no-record suspects."

For example, consider a population of arrestees where 100 are white and 100 are black.

Assume that the conviction rates between the races are identical: 50% of all "recidivist suspects"

are convicted; 25% of all "no-record suspects" are convicted.  There is no racial difference in

conviction rates within either the group of "recidivist suspects" or the group of "no-record

suspects."  However, if more blacks are "recidivist suspects" than whites, then there will be an

overall disproportionality, albeit one that is explained by a race-neutral variable.  Thus, if 40 of

the black arrestees are "recidivist suspects," but only 20 of the white arrestees are "recidivist

suspects," then the total number of convictions out of each population of 100 arrests is:

| | BLACK ARRESTS | BLACK CONVICTIONS | BLACK CONVICTION RATE | WHITE ARRESTS | WHITE CONVICTIONS | WHITE CONVICTION RATE |
|---|---|---|---|---|---|---|
| RECIDIVISTS | 40 | 20 | 50% | 20 | 10 | 50% |
| NO-RECORD | 60 | 15 | 25% | 80 | 20 | 25% |
| TOTAL | 100 | 35 | 35% | 100 | 30 | 30% |

22

Thus, based solely on the higher incidence of "recidivist-suspects" and the higher conviction rate for recidivists in the forgoing example, there would be an *explained* racial disproportionality of 5% disfavoring blacks.

## VIII.  CONCLUSION

The unexplained racial disproportionality identified by Dr. Chiricos in Tables 2, 3, and 4 of his report can be explained by two factors: Dr. Chiricos used 1998 arrest data that was not limited to felony arrests, and Dr, Chiricos used 1998 conviction data that did not include offenders who were sentenced on a felony charge with adjudication withheld. By limiting the 1998 arrest population to felony arrests and adding offenders who were sentenced on a felony charge with adjudication withheld to the population of convicted felons considered by Dr. Chiricos, the overall unexplained racial disproportionality against black offenders reported by Dr. Chiricos disappears entirely and becomes a small disproportionality against white offenders. One reason for the reversal is the relatively higher number of white offenders (24,291) to black offenders (12,687) who were sentenced to supervision with adjudication withheld. After considering the sentencing guideline score data, I conclude that this difference is not due to systemic racial bias because the population of white offenders who were sentenced to supervision on a felony charge with adjudication withheld is not more aggravated than the similarly sentenced population of black offenders.

_Joseph L. Katz_
Joseph L. Katz, Ph.D.

_8/31/01_
Date

23

JOSEPH L. KATZ, Ph.D.
CURRICULUM VITA
August 29, 2001

WORK ADDRESS
DEPARTMENT OF MANAGEMENT
COLLEGE OF BUSINESS
GEORGIA STATE UNIVERSITY
35 BROAD STREET
ATLANTA, GA 30303
PHONE: 404-651-4072
FAX: 404-651-3498
E-MAIL: jkatz@gsu.edu

HOME ADDRESS
1101 JUNIPER STREET, #804
ATLANTA, GEORGIA 30309
PHONE: 404-874-4397
FAX: 404-875-6026

## EDUCATION

B.S. Mathematics, Louisiana State University, May 1972.

B.S. Computer Science, Louisiana State University, May 1973.

M.S. Mathematics, Louisiana State University, Aug. 1975.
THESIS: Basic Results in Edge Critical Graphs.

Ph.D. Quantitative Methods, Louisiana State University, Aug. 1978.
DISSERTATION: The Insensitivity of Leontief Multipliers to Random Input-Output Matrices With Fixed Column Sums.

## ACADEMIC WORK EXPERIENCE

### GEORGIA STATE UNIVERSITY: COLLEGE OF BUSINESS
Associate Professor, 1986 -- present, Assistant Professor, 1981 - 1986.

UNDERGRADUATE COURSES TAUGHT: Business Statistics I and II, Management Science, Theory of Sampling, Analysis of Business Data, and Basic Calculus and Matrix Algebra.

GRADUATE COURSES TAUGHT: Mathematical Probability and Statistical Theory I and II, Applied Regression Analysis, Advanced Calculus and Linear Algebra, Applied Statistics for M.B.A. students, and Sampling in the Business Environment.

I presented a 4 hour tutorial on ANOVA/ANCOVA/MANOVA/MANCOVA at a Faculty Development Seminar at Lake Arrowhead, sponsored by the College Development of Education Committee, December 1987.

1

Twice a year (spring and fall) I teach a seminar on REGRESSION ANALYSIS, TIMES SERIES, and FORECASTING for the GSU Actuarial Science Seminar Series to prepare students to take the exam offered by the Society of Actuaries, Spring 1992 through Spring 2001.

UNIVERSITY OF ARIZONA: COLLEGE OF BUSINESS
Assistant Professor, 1979 - 1981.

UNDERGRADUATE COURSES TAUGHT: Business Statistics I and II, and Fortran programming.

GRADUATE COURSES TAUGHT: Applied Statistics and Operations Research.

LOUISIANA STATE UNIVERSITY: COLLEGE OF BUSINESS
Assistant Professor, 1978 - 1979.

UNDERGRADUATE COURSES TAUGHT: Business Statistics, Management Science, and Business Calculus.

GRADUATE COURSES TAUGHT: Theory of Linear Programming and Introduction to Operations Research.

## AREAS OF APPLICATION AND RESEARCH

### 1. CRIMINAL SENTENCING, RACE, AND THE DEATH PENALTY

McCleskey v. Zant. I was retained by the Georgia Attorney General, Atlanta GA, Nov. 1982 to April 1987. The issue was whether a broad based statistical study of Georgia offenders convicted of murder or voluntary manslaughter showed that the application of the death penalty in Georgia is racially biased. I statistically analyzed two large databases, compiled by a research team led by Professor David Baldus, containing information on voluntary manslaughter and murder cases. I testified in Federal District Court in Atlanta GA, August 1983. I was qualified as an expert in analyzing data, research design, statistics, statistical analysis, and quantitative methods and testified concerning numerous analyses that I had conducted and on the use of multiple regression and other models to measure racial bias in sentencing convicted murderers to death.

I testified by affidavit (Affidavit on Regression and Statistical Analysis) in the case Joseph Wilson v. Ralph Kemp pertaining to the use of regression analysis in capital sentencing decisions. March 1984.

Earl Lloyd Jackson v. People. I was retained by the District Attorney's Office for the County of Los Angeles, Los Angeles CA, Nov. 1984 to Oct. 1987. The issue was whether the imposition of the death penalty in California was biased on the basis of race and/or gender. I statistically analyzed several large databases compiled by the

2

California Bureau of Criminal Statistics relating to offenders convicted of murder or voluntary manslaughter in California. I testified in two declarations concerning the use of multiple regression analysis and other methods to measure racial bias in sentencing.

I was an invited speaker to a forum sponsored by the Metro Atlanta Crime Commission on statistical issues related to race and the death penalty, 1987.

Jimmy Lee Horton v. Ralph Kemp. I was retained by the Georgia Attorney General, Atlanta GA, July 1989 to Oct. 1989. The issue was whether the prosecutor for the Ocmulgee Judicial Circuit generally uses his peremptory strikes to exclude blacks from juries. I analyzed a database of jury strikes for a large sample of cases handled by the prosecutor. I testified in Federal District Court, Macon GA, Sept. 1989.

"Statement To The Senate Committee On The Judiciary Concerning The Relationship Between Race And The Death Penalty," testimony given before the United States Senate Committee on the Judiciary, October 2, 1989.

"Is The Georgia Death Sentencing System Racially Biased?" invited talk presented to the Atlanta Chapter of the American Statistical Association, January 23, 1990.

State v. William Anthony Brooks. I was retained by the District Attorney for the Chattahoochee Judicial Circuit, Columbus GA, September 1990. The issue was whether the District Attorney for the Chattahoochee Judicial Circuit was racially discriminatory in his decisions to seek the death penalty. I statistically analyzed data on defendants convicted of murder in the Chattahoochee Judicial Circuit. I testified in State Superior Court, Columbus GA, Sept. 1990.

I appeared as a panel member on T. V. show moderated by Neil Boortz on issues related to race and the death penalty, August 1991.

Oscar Greene v. Georgia State Board of Pardons and Paroles. I was retained by the Georgia Attorney General, Atlanta GA, Oct. 1991 to June 1992. The issue was whether the Georgia State Board of Pardons and Paroles was discriminatory with respect to offender race and/or gender in its parole decisions. I analyzed a large database of parole decisions by the Georgia State Board of Pardons and Paroles. I testified in two affidavits and by deposition.

I was a research reviewer for the United States Department of Justice, Bureau of Statistics, Washington, D.C., June 1993 to Aug. 1993. I reviewed the ABT study on the racial and gender impacts of the Federal Sentencing Guidelines.

State v. Teresa Farguson. I was retained by the District Attorney for the Macon Judicial Circuit, Macon GA, Sept. 1993. The defendant was tried on a first-degree murder charge. I statistically analyzed data from a tire survey taken by detectives at Macon Mall in August 1993.

3

141

<u>Stephens v. State.</u>  The District Attorney for the Northeastern Judicial Circuit in Gainseville GA retained me, November 1994. The issue was whether there is racial bias by prosecutors in the Northeastern Judicial Circuit in seeking mandatory life sentences against offenders convicted of a second or subsequent offense for the sale, or possession with intent to sell, Schedule I controlled substances or Schedule II narcotics. I testified as to the limited value of aggregate racial sentencing percentages to infer racial bias in prosecutorial decisions. I testified in State Superior Court, Gainseville GA, November 1994.

I was a statistical consultant to the Georgia Prosecuting Attorneys' Council, Smyrna Georgia, July 1995. I analyzed the Georgia Department of Corrections INMATE database to assess the underlying forces that produced a large racial disparity in mandatory life sentence cases for a second or subsequent conviction for the sale, or possession with intent to sell, Schedule I controlled substances or Schedule II narcotics. I presented the results of my analysis titled "Sentencing Analysis of Georgia Inmates Convicted of Drug Crimes" to the Prosecuting Attorneys' Council of Georgia, Jekyll Island, Georgia, July 1995.

I was a statistical consultant to Human Rights Watch, New York City, New York, Jan. 1996 to March 1996. I provided a statistical analysis of drug offenders who were imprisoned in Georgia between 1990 and 1995.

"A Simulation Model To Assess The Impact of Peremptory Challenge Rules on The Outcome of Criminal Trials," <u>Proceedings of the American Statistical Association, Social Statistics Section</u>, August 1996, pp. 56-61.

I was a statistical consultant to Georgia Board of Pardons and Paroles, Atlanta, Georgia, October 1996 to May 1997. I analyzed the Georgia INMATE database to forecast the impact on the prison population of changes in rules and policies governing the time served by inmates.

I was a statistical consultant to the Kentucky Office of the Attorney General, Frankfort Kentucky (hired July 1998). I assist the Kentucky Office of the Attorney General to defend lawsuits arising out of State Senate Bill 171, titled the Racial Justice Act.

"<u>Statement To The Florida Capital Cases Task Force on the Use of Statistical Models in Capital Sentencing</u>," testimony given before the Florida Capital Cases Task Force, Tallahassee Florida, February, 2000.

"<u>Response To Professor Baldus' Presentation to the Pennsylvania Senate Judicial Committee on 02/22/2000 on Race and the Death Penalty</u>," written testimony given to the Pennsylvania Senate Judicial Committee, March 10, 2000.

"<u>Joseph Katz's Critique of the Evidence and Methodology in McCleskey v. Kemp(1987): A Framework For Evaluation  Response to Baldus and Woodworth,</u> "

4

142

written testimony given to the Florida Capital Cases Task Force and the Pennsylvania Senate Judicial Committee, May 2, 2000.

Johnson v. Bush. The law firm of Cooper & Kirk retained me in May 2001. The issue is whether there exists a racial disproportionality in conviction rates for Florida offenders.

"Answering Statistical Challenges," invited presentation made at the meeting of the Association of Government Attorneys in Capital Litigation (AGACL), Miami Florida, July 2001.

## 2. INSURANCE AND ANALYSIS OF MEDICAL CLAIMS

"Performance of Audit Procedures by Governmental Auditors: Some Preliminary Evidence," presented to the American Accounting Association Midwest Regional Meeting, Chicago Illinois, March 1985 (with Leonard Berry and Gordon Harwood).

"Capital Investment In Information Technology: Does It Make A Difference?" Life Office Management Association, Atlanta Georgia, 1987 (with Sidney E. Harris)

"Profitability and Information Technology Capital Intensity In The Insurance Industry," Proceedings of the International System Science Meeting, Honolulu, Hawaii, November 1987 (with Sidney E. Harris)

"A Study of Governmental Auditors' Performance of Audit Procedures," The Accounting Review, Vol. 42, No. 1, pp. 14-28, 1987 (with Leonard Eugene Berry and Gordon B. Harwood).

I was a statistical consultant to Piedmont Hospital, Atlanta Georgia, Sept. 1988. I Analyzed data on cases involving injuries covered by Worker's Compensation.

I was a statistical consultant to Insurance Industry Consultants of Georgia, Atlanta GA, Sept. 1988 to present. Over the years, I have analyzed hundreds of claim and premium computer data files for workers' compensation funds and insurance companies from Georgia, Florida, Alabama, Louisiana, Mississippi, North Carolina, and South Carolina. Furthermore, I conducted and analyzed a survey of Florida independent insurance agents on the effectiveness of Self Insured Funds for Worker's Compensation coverage. I developed a computer simulation analyses to predict future losses for insurance companies. I analyzed claim data from the Georgia Workers' Compensation Board and the National Association of Insurance Commissioners (NAIC). I testified in a Florida Administrative Court Hearing on definition of high frequency workers compensation employers, Tallahassee FL, August 1994. I guided a market survey for Superior Insurance Company of their independent insurance agents. I analyzed the Florida Department of Labor database of workers' compensation lost time claims between 1982 and 1992.

"Predicting Organizational Performance Using Information Technology Managerial Control Ratios," <u>Proceedings of the International System Science Meeting</u>, Honolulu, Hawaii, December 1988 (with Sidney E. Harris).

"Differentiating Organizational Performance Using Information Technology Managerial Control Ratios in the Insurance Industry," <u>Office Technology and People</u>, Vol. 5, No. 4, pp. 275-297, 1989, (with Sidney E. Harris).

"Organizational Performance And Information Technology Investment Intensity," presented to the ORSA/TIMS conference, New York, NY, October 1989 (with Sidney E. Harris).

"The Effect Of Firm Structure On Performance In The Insurance Industry" <u>Proceedings of the 1990 Annual Meeting of the Decision Sciences Institute</u>, November 1990, pp. 1382-1384.

"Organizational Performance and Information Technology Investment Intensity," <u>Organization Science</u>, Vol. 2, No. 3, August 1991, pp. 263-295 (with Sidney E. Harris).

"Firm Size and The Information Technology Investment Intensity of Life Insurers" <u>Management Information Systems Quarterly</u>, Vol. 15, No. 3, 1991, pp. 333-352 (with Sidney E. Harris).

"Profiting from Information Technology In The Insurance Industry," <u>Resource</u>, Vol. 16, No. 2, pp. 35-38, 1991. (with Sidney E. Harris and Ann M. Purr).

I was a statistical consultant to DNV Loss Control Management, Loganville, Georgia, Sept. 1993 to Dec. 1993. I evaluated the statistical validity of the Performance Assessment Service Report that assesses the safety and loss control activities of the client.

<u>Department of Human Resources v. U.S. Department of Health and Human Services</u>. I was retained by the Georgia Attorney General, Atlanta GA, March 1994 to Nov. 1994. I analyzed the statistical methodology used by federal auditors to review Georgia AFDC cases. I testified by affidavit.

I was a statistical consultant to Caredata.com ( formerly MediRisk), Atlanta Georgia, July 1998 to December 1999. Dr. Mer Elliott and I were their litigation support team, to provide statistical assistance and litigation support for clients who subscribe to MediRisk's medical fee schedules.

<u>United States v. Marshall Newsome et al.</u>  I was a statistical consultant to the U.S. Attorney's Office for the Northern District of Georgia, Atlanta, Georgia (hired July 1998). I analyzed large Medicaid claim databases to investigate a Medicaid fraud case.

I am a statistical consultant for the Georgia Department of Audits, Atlanta GA, March 2000 to present. I provide statistical sampling support for their audits of Georgia Medicaid providers.

## 3. RACE DISCRIMINATION AND VOTING RIGHTS

Brooks et al. v. Georgia Board of Elections. I was retained by the Georgia Attorney General, Atlanta GA, July 1989 to 1997. The issue is whether the method Georgia uses to elect Superior Court Judges is racially discriminatory and in violation of Section 2 of the Voting Rights Act. I statistically analyzed judicial elections from Georgia using statistical regression, bivariate ecological regression, and other methods.

Brooks et al. v. Zell Miller. I was retained by the Georgia Attorney General, Atlanta GA, June 1990 to 1997. The issue is whether the majority vote rule in Georgia elections discriminates against black voters. I statistically analyzed a database of Georgia elections using statistical regression, bivariate ecological regression, and other methods. I testified by deposition.

Davida Johnson et al. v. Zell Miller et al. I was retained by the Georgia Attorney General, Atlanta GA, Feb. 1994 to September 1995. The issue was whether Georgia's 11th Congressional District, approved by the State Legislature in 1992, was drawn based upon inappropriate racial considerations. I analyzed Georgia election data using statistical regression, ecological regression, and other methods. I testified in Federal District Court, Savannah GA, July 1994.

Georgia v. Reno. I was retained by the Georgia Attorney General, Atlanta GA, 1994. The issue is whether the method Georgia uses to elect judges is in violation of Section 5 of the Voting Rights Act, permitting the United States Justice Department to refuse pre clearance of certain superior court judgeships that were added since 1965. I conducted a study to determine the percentage of black attorneys in Georgia, and the appointment pattern by race of superior court judges in Georgia through the Judicial Nominating Commission. I testified in Federal District Court, Washington, D.C., October 1994.

"The Use Of Precinct Probability Analysis To Assess Voting Behavior," Proceedings of the American Statistical Association, Social Statistics Section, August 1997.

## 4. EMPLOYMENT DISCRIMINATION

"Tests of Discrimination in Block Hiring," Proceedings of the American Statistical Association, Business and Economics, Chicago, August 1986.

"Statistical Methods To Detect Discrimination In Block Hiring," Proceedings of the Decision Sciences Institute Meeting, Honolulu, Hawaii, November 1986.

7

I gave a presentation on the use of statistics in testing discrimination for the Bell South Program on developing teaching excellence, 1989.

Meena v. Pulsar Data Systems Inc., Atlanta, Georgia, 1998 to January 2000. I was retained to analyze data to determine whether Mr. Meena had been terminated from his job due to his race and or age. The case was settled out of court.

I was a statistical consultant to the Georgia Department of Corrections, Atlanta, Georgia (hired July 1998). I was retained to analyze databases pertaining to the hiring of correctional officers in response to a Justice Department investigation as to whether or not there is gender bias in the hiring of correctional officers.

## 5. INPUT-OUTPUT MODELS

"An Estimator of Regional Interindustry Multipliers Without and I-O Matrix," Proceedings of the American Statistical Association, Business and Economics, 1977 (with Roger L. Burford).

"Regional Input-Output Multipliers Without a Full I-O Table," Annals of Regional Science, Vol. 11, No. 3, pp. 21-37, 1977 (with Roger L. Burford).

"Regional Input-Output Multipliers Without a Full I-O Table: Reply," Annals of Regional Science, Vol. 12, No. 3, pp. 99-102, 1978 (with Roger L. Burford).

"The Relationship Between Type I and Type II Income Multipliers," International Regional Science Review, Vol. 5, No. 1, pp. 51-56, 1980.

"The Effect of Aggregation On The Output Multipliers in Input-Output Models," Proceedings of the American Statistical Association, Business and Economics, 1980 (with Roger L. Burford).

"A Method for Estimation of Input-Output Output Multipliers When No I-O Model Exists," Journal of Regional Science, Vol. 21, No. 2, pp. 151-161, 1981 (with Roger L. Burford).

"A Comparison of Estimators of Output Multipliers From an Incomplete Input-Output Table," Annals of Regional Science, Vol. 15, No. 2, pp. 39-54, 1981 (with Roger L. Burford).

"The Effect of Aggregation On The Output Multipliers in Input-Output Models," Annals of Regional Science, Vol. 15, No. 3, 1981, (with Roger L. Burford).

"The Burford-Katz Approach to Input-Output Multiplier Estimation," an invited paper to the Seventh Pacific Regional Science Conference, Brisbane Queensland, Australia, August 1981 (with Roger L. Burford).

"The Theory of Random Matrices to Shortcut Formula Estimation of Input-Output Multipliers, presented to the Regional Science Association, Nov. 1981 (with Roger L. Burford)

"The Estimation of Input-Output Type Output Multipliers When No Input-Output Model Exists: A Reply," Journal of Regional Science, Vol. 22, No. 3, pp. 383-387, 1982 (with Roger L. Burford).

"A Technique To Obtain Accurate Impact Multipliers For Individual Firms Using Existing Input-Output Models," Environment and Planning A, Vol. 14, No. 6, pp. 739-744, 1982 (with R. Bruce Billings).

"The Effect of Aggregation On The Output Multipliers in Input-Output Models: Reply," Annals of Regional Science, Vol. 16, No. 3, pp. 102, 1982 (with Roger L. Burford).

"A Shortcut Method For Computing Final Demand Multipliers For Small Regions: Comment," Environment and Planning A, Vol. 15, No. 5, pp. 551-554, 1983.

"Limited Information Estimators For Multi regional Input-Output Multipliers," presented to the Western Regional Science Association meeting, February 1983, also presented to the World Regional Science Association Meeting, Rotterdam Holland, June 1984 (with Roger L. Burford).

"Variances and Limits of Error in Input-Output Estimates With Limited Information," presented to the ORSA/TIMS meeting, Dallas, November 1984 (with Roger L. Burford).

"Shortcut Multiplier Formulas For Output, Income and Employment Multipliers," Annals of Regional Science, Vol. 19, No. 2, pp. 61-76, 1985 (with Roger L. Burford)

"Shortcut 'Input-Output' Multipliers, Alive and Well - Response to Jensen and Hewings," Environment and Planning A, Vol. 17, No. 11, pp. 1541-1549, 1985 (with Roger L. Burford).

Book Review of An Interregional Input-Output Table For Queensland by G. R. West, J. B. Morison and R. C. Jensen, Annals of Regional Science, Vol. 19, No. 1, pp. 145, 1985.

"An Alternative To The Technical Coefficient Assumption in Input-Output Models," presented to the Western Regional Science Association Meeting, Coronado California, February 1985.

"A Reevaluation of the Technical Coefficient Assumption In Input-Output Models," presented to the Southern Regional Science Association meeting, Washington D.C., May 1985.

"Small Area Impact Multiplier Estimates Without and Input-Output Model: A Case Study," The Southwestern Review of Management and Economics, Vol. 5, No. 1, pp. 31-41, 1986 (with R. Bruce Billings).

Holistically Accurate Input-Output Matrices Through Hybrid Methods," presented to the Western Regional Science Association Meeting, Laguna Beach California, February 1986.

Estimation of A Regional Input-Output Matrix Using a New Hybrid Method," presented to the Southern Regional Science Association Meeting, New Orleans, March 1986.

"Shortcut Multiplier Formulas For Interregional Input-Output Models," Review of Regional Studies, Vol. 17, No. 2, pp. 31-45, 1987 (with Roger L. Burford).

"Selective Aggregation in Input-Output Impact Analysis," presented to the Southern Regional Science Association meeting, Chapel Hill, North Carolina, April 1989 (with Danial L. Clapper).

## 6. STOCHASTIC PROCESSES

"Estimation of the Mean Number of Visits to Transient States Before Absorption in An Absorbing Markov Chain By Only Row Sums of the Submatrix of Transient States," presented to the ORSA/TIMS meeting, May 1980 (with Roger L. Burford).

"Compatibility Analysis and Applications For A Wide Range of Management Problems," presented to the ORSA/TIMS meeting, November 1981, (with Kalyan Singhal).

"Estimating Time To Absorption and Variances With Limited Information," Proceedings of the American Statistical Association, Business and Economics, 1984 (with Roger L. Burford).

"The Sensitivity and Limits of Error of Markov Chain Steady State Probabilities," presented to the ORSA/TIMS meeting, Dallas, November 1984.

"Variances and Limits of Error in Input-Output Estimates With Limited Information," Proceedings of the Pittsburgh Conference on Modeling and Simulation, April 1985 (with Roger L. Burford).

"A Branch and Fathom Algorithm For The Long Range Process Design Problem," presented to the ORSA/TIMS meeting, Washington D.C., May 1988, (with Jaya Singhal).

10

"Structural Properties of the Compatibility Matrix: Existence of Mathematical Relationships," Information Systems and Operations Research (INFOR), Vol. 26, No. 3, pp. 163-169, 1988, (with Jaya Singhal).

"Estimating Mean Time To Absorption For A Markov Chain With Limited Information," Applied Stochastic Processes and Data Analysis, Vol. 4, pp. 217-230, 1988, (with Roger L. Burford).

"A Branch and Fathom Algorithm For The Long Range Process Design Problem," Management Science, Vol. 36, No. 4, pp. 513-516, 1990, (with Jaya Singhal).

## 7. ELECTRONIC COMMERCE

"Successful Product Characteristics for Electronic Commerce: A Taxonomy of Transaction Types," Proceedings of the Fourth International Workshop on Community Networking, September 1997, pp. 77-85 (with Cherian S. Thachenkary and Samir Chatterjee).

"Successful Product Characteristics for Electronic Commerce: A Taxonomy of Transaction Types," presented at the Fourth International Workshop on Community Networking, Atlanta Georgia, September 1997 (with Cherian Thachenkary and Samir Chatterjee).

"Household Characteristics and Technology Adoption: Implications for Delivering Broadband Telecommunication Services," presented at the Decision Sciences Institute, 1997 Annual Meeting, San Diego California, November 1997 (with Cherian Thachenkary, Samir Chatterjee, Sekhar Ryali, and Xinping Zhao).

## 8. OTHER PROFESSIONAL STATISTICAL EXPERIENCE

Statistical consultant for the Economic and Industrial Research Inc., Baton Rouge LA, Summer 1978. I developed multiple regression models to predict demand for Greyhound Bus service between Atlanta and Dallas.

I was a statistical consultant to Atlantic Southeast Airlines, Atlanta, GA, April 1986. I conferred with top management concerning sampling issues related to the distribution of plane ticket revenues between the airline and Delta Air Line.

Irvin v. Scott Farms. I was retained by the Georgia Attorney General, Atlanta GA, Sept. 1985. The issue was whether Scott Farms could relabel and sell out of state onions as Vidalia onions. I developed and executed a market survey (with Dr. Richard Rexeisen) to measure the perception of Georgia residents as to where Vidalia onions are grown. I testified in State Superior Court, Statesboro GA. The validity of the survey was accepted by the court.

<u>Federated Department Stores v. Marcus E. Collins</u>. I was retained by the Georgia Attorney General, Atlanta GA, April 1988. I conferred on statistical issues relating to a market survey of newspaper readership and newspaper inserts.

<u>Tina Burton et al. v. Zell Miller et al.</u> I was retained by the Georgia Attorney General, Atlanta GA, Dec. 1990 to Feb. 1991. The issue was whether the ballot language for Amendment 1 in the 1990 Georgia general election misled voters. I analyzed two surveys of Georgians who voted in the 1990 general election. I testified in Federal District Court, Atlanta GA, Jan. 1991.

I served as reviewer of the mathematics curriculum of Walter F. George High School as part of the visiting committee for the Southern Association of Colleges and Schools, 1991.

<u>United States v. Maola Milk & Ice Cream Company</u>. I was retained by Walbert & Hermann, Atlanta GA, Feb. 1993 to Sept. 1993. The issue was whether Maola was involved in a conspiracy to fix milk prices for school districts in North Carolina. I statistically analyzed a database of milk bid prices by Maola and other dairies between 1983 and 1992.

I provide statistical support to Dr. John Goldman on medical issues related to an analysis of his patient database.

I am a statistical consultant for the Treasury Inspector General for Tax Administration (TIGTA), May 2000 to present. I provide statistical sampling support for their audits of the IRS.

12

**150**

## APPENDIX A

## THE LANGAN AND CRUTCHFIELD FORMULAS ARE ALGEBRAICALLY EQUIVALENT

The formula for the Percent Disproportionality Unexplained for the Langan Method is:

$$\left[ \frac{\text{(black convictions)}}{\text{(black arrests)} * \frac{\text{(white convictions)}}{\text{(white arrests)}}} - 1 \right] \times 100\%$$

Applying this formula to the Drug Offense Crime Type data from Table 3 of Dr. Chiricos' report yields:

$$\left[ \frac{(17,481)}{(50,932) * \frac{(10,605)}{(50,572)}} - 1 \right] \times 100\% = +63.67223\%.$$

The formula for the Percent Disproportionality Unexplained for the Crutchfield Method is:

$$\left\{ \left[ \frac{\{\text{(black convictions)/(black population)}\}}{\{\text{(white convictions)/(white population)}\}} \div \frac{\{\text{(black arrests)/(black population)}\}}{\{\text{(white arrests)/(white population)}\}} \right] - 1 \right\} \times 100\%.$$

The black and white population terms cancel out. The Crutchfield formula reduces to:

$$\left\{ \left[ \frac{\{\text{(black convictions)/(black arrests)}\}}{\{\text{(white convictions)/(white arrests)}\}} \right] - 1 \right\} \times 100\%,$$

which is equivalent to the Langan formula.

Applying this formula to the Drug Offense Crime Type data above gives:

$$\left\{ \left[ \frac{\{(17,481)/(50,932)\}}{\{(10,605)/(50,572)\}} \right] - 1 \right\} \times 100\% = +63.67223\%.$$

151

## APPENDIX B

**EXAMPLE TO DEMONSTRATE THAT THE CRUTCHFIELD MEASURE IS BIASED TO FIND A LARGER DISPROPORTIONALITY WHEN BLACKS ARE CONVICTED AT A HIGHER RATE THAN WHITES.**

Suppose that 40% of blacks and 20% of whites are convicted.

The Percent Disproportionality Unexplained for the Crutchfield Method is

$$\left\{ \left[ \frac{\text{(black convictions)/(black arrests)}}{\text{(white convictions)/(white arrests)}} \right] - 1 \right\} \times 100\%,$$

$$= \quad \left\{ \left[ \frac{(.40)}{(.20)} \right] - 1 \right\} \times 100\% = +100\%.$$

Now switch the white and black conviction rates. Suppose that 20% of blacks and 40% of whites are convicted.

The Percent Disproportionality Unexplained for the Crutchfield Method is

$$\left\{ \left[ \frac{\text{(black convictions)/(black arrests)}}{\text{(white convictions)/(white arrests)}} \right] - 1 \right\} \times 100\%,$$

$$= \quad \left\{ \left[ \frac{(.20)}{(.40)} \right] - 1 \right\} \times 100\% = -50\%.$$

**152**

## APPENDIX C

## EXAMPLE TO DEMONSTRATE THAT THE BLUMSTEIN MEASURE IS BIASED TO FIND A LARGER DISPROPORTIONALITY WHEN WHITES ARE CONVICTED AT A HIGHER RATE THAN BLACKS.

Suppose that of 100 whites and 100 blacks are arrested. Suppose that 20 whites and 40 blacks are convicted.

The Percent Disproportionality Unexplained for the Blumstein Method is

$$\left[1 - \frac{\frac{(\text{black arrests})}{(\text{total arrests})} * (1 - \frac{(\text{black convictions})}{(\text{total convictions})})}{\frac{(\text{black convictions})}{(\text{total convictions})} * (1 - \frac{(\text{black arrests})}{(\text{total arrests})})}\right] \times 100\%.$$

$$= \left[1 - \frac{\frac{(100)}{(200)} * (1 - \frac{(40)}{(60)})}{\frac{(40)}{(60)} * (1 - \frac{(100)}{(200)})}\right] \times 100\% = +50\%.$$

Now switch the white and black conviction rates. Suppose that 40 of the 100 whites arrested are convicted and only 20 of the 100 blacks are convicted.

The Percent Disproportionality Unexplained for the Blumstein Method is

$$\left[1 - \frac{\frac{(\text{black arrests})}{(\text{total arrests})} * (1 - \frac{(\text{black convictions})}{(\text{total convictions})})}{\frac{(\text{black convictions})}{(\text{total convictions})} * (1 - \frac{(\text{black arrests})}{(\text{total arrests})})}\right] \times 100\%.$$

$$= \left[1 - \frac{\frac{(100)}{(200)} * (1 - \frac{(20)}{(60)})}{\frac{(20)}{(60)} * (1 - \frac{(100)}{(200)})}\right] \times 100\% = -100\%.$$

153

# APPENDIX D

## 1995 Florida Sentencing Guidelines Scoresheet

### (3 pages)

# OCTOBER 1995 RULE 3.991(a) SENTENCING GUIDELINES SCORESHEET

| 1 DATE OF SENTENCE | 2 PREPARED BY ☐DC ☐SA | 3 COUNTY | 4 SENTENCING JUDGE |
|---|---|---|---|
| MO DY YR | | | |

| NAME (LAST, FIRST, M I) | 6. DOB MO DY YR | 7 DC# ___ 8 OBTS# ___ | 9. RACE ☐B ☐W ☐OTH | 10 GENDER ☐M ☐F ☐PLEA ☐TRIAL |

CODES DC USE ONLY

**I. PRIMARY OFFENSE:** If Qualifier, please check ___A ___S ___C ___R (A=Attempt, S=Solicitation, C=Conspiracy, R=Reclassification)

DOCKET# ___ FELONY DEGREE ___ F.S. # ___ OFFENSE LEVEL ___ OFFENSE DATE MO DY YR ___ POINTS

Description: ___
(Level = Pts: 1=4, 2=10, 3=16, 4=22, 5=28, 6=36, 7=56, 8=74, 9=92, 10=116)
Prior capital felony triples primary offense points ☐   I. ___

**II. ADDITIONAL OFFENSE(S):** Supplemental page attached ☐

DOCKET# ___ FEL/MM F.S. # ___ OFFENSE LEVEL ___ QUALIFY A S C R ___ CNTS ___ POINTS ___ X ___ = ___

Description: ___
(Level = Pts: M=0.2, 1=0.7, 2=1.2, 3=2.4, 4=3.6, 5=5.4, 6=18, 7=28, 8=37, 9=46, 10=58)
Prior capital felony triples additional offense points ☐   Supplemental page points ___   II. ___

**III. VICTIM INJURY:**

| | | Number | Total | | | Number | Total |
|---|---|---|---|---|---|---|---|
| 2nd Degree Murder | 240 X | | = | Slight | 4 X | = | |
| Death | 120 X | | = | Sex Penetration | 80 X | = | |
| Severe | 40 X | | = | Sex Contact | 40 X | = | |
| Moderate | 18 X | | = | | | | |

III. ___

**IV. PRIOR RECORD:** Supplemental page attached ☐

| FEL/MM DEGREE | F.S. # | OFFENSE LEVEL | QUALIFY A S C R | DESCRIPTION | NUM | POINTS |
|---|---|---|---|---|---|---|
| ___ | ___ | ☐☐☐☐ | | ___ | X ___ = ___ |
| ___ | ___ | ☐☐☐☐ | | ___ | X ___ = ___ |
| ___ | ___ | ☐☐☐☐ | | ___ | X ___ = ___ |
| ___ | ___ | ☐☐☐☐ | | ___ | X ___ = ___ |
| ___ | ___ | ☐☐☐☐ | | ___ | X ___ = ___ |

(Level = Pts: M=0.2, 1=0.5, 2=0.8, 3=1.6, 4=2.4, 5=3.6, 6=9, 7=14, 8=19, 9=23, 10=29)

Supplemental page points ___   IV. ___

155

Effective Date: For offenses committed under the sentencing guidelines effective October 1, 1995 or any subsequent revision   Page Subtotal ___

V.   Legal Status Violation = 4 Points                                                           V.   _____

VI.  Community Sanction Violation before the court for sentencing
     A)  6 Pts x each such successive violation OR                                            VI.  A _____
     B)  New Felony Conviction = 12 Pts x each such successive violation              B _____

VII. Firearm/Semi-Automatic or Machine Gun = 18 or 25 Points                            VII. _____

VIII. Prior Serious Felony = 30 Pts                                                                VIII. _____

                                                                  Subtotal Sentence Points. _____

IX.  Enhancements (only if the primary offense qualifies for enhancement)

| Law Enforcement Protection | Drug Trafficking | Grand Theft Motor Vehicle | Street Gang (offenses committed on or after 10-1-96) | Domestic Violence (offenses committed on or after 10-1-97) |
|---|---|---|---|---|
| ☐ x 1.5 ☐ x 2.0 ☐ x 2.5 | ☐ x 1.5 | ☐ x 1.5 | ☐ x 1.5 | ☐ x 1.5 |

                                          Enhanced Subtotal Sentence Points  IX.  _____

                                                        TOTAL SENTENCE POINTS  _____

## SENTENCE COMPUTATION

For any felony committed on or after July 1, 1997, where the defendant has at least one prior felony conviction, the court may impose a state prison sentence not to exceed 22 months when a non state prison sanction is recommended, or when the minimum recommended sentence is less than 22 months in state prison.

- 40 or less total sentence points mandates a non state prison sanction, except
as provided above. Sentence points less than or equal to 40 may be increased
by 15 percent.

$$\underline{\hspace{3cm}} \text{ x 1.15 = } \underline{\hspace{3cm}}$$
Total Sentence Points          Increased Sentence Points

- If total or increased sentence points are greater than 40 or equal to 52,
state incarceration is discretionary. A total of more than 52 total or
increased sentence points must be a state prison sentence. A life
sentence may be imposed at the discretion of the court if total sentence
points are 363 or greater.

$$\underline{\hspace{3cm}} \text{ minus 28 = } \underline{\hspace{3cm}}$$
Total/Increased Points          State Prison Months

- The sentencing court may increase or decrease prison months by
up to 25 percent except where total sentence points were originally
increased by 15 percent to exceed 40 points. Any state prison sentence
must exceed 12 months.

$$\underline{\hspace{3cm}} \text{ x .75 = } \underline{\hspace{3cm}}$$
State Prison Months                Min. Prison Months

$$\text{ x 1.25 = } \underline{\hspace{3cm}}$$
Max. Prison Months

## TOTAL SENTENCE IMPOSED

|  | Years | Months | Days |  |
|---|---|---|---|---|
| ☐ State Prison  ☐ Life | _____ | _____ | _____ | Has more than one scoresheet |
| ☐ County Jail  ☐ Time Served | _____ | _____ | _____ | been used at sentencing? |
| ☐ Community Control | _____ | _____ | _____ | _____ Yes  _____ No |
| ☐ Probation | _____ | _____ | _____ |  |

- Please designate the particular type of sentence where an enhanced or mandatory sentence imposed.

☐ Habitual Felony/Habitual Violent Offender          ☐ Guideline Aggravated Departure
☐ Violent Career Criminal                                      ☐ Guideline Mitigated Departure
☐ Prison Releases Reoffender Punishment Act
☐ Mandatory pursuant to:   ☐ §775.087      ☐ §893.13      ☐ §893.135

## JUDGE'S SIGNATURE

                                      156

If reasons cited for departure are not listed below, please write the reasons on the reverse side.

## Reasons for Departure — Aggravating Circumstances

☐ Legitimate, uncoerced, plea bargain.

☐ Offense was one of violence and was committed in a manner that was especially heinous, atrocious or cruel.

☐ Offenses arose from separate episodes. Primary offense is at level 4 or higher and the defendant has committed 5 or more offenses within a 180 day period that have resulted in convictions.

☐ Primary offense is scored at level 3 and the defendant has committed 8 or more offenses within a 180 day period that have resulted in convictions.

☐ Offense was committed within 6 months of defendant's discharge from a release program or state prison.

☐ Defendant occupied a leadership role in a criminal organization.

☐ Offense committed by a public official under color of office.

☐ Defendant knew victim was a law enforcement officer at the time of the offense; the offense was a violent offense; and that status is not an element of the primary offense.

☐ Offense created substantial risk of death or great bodily harm to many persons or to one or more small children.

☐ Victim especially vulnerable due to age or physical or mental disability.

☐ Offense was motivated by prejudice based on race, color, ancestry, ethnicity, religion, sexual orientation, or national origin of the victim.

☐ Victim suffered extraordinary physical or emotional trauma or permanent physical injury, or was treated with particular cruelty.

☐ Victim was physically attacked by the defendant in the presence of one or more members of the victim's family.

☐ Offense resulted in substantial economic hardship to a victim and consisted of an illegal act or acts committed by means of concealment, guile, or fraud to obtain money or property, to avoid payment or loss of money or property, or to obtain business or professional advantage, when two or more of the following circumstances were present:

  ☐ Offense involved multiple victims or multiple incidents per victim;

  ☐ Offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;

  ☐ The defendant used position or status to facilitate the commission of the offense, including positions of trust, confidence, or fiduciary relationship; or

  ☐ The defendant was in the past involved in other conduct similar to that involved in the current offense.

☐ Offense committed in order to prevent or avoid arrest, to impede or prevent prosecution for the conduct underlying the arrest, or to effect an escape from custody.

☐ Defendant is not amenable to rehabilitation or supervision, as evidenced by an escalating pattern of criminal conduct as described in s.921.001(8).

☐ Defendant induced a minor to participate in any of the offenses pending before the court for disposition.

☐ Primary offense is scored at level 7 or higher and the defendant has been convicted of one or more offense that scored, or would have scored, at an offense 8 or higher.

☐ Defendant has an extensive unscoreable juvenile record.

☐ Effective for offenses committed on or after January 1, 1997 — Defendant committed an offense involving sexual contact or sexual penetration and as a direct result of the offense, the victim contracted a sexually transmissable disease.

## Reasons for Departure — Mitigating Circumstances

☐ Legitimate, uncoerced plea bargain.

☐ Defendant was an accomplice to the offense and was a relatively minor participant in the criminal conduct.

☐ The capacity of the defendant to appreciate the criminal nature of the conduct or to conform that conduct to the requirements of law was substantially impaired.

☐ Defendant requires specialized treatment for a mental disorder that is unrelated to substance abuse or addiction, or for a physical disability, and the defendant is amenable to treatment.

☐ Effective only for offenses committed prior to July 1, 1997 — Defendant requires specialized treatment for addiction and is amenable to treatment.

☐ The need for payment of restitution to the victim outweighs the need for a prison sentence.

☐ The victim was an initiator, willing participant, aggressor, or provoker of the incident.

☐ The defendant acted under extreme duress or under the domination of another person.

☐ Before the identity of the defendant was determined, the victim was substantially compensated.

☐ Defendant cooperated with the State to resolve the current offense or any other offense.

☐ The offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse.

☐ At the time of the offense the defendant was too young to appreciate the consequences of the offense.

☐ Defendant to be sentenced as a youthful offender.

157

Table 1. Calculation of Percent Difference in Conviction Rates Using Data From Table 2 of Dr. Chiricos' Report

| CRIME TYPE | CONVICTIONS (1) | | ARRESTS (2) | | BLACK CONVICTION RATE (3) | WHITE CONVICTION RATE (4) | PERCENT DIFFERENCE (5) |
|---|---|---|---|---|---|---|---|
| | BLACK | WHITE | BLACK | WHITE | | | |
| 1. Murder | 532 | 688 | 1,242 | 1,249 | 42.83% | 55.08% | -12.25% |
| 2. Sex Offenses | 797 | 1,945 | 2,063 | 4,988 | 38.63% | 38.99% | -0.36% |
| 3. Robbery | 2,093 | 1,322 | 5,868 | 3,942 | 35.67% | 33.54% | 2.13% |
| 4. Other Violent Offenses | 4,789 | 5,933 | 55,241 | 87,119 | 8.67% | 6.81% | 1.86% |
| 5. Burglary | 3,704 | 5,989 | 16,117 | 28,751 | 22.98% | 20.83% | 2.15% |
| 6. Theft | 6,963 | 10,089 | 34,720 | 57,584 | 20.05% | 17.52% | 2.53% |
| 7. Drug Offenses | 17,481 | 10,605 | 50,932 | 50,572 | 34.32% | 20.97% | 13.35% |
| 8. Weapon Offenses | 1,549 | 1,166 | 3,204 | 4,035 | 48.35% | 28.90% | 19.45% |
| 9. Other Offenses | 2,712 | 4,750 | 13,347 | 21,918 | 20.32% | 21.67% | -1.35% |
| Total | 40,620 | 42,487 | 182,734 | 260,158 | 22.23% | 16.33% | 5.90% |

NOTES:
(1). Convictions are from Table 2 of Dr. Chiricos' report.
(2). Arrests are from Table 2 of Dr. Chiricos' Report.
(3). Black conviction rate is (black convictions/black arrests)*100%.
(4). White conviction rate is (white convictions/white arrests)*100%.
(5). The Percent Difference is the black conviction rate - the white conviction rate.

158

Table 2. Recalculation of Blumstein Percent Dispropropotionality Unexplained from Table 2 of Dr. Chiricos' Report Using Arrests With Felony Charge Level

| CRIME TYPE | FELONY CONVICTIONS (1) | | | FELONY ARRESTS (2) | | | BLACK PERCENTAGE ACTUAL CONVICTION RATE (3) | BLACK PERCENTAGE ACTUAL ARREST RATE (4) | BLUMSTEIN PERCENT DISPROPORTIONALITY UNEXPLAINED (5) |
|---|---|---|---|---|---|---|---|---|---|
| | BLACK | WHITE | TOTAL | BLACK | WHITE | TOTAL | | | |
| 1. Murder | 532 | 688 | 1,245 | 1,209 | 1,222 | 2,441 | 42.73% | 49.53% | -31.52 |
| 2. Sex Offenses | 797 | 1,945 | 2,790 | 1,761 | 3,753 | 5,523 | 28.57% | 31.88% | -17.05 |
| 3. Robbery | 2,093 | 1,322 | 3,462 | 5,573 | 3,805 | 9,394 | 60.46% | 59.33% | 4.60 |
| 4. Other Violent Offenses | 4,789 | 5,933 | 10,876 | 23,336 | 27,492 | 50,937 | 44.03% | 45.81% | -7.46 |
| 5. Burglary | 3,704 | 5,989 | 9,880 | 10,396 | 19,534 | 29,980 | 37.49% | 34.68% | 11.49 |
| 6. Theft | 6,963 | 10,089 | 17,249 | 19,059 | 31,043 | 50,198 | 40.37% | 37.97% | 9.58 |
| 7. Drug Offenses | 17,481 | 10,605 | 28,270 | 39,077 | 28,979 | 68,115 | 61.84% | 57.37% | 16.94 |
| 8. Weapon Offenses | 1,549 | 1,166 | 2,743 | 1,919 | 2,166 | 4,098 | 56.47% | 46.83% | 32.12 |
| 9. Other Offenses | 2,712 | 4,750 | 7,559 | 2,212 | 3,193 | 5,418 | 35.88% | 40.83% | -23.31 |
| Total | 40,620 | 42,487 | 84,074 | 104,542 | 121,187 | 226,104 | 48.31% | 46.24% | 8.00 |

NOTES:
(1). Felony convictions are from Table 2 of Dr. Chiricos' report.
(2). 1998 primary arrests from Dr. Chiricos' arrest data set with a felony arrest charge level. The TOTAL column includes "other" race.
(3). Black Percentage Actual Conviction Rate is (black convictions/total convictions)*100%.
(4). Black Percentage Actual Arrest Rate is (black arrests/total arrests)*100%.
(5). The Blumstein Percent Disproportionality Unexplained formula is {1 - (black conviction rate)/(black arrest rate*(1 - black conviction rate)/(1 - black arrest rate))}*100%.

159

**Table 3. Recalcular... of Crutchfield Percent Disproportionality Unexplained from Table 4 of Dr. Chiricos' Report Using Arrests With Felony Charge Level**

| CRIME TYPE | FELONY CONVICTIONS (1) BLACK | WHITE | FELONY ARRESTS (2) BLACK | WHITE | BLACK/WHITE RATIO ARREST 98 (3) | CONVICTION 98 (4) | CRUTCHFIELD PERCENT DISPROPORTIONALITY UNEXPLAINED (5) |
|---|---|---|---|---|---|---|---|
| 1 Murder | 532 | 688 | 1,209 | 1,222 | 7.07 | 5.52 | -21.84 |
| 2 Sex Offenses | 797 | 1,945 | 1,761 | 3,753 | 3.35 | 2.93 | -12.67 |
| 3 Robbery | 2,093 | 1,322 | 5,573 | 3,805 | 10.46 | 11.31 | 8.09 |
| 4 Other Violent Offenses | 4,789 | 5,933 | 23,336 | 27,492 | 6.06 | 5.77 | -4.91 |
| 5 Burglary | 3,704 | 5,989 | 10,396 | 19,534 | 3.80 | 4.42 | 16.21 |
| 6 Theft | 6,963 | 10,089 | 19,059 | 31,043 | 4.39 | 4.93 | 12.41 |
| 7 Drug Offenses | 17,481 | 10,605 | 39,077 | 28,979 | 9.63 | 11.77 | 22.24 |
| 8 Weapon Offenses | 1,549 | 1,166 | 1,919 | 2,166 | 6.33 | 9.49 | 49.95 |
| 9 Other Offenses | 2,712 | 4,750 | 2,212 | 3,193 | 4.95 | 4.08 | -17.58 |
| Total | 40,620 | 42,487 | 104,542 | 121,187 | 6.16 | 6.83 | 10.83 |

**NOTES:**

(1). Felony convictions are from Table 2 of Dr. Chiricos' report.

(2). 1998 primary arrests from Dr. Chiricos' arrest data set with a felony arrest charge level.

(3). Arrest 98 is [(black arrests/black population)/(white arrests/white population)].

(4). Conviction 98 is [(black convictions/black population)/(white convictions/white population)].

(5). The Crutchfield Percent Disproportionality Unexplained formula is [(conviction 98 -arrest 98)/arrest98]*100%.

160

**Table 4. Recalculation of Percent Difference Between Black and White Conviction Rates Using Arrests With Felony Charge Level**

| CRIME TYPE | FELONY CONVICTIONS (1) BLACK | WHITE | FELONY ARRESTS (2) BLACK | WHITE | FELONY CONVICTION RATE BLACK (3) | WHITE (4) | PERCENT DIFFERENCE (5) |
|---|---|---|---|---|---|---|---|
| 1. Murder | 532 | 688 | 1,209 | 1,222 | 44.00% | 56.30% | -12.30% |
| 2. Sex Offenses | 797 | 1,945 | 1,761 | 3,753 | 45.26% | 51.83% | -6.57% |
| 3. Robbery | 2,093 | 1,322 | 5,573 | 3,805 | 37.56% | 34.74% | 2.81% |
| 4. Other Violent Offenses | 4,789 | 5,933 | 23,336 | 27,492 | 20.52% | 21.58% | -1.06% |
| 5. Burglary | 3,704 | 5,989 | 10,396 | 19,534 | 35.63% | 30.66% | 4.97% |
| 6. Theft | 6,963 | 10,089 | 19,059 | 31,043 | 36.53% | 32.50% | 4.03% |
| 7. Drug Offenses | 17,481 | 10,605 | 39,077 | 28,979 | 44.73% | 36.60% | 8.14% |
| 8. Weapon Offenses | 1,549 | 1,166 | 1,919 | 2,166 | 80.72% | 53.83% | 26.89% |
| 9. Other Offenses | 2,712 | 4,750 | 2,212 | 3,193 | 122.60% | 148.76% | -26.16% |
| Total | 40,620 | 42,487 | 104,542 | 121,187 | 38.86% | 35.06% | 3.80% |

NOTES:
(1). Felony convictions are taken from Table 2 of Dr. Chiricos' report.
(2). 1998 primary arrests from Dr. Chiricos' arrest data set with a felony arrest charge level.
(3). Black felony conviction rate is [(black felony convictions/black felony arrests)]*100%.
(4). White felony conviction rate is [(white felony convictions/white felony arrests)]*100%.
(5). The Percent difference is the black felony conviction rate - the white felony conviction rate.

161

**Table 5. Comparison Between Dr. Chiricos' Study and Dr. Katz's Reanalysis of the Number of Offenders By Race and Type of Sentence**

| TYPE OF SENTENCE (1) | DR. CHIRICOS' STUDY (2) | | | | |
| --- | --- | --- | --- | --- | --- |
| | BLACK | PERCENT | WHITE | PERCENT | TOTAL |
| 1. State Prison | 12,309 | 30.30% | 10,446 | 24.59% | 22,755 |
| 2. County Jail | 14,185 | 34.92% | 11,843 | 27.87% | 26,028 |
| 3. Supervision, Adjudication Applied | 14,126 | 34.78% | 20,198 | 47.54% | 34,324 |
| 4. Supervision, Adjudication Withheld | ------ | 0.00% | ------ | 0.00% | ------ |
| Total | 40,620 | 100.00% | 42,487 | 100.00% | 83,107 |

| TYPE OF SENTENCE (1) | DR. KATZ'S REANALYSIS (3) | | | | |
| --- | --- | --- | --- | --- | --- |
| | BLACK | PERCENT | WHITE | PERCENT | TOTAL |
| 1. State Prison | 12,304 | 21.21% | 10,434 | 14.72% | 22,738 |
| 2. County Jail | 16,315 | 28.12% | 13,732 | 19.37% | 30,047 |
| 3. Supervision, Adjudication Applied | 16,714 | 28.81% | 22,441 | 31.65% | 39,155 |
| 4. Supervision, Adjudication Withheld | 12,685 | 21.86% | 24,287 | 34.26% | 36,972 |
| Total | 58,018 | 100.00% | 70,894 | 100.00% | 128,912 |

**Notes:**
(1). Felony offenders sentenced to prison or supervision who began their sentence in 1998 plus felony offenders sentenced to county jail in 1998.
(2). Number of offenders, by sentence type, from the table on page 4 of Dr. Chiricos' report.
(3). Count of offenders, by sentence type, derived from the four data files that were provided by the Florida Department of Corrections.

162

Table 7. Calculation of Percent Difference Using Arrests With Felony Charge and Offenders Sentenced on a Felony Charge

| CRIME TYPE | FELONY SENTENCES (1) | | FELONY ARRESTS (2) | | FELONY SENTENCE RATE | | PERCENT DIFFERENCE (5) |
|---|---|---|---|---|---|---|---|
| | BLACK | WHITE | BLACK | WHITE | BLACK (3) | WHITE (4) | |
| 1. Murder | 553 | 707 | 1,209 | 1,222 | 45.74% | 57.86% | -12.12 |
| 2. Sex Offenses | 937 | 2,266 | 1,761 | 3,753 | 53.21% | 60.38% | -7.17% |
| 3. Robbery | 2,419 | 1,631 | 5,573 | 3,805 | 43.41% | 42.86% | 0.54% |
| 4. Other Violent Offenses | 6,934 | 9,987 | 23,336 | 27,492 | 29.71% | 36.33% | -6.61% |
| 5. Burglary | 4,695 | 8,713 | 10,396 | 19,534 | 45.16% | 44.60% | 0.56% |
| 6. Theft | 10,927 | 17,608 | 19,059 | ... | ... | ... | ... |

TABLE 6. Calculation of Crutchfield Percent Disproportionality Unexplained Using Arrests With Felony Charge and Offenders Sentenced on Felony Charge

| CRIME TYPE | FELONY SENTENCES (1) | | FELONY ARRESTS (2) | | FELONY SENTENCE RATE | | CRUTCHFIELD PERCENT DISPROPORTIONALITY UNEXPLAINED (5) |
|---|---|---|---|---|---|---|---|
| | BLACK | WHITE | BLACK | WHITE | BLACK (3) | WHITE (4) | |
| 1. Murder | 553 | 707 | 1,209 | 1,222 | 45.74% | 57.86% | -20.94 |
| 2. Sex Offenses | 937 | 2,266 | 1,761 | 3,753 | 53.21% | 60.38% | -11.88 |
| 3. Robbery | 2,419 | 1,631 | 5,573 | 3,805 | 43.41% | 42.86% | 1.26 |
| 4. Other Violent Offenses | 6,934 | 9,987 | 23,336 | 27,492 | 29.71% | 36.33% | -18.20 |
| 5. Burglary | 4,695 | 8,713 | 10,396 | 19,534 | 45.16% | 44.60% | 1.25 |
| 6. Theft | 10,927 | 17,608 | 19,059 | 31,043 | 57.33% | 56.72% | 1.08 |
| 7. Drug Offenses | 25,286 | 20,968 | 39,077 | 28,979 | 64.71% | 72.36% | -10.57 |
| 8. Weapon Offenses | 2,233 | 1,921 | 1,919 | 2,166 | 116.36% | 88.69% | 31.20 |
| 9. Other Offenses | 4,034 | 7,093 | 2,212 | 3,193 | 182.37% | 222.14% | -17.90 |
| Total | 58,018 | 70,894 | 104,542 | 121,187 | 55.50% | 58.50% | -5.13 |

NOTES:
(1). Felony offenders sentenced to prison or supervision who began their sentence in 1998 plus felony offenders sentenced to county jail in 1998.
(2). 1998 primary arrests from Dr. Chiricos' arrest data set with a felony arrest charge level.
(3). Black felony sentence rate is [(blacks sentenced on a felony charge/black felony arrests)*100%.
(4). White felony sentence rate is [(whites sentenced on a felony charge/white felony arrests)*100%.
(5). The Crutchfield Percent Disproportionality Unexplained formula is [(black felony sentence rate - white felony sentence rate)/(white felony sentence rate)]*100%.

163

**Table 8. The Classification of Offenders Sentenced to Supervision By Date of Primary Offense**

| | ADJUDICATION APPLIED | | | ADJUDICATION WITHHELD | | |
|---|---|---|---|---|---|---|
| | BLACK | WHITE | TOTAL (5) | BLACK | WHITE | TOTAL (6) |
| **OFFENDERS BY PRIMARY OFFENSE DATE** | | | | | | |
| Date of Primary Offense on or before 12/31/93 (1) | 565 | 972 | 1537 | 167 | 301 | 468 |
| Date of Primary Offense between 1/1/94 and 9/30/95 (2) | 822 | 1349 | 2171 | 396 | 648 | 1044 |
| Date of Primary Offense between 10/1/95 and 9/30/98 (3) | 14,954 | 19,729 | 34,683 | 11,748 | 22,754 | 34,502 |
| Date of Primary Offense on or after 10/1/98 (4) | 372 | 380 | 752 | 369 | 582 | 951 |
| Total Number of Cases | 16,713 | 22,430 | 39143 | 12,680 | 24,285 | 36,965 |
| | | | | | | |
| **OFFENDERS WITH GUIDELINE SCORES BY PRIMARY OFFENSE DATE** | | | | | | |
| Date of Primary Offense on or before 12/31/93 (1) | 51 | 67 | 118 | 23 | 30 | 53 |
| Date of Primary Offense between 1/1/94 and 9/30/95 (2) | 422 | 725 | 1,147 | 241 | 409 | 650 |
| Date of Primary Offense between 10/1/95 and 9/30/98 (3) | 10,693 | 13,977 | 24,670 | 9,175 | 18,187 | 27,362 |
| Date of Primary Offense on or after 10/1/98 (4) | 182 | 218 | 400 | 186 | 318 | 504 |
| Total Number of Cases with Guideline Scores | 11,348 | 14,987 | 26,335 | 9,625 | 18,944 | 28,569 |
| Percent of Cases with Guideline Scores | 67.90% | 66.82% | 67.28% | 75.91% | 78.01% | 77.29% |

**Notes:**
(1). 1983 Sentencing Guidelines
(2). 1994 Sentencing Guidelines
(3). 1995 Sentencing Guidelines
(4). The Criminal Punishment Code
(5). The primary offense date is missing for 12 cases.
(6). The primary offense date is missing for 7 cases.

165

Table 9. A Racial Comparison of Guideline Points For Offenders Sentenced to Supervision, Date of Primary Offense Between 10/1/95 and 9/30/98

| | ADJUDICATION APPLIED | | | ADJUDICATION WITHHELD | | |
|---|---|---|---|---|---|---|
| OFFENDERS WITH 1995 GUIDELINE SCORES (1) Date of Primary Offense between 10/1/95 and 9/30/98 | BLACK 10,693 | WHITE 13,977 | TOTAL 24,670 | BLACK 9,175 | WHITE 18,187 | TOTAL 27,362 |
| | BLACK | WHITE | DIFFERENCE | BLACK | WHITE | DIFFERENCE |
| **TOTAL SENTENCE POINTS (BEFORE CONSIDERATION OF 15% INCREASE)** | | | | | | |
| Average | 38.18 | 37.29 | 0.89 | 26.78 | 25.44 | 1.34 |
| Median | 34 | 31.2 | 2.8 | 22.2 | 21.2 | 1.0 |
| 75th percentile | 45.1 | 43.2 | 1.9 | 33.4 | 31.4 | 2.0 |
| 90th percentile | 61.4 | 63.4 | -2 | 46.8 | 43.4 | 3.4 |
| 95th percentile | 82 | 92 | -10 | 60.4 | 60 | 0.4 |
| 99th percentile | 140.4 | 157 | -16.6 | 120 | 111.2 | 8.8 |
| **IV. PRIOR RECORD POINTS** | | | | | | |
| Average | 9.23 | 6.37 | 2.86 | 1.45 | 1.01 | 0.44 |
| Median | 5 | 2.6 | 2.4 | 0 | 0 | 0.0 |
| 75th percentile | 13.2 | 8.4 | 4.8 | 0.6 | 0.6 | 0.0 |
| 90th percentile | 23 | 17.6 | 5.4 | 3 | 2 | 1.0 |
| 95th percentile | 30.9 | 23.9 | 7.0 | 8.2 | 4.2 | 4.0 |
| 99th percentile | 57 | 44.4 | 12.6 | 23.7 | 16.5 | 7.2 |
| **PERCENTAGE OF CASES WITH 0 POINTS (NO POINTS) IN SENTENCE GUIDELINE CATEGORY** | | | | | | |
| II. Additional Offense(s) | 44.03% | 44.12% | -0.09% | 57.34% | 53.29% | 4.05% |
| III. Victim Injury | 93.73% | 92.36% | 1.37% | 93.45% | 93.83% | -0.38% |
| IV. Prior Record | 11.29% | 18.11% | -6.82% | 52.31% | 55.38% | -3.07% |
| V. Legal Status Violation | 90.41% | 89.75% | 0.66% | 95.95% | 95.98% | -0.03% |
| VI. Community Sanction Violation | 80.51% | 79.07% | 1.44% | 95.56% | 95.54% | 0.02% |
| VII. Firearm/Semi Automatic or Machine Gun | 99.35% | 99.50% | -0.15% | 99.40% | 99.46% | -0.06% |
| VIII. Prior Serious Felony (2) | 100.00% | 99.98% | 0.02% | 100.00% | 100.00% | 0.00% |
| IX. Enhancements | 99.49% | 99.22% | 0.27% | 99.48% | 99.54% | -0.06% |

**Notes:**
(1). These offenders received guideline scores based upon the 1995 Sentencing Guidelines
(2). Data provided by Ms. Stacey Anderson

166

**Table 10. The Effect of Controlling for Prior Felony Record on Conviction Rate Disparities**

| PRIOR FELONY RECORD (1) | ARRESTS (2) | | CONVICTIONS (3) | | CONVICTION RATE (4) | | |
|---|---|---|---|---|---|---|---|
| | BLACK | WHITE | BLACK | WHITE | BLACK | WHITE | DIFFERENCE |
| NO PRIOR FELONY RECORD | 112,683 | 207,506 | 20,886 | 28,043 | 18.54% | 13.51% | 5.02% |
| PRIOR FELONY RECORD | 70,072 | 52,625 | 23,063 | 17,432 | 32.91% | 33.12% | -0.21% |
| TOTAL | 182,755 | 260,131 | 43,949 | 45,475 | 24.05% | 17.48% | 6.57% |

(1). The CCH data file identified the prior felony record status for an arrestee.
The Department of Correction files has a variable that indicates whether or not the offender has a prior felony record.
(2). The arrest data is from the CCH database and is very close to the arrest data from Table 2 of Dr. Chiricos' Report.
(3). The conviction data is from the Katz Reanalysis portion of Table 5 of this report.
The analysis considers only offenders sentenced to state prison, county jail, or supervision with adjudication applied.
The prior felony record status is unknown for 2,516 offenders (white = 1,132, black = 1,384) who were sentenced to county jail. These cases are not included.
(4). The conviction rate is (number of offenders convicted/number of offenders arrested).

167

# The Origins and Impacts of Felon Disenfranchisement in Florida

**Lance deHaven-Smith, Ph.D.**
**September 2001**

# The Origins and Impacts of Felon Disenfranchisement in Florida

Lance deHaven-Smith, Ph.D.
September 2001

## Overview

This is an analysis of felon disenfranchisement in Florida. The study was prepared for the State of Florida as expert testimony in a court case (*Johnson et al. v. Bush et al.*) challenging the felon disenfranchisement clauses in the Florida Constitution. The central claim of plaintiffs' historical expert, Professor Shofner, is that the felon disenfranchisement provision of Florida's 1868 Constitution was adopted intentionally to weaken the voting strength of African Americans in Florida. After studying the issue very carefully, I have concluded without any residual doubt that felon disenfranchisement simply was not intended to affect black electoral power. To be sure, there were many other techniques used historically in Florida to limit African American political participation and influence, but the felon disenfranchisement law was not such a device.

My specific conclusions are summarized in the bulleted statements below. The next section of this report discusses my background and expertise. This section is then followed by the body of the report.

- Disenfranchisement of electors convicted of serious crimes has been a standard feature of Florida Constitutions throughout the state's history, from before the state entered the Union, through the Civil War, Reconstruction, and post-Reconstruction, to the present day. Indeed, the disenfranchisement of felons in Florida predates the extension of the franchise to African-Americans and thus plainly was not racially motivated. Changes in the wording of criminal disenfranchisement clauses have had no appreciable effect on their meaning.

- It is a fundamental error to draw conclusions about the intentions of delegates to Florida's 1868 Constitutional Convention from the statements and actions of Florida's leaders in 1865 and 1866. In 1865, the slave-owning class of the

1

antebellum era was still in power.  By 1868, Radical Republicans in Congress had overturned the old order.

- The Constitution of 1868 was a progressive document written primarily by African Americans, whites from the North, and Southern Unionists.

- The voting pattern at the Constitutional Convention of 1868 on the Constitution's felon disenfranchisement clauses shows that felon disenfranchisement was not targeted at blacks.  The Article that included felon disenfranchisement was endorsed by half of the blacks in attendance (some of whom were Florida's greatest black leaders) and by all of the white Northerners.  It was opposed by half of the white Southerners.

- The Florida Constitutions of 1868 and 1885 did include elements that may have weakened the political influence of blacks, but they did not rely on felon disenfranchisement.  In 1868, black influence may have been diluted through the system of legislative apportionment.  In the Constitution of 1885, a poll tax was authorized.

- After the Civil War, felon disenfranchisement did in fact impact black electors more than white electors, because blacks were disproportionately arrested and convicted.  However, the number of felony convictions in Florida was small and therefore had little effect on black voting strength.

**Personal Background**

A former President of the Florida Political Science Association, I am a tenured, full professor in the Reubin O'D. Askew School of Public Administration and Policy at Florida State University.  I received my B.A. degree from the University of Georgia in 1975, *summa cum laude*, and my M.A. and Ph.D. in Political Science from the Ohio State University in 1978 and 1980, respectively.  I am the author of fourteen books and numerous articles in the top academic journals of my fields.  My first book won the Manning Dauer Prize for scholarship from the University of Florida.

I have written and conducted research on a wide range of topics, including Florida history, political philosophy, public opinion, public policy, religion, and national, state, and local government.  My books on Florida include *Government in the Sunshine State:*

2

**170**

*Florida Since Statehood* (with David Colburn); *The Florida Voter*; *Environmental Concern in Florida and the Nation; The Almanac of Florida Politics* (with Tom Fiedler); and *The Atlas of Florida Voting and Public Opinion.* Some of my other books are *The Hidden Teachings of Jesus; Foundations of Representative Democracy*; and *Philosophical Critiques of Policy Analysis.*

I have directed two blue-ribbon commissions for the State of Florida. In 1995, I served as Director of the Citizens Commission on Cabinet Reform, which was appointed by the Governor and Cabinet to evaluate the basic structure of Florida's executive branch in advance of the Constitution revision process of 1998. In 1997-98, I was Executive Director of the Local Government Commission II, which was appointed by the Governor, the President of the Senate, and the Speaker of the House, to study the authority, capacity, and needs of Florida's cities, counties, and special districts. My research for both of these commissions included studies of the history of Florida government since statehood.

**Felon Disenfranchisement in Florida History**

Florida has had six Constitutions, and each one has included one or more clauses disenfranchising electors who have been convicted of serious crimes. The Constitutions are generally referred to by the year in which they were adopted: 1838, 1861, 1865, 1868, 1885, and 1968. Table 1 lists the criminal disenfranchisement clauses in each of the Constitutions. Table 2 is a summary of the pertinent language from Table 1. *See also* Table 3 (listing main constitutional developments in Florida history). As highlighted by Table 2, the Constitutions of 1838, 1861, and 1865 empowered the State Legislature in two slightly different ways to disenfranchise criminals. In one clause, which referred to

3

**171**

"bribery, perjury, or other infamous crime," the Legislature was authorized to enact statutes for disenfranchisement. In another clause, this one referring to "bribery, perjury, forgery, or other high crime or misdemeanor," the Legislature was required to enact disenfranchising statutes.

After 1865, the disenfranchisement clauses were modified slightly in each of the subsequent constitutions. In 1868, three changes were introduced. The Legislature was required rather than simply authorized to disenfranchise all of the criminal categories listed; the crime of *forgery* was dropped from the list; and *larceny* and *felony* were added. In 1885, the word felony was qualified by the phrase "in a court of record." Finally, in 1968, the words *bribery, perjury, larceny,* and *infamous crime* were dropped, and the crime category of felony was left to stand by itself.

Professor Shofner maintains that the felon disenfranchisement provision of the 1868 Constitution was motivated by racial discrimination against African-Americans. The central premise of Professor Shofner's thesis is that the 1868 Constitution "expanded" upon the prior disenfranchisement provisions by specifying that the conviction of any "felony" or even misdemeanor larceny would result in disenfranchisement. Contrary to his assertions, these provisions of the 1868 Constitution simply did not expand upon Florida's longstanding prohibition on felon voting, and there is no persuasive evidence that the disenfranchisement provision of 1868 was racially motivated.

Dating back to its status as a territory, Florida's constitutions have uniformly provided for the disenfranchisement of those convicted of serious crimes. Florida's first constitution in 1838 provided that: "The general assembly shall have power to exclude

from . . . the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime." FLA. CONST. ART. VI, §4 (1838). This clause provided for the disqualification from voting of any criminal who had been convicted of a felonious crime.

The term "infamous crime" was a far-reaching one, and generally referred to those crimes in which conviction rendered a person incompetent to testify as a witness. At the time of the adoption of the 1838 Constitution, infamous crimes were understood to include the crimes of "treason, felony, and the *crimen falsi*."[1] For example, The Law of Nisi Prius, Evidence in Civil Action, and Arbitration and Awards, a legal treatise published in 1844, defines a long list of crimes that are infamous, including "treason, *felony*, piracy . . . forgery, perjury . . . and persons outlawed for treason and *felony*."[2] And the discussion in the Treatise on the Law of Evidence (1816), as to what crimes rendered a witness incompetent (i.e., what crimes were infamous), included: "the whole class of offences which come under the denomination of *felony* . . . ."[3]

In 1845, Florida was admitted to the Union as a State. In that same year, the Florida Legislature confirmed and codified the breadth of the term "infamous crime." The legislature created a specific list of crimes that qualified as "infamous": "That hereafter no person shall be excluded from being a witness, or from giving evidence. . .by reason of having been convicted of any criminal offense, except the crimes of murder,

---

[1] *See, e.g.*, S.M. Phillips, Treatise on the Law of Evidence 22 (1816); *See also* 1 Joel Prentiss Bishop, Commentaries on The Criminal Law § 972.

[2] Archibald John Stephens, The Law of Nisi Prius, Evidence in Civil Action, and Arbitration and Awards 1721 (1844) (emphases added).

[3] Treatise on the Law of Evidence at 22.

5

perjury, piracy, forgery, *larceny*, robbery, arson, sodomy, or buggery. . ."[4]  Subsequently, Florida courts referenced this Act as providing the enumerated list of infamous crimes for Florida.  As the Supreme Court of Florida has stated,

> The law (Thomp. Dig., 335,) does name the crimes the conviction for which shall exclude the person from being a witness or giving evidence, thus establishing the meaning of the term "Infamous Crimes," as used in section 8 of the Declaration of Rights.  The offences thus named are "the crimes of murder, perjury, piracy, forgery, *larceny*, robbery, arson, sodomy, or buggery."

*King v. The State of Florida,* 17 Fla. 183, 186 (1879) (emphasis added) (quoting The Act of 1845, Section 6).[5]

It is uncontroverted that this sweeping disenfranchisement provision established in the 1838 Constitution and subsequently codified by the legislature in 1845 was not in any way motivated by racial discrimination.  Indeed, at the time of the adoption of Florida's first Constitution and its admission to the United States, African-Americans in the State were still subject to slavery and not permitted to vote.  *See* Florida Constitution, Article VI § 1 (1838) (granting franchise to "[e]very free white male person of the age of twenty-one" with certain exceptions).  Thus, the provision fell exclusively on white males convicted of infamous crimes.

The Constitution of 1868 was virtually identical to the earlier provisions, and as such, was not the result of racial discrimination but rather reflected the State's

---

[4] Act of 1845, Section 6 (emphasis added).  Reprinted in: Leslie A. Thompson, Esq., <u>A Manual or Digest of the Statute Law of the State of Florida</u> 335 (1847) (commonly known and cited to at the time as <u>Thompson's Digest</u>).

[5] Section 9 of the 1868 Constitution states "No person shall be tried for a capital or otherwise infamous crime, except in cases of impeachment, and in cases of the militia when in active service in time of war. . ." FLA. CONST. ART. I, §9 (1868) (superseded).

6

longstanding policy.  The 1868 provision stated "The legislature shall have power, and shall enact the necessary laws to exclude from. . .the right of suffrage, all persons convicted of bribery, perjury, larceny. or of infamous crime. . ."  FLA. CONST. ART. XV, §4 (1868). [6]  In addition, the 1868 Constitution contained the following provision: "No person under guardianship, *non compos mentis*, or insane, shall be qualified to vote at any election; nor shall any person convicted of felony be qualified to vote at any election unless restored to civil rights. . ."  FLA. CONST. ART. XV, §2 (1868) (superseded).

Professor Shofner maintains that these provisions are demonstrative of racial discrimination because they expanded restriction on felon disenfranchisement by (1) covering larceny for the first time and (2) covering all felonies for the first time in Florida's history.  Neither premise is accurate.  First, the term "infamous crime" included all forms of larceny, and thus the felon disenfranchisement provision in effect prior to 1868 disenfranchised those convicted of this crime.  As noted, the Act of 1845, *specifically* mentioned larceny as among those crimes interpreted to be infamous.  *See supra* at 5.  And *all* forms of larceny were infamous at common law, as even petit larceny, a misdemeanor, was considered to be an infamous crime.  For example, in *The State of Florida Ex Rel. Richard Jordan v. T.E. Buckman*, 18 Fla. 267, 270 (1881), the court stated: "The term 'larceny'. . .embraces petty larceny, and petty larceny, so far as its

---

[6] Section 4 of the 1868 Constitution also referred to betting on elections, dueling, and fighting as disqualifiers for voting.  However, I know of no evidence that these were included with a racially discriminatory intent, nor of evidence that they were not applied on a racially neutral basis.  And I note that plaintiff's expert has made neither of these allegations.

7

nature is defined by the Constitution, is, under section 8 of the Declaration of Rights, an 'infamous crime.' "

The reference to disenfranchisement of those convicted of "felonies" was also not expansive. As noted, felonies clearly fell within the rubric of "infamous crime." In addition to the previously cited sources that specifically mentioned felony as being included within the meaning of "infamous crimes," the Supreme Court of the United States, in *Ex Parte Wilson*, 114 U.S. 417, 429 (1885) defined infamous crime as, "a crime punishable by imprisonment for a term of years at hard labor," a definition which was virtually synonymous with Florida's definition of felony.[7]

Indeed, the Legislature's enactment of Article XV §4 of the 1868 Constitution made it clear that felonies were considered to be infamous crimes in Florida as elsewhere. "The Legislature, in 1868 enacted that '[p]ersons hereafter convicted of *felony*, bribery, perjury, larceny, or *other* infamous crime, shall not be entitled to vote.'" *Buckman* at 269 (emphasis added) quoting Section 6, Chapter 1625, Laws. The term "other," modifying "infamous crime," suggests that all terms listed before it, including the term "felony," are infamous crimes.

Florida's disenfranchisement provisions reflected the widespread view that such convicts should not be permitted to vote. This belief is deeply rooted in the nation's history. For example, eleven state constitutions adopted between 1776 and 1821 prohibited or allowed the state legislature to prohibit exercise of the franchise by

---

[7] *William Kennedy v. The State of Florida*, 15 Fla. 635, 636 (1876) "The statute of 1868, relating to crimes and punishment, provides that any crime punishable by death or imprisonment in the state prison is a felony, and every other offense is a misdemeanor."

8

176

convicted felons.[8]  On the eve of the Civil War, in 1860, 24 of 34 states had disenfranchisement provisions of some sort in their constitutions.[9]  Thus Florida's disenfranchisement provision was a common feature of the constitutions of both northern and southern States and was in no way reflective of racial discrimination.

**Radical Reconstruction and
Florida's Constitutional History**

Professor Shofner attempts to demonstrate the racially discriminatory purpose of the felon disenfranchisement provision of the 1868 Constitution by citing historical evidence relating to the 1865 Constitutional Convention.  This approach ignores the important shift in political power that occurred from 1865 to 1868.  Of particular significance are the differences between the 1865 and 1868 Constitutions and the shift in political power underlying these differences.  In 1865, the white power structure of the antebellum era was still in control of state and local government.  The War had been lost, but the South reemerging from the destruction was not much different from the South before the War.  In contrast, by 1868 the post-War governments formed in 1865 had been disbanded, African Americans had become politically organized, and adult black males had been empowered to vote and hold elected office.

---

[8] VA.CONST. ART. III, § 1 (1776); KY.CONST. ART. VIII, § 8 (1799); OHIO CONST. ART. IV, § 4 (1802); LA. CONST. ART. VI, § 4 (1812); IND.CONST. ART. VI, § 4 (1816); MISS.CONST. ART. VI, § 5 (1817); CONN.CONST. ART. VI, § 2 (1818); ILL.CONST. ART. II, § 30 (1818); ALA.CONST. ART. VI. § 5 (1819); MO.CONST. ART. III, § 14 (1820); N.Y.CONST. ART. II, § 2 (1821).

[9] DEL. CONST. art. IV, § 1 (1831); TENN.CONST. art. IV, § 2 (1834); FLA.CONST. art. VI, § 4 (1838); R.I. CONST. art. 2, § 4 (1842); N.J. CONST. art. II, § 1 (1844); TEX. CONST. art. VII, § 4 (1845); IOWA CONST. art. II, § 5 (1846); WIS.CONST. art. III, § 2 (1848); CAL.CONST. art. II, § 5 (1849); MD.CONST. art. I, § 5 (1851); MINN.CONST. art. VII, § 2 (1857); OR.CONST. art. II, § 3 (1857); KAN.CONST. art. V, § 2 (1859).

9

This dramatic shift in power was wrought by the U.S. Congress, which was dominated by Radical Republicans. It is important to keep in mind the nation's emotional state after the War. The Radical Republicans were radical, because they were energized by the North's righteous zeal after winning the war, burying its sons, and losing its President to a Southern assassin.

Nor were Northerners and Congressional Radicals motivated exclusively by idealism. They also had a very real political interest in overturning the old guard in the Southern states. Unless a political transformation occurred in the South, the Southern states would reenter the Union as bastions of the Democratic Party, just as they had been before the War, and the Democrats would retake control of the White House and of Congress. The Republican Party was a new and still-shaky party; it had only been formed in 1856, and it had captured the Presidency in 1860 only because Northern and Southern Democrats had split over slavery and run separate Presidential candidates, thus dividing the Democratic vote and throwing the election to the Republicans. If the South returned to the Union unrepentant, everything might be lost—the Republicans would be thrown out, the Southerners would try to have their war debts paid and obtain compensation for having lost their slaves, and these efforts might bring slavery back or lead to yet another disastrous war, especially once the South had recovered from its losses. This is why Northerners, led by the Radical Republicans in Congress, were willing to turn the South upside down after the War.

It is also why the Congress controlled by Radical Republicans was the first Congress to impeach a President. Johnson was perceived, correctly, to be selling out the ideals of Lincoln, which had been written in soldiers' blood and the blood of Lincoln

10

himself. Under Johnson's plan for Reconstruction, the Southern states had to ratify the Thirteenth Amendment outlawing slavery and to revise their state constitutions and statutes to reflect the new status of freedmen, but their new state constitutions did not have to grant freedmen the right to vote or to in any way protect their civil rights. When Congress enacted the Civil Rights Act of 1866 to assure freedmen equal treatment under the law, access to public accommodations, and similar basic rights, Johnson vetoed it on the grounds that, in his opinion, protection of civil rights was a power reserved to the states in the U.S. Constitution. Congress responded by overriding his veto and then passing other Reconstruction Acts. Johnson vetoed these Acts, too, and Congress overrode these vetoes as well.

The Congressional plan for Reconstruction required Southern states to ratify the Fourteenth Amendment and to adopt new state constitutions extending suffrage to black males. Further, blacks had to be allowed to vote in the election for delegates to the state constitutional conventions. Accordingly, after the Reconstruction Acts were passed, the civil governments in the South established under Johnson's framework were disbanded, and the South was again placed under marshal law.

In Florida, white Confederates tried to prevent the 1868 Constitutional Convention from being called. They did this by boycotting the election to choose delegates, which had to attract at least half of the state's registered voters for the Convention to take place. They also used murder and terrorism, which were not fully suppressed by the Union troops until almost 1870. Nevertheless, their efforts to sabotage the political process were unsuccessful, and enough voters went to the polls to be able to call the Convention. Moreover, because Confederate loyalists boycotted the election, the

11

179

delegates to Florida's 1868 Convention ended up being overwhelmingly Unionist in orientation, and they produced a progressive Constitution.

Clearly, given the huge changes achieved in the South by the Reconstruction Congress, it is a fundamental error to draw judgments about the lineup of political forces in Florida in 1868 based on the actions of state officials three years earlier. To ignore the drastic shift in political circumstances that occurred from 1865 to 1868 is to slight the ideals which infused the Union by the end of the Civil War. It is also unfair to the many African Americans, Northerners, pro-Union Southerners, and Union soldiers who, with the backing of Congress, made enormous sacrifices to successfully overcome the South's resistance to Reconstruction.

After the war this coalition took control of the state in 1868 when Congress overthrew the white power structure by force. Now the Republicans, rather than the rebels, possessed the power of incumbency writ large, and they used it to reshape the state.

**The 1868 Constitution and
Constitutional Convention**

Florida's 1868 Constitution was shaped by the direct and growing involvement in Florida politics of the Reconstruction Congress, which was insisting that suffrage be extended to freedmen and that the freedmen's civil rights be protected. Radical Republicans in Congress had sufficient votes to override Presidential vetoes, and federal military troops to enforce the Reconstruction Acts were stationed throughout the South. The direct involvement of the Freedmen's Bureau in Florida's 1868 Constitutional Convention has been well documented. Former and current officials of the Bureau were the primary authors of the 1868 Constitution. The most influential faction at the

12

**180**

Convention was led by Thomas Osborn, the Bureau's former Assistant Director, and this faction also included Bureau agents W. J. Purman and Marcellus Stearns, and former Bureau agent Charles M. Hamilton. [10] Later, many Bureau agents rose to the highest levels of leadership in Florida politics. Osborn became a U.S. Senator, Hamilton was elected to Congress, Purman was appointed Secretary of State, and Stearns became Speaker of the Florida Assembly and, after that, Governor.

To this day Florida's 1868 Constitution is sometimes referred to as the "Carpetbag Constitution,"[11] because native Southerners played such a small role in the 1868 Constitutional Convention. To be sure, the old white Southern guard was represented, but its members were a distinct minority. A list of the Convention delegates with their demographic backgrounds is contained in Table 4.[12] Figure 3 is a pie chart showing the Convention's makeup. Over a third (38%) of the delegates were black, and more than another quarter (26%) were non-Southern whites,[13] all but one of whom had come to Florida as Federal officials or members of the Union army.[14] For their part, the 19 white delegates who were native Southerners included three deserters from the

---

[10] These observations and those in the next sentence are from George R. Bentley, "The Political Activity of the Freedmen's Bureau in Florida," <u>The Florida Historical Quarterly</u> (July 1949), pp. 28-37.

[11] See, for example, the web page of the Florida Department of State describing Florida's various Constitutions.

[12] These data come from Richard L. Hume, "Membership of the Florida Constitutional Convention of 1868: A Case Study of Republican Factionalism in the Reconstruction South," <u>Florida Historical Quarterly</u>, pp. 1-21.

[13] <u>Ibid</u>. pp. 3, 9.

[14] <u>Ibid</u>. p. 13.

13

Confederate army and four Radical Republicans.[15]  Overall, 93 percent of the delegates were Republicans.[16]

It may be useful to hear how the 1868 Constitutional Convention and its product were viewed by whites who had been part of the old regime.  Here is an assessment by Samuel Pasco, [17] the namesake of Pasco County:

> A new convention was ordered; many of the prominent and influential citizens of the state were disenfranchised; the ballot was given to the recently enfranchised freedmen; men who had followed the Army into the state for gain and graft organized the Negroes into secret leagues in the black belt and by their votes were elected to represent counties where they were strangers and had no personal property but their baggage, which they carried in their carpet bags.  A constitution was framed by a convention made up largely of such delegates as these and ignorant Negroes; the few old citizens of the State who were chosen from the white counties were powerless.

Meeting the expectations of Congress and fulfilling the requirement seen by most of the delegates as essential to true emancipation and reconstruction, the 1868 Constitution extended suffrage to all adult males, and equal civil and political rights to whites and blacks alike.[18]

---

[15] Ibid.  p. 12.

[16] John Luther Bell, Jr., Constitutions and Politics: Constitutional Revision in the South Atlantic States, 1864-1902, unpublished Ph.D. dissertation, Department of History, University of North Carolina, Chapel Hill, 1969, p. 173.

[17] "Jefferson County, Florida, 1827-1910," The Quarterly Periodical of the Florida Historical Society (January 1929), p.254

[18] Professor Shofner tries to make the case that the 1868 Constitution was the product of a devil's bargain made by the moderate Republicans with the Conservatives, who in Professor Shofner's view represented the Old Order.  See Shofner Report at 11.  Clearly, this is an attempt by Shofner to impugn the motives of the moderate Republicans and therefore also the 1868 Constitution they drafted.  To make this claim stick, however, Professor Shofner has to show that the Radical Republicans were attacked unfairly by the Moderates and had purer intentions.  In reality, however, the Radicals were the self-serving Republicans at the convention, while the moderates were the statesmen.  The Radicals were led by men who tried to highjack the convention by adopting a constitution

14

**The Adoption of 1868 Felon
Disenfranchisement Provision**

The felon disenfranchisement provision of the 1868 Constitution was not adopted for racially discriminatorily purposes. Not only has Professor Shofner failed to collect any evidence supporting this contention, the broad based support for this provision among the delegates refutes his conclusion. The voting pattern on the felon disenfranchisement clauses demonstrates that Convention delegates did not intend for felon disenfranchisement to target blacks. Two proposed drafts of what would become Article XIV of the 1868 Constitution were brought forward. The votes of individual delegates are shown in Table 4. The Article that was adopted by the delegates was endorsed by half of the blacks in attendance and by all of the white Northerners. It was opposed by half of the white Southerners. Moreover, one of the African Americans voting in support was Josiah Walls, a veteran of the Union army and Radical Republican who was later elected to Congress.

The Article in the 1868 Constitution that includes the felon disenfranchisement clauses was not voted on until the next-to-last day of the convention, and it was the last

---

when only 22 of the 40 members had arrived in Tallahassee. They also wrote sizable checks to themselves to be covered by the state. Two of the three were ineligible for election to the Convention because they did not reside in the geographical areas from which they were elected. The military supported the Moderates over the Radicals, as did the Reconstruction Committee of Congress, which was presented with two Constitutions, one from the Radicals and the other from the Moderates. The Radical Republicans simply could not secure a majority of votes at the Convention for their proposal, while the moderate Republicans could. Not surprisingly, Professor Shofner has failed to explain away the reactions of the military, a majority of delegates, the black Radicals who joined the moderates to give them a majority, the head of the Freedman' Bureau, and the Reconstruction Committee of Congress, all of whom supported the moderates.

15

**183**

Article to be amended and adopted.[19]  The felon disenfranchisement clauses in one draft of the suffrage Article—the draft that was eventually adopted--were related in part to other Articles dealing with the penal system and the judiciary, and therefore these Articles needed to have been taken up first.

The 1868 Constitution included major judicial and penal reforms to assure that the rights of freedmen would be protected.  By way of background, the Constitution of 1865 had given broad latitude to the Legislature with respect to the judiciary.  In fact, it authorized the Legislature to establish any courts it deemed necessary over and above those Constitutionally mandated.  Already, in 1861, Florida had created a system of county courts to handle criminal charges against slaves and other blacks.  This expansion of the local system of law enforcement at the beginning of the War had been initiated out of fears of possible slave uprisings, which, as previously stated, never occurred.

The first Florida Legislature to meet under the new Constitution of 1865 (the 1865 Legislature) restructured these slave courts into a system of county criminal courts.  The 1865 Legislature also enacted laws prohibiting racial intermarriage, black ownership of guns, and black entry into certain occupations and professions.  These were the so-called "Black Codes."  The county criminal courts handled all criminal offenses except those punishable by death.[20]  The judges were appointed by the Governor, trials were before 12-person juries, and verdicts were reached by majority rule.  The county criminal

---

[19] Professor Shofner maintains that the suffrage Article had already been adopted prior to February 24 and then was brought up for reconsideration.  *See* Shofner Report at 16.  In reality, the suffrage Article had its first reading but had not been formerly adopted prior to that time.

[20] The county criminal courts are established in Chapter 1,465 [No 2] of the Laws of Florida, 14th Session, pp. 20-23.

16

courts were also authorized to lease out the labor of those who could not pay their fines on their own.

As part of its reform agenda, the Constitutional Convention of 1868 adopted an ordinance entirely abolishing the system of county criminal courts, pardoning all persons convicted by them, rescinding their fines, and releasing all prisoners still incarcerated by their orders.[21]  The full wording of ordinance is as follows:

### No. 8  An Ordinance Abolishing County Criminal Courts.

Be it Ordained by the People of Florida in Convention assembled, That from and after the passage of this ordinance, the County Criminal Courts of this State shall be abolished, and all fees, costs, and charges of every kind whatsoever, due or to become due, to any justice of the peace, constable, clerk of circuit court, or of the county criminal court, sheriff, or any officer of this State, for services, issuing warrants, arresting accused, preparing docket and papers, confining prisoners, or for any service whatever, in and about said county criminal court, are declared illegal and void, and fully satisfied and extinguished; and it shall not be lawful for any Board of County Commissioners of this State, or any Treasurer, State or county, to allow or pay out any money or moneys for any such services; Provided, A small allowance, not to exceed the actual cost of the provisions, shall be allowed for the feeding of accused defendants and prisoners, bound over to or fined in said county criminal courts, and nothing shall be so construed as to deprive judges and solicitors of their fees.

Be it further ordained, That all fines, penalties, and disabilities ordered, entered up, or created in said county criminal courts are hereby rescinded and removed; all prisoners found guilty in said county criminal courts are hereby pardoned and released, and all judgments, executions, bonds, and recognizances, now outstanding and unsatisfied, originating or created in said courts, are hereby declared null, void, and paid off.

Be it further ordained, That all cases now pending in said court shall be transferred to the circuit court, and the officer transferring them to said circuit court shall be allowed the regular fees now allowed for such services.

The ordinance was ratified by the electors with the rest of the Constitution in May of 1868.

---

[21] An ordinance from a Constitutional Convention is an element of the proposed Constitution that is voted on separately by the electors at the election for ratifying or rejecting the Convention's products.

17

To be sure, not all provisions of the Constitution of 1868 strengthened the political power of the freedman. Professor Shofner maintains that the legislative apportionment formula contained in the Constitution discriminated against African-Americans. Yet, Professor Shofner points to no evidence, and I am aware of none, that connects this dilutive mechanism with the felon disenfranchisement provision. If anything, the Constitution's inclusion of this dilutive mechanism evidences the fact that the old Southern Guard attempted to achieve dilution of black voting strength through mechanisms that had nothing to do with felon disenfranchisement. And in any event, as noted below, blacks exercised considerable political power in Florida up until the enactment of other discriminatory mechanisms, such as the poll tax.

**The Impacts of Felon Disenfranchisement**
**On Black Voting Strength**

In 1868, agents of the Freedmen's Bureau, a federal agency established by Congress immediately after the War, were helping freedmen register to vote and understand the importance of the franchise. From a systemic perspective, the Freedmen's Bureau had quickly generated what political scientists refer to as an "iron triangle," an almost indestructible arrangement of self-reinforcing political interests involving members of Congress, executive agencies, and cohesive groups of constituents. In an iron triangle, members of Congress create an executive agency and give it resources, the agency serves its bureaucratic interest in expansion by aggressively delivering assistance and other benefits to a constituency, and the constituency, expanded and energized by these resources, provides electoral support back to its Congressional benefactors. During Reconstruction, the Freedmen's Bureau helped swell the voter registration rolls in the South with freedmen, who in turn helped more Radical Republicans win election to

18

Congress. As this dynamic fed on itself, Reconstruction turned into Radical Reconstruction, and Radical Reconstruction increasingly came to serve partisan as well as humanitarian ends.

After passage of the 1868 Constitution, black voter registration remained at high levels. Indeed, black voters far outnumbered white voters in many counties. Florida did not compile data on voter registration by race prior to 1920, but it is possible to assemble this data from the voter registration rolls of 1868, which list each registered voter by name, registration number, precinct number, race, and other information. [22] Although the records are incomplete-- the archives contain the rolls only of those counties from Hernando on, listed alphabetically--the proportion of registered voters who were black in the included counties can be estimated accurately. [23] Figure 2 is a bar chart showing the range. It confirms that African Americans constituted a majority of the registered voters in many counties.

In the aftermath of 1868 Constitution, African Americans exercised considerable political power. Indeed, in the first election after the ratification of the 1868 Constitution, all of the State Senators and Representatives elected from Duval County were African American, as were four of Leon County's five legislators, and four of Alachua's five.[24]

---

[22] The rolls were obtained on microfilm from the State Archives in Tallahassee, Florida (Project # FLA 03700, Film Unit Serial # E1747).

[23] From the counties available in the archived data, a random sample was drawn of 10 percent of the registration pages. The data on these sampled pages were tabulated to determine the percentage of registered voters by race for each county.

[24] Edward C. Williamson, "Florida's First Reconstruction Legislature: A Letter of William H. Gleason," The Florida Historical Quarterly (July 1953), p. 42.

19

Overall, out of 76 legislators in 1868. 19 were freedmen, and 13 were from the North.[25] In terms of party, Republicans outnumbered Conservatives two-to-one in both the House and the Senate.  The House had 37 Republicans and 15 Conservatives, and the Senate had 16 Republicans and 8 Conservatives.[26]

Ignoring this evidence of black political success, Professor Shofner maintains that the felon disenfranchisement provision had a negative impact on black voting strength. To address this question, data were gathered on the prison inmate population between 1877 and 1900.  The data source was the Prison Register for this period, available on microfilm through the Florida Archives.[27]  The data yielded three observations.

First, felon disenfranchisement affected many whites.  Between 1877 and 1900, whites comprised 18 percent of the prison population.  Although this is much lower than the white percentage of the total population (52 percent in 1870), it is significantly higher than the figures drawn from anecdotal statements in 19th Century sources which based their estimates on casual impressions and upon which Professor Shofner relies.[28]

---

[25] Joe M. Richardson, <u>The Negro in the Reconstruction of Florida, 1865-1877</u> (Tallahassee: Florida State University, 1965), p.187.

[26] Jerrell H. Shofner, <u>Nor Is It Over Yet: Florida in the Era of Reconstruction, 1863-1877</u> (University Presses of Florida, 1974). p. 194.

[27] Film Unit Serial Number E1747. Projection Number 03700, Roll Number 31.

[28] Similar conclusions based on a quantitative analysis of incarcerations during a slightly later period (1889 to 1916) were reached by Vivien M. L. Miller, <u>Crime, Sexual Violence, and Clemency:  Florida's Pardon Board and Penal System in the Progressive Era</u> (Gainesville:  University Press of Florida, 2000).  Miller's data show that whites made up about 17 percent of annual incarcerations in the state penal system between 1889 to 1900.

20

**188**

Second, adding the category of larceny to the disenfranchisement clause in 1868 did not significantly affect the number of black inmates given that 78 percent of the black prison population was incarcerated for other crimes.

Third, felon disenfranchisement may have had a modest impact on black voting strength during this period simply because blacks were over-represented in the felon population, but the impact at any single point in time was probably small. During the entire 23 years under analysis, a total of 5,615 prisoners were incarcerated in state prisons. The number began small and accumulated at about 245 per year. Of the total, 3,987 were black, and 1,628 were white, which means that 2,359 more blacks were disenfranchised than whites, accumulating at a rate of about 103 per year.[29] Of course, not all of these 103 blacks would have voted even if they had not been convicted of a felony. A rough estimate of the percentage of African Americans who registered to vote during Reconstruction can be obtained by comparing the county-level voter registration percentages for blacks compiled from the 1868 voter registration rolls to the county-level black population percentages calculated from the 1870 census. This comparison is shown in Table 5. It is clear from the table that in 1868 the percentage of voters who were black was at least as high as the black percentage of the population. This means that freedmen were registering to vote as frequently as whites. In the presidential election of 1872, about 83 percent of Florida's adult males went to the polls.[30] Thus, a reasonable estimate would be that about 83 percent of disenfranchised blacks and whites would have voted, absent the felon disenfranchisement provision. This was a small

---

[29] 2,359 divided by 23 years.

21

**189**

number in the 1870s and 1880s even when statewide elections were close, and it would not have affected the outcomes of statewide elections except in rare circumstances. African Americans and other Republicans dominated Florida politics from 1868 until at least 1876, and were an even match for Democrats until the early to mid-1880s.

Unfortunately, the measure of political success and power exercised by African-Americans in the years after the adoption of the 1868 Constitution was not long lived. After the withdrawal of federal troop in 1877, a new constitution was ratified in 1885. That constitution led to the disenfranchised of most blacks and poor whites directly by authorizing the Florida Legislature to impose a poll tax. The Legislature enacted the poll tax in 1889. This measure, not the felon disenfranchisement provisions cited by Professor Shofner, explain the dramatic decrease in black voting strength at the end of the nineteenth century.

The only direct evidence cited by Professor Shofner in support of his contention that felon disenfranchisement was used to weaken black voting power was a report written by the State Executive Committee of the Florida Republican Party in response to the 1880 election, which Republicans accused Democrats of having stolen. Written by T.W. Osborn, who was the leader of the moderate Republicans at the 1868 Constitutional Convention, the Report alleged that the Democratic Party had carried out an organized conspiracy to reduce Republican votes between 1877 and 1880. I have not found any confirmation of the Report's claims about felon disenfranchisement, and one would have to be cautious in accepting uncritically a partisan report intended to mobilize support for the next election. But even if some or all of the Report's assertions are true, they actually

---

[30] The adult male population shown in the 1870 census in Florida was 39,907. The total

argue against Shofner's contention that felon disenfranchisement was intended to be used as a tool for weakening black voting strength.

According to Osborn, after the Legislature became Democratic in the 1876 election, it passed a law in 1877 to allow county commissioners to remove from the voter registration rolls the names of people known "to have died or ceased to reside permanently in the county, or who are otherwise disqualified to vote."[31]  Since the Governor elected in 1876 was a Democrat and the 1868 Constitution vested with the Governor the power to appoint County Commissioners, the latter were now predominately Democratic, and they proceeded to wantonly remove Republicans from the lists.  They also dragged their feet and in other ways prevented these de-registered Republican voters from using the legally mandated process, which was also administered by the County Commissions, to be put back on the rolls.  "By these methods," the Report explained, "the Republicans suffered a loss in the eight or nine large Republican counties of from 250 to 2,500 voters in each county, and a less number in each county in the State."[32]  Later in the Report, the Constitution's felon disenfranchisement clause was discussed, but Osborne did not say that the clause authorized citizens to be disenfranchised for petty offenses.  Just the opposite; he explained that the issue needed to be taken to the Florida Supreme Court, because the Court would overturn the actions

___

number of votes cast for president in 1872 in Florida was 33,190.
[31] Republican State Executive Committee of Florida, Report to the Republicans of the State Upon the Election held on November 2, 1880 (Washington, D.C.: National Republican Publishing Company, 1881), p. 11.

[32] Ibid., p. 13.

23

**191**

of county commissioners who had misconstrued the felon disenfranchisement clause to apply to convictions in "justice of the peace courts."[33]

In short, no one would deny that, after Reconstruction, most African Americans were eventually excluded from Florida politics, but the question is not if, but how. In one form or another, felon disenfranchisement has always been a part of Florida's Constitution, and it was never intended to be used for racially discriminatory ends. Obviously, however, the same cannot be said for Florida's system of apportioning the Legislature or for the poll tax the Legislature enacted in 1889. These were designed to reduce black influence, and they did. Professor Shofner improperly adds felon disenfranchisement to this list and then attributes declines in black politic participation to felon disenfranchisement rather than to its true causes. In science, this is referred to as confusing a spurious relationship with a causal relationship.

Professor Lance deHaven-Smith

---

[33] Ibid, p. 18-19.

24

**192**

# References

Jeffrey S. Adler, "Black Violence in the New South: Patterns of Conflict in Late-Nineteenth Century Tampa," in David Colburn and Jane L. Landers, eds., The African American Heritage of Florida (Gainesville: University Presses of Florida, 1995),, pp. 207-239.

Joseph A. Aistrup, The Southern Strategy Revisited: Republican Top-Down Advancement in the South (Lexington: University Press of Kentucky, 1996).

Assembly Journal, Extra Session, June 8th, 1869.

John Luther Bell, Jr., Constitutions and Politics: Constitutional Revision in the South Atlantic States, 1864-1902, Doctoral Dissertation in Department of History, University of North Carolina, Chapel Hill, 1969.

George R. Bentley, "The Political Activity of the Freedmen's Bureau in Florida," The Florida Historical Quarterly (July 1949), pp. 28-37.

Joel Prentiss Bishop, Commentaries on The Criminal Law.

Earl Black and Merle Black, Politics and Society in the South (Cambridge, Mass: Harvard College, 1987).

Edward G. Carmines and James A. Stimson, Issue Evolution: Race and the Transformation of American Politics (Princeton: Princeton University Press, 1989).

LeRoy Collins, Forerunners Courageous: Stories of Frontier Florida (Tallahassee: Colcade Publishers, Inc., 1971).

Complaint-Class Action, 00-3542.

Constitution of the State of Florida as Adopted in 1885

Defendants' Clemency Board Members' Motion to Dismiss Pursuant to Rule 12(b)(6)

James A. Denham, "A Rogue's Paradise": Violent Crime in Florida, Dissertation, Florida State University College of Arts and Sciences, 1988.

William A. Dunning, "The Undoing of Reconstruction," The Atlantic Monthly, pp. 437-449.

House and Senate Journals, Fourteenth Session (1865).

Republican State Executive Committee of Florida, <u>Report to the Republicans of the State Upon the Election held on November 2, 1880</u> (Washington, D.C.: National Republican Publishing Company, 1881).

Richard L. Hume, "Membership of the Florida Constitutional Convention of 1868: A Case Study of Republican Factionalism in the Reconstruction South,"...

"Jefferson County, Florida, 1827-1910," <u>The Quarterly Periodical of the Florida Historical Society</u> (January 1929), p.254

<u>Journal of the Proceedings of the Constitutional Convention of the State of Florida</u>, 1885.

<u>Journal of the Senate, First Session, Fifteenth Legislature</u> (1868).

V.O. Key, <u>Southern Politics in State and Nation</u> (Knoxville: University of Tennessee Press, 1984—first published in 1949).

Patricia L. Kinney, "LaVilla, Florida. 1866-1887: Reconstruction Dreams and the Formation of a Black Community," in Colburn and Jane L. Landers, eds., <u>op. cit.</u>, pp. 185-206.

<u>Laws of Florida</u> 1868-1875.

Vivien M. L. Miller, <u>Crime, Sexual Violence, and Clemency:  Florida's Pardon Board and Penal System in the Progressive Era</u> (Gainesville:  University Press of Florida, 2000).

William E. Nelson, "Fourteenth Amendment (Framing),"in Leonard W. Levy, Kenneth L. Karst, and Dennis J. Mahoney, <u>Civil Rights and Equality: Selections from the Encyclopedia of the American Constitution</u> (Macmillan Publishers, 1989), pp. 118-124.

S.M. Phillips, <u>Treatise on the Law of Evidence</u> (1816).

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, 00-3542-CIV-King

John C. Powell, <u>The American Siberia, or, Fourteen Years' Experience in a Southern Convict Camp.</u>

Joe M. Richardson, <u>The Negro in the Reconstruction of Florida, 1865-1877</u> (Tallahassee: Florida State University, 1965), p.187.

Larry Eugene Rivers, <u>Slavery in Florida: Territorial Days to Emancipation</u> (Gainesville: University Press of Florida, 2000).

Jerrell H. Shofner, <u>Florida's Political Reconstruction and the Presidential Election of 1876</u>, University Microfilms, Ann Arbor Michigan

Jerrell H. Shofner, <u>Nor Is It Over Yet: Florida in the Era of Reconstruction, 1863-1877</u> (University Presses of Florida, 1974).

Jim Smith, Florida Department of State, <u>Election Reform in Florida 1990: Report and Recommendations</u>.

Archibald John Stephens, <u>The Law of Nisi Prius, Evidence in Civil Action, and Arbitration and Awards</u> (1844).

Leslie A. Thompson, Esq., <u>A Manual or Digest of the Statute Law of the State of Florida</u> (1847).

Louie L. Wainwright, A History of Florida's Correctional System, 1832-1978, Practicum presented to Nova University for Maters of Science Degree Criminal Justice, 1978.

Edward C. Williamson, "Florida's First Reconstruction Legilsature: A Letter of William H. Gleason," <u>The Florida Historical Quarterly</u> (July 1953), p. 42.

C. Vann Woodward, <u>The Strange Career of Jim Crow</u> (New York: Oxford University Press, 1974—first published in 1955).

--------- , <u>Origins of the New South, 1877-1913</u> (Baton Rouge: Louisiana State University Press, 1971—first published in 1951).

27

**195**

**Table 2**

**Constitutional Disenfranchisement Clauses, 1838 – Present**

1838    **Article VI, Section 4.** The General Assembly shall have power to exclude from every office of honor, trust or profit, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime. **Section 13.** Laws shall be made by the General Assembly, to exclude from office, and from suffrage, those who shall have been or may thereafter be convicted of bribery, perjury, forgery, or other high crime, or misdemeanor; and the privilege of suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult, or other improper practices.

1861    **Article VI, Section 2.** The General Assembly shall have power to exclude from every office of honor, trust or profit within the State, and from the right of suffrage, all persons convicted of bribery, perjury or other infamous crime. **Section 9.** Laws shall be made by the General Assembly to exclude from office and from suffrage those who shall have been or may hereafter be convicted of bribery, perjury, forgery, or other high crime or misdemeanor; and the privilege of suffrage shall be supported by laws regulating elections and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult, or other improper practices.

1865    **Article VI, Section 2.** The General Assembly shall have power to exclude from every office of honor, trust, or profit within the State, and from the right of suffrage, all persons convicted of bribery, perjury or other infamous crime. **Section 9.** Laws shall be made by the General Assembly to exclude from office, and from suffrage, those who shall have been, or may hereafter be convicted of bribery, perjury, forgery, or other high crime or misdemeanor; and the privilege of suffrage shall be supported by laws regulating elections and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult, or other improper practices.

        **Article XIV, Section 2.** No person under guardianship *noa compos mentis*, or insane, shall be qualified to vote at any election, nor shall any person convicted of felony be qualified to vote at any election unless restored to civil rights. **Section 4.** The Legislature shall have power and shall enact the necessary laws to exclude from every office of honor, power, trust, or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime, or who shall make or become, directly or indirectly, interested in any bet or wager, the result of which shall depend upon any election; or who shall hereafter fight a duel, or send or accept a challenge to fight, or who shall be a second to either party, or be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law.

1885    **Article VI, Section 4.** No person under guardianship, *non compos mentis* or insane shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights. **Section 5.** The Legislature shall have power to, and shall, enact the necessary laws to exclude from every office of honor, power, trust or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime, or who shall make, or become directly or indirectly interested in, any bet or wager, the result of which shall depend upon any election; or that shall hereafter fight a duel or send or accept a challenge to fight, or that shall be a second to either party, or that shall be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law.

1968    **Article VI, Section(4)(a)** No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.

28

196

Table 2

| Disenfranchisement Categories in Florida's Constitutions | | |
|---|---|---|
| **Constitution** | **Authorizes Disenfranchisement for** | **Requires Disenfranchisement for** |
| **1838** | Bribery, perjury, or other infamous crime | Bribery, perjury, forgery, or other high crime or misdemeanor |
| **1861** | Bribery, perjury, or other infamous crime | Bribery, perjury, forgery, or other high crime or misdemeanor |
| **1865** | Bribery, perjury, or other infamous crime | Bribery, perjury, forgery, or other high crime or misdemeanor |
| **1868** | | Felony unless restored to civil rights; bribery, perjury, larceny, or infamous crime |
| **1885** | | Felony by a court of record, unless restored to civil rights; bribery, perjury, larceny, or infamous crime |
| **1968** | | Felony unless restored to civil rights |

29

**Table 3**
**Timeline of Constitutional Developments**

**1838   Constitution of 1838**
A Territorial Constitution is written to provide a Republican form of government in Florida and to accompany Florida's request for admission to the Union.

**1845**   Florida is admitted to the Union

**1861   Constitution of 1861**.
In an unsuccessful effort to avoid Southern secession, Congress proposes and three states ratify a Thirteenth Amendment to the U.S. Constitution to forever prohibit the nation from curtailing slavery in the states where it then existed.

Florida is the third state to secede from the Union and revises its Constitution to accord with the new nation of the Confederacy. Article IV, Section 27, creates a court in each county specifically to "try all cases of felony committed in their county by slaves, free negroes and mulattoes." These are the first county courts in Florida other than those of Justices of the Peace.

**1862**   In the Confiscation Acts, Congress prohibits slavery in the territories, ends slavery in the District of Columbia (with compensation to owners), and prohibits Union troops form returning runaway slaves to Confederate states.

By proclamation, President Lincoln frees the slaves of all slaveholders in Confederacy who do not publicly renounce the rebellion by January 1863.

**1863**   Lincoln requires Union military personnel to provide active assistance to runaway slaves from Confederate states.

**1865   Constitution of 1865**
President Lincoln assassinated.  Andrew Johnson, a native Southerner, becomes President.

Johnson's plan for Reconstruction requires Southern states to ratify the Thirteenth Amendment and adopt new state constitutions to reflect the new status of freedmen.

Oct 10, Florida election held for delegates to a Constitutional Convention.
Oct 25, Florida Constitutional Convention is assembled to draft for Constitution for readmission to the Union per Johnson's plan for reconstruction.  Does not include suffrage for freedmen.  Authorizes the Legislature (Article V, Section 1) to create any courts deemed needed.
The 1865 Florida Legislature creates county criminal courts (Chapter 1,465 (No.2) of the Laws of Florida).  Judges are appointed by Governor.
Thirteenth Amendment to U.S. Constitution ratified by Florida Legislature

**1866-7**  Congress enacts a Civil Rights Act to protect the civil rights of freedmen.
Johnson vetoes the Civil Rights Act on the grounds that protection of civil rights is a power reserved to the states in the U.S. Constitution.
Congress overrides Johnson's veto of the Civil Rights Act, passes the Reconstruction Acts over Johnson's veto, and drafts the Fourteenth

30

198

Amendment.  The Reconstruction Acts require Southern states to ratify the Fourteenth Amendment and adopt new state constitutions extending suffrage to black males.  Blacks must be registered to vote for delegates to the state constitutional conventions.

**1868  Constitution of 1868**

Jan 20 - Feb 25, the Florida Constitutional Convention drafts new state constitutions per the Reconstruction Acts.  Florida's new Constitution provides for black suffrage and eliminates county criminal courts, but under-represents black counties in the Legislature and  preempts "black rule" in "black belt counties" by having most local officials appointed by the Governor.  The Governor is to be assisted by a Cabinet of agency heads, whom he also appoints.

County court criminal records are moved to Circuit Courts per Sections 5 and 6 of Chapter 1,629 of the Laws of Florida, July 1868.

May 4-6,  New Constitution is ratified

June 9 Florida Legislature ratifies Fourteenth Amendment

June 18-19 Florida Legislature elects Florida's U.S. Senators

**1869**  Florida Legislature ratifies the Fifteenth Amendment

**1876**  Presidential election dispute resolved by ending Reconstruction (and military occupation of the South).

**1885  Constitution of 1885**

Florida revises its Constitution to institute a poll tax.  New Constitution also provides for election of all local officials except for County Commissioners, who continue to be appointed by the Governor.  Authority of the executive branch is fragmented by making the cabinet officials separately elected.

**1968  Constitution of 1968**

Florida revises Constitution to consolidate Cabinet decision-making, reapportion the Legislature, strengthen the office of Governor, and create a process of county government home rule.  Submitted to and approved by voters in 1968.

**1972**  Article V of the Constitution is amended to overhaul the Florida judicial system.  Municipal courts are eliminated.  Appellate court judges are to be appointed by the Governor and to undergo merit retention elections rather than competitive elections.

**1978**  All constitutional amendments proposed by the Constitution Revision Commission of 1977-78, including one to eliminate the Cabinet, are rejected by voters.

**1998**  Constitution Revision Commission of 1997-98 propose a number of revisions to strengthen the executive branch.  All but two (both applying to local government) are supported.

## Map 1



32

Map  2



**Figure 1**



**Figure 2**



Percent of Registered Voters Black

**Table 4**

## Background of 1868 Convention Delegates

| NAME | BACKGROUND | Vote on Clause |
|------|-----------|----------------|
| Alden | Outside White | For |
| Armistead | Southern White | For |
| Armstrong | African American | . |
| Bass | Unclassified White | Against |
| Billings | Outside White | . |
| Bradwell | African American | Against |
| Bryan | African American | For |
| Butler | Outside White | For |
| Campbell | Southern White | For |
| Cessna | Outside White | For |
| Chandler | African American | . |
| Childs | Outside White | For |
| Cone | Southern White | Against |
| Conover | Outside White | For |
| Davidson, Green | African American | Against |
| Davidson, J.E. | Southern White | For |
| Dennett | Outside White | For |
| Erwin | African American | For |

35

| | | |
|---|---|---|
| Fortune | African American | For |
| Gibbs | African American | Against |
| Goss | Southern White | Against |
| Hart | Southern White | For |
| Hill | African American | For |
| Howse | Southern White | . |
| Jenkins | Outside White | . |
| Johnson | African American | Against |
| Krimminger | Southern White | Against |
| McRae | Southern White | For |
| Meacham | African American | . |
| Mills | African American | Against |
| Mizell | Southern White | . |
| Mobley | Southern White | For |
| Oats | African American | . |
| Osborn | Outside White | For |
| Pearce, Charles | African American | . |
| Pearce, Samuel | Southern White | For |
| Powell | Unclassified White | For |
| Purman | Outside White | For |
| Richards | Outside White | . |
| Rogers | Southern White | For |
| Rombauer | Outside White | For |
| Rowley | Southern White | For |
| Saunders | African American | . |
| Shuler | Unclassified White | For |
| Stearns | Outside White | For |
| Urquhart | African American | For |
| Walker | Southern White | . |
| Walls | African American | For |
| Ware | Southern White | Against |
| Wells | African American | Against |
| Wyatt | African American | . |

36

**204**

**Figure 3**

## Composition of 1868 Constitutional Convention



Unclassified White
5.9%

Southern White
31.4%

African American
37.3%

Outside White
25.5%

37

**205**

**Table 5**

| | % Reg Voters Black 1868 | % Pop Black 1870 | Difference |
|---|---|---|---|
| FL, Hernando County | 39.00 | 29.07 | 9.93 |
| FL, Leon County | 84.00 | 81.00 | 3.00 |
| FL, Levy County | 31.00 | 19.57 | 11.43 |
| FL, Liberty County | 35.00 | 30.76 | 4.24 |
| FL, Madison County | 75.00 | 60.17 | 14.83 |
| FL, Marion County | 69.00 | 72.92 | -3.92 |
| FL, Nassau County | 64.00 | 46.39 | 17.61 |
| FL, Orange County | 18.00 | 9.02 | 8.98 |
| FL, Santa Rosa County | 27.00 | 16.97 | 10.03 |
| FL, Sumter County | 34.00 | 33.20 | .80 |
| FL, Suwannee County | 46.00 | 40.35 | 5.65 |
| FL, Taylor County | 13.00 | 5.44 | 7.56 |
| FL, Volusia County | 27.00 | 19.04 | 7.96 |
| FL, Wakulla County | 57.00 | 37.67 | 19.33 |
| FL, Walton County | 14.00 | 13.32 | .68 |
| FL, Washington County | 14.00 | 16.20 | -2.20 |

**Addendum to Expert Report**

**The Origins and Impacts of Felon Disenfranchisement in Florida**

Lance deHaven-Smith, Ph.D.
November 28, 2001

Case:  <u>Johnson v. Bush</u>
    No. 00-CV-3542
    U.S. District Court
    Southern District of Florida

**Personal Background**

A former President of the Florida Political Science Association, I am a tenured, full professor in the Reubin O'D. Askew School of Public Administration and Policy at Florida State University. I received my B.A. degree from the University of Georgia in 1975, *summa cum laude*, and my M.A. and Ph.D. in Political Science from the Ohio State University in 1978 and 1980, respectively. A copy of my curriculum vitae is attached.

I am the author of fourteen books and numerous articles in the top academic journals of my fields. My first book won the Manning Dauer Prize for scholarship from the University of Florida. I have written and conducted research on a wide range of topics, including Florida history, political philosophy, public opinion, public policy, religion, and national, state, and local government. My books on Florida include *Government in the Sunshine State: Florida Since Statehood* (with David Colburn); *The Florida Voter*; *Environmental Concern in Florida and the Nation; The Almanac of Florida Politics* (with Tom Fiedler); and *The Atlas of Florida Voting and Public Opinion.* Some of my other books are *The Hidden Teachings of Jesus*; *Foundations of Representative Democracy*; and *Philosophical Critiques of Policy Analysis.*

I have directed two blue-ribbon commissions for the State of Florida.  In 1995, I served as Director of the Citizens Commission on Cabinet Reform, which was appointed by the Governor and Cabinet to evaluate the basic structure of Florida's executive branch in advance of the Constitution revision process of 1998.  In 1997-98, I was Executive Director of the Local Government Commission II, which was appointed by the Governor, the President of the Senate, and the Speaker of the House, to study the authority, capacity, and needs of Florida's cities, counties, and special districts.  My research for both of these commissions included studies of the history of Florida government since statehood.

Within the last four years, I have been retained as an expert at trial or by deposition in two cases.  In 1999, I was retained as an expert witness in the case Florida Right to Life v. Mortham, Case No. 98-770-CIV-ORL-19A, U.S. District Court for the Middle District of Florida, Orlando Division, where I testified regarding the need for campaign finance limitations to clean up corruption in Florida and responded to the public choice theory argument that campaign finance limits are counter-productive.  In 1999, I was also retained as an expert witness in the case Calabrese v. The City of Indian Harbor Beach (Florida state court), where I prepared an expert report regarding the violation of Mr. Calabrese's civil rights by the City of Indian Harbor Beach, when the City eliminated Mr. Calabrese's job position.

I have been retained as an expert witness by counsel for the Florida Clemency Board Defendants in this case, and I am being compensated at the rate of $200 per hour plus reasonable out-of-pocket expenses.

Lance deHaven-Smith

11/22/01
Date

2

**208**

# CURRICULUM VITA

**NAME:**

Lance deHaven-Smith

**MILITARY:**

Infantry Rifleman, U.S. Army, 1971-72, honorably discharged

**EDUCATION:**

B.A., University of Georgia, 1975, Summa Cum Laude. M.A., The Ohio State University, 1978. Ph.D., The Ohio State University, 1980.

**PROFESSIONAL AWARDS:**

Selected by the International City-County Managers Association to present at the Eldon Fields Colloquium at the ICCMA's annual meeting, October 1998.

Outstanding Teacher of the Year, College of Urban and Public Affairs, Florida Atlantic University, 1992-93. Awarded by the students of the College.

The Manning J. Dauer Prize, awarded by the Political Science Department at the University of Florida for the best work in public affairs submitted to the University of Florida Press, 1988.

The Chastain Award, given by the Southern Political Science Association for the best paper presented at its Annual Convention, 1978.

University Fellow, The Ohio State University, 1975-1979.

First Place for Undergraduate Category, Frank Meyer Essay Contest, Young Americas' Foundation, 1975.

**ADMINISTRATIVE POSITIONS:**

Associate Director, Florida Institute of Government, State University System of Florida, 1993-2001.

Executive Director, National Public Sector Gaming Study Commission, established by the National Council of Legislators from Gaming States, 1999 - 2000.

1

Executive Director, Local Government Commission II, 1996 - 1998. This commission was appointed by the Governor, the President of the Florida Senate, and the Speaker of the Florida House.

Staff Director, Citizens Commission on Cabinet Reform, 1995 - 1996. This commission was appointed by the Governor, each member of the Florida Cabinet, the President of the Florida Senate, and the Speaker of the Florida House.

Director, Reubin O'D. Askew School of Public Administration and Policy, Florida State University, 1995-1998.

Director, Social Science Research Laboratory, Florida Atlantic University, 1983-1992.

Director, Institute of Government, Florida Atlantic University, 1983-1990.

Provost of Florida Atlantic University's Broward County Campuses, 1990-1992. Acting Broward Provost, 1988-1990.

Associate Director, Florida Atlantic University/Florida International University Joint Center for Environmental and Urban Problems, 1983-1990.

## TEACHING AND RESEARCH:

Professor, Reubin O'D. Askew School of Public Administration and Policy, Florida State University, 1994-present.

Professor, School of Public Administration, Florida Atlantic University, 1991-1994.

Professor, with a joint appointment to the Department of Political Science and the School of Public Administration, Florida Atlantic University, 1989-1991. Associate Professor, 1985-1989. Assistant Professor, 1981-1985.

Research Associate, The Mershon Center, Ohio State University, 1978-1981.

## PUBLICATIONS:

### Books and Monographs

Lance deHaven-Smith and Dena Hurst, eds., On the Verge (Tallahassee: Florida Institute of Government, 1999).

Tom Fiedeler and Lance deHaven-Smith, The 2000 Almanac of Florida Politics (Dubuque, Iowa: Kendall-Hunt, 1998).

2

Lance deHaven-Smith, <u>Foundations of Representative Democracy</u> (New York: Peter Lang, 1999).

David R. Colburn and Lance deHaven-Smith, <u>Government in the Sunshine State: Florida Since Statehood</u> (Gainesville: University Press of Florida, 1999).

Lance deHaven-Smith and Dena Hurst, eds., <u>Charting Florida's Future</u> (Tallahassee, FL: Florida Institute of Government, 1999).

Lance deHaven-Smith, <u>The Atlas of Florida Voting and Public Opinion</u> (Tallahassee, FL: Florida Institute of Government, 1998).

Lance deHaven-Smith and David Colburn, <u>Amid Political, Cultural and Civic Diversity: Building a Sense of Statewide Community in Florida</u> (Dubuque, Iowa: Kendall-Hunt, 1998).

Tom Fiedeler and Lance deHaven-Smith, <u>The 1998 Almanac of Florida Politics</u> (Dubuque, Iowa: Kendall-Hunt, 1998).

Lance deHaven-Smith, <u>Foundations of Representative Democracy</u> (Collins Center for Public Policy: Tallahassee, Florida, 1997).

Lance deHaven-Smith, <u>The Florida Voter</u> (Florida Institute of Government: Tallahassee, Florida, 1995).

Lance deHaven-Smith, <u>The Hidden Teachings of Jesus: The Political Meaning of the Kingdom of God</u> (Grand Rapids, Michigan: Phanes Press, 1994).

Lance deHaven-Smith, <u>Environmental Concern in Florida and the Nation</u> (Gainesville: University of Florida Press, 1991).

Lance deHaven-Smith, <u>Controlling Florida's Development</u> (Wakefield, New Hampshire: Hollowbrook Publishing, 1991).

Lance deHaven-Smith, <u>Philosophical Critiques of Policy Analysis: Lindblom, Habermas, and The Great Society</u> (Gainesville: University Presses of Florida, 1988).  Winner of the Manning J. Dauer Prize.

Lance deHaven-Smith, <u>Environmental Publics: Public Opinion on Environmental Protection and Growth Management</u>, (Boston: Lincoln Institute of Land Policy, 1987), Monograph #87-2.

Lance deHaven-Smith and Kenneth M. Michels, eds., <u>Issues and Options in Health Care Delivery: The Florida Perspective</u>, (Boca Raton, FL: FAU Institute of Government, 1986), Monograph #86-1.  Includes Lance deHaven-Smith and Barbara C. Brumback, "The Politics of Health Care Delivery: Changes in Florida's Medicaid Program," pp. 32-49.

3

## Chapters in Books

Lance deHaven-Smith and David Colburn, "Restoring Balance to Florida's System of Growth Management and Environmental Protection," in Lance deHaven-Smith and Dena Hurst, eds., Charting Florida's Future (Tallahassee, FL:  Florida Institute of Government, 1999).

Lance deHaven-Smith, "Jesus and Public Administration," in Thomas D. Lynch and Todd J. Dicker, Handbook of Organization Theory and Management (New York: Marcel Dekker, 1998.

Lance deHaven-Smith, "Constitution Revision in Florida," in Richard Chackerian, editor, The Florida Public Policy Management System (Dubuque, Iowa: Kendall/Hunt, 1998).

Lance deHaven-Smith, "Florida's Unfinished Agenda in Growth Management and Environmental Protection," in Robert J. Huckshorn, Florida Politics and Government, (Gainesville, FL: University of Florida Press, 1991).  Second Edition 1998, Univesity Press of Florida.

Lance deHaven-Smith, James C. Nicholas, and Teresa Herrero, "Farmland Protection: Issues and Techniques," in Hal Hiemstra and Nancy Bushwick, Plowing the Urban Fringe: Alternative Approaches to Farmland Preservation (Fort Lauderdale: FAU/FIU Joint Center for Environmental and Urban Problems, 1989), Monograph #88-2.

Lance deHaven-Smith and Randall B. Ripley, "The Political-Theoretical Foundations of Public Policy," in Edward B. Portis and Michael B. Levy, eds., Handbook of Political Theory and Policy Science (Westport, CN: Greenwood Press, 1988).

Lance deHaven-Smith and Allen Imershein, "Florida," in Richard C. Nathan, Fred Doolittle, and Associates, eds., Reagan and the States: Federalism Under Stress. (Princeton: Princeton University Press, 1987).

Lance deHaven-Smith, "Survey Research for Comprehensive Planning," in John M. DeGrove and Julian Conrad Juergensmeyer, eds., Perspectives on Florida's Growth Management Act of 1985. (Boston: Lincoln Institute of Land Policy, 1986).  Monograph #86-5.

Lance deHaven-Smith, "Special Districts: A Structural Approach to Infrastructure Finance and Management," in James C. Nicholas, ed., The Changing Structure of Infrastructure Finance. (Boston: Lincoln Institute of Land Policy, 1985).  Monograph #85-5.

## Articles in Nationally Refereed Journals

Lance deHaven-Smith, "Collective Will-Formation: The Missing Dimension in Public Administration," Administrative Theory and Praxis, Volume 20, Number 2, 1998, pp. 126-140.

4

Lance deHaven-Smith, "How Jesus Planned to Overthrow the Roman Empire," <u>Religious Studies and Theology</u>, Vol. 16, No.1, June 1997.

Lance deHaven-Smith and John Wodraska, "Consensus-Building in Integrated Resources Planning," <u>Public Administration Review</u>, Summer 1996.

Lance deHaven-Smith, "Toward a Communicative Theory of Environmental Opinion: A Rejoinder to Audirac and Shoemyen," <u>Environment and Behavior</u>, 21 (September) 1989, pp. 630-635.

Lance deHaven-Smith, "Environmental Belief Systems: Public Opinion Toward Land Use Regulation in Florida," <u>Environment and Behavior</u>, March 1988.

Lance deHaven-Smith, "Ideology and the Tax Revolt: Florida's Amendment 1," <u>The Public Opinion Quarterly</u>, Vol. 49, Fall 1985, pp. 300-309.

Lance deHaven-Smith, "Regulatory Theory and State Land-Use Regulation: Implications from Florida's Experience with Growth Management," <u>Public Administration Review</u>, Vol. 44 (No. 5), September/October 1984, pp. 413-420.

Lance deHaven-Smith and Carl E. Van Horn, "Subgovernment Conflict in Public Policy," <u>Policy Studies Journal</u>, Vol. 12 (No. 4), June 1984, pp. 627-642.

Lance deHaven-Smith, "Evidence on the Minimal Management Principle of Program Design: Implementation of the Targeted Jobs Tax Credit," <u>The Journal of Politics</u>, Vol. 45 (No. 3), August 1983, pp. 711-730.

Aage R. Clausen, Soren Holmberg and Lance deHaven-Smith, "Contextual Factors in the Accuracy of Leader Perceptions of Constituents' Views," <u>The Journal of Politics</u>, Vol. 45 (No. 2), May 1983, pp. 450-472.

### Other Articles

Lance deHaven-Smith, "Cities of the Future," <u>Quality Cities</u>, Florida League of Cities, September/October 2001, pp. 7, 15-16.

Lance deHaven-Smith, "Florida's Economy Is E-volving," <u>Florida Trend Magazine</u>: 2001 Annual TopRank Florida (December 2000), pp. 8-11.

Lance deHaven-Smith, "Term Limits May Increase Home Rule," <u>Florida Counties: The Magazine of the Florida Association of Counties</u>, March/April 1999.

Lance and Westi Jo deHaven-Smith, "Understanding the Vote on the Sugar Fee," <u>The Florida Voter</u>, Jan. 1997.

5

Lance deHaven-Smith, "What's Wrong with Florida's Cabinet System, <u>The Debate</u> (published by the Lincoln Center for Public Service), Vol. I, Issue 2.

Lance deHaven-Smith, "Profiles in Cowardice," <u>Florida Trend</u>, August 1995.

Lance deHaven-Smith, "The Use and Abuse of Survey Research—A Review of <u>The Captive Public</u>." <u>Florida Environmental and Urban Issues</u>, Vol. XV (No. 1), October 1987.

Lance deHaven-Smith, "The Public's Attitudes on Growth Management Issues in the Treasure Coast Region," <u>Florida Environmental and Urban Issues</u>, Vol. XIV (No. 2), January, 1987.

Lance deHaven-Smith, "Growth Management Issues in the Northeast Region of Florida," <u>Florida Environmental and Urban Issues</u>, Vol. XIV (No. 1), October 1986.

Lance deHaven-Smith, "Florida's Changing Values: Environmentalism and the Tax Revolt," <u>Florida Environmental and Urban Issues</u>, Vol. XIII (No. 3), April 1986.

Lance deHaven-Smith, "The Attitudes of Delray Beach Residents on Growth Management Issues," <u>Florida Environmental and Urban Issues</u>, Vol. XIII (No. 1), October 1985.

Lance deHaven-Smith and Douglas Gatlin, "The Florida Voter," <u>Florida Environmental and Urban Issues</u>, Vol. XIII (No. 3), April 1985. Reprinted in <u>The Florida Geographer</u>, "The Florida Voter: A Regional Analysis," Vol. 19 (No. 1), September 1985.

Lance deHaven-Smith, "The Attitudes of New Smyrna Beach Residents on Growth Management Issues," <u>Florida Environmental and Urban Issues</u>, Vol. XII (No. 4), July 1985.

Lance deHaven-Smith, The Attitudes of Lee County Voters on Growth Management Issues," <u>Florida Environmental and Urban Issues</u>, Vol. XII (No. 2), January 1985.

Lance deHaven-Smith, "Overwhelming Support for Land-Use Controls: The Attitudes of Monroe County Residents on Growth Management Issues," <u>Florida Environmental and Urban Issues</u>, Vol. XII (No. 1), October 1984, pp. 4-11.

Lance deHaven-Smith, "Concern Over Waste in Government: The Attitudes of Palm Beach County Residents on Florida's Taxes and Services," <u>Florida Environmental and Urban Issues</u>, Vol. XI (No. 3), April 1984, pp. 6-13.

Lance deHaven-Smith, "How to Calculate the Revenue Limit from Proposition 1," <u>Florida Environmental and Urban Issues</u>, Vol. XI (No. 2), January 1984, pp. 26-30.

6

Lance deHaven-Smith, "Forging University-Government Partnerships: FAU's Institute of Government Program," <u>Florida Environmental and Urban Issues</u>, Vol. XI (No. 17). October 1983, pp. 12-13.

Lance deHaven-Smith, "Emergent Issues in Growth Management: Proceedings of a Policy Conference," <u>Florida Environmental and Urban Issues</u>, Vol. X (No. 3), April 1983, pp. 1-3, 21-22.

### Books Reviewed

Lance deHaven-Smith, Review of <u>Evidence, Argument, and Persuasion in the Policy Process</u>, by Giandomenico Majone, <u>Journal of Politics</u> (August, 1990).

## PAPERS:

Lance deHaven-Smith, "The Politics of Classical Political Philosophy," paper presented to the Southeast Conference of Public Administration, Pensacola, Florida, January 1999.

Lance deHaven-Smith, "The Impacts of Growth on Florida Politics," paper presented at the Florida Political Science Association Meeting, Fort Lauderdale, Florida, April 1988.

Lance deHaven-Smith, "Collective Will-Formation," paper presented to the National Academy of Public Administration, Spring Meeting, Duke University, 1997.

Lance deHaven-Smith, "The Cognitive Foundations of Issue Publics: Environmental Issues in the Florida Keys," Florida Political Science Association Meeting, Winter Park, Florida, April 1987.

Lance deHaven-Smith and Allen Imershein, "Florida," presented at a conference on the effects of the Reagan domestic program, Princeton University, June 1984. Published as "The New Federalism in Florida," by the Policy Sciences Program, Florida State University, 1985.

Lance deHaven-Smith and Randall B. Ripley, "The Political-Theoretic Foundations of Public Policy," presented at the annual meeting of the Southwest Political Science association, Fort Worth, Texas, March 1984.

Lance deHaven-Smith, Aage R. Clausen, and Soren Holmberg, "Perceptual Accuracy as a Function of Legislative Attitudes and the Distribution of Constituency Views," presented at the Annual Meeting of the American Political Science Association, New York, New York, September 1981.

Lance deHaven-Smith and Carl Van Horn, "The Role of Interest Groups and Subgovernments in Policy Formulation and Implementation," presented at the Annual Meeting of the Midwest Political Science Association, Chicago, Illinois, April 1980.

7

Aage R. Clausen, Soren Holmberg and Lance Smith, "Contextual Factors in the Accuracy of Leader Perceptions of Constituents' Views," presented at the Annual Meeting of the Southern Political Science Association, Atlanta, Georgia, November 1978.

## GRANTS, CONTRACTS AND REPORTS:

### Reports to/for Government Agencies

Lance deHaven-Smith, "Final Report of the National Public Sector Gaming Study Commission," for the National Council of Legislators from Gaming States," March 2000.

Lance deHaven-Smith and Veronica Alvarez, "Structural Problems in Hillsborough County's Fiscal and Service System," for the Hillsborough County Board of Commissioners, Summer, 1998.

Final Report, Commission on Local Government II. Tallahassee, Florida, January 1998.

"A Snapshot of Two Communities: Sunrise and Weston," prepared for the Legislative Delegation of Broward County to address annexation issues for Bonaventure, whose residents were being asked to choose to be annexed by either Sunrise or Weston, February 1997.

Final Report, Citizens Commission on Cabinet Reform. Tallahassee, Florida, December 1995.

### Projects of National Scope

The National Public Sector Gaming Study Commission, $240,000. Funded by the Florida Legislature, other states, the National Council of Legislators from Gaming States, and private contributions.

Princeton University, September 1983, $13,000. (Part of a nationwide project which tracked the effects of the Reagan budget cuts on state and local governments. This grant was to direct the team in Florida.)

"A Case Study of the Targeted Jobs Demonstration Program in Metcalfe, Mississippi," prepared for the TJDP Interagency Monitoring Board (U.S. Department of Housing and Urban Development, Chair), August 1982. Part of a 14 site, nationwide study.

"The Implementation of the Targeted Job Tax Credit," four reports prepared for the Office of program Evaluation, Employment and Training Administration, U.S. Department of Labor, July 1980; January 1981; May 1981; November 1981 (with Randall B. Ripley).

"The Implementation of HIRE II," two reports prepared for the office of Program Evaluation, Employment and Training Administration, U.S. Department of Labor, 1979 (with Randall B.

8

Ripley).  Final report published in <u>Hearing of Veterans' Employment Programs and Policies</u>, 96th Congress, 1st Session, May 23, pp. 720-797.

## Survey Research

The Florida Senate, 1992 (a statewide survey to identify key opinion blocks and their demographic and ideological profiles).

The Economic Development Council of Broward County, Inc., September 1989, $4,000 (survey of registered voters in Broward County toward a proposed one cent local option sales tax).

Citizens for Florida's Future, March 1989, $5,000 (survey on public willingness to fund growth and services).

Southwest Florida Water Management District, March 1989, $10,000 (SWIM Bill survey).

Chamber of Commerce of the Palm Beaches, February 1989, $3,000 (downtown tram feasibility survey).

Fort Lauderdale Police Department, November-December 1988, $6,500 (police service survey).

Department of State-Division of Elections, November-December 1988, $14,500 (survey of registered voters on voting patterns).

Department of State-Division of Elections, October-November 1988, $14,500 (survey of non-registered voters on registration patterns).

Broward County, Florida, March through August 1988, (education and training needs assessment).

Florida State Legislature through Florida Department of Community Affairs, January/February 1988, $10,000.  (Farm worker Housing Pocket of Poverty Bill).

Broward County, Florida, January 1988, $6,500.  (Broward County Charter).

Southwest Florida Water Management District, January 1988, $10,000 (survey of recreational land uses).

Children's Services Council of Palm Beach County, October 1987, $6,500 (telephone survey of parents).

Board of Commissioner of Palm Beach County, Florida, June 1987, $15,600 (opinion survey on controversial land uses).

9

City of Boca Raton Community Redevelopment Agency, June 1987, $2,000 (Boca Raton downtown redevelopment survey).

The Palm Beach Post, West Palm Beach, Florida, June 1987, $4,000 (opinion survey on attitudes of Catholics).

Florida International University, October 1986, $15,000 (survey of public attitudes toward prisons).

School Board of Palm Beach County, Florida, August 1986, $6,500 (Palm Beach County demographic multiplier study).

City Council of Sunrise, Florida, July 1986, $3,500 (public opinion in Sunrise, Florida).

Treasure Coast Regional Planning Council, February 1986, $27,000 (the growth management attitudes of residents of the Treasure Coast Region).

Northeast Florida Regional Planning Council, January 1986, $6,500 (the growth management attitudes of residents of Northeast Florida).

Citrus County, Florida, October 1985, $5,500 (demographic multiplier, road travel and service preferences for Citrus County).

Osceola County School Board, Osceola County, Florida, August 1985, $4,900 (Osceola County demographic multiplier study).

City of Delray Beach, Florida, July 1985, $5,500 (the attitudes of Delray Beach residents on growth management issues).

City of New Smyrna Beach, Florida, May 1985, $2,000 (the attitudes of New Smyrna Beach residents on growth management issues).

St. Lucie County, Fort Pierce, Florida, February 1985, $4,500 (St. Lucie County demographic multiplier study).

Palm Beach County Board of Commissioners, West Palm Beach, Florida, April 1984, $6,500 (the attitudes of Palm Beach County residents on Florida's taxes and services).

### Assemblies and Conferences Directed

Charlotte Assembly 2001, Port Charlotte, Florida, August 16-18, 2001.

The Future of Florida Assembly, Tampa, Florida, September 18-20, 2000.  The Assembly was initiated by the Florida Chapter of the American Planning Association and planned by an independent Steering Committee.   The latter included representatives from over forty organizations.

10

**218**

Conference to Plan a Museum of Florida's Political History, at the Old Capitol, Tallahassee, June 2, 1999. The group included two former Florida governors, two Florida Speakers of the House, and others.

Leadership Florida Planning Retreat, Tampa, Florida, May 18, 1999.

Charlotte Assembly 1998, Punta Gorda, Florida, June 1998.

Retreat for the Metropolitan Water District of Southern California, June 1998.

Facilitator, Ecosystem Team Permitting Committee, Hillsborough Water Resources Recovery Project, 1997-1998. This was only Florida's second ecosystem team permitting project. Members include federal, state, and local permitting agencies. The committee met monthly.

Facilitator, Public Working Committee, Hillsborough Water Resources Recovery Project, 1997-1998. (Monthly meetings of a 30-member citizens group).

"The State of Land and Water: Forging Stronger Linkages," for the Florida's water management districts and regional planning councils, May 1997.

Leadership Issues Conference for the Florida Senate, October 1997.

Charlotte Assembly 1996, Punta Gorda, Florida, August 1996.

Leadership Issues Conference for the Florida Senate, October 1996.

Strategic Plan Assembly for the Metropolitan Water District of Southern California, 1994.

Strategic Plan Assembly for the Metropolitan Water District, 1993.

Florida Intergovernmental Challenges Summit, January 1995, Tallahassee, Florida. An assembly of cities, counties, special districts, state legislators, and state agencies.

Louisiana Summit on Adolescent Pregnancy Prevention, January 1993, Baton Rouge, Louisiana. An assembly of legislators, educators, teenagers, and activists.

Government Day, Youth Leadership Broward, October 1991. A workshop of Broward County's top students and student leaders.

Southern Legislators' Association, Assembly on Infant Mortality, October 1990. A three-day assembly of state legislators from twenty-one states.

Florida House of Representatives, Legislative Issues Conference, February 1990. A three-day assembly of all members of the Florida House of Representatives.

11

Jupiter Beach, Florida, October 5-7, 1989, $39,000 (Our Children—Our Future American Assembly.

Palm Beach County, Florida, August 24, 1989, (workshop of all elected municipal and county officials in Palm Beach County).

Florida House of Representatives, Legislative Issues Conference, Broward County, Florida, December 1988. A three-day assembly of all members of the Florida House of Representatives.

Jupiter Beach, Florida, October 5-7, 1989, $39,000 (Out Children--Our Future American Assembly).

Palm Beach County, Florida, August 29, 1989, (workshop of all elected municipal and county officials in Palm Beach County).

Florida House of Representatives, Legislative Issues Conference, Broward County, Florida, December 1988. A three-day assembly of all members of the Florida House of Representatives.

Town of Davie, Florida, June 10, 1989 (Open Space Symposium).

City of Hollywood, Florida, May 11-13, 1989, $32,000 (Vision 2000 American Assembly).

Palm Beach County, Florida, June 30, 1988, (workshop of all elected municipal and county officials in Palm Beach County).

City of Delray Beach, Florida, May 1988, $38,000 ("Greater Delray Beach: Vision 2000 Assembly").

Palm Beach County, Florida, May 1988, $42,000 ("Directions '88: Charting the Course for Palm Beach County").

City of Pahokee, Florida, February 1988, $17,000 ("Pahokee Potentials Assembly").

Town of Davie, Florida, December 1987, $27,370 ("Visions 2000 Assembly").

Florida Department of Community Affairs, September 1987, $11,000 ("Mapping and Monitoring Assembly").

Board of Commissioners of Palm Beach County, Florida, March 1987, $42,000 ("The Palm Beach County Criminal Justice Assembly").

Board of Commissioners of Sarasota County, Florida, November 1986, $9,500 ("Sarasota County Assembly for Wastewater Treatment").

12

**220**

City of West Palm Beach, Florida, November 1986, $32,000 ("The West Palm Beach City-Wide Forum").

Palm Beach County Commission, Palm Beach County School Board, South Florida Water Management District, Economic Council of Palm Beaches, October 1985, $38,000 (with James C. Nicholas) ("Directions '85: Charting the Course for Palm Beach County").

Florida Department of Transportation, June 1985, $20,000 (conducted conference on the relationship between transportation systems and growth management).

Palm Beach County Board of Commissioners, October 1983, $10,000 ("Directions '84: Charting the Course for Palm Beach County").

### State/Local Research

Florida Department of State, February 2000, for computer programming and historical research related to a new museum-center on Florida Government and Politics, to be housed at Florida's Old Capitol.

Florida Institute of Government, February 1993, $60,000, to conduct statewide surveys and identify the "opinion sector" in Florida.

City of Oakland Park, Florida, December 1987, $26,500 (With Marie York) ("Study for an Interim Services Fee").

South Florida Water Management District, May 1987 ("Study of Aquatic Weed Control").

Florida Department of Community Affairs, August 1986, $24,000 (with Deborah Flack) ("A Coastal Barriers Resource Manual: Federal and State Program Highlights").

Florida Institute of Government, July 1986, $21,000 ("Study of Additional Mechanisms for Meeting Florida's Transportation Needs and Associated Growth Management Goals").

"Platted Lands in the Florida Keys," prepared for the Florida Department of Community Affairs, January 1986 (with John DeGrove).

Florida Institute of Government, July 1985, $22,500 ("State Transportation Modal Alternatives for Growth Management").

Joint Center for Political Studies (Washington D.C.), May 1984, $2,000. (Part of a nationwide study on the effects of privatizing public services, this project focused on the experience of Fort Lauderdale, Florida, in its privatization efforts.)

13

City of Miramar, Florida, March 1984, $4,985 ("Recreation and Leisure: Inventory and Analysis for Improving the Quality of Life in the City of Miramar").

South Florida Water Management District, March 1984, $11,600 ("South Florida's Wastewater Reuse Systems").

## Other Grants

Florida Institute of Government, October 1983, $47,000; August 1984, $49,000; July 1985, $50,000; July 1986, $50,000; July 1987, $50,000; July 1988 $50,000; July 1989, $50,000; July 1990 $50,000; July 1991, $50,000; July 1992, $60,000 (Annual grant for administration of the Florida Atlantic University Institute of Government).

# SERVICE

## University Service

Ph.D. Committee, Askew School, 1999-present. Member, Faculty Senate, Florida State University, 2000-2001. Ex Officio Member, Search Committee, Leroy Collins Eminent Scholar's Chair. Member, Faculty Senate, Florida State University, 1997-1999. Policy Committee, Askew School, 1994. Ph.D. Committee, Askew School, 1994. Member, Dean's Search Committee, College of Urban and Public Affairs, FAU, 1992-93. Chair, FAU Presidential Search Advisory Committee, 1989. Chair, Search Committee for Director of FAU's Masters Program in Urban and Regional Planning, 1989. Member, Policy Council, Florida Institute of Government, representing Florida Atlantic University, 1985-1986. Member, Board of Directors, Florida Training Institute, representing Florida Atlantic University, 1982-1983. Member, Curriculum Committee, FAU Master's of Public Administration. Member, Steering Committee for FAU/FIU Ph.D. in Public Administration. Member, Bachelor's of Public Affairs and Master's Public Administration Recruitment Committee, 1984-1985. Faculty Advisor, FAU Chapter of Pi Sigma Alpha, 1984-1989. Director of FAU's 1983 Special Summer Program for Black Graduate and Professional Students. Member, College of Social Science Building Committee, 1986. Member, ad hoc committee on the Southeast Florida Plan for a Comprehensive University Presence. Member, Recruitment and Screening Committee for Associate Vice President of Academic Affairs, 1987. Member, Master's of Urban and Regional Planning Advisory Committee, 1987.

## Service to the Profession

Senior Fellow, Florida TaxWatch, 1996 - present. Member, Executive Committee, The Askew Institute for Politics and Society, University of Florida, 1995-present. Member, Board of Directors, The Collins Center for Public Policy, 1996-1998. President, Florida political science Association, 1990-1991. First Vice President, Florida Political Science Association, 1989-90. Second Vice President, Florida Political Science Association, 1988-89. Member, Executive Committee, Florida Political Science Association, 1981-1987.

## Community Service

14

222

Senior Fellow, Florida TaxWatch, 1996 - present.  HRS Secretary appointee, HRS Reorganization Work Group, 1992-1993.  Member, Board of Trustees, Greater Fort Lauderdale Chamber of Commerce, 1992-93.  Co-Chair, Education Division, United Way of Broward County, 1991-1992.  County Commission Appointee, County wide Planning Council of Palm Beach County, 1987-1990.  Gubernatorial Appointee, Treasure Coast Regional Planning Council, 1986-1987.

### Legislative Testimony

Testimony before the U.S. Senate Veterans' Affairs Committee; the Florida House Committee on Agriculture; the Florida House Committee on Higher Education; the Advisory Committee on the Future for the Speaker of the Florida House; the Florida House Committee on Transportation; the Florida House Committee on Community Affairs; the Florida House and Senate Hearing on the Sales Tax on Services.

### Public Speaking

Speakers at meetings sponsored the U.S. Department of Labor, National Association of Counties, National Alliance of Business, South Florida Water Management District, Florida Endowment for the Humanities, Florida Department of Health and Rehabilitative Services, Florida Planning and Zoning Association, the Florida Institute of Municipal Clerks and Finance Officers, International Association of Shopping Center Developers, and many others.

**MASS MEDIA:**

### Television Appearances

Appearances in 2000 and 2001 on *Good Morning America*, the *Today* Show, *NBC Nightly News with Tom Brokaw*, *CBS Nightly News with Dan Rather*, the *Jim Lehrer News Hour*, *CNN*, *NPR*, and other national TV and radio shows.  Quoted in 2000-2001 in the *New York Times*, the *Los Angeles Times*, the *Chicago Tribune*, the *Washington Post*, the *Miami Herald*, the *Wall Street Journal*, and many other major newspapers. Political Commentator during six hours of live, election-night coverage by Selkirk Communications, November 4, 1986.  Interviewed on "Good Morning America," November 10, 1987.  Periodic live interviews for Channel 12, WPEC in West Palm Beach, during the 1988 election year.  Periodic editorial commentaries for Channel 12, WPEC, during 1989.  Commentary, "Riding the Rails," Florida Public Television, October 21, 1989.  Interviewed live on "Good Morning America," February 1990.  Guest Commentator, Florida Sunshine Network, Election Night Coverage, 1990.  Guest Commentator, Florida Sunshine Network, Election Night Coverage, 1994.  Interviewed on "NBC Nightly News with Tom Brokaw," October 1997.  Guest Commentator, the Florida News Channel, election night 1998.

### Newspaper Articles

15

Lance deHaven-Smith, "Florida's Issue Cycles," *The Tampa Tribune*, May 6, 1999.

Lance deHaven-Smith, "Term Limits and Reapportionment Will Benefit Republicans," *The Fort Lauderdale Sun-Sentinel*, April 30, 1999.

Lance deHaven-Smith, "A Senior Boom Is Headed Our Way," *The Palm Beach Post*, February 10, 1999.

Lance deHaven-Smith, "A Republican Florida? Not so fast," *Miami Herald*, November 19, 1998, p. 25A.

Lance deHaven-Smith, "Crackers will have last word on Bush-MacKay," *The Miami Herald*, August 12, 1998.

Lance deHaven-Smith, "Broward's Shifting Population Poses Challenge," Miami Herald (Broward Edition), March 7, 1993.

Lance deHaven-Smith, "FAU Can Bring Region Wealth," Boca Raton News, September 24, 1989.

Lance deHaven-Smith, "Rapid Growth, Low Taxes: You Can't Have Both," The Palm Beach Post, September 24, 1989.

Lance deHaven-Smith, "Plan Council Mired in Never-Ending Debate," The Palm Beach Post, June 15, 1989.

Lance deHaven-Smith, "Let Developers Pay for Preservation," Boca Raton News, May 21, 1989.

Lance deHaven-Smith, "Rail Won't Pay For Itself, But Don't Pitch It Out," Palm Beach Post, January 9, 1989.

Lance deHaven-Smith, "Courts Can Integrate Schools; Politicians Can't," Palm Beach Post, August 1, 1988.

Lance deHaven-Smith, "Social Issues End Road-Planning Rut," Palm Beach Post, July 28, 1988.

Lance deHaven-Smith, "Shake Up Deficient Tax System," Palm Beach Post, July 28, 1988.

Lance deHaven-Smith, "Political Middle Path Doesn't Satisfy Anyone," Palm Beach Post, July 12, 1988.

Lance deHaven-Smith, "Palm Beach Can Learn From Broward Sprawl," Palm Beach Post, June 14, 1988.

16

Lance deHaven-Smith, "Raise Property Tax to Maintain Quality of Life," <u>Palm Beach Post</u>, June 7, 1988.

Lance deHaven-Smith, "Boundary for Growth Best Plan," <u>Palm Beach Post</u>, May 18, 1988.

Lance deHaven-Smith, "County Must Address Quality-of-Life Deficit," <u>Palm Beach Post</u>, May 7, 1988.

Lance deHaven-Smith, "Florida Needs, and Will Get, an Income Tax," <u>Palm Beach Post</u>, February 7, 1988.

Lance deHaven-Smith, "West Palm Beach:  Where Do We Go From Here," <u>Palm Beach Post</u>, January 1, 1987.

Lance deHaven-Smith and Douglas Gatlin, "FAU Researchers Discover a Homogeneous Florida," <u>Fort Lauderdale News/Sun-Sentinel</u>, January 20, 1985, pp. 1F, 3F.

17

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2002, I caused true copies of the foregoing to be served via facsimile and overnight delivery on the following counsel:

Nancy Northup
Jessie Allen
Brennan Center for Justice
at New York University School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
Phone: 212.998.6735
Facsimile: 212.995.4550

*Lead Counsel for Plaintiffs*

Ron Labasky
General Counsel for Supervisors of
Elections
P.O. Box 669
Tallahassee, FL 32302
Phone: 850.222.3730
Facsimile: 850.224.6422

David Wagner
Robert Livingston
Alachua County Attorney's Office
P.O. Box 2877
Gainesville, FL 32602
Phone: 352.374.5218
Facsimile: 352.374.5216

Robert Buschel
Buschel, Carter, Schwarzreich & Yates
201 S.E. 8th Street
Fort Lauderdale, FL 33316-1013
Phone: 954.525.8000
Facsimile: 954.525.8331

H. Ray Allen II
Mary Helen Campbell, Rebecca M. Kert
Attorneys for Defendant Pam Iorio
P.O. Box 1110
Tampa, FL 33601
Phone: 813.272.5670
Facsimile: 813.272.5846

Robert A. Ginsberg
Jeff Ehrlich
Miami-Dade County Attorney
Stephen P. Clark Center, Suite 2810
111 N.W. 1st Street
Miami, FL 33128-1993
Phone: 305.375.5151
Facsimile: 305.375.5611

Betsy M. Steg
Office of the County Attorney
Pinellas County
315 Court Street
Clearwater, FL 33756
Phone: 727.464.3354
Facsimile: 727.464.4147

Samuel S. Goren
Michael D. Cirullo, Jr.
Josias, Goren, Cheroff, Doody & Ezrol, P.A.
3099 E. Commercial Blvd., Suite 200
Fort Lauderdale, FL 33308
Phone: 954.771.4500
Facsimile: 954.771.4923

James K. Green
Nina Zollo
James K. Green, P.A.
Suite 1630, Esperante'
222 Lakeview Ave.
West Palm Beach, FL 33401
Phone: 561-659-2029
Fasimile: 561-655-1357

Anita Hodgkiss
Lori Outzs Borgen
Lawyers' Committee for Civil Rights Under Law
1401 New York Ave., NW, Suite 400
Washington, DC 20005-2124
Facsimile: 202-783-5130

Stephanie Sherman