## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Case No. 00-CV-3542
## JUDGE JAMES LAWRENCE KING

NIGHT BOX
FILED

JAN 04 2002

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

THOMAS JOHNSON, *et al.*,                )
                                         )
                          Plaintiffs,    )
                                         )
v.                                       )
                                         )
JEB BUSH, Governor of Florida, *et al.*, )
                                         )
                          Defendants.    )
                                         )

## EXHIBITS TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### VOLUME 2

Paul Hancock
Florida Bar No. 0140619
Deputy Attorney General
  for Southern Florida
Office of the Attorney General
110 Southeast 6th St., 10th Floor
Fort Lauderdale, FL 33301
(954) 712-4670
(954) 712-4707
Paul_Hancock@oag.state.fl.us

George Waas
Florida Bar No. 129967
Assistant Attorney General
The Capitol
Tallahassee, FL 32399
(850) 414-3300
(850) 487-0997
George_Waas@oag.state.fl.us

Charles J. Cooper
David H. Thompson
Hamish P.M. Hume
Derek L. Shaffer
COOPER & KIRK, PLLC
1500 K Street, N.W., Suite 200
Washington, D.C. 20005
(202) 220-9600
(202) 220-9601
dthompson@cooperkirk.com

January 4, 2002

# INDEX

**Page**

**VOLUME 1**

Expert Report of Professor Richard K. Scher, Ph.D. (June 14, 2001)............... 1

Expert Report of Professor Theodore Chiricos, Ph.D. (June 21, 2001)............. 11

Letter from J. Allen (Brennan Center) to H. Hume (C&K) re enclosure
of supplemental responses to Florida Clemency Board Defendants' Second
Set of Requests for Production of Documents related to Theodore Chiricos
(Dec. 10, 2001) ................................................................................................ 58

Expert Report of Richard L. Engstrom, Ph.D. (July 1, 2001)............................ 63

Expert Report of Joseph L. Katz, Ph.D. (August 31, 2001)............................... 116

Expert Report of Lance deHaven-Smith, Ph.D., The Origins and Impacts
of Felon Disenfranchisement in Florida (Sept. 2001)....................................... 168

Addendum to Expert Report of Lance deHaven-Smith, Ph.D., The Origins
and Impacts of Felon Disenfranchisement in Florida (Nov. 28, 2001) ............. 207

**VOLUME 2**

Expert Report of Professor Ronald E. Weber, A Report on Vote Dilution
Issues for the Case of *Johnson v. Bush* (Oct. 16, 2001)................................... 226

Expert Report of Professor Jerrell Shofner, Ph.D. (Oct. 24, 2001) ................... 426

Addendum to Expert Report of Professor Jerrell Shofner, Ph.D.
(June 20, 2001)................................................................................................. 463

Supplemental Expert Report of Joseph L. Katz, Ph.D. (Nov. 9, 2001) ............. 467

Expert Report of Christopher Uggen, Ph.D. (Dec. 16, 2001)............................ 488

Christopher Uggen, Memo: Race and Automatic Restoration of Civil
Rights (ARCR) in Florida (Oct. 17, 2001) ....................................................... 537

Letter from N. Northup (Brennan Center) to H. Hume (C&K) re enclosure
of supplemental responses to Florida Clemency Board Defendants' Second
Set of Requests for Production of Documents related to Christopher Uggen

(Dec. 6, 2001) .................................................................................................. 545

FLA. CONST. 1838 ........................................................................................... 552

FLA. CONST. 1865 ........................................................................................... 570

FLA. CONST. 1868 ........................................................................................... 588

**VOLUME 3**

FLA. CONST. 1885 ........................................................................................... 615

FLA. CONST. 1968 ........................................................................................... 645

Florida Rules of Executive Clemency ................................................................ 714

Florida Rules of Executive Clemency prior to June 14, 2001 ........................... 732
Plaintiffs; Response to Florida Clemency Board Defendants' First Set of
Interrogatories and First Request for Production of Documents
(July 3, 2001) .................................................................................................. 739

JERRELL H. SHOFNER, NOR IS IT OVER YET: FLORIDA IN THE ERA OF
RECONSTRUCTION 1863-1877 (1974) (excerpt) ................................................ 769

Jerrell H. Shofner, *The Constitution of 1868*, FLORIDA HISTORICAL
QUARTERLY (1963) ........................................................................................... 782

Deposition of Professor Richard Scher (Dec. 5, 2001) ..................................... 792

Deposition of Jerrell H. Shofer (Oct. 25, 2001) ................................................ 854

Deposition of Theodore G. Chiricos (Dec. 11, 2001) (excerpts) ...................... 941

Deposition of Richard L. Engstrom (Dec. 11, 2001) (excerpts) ........................ 951

Deposition of Christopher Uggen (Dec. 8, 2001) (excerpts) ............................. 955

Questions and Responses to Katz's Supplemental Report (Nov. 19, 2001) ...... 958

Order Granting Defendants' Motion for Summary Judgment and Denying
Plaintiffs' Motion for Summary Judgment, *Farrakhan v. Locke*,
No. CS-96-76-RHW (E.D. Wash. Dec. 1, 2000) ............................................... 960

FLA. STAT. § 921.0021 .................................................................................... 973

FLA. STAT. §921.0011 ..................................................................................... 975

A REPORT ON VOTE DILUTION ISSUES FOR THE

CASE OF <u>JOHNSON v. BUSH</u>

by

RONALD E. WEBER

WILDER CRANE PROFESSOR OF GOVERNMENT
UNIVERSITY OF WISCONSIN--MILWAUKEE

and

PRESIDENT, CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.
110 EAST CORNERVIEW ROAD
GONZALES, LA 70737

October 16, 2001

<u>INTRODUCTION</u>

<u>A. Background and Experience</u>

1.  My name is Ronald E. Weber and I am a resident of the State of Wisconsin.

2.  I am currently the Wilder Crane Professor of Government in the Department of Political Science at the University of Wisconsin, Milwaukee, Wisconsin; President of Campaign and Opinion Research Analysts, Inc., Gonzales, Louisiana; former co-editor of <u>The Journal of Politics</u> and Chairman of the Department of Political Science at the University of Wisconsin, Milwaukee; past President of the Southern Political Science Association; and former Fulbright Commission John Marshall Professor of Political Science at the Budapest University of Economic Sciences and the Central European University, Budapest, Hungary (1996-97).  I received my B.A. in Political Science and History from Macalester College, St. Paul, MN, in 1964 and a Ph.D. in Political Science from Syracuse University in 1969, with specialties in American state politics, voting behavior, and quantitative analyses of political data.  A copy of my curriculum vitae is attached as Exhibit A.

3.  I am the author of numerous scholarly works on state political behavior, including several works on state legislative elections and voting behavior at the individual and aggregate levels of analysis.  These works have appeared in such academic journals as the <u>American Political Science Review</u>, <u>The Journal of</u>

-2-

**227**

Politics, <u>Midwest Journal of Political Science</u>, <u>Public Opinion Quarterly</u>, <u>American Politics Quarterly</u>, <u>Political Geography</u>, and <u>Legislative Studies Quarterly</u>.

4.    I have been retained as a consultant and expert witness in a number of redistricting and voting rights cases and have been qualified as an expert by the U.S. District Courts in the Middle District (Eastern, Northern, and Southern Divisions) of Alabama, the Northern District (Tallahassee Division) and Middle District (Jacksonville Division) of Florida, the Southern District (Augusta Division) of Georgia, the Northern District (Eastern Division) of Illinois, the Eastern, Middle, and Western Districts of Louisiana, the District of Maryland, the District (Western Division) of Massachusetts, the Eastern District (Southern Division) of Michigan, the Northern District (Eastern and Western Divisions) of Mississippi, the Eastern District (Eastern Division) of Missouri, the District of Nebraska, the Southern District of New York, the Eastern District of North Carolina (Eastern Division), the Northern (Dallas Division), Southern (Houston Division), and Western (Austin Division) Districts of Texas, the Eastern District (Richmond Division) of Virginia, and the Eastern District of Wisconsin.  I have also given testimony by deposition in a number of cases, including a deposition for the plaintiffs in the Congressional redistricting case of <u>Shaw v. Reno</u>, n/k/a <u>Shaw v. Hunt</u> (Eastern District of North Carolina, Raleigh Division).  I have testified in a number of Congressional and state legislative redistricting cases,

-3-

228

including Johnson v. Miller (Southern District of Georgia, Augusta Division), Vera v. Richards (Southern District of Texas, Houston Division), Hays v. State of Louisiana (Western District of Louisiana, Shreveport Division), Johnson v. Mortham (Northern District of Florida, Tallahassee Division), Moon v. Meadows (Eastern District of Virginia, Richmond Division), DeGrandy v. Wetherell (Northern District of Florida, Tallahassee Division), NAACP v. Austin, (Eastern District of Michigan, Southern Division), and Thomas v. Bush, (Western District of Texas, Austin Division).  A full listing of the cases in which I have testified in Federal court or I was deposed under oath is attached as Exhibit B.  I also have extensive experience developing redistricting plans for local and state government clients and assisting them with preclearance of those plans under Section 5 of the U.S. Voting Rights Act of 1965, as amended in 1982.

5.  I have been retained by defendants in this case and am being compensated at the rate of $200 per hour plus out-of-pocket expenses.  Neither the amount of my compensation nor the fact that I am being compensated has altered the opinions that I have given and will give in this report and case.

## B.  Purpose of the Analysis and Conclusions

6.  I have addressed the following questions in analyzing whether minority vote dilution occurs in the state of Florida due

-4-

to the alleged disenfranchisement of convicted felons, thus resulting in a violation of Section 2 of the U.S. Voting Rights Act of 1965, as amended, and the Fourteenth and Fifteenth Amendments of the U.S. Constitution:

(1) whether voter registration and/or participation differences exist between African-American and non-Hispanic white (``Anglo'') voters in recent Florida statewide Democratic primary, runoff, and general elections;

(2) whether the voting patterns of African-American and non-Hispanic white (``Anglo'') voters in recent statewide Florida Democratic primary and runoff elections are polarized.  In answering this question, I focus on whether African-American voters are cohesive, whether non-Hispanic white (``Anglo'') voters prefer different candidates than the African-American voters, and on determining the level of non-Hispanic white (``Anglo'') crossover voting;

(3) whether legally significant vote dilution is occurring in recent statewide Florida Democratic primary and runoff elections in that the candidates clearly preferred by African-American voters are not being nominated due to racial bloc voting by non-Hispanic white (``Anglo'') voters;

(4) whether the voting patterns of African-American and non-Hispanic white (``Anglo'') voters in recent

-5-

**230**

Florida statewide general elections reveal patterns of polarized voting.  In answering this question, I focus on whether African-American voters are cohesive, whether non-Hispanic white (``Anglo'') voters prefer different candidates than the African-American voters, and on determining the level of non-Hispanic white (``Anglo'')  crossover voting; and

(5) whether legally significant vote dilution is occurring in recent statewide Florida general elections in that the candidates clearly preferred by African-American voters are not being elected due to racial bloc voting by non-Hispanic white (``Anglo'') voters?

For the reasons stated in this report, my conclusions are as follows:

(1) there are differences in voter registration rates between African-American and non-Hispanic white (``Anglo'') persons of voting age at the time of recent Florida Democratic primary and general elections, with the differences advantaging non-Hispanic white (``Anglo'') potential voters from 1992 through 2000;

(2) there are voter participation differences between African-American and non-Hispanic white (``Anglo'') voters in recent Florida statewide Democratic primary and runoff primary elections, with the differences advantaging the African-American group at Democratic primary elections;

-6-

**231**

(3) there are voter participation differences between African-American and non-Hispanic white (``Anglo'') voters in recent Florida statewide general elections, with the differences advantaging the non-Hispanic white (``Anglo'') group at general elections;

(4) evidence exists that African-American voters are usually cohesive in recent statewide Florida Democratic primary and runoff elections. However, I find no usual pattern of racial polarization in voting in recent statewide Florida Democratic primary and runoff elections. For the most part, however, these are elections where whatever racial polarization in voting exists is not politically or legally consequential, in that the candidates of choice of African-American voters are not usually defeated for nomination due to non-Hispanic white (``Anglo'') racial bloc voting. These are elections where non-Hispanic white (``Anglo'') voters usually provide high levels of crossover support for candidates of choice of African-American voters;

(5) no legally significant vote dilution is occurring in recent statewide Florida Democratic primary and runoff elections;

(6) evidence exists that African-American voters are usually cohesive in statewide general elections, but I find no usual pattern of racial polarization in voting

-7-

**232**

in recent statewide Florida general elections.  For the most part, however, these are elections where whatever polarization in voting exists does not end up being politically or legally consequential, in that the candidates of choice of African-American voters are not usually defeated due to non-Hispanic white (``Anglo'') racial bloc voting.  These are elections where non-Hispanic white (``Anglo'') voters usually provide high levels of crossover support for candidates of choice of African-American voters.  I also find for the recent 1998 statewide elections for eight offices that Hispanic voters are usually cohesive, that Hispanic voters usually disagree with African-American voters over candidates of choice, and that the level of Hispanic crossover voting is sometimes high enough to produce a win for Democratic candidates preferred by African-American voters; and

(7) no legally significant vote dilution is occurring in recent Florida statewide general elections.

<u>C. Methodology</u>

7.  In order to answer the five questions posed above, I have undertaken several distinct forms of data analysis.  First, I employ historical 1990 and contemporary 2000 data from the U.S. Bureau of the Census and historical statewide voter registration data by race to answer question one which calls upon me to

-8-

**233**

calculate the rate of group registration for the State of
Florida.  For each time point, I have voter registration counts
statewide by race and these counts are divided by estimated
voting age population data taken from the 1990 and 2000 Censuses
of Population.  I employ standard intercensal estimation
techniques to determine the number of persons in voting age
population in 1992, 1994, 1996, and 1998.  Second, I employ
precinct level data collected and reported by the Florida
Secretary of State from the county Supervisors of Election
measuring the non-Hispanic white (``Anglo''), African-American,
and Hispanic (only in 1998) composition of the voter registration
rolls in Florida, and precinct level data measuring the actual
election preferences of the voters voting in statewide Democratic
primary, runoff, and general elections conducted in Florida
between 1992 and 1998 to estimate participation rates and voting
preferences of the African-American and non-Hispanic white
(``Anglo'') groups (and the Hispanic group in 1998).  In Florida,
the most appropriate way to measure the African-American and non-
Hispanic white (``Anglo'') composition of the electorate is to
use contemporary voter registration data.  Because numerous
Federal courts have held that recent elections are the most
probative in determining vote dilution, I have begun my analyses
with the 1992 statewide Democratic primary, runoff, and general
elections and then worked forward through the 1998 Democratic
primary, runoff, and general returns.

-9-

234

8.  Primary elections are held in early September of the
even numbered years in which candidates compete for the position.
The candidate in each party primary who wins a majority of the
vote gains the party nomination to the general election.  If no
candidate wins a majority of the votes in the primary election,
there is then a runoff primary election between the two leading
candidates in the first primary election.  Each primary is a
closed primary in which voters who are enrolled in either the
Democratic or Republican party are permitted to vote in the party
primary of the party in which they are enrolled.  However,
Florida law was changed in 1999 to permit party enrollees of the
other party or those who do not enroll in any party to
participate in either the Democratic or Republican primary if no
candidate files for office in the other party's primary.  Since
statewide offices are typically contested by both major parties,
this provision has not yet had an impact on who can participate
in the statewide Democratic or Republican primaries.

9.  All of the contested Florida statewide Democratic
primary, runoff primary, and general elections from 1992 through
1998 have been analyzed employing both bivariate ecological
regression analysis and the complementary technique of extreme
case (or homogeneous precinct) analysis.  These are the analysis
procedures used in Thornburg v. Gingles 478 U.S. 30 (1986) to
determine whether blacks and whites differed in their voting
behavior in North Carolina state legislative elections.  I have

-10-

235

employed these same procedures in preparing expert reports for other vote dilution cases in which I have prepared expert reports and testified.   These are among the same techniques employed by plaintiffs' expert in doing work for the case.   In the participation, cohesion, and polarization analyses reported below, I rely on the weighted regression and extreme case results for the statewide elections conducted in Florida.   The full procedures are detailed in Exhibit C.

## FINDINGS

### A. African-American and Non-Hispanic White (``Anglo'') Registration
### Rates at the Time of Recent Florida Statewide
### Primary and General Elections

10.   In order to address the question of whether African-American persons of voting age in the State of Florida have less opportunity than non-Hispanic white (``Anglo'') persons of voting age to participate in the political process at the time of recent Democratic primary and general elections, I have calculated first registration rates for the two groups just before the primary and general elections beginning in October 1992 and concluding in October 2000 to determine the patterns of registration between the two groups.   For the purposes of my analyses, I begin by

-11-

examining the first of two dimensions of overall participation in the electoral process.  Registration rates are defined and measured as the estimated proportion of persons of voting age who were registered to vote at the close of the registration period prior to the election.  The number of persons of voting age for each election other than in the years in which the Census of Population was conducted is calculated by using standard intercensal estimation techniques to determine the number of persons in voting age population in 1992, 1994, 1996, and 1998. This procedure involves taking data on the voting age population for Florida from the Census of Population at two time points-- 1990 and 2000--and then determining the rate of change by group between the two time points.  Then the rate of change data are applied to estimate the voting age population data for the time points between the two census dates.  The second dimension of participation will be discussed below.

11.  I have both voter registration and estimated voting age population data for a total of four primary and five general elections since the fall of 1992 through the present.  In Table 1, I report the estimated group registration rates for those nine elections.

12.  As to registration rates, the analyses show that the African-American rate has fluctuated from a low of 46.8 percent at the time of the 1994 primary election to a high of 61.7

-12-

237

percent at the time of the 1996 general election, based on the weighted regression analyses.  On the other hand, the non-Hispanic white (``Anglo'') registration rate varies from a low 72.0 percent at the time of the 1994 primary election to a high of 80.6 percent at the time of the 1996 general election.  Thus, in

-13-

238

Table 1

VOTER REGISTRATION AS A PERCENTAGE OF ESTIMATED CONTEMPORARY TOTAL
AND GROUP VOTING AGE POPULATION AT RECENT STATEWIDE
ELECTIONS IN FLORIDA
1992-2000

|  | Total% | Non-Hispanic White% | Non-Hispanic Afr.-Amer.% |
|---|---|---|---|
| October, 1992 Regis. | 61.9% | 74.5% | 51.5% |
| August, 1994 Regis. | 58.7% | 72.0% | 46.8% |
| October, 1994 Regis. | 59.8% | 73.2% | 47.9% |
| August, 1996 Regis. | 67.7% | 78.4% | 58.4% |
| October, 1996 Regis. | 70.7% | 80.6% | 61.7% |
| August, 1998 Regis. | 68.8% | 78.9% | 59.1% |
| October, 1998 Regis. | 69.2% | 79.2% | 59.5% |
| August, 2000 Regis. | 68.2% | 78.0% | 57.6% |
| October, 2000 Regis. | 71.0% | 80.2% | 60.6% |

Source: Florida Secretary of State, Division of Elections Web-site:
www.state.fl.us/elections.

-14-

239

all nine elections I examine, the non-Hispanic white (``Anglo'') registration rate is higher for that group than for the African-American group.  Up through 1994, the Supervisors of Election were permitted to purge voters from the registration rolls if they failed to vote in the previous Presidential election.  Now under the National Voter Registration Act, the County Supervisor of Elections maintains an inactive voter roll which includes persons who would have been purged in the past for non-voting. Anyone on the inactive roll is permitted to vote at the time of any Federal election, which includes all times the statewide offices I analyze are voted upon by the registered voters of Florida.

13.  Statewide the gap between African-American and non-Hispanic white (``Anglo'') registration rates has changed in a favorable direction since the fall of 1992.  The gap in the fall of 1992 was about 23 points, whereas the gap in fall of 1996 was 18.9 points and in the fall of 2000 was 19.6 points (see the weighted regression analyses in Table 1).

14.  Given the figures noted above for group voter registration rates, I conclude that African-American persons of voting age in the State of Florida participate less than non-Hispanic white (``Anglo'') persons of voting age by registering to vote.  This finding should not be surprising since the non-Hispanic white (``Anglo'') group within the State of Florida

-15-

240

includes a large number of persons over the age of 65 who are well known among social scientists for having very high rates of political participation through registration and voting.   My analysis does not control for median age differences between the two groups and undoubtedly some of the difference in registration rates between the two groups could be accounted for by controlling for age differences.   The 2000 Census of Population data for the State of Florida show that the non-Hispanic white (``Anglo'') group has the highest median age for the total population at 43.1 years, while the Hispanic group has a median age for the total population at 32.6 years.   The African-American median age for the total population is 28.7 years, and the median age for the entire population of the state is 38.7 years.   Since the median age for the African-American group is the lowest and is the highest for the non-Hispanic white (``Anglo'') group, this difference contributes to the difference in voter registration rates for the two groups.

B.  African-American and Non-Hispanic White (``Anglo'')
Participation Rates at the Time of Recent Florida Statewide
Primary and General Elections

15.   In order to address the question of whether African-American persons who are registered to vote in Florida have less

-16-

241

opportunity than non-Hispanic white (``Anglo'') persons who are registered to vote to participate in the political process, I have estimated participation rates for contested Democratic primary, runoff, and general elections for statewide office from 1992-1998 to determine the patterns of participation among the two groups.  For the purposes of these analyses, I am looking at a second dimension of participation in the electoral process, where participation is defined and measured as the proportion of persons registered to vote who then voted in the contest in question by selecting one of the candidates running.  Thus, African-American and non-Hispanic white (``Anglo'') participation rates for the period of 1992-1998 represent participation as a proportion of the persons registered to vote who went to the polls from each group.  The participation figures are calculated using the bivariate ecological regression analysis technique and the complementary technique of extreme case (or homogeneous precinct) analysis to estimate participation rates for the African-American and non-Hispanic white (``Anglo'') groups.

16.  I turn first in Table 2 to a discussion of participation rates in the ten contested statewide Democratic primary and runoff elections between 1992 and 1998 (see Exhibit C for summaries of the regression and extreme case analyses for participation and vote preferences in the Democratic primary and runoff elections).  In every one of the contested Democratic primary or runoff elections from September, 1992, through

-17-

242

October, 1998, I find that African-American persons who were registered to vote participated at a higher rate than non-Hispanic white (``Anglo'') persons who were registered to vote, based on the weighted regression and extreme case analyses (see Table 2).  African-American participation was the highest in the September 1, 1992, Democratic primary for the U.S. Senate at 29.2 percent of registered voters, followed by a rate of 23.0 percent in the September 8, 1994, Democratic primary for Governor and a rate of 20.0 percent in the September 8, 1994, Democratic primary for Commissioner of Education.  The lowest rates of African-American participation occur in the Democrat runoff primary elections of October 1, 1994, for U.S. Senate and of October 1, 1998, for Commissioner of Education.  However, in both of these

-18-

243

Table 2

Estimated Voter Participation Rates by Race in Florida Statewide
Democratic Primary and Runoff Elections (1992-1998)

| Date of Elect. | Office | Weighted Regression Results | | Extreme Case Results | |
|---|---|---|---|---|---|
| | | Black Part. | White Part. | Black Part. | White Part. |
| 09/01/92 | Sen. | .292 | .150 | .248 | .136 |
| 09/08/94 | Sen. | .186 | .103 | .168 | .102 |
| 09/08/94 | Gov. | .230 | .110 | .213 | .110 |
| 09/08/94 | Comp. | .199 | .106 | .179 | .105 |
| 09/08/94 | Tre. | .194 | .107 | .175 | .106 |
| 09/08/94 | C.Ed. | .200 | .099 | .181 | .099 |
| 10/01/94 | Sen. | .076 | .052 | .058 | .050 |
| 09/01/98 | A.G. | .136 | .061 | .132 | .064 |
| 09/01/98 | C.Ed. | .126 | .057 | .120 | .058 |
| 10/01/98 | C.Ed. | .039 | .024 | .038 | .024 |

Notes:     Participation is measured as the percentage of registered voters of the group
who voted for the office in question when at the polls.

244

elections, the African-American participation rate was higher than the non-Hispanic white (``Anglo'')  rate.

17. Typically in these statewide Democratic primary and runoff elections, African-American persons who were registered to vote participated at rates almost twice those of non-Hispanic white (``Anglo'') persons who were registered to vote, based on the weighted regression and extreme case analyses (see Table 2). And in half of the ten contests, the rate of non-Hispanic white (``Anglo'') participation dropped below the rate of ten percent. Thus, African-American persons who are registered to vote have an enhanced presence in the contested primary and runoff elections of the Democratic party beyond their presence on the voter registration rolls of the state.

18. I turn next in Table 3 to a discussion of participation rates in the 19 contested statewide general elections between 1992 and 1998 (see Exhibit D for summaries of the regression and extreme case analyses for participation and vote preferences in the general elections).  In every one of the contested general elections from November, 1992, through November, 1998, I find that African-American persons who were registered to vote participated at a lower rate than non-Hispanic white (``Anglo'')

-20-

245

Table 3

Estimated Voter Participation Rates by Race in Florida
Statewide General Elections (1992-1998)

| Date of Elect. | Office | Weighted Regression Results | | Extreme Case Results | |
|---|---|---|---|---|---|
| | | Black Part. | White Part. | Black Part. | White Part. |
| 11/03/92 | Pres. | .628 | .727 | .651 | .724 |
| 11/03/92 | Sen. | .576 | .681 | .584 | .676 |
| 11/08/94 | Sen. | .417 | .611 | .447 | .607 |
| 11/08/94 | Gov. | .461 | .622 | .499 | .620 |
| 11/08/94 | SofS | .417 | .588 | .446 | .584 |
| 11/08/94 | A.G. | .428 | .596 | .461 | .594 |
| 11/08/94 | Comp. | .422 | .590 | .451 | .587 |
| 11/08/94 | Tre. | .420 | .596 | .451 | .592 |
| 11/08/94 | C.Ed. | .441 | .590 | .475 | .586 |
| 11/08/94 | Agr. | .421 | .596 | .453 | .592 |
| 11/05/96 | Pres. | .478 | .614 | .530 | .616 |
| 11/03/98 | Sen. | .327 | .464 | .389 | .472 |
| 11/03/98 | Gov. | .356 | .467 | .403 | .477 |
| 11/03/98 | SofS | .321 | .459 | .385 | .467 |
| 11/03/98 | A.G. | .326 | .462 | .390 | .469 |
| 11/03/98 | Comp. | .314 | .453 | .377 | .460 |
| 11/03/98 | Tre. | .326 | .464 | .391 | .473 |
| 11/03/98 | C.Ed. | .321 | .461 | .387 | .469 |
| 11/03/98 | Agr. | .317 | .457 | .380 | .463 |

-21-

Notes:      Participation is measured as the percentage of registered voters
            of the group who voted for the office in question when at the
            polls.

persons who were registered to vote, based on the weighted

regression and extreme case analyses (see Table 3).  African-

American participation was the highest in the November 3, 1992,

general elections for U.S. President at 62.8 percent of

registered voters and for the U.S. Senate at 57.6 percent of

registered voters.  The next highest rate of African-American

participation occurred at the November 5, 1996, general election

for U.S. President at 47.8 percent.  Typically, the rate of

African-American participation was lower in general elections

contests occurring in the mid-term years of 1994 and 1998.  Non-

Hispanic white (``Anglo'') participation was also the highest in

the November 3, 1992, general elections for U.S. President at

72.7 percent of registered voters and for the U.S. Senate at 68.1

percent of registered voters.  The next highest rate of non-

Hispanic white (``Anglo'') participation occurred at the November

5, 1996, general election for U.S. President at 61.4 percent.


    19.  The gap between African-American and non-Hispanic white

(``Anglo'') participation rates is the least at the time of the

Presidential election of 1992 and somewhat greater at the time of

the 1994, 1996, and 1998 elections.  The gap is also less in

elections for offices at the top of the ticket such as Governor

in the mid-term election years when contrasted with differences

in participation rates for offices down the ballot from the top

-22-

of the ticket.  I examine closely the behavior of the two groups in the 1994 general election when there was an African-American candidate Doug Jamerson running as the Democratic candidate for Commissioner of Education.  In that contest the African-American participation rate was actually lower than that for the top of the ticket office of Governor.  The same pattern holds for the participation rate of the non-Hispanic white (``Anglo'') group. Thus, there is no evidence that the race of the Democratic candidate in the Commissioner of Education contest stimulated either African-American or non-Hispanic white (``Anglo'') participation.

20.  Summing up the analyses of participation differences between the African-American and non-Hispanic white (Anglo') persons who were registered to vote, I find that 1) in the ten Democratic primary and runoff elections there was a consistent pattern of higher African-American participation than non-Hispanic white (``Anglo'') participation, with the African-American participation advantage usually running almost two to one; 2) in the 19 general elections, the pattern shows higher participation rates for non-Hispanic white (``Anglo'') persons who were registered to vote than for African-American persons who were registered to vote, with the non-Hispanic white (``Anglo'') group advantage running from about ten to 13 percentage points; and 3) that in the 1994 general election for Commissioner of Education where the Democratic nominee was an African-American

-23-

**248**

candidate there is no evidence that either African-American or non-Hispanic white (``Anglo'') participation was stimulated by the presence of the candidate Doug Jamerson.  Although the rates of voter registration for African-American persons of voting age are lower than those for non-Hispanic white (``Anglo'') persons of voting age, it is significant that African-American persons who are registered to vote do participate at higher rates than persons of the non-Hispanic white (``Anglo'') group in Democratic primaries and runoffs.  On the other hand, the differences in participation rates in the general elections between the African-American and non-Hispanic white (``Anglo'') groups can be explained, at least in part, by the median age differences between the two groups.

C.  Voting Patterns in Florida Statewide
Democratic Primary and Runoff Elections--1992-1998

21.  The next questions to be addressed are the degree of African-American cohesion, the extent of racial polarization in voting, and the level of non-Hispanic white (``Anglo'') crossover voting in Florida statewide Democratic primary and runoff elections between 1992 and 1998.  While some have claimed that polarized voting requires only that a majority of the voters of one group prefers different candidates than a majority of voters of another group, that is insufficient to sustain a claim of vote dilution.  Under the Thornburg decision, self-identified African-

-24-

American voters must give more than just a bare majority of
support to African-American preferred candidates in order to
sustain a vote dilution claim.  The U.S. Supreme Court suggests
that "a showing that a significant number of minority group
members usually vote for same candidates is one way of proving
the political cohesiveness necessary to a vote dilution
claim...." (487 U.S. 30, at 56).  Thus, as I present my analyses
below I will determine whether or not a significant percentage of
African-American group members support a candidate of choice, and
whether or not a significant percentage of white voters support a
different candidate of choice to yield racial polarization in
voting.


22.  Because the Democratic primary election system used in
Florida sometimes has more than two candidates running for the
party nomination to an office, I must look at the support levels
given to the top contending candidates as I determine cohesion
and polarization.  One has to take into account the percentage of
a group's support for a candidate of choice in comparison to the
percentage of a group's support for other candidates.  When a
group's percentage of support for a candidate of choice is at
least 60 percent of the total vote for the two top candidates and
at least 50 percent of the total vote among all candidates, I
will classify the group as acting cohesively.  But, because
cohesion is really measured on a continuum, I prefer to break

-25-


**250**

cohesion into two categories where there are gradations of cohesion in voting with levels of 80 percent or more of African-American voters supporting a preferred candidate indicating strong levels of cohesion, and levels between 60 and 79.9 percent of African-American voters supporting a preferred candidate indicating moderate levels of minority cohesion.  Then, to determine the degree of polarization in voting, I must also analyze non-Hispanic white (``Anglo'')  voter preferences.  If non-Hispanic white (``Anglo'')  voters give 80 percent or higher support to a preferred candidate, while African-American voters give a similar level of support to a different preferred candidate, this would be an example of strong polarization in voting.  But if non-Hispanic white (``Anglo'') voters only give 60-79.9 percent support to a preferred candidate, while African-American voters only give 60-79.9 percent support to a different preferred candidate, then the degree of polarization in voting would be labeled as moderate.  In order for polarization to occur, the candidate of choice cohesively preferred by one group, must be juxtaposed against the cohesive behavior of the other group behind a different candidate of choice.  Because all the figures I work with are estimates, either from weighted regression or extreme cases analyses, I must be certain that a group is cohesive when an estimate suggests it is cohesive.  The error involved in estimating voting behavior is such that one must be confident that when an election is characterized as polarized, the conclusion is not due to errors in the estimates.

-26-

251

23.   As the analyses below will indicate, the most likely outcome in Democratic primary and runoff elections is for the African-American group to be strongly or moderately cohesive in a majority of those elections, while the non-Hispanic white (``Anglo'') group has been usually uncohesive in a majority of these contested elections.   In the four cases where each group is cohesive, the non-Hispanic white (``Anglo'') voters support the same candidates as the African-American voters in all four elections.   Thus, on the whole, the ten Democratic primary and runoff elections cannot be characterized as polarized elections. The principal reasons why the ten Democratic primary and runoff elections are not polarized is because the non-Hispanic white (``Anglo'')  candidate of choice is the same as the candidate of choice of African-American voters in eight of those ten elections and because the level of crossover support given by those non-Hispanic white (``Anglo'')  voters to the candidates of choice of African-American voters is a majority of the Democratic primary voters in six of ten cases and a plurality of those voters in two other cases.   Thus, there are strong levels of non-Hispanic white (``Anglo'') crossover support in those ten Democratic primary and runoff elections.

24.   Data are reported in Table 4 for the 10 Democratic primary and runoff elections since September, 1992 through September, 1998 (see Exhibit D for summaries of the regression

-27-

and extreme case analyses for cohesion and polarization).  In these ten statewide contests, only one involved an African-American candidate competing against a non-Hispanic white (``Anglo'') candidate, while nine were contests among non-Hispanic white (``Anglo'') candidates only.  In the 1994 Democratic primary for Commissioner of Education, Douglas Jamerson, an African- American candidate, was the candidate of choice of African- American voters but did not achieve a cohesive level of support

-28-

TABLE 4

STATE OF FLORIDA
Democratic Primary and Runoff Elections for Statewide Office (1992-1998): Cohesion and Polarization Results
(Based on Weighted Regression Analysis)

| Date of Election | Off. | Number of Candidates | Candidate of Choice of AA Voters | % AA Voters Support for Candidate of Choice | AA Cohesion | Candidate of Choice of White Voters | % White Voters Support for Candidates of Choice | White Cohesion | AA/White Polarization | AA Voter Candidate of Choice Defeated | Winner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/01/1992 | Sen. | 2 | Graham | 91.8 | S | Graham | 82.0 | S | NP | N | Graham |
| 09/08/1994 | Sen. | 4 | Rodham | 33.9 | U | Rodham | 33.0 | U | NP | N | Rodham Wiley |
| 09/08/1994 | Gov. | 2 | Chiles | 87.0 | S | Chiles | 68.2 | M | NP | N | Chiles |
| 09/08/1994 | Comp. | 2 | Lewis | 84.9 | S | Lewis | 64.2 | M | NP | N | Lewis |
| 09/08/1994 | Tre. | 3 | Nelson | 58.8 | M | Nelson | 54.2 | U | NP | N | Nelson |
| 09/08/1994 | C.Ed. | 2 | Jamerson | 59.5 | U | Griffin | 50.5 | U | NP | N | Jamerson |
| 10/01/1994 | Sen. | 2 | Rodham | 67.1 | M | Rodham | 57.7 | U | NP | N | Rodham |
| 09/01/1998 | A.G. | 2 | Butterworth | 74.3 | M | Butterworth | 85.2 | S | NP | N | Butterworth |
| 09/01/1998 | C.Ed. | 3 | Howard | 38.1 | U | Howard | 40.4 | U | NP | N | Howard Wallace |
| 10/01/1998 | C.Ed. | 2 | Howard | 51.3 | U | Wallace | 58.3 | U | NP | Y | Wallace |

Notes:  Strong cohesion is defined as a condition where in a two candidate race, one candidate achieves 80 percent or more of the vote of the group.  Moderate cohesion is defined as a condition where in a two candidate race, one candidate achieves 60 through 79.9 percent of the vote of the group.  In multi-candidate races, strong cohesion is the condition where the front-running candidate gets 80 percent or more of the vote from among the two front running candidates, and moderate cohesion is the condition where the front-running candidate obtains between 60 and 79.9 percent of the vote from among the two front running candidates.  To be judged cohesive, the group must participate in the election at a level sufficient to conclude that a significant number of persons from the group prefer a candidate.  Strong polarization is defined as the occasions when both the African-American and white groups are strongly cohesive and prefer different candidates, while moderate polarization is defined as the occasions when one or both the African-American and white groups are moderately cohesive and support different candidates.  Symbols mean: (S) strongly cohesive, (M) moderately cohesive, (U) uncohesive, (SP) strongly polarized, (MP) moderately polarized, (NP) unpolarized.  AA denotes African-American.

- 29 -

from among African-American voters.  Jamerson's opponent was the
candidate of choice of non-Hispanic white (``Anglo'') voters and
that level of support was uncohesive.  And Jamerson won the
Democratic nomination for Commissioner of Education with 50.9
percent of the total vote in the 1994 Democratic primary.

25.  In the six statewide Democratic primary or runoff
elections where African-American voters were either strongly or
moderately cohesive, the candidates of choice of African-American
voters were also supported by the non-Hispanic white (``Anglo'')
voters in each instance.  Thus, the candidates of choice of both
groups were nominated.  Only in one election, the October 10,
1998, Democratic runoff primary for Commissioner of Education,
was the candidate of choice of African-American voters not
nominated.  But in that runoff election neither the African-
American nor the non-Hispanic white (``Anglo'') groups were
cohesive in support of the respective candidates of choice.

26.  To summarize my findings on cohesion, racial
polarization, and crossover voting in the ten statewide
Democratic primary and runoff elections, I find that African-
American voters were strongly cohesive in three elections,
moderately cohesive in three, and uncohesive in four.  As to
racial polarization, I find that none of the ten elections were
racially polarized.  As to crossover voting by non-Hispanic white
(``Anglo'')  voters, I find that crossover voting for the

-30-

candidates of choice of African-American voters is at least a majority of the Democratic primary voters in six of ten cases and a plurality of those voters in two other cases.

### D.  Vote Dilution in Florida Statewide
### Democratic Primary and Runoff Elections

27.  In order to say that legally significant vote dilution has occurred in the ten Democratic primary and runoff elections I have examined, I must demonstrate that candidates preferred clearly by African-American voters have not been elected due to racial bloc voting by non-Hispanic white (``Anglo'')  voters. The evidence from the ten Democratic primary and general elections is that on no occasion did a candidate clearly preferred cohesively by African-American voters fail to be nominated due to the cohesive behavior of non-Hispanic white (``Anglo'') voters who supported the candidate not preferred by African-American voters.  This is clearly not a picture of legally significant vote dilution for African-American voters in statewide Democratic primary and runoff elections from 1992-1998 in Florida.

### E.  Voting Patterns in Florida Statewide
### General Elections--1992-1998

28.  The next questions to be addressed are the degree of

-31-

256

African-American cohesion, the extent of racial polarization in voting, and the level of crossover voting in recent statewide general elections for National and State offices between 1992 and 1998.  To date I have examined a total of 19 general elections including those for President in 1992 and 1996; for U.S. Senator in 1992, 1994, and 1998; and for Governor and other cabinet level offices in 1994 and 1998.  I summarize the cohesion and polarization results for these 19 elections in Table 5 (see Exhibit E for the summaries of the regression and extreme case results for each of these contested general elections).  Below I also present statewide exit poll results for the top of the ticket elections (either President or Governor) from 1992 through 2000 to double-check the accuracy of my cohesion, polarization, and crossover results for those elections.

29.  African-American voters were strongly cohesive behind Democratic candidates in all 19 general elections.  The level of cohesion ranged from a low of 89.4 percent in support of Hugh Rodham in the 1994 general election for U.S. Senate to a high of

-32-

Table 5

STATE OF FLORIDA

General Elections for Statewide Office (1992-1998): Cohesion and Polarization Results
(Based on Weighted Regression Analysis)

| Date of Election | Off. | Number of Candidates | Candidate of Choice of AA Voters | % AA Voters Support for Candidate of Choice | AA Cohesion | Candidate of Choice of White Voters | % White Voter Support for Candidates of Choice | White Cohesion | AA/White Polarization | AA Voter Candidate of Choice Defeated | Winner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/03/1992 | Pres. | 3 | Clinton | 95.1 | S | Bush | 44.6 | U | NP | Y | Bush |
| 11/03/1992 | Sen. | 2 | Graham | 99.8 | S | Graham | 62.6 | M | NP | N | Graham |
| 11/08/1994 | Sen. | 2 | Rodham | 89.4 | S | Mack | 74.8 | M | NP | Y | Mack |
| 11/08/1994 | Gov. | 2 | Chiles | 100.2 | S | Bush | 52.7 | U | NP | N | Chiles |
| 11/08/1994 | SofS | 2 | Saunders | 102.6 | S | Mortham | 56.1 | U | NP | Y | Mortham |
| 11/08/1994 | A.G. | 2 | Butterworth | 103.5 | S | Butterworth | 54.5 | U | NP | N | Butterworth |
| 11/08/1994 | Comp. | 2 | Lewis | 105.2 | S | Milligan | 54.9 | U | NP | Y | Milligan |
| 11/08/1994 | Tre. | 2 | Nelson | 103.8 | S | Ireland | 51.7 | U | NP | N | Nelson |
| 11/08/1994 | C.Ed. | 2 | Jamerson | 103.9 | S | Brogan | 57.5 | U | NP | Y | Brogan |
| 11/08/1994 | Agr. | 2 | Crawford | 99.3 | S | Smith | 52.2 | U | NP | N | Crawford |
| 11/05/1996 | Pres. | 3 | Clinton | 105.2 | S | Dole | 46.3 | U | NP | N | Clinton |
| 11/03/1998 | Sen. | 2 | Graham | 108.6 | S | Graham | 57.5 | U | NP | N | Graham |
| 11/03/1998 | Gov. | 2 | MacKay | 99.4 | S | Bush | 59.3 | U | NP | Y | Bush |
| 11/03/1998 | SofS | 2 | Glevers | 106.2 | S | Harris | 58.4 | U | NP | Y | Harris |
| 11/03/1998 | A.G. | 2 | Butterworth | 107.7 | S | Butterworth | 56.7 | U | NP | N | Butterworth |
| 11/03/1998 | Comp. | 2 | Daughtrey | 108.6 | S | Milligan | 66.7 | M | NP | Y | Milligan |
| 11/03/1998 | Tre. | 2 | Nelson | 108.9 | S | Nelson | 52.8 | U | NP | N | Nelson |
| 11/03/1998 | C.Ed. | 2 | Wallace | 104.1 | S | Gallagher | 60.8 | M | NP | Y | Gallagher |

- 33 -

258

Table 5

STATE OF FLORIDA

General Elections for Statewide Office (1992-1998): Cohesion and Polarization Results
(Based on Weighted Regression Analysis)

| Date of Election | Off. | Agr. | Number of Candidates | Candidate of Choice of AA Voters | % AA Voters Support for Candidate of Choice | AA Cohesion | Candidate of Choice of White Voters | % White Voter Support for Candidates of Choice | White Cohesion | AA/White Polarization | AA Voter Candidate of Choice Defeated | Winner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/03/1998 | Agr. | | 2 | Crawford | 106.9 | S | Crawford | 59.5 | U | MP | N | Crawford |

Notes:  Strong cohesion is defined as a condition where in a two candidate race, one candidate achieves 80 percent or more of the vote of the group.  Moderate cohesion is
defined as a condition where in a two candidate race, one candidate achieves 60 through 79.9 percent of the vote of the group.  In multi-candidate races, strong
cohesion is the condition where the front-running candidate gets 80 percent or more of the vote from among the two front running candidates, and moderate cohesion is
the condition where the front-running candidate obtains between 60 and 79.9 percent of the vote from among the two front running candidates.  To be judged cohesive,
the group must participate in the election at a level sufficient to conclude that a significant number of persons from the group prefer a candidate.  Strong
polarization is defined as the occasions when both of the African-American and White groups are strongly cohesive and prefer different candidates, while moderate
polarization is defined as the occasions when one or both of the African-American and white groups are moderately cohesive and support different candidates.  Symbols
mean: (S) strongly cohesive, (M) moderately cohesive, (U) uncohesive, (SP) strongly polarized, (MP) moderately polarized, (NP) unpolarized.  AA denotes African-
American.

- 34 -

259

108.9 percent in support of Bill Nelson in the 1998 general
election for State Treasurer (based on the weighted regression
analysis).  On the other hand, I find only four elections with
moderate cohesion (and no election with strong cohesion) for the
non-Hispanic white (``Anglo'') group.  Non-Hispanic white
(``Anglo'') voters were moderately cohesive in support of
Democratic candidate Bob Graham in the 1992 election for the U.S.
Senate, Republican candidate Connie Mack in the 1994 U.S. Senate
election, Republican candidate Bob Milligan in the 1998
Comptroller election, and Republican candidate Tom Gallagher in
the 1998 Commissioner of Education election.  In the other 15
elections, the non-Hispanic white (``Anglo'') group is judged
uncohesive.  In the three elections where African-American voters
supported Democratic candidates cohesively and where the non-
Hispanic white (``Anglo'') voters supported Republican candidates
cohesively, I find the electorate to be moderately polarized.
This condition occurs only in three of 19 elections (or 15.8
percent).  However, to the extent there is any polarization in
those three elections, it is attributable to race-neutral causal
factors.  Specificaly, the African-American voters strongly
supports Democrats, while the non-Hispanic white (``Anglo'')
voters split their votes more evenly between Democrats and
Republicans. Non-Hispanic white (``Anglo'') crossover voting is
evident in these 19 statewide elections enabling the Democratic
candidates to win ten of the 19 elections.  In the other nine
elections, non-Hispanic white (``Anglo'') crossover voting ranges

-35-

**260**

from 25.2 percent in 1994 general election for U.S. Senate where
Republican incumbent Connie Mack was reelected over Democratic
candidate Hugh Rodham to 45.1 percent in the 1994 election for
Comptroller where Republican Bob Milligan defeated Democratic
incumbent Gerald Lewis.  In those nine general elections, the
Republican candidates won statewide.

30.   I am also able to examine the question of whether
Hispanic voters act cohesively and the extent to which those
voters crossover in support of candidates of choice of African-
American voters in a limited set of general elections held in
1998.  Prior to 1998 the State of Florida did not report Hispanic
registered voters for all precincts in Florida.  There are a
total of eight general elections in 1998 for which I can estimate
Hispanic voting behavior using the bivariate ecological
regression technique.  The cohesion and polarization results for
African-American and Hispanic voters are reported in Table 6.

31.   In the eight statewide 1998 general elections I find
that Hispanic voters were cohesive in five of those elections,

Table 6

STATE OF FLORIDA

General Elections for Statewide Office (1998): Cohesion and Polarization Results
(Based on Weighted Regression Analysis)

| Date of Election | Off. | Number of Candidates | Candidate of Choice of AA Voters | % AA Voters Support for Candidate of Choice | AA Cohesion | Candidate of Choice of Hispanic Voters | % Hispanic Voter Support for Candidates of Choice | Hispanic Cohesion | AA/Hispanic Polarization | AA Voter Candidate of Choice Defeated | Winner |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/03/1998 | Sen. | 2 | Graham | 108.6 | S | Graham | 85.0 | S | NP | N | Graham |
| 11/03/1998 | Gov. | 2 | MacKay | 99.4 | S | Bush | 97.5 | S | SP | Y | Bush |
| 11/03/1998 | SofS | 2 | Gievers | 106.2 | S | Harris | 65.3 | M | MP | Y | Harris |
| 11/03/1998 | A.G. | 2 | Butterworth | 107.7 | S | Bludworth | 59.2 | U | NP | N | Butterworth |
| 11/03/1998 | Comp. | 2 | Daughtrey | 108.6 | S | Milligan | 67.3 | M | MP | Y | Milligan |
| 11/03/1998 | Tre. | 2 | Nelson | 108.9 | S | Ireland | 59.5 | U | NP | N | Nelson |
| 11/03/1998 | C.Ed. | 2 | Wallace | 104.1 | S | Gallagher | 78.3 | M | MP | Y | Gallagher |
| 11/03/1998 | Agr. | 2 | Crawford | 106.9 | S | Faircloth | 59.1 | U | NP | N | Crawford |

Notes: Strong cohesion is defined as a condition where in a two candidate race, one candidate achieves 80 percent or more of the vote of the group. Moderate cohesion is defined as a condition where in a two candidate race, one candidate achieves 60 through 79.9 percent of the vote of the group. In multi-candidate races, strong cohesion is the condition where the front-running candidate gets 80 percent or more of the vote from among the two front running candidates, and moderate cohesion is the condition where the front-running candidate obtains between 60 and 79.9 percent of the vote from among the two front running candidates. To be judged cohesive, the group must participate in the election at a level sufficient to conclude that a significant number of persons from the group prefer the candidate. Strong polarization is defined as the occasions when both of the African-American and Hispanic groups are strongly cohesive and prefer different candidates. Moderate polarization is defined as the occasions when one or both of the African-American and Hispanic groups are moderately cohesive and support different candidates, while moderate. Symbols mean: (S) strongly cohesive, (M) moderately cohesive, (U) uncohesive, (SP) strongly polarized, (MP) moderately polarized, (NP) unpolarized. AA denotes African-American.

-37-

262

four times in support of Republican candidates and one time in support of a Democratic candidate.  In the other three elections, Hispanic voters were deemed uncohesive, but nevertheless the candidate of choice of those voters was a Republican candidate. Since African-American voters were strongly cohesive in support of the Democratic candidates in all eight elections, the Hispanic and African-American voters agreed on the same candidate only once when both groups supported Democratic U.S. Senator Bob Graham in his reelection bid.  In the other seven elections, the two groups disagreed on the candidate of choice, with Republicans preferred by Hispanic voters winning four of seven times.  The level of crossover voting by Hispanic voters in support of the candidates of choice of African-American voters ranged from a high of 85.0 percent in the election for U.S. Senator to a low of 2.5 percent in the election for Governor.  More typically across the other six elections, Hispanic crossover was ranged from 21.7 percent to highs of around 40 percent.  In the three elections where Hispanic crossover was around 40 percent, the Democratic candidate won all three elections.

32.  In Table 7 I report the exit poll results for African-American, non-Hispanic white (``Anglo''), and Hispanic voters for the Presidential elections of 1992, 1996, and 2000 and for the

TABLE 7

FLORIDA EXIT POLL RESULTS BY RACE
FOR TOP OF THE TICKET ELECTIONS 1992-2000

| Election | White | Black | Hispanic | Asian | Other |
|----------|-------|-------|----------|-------|-------|
| <u>1992 Gen. for Pres.</u> | | | | | |
| Clinton | 35% | 85% | 31% | 0% | 0% |
| Bush | 43% | 10% | 59% | 0% | 0% |
| Perot | 22% | 5% | 10% | 0% | 0% |
| Total | 84% | 9% | 5% | 1% | 1% |

Number of Respondents=1514

| | White | Black | Hispanic | Asian | Other |
|----------|-------|-------|----------|-------|-------|
| <u>1994 Gen. for Gov.</u> | | | | | |
| Chiles | 47% | 94% | 29% | 0% | 0% |
| Bush | 53% | 6% | 71% | 0% | 0% |
| Total | 80% | 12% | 8% | 1% | 0% |

Number of Respondents=1877

| | White | Black | Hispanic | Asian | Other |
|----------|-------|-------|----------|-------|-------|
| <u>1996 Gen. for Pres.</u> | | | | | |
| Clinton | 43% | 86% | 42% | 0% | 0% |
| Dole | 46% | 9% | 46% | 0% | 0% |
| Perot | 10% | 5% | 7% | 0% | 0% |
| Total | 76% | 10% | 12% | 1% | 1% |

Number of Respondents=1876

| | White | Black | Hispanic | Asian | Other |
|----------|-------|-------|----------|-------|-------|
| <u>1998 Gen. for Gov.</u> | | | | | |
| MacKay | 40% | 86% | 38% | 0% | 0% |
| Bush | 60% | 14% | 61% | 0% | 0% |
| Total | 82% | 10% | 7% | 1% | 1% |

Number of Respondents=1822

TABLE 7 (Ctd.)

FLORIDA EXIT POLL RESULTS BY RACE
FOR TOP OF THE TICKET ELECTIONS 1992-2000

| Election | White | Black | Hispanic | Asian | Other |
|----------|-------|-------|----------|-------|-------|

-39-

<u>2000 Gen. for Pres.</u>

| | | | | | |
|---|---|---|---|---|---|
| Gore | 40% | 93% | 48% | 0% | 0% |
| Bush | 57% | 7% | 49% | 0% | 0% |
| Buchanan | 0% | 0% | 1% | 0% | 0% |
| Nader | 2% | 0% | 0% | 0% | 0% |
| Total | 73% | 15% | 11% | 1% | 1% |

Number of Respondents=1818

Source:  Voter News Service (VNS).  Websites:

1992
http//www.cnn.com/ELECTION/1998/states/FL/polls/FL92PH.html

1994
http//www.cnn.com/ELECTION/1998/states/FL/polls/FL94GH.html

1996
http//www.cnn.com/ELECTION/1998/states/FL/polls/FL96PH.html

1998
http//www.cnn.com/ELECTION/1998/states/FL/G/exit.poll.html

2000
http//www.cnn.com/ELECTION/2000/epolls/FL/P000.html

Gubernatorial elections of 1994 and 1998.  These exit polls were conducted by Voter New Service (VNS) and contain samples ranging from 1,514 in 1992 to 1,877 in 1994.  For the most part each exit poll has a sample of least 1800 voters.  The results of these exit polls can be found at the following websites: http//www.cnn.com/ELECTION/1998/states/FL/polls/ and http//www.cnn.com/ELECTION/2000/epolls/FL/.

33.  These five exit polls confirm the results of the weighted regression and homogeneous (extreme case) precinct analyses for African-American voters, showing that those voters are strongly cohesive in support of Democratic candidates.  For non-Hispanic white (``Anglo'') voters the results from the exit polls for the four elections where I have calculated weighted regression estimates are quite comparable across the two forms of analysis.  The difference between the exit poll and the weighted regression results for Republican candidates in the 1992 and 1996 Presidential elections and the 1994 and 1998 gubernatorial elections vary by around one percentage point.  For example, in the 1992 Presidential election, the exit poll shows that former President Bush won about 43 percent of the non-Hispanic white (``Anglo'') vote while the weighted regression analysis estimates that Bush won about 44.6 percent of the group vote (see Table 5).  A similar pattern is seen in the three other comparable elections.  In all five top of the ticket elections, I find relatively high levels of non-Hispanic white (``Anglo'')

-41-

266

crossover voting in support of candidates of choice of African-American voters.  For Hispanic voters, the exit poll results reveal that this group cohesively supports Republican candidates in the two gubernatorial elections of 1994 and 1998.  On the other hand, in the three most recent Presidential elections, Hispanic voters were the most supportive group for former President Bush in 1992, but gave narrow support to both Bob Dole in 1996 and George W. Bush in 2000.  In the one 1998 election where I can directly compare the exit poll results with the weighted regression estimates, I find that the regression technique strongly overstates the level of Hispanic support for the Republican candidate for Governor.  The exit poll suggests that Democratic candidate Buddy MacKay won a healthy crossover vote from Hispanics, whereas the weighted regression technique gives me only a 2.5 percent crossover vote.

34.  To summarize my findings on cohesion and racial polarization in the Florida statewide general elections for national and state offices, I find that African-American voters were strongly cohesive in all 19 elections and non-Hispanic white (``Anglo'') voters were moderately cohesive in just four elections.  As to polarization, I find that only three of the 19 elections were polarized.  None of these three elections involved an African-American candidate.  To the extent there is any polarization in these three elections, it is attributable to race-neutral factors.  Specifically, the African-American

-42-

267

electorate consistently votes for Democrats, and non-Hispanic white (``Anglo'') voters split their votes between Democrats and Republicans.  As to non-Hispanic white (``Anglo'') crossover voting, the level was high enough to permit Democratic candidates to win statewide in ten of the 19 elections.  In the eight elections from 1998 where I was able to estimate Hispanic voter behavior, I find that Hispanic voters were cohesive in five of the eight elections.  As to polarization, I find that four of the eight elections were polarized.  As to Hispanic crossover voting, the level was high enough to permit Democratic candidates to win statewide in four of the eight elections.

### F.   Vote Dilution in Florida Statewide
### General Elections

35.   In order to say that legally significant vote dilution has occurred in recent Florida statewide general elections for National and State offices between 1992 and 1998, I must demonstrate that candidates preferred clearly by African-American voters have not been elected due to racial bloc voting by non-Hispanic white (``Anglo'') voters.  The evidence to date from the 19 elections for each of the offices analyzed is that on only three occasions did a candidate clearly preferred cohesively by African-American voters fail to be elected due to the cohesive behavior of non-Hispanic white (``Anglo'') voters who supported the candidate not preferred by African-American voters.  This is

-43-

clearly not a picture of legally significant vote dilution for African-American voters in statewide general elections from 1992-1998 in Florida.

### G. Comments on Plaintiffs' Initial Expert Reports

36. Counsel for the defendants has made available to me the initial expert reports of plaintiffs' expert Professor Richard L. Engstrom, whose report has the most in common with the analyses provided in my report. In addition, counsel for the defendants have provided me copies of supplemental material from the expert. This report and the supplemental material will be referenced in my comments on his work.

37. Professor Engstrom's focus like mine has been on analyzing election results for elections held within the State of Florida. The first question I examine is whether Professor Engstrom has demonstrated that there are participation differences between African-American and non-African voters in the limited set of Florida statewide and district level elections he chose to analyze. The next question I pursue is whether or not the analyses conducted by Professor Engstrom demonstrates that the voting patterns of African American, and non-African American voters in his limited set of Florida elections are racially polarized. Furthermore, I focus on whether or not

-44-

269

Professor Engstrom has demonstrated that African-American voters are cohesive and whether or not non-African-American voters prefer different candidates than the African American voters. In addition, I focus on whether Professor Engstrom has determined the level of non-African-American crossover voting in support of candidates of choice of African-American voters. In addition, I ask whether the analyses conducted by Professor Engstrom show that legally significant vote dilution is occurring in his selected set of Florida elections; i.e., that candidates clearly preferred by African American voters are not being elected due to racial bloc voting by non-African-American voters. Because I may not have received all material related to his analyses as of this date, I may need to revise and extend my comments on his analyses at a later date.

38. Professor Engstrom focuses on a small set of elections defined as those in which one or more African American candidate(s) compete against one or more candidates who are non-African American for statewide office or for the office of U.S. Representative. As a general matter, there is no basis for ignoring the results of elections in which there are no African-American candidates. This is particularly true where there are relatively few such elections. On the facts of this case, it is particularly appropriate to consider the results of elections that do not involve African-American candidates. Specifically, both the cohesion and the turnout rates demonstrate that African-

-45-

American voters strongly supported white Democratic candidates and that these candidates thus were, in fact, "black preferred candidates." Professor Engstrom drops out elections in which African American candidates get a small share of the vote. These two rules result in a small number of elections being examined, because there are fewer and fewer biracial elections occurring in the State of Florida. In the end, Professor Engstrom analyses four statewide elections (three Democratic primaries or runoffs and one general election) and 11 district-level elections for the U.S. House of Representatives (seven Democratic primaries or runoffs and four general elections). These 11 district-level elections come from a small geographic slice of the whole State of Florida just four out of the 23 Congressional districts in the state. Congressional District 2 is in the north central part of the state with Tallahassee as the major city; Congressional District 3 has two different forms during the 1990s with anchors in the north around Jacksonville and in the central part of the state around Orlando; Congressional District 7 is in central Florida with parts of Orlando in it; and Congressional District 23 is in the southeast part of the state ranging from Dade County in the south through parts of Fort Lauderdale and West Palm Beach to around Lake Okeechobee in the north. These four districts contain about 17.4 percent of the total population in the state.

39. Professor Engstrom's analysis also reflects sampling error. Specifically, the congressional races he analyzes mostly

reflect African-American majority districts.  Given the cohesion of the African-American electorate, African-American candidates in such districts have no incentive to appeal to the non-African-American electorate.  Accordingly, it is problematic to base a conclusion of racially polarized voting on such a sample. Even if such a circumscribed approach were appropriate, Professor Engstrom ignores the special circumstances surrounding two of the African-American candidates for these congressional seats.  Both Mr. Hastings in Congressional District 23 and Ms. Brown in Congressional District 3 were the subject of widely publicized scandals.  Where there is well-founded concerns about official misconduct by a candidate, it is problematic to draw conclusions about racially polarized voting on the basis of elections involving such candidates.

40.  Professor Engstrom's conclusions about racially polarized voting are also flawed in that they ignore the race-neutral explanation for the voting patterns he observes. Specifically, it is clear that African-American voters consistently, and almost uniformly, prefer Democrat candidates. This is true regardless of the race of candidates.  By contrast, non-Hispanic white (``Anglo'')  voters split their votes among Republicans and Democrats.  And, in general, voting patterns demonstrate that this selection process is not affected by the race of the candidate.  It is this pattern of partisan voting

-47-

272

that explains the "polarization" that Professor Engstrom claims to observe.


41.   In terms of the elections involving African-American candidates which Professor Engstrom has chosen to exclude from his analyses, I find most interesting the exclusion of the Republican primary and runoff elections for Congressional District 2 held in September and October of 1996.  Although it would be difficult to learn much about African-American voter preferences for the candidates in that election given the low levels of participation of African-American voters in Republican primaries, one can at least run a homogeneous (extreme case) precinct analysis for the 90 percent or greater non-Hispanic white (``Anglo'') precincts in the district to learn about non-Hispanic white (``Anglo'') preferences in relation to an African-American candidate.  Assuming as Professor Engstrom does that the Republican primary electorate was probably homogeneously non-Hispanic white (``Anglo'') that year, one can just look at the election returns to a get a rough estimate of non-Hispanic white (``Anglo'') support for an African-American candidate.  In a three candidate contest in the Republican primary, Carole Griffin placed second won 36.5 percent of the vote to make the runoff.  In the runoff contest, Ms. Griffin won 49.2 percent of the vote district-wide.  It is reasonable to conclude that in that highly contested runoff election Ms. Griffin got almost 50

-48-

percent of the non-Hispanic white (``Anglo'') vote in that district.

42.  Professor Engstrom also dichotomizes the candidates based on race into a combined set of African-American candidates competing against a combined set of non-African-American candidates.  However, he does report estimates of voting behavior for the leading African-American candidate in most of the elections he analyzes.  On the other hand, he does not report who is the candidate preferred by non-African-American voters, thus making it impossible to determine whether or not legally significant vote dilution is occurring in the Florida elections he analyzes.  In addition, the approach taken by Professor Engstrom does not lead to a clear answer as to whether or not African-American voters are politically cohesive in voting in Florida elections.

42.  Professor Engstrom, as he reports the preferences of the voting groups, aggregates the preferences of Hispanic, non-Hispanic white (``Anglo'', and other voters into a category he labels as non-African-Americans.  This category has no analytical meaning in the State of Florida since it is up to the plaintiffs to demonstrate that Hispanic, non-Hispanic white (``Anglo''), and other voters do agree politically on which candidates to back in contests against African-American candidates.  Professor Engstrom assumes this agreement to be true rather than demonstrating it.

-49-

44.   Professor Engstrom provides no analysis of participation patterns by groups in the elections he analyzes in his report.  Professor Engstrom, appears to have completed analyses of participation in the elections he examines, but only reports on differences in voter registration rates for one time point in his report--February 14, 2000.  Despite the importance of participation in voting rights cases, the plaintiffs' expert has chosen to downplay generally the important factor of participation.

45.   Because Professor Engstrom has provided defendants' counsel copies of his computer printouts from his analyses of the 15 elections he selected, I was able to summarize the participation differences between African-American and non-African American voters in those elections.  These are reported in Table 8 in terms of the percentage of registered voters of the group who voted for the office in question when at the polls.

46.   In all three statewide Democratic primary or runoff elections in Table 8, Professor Engstrom finds that African-American voters participate at higher rates than non-African-American voters.  In the seven U.S. House of Representatives Democratic primary or runoff elections, he finds that in four

-50-

Table 8

Estimated Voter Participation Rates by Race in Florida Bi-Racial Candidate
Elections Analyzed by Professor Richard E. Engstrom (1990-2000)

| Date of Elect. | Office | Weighted Regression Results | | Extreme Case Results | |
|---|---|---|---|---|---|
| | | Black Part. | Non-black Part. | Black Part. | Non-black Part. |
| 09/04/90 | SofS | .270 | .150 | .245 | .150 |
| 10/02/90 | SofS | .196 | .065 | .192 | .067 |
| 09/08/94 | CEd. | .184 | .102 | .170 | .101 |
| 11/08/94 | CEd. | .435 | .564 | .474 | .563 |
| 09/01/92 | CD03 | .350 | .248 | .322 | .209 |
| 10/01/92 | CD03 | .268 | .144 | .254 | .133 |
| 11/03/92 | CD03 | .640 | .299 | .602 | .265 |
| 09/01/92 | CD07 | .183 | .328 | No cases | .319 |
| 09/01/92 | CD23 | .234 | .253 | .246 | .283 |
| 10/01/92 | CD23 | .282 | .235 | .304 | .273 |
| 11/03/92 | CD23 | .637 | .540 | .628 | .520 |
| 09/03/96 | CD02 | .419 | .517 | .486 | .511 |
| 10/01/96 | CD02 | .364 | .428 | .441 | .429 |
| 11/05/96 | CD03 | .502 | .466 | .541 | .484 |
| 11/07/00 | CD23 | .370 | .522 | .390 | .485 |

Notes:     Participation is measured as the percentage of registered voters
of the group who voted for the office in question when at the
polls.  The figures are taken from Professor Richard E. Engstrom's
documents supporting his expert report of July 1, 2001.

-51-

elections non-African-American voters participate at higher rates than African-American voters.  These are the Democratic primary elections of 1992 in Districts 7 and 23, and the Democratic primary and runoff elections of 1996 in District 2.  In the other three Democratic primary or runoff elections, the African-American voters participate at higher levels than non-African voters.  Two of these elections occur in District 3 and one occurs in District 23.  In the one statewide general election involving an African-American candidate, the rate of non-African-American participation was higher than that of African-American voters.  In the four U.S. House of Representatives general elections, Professor Engstrom finds that the rate of African-American voter participation is higher than non-African-American participation in three of these four elections, with the sole exception being the November 2000 general election in Congressional District 23.  Thus, my reporting of Professor Engstrom's participation data for his defined groups reveals that in six of ten Democratic primary or runoff elections for Congressional district offices has African-American participation higher than non-African-American participation and that in three of five general elections for Congressional district offices has African-American participation higher than non-African-American participation.  For the 15 total elections covered in Professor Engstrom's report, African-American participation was higher than non-African-American participation in nine and lower in six.

47.   Having failed to report participation differences but for one time point in 2000, Professor Engstrom then reports a standard list of socio-economic disparities for African-Americans and non-African-Americans from the 1990 Census of Population for the State of Florida.   These figures are comparable to socio-economic disparity data that could be reported for any of the other 49 states which have enough African-American population to make the statistics meaningful.   However, Professor Engstrom makes no attempt to determine whether these socio-economic disparities have any impact upon current participation differences in the State of Florida.   One cannot assume in the absence of analyses that socio-economic disparities of ten years ago have any relationship to current differences in voter registration or participation rates in Florida.

48.   In summary, Professor Engstrom employing an inappropriate choice of elections and a flawed analysis approach has not answered the important questions for this case.   His approach does not permit him to identify definitively the candidate of choice of non-African-American voters or determine the degree of non-African-American group cohesion in support of the candidate of choice in multi-candidate elections like Democratic primary or runoff elections.   Because of a lack of information on the winning candidates in each contest, Professor

-53-

Engstrom is hampered in reaching any conclusions about vote dilution in the small set of elections he has analyzed in the State of Florida.  And his analysis of participation differences is confined to one time point and my reporting of participation differences for his 15 elections suggests that African-American voters usually participate at higher rates than non-African-American voters.

CONCLUSION

49.  In answering the five questions I posed at the beginning of this report, I conclude that African-American vote dilution does not occur in Florida in recent statewide Democratic primary, runoff, and general elections.  Specifically, I find that:

> (1) there are differences in voter registration rates between African-American and non-Hispanic white (``Anglo'')  persons of voting age at the time of recent Florida Democratic primary and general elections, with the differences advantaging non-Hispanic white (``Anglo'')  potential voters from 1992 through 2000;
>
> (2) there are voter participation differences between African-American and non-Hispanic white (``Anglo'') voters in recent Florida statewide Democratic primary and runoff primary elections, with the differences

-54-

advantaging the African-American group at Democratic primary elections;

(3) there are voter participation differences between African-American and non-Hispanic white (``Anglo'') voters in recent Florida statewide general elections, with the differences advantaging the non-Hispanic white (``Anglo'')  group at general elections;

(4) evidence exists that African-American voters are usually cohesive in recent statewide Florida Democratic primary and runoff elections.  However, I find no usual pattern of racial polarization in voting in recent statewide Florida Democratic primary and runoff elections.  For the most part, however, these are elections where whatever racial polarization in voting exists is not politically or legally consequential, in that the candidates of choice of African-American voters are not usually defeated for nomination due to non-Hispanic white (``Anglo'') racial bloc voting. These are elections where non-Hispanic white (``Anglo'') voters usually provide high levels of crossover support for candidates of choice of African-American voters;

(5) no legally significant vote dilution is occurring in recent statewide Florida Democratic primary and runoff elections;

-55-

280

(6) evidence exists that African-American voters are usually cohesive in statewide general elections, but I find no usual pattern of racial polarization in voting in recent statewide Florida general elections.  For the most part, however, these are elections where whatever polarization in voting exists does not end up being politically or legally consequential, in that the candidates of choice of African-American voters are not usually defeated due to non-Hispanic white (``Anglo'') racial bloc voting.  These are elections where non-Hispanic white (``Anglo'') voters usually provide high levels of crossover support for candidates of choice of African-American voters.  I also find for the recent 1998 statewide elections for eight offices that Hispanic voters are usually cohesive, that Hispanic voters usually disagree with African-American voters over candidates of choice, and that the level of Hispanic crossover voting is sometimes high enough to produce a win for Democratic candidates preferred by African-American voters; and

(7) no legally significant vote dilution is occurring in recent Florida statewide general elections.

-56-

281

This is a preliminary report on the issues in this case and I expect to supplement my opinions in this report if necessary. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16th day of October, 2001.

Exhibits to
A Report on Vote Dilution Issues
for the Case of Johnson v. Bush

by Ronald E. Weber
October 16, 2001

EXHIBIT A

CURRICULUM VITA

<u>Name</u>:  Ronald E. Weber

<u>Personal Data</u>:

> Home Address: 270 E. Highland Avenue, Apt. 916, Milwaukee,
> WI 53202-6607
> Office Address: Department of Political Science, University
> of Wisconsin, Milwaukee, P. O. Box 413,
> Milwaukee, WI   53201-0413
> Home Phone: (414) 277-7981
> Office Phone: (414) 229-6641, (414) 229-4221, or (225)
> 647-1767
> FAX: (414) 229-5747 or (225) 647-6600
> Born: June 14, 1938, Staples, Minnesota
> Marital Status: married, two children

<u>Present Position</u>:

> Wilder Crane Professor of Government, University of
> Wisconsin, Milwaukee, 1990-

<u>Education</u>:

> B.A., 1964:  Macalester College, St. Paul, Minnesota
> Ph.D., 1969:  Syracuse University, Syracuse, New York

<u>Previous Experience:</u>

> Fulbright Commission John Marshall Professor of Political
> Science, Budapest University of Economics, 1996-97, and
> Central European University, Budapest, Hungary, Winter
> Term, 1997.
> Chair, Department of Political Science, University of
> Wisconsin, Milwaukee, 1992-94.
> Co-Editor, <u>The Journal of Politics</u>, 1988-93.
> Professor of Political Science, Louisiana State University,
> 1979-1990.
> Director of Graduate Studies, Department of Political
> Science, Louisiana State University, 1986-1989.
> Instructor, American Political Science Association Ralph
> Bunche Summer Institute in Political Science for Black
> Students, 1986-1989.
> Visiting Fulbright Professor of American Studies and Law,
> Hiroshima University, Hiroshima, Japan, 1982-83.
> Director, College of Arts and Sciences Division of Research
> Services, Louisiana State University 1981-82.
> Director, Institute of Government Research, Louisiana
> State University, 1979-81.
> Director, Political Science Laboratory and Data Archive
> Program, Indiana University, 1970-79.

Acting Director, Institute of Public Administration, Indiana University, 1975-79.
Associate Professor of Political Science, Indiana University, 1973-79.
Assistant Professor of Political Science, Indiana University, 1969-73.
Research Associate, "Two-Party Competition and Policy-Making in the American States," National Science Foundation Project (Frank J. Munger, Principal Investigator), Department of Political Science, Syracuse University, 1967-69.
U.S. Navy, June, 1956 to June, 1960.

Teaching and Research Interests

1) American Politics; 2) Policy Analysis; (3) Empirical Theory and Methodology. Subfield interests in American state and local policy-making; comparative policy analysis; American state politics; public opinion and electoral behavior, political parties; interest representation; empirical democratic theory; law and the electoral process, survey and aggregate data analysis techniques; and computer simulation.

Undergraduate Courses Taught (1969-2001): Introduction to American Politics, State and Local Government, State Politics in the United States, American Federalism, Political Parties and Interest Groups, Electoral Behavior, Political Behavior, Political Science Laboratory, State Legislative Politics, Political Science Internship, Scope and Methods in Political Science, Special Topics in Legal Studies: The U.S. Constitution and the Voting Rights Act, and Special Topics in Legal Studies: The U.S. Constitution and the Electoral Process.

Graduate Courses Taught (1969-2001): Pro-Seminar in American Politics, Seminar in American Political Institutions, Seminars in State and Local Government, Comparative State Politics and Policy-Making, Comparative State Political Parties and Elections, Research Design and Quantitative Techniques, Approaches to Policy Analysis, Interest Representation in American Politics, Political Parties and Elections, Empirical Democratic Theory, Political Data Analysis, Computer Simulation of Political Processes, and Use of Computing Machinery in Political Science.

3

## Publications:

### Books and Monographs

Public Policy Preferences in the States (Bloomington: Indiana University, Institute of Public Administration, 1971).

with William R. Shaffer, "Policy Responsiveness in the American States," Sage Professional Papers in Administrative and Policy Studies (Beverly Hills: Sage Publications, Vol.2, Series No.03-021, 1974). (co-author)

with Eric M. Uslaner, Patterns of Decision-Making in State Legislatures (New York: Praeger, 1977). (co-author)

Wisconsin Government and Politics, Sixth Ed. Chicago: McGraw Hill College Custom Series, 1996). (editor)

with Paul Brace, American State and Local Politics: Directions for the 21st Century (Chatham, NJ: Chatham House, 1999). (co-editor)

Wisconsin Government and Politics, Seventh Ed. Chicago: McGraw Hill College Custom Series, 2000). (editor)

### Articles and Book Chapters

with William R. Shaffer, "Public Opinion and American State Policy-Making," Midwest Journal of Political Science, Vol. 16 (November, 1972), pp. 683-699. (first author)

with Anne H. Hopkins, Michael L. Mezey, and Frank J. Munger, "A Computer Simulation Methodology for Estimating State Policy Preferences," Public Opinion Quarterly, Vol. 36 (Winter, 1971-72), pp. 549-565. (first author)

"The Political Responsiveness of the American States and Their Local Governments," in Leroy N. Rieselbach (ed.), People vs. Government: The Responsiveness of American Institutions (Bloomington: Indiana University Press, 1975), pp. 189-225.

with Eric M. Uslaner, "The 'Politics' of Redistribution: Towards a Model of the Policy-Making Process in the American States," American Politics Quarterly, Vol. 3 (April, 1975), pp. 130-170. (second author)

with Anne H. Hopkins, "Dimensions of Public Policies in the American States: A Research Note," Polity, Vol. 8 (Spring, 1976), pp. 475-489. (co-author)

with William R. Shaffer, "Computer Simulation of Voting: A Test of a Revised Model." Political Methodology, Vol. 3 (Fall, 1976), pp. 253-279. (second author)

with Eric M. Uslaner, "Changes in Legislator Attitudes Toward Gubernatorial Power," State and Local Government Review, Vol. 9 (May, 1977), pp. 40-43. (co-author)

with Eric M. Uslaner, "Partisan Cues and Decision Loci in U.S. State Legislatures," Legislature Studies Quarterly, Vol. 2 (November, 1977), pp. 423-444. (co-author)

with Eric M. Uslaner, "U.S. State Legislators' Opinions and Perceptions of Constituency Attitudes," <u>Legislative Studies Quarterly</u>, Vol. 4 (November, 1979), pp. 563-585. (co-author)

with Eric M. Uslaner, "Public Support for Pro-Choice Abortion Policies in the Nation and States: Changes and Stability after the <u>Roe</u> and <u>Doe</u> Decision," <u>Michigan Law Review</u>, Vol. 177 (November, 1979), pp. 1722-1789 (co-author). An extended version appears in Karl Schneider and Maris Vinovskis (eds.), <u>Perspectives on Abortion and Law Since 1973</u> (Lexington, MA: Lexington Books, 1980), pp. 206-223.

with Robert S. Montjoy and William R. Shaffer, "Policy Preferences of Party Elites and Masses: Conflict or Consensus?" <u>American Politics Quarterly</u>, Vol. 8 (July, 1980), pp. 319-343 (co-author). Article also appears as chapter in Norman R. Luttbeg (ed.), <u>Public Opinion and Public Policy</u>, third edition (Ithaca, IL: F.E. Peacock, 1980), pp. 280-296.

with Wayne L. Francis, "Legislative Issues in the Fifty American States (1963-1974): Managing Complexity Through Classification, <u>Legislative Studies Quarterly</u>, Vol. 5 (August, 1980), pp. 407-421. (co-author)

"Gubernatorial Coattails: A Vanishing Phenomenon?" <u>State Government</u>, Vol. 53 (Summer, 1980), pp. 153-156.

"Redistricting in Louisiana," in LeRoy Hardy, Alan Heslop and Stuart Anderson (eds.) <u>Redistricting in the Fifty States</u> (Beverly Hills: Sage Publications, 1981), pp. 134-140.

with John J. Cogan, "The History Textbook Controversy in Japan," <u>Social Education</u>, Vol. 47 (April, 1983), pp. 253-257. (co-author)

with Eric M. Uslaner, "Policy Congruence Among American State Elites," <u>Journal of Politics</u>, Vol. 45 (Feb., 1983), pp. 183-196. (co-author)

with Michael A. Maggiotto, "The Impact of Organizational Incentives on County Chairpersons," <u>American Politics Quarterly</u>, Vol. 14 (July, 1986), pp. 201-218. (second author)

with T. Wayne Parent and Calvin C. Jillson, "Voting Outcomes in the 1984 Democratic Party Primaries and Caucuses," <u>American Political Science Review</u>, Vol. 81 (March, 1987), pp. 67-84. (co-author)

with Harvey J. Tucker, "State Legislative Election Outcomes: Contextual Effects and Legislative Performance Effects," <u>Legislative Studies Quarterly</u>, Vol. 12 (November, 1987), pp. 537-553. (co-author)

"Historical Development of the Louisiana State Tax Structure," in James A. Richardson (ed.) <u>Louisiana's Fiscal Alternatives: Finding Permanent Solutions to Recurring Budget Crisis</u>. (Baton Rouge: Louisiana State University Press, 1988), pp. 43-61.

"The Voting Rights Act and Judicial Election Litigation: The Defendant States' Perspective," <u>Judicature</u>, Vol. 73 (August/September, 1989), pp. 85-86.

with Harvey J. Tucker and Paul Brace, "Vanishing Marginals in State Elections:  The Impact of Incumbency, Institutionalization, Legislative Performance, and Redistricting," <u>Legislative Studies Quarterly</u>, Vol. 16 (Feb., 1991), 29-47. (co-author)

"The Study of State and Local Politics: A Preliminary Exploration of Its Contributions to Empirical Political Theory," in William Crotty (ed.) <u>Political Science: Looking to the Future.  Vol. 4, American Institutions</u>. (Evanston: Northwestern University Press, 1991, 255-285.)

with Harvey J. Tucker, "Electoral Change in U.S. States: System Versus Constituency Competition," in Gary F. Moncrief and Joel A. Thompson (eds.) <u>Changing Patterns in State Legislative Careers</u>. (Ann Arbor, MI: University of Michigan Press, 1992, 75-86.) (co-author)

"Louisiana," in Leroy Hardy, Alan Heslop, and George Blair (eds.) <u>Redistricting in the 1980s: A 50-State Survey</u>. (Claremont, CA: The Rose Institute of State and Local Government, 1993, 111-114.)

with David M. Olson, "The U.S. Congress and National Executive," in C.E.S. Franks and David M. Olson (eds.) <u>Representation and the Policy Process in Federal Systems</u>. Berkeley, CA: The Institute of Governmental Studies, 1993).

"Redistricting and the Courts: Judicial Activism in the 1990s," <u>American Politics Quarterly</u>, Vol. 23 (April, 1995), 204-228.

with Emily Van Dunk, "Constituency Level Competition in the U.S. States, 1968-1988: A Pooled Analysis," <u>Legislative Studies Quarterly</u>, Vol. 22 (May, 1997), 141-159.

"The Quality of State Legislative Representation: A Critical Assessment," <u>The Journal of Politics</u>, Vol. 61 (August, 1999), 609-627.

"Race-Based Districting: Does It Help or Hinder Legislative Representation," <u>Political Geography</u>, Vol. 18 (February, 2000), 213-247.

## Contract Research Reports

with William Kimberling, David Skelton, and Carl Banks, <u>An Analysis of Laws and Procedures Governing Absentee Registration and Absentee Voting in the United States</u> (Bloomington: Indiana University School of Public and Environmental Affairs Research Division, 1975). (contributor)

with Rex D. Hume, Robert S. Montjoy, and James A. Palmer, <u>An Analysis of Laws and Procedures Governing Contested Elections and Recounts</u> (Bloomington: Indiana University School of Public and Environmental Affairs, Institute for

Research in Public Safety, 1978). (major contributor)

with Lance E. Brouthers, Jay R. Lueckel, and H. Gordon Monk, Final Report on State-Local Fiscal Study (Baton Rouge: Louisiana State Legislative Fiscal Office, 1982). (major contributor)

with Jay R. Lueckel and George Silbernagel III, The State of Local Finance in Louisiana, 1983 (Baton Rouge: Louisiana State Legislative Fiscal Office, 1984). (major contributor)


Professional Papers

with Anne H. Hopkins, "A Methodology for Synthesizing State Policy Preferences," 1968 Conference on the Measurement of Public Policies in the American States, Ann Arbor, Michigan. (co-author)

with Frank J. Munger, "Party Identification and the Classification of State Party Systems," 1968 Annual Meeting of the American Political Science Association, Washington, D.C. (first author)

"Dimensions of State Party Systems," 1969 Annual Meeting of the Northeastern Political Science Association, Hartford, Connecticut.

with William R. Shaffer, "The Comparative Study of American State Policy-Making: What Lessons for the Policy-Maker?", 1970 Conference on the City and the State: Problems of the Seventies, Bloomington, Indiana. (co-author)

with William R. Shaffer, "The State Public Policy-Making Process, Political Culture, and Public Opinion: A Limited Consideration of a General Model," 1970 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois. (first author)

with Anne H. Hopkins, "Dimensions of Public Policies in the American States," 1970 Annual Meeting of the American Political Science Association, Los Angeles, California. (co-author)

with William R. Shaffer, "Computer Simulation of Voting: A Test of a Revised Model," 1972 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois. (second author)

with William R. Shaffer, "The Costs and Benefits of American State-Local Government Policies," 1972 Annual Meeting of the Southwestern Political Science Association, San Antonio, Texas. (first author)

with William R. Shaffer, "Political Responsiveness in the American States," 1972 Annual Meeting of the American Political Science Association, Washington, D.C. (co-author)

with William L. Shade, "The Determinants of Party Structure and Party Competitiveness in the American States," 1972 Annual Meeting of the Southern Political Science Association, Atlanta, Georgia. (second author)

with William R. Shaffer and Robert S. Montjoy, "Mass and
Political Elite Beliefs about the Policies of the Regime,"
1973 Annual Meeting of the American Political Science
Association, New Orleans, Louisiana. (co-author)

with Eric M. Uslaner, "The Electoral Impact of
Reapportionment," 1973 Annual Meeting of the Southern
Political Science Association, Atlanta, Georgia.
(co-author)

with Wayne L. Francis, "Legislative Issues in the States:
1963-1973," 1975 Annual Meeting of Western Political
Science Association, Seattle, Washington. (first author)

with Eric M. Uslaner, "Partisan Cues and Legislative Deci
sion Making in the American States," 1975 Annual Meeting
of the Midwest Political Science Association, Chicago,
Illinois. (co-author)

with Eric M. Uslaner, "Legislative Professionalism and
Legislative Reform: A Reconsideration," 1976 Annual
Meeting of the American Political Science Association,
Chicago, Illinois. (co-author)

with Eric M. Uslaner, "Patterns of Gubernatorial Power and
Influence in the American States," 1976 Annual Meeting of
the Southern Political Science Association, Atlanta,
Georgia. (co-author)

with Eric M. Uslaner, "Reapportionment, Gerrymandering, and
Change in the Partisan Balance of Power in the American
States," 1977 Annual Meeting of the Midwest Political
Science Association, Chicago, Illinois. (co-author)

with Eric M. Uslaner, "Public Opinion and Linkage Politics
in the American States:  Which 'Elite' is Most Representa-
tive," 1977 Annual Meeting of the American Political
Science Association, Washington, D.C. (co-author)

with Debra L. Dean and Robert W. Behrman, "Elite and Mass
Opinions in the Formulation of American State Public
Policies," 1977 Annual Meeting of the Southern Political
Science Association, New Orleans, Louisiana. (first
author)

with Rex D. Hume, Robert S. Montjoy and James A. Palmer,
"What Happens After the Polls Close?:  Recounts, Contests,
and the Integrity of the Electoral Process," 1977, Annual
Meeting of the Southern Political Science Association, New
Orleans, Louisiana. (co-author)

with Eric M. Uslaner, "Legislators' Opinions and Perceptions
of Constituency Attitudes:  Linkage Politics in the
American States," 1978 Annual Meeting of the Western
Political Science Association, Los Angeles, California.
(co-author)

with Eric M. Uslaner, "Policy Congruence in the American
States:  Descriptive Representation Versus Electoral
Accountability," 1979 Annual Meeting of the Midwest
Political Science Association, Chicago, Illinois.(co-
author)

with Eric M. Uslaner, "The 'String of Votes' Hypothesis,"

1979 Annual Meeting of the Southern Political Science Association, Gatlinburg, Tennessee. (co-author)

with Edward D. Feigenbaum, "Contested Election Disputes in the U.S. House of Representatives:  A Longitudinal Analysis," 1979 Annual Meeting of the Southern Political Science Association, Gatlinburg,  Tennessee. (first author)

with Eric M. Uslaner, "Representing People Who Have Interests," 1980 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois. (co-author)

with Eric M. Uslaner, "Cognitive Consistency and the Politicization of the Abortion Issue Among the Mass Public, 1972-1976," 1981 Annual Meeting of the Midwest Political Science Association, Cincinnati, Ohio. (co-author)

"The Political and Social Beliefs of Evangelical Protestants in the United States," 1983 Annual Meeting of the American Political Science Association, Chicago, Illinois.

"Evangelical Christians in the American Electoral Process," 1983 Annual Meeting of the Southern Political Science Association, Birmingham, Alabama.

"Competing Explanations of Electoral Success in Gubernatorial Elections," 1984 Annual Meeting of the Southern Political Science Association, Savannah, Georgia.

with T. Wayne Parent, "National Versus State Effects on State and Local Elections," 1985 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois. (co-author)

with Harvey J. Tucker, "Electoral Change in U.S. States: System versus Constituency Competition," 1985 Annual Meeting of American Political Science Association, New Orleans, Louisiana. (co-author)

with James C. Garand, "Partisan Change and Shifts in State Revenue Priorities," 1986 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois. (co-author)

with Harvey J. Tucker, "State Legislative Election Outcomes: Contextual Effects, Historical Effects, and Legislative Performance Effects," 1986 Annual Meeting of the Southern Political Science Association, Atlanta, Georgia. (co-author)

"Historical Development of the Louisiana State Tax Structure," 1987 Conference on Finding Permanent Solutions to Louisiana's Recurring Fiscal Crisis, Baton Rouge, Louisiana.

with T. Wayne Parent, "National Effects in State Elections: A Time-Series Analysis," 1987 Annual Meeting of the Southern Political Science Association, Charlotte, North Carolina. (co-author)

with Harvey J. Tucker, "Vanishing Marginals in State Legislative Elections: A Preliminary Exploration of the Impact of Incumbency, Institutionalization, Redistricting, and Legislative Performance," 1988 Annual Meeting of the

Southern Political Science Association, Atlanta, Georgia. (co-author)

"The Study of State and Local Politics: A Preliminary Exploration of Its Contributions to Empirical Political Theory," 1989 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois.

with Harvey J. Tucker and Paul Brace, "Vanishing Marginals in State Elections: The Impact of Incumbency, Institutionalization, and Redistricting, and Legislative Performance," 1990 ICPSR Conference on State Legislative Elections, Lexington, Kentucky. (co-author)

with Kevin B. Smith, "Voter Turnout in U.S. Gubernatorial Elections, 1980-1990: A Pooled Analysis," 1992 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois. (co-author)

"At-Large State Judicial Elections: An Endangered Species?" 1992 Annual Meeting of the American Political Science Association, Chicago, Illinois.

"Redistricting and the Courts: Judicial Activism in the 1990s," 1994 Hendricks Symposium on Legislative Districting in the 1990s, University of Nebraska, Lincoln, Nebraska.

with Emily Van Dunk, "Constituency Level Competition in the States, 1968-1988: A Pooled Analysis," 1994 Annual Meeting of the American Political Science Association, New York, New York. (co-author)

"Restoring the Lost World of State Legislative Elections Research: The Contributions of Malcolm E. Jewell," 1994 Annual Meeting of the Southern Political Science Association, Atlanta, Georgia.

with Tomas Longoria, "Predicting Litigation Against Congressional and State Legislative Districting Plans: A Multi-variate Analysis," 1995 Annual Meeting of the Southwestern Political Science Association, Dallas, Texas. (co-author)

"Unintended Consequences of Race-Based Districting: The Impact on Electoral Participation and Competition," 1995 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois.

"The Evolving Meaning of Retrogression in Voting Rights Controversies," 1998 Voting Rights Conference, University of Georgia, Athens, Georgia.

"The Quality of State Legislative Representation: A Critical Assessment," 1998 Annual Meeting of the Southern Political Science Association, Atlanta, Georgia.

with Charles S. Bullock III and Michael A. Maggiotto, "Measuring Voter Participation by Groups in Local Elections," 1999 Annual Meeting of the Southern Political Science Association, Savannah, Georgia. (co-author)

with Kenneth A. Wink, "Partisan Bias in State House Elections Since 1968: A `Cheap Seats' Approach to Measuring Bias," 2000 Annual Meeting of the Southwestern

Political Science Association, Galveston, Texas (co-author)
"Voting Turnout and Participation in State Elections," 2000 Annual Meeting of the Midwest Political Science Association, Chicago, Illinois.
with Kenneth A. Wink, "Life in the `Cheap Seats': An Update on Applying the Campbell Operationalization of Partisan Bias to U.S. State Lower House Elections," 2000 Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (co-author)

## Fellowship and Grants

National Defense Education Act Graduate Fellowship in Political Science, 1964-1965, 1965-1966, and 1966-1967.
National Science Foundation Fellowship to attend Seminar in Mathematical Political Research, University of Michigan, Ann Arbor, Michigan, Summer, 1966.
National Science Foundation Doctoral Dissertation Research Grant, 1968-1970.
Research Grant from Metropolitan Studies Program, Syracuse University, 1969-1970.
National Science Foundation Grant from the Undergraduate Instructional Scientific Equipment Program, 1970-1972. (with John V. Gillespie)
Indiana University Equipment Committee Grant to match the National Science Foundation Equipment Grant, 1970-1972. (with John V. Gillespie)
Research Grant from Metropolitan Studies Program, Syracuse University, Summer, 1970. (with William R. Shaffer, Purdue University)
Research Grant from the School of Education, Purdue University, 1970-1971.
Faculty Research Fellowship, Indiana University, Summer, 1972.
Research Contract from the Clearing House on Election Administration, U.S. Government Accounting Office, 1974-1975. (with William Kimberling, Indiana University)
Research Contract from the Clearing House on Election Law and Administration, Federal Election Commission, 1976-78. (with Rex D. Hume and James A. Palmer, Indiana University, and Robert S. Montjoy, University of Virginia)
Research Contract from the Louisiana Legislative Fiscal Office, 1980-84.
Research Contract from the Louisiana House of Representatives, 1980-81. (with Lawrence S. Falkowski)
Research Contract from Louisiana House of Representatives, 1981-1982. (with Lawrence S. Falkowski)
Senior Lecturer Fellowship from the Fulbright-Hays Program to lecture in Japan, 1982-83.
Senior Lecturer Fellowship from the Fulbright-Hays Program to lecture in Hungary, 1996-97.

## Administrative Activities at University of Wisconsin, Milwaukee

Chair, University Division of the Social Sciences Executive
Committee, 1994-96.
Chair, University Academic Program and Curriculum Committee,
1995-96, 1998-  .
Member, University Faculty Appeals and Grievances Committee,
1994-95, 1997-2000.
Member, University Program Array Review Steering Committee,
1997-98.
Member, University Academic Program and Curriculum
Committee, 1992-  .
Member, University Division of the Social Sciences Executive
Committee, 1992-96, 1999-  .
Member, University Academic Administrative Policy Committee,
1995-96.
Member, University Faculty Academic Planning and Budget
Committee, 1995-96, 1998-  .
Member, University Chancellor's Budget Advisory Committee,
1995-96, 1998-2000.
Member, University Physical Environment Committee, 1995-96.
Chair, Departmental Full Professors Committee, 1999-2000.
Chair, Departmental Sabbatical Leave Review Committee,
2000-  .
Member, Departmental Graduate Committee, 1990-94, 1995-96.
Member, Departmental Full Professors Committee, 1990-91,
1997-2000.
Member, Departmental Merit Salary Committee, 1992-96.
Member, Departmental Courses and Curriculum Committee, 1992-
94.
Member, Departmental Asian Politics Recruitment Committee,
1992-93.
Member, Departmental Minority Politics Recruitment
Committee, 1993-94.
Member, Departmental American Politics Recruitment
Committee, 1999-2000.
Member, Departmental Public Law Recruitment Committee,
2000-  .

## Administrative Activities at Louisiana State University

Chairman, College of Arts and Sciences Committee on Social
Science Research Institute Proposal, 1979-81.
Member, College of Arts and Sciences Promotion and Tenure
Committee, 1987-1990.
Member, College of Arts and Sciences Search Committee for
Department Chair, 1985-86.
Member, College of Arts and Sciences Long Range Capital
Outlay Coordinating Committee, 1984-86.
Member, Public Administration Institute Faculty Committee,
1983-84.
Member, College of Arts and Sciences Senate, 1980-82.

Member, College of Arts and Sciences Committee on Center for
the Studies of the South Proposal, 1979-80.
Member, College of Arts and Sciences Computer Committee,
1979-80.
Director, Departmental Internship Program, 1985-86.
Chairman, Departmental Graduate Committee, 1986-89.
Chairman, Departmental Lecture Committee, 1979-80, 1983-84.
Chairman, Departmental Research Committee, 1980-82, 1985-86.
Chairman, Departmental Recruitment Committee, 1980-1982,
1983-85, 1987-1990.
Chairman, Departmental Advisory Committee, 1987-89.
Chairman, Departmental Public Affairs Committee, 1989-1990.
Member, Departmental Graduate Committee, 1979-1990.
Member, Departmental Recruitment Committee, 1979-80,
1983-1990.
Member, Departmental Advisory Committee, 1980-81, 1985-1990.
Member, Departmental Research Committee, 1980-1990.
Member, Departmental Lecture Committee, 1979-80, 1983-86.
Member, Southern University Public Administration
Recruitment Committee, 1983-85.

## Administrative Activities at Indiana University

Placement Director, Department of Political Science, Indiana
University, 1975-76.
Acting Chairman, Department of Political Science, Indiana
University, Summer Session II, 1973; Summer Sessions I &
II, 1974, Summer Session I & II, 1975.
Director, American Political Science Association State
and Local Government Internship Program, 1970-1971.
Director, Lilly Endowment grant for Seminar on "The Study of
Public Policy-Making," 1975-1976.
Project Director, National Science Foundation Grant for
Purchase of Undergraduate Instructional Scientific
Equipment, 1970-72.
Representative of Indiana University to the International
Survey Library Association, The Roper Opinion Research
Center, Williamstown, Massachusetts, 1969-79.
Representative of Indiana University to the Inter-University
Consortium for Political and Social Research, The
Institute of Social Research, University of Michigan, Ann
Arbor, Michigan, 1971-79.
Chairman, Departmental Committee on Data Archives and
Facilities, 1969-1973.
Chairman, Departmental American Politics Search Committee,
1971-1972.
Chairman, Departmental Committee on Faculty Needs,
1974-1975.
Chairman, Departmental Faculty Recruitment Committee,
1975-1976.
Member, Departmental American Politics Search Committee,
1973-1975.

13

Member, Departmental Committee on Graduate Admissions and
Financial Aids, 1969-1971, 1973-1975, 1978-1979.
Member, Departmental Committee on Promotions and Tenure,
1970-1972, 1977-1979.
Member, Departmental Committee on Political Science
Publications Series, 1973-1974.
Member, Departmental Graduate Policy Committee, 1975-1976.
Member, Departmental Committee on Affirmative Action,
1978-1979.
Member, University Committee on Use of the 1970 Census,
1970-1972.
Member, University Faculty Committee on Indiana University
Press Affairs, 1972-1975.
Member, University Management Information System Faculty
Employee/Research Information Projects Task Force,
1973-1974.
Member, School of Public and Environmental Affairs Committee
on Undergraduate Curriculum, 1971-1973.
Member, School of Education, Spencer Foundation Research
Proposal Review Committee, 1977-1978.
Member, Arts and Sciences Committee on General Education
Requirements for Education Degrees, 1977.
Member, Graduate School Committee on Ph.D. Degree Require-
ments, 1978-1979.

Professional Activities

Editorial Board: The Journal of Politics, 1993-    .
State Politics and Policy Quarterly, 1999-
American Politics Quarterly, 1977-1987.
Sage University Papers on Quantitative
Applications in the Social Sciences,
1974-1983.

Consultant to the Book Review Editor: The Journal of
Politics, 1985-87.

Member:  American Political Science Association
Midwest Political Science Association
Southern Political Science Association
American Society for Public Administration
Southwestern Political Science Association
Western Political Science Association
International Political Science Association
Research Committee on Legislative Systems of the
International Political Science Association

Vice President Elect:  Southern Political Science
Association, 1993-94.

Vice President:  Southern Political Science Association,
1994-95.

297

14

President Elect:   Southern Political Science Association,
          1996-97.

President: Southern Political Science Association, 1997-98.

Past President: Southern Political Science Association,
          1998-99.

Executive Council:   American Political Science Association,
          1981-1983.
          Southern Political Science Association,
          1985-1988, 1993-95, 1996-99.
          Southwestern Political Science
          Association, 1990-1992.

Steering Committee: Comparative State Politics Group,
          1983-1986.
          Inter-University Consortium for
          Political and Social Research,
          State Legislative Electoral Data
          Project, 1987-1990.

Proposal Reviewer: National Science Foundation

Editorial Consultant: Pearson Publishing Company

Manuscript Reviewer: American Political Science Review
          The Journal of Politics
          American Journal of Political Science
          American Politics Quarterly
          Legislative Studies Quarterly
          Political Research Quarterly
          Polity
          Political Methodology
          Public Administration Review
          Public Opinion Quarterly
          Sage Professional Papers in American
          Politics
          Social Science Quarterly
          Western Political Quarterly
          Electoral Studies
          Political Geography
          State Politics and Policy Quarterly
          Indiana University Press
          Duxbury Publishing Co.
          McGraw-Hill Book Co.
          Prentice-Hall, Inc.
          Westview Press
          Johns Hopkins Press
          University of South Florida Press
          Chatham House
          Congressional Quarterly Press

298

Program Committee:      Southern Political Science Association
                        annual meeting--1980
                        American Society for Public Administra-
                        tion, Southeastern Regional annual
                        meeting--1981
                        American Political Science Association
                        annual meeting--1991

Nominations Committee:  Southwestern Political Science
                        Association, 1985-1988.
                        Southern Political Science
                        Association, 1992-1993.

Resolutions Committee:  Southwestern Social Science
                        Association, 1985-1988.

Awards Committee:       <u>Southern Review of Public Administration</u>,
                        Chester I. Barnard Award Committee
                        --1980
                        Southwestern Political Science Associa-
                        tion, Paper Award Committee--1981
                        Southern Political Science Association,
                        V.O. Key Book Award Committee--1981
                        Southern Political Science Association,
                        Women and Politics Paper Award
                        Committee--1985

Ad Hoc Committee:       Southern Political Science Association,
                        Committee to Increase the
                        Inclusiveness of the
                        Association/Profession--1995
                        Southern Political Science Association,
                        <u>The Journal of Politics</u> Editor
                        Selection Committee--1996 (chair)

Panel Chairperson:      American Political Science Association
                        annual meeting--1980, 1988, 1989,
                        1994, 1996
                        Midwest Political Science Association
                        annual meeting--1974, 1976, 1978,
                        1979, 1983, 1993, 1994, 1995, 1996,
                        1999, 2000
                        Southern Political Science Association
                        annual meeting--1995, 1997
                        Southwestern Political Science
                        Association annual meeting--1974,
                        1980, 1985, 1987, 1988, 1989, 1993,
                        1995, 1996
                        Western Political Science Association
                        annual meeting--1995, 1996, 1998

## Public Service Activities at Indiana University

Democratic Party Nominee for County Commissioner, 1972.
Democratic Party Nominee for County Councilman-at-Large,
     1974.
Democratic Party Nominee for County Commissioner, 1976.
Democratic Party Nominee for Councilman, First District,
     1978.
Delegate to Democratic State Convention, 1976, 1978.
Democratic Party Precinct Committeeman, 1978-79.
Monroe County Councilman-at-Large, 1974-76.
Monroe County Councilman, First District, 1978-79.
Monroe County Tax Adjustment Board, 1976.
Monroe County Community Action Program Board, 1974-76, 1979.
Monroe County Criminal Justice Planning Task Force, 1976.
Monroe County Jail Task Force, 1977-78.
Monroe County Data Processing Task Force, Chairperson,
     1978-79.
Bloomington Workable Programs Committee, Chairperson,
     1975-79.
Bloomington City Council Downtown Steering Committee,
     1977-79.
Bloomington Urban Development Action Grant Steering Commit-
     tee, 1978-79.
Monroe County Legal Services Bureau Advisory Council,
     1976-79.
Consultant to UAW--CAP, Indiana State Teachers
     Association-IPACE and political candidates for Congress
     and State Office.

## Public Service Activities at Louisiana State University

Consultant to the Louisiana Legislative Fiscal Office on
     State and Local Government Finance in Louisiana,
     1980-84.
Consultant to the Louisiana House of Representatives on the
     Reapportionment of Congressional and House of
     Representative Districts, 1980-82.
Consultant to the Lafayette Parish Charter Commission on
     the apportionment of Parish Council Districts, 1981-82.
Consultant to the St. Martin Parish Police Jury and School
     Board on the Reapportionment of Police Jury and School
     Board Districts, 1981-82.
Consultant to the Attorney General of Louisiana as expert
     witness in the voter registration case of Quant
     vs. Edwards (U.S. District Court, Eastern District of
     Louisiana), 1984-86.
Consultant to the City of Gretna on the Apportionment of
     Board of Aldermen Districts, 1985-86.
Consultant to the Parish of Plaquemines on the Revision of
     the Parish Home Rule Charter, 1985-86.
Consultant to the Etowah County (Alabama) Board of County

Commissioners on the Apportionment of County Commission Districts, 1986.

Consultant to the Jefferson Parish Coalition for Better Representation on the Apportionment of Parish Council Districts, 1986-88.

Consultant to the Attorney General of Louisiana as expert witness in the voting rights case of Clark v. Edwards (U.S. District Court, Middle District of Louisiana), 1987-92.

Consultant to the Attorney General of Louisiana as expert witness in the voting rights case of Richardson v. Edwards (U.S. District Court, Middle District of Louisiana), 1987-88.

Consultant to East Jefferson Coalition for Leadership and Development as expert witness in the voting rights case of East Jefferson Coalition for Leadership and Development v. Parish of Jefferson (U.S. District Court, Eastern District of Louisiana), 1987-92.

Consultant to the City of Gonzales on the Apportionment of Board of Alderman Districts, 1988.

Consultant to the Town of Lutcher on the Apportionment of Board of Aldermen Districts, 1988-89.

Consultant to Attorney General of Louisiana as expert witness in voting rights case of Chisom v. Roemer (U.S. District Court, Eastern District of Louisiana), 1988-92.

Consultant to Attorney General of Louisiana as expert witness in voting rights case of Arnold v. Roemer (U.S. District Court, Eastern District of Louisiana), 1988-89.

Consultant to Limestone County (Alabama) School Board, Shelby County Board of County Commissioners and School Board, and St. Clair County Board of County Commissioners and School Board as expert witness in voting rights case of Dillard v. Crenshaw (U.S. District Court, Middle District of Alabama), 1988-90.

Consultant to the Lafayette Parish School Board on the Reapportionment of the School Board Districts, 1988-89.

Consultant to the Monroe County (Mississippi) Board of Supervisors as expert witness in voting rights case of Ewing v. Monroe County (U.S. District Court, Northern District of Mississippi, Eastern Division), 1989-90.

Consultant to the Attorney General of Alabama as expert witness in voting rights case of SCLC v. Evans (U.S. District Court, Middle District of Alabama, Northern Division), 1989-90.

Consultant to the defendant as expert witness in the contested elections case of Granados-Navedo v. Acevedo (Superior Court, San Juan, Puerto Rico), 1989-90.

Consultant to the plaintiffs as expert witness in the voting rights and partisan gerrymandering case of Murray v. Consolidated City of Indianapolis (U.S. District Court, Southern District of Indiana, Indianapolis Division), 1989-90.

Consultant to the Alabama State Democratic Executive
Committee as expert witness in the voting rights case of
Hawthorne v. Baker (U.S. District Court, Middle District
of Alabama, Southern Division), 1989-90.
Consultant to the Lee County (North Carolina) Board of
Commissioners and City of Sanford as expert witness in
voting rights case of Sellars v. Lee County (U.S.
District Court, Middle District of North Carolina,
Durham Division), 1989-90.
Consultant to the Wicomico County (Maryland) County Council
as expert witness in voting rights case of U.S. v.
Wicomico County (U.S. District Court, District of
Maryland), 1989-91.
Consultant to the City Attorney of Dallas (Texas) as expert
witness in voting rights case of Roy Williams v. City
of Dallas (U.S. District Court, Northern District of
Texas, Dallas Division), 1990-91.
Consultant to Political Action Committees and political
candidates for Congress and State-Local Offices, 1979-
1990.
Member, Revenue and Budget Review Committee, City of Baton
Rouge and Parish of East Baton Rouge, 1985.
Member, Federal Grand Jury 85-2, Middle District of
Louisiana, 1985-86.

## Public Service Activities at University of Wisconsin, Milwaukee

Consultant to the Attorney General of Louisiana as expert
witness in the voting rights case of Clark v. Edwards
(U.S. District Court, Middle District of Louisiana),
1987-92.
Consultant to East Jefferson Coalition for Leadership and
Development as expert witness in the voting rights case
of East Jefferson Coalition for Leadership and
Development v. Parish of Jefferson (U.S. District Court,
Eastern District of Louisiana), 1987-92.
Consultant to Attorney General of Louisiana as expert
witness in voting rights case of Chisom v. Roemer (U.S.
District Court, Eastern District of Louisiana), 1988-92.
Consultant to Limestone County (Alabama) School Board,
Shelby County Board of County Commissioners and School
Board, and St. Clair County Board of County
Commissioners and School Board as expert witness in
voting rights case of Dillard v. Crenshaw (U.S. District
Court, Middle District of Alabama), 1988-91.
Consultant to the Attorney General of Alabama as expert
witness in voting rights case of SCLC v. Evans (U.S.
District Court, Middle District of Alabama, Northern
Division), 1989-95.
Consultant to the Alabama State Democratic Executive
Committee as expert witness in the voting rights case of
Hawthorne v. Baker (U.S. District Court, Middle District

of Alabama, Southern Division), 1989-90.

Consultant to the Lee County (North Carolina) Board of Commissioners and City of Sanford as expert witness in voting rights case of <u>Sellars v. Lee County</u> (U.S. District Court, Middle District of North Carolina, Durham Division), 1989-90.

Consultant to the Wicomico County (Maryland) County Council as expert witness in voting rights case of <u>U.S. v. Wicomico County</u> (U.S. District Court, District of Maryland), 1989-91.

Consultant to the City Attorney of Dallas (Texas) as expert witness in voting rights case of <u>Roy v. Williams v. City of Dallas</u> (U.S. District Court, Northern District of Texas, Dallas Division), 1990-91.

Consultant to the Attorney General of Florida as expert witness in voting rights case of <u>Nipper v. Chiles</u> (U.S. District Court, Middle District of Florida, Jacksonville Division), 1991-94.

Consultant to the Attorney General of Florida as expert witness in voting rights case of <u>Davis v. Chiles</u> (U.S. District Court, Northern District of Florida, Tallahassee Division), 1991-94.

Consultant to the Attorney General of New Mexico as expert witness in voting rights case of <u>Tsosie v. King</u> (U.S. District Court, District of New Mexico), 1991-92.

Consultant to the Lafayette County (Mississippi) Board of Supervisors as expert witness in voting rights case of <u>Houston v. Lafayette County</u> (U.S. District Court, Northern District of Mississippi, Western Division), 1991-98.

Consultant to the Attorney General of Louisiana as expert witness in the voting rights case of <u>Louisiana v. U.S.</u> (U.S. District Court, District of Columbia), 1992-93.

Consultant to the St. Louis City (Missouri) School Board as expert witness in voting rights case of <u>Clay v. The Board of Education of the City of St. Louis</u> (U.S. District Court, Eastern District of Missouri, Eastern Division), 1992-95.

Consultant to the Kent County (Michigan) Board of County Commissioners as expert witness in voting rights case of <u>Nixon v. Kent County</u> (U.S. District Court, Western District of Michigan, Southern Division), 1992-96.

Consultant to the Florida State Senate as expert witness in voting rights case of <u>DeGrandy v. Wetherell</u> (U.S. District Court, Northern District of Florida, Tallahassee Division), 1992.

Consultant to the Michigan Republican Party as expert witness in voting rights case of <u>NAACP v. Austin</u> (U.S. District Court, Eastern District of Michigan, Southern Division), 1992.

Consultant to the Spartanburg County (South Carolina) Board of Education as expert witness in voting rights case of

NAACP v. Spartanburg County Board of Education (U.S. District Court, District of South Carolina, Spartanburg Division), 1992-94.

Consultant to the plaintiffs as expert witness in voting rights case of Hays v. State of Louisiana (U.S. District Court, Western District of Louisiana, Shreveport Division), 1992-96.

Consultant to the city of Chicago as expert witness in voting rights case of Barnett v. Daley and Bonilla v. Daley (U.S. District Court, Northern District of Illinois, Eastern Division), 1992-98.

Consultant to the Monterey County (California) Board of Supervisors as expert witness in voting rights case of Gonzalez v. Monterey County (U.S. District Court, Northern District of California, 1992.

Consultant to the Lee County (Mississippi) Board of Supervisors as expert witness in voting rights case of Lee County v. U.S. (U.S. District Court, District of Columbia), 1992-93.

Consultant to the West Feliciana Parish (Louisiana) Police Jury as expert witness in voting rights case of Rodney v. McKeithen (U.S. District Court, Middle District of Louisiana), 1992-94.

Consultant to the Madison Parish (Louisiana) Police Jury and School Board as expert witness in voting rights case of Rodney v. McKeithen (U.S. District Court, Middle District of Louisiana), 1992-94.

Consultant to the city of Holyoke (Massachusetts) as expert witness in voting rights case of Vecinos De Barrio Uno v. City of Holyoke (U.S. District Court, District of Massachusetts, Western Division), 1992-97.

Consultant to the town of Gramercy (Louisiana) as expert witness in voting rights case of Allen v. Cantillo (U.S. District Court, Eastern District of Louisiana, New Orleans Division), 1993-94.

Consultant to the Worcester County (Maryland) County Commissioners as expert witness in voting rights case of Cane v. Worcester County (U.S. District Court, District of Maryland), 1993-96.

Consultant to the East Carroll Parish (Louisiana) Police Jury as expert witness in voting rights case of Rodney v. McKeithen (U.S. District Court, Middle District of Louisiana), 1993-94.

Consultant to the Attorney General of Michigan as expert witness in voting rights case of NAACP v. Austin (U.S. District Court, Eastern District of Michigan, Southern Division), 1993-94.

Consultant to the Coahoma County (Mississippi) Board of Supervisors as expert witness in voting rights case of Coahoma County NAACP v. Coahoma County (U.S. District Court, Northern District of Mississippi, Delta Division), 1993-94.

Consultant to the Covington County (Mississippi) Board of
Supervisors as expert witness in voting rights case of
Carney v. Covington County (U.S. District Court,
Southern District of Mississippi, Hattiesburg
Division), 1993-94.
Consultant to the Castro County (Texas) Board of County
Commissioners as expert witness in voting rights case
of Reyna v. Castro County (U.S. District Court,
Northern District of Texas, Amarillo Division), 1993-
94.
Consultant to the City of Baton Rouge/East Baton Rouge
Parish (Louisiana) Metropolitan Council as expert
witness in voting rights cases of Glasper v. City of
Baton Rouge/East Baton Rouge Parish and U.S. v. City
of Baton Rouge/East Baton Rouge Parish (U.S. District
Court, Middle District of Louisiana), 1993-   .
Consultant to the McCullough County (Texas) Board of County
Commissioners as expert witness in voting rights case
of Mireles v. McCullough County (U.S. District Court,
Western District of Texas, Austin Division), 1993-94.
Consultant to the Judicial Nominating Commission for the
Superior Court of Lake County (Indiana) as expert
witness in voting rights case of Bradley v. Lake County
Election Board (U.S. District Court, Southern District
of Indiana, Indianapolis Division), 1993-96.
Consultant to the Thurston County (Nebraska) Board of County
Commissioners, Thurston County School District 13, and
Village of Walthill (Nebraska) as expert witness in
voting rights case of Stabler v. Thurston County (U.S.
District Court, District of Nebraska, Omaha Division),
1993-98.
Consultant to the plaintiffs as expert witness in voting
rights case of Shaw v. Hunt (U.S. District Court,
Eastern District of North Carolina, Raleigh Division),
1993-96.
Consultant to the city of Bovina (Texas) City Council as
expert witness in voting rights case of LULAC v. City
of Bovina (U.S. District Court, Northern District of
Texas, Amarillo Division), 1993-94.
Consultant to the city of Friona (Texas) City Council as
expert witness in voting rights case of LULAC v. City
of Friona (U.S. District Court, Northern District of
Texas, Amarillo Division), 1993-94.
Consultant to the town of St. Francisville (Louisiana) Board
of Aldermen as expert witness in voting rights case of
Wilson v. Town of St. Francisville (U.S. District
Court, Middle District of Louisiana), 1994-96.
Consultant to the plaintiffs as expert witness in voting
rights case of Vera v. Richards (U.S. District Court,
Southern District of Texas, Houston Division), 1994-96.
Consultant to the Attorney General of New York as expert
witness in voting rights case of France v. Pataki (U.S.

District Court, Southern District of New York), 1994-2000.

Consultant to the plaintiffs as expert witness in voting rights case of <u>Johnson v. Miller</u> (U.S. District Court, Southern District of Georgia, Augusta Division), 1994-95.

Consultant to the city of Marks (Mississippi) Board of Aldermen as expert witness in voting rights case of <u>Sims v. City of Marks</u> (U.S. District Court, Northern District of Mississippi), 1994.

Consultant to the Attala County (Mississippi) Board of Supervisors as expert witness in voting rights case of <u>Teague v. Attala County</u> (U.S. District Court, Northern District of Mississippi), 1994-98.

Consultant to the Attorney General of Missouri as expert witness in voting rights case of <u>African-American Voting Rights Legal Defense Fund v. State of Missouri</u> (U.S. District Court, Eastern District of Missouri, Eastern Division), 1994-98.

Consultant to the East Carroll Parish (Louisiana) School Board as expert witness in voting rights case of <u>Knight v. McKeithen</u> (U.S. District Court, Middle District of Louisiana), 1994.

Consultant to the city of Greenville (Mississippi) as expert witness in voting rights case of <u>Thornton v. City of Greenville</u> (U.S. District Court, Northern District of Mississippi), 1994-97.

Consultant to the plaintiffs as expert witness in voting rights case of <u>Burl v. McTopy</u> (U.S. District Court, Eastern District of Louisiana), 1995.

Consultant to the plaintiffs as expert witness in voting rights case of <u>Thomas v. Bush</u> (U.S. District Court, Western District of Texas, Austin Division), 1995.

Consultant to the Attorney General of Wisconsin as expert witness in voting rights case of <u>Milwaukee Branch of the NAACP v. Thompson</u> (U.S. District Court, Eastern District of Wisconsin), 1995-96.

Consultant to the plaintiffs as expert witness in voting rights case of <u>Johnson v. Mortham</u> (U.S. District Court, Northern District of Florida, Tallahassee Division), 1996.

Consultant to the plaintiffs as expert witness in voting rights case of <u>Moon v. Meadows</u> (U.S. District Court, Eastern District of Virginia, Richmond Division), 1996-98.

Consultant to the city of Belle Glade (Florida) as expert witness in voting rights case of <u>Burton v. City of Belle Glade</u> (U.S. District Court, Southern District of Florida, West Palm Beach Division), 1996-1999.

Consultant to the Marion County Election Board (Indiana) as expert witness in voting rights case of <u>Anderson v. The Indiana State Election Board</u> (U.S. District Court,

Southern District of Indiana, Indianapolis Division),
1996-1999.
Consultant to the city of New Roads (Louisiana) City Council
as expert witness in voting rights case of <u>U.S. v. New
Roads</u> (U.S. District Court, Middle District of
Louisiana), 1997-98.
Consultant to the plaintiffs as expert witness in voting
rights case of <u>Currie v. Foster</u> (U.S. District Court,
Western District of Louisiana, Monroe Division), 1997-
98.
Consultant to the plaintiffs as expert witness in voting
rights case of <u>Leonard v. Beasley</u> (U.S. District Court,
District of South Carolina, Columbia Division), 1997.
Consultant to the plaintiffs as expert witness in voting
rights case of <u>Chen v. City of Houston</u> (U.S. District
Court, Southern District of Texas, Houston Division),
1997-
Consultant to the plaintiffs as expert witness in voting
rights case of <u>Cromartie v. Hunt</u> (U.S. District Court,
Eastern District of North Carolina, Raleigh Division),
1998-
Consultant to the plaintiffs as expert witness in Census
case of <u>Glavin v. Clinton</u> (U.S. District Court,
Eastern District of Virginia), 1998-99.
Consultant to the plaintiff as expert witness in the
contested election case of <u>Wright v. Williams</u>
(Louisiana District Court, Sixth Judicial District),
1998.
Consultant to the plaintiffs as expert witness in voting
rights case of <u>Maxwell v. Foster</u> (U.S. District Court,
Western District of Louisiana, Shreveport Division),
1998-99.
Consultant to the plaintiff as expert witness in the
contested election case of <u>In Re: Election Contest of
Democratic Primary Election Held May 4, 1999 for
Nomination to the office of Clerk, Youngstown Municipal
Court</u> (Ohio Court of Common Pleas, Mahoning County),
1999.
Consultant to the plaintiffs as expert witness in voting
rights case of <u>Thompson v. Bennett</u> (U.S. District
Court, Middle District of Alabama, Eastern Division),
1999-
Consultant to the Blaine County (Montana) Board of County
Commissioners as expert witness in voting rights case
of <u>U.S. v. Blaine County</u> (U.S. District Court,
District of Montana, Great Falls Division), 1999-   .
Consultant to the plaintiffs as expert witness in Census
case of <u>State of Utah v. Evans</u> (U.S. District Court,
District of Utah), 2001.
Consultant to the Charleston County Council (South Carolina)
as expert witness in voting rights case of
<u>U.S./Moultrie v. Charleston County</u> (U.S. District

24

Court) District of South Carolina, Charleston Division,
   2001-    .
Consultant to the florida Clemency Board as expert witness
   in voting rights case of <u>Johnson v. Bush</u> (U.S. District
   Court, southern district of florida, Miami Division),
   2001-    .
Consultant to Political Action Committees and political
   candidates for Congress and State-Local Offices, 1990-

August 2001

EXHIBIT B

**CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.**
110 EAST CORNERVIEW
GONZALES, LA    70737
Phone # (225) 647-1767/FAX # (225) 647-6600

Cases in which Dr. Ronald E. Weber has Testified as an Expert
or been Deposed Under Oath

| Case | Case # | Court |
|------|--------|-------|
| Clark v. Edwards | Civil Action No. 86-435 Section A | U.S. District Court, Middle District of Louisiana |
| East Jefferson Coalition v. Parish of Jefferson | Civil Action No. 86-3668 Sec. M | U.S. District Court, Eastern District of Louisiana |
| Chisom v. Roemer | Civil Action No. 86-4057 Sec. A | U.S. District Court, Eastern District of Louisiana |
| Ewing v. Monroe Cty. | Civil Action No. 86-37-B-D | U.S. District Court, Northern District of Mississippi, Eastern Division |
| SCLC v. Evans | Civil Action No. 88-D-462-N | U.S. District Court, Middle District of Alabama, Northern Division |
| Murray v. Consolidated City of Indianapolis | Civil Action No. 87-111C | U.S. District Court, for the Southern District of Indiana, Indianapolis Division |
| Hawthorne v. Baker | Civil Action No. CA-89-T-381-S | U.S. District Court, for the Middle District of Alabama, Northern Division |
| Roy Williams v. City of Dallas | Civil Action No. CA 3 88-1152-R | U.S. District Court, for the Northern District of Texas, Dallas Division |

1

**CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.**
110 EAST CORNERVIEW
GONZALES, LA   70737
Phone # (225) 647-1767/FAX # (225) 647-6600

Cases in which Dr. Ronald E. Weber has Testified as an Expert
or been Deposed Under Oath

| Case | Case # | Court |
|------|--------|-------|
| Nipper v. Chiles | Civil Action No. 90-447-Civ-J-16 | U.S. District Court, Middle District of Florida, Jacksonville Div. |
| Davis v. Chiles | Civil Action No. 90-40098 MMP | U.S. District Court, Northern District of Florida, Tallahassee Division |
| U.S. v. Wicomico | Civil Action No. S-87-2557 | U.S. District Court, District of Maryland |
| Houston v. Lafayette | Civil Action No. WC 91-108-D-D | U.S. District Court, Northern District of Mississippi, Western Division |
| DeGrandy v. Wetherell | Civil Action No. TCA 92-40015-WS CA 92-40131-WS | U.S. District Court, Northern District of Florida, Tallahassee Division |
| NAACP v. Austin | Civil Action No. 92-CV-92695 | U.S. District Court, Eastern District of Michigan, Southern Division |
| Hays v. State of Louisiana | Civil Action No. CV 92-1392 CV 95-1241 | U.S. District Court, Western District of Louisiana, Shreveport Division |
| Cane v. Worcester | Civil Action No. Y 92-3226 | U.S. District Court, District of Maryland |

2

**CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.**
110 EAST CORNERVIEW
GONZALES, LA   70737
Phone # (225) 647-1767/FAX # (225) 647-6600

Cases in which Dr. Ronald E. Weber has Testified as an Expert
or been Deposed Under Oath

| <u>Case</u> | <u>Case #</u> | <u>Court</u> |
|---|---|---|
| <u>Johnson v. Miller</u> | Civil Action No. CV 194-008 | U.S. District Court, Southern District of Georgia, Augusta Division |
| <u>Vecinos De Barrio Uno v. City of Holyoke</u> | Civil Action No. 92-30052-F | U.S. District Court, District of Massachusetts, Western Division |
| <u>Shaw v. Hunt</u> | Civil Action No. 92-202-CIV-5-BR | U.S. District Court, Eastern District of North Carolina, Raleigh Division |
| <u>Glasper v. City of Baton Rouge/East Baton Rouge Parish</u> | Civil Action No. 93-537 Sec. A (M2) | U.S. District Court, Middle District of Louisiana |
| <u>Rodney v. McKeithen</u> | Civil Action No. 92-0735 Sec. A (M2) | U.S. District Court, Middle District of Louisiana |
| <u>Louisiana v. U.S.</u> | Civil Action No. 91-0122 (ARR U.S.C.A., JHG, TFH) | U.S. District Court, District of Columbia |
| <u>Gonzales v. Monterey County</u> | Civil Action No. C-91-20736 WAI (PVT) | U.S. District Court, Northern District of California |
| <u>Sims v. City of Marks</u> | Civil Action No. 2:93CV60-B-O | U.S. District Court, Northern District of Mississippi, Northern Division |
| <u>Vera v. Richards</u> | Civil Action No. H-94-0277 | U.S. District Court, for the Southern District of Texas, Houston Division |

3

**CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.**
110 EAST CORNERVIEW
GONZALES, LA   70737
Phone # (225) 647-1767/FAX # (225) 647-6600

Cases in which Dr. Ronald E. Weber has Testified as an Expert
or been Deposed Under Oath

| Case | Case # | Court |
|---|---|---|
| Knight v. McKeithen | Civil Action No. 94-848-A-2 | U.S. District Court, Middle District of Louisiana |
| Clay v. Board of Education of the City of St. Louis | Civil Action No. 91-0636-C-8 | U.S. District Court, Eastern District of Missouri, Eastern Division |
| African-American Voting Rights Legal Defense Fund v. State of Missouri | Civil Action No. 4: 92CV00973 ELF | U.S. District Court, Eastern District of Missouri, Eastern Division |
| Stabler v. Thurston County | Civil Action No. 8:93CV00394 | U.S. District Court, District of Nebraska |
| Thomas v. Bush | Civil Action No. A-95-CV-186-SS | U.S. District Court, Western District of Texas, Austin Division |
| Barnett v. City of Chicago | Civil Action No. 92C-1683 | U.S. District Court, Northern District of Illinois, Eastern Division |
| Bonilla v. City of Chicago | Civil Action No. 92C-2666 | U.S. District Court, Northern District of Illinois, Eastern Division |
| Milwaukee Branch of the NAACP v. Thompson | Civil Action No. 94-C-1245 | U.S. District Court, Eastern District of Wisconsin |
| Johnson v. Mortham | Civil Action No. TCA 94-40025-MMP | U.S. District Court, Northern District of Florida, Tallahassee Division |

4

## CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.
110 EAST CORNERVIEW
GONZALES, LA   70737
Phone # (225) 647-1767/FAX # (225) 647-6600

Cases in which Dr. Ronald E. Weber has Testified as an Expert
or been Deposed Under Oath

| Case | Case # | Court |
|------|--------|-------|
| France v. Pataki | Civil Action No. 92C-1144 (JES) | U.S. District Court, Southern District of New York |
| Smith v. Beasley | Civil Action No. 3-95-3235-O | U.S. District Court, District of South Carolina, Columbia Division |
| Wilson v. Town of St. Francisville | Civil Action No. 92-765-B-M1 | U.S. District Court, Middle District of Louisiana |
| Moon v. Meadows | Civil Action No. 4:95CV83 | U.S. District Court, Eastern District of Virginia, Richmond Division |
| Burton v. City of Belle Glade | Civil Action No. 95-8356-CIV-RYSKAMP | U.S. District Court, Southern District of Florida, West Palm Beach Division |
| Chen v. City of Houston | Civil Action No. H-97-1180 | U.S. District Court, Southern District of Texas, Houston Division |
| Maxwell v. Foster | Civil Action No. CV98-1378 M | U.S. District Court, Western District of Louisiana, Monroe Division |
| Cromartie v. Hunt | Civil Action No. 04-CV-104-H2 | U.S. District Court, Eastern District of North Carolina, Eastern Division |

**CAMPAIGN AND OPINION RESEARCH ANALYSTS, INC.**
110 EAST CORNERVIEW
GONZALES, LA    70737
Phone # (225) 647-1767/FAX # (225) 647-6600

Cases in which Dr. Ronald E. Weber has Testified as an Expert
or been Deposed Under Oath

| Case | Case # | Court |
| --- | --- | --- |
| Thompson v. Bennett | Civil Action No. 97-A-715-E | U.S. District Court, Middle District of Alabama, Eastern Division |
| U.S. v. Blaine County | Civil Action No. CV-99-122-GF-DWM | U.S. District Court, District of Montana, Great Falls Division |

6

315

EXHIBIT C

## DATA ANALYSIS PROCEDURES

1.   These analyses produce estimates of the percentage of votes won by each of the candidates from African-American, Hispanic, and non-Hispanic white ("Anglo") voters within the State of Florida.  The estimated racial divisions in the vote enable one to determine if non-Hispanic white ("Anglo"), African-American, and Hispanic voters differ in participation behavior, who the candidate of choice is of each group, the level of cohesion of each group, the extent to which the voting patterns are racially or ethnically polarized, and whether or not the winner of the election was preferred by a majority of African-American, Hispanic, and/or non-Hispanic white ("Anglo") voters.

2.   The bivariate ecological regression analyses employ the percentage of the registered voters won by each candidate as the dependent variable and the percentages of the registered voters who are African-American, Hispanic, or non-Hispanic white ("Anglo") as the independent variable.  Commonly known as a "double regression" technique, two regression equations are run for each estimation.  For example, I display in Figure 1A an analysis using the percentage of the registered voters who are African-American as the independent variable and in Figure 1B an

1

FIGURE 1A

## Weighted REG Analysis for MacKay

### 1998 General



Black % of REG

Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .439[a] | .193 | .193 | 7.407E-02 |

a. Predictors: (Constant), Black % of REG

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .183 | .000 | | 6226.116 | .000 |
| | Black % of REG | .171 | .000 | .439 | 1386.859 | .000 |

a. Dependent Variable: MacKay % of Total REG

FIGURE 1B

## Weighted REG Analysis for MacKay

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .439[a] | .193 | .193 | 7.407E-02 |

a. Predictors: (Constant), Nonblack % of RVS

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .354 | .000 | | 3129.988 | .000 |
| | Nonblack % of RVS | -.171 | .000 | -.439 | -1386.859 | .000 |

a. Dependent Variable: MacKay % of Total REG

319

analysis using the percentage of registered voters who are non-African-American as the independent variable.  These two variables are plotted as the horizontal axis in figures 1A and 1B.  To obtain an estimate of African-American support for the Democratic candidate Buddy MacKay for Governor along with an estimate of non-African-American support for the Democratic candidate Buddy MacKay for Governor, I plot the percentage of the total registered voters supporting MacKay in each precinct in the 1998 general election for Governor as the vertical axis in Figures 1A and 1B.

3.   Similarly, to estimate Hispanic preferences, I run one regression equation with the percentage of the registered voters who are Hispanic as the independent variable (see Figure 1C) and one with the percentage of the registered voters who are non-Hispanic as the independent variable (see Figure 1D).  This analysis produces an estimates of Hispanic and non-Hispanic support for MacKay by plotting the percentage of the total registered voters supporting his candidacy in each precinct in the 1998 general election for Governor as the vertical axis in Figures 1C and 1D.

4.   Finally, to estimate non-Hispanic white ("Anglo")

2

FIGURE 1C

## Weighted REG Analysis for MacKay

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .237[a] | .056 | .056 | 8.054E-02 |

a. Predictors: (Constant), Hispanic % of REG

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .210 | .000 | | 6781.025 | .000 |
| | Hispanic % of REG | -.126 | .000 | -.237 | -692.260 | .000 |

a. Dependent Variable: MacKay % of Total REG

321

FIGURE 1D

## Weighted REG Analysis for MacKay

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .237[a] | .056 | .056 | 8.054E-02 |

a. Predictors: (Constant), Nonhispanic % of RVS

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | 8.376E-02 | .000 | | 486.877 | .000 |
| | Nonhispanic % of RVS | .126 | .000 | .237 | 692.260 | .000 |

a. Dependent Variable: MacKay % of Total REG

322

preferences, I run one regression equation with the percentage of the registered voters who are non-Hispanic white ("Anglo") as the independent variable (see Figure 1E) and one with the percentage of registered voters who are not non-Hispanic white ("non-Anglo") as the independent variable (see Figure 1F). This analysis provides an estimate of non-Hispanic white ("Anglo") and not non-Hispanic white ("non-Anglo") support for MacKay by plotting the percentage of the total registered voters supporting MacKay in each precinct in the 1998 general election for Governor as the vertical axis in Figures 1E and 1F. Each set of these two regression equations yields a wealth of information that is useful in examining the questions addressed in this report.

5. The bivariate regression analyses produce the slope and the intercept of the regression line and a scatterplot of the data points. The slope or "b" coefficient measures the degree of change in the dependent variable produced by one unit change in the independent variable (That is, how much the participation level, or a candidate's percent of the vote changes when the racial or ethnic composition of the electorate changes). The greater the "b" value, the steeper the slope in the linear regression line. The intercept indicates the points at which the regression line passes through the left and right vertical axes

3

## Weighted REG Analysis for MacKay

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .188[a] | .035 | .035 | 8.379E-02 |

a. Predictors: (Constant), White % of REG

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .252 | .000 | | 2644.957 | .000 |
| | White % of REG | -6.24E-02 | .000 | -.188 | -549.875 | .000 |

a. Dependent Variable: MacKay % of Total REG

FIGURE 1F

## Weighted REG Analysis for MacKay

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .188ª | .035 | .035 | 8.379E-02 |

a. Predictors: (Constant), NonWhite % of RVS

**Coefficientsª**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .190 | .000 | | 5149.185 | .000 |
| | NonWhite % of RVS | 6.239E-02 | .000 | .188 | 549.875 | .000 |

a. Dependent Variable: MacKay % of Total REG

of a scatterplot of the relationship between the two variables. The intercept values provide estimates of the actual percentages of non-Hispanic white ("Anglo"), Hispanic, and African-American voters participating by voting for the candidates running for an office or supporting a candidate.  For a regression equation in which the independent variable is percentage of the registered voters who are African-American, the left intercept estimates the percentage of voters participating by voting for the candidates running for an office or supporting a candidate in a precinct with no African-American voters.  The resulting estimate is the proportion of non-African-American voters participating by voting for the candidates running for an office or preferring the candidate.  This point can be demonstrated by examining Figure 1A.  Note that the intercept value for the precinct with no African-American voters is .183.  This means that I estimate that 18.3 percent of the non-African-American registered voters supported MacKay in the 1998 general election for Governor.  Conversely, for a regression equation in which the independent variable is the percentage of registered voters who are non-African-American, the left intercept estimates the percentage of registered voters participating by voting for the candidates running for an office or supporting a candidate in a precinct with no non-African-American voters.  The resulting

4

<u>estimate is the proportion of African-American voters</u>
<u>participating by voting for the candidates running for an office</u>
<u>or preferring the candidate</u>.  This point can be demonstrated by
examining Figure 1B.  Note that the intercept value for the
precinct with no non-African-American voters is .354.  This means
that I estimate that 35.4 percent of the African-American
registered voters supported MacKay in the 1998 general election
for Governor.  Similarly, I calculate the Hispanic and non-
Hispanic white ("Anglo") estimates of the percentage of
registered voters participating by voting for the candidates
running for an office or preferring a candidate.  To obtain the
participation estimates, one must also run the regression
analyses for the other candidates in the election (e.g., Jeb Bush
in the 1998 Gubernatorial election) and then sum the figures
across the number of candidates in the contest (see Figures 1G
thru 1L for the Bush estimates).

6.  A correlation coefficient (R) is also produced that
measures the magnitude of the relationship between the dependent
and independent variables.  The maximum value of this coefficient
is 1.0.  The stronger the relationship between the two variables,
the closer the coefficient will be to 1.0.  The weaker the
relationship, the closer the coefficient will be to 0.0.  A

5

327

FIGURE 1G

## Weighted REG Analysis for Bush

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .641[a] | .411 | .411 | 7.423E-02 |

a. Predictors: (Constant), Black % of REG

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .272 | .000 | | 9263.599 | .000 |
| | Black % of REG | -.293 | .000 | -.641 | -2368.843 | .000 |

a. Dependent Variable: Bush % of Total REG

FIGURE 1H

## Weighted REG Analysis for Bush

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .641[a] | .411 | .411 | 7.423E-02 |

a. Predictors: (Constant), Nonblack % of RVS

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | -2.02E-02 | .000 | | -178.851 | .000 |
| | Nonblack % of RVS | .293 | .000 | .641 | 2368.843 | .000 |

a. Dependent Variable: Bush % of Total REG

FIGURE 1I

## Weighted REG Analysis for Bush

### 1998 General



*Cases weighted by RVS*

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|-------|------|----------|-------------------|----------------------------|
| 1 | .126[a] | .016 | .016 | 9.607E-02 |

a. Predictors: (Constant), Hispanic % of REG

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|-------|-----------|------|------------|------|----------|------|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .237 | .000 | | 6417.870 | .000 |
| | Hispanic % of REG | 7.830E-02 | .000 | .126 | 360.564 | .000 |

a. Dependent Variable: Bush % of Total REG

FIGURE 1J

## Weighted REG Analysis for Bush

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .126[a] | .016 | .016 | 9.607E-02 |

a. Predictors: (Constant), Nonhispanic % of RVS

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .315 | .000 | | 1535.754 | .000 |
| | Nonhispanic % of RVS | -7.83E-02 | .000 | -.126 | -360.564 | .000 |

a. Dependent Variable: Bush % of Total REG

331

FIGURE 1K

## Weighted REG Analysis for Bush

### 1998 General



Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .457[a] | .209 | .209 | 8.696E-02 |

a. Predictors: (Constant), White % of REG

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .103 | .000 | | 1038.703 | .000 |
| | White % of REG | .174 | .000 | .457 | 1474.786 | .000 |

a. Dependent Variable: Bush % of Total REG

FIGURE 1L

## Weighted REG Analysis for Bush

### 1998 General



NonWhite % of RVS

Cases weighted by RVS

**Model Summary**

| Model | R | R Square | Adjusted R Square | Std. Error of the Estimate |
|---|---|---|---|---|
| 1 | .457[a] | .209 | .209 | 8.696E-02 |

a. Predictors: (Constant), NonWhite % of RVS

**Coefficients[a]**

| Model | | Unstandardized Coefficients | | Standardized Coefficients | t | Sig. |
|---|---|---|---|---|---|---|
| | | B | Std. Error | Beta | | |
| 1 | (Constant) | .277 | .000 | | 7220.588 | .000 |
| | NonWhite % of RVS | -.174 | .000 | -.457 | -1474.786 | .000 |

a. Dependent Variable: Bush % of Total REG

measure of the degree of statistical significance is also calculated for each correlation coefficient. This statistic reveals the probability that the relationship between the two variables is a result of chance or is a true relationship. A coefficient that is statistically significant at the .05 level is regarded as true or non-random in 95 out of 100 occurrences. A coefficient that is statistically significant at the .01 level is regarded as true or non-random in 99 out of 100 occurrences.

7. I calculate values of the correlation coefficient (R), levels of statistical significance, coefficient of determination ($R^2$), and intercepts for both "unweighted" and "weighted" regression analyses. In an unweighted analysis, each precinct is treated as an equal unit in determining these values, no matter the actual number of votes cast or registered voters in these precincts. In a weighted analysis, differences in the number of registered voters in each precinct is taken into account, so that the impact each precinct has on the values of the statistical coefficients varies by the number of registered voters in that precinct. A weighted analysis has as many cases as there are registered voters on the rolls in the state where the election occurred. Weighted regression will produce coefficients with different values from those based on the unweighted analysis only

6

if the voting patterns vary systematically with the size of precincts.  As other expert witnesses do, I calculate the results for both weighted and unweighted analyses.

8.  The final analysis technique employed is the extreme case (or homogeneous precinct) analysis.  A precinct is deemed homogeneous or an extreme case if at least 90 percent of the voting age population in the precinct are of one race or ethnicity.  At the one extreme are the predominantly African-American or Hispanic precincts, while at the other extreme are the predominantly non-Hispanic white ("Anglo") precincts.  In the homogeneous analysis the preferences of all of the voters in the predominantly one-race precincts are summed and percentaged to gain an estimate of the levels of participation or the candidate support by the voters of that race or ethnicity.  The estimates are then reported for the homogeneous African-American, homogeneous Hispanic, and the homogeneous non-Hispanic white ("Anglo")  precincts.  Although homogeneous precinct analysis is straightforward and the results are easy to understand, the technique is not always as valid as the regression analyses for estimating voter preferences by race or ethnicity.  Not all jurisdictions have homogeneous precincts and if they do, the number may be small.  This is not a problem in the statewide

7

335

elections of Florida for African-American and non-Hispanic white ("Anglo") precincts because of a sufficient number of African-American and non-Hispanic white ("Anglo") homogenous precincts in Florida.   However, use of Hispanic extreme case estimates in Florida is impossible since there are no 90 percent Hispanic precincts in the state.   I calculate the homogeneous precinct analyses in this report for the African-American and non-Hispanic white ("Anglo') groups, but rely primarily on the results of the weighted regression analyses in determining the participation behavior and the candidate preferences of African-American, Hispanic, and non-Hispanic white ("Anglo") voters in Florida.

8

EXHIBIT D

## STATE OF FLORIDA

### 1992 Democratic Primary Election for U.S. Senate

### Weighted Regression Analysis

#### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|---|-----------|---|-------------|-------|
| Graham   + | .123 | (82.0%) | .260 | (91.9%) | .301** | .091 |
| Mahorner   | .027 | (18.0%) | .023 | ( 8.1%) | .031** | .001 |
|            | .150 | | .283 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|---|-----------|---|-------------|-------|
| Graham   + | .268 | (91.8%) | .124 | (82.7%) | .317** | .100 |
| Mahorner   | .024 | ( 8.2%) | .026 | (17.3%) | .017** | .000 |
|            | .292 | | .150 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**338**

## STATE OF FLORIDA

1992 Democratic Primary Election for U.S. Senate

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|---------|------------|---------|
| Graham    + | .113 | (83.1%) | .231 | (92.8%) |
| Mahorner | .023 | (16.9%) | .018 | ( 7.2%) |
|          | .136 | | .249 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|---------|------------|---------|
| Graham    + | .230 | (92.7%) | .113 | (83.1%) |
| Mahorner | .018 | ( 7.3%) | .023 | (16.9%) |
|          | .248 | | .136 | |

+ denotes winner

**339**

**STATE OF FLORIDA**

1992 Democratic Primary Election for U.S. Senate

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Graham    + | .146 | (81.6%) | .261 | (91.6%) | .232** | .054 |
| Mahorner | .033 | (18.4%) | .024 | ( 8.4%) | .068** | .005 |
| | .179 | | .285 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Graham    + | .270 | (91.5%) | .146 | (82.0%) | .248** | .062 |
| Mahorner | .025 | ( 8.5%) | .032 | (18.0%) | .055** | .003 |
| | .295 | | .178 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**340**

**STATE OF FLORIDA**

1994 Democratic Primary Election for U.S. Senate

Weighted Regression Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Perez     |   | .022 | (21.4%) | .032 | (17.4%) | .087** | .008 |
| Rodham    | + | .034 | (33.0%) | .062 | (33.7%) | .130** | .017 |
| Rubin     |   | .020 | (19.4%) | .058 | (31.5%) | .295** | .087 |
| Wiley     | + | .027 | (26.2%) | .032 | (17.4%) | .029** | .001 |
|           |   | .103 |         | .184 |         |        |      |

| Candidate | | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Perez     |   | .032 | (17.2%) | .021 | (20.4%) | .091** | .008 |
| Rodham    | + | .063 | (33.9%) | .035 | (34.0%) | .131** | .017 |
| Rubin     |   | .059 | (31.7%) | .020 | (19.4%) | .298** | .089 |
| Wiley     | + | .032 | (17.2%) | .027 | (26.2%) | .031** | .001 |
|           |   | .186 |         | .103 |         |        |      |

+ denotes candidates advancing to runoff election
** Statistically Significant at the .01 level

**STATE OF FLORIDA**

1994 Democratic Primary Election for U.S. Senate

Extreme Case Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | |
|-----------|---|---------|---|------------|---|
| Perez     |   | .021 | (20.6%) | .026 | (15.5%) |
| Rodham    | + | .035 | (34.3%) | .059 | (35.1%) |
| Rubin     |   | .020 | (19.6%) | .057 | (33.9%) |
| Wiley     | + | .026 | (25.5%) | .026 | (15.5%) |
|           |   | .102 |         | .168 |         |

| Candidate | | Black % | | Nonblack % | |
|-----------|---|---------|---|------------|---|
| Perez     |   | .026 | (15.5%) | .021 | (20.6%) |
| Rodham    | + | .059 | (35.1%) | .035 | (34.3%) |
| Rubin     | + | .057 | (33.9%) | .020 | (19.6%) |
| Wiley     |   | .026 | (15.5%) | .026 | (25.5%) |
|           |   | .168 |         | .102 |         |

+ denotes candidates advancing to runoff election winner

## STATE OF FLORIDA

1994 Democratic Primary Election for U.S. Senate

Unweighted Regression Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Perez  |   | .030 | (20.0%) | .030 | (18.0%) | .000 | .000 |
| Rodham | + | .045 | (30.0%) | .060 | (35.9%) | .009 | .000 |
| Rubin  |   | .031 | (20.7%) | .052 | (31.1%) | .001 | .000 |
| Wiley  | + | .044 | (29.3%) | .025 | (15.0%) | .007 | .000 |
|        |   | .150 |         | .167 |         |      |      |

| Candidate | | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Perez  |   | .030 | (17.6%) | .030 | (20.0%) | .000 | .000 |
| Rodham | + | .061 | (35.9%) | .045 | (30.0%) | .009** | .000 |
| Rubin  |   | .053 | (31.2%) | .031 | (20.7%) | .011 | .000 |
| Wiley  | + | .026 | (15.3%) | .044 | (29.3%) | .006 | .000 |
|        |   | .170 |         | .150 |         |      |      |

+ denotes candidates advancing to runoff election
** Statistically Significant at the .01 level

**343**

## STATE OF FLORIDA

### 1994 Democratic Primary Election for Governor

### Weighted Regression Analysis

### (as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | | Corr. Coef. | R² |
|---|---|---|---|---|---|---|---|
| Chiles | + | .075 | (68.2%) | .197 | (87.2%) | .231** | .053 |
| Gargan | | .035 | (31.8%) | .029 | (12.8%) | .024** | .001 |
| | | .110 | | .226 | | | |

| Candidate | | Black % | | Nonblack % | | Corr. Coef. | R² |
|---|---|---|---|---|---|---|---|
| Chiles | + | .200 | (87.0%) | .076 | (68.5%) | .233** | .055 |
| Gargan | | .030 | (13.0%) | .035 | (31.5%) | .021** | .000 |
| | | .230 | | .111 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**344**

**STATE OF FLORIDA**

1994 Democratic Primary Election for Governor

Extreme Case Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | |
|---|---|---|---|---|---|
| Chiles | + | .077 | (70.0%) | .192 | (90.6%) |
| Gargan | | .033 | (30.0%) | .020 | ( 9.4%) |
| | | .110 | | .212 | |

| Candidate | | Black % | | Nonblack % | |
|---|---|---|---|---|---|
| Chiles | + | .193 | (90.6%) | .077 | (70.0%) |
| Gargan | | .020 | ( 9.4%) | .033 | (30.0%) |
| | | .213 | | .110 | |

+ denotes winner

345

# STATE OF FLORIDA

## 1994 Democratic Primary Election for Governor

### Unweighted Regression Analysis

#### (as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|---|
| Chiles | + | .111 | (65.3%) | .182 | (90.5%) | .011 | .000 |
| Gargan | | .059 | (34.7%) | .019 | ( 9.5%) | .010 | .000 |
| | | .170 | | .201 | | | |

| Candidate | | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|---|
| Chiles | + | .111 | (84.7%) | .185 | (76.1%) | .012 | .000 |
| Gargan | | .020 | (15.3%) | .058 | (23.9%) | .010 | .000 |
| | | .131 | | .243 | | | |

+ denotes winner
** Statistically Significant at the .01 level

346

## STATE OF FLORIDA

### 1994 Democratic Primary Election for Treasurer

### Weighted Regression Analysis

### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|-----|-----------|-----|-------------|-------|
| Gievers | .041 | (38.3%) | .067 | (34.9%) | .139** | .019 |
| Nelson + | .058 | (54.2%) | .113 | (58.9%) | .117** | .014 |
| Westman | .008 | ( 7.5%) | .012 | ( 6.3%) | .084** | .007 |
|  | .107 | | .192 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|-----|-----------|-----|-------------|-------|
| Gievers | .068 | (35.1%) | .041 | (38.3%) | .141** | .020 |
| Nelson + | .114 | (58.8%) | .058 | (54.2%) | .119** | .014 |
| Westman | .012 | ( 6.2%) | .008 | ( 7.5%) | .087** | .008 |
|  | .194 | | .107 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**347**

**STATE OF FLORIDA**

1994 Democratic Primary Election for Treasurer

Extreme Case Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | |
|-----------|---|---------|---|------------|---|
| Gievers | | .041 | (38.7%) | .065 | (37.4%) |
| Nelson | + | .057 | (53.8%) | .098 | (56.3%) |
| Westman | | .008 | ( 7.5%) | .011 | ( 6.3%) |
| | | .106 | | .174 | |

| Candidate | | Black % | | Nonblack % | |
|-----------|---|---------|---|------------|---|
| Gievers | | .065 | (37.1%) | .041 | (38.7%) |
| Nelson | + | .099 | (56.6%) | .057 | (53.8%) |
| Westman | | .011 | ( 6.3%) | .008 | ( 7.5%) |
| | | .175 | | .106 | |

+ denotes winner

## STATE OF FLORIDA

1994 Democratic Primary Election for Treasurer

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | R² |
|-----------|---------|---|-----------|---|-------------|----|
| Gievers   | .051 | (30.7%) | .065 | (38.7%) | .010** | .000 |
| Nelson  + | .102 | (61.4%) | .092 | (54.8%) | .001 | .000 |
| Westman   | .013 | ( 7.8%) | .011 | ( 6.5%) | .003 | .000 |
|           | .166 | | .168 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | R² |
|-----------|---------|---|-----------|---|-------------|----|
| Gievers   | .065 | (38.0%) | .051 | (30.9%) | .011** | .000 |
| Nelson  + | .095 | (55.6%) | .101 | (61.2%) | .001 | .000 |
| Westman   | .011 | ( 6.4%) | .013 | ( 7.9%) | .003 | .000 |
|           | .171 | | .165 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**STATE OF FLORIDA**

1994 Democratic Primary Election for Commissioner of Education

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Griffin | .050 | (50.5%) | .080 | (40.6%) | .110** | .012 |
| Jamerson + | .049 | (49.5%) | .117 | (59.4%) | .178** | .032 |
| | .099 | | .197 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Griffin | .081 | (40.5%) | .051 | (51.0%) | .112** | .013 |
| Jamerson + | .119 | (59.5%) | .049 | (49.0%) | .180** | .032 |
| | .200 | | .100 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**350**

E - 13

**STATE OF FLORIDA**

1994 Democratic Primary Election for Commissioner of Education

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|---------|------------|---------|
| Griffin | .050 | (50.5%) | .072 | (39.8%) |
| Jamerson + | .049 | (49.5%) | .109 | (60.2%) |
| | .099 | | .181 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|---------|------------|---------|
| Griffin | .072 | (39.8%) | .050 | (50.5%) |
| Jamerson + | .109 | (60.2%) | .049 | (49.5%) |
| | .181 | | .099 | |

+ denotes winner

*351*

**STATE OF FLORIDA**

1994 Democratic Primary Election for Commissioner of Education

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|--|------------|--|-------------|-------|
| Griffin | .076 | (49.7%) | .070 | (40.0%) | .002 | .000 |
| Jamerson + | .077 | (50.3%) | .105 | (60.0%) | .005 | .000 |
| | .153 | | .175 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|--|------------|--|-------------|-------|
| Griffin | .071 | (39.9%) | .076 | (49.7%) | .001 | .000 |
| Jamerson + | .107 | (60.1%) | .077 | (50.3%) | .006 | .000 |
| | .178 | | .153 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**352**

**STATE OF FLORIDA**

1994 Democratic Primary Election for Comptroller

Weighted Regression Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Lewis | + | .068 | (64.2%) | .167 | (84.8%) | .195** | .038 |
| Simon | | .038 | (35.8%) | .030 | (15.2%) | .043** | .002 |
| | | .106 | | .197 | | | |

| Candidate | | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Lewis | + | .169 | (84.9%) | .068 | (64.2%) | .198** | .039 |
| Simon | | .030 | (15.1%) | .038 | (35.8%) | .032** | .002 |
| | | .199 | | .106 | | | |

+ denotes winner
** Statistically Significant at the .01 level

353

## STATE OF FLORIDA

1994 Democratic Primary Election for Comptroller

Extreme Case Analysis

(as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | |
|-----------|---|---------|---|------------|---|
| Lewis | + | .068 | (64.8%) | .150 | (84.3%) |
| Simon | | .037 | (35.2%) | .028 | (15.7%) |
| | | .105 | | .178 | |

| Candidate | | Black % | | Nonblack % | |
|-----------|---|---------|---|------------|---|
| Lewis | + | .151 | (84.4%) | .068 | (64.8%) |
| Simon | | .028 | (15.6%) | .037 | (35.2%) |
| | | .179 | | .105 | |

+ denotes winner

**354**

D – 17

## STATE OF FLORIDA

### 1994 Democratic Primary Election for Comptroller

### Unweighted Regression Analysis

### (as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Lewis | + | .112 | (68.7%) | .147 | (86.0%) | .005 | .000 |
| Simon | | .051 | (31.3%) | .024 | (14.0%) | .011 | .000 |
| | | .163 | | .171 | | | |

| Candidate | | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---|---------|---|------------|---|-------------|-------|
| Lewis | + | .150 | (85.7%) | .112 | (68.7%) | .005 | .000 |
| Simon | | .025 | (14.3%) | .051 | (31.3%) | .011** | .000 |
| | | .175 | | .163 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**355**

**STATE OF FLORIDA**

1994 Democratic Runoff Election for U.S. Senate

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Rodham  + | .030 | (57.7%) | .051 | (67.1%) | .086** | .007 |
| Wiley | .022 | (42.3%) | .025 | (32.9%) | .008** | .000 |
| | .052 | | .076 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Rodham  + | .051 | (67.1%) | .030 | (57.7%) | .087** | .008 |
| Wiley | .025 | (32.9%) | .022 | (42.3%) | .010** | .000 |
| | .076 | | .052 | | | |

● denotes winner
** Statistically Significant at the .01 level

**356**

# STATE OF FLORIDA

## 1994 Democratic Runoff Election for U.S. Senate

### Extreme Case Analysis

### (as % of Registration)

| Candidate | | Anglo % | | NonAnglo % | |
|---|---|---|---|---|---|
| Rodham | + | .029 | (58.0%) | .044 | (75.9%) |
| Wiley | | .021 | (42.0%) | .014 | (24.1%) |
| | | .050 | | .058 | |

| Candidate | | Black % | | Nonblack % | |
|---|---|---|---|---|---|
| Rodham | + | .044 | (75.9%) | .029 | (58.0%) |
| Wiley | | .014 | (24.1%) | .021 | (42.0%) |
| | | .058 | | .050 | |

+ denotes winner

357

**STATE OF FLORIDA**

1994 Democratic Runoff Election for U.S. Senate

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Rodham + | .046 | (46.7%) | .048 | (80.0%) | .001 | .000 |
| Wiley | .053 | (53.3%) | .012 | (20.0%) | .007 | .000 |
| | .099 | | .060 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| ●odham + | .049 | (79.0%) | .046 | (46.9%) | .001 | .000 |
| Wiley | .013 | (21.0%) | .052 | (53.1%) | .007 | .000 |
| | .062 | | .098 | | | |

● denotes winner
** Statistically Significant at the .01 level

D - 21      **358**

**STATE OF FLORIDA**

1998 Democratic Primary Election for Attorney General

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth + | .052 (85.2%) | .062 (72.9%) | .060** | .004 |
| Rubin | .009 (14.8%) | .023 (27.1%) | .288** | .053 |
| | .061 | .085 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth + | .101 (74.3%) | .048 (84.2%) | .241** | .058 |
| Rubin | .035 (25.7%) | .009 (15.8%) | .432** | .187 |
| | .136 | .057 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth + | -.005 (-500.0%) | .058 (81.7%) | .213** | .045 |
| Rubin | .004 ( 400.0%) | .013 (18.3%) | .103** | .011 |
| | -.001 | .071 | | |

● denotes winner
* Statistically Significant at the .01 level

**359**

# STATE OF FLORIDA

1998 Democratic Primary Election for Attorney General

Extreme Case Analysis

(as % of REG)

| Candidate | | Anglo % | NonAnglo % |
|---|---|---|---|
| Butterworth | + | .053 (82.8%) | .087 (71.3%) |
| Rubin | | .011 (17.2%) | .035 (28.7%) |
| | | .064 | .122 |

| Candidate | | Black % | Nonblack % |
|---|---|---|---|
| Butterworth | + | .098 (74.2%) | .048 (82.8%) |
| Rubin | | .034 (25.8%) | .010 (17.2%) |
| | | .132 | .058 |

| Candidate | | Hispanic % | Nonhisp. % |
|---|---|---|---|
| Butterworth | + | no cases | .056 (82.4%) |
| Rubin | | no cases | .012 (17.6%) |
| | | | .068 |

+ denotes winner

*360*

### State of FLORIDA

### 1998 Democratic Primary Election for Attorney General

### Unweighted REG Analysis

#### (as % of REG)

| Candidate | | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|
| Butterworth | + | .059 (84.3%) | .066 (74.2%) | .034** | .001 |
| Rubin | | .011 (15.7%) | .023 (25.8%) | .188** | .035 |
| | | .070 | .089 | | |

| Candidate | | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|
| Butterworth | + | .099 (75.6%) | .055 (83.3%) | .179** | .032 |
| Rubin | | .032 (24.4%) | .011 (16.7%) | .289** | .083 |
| | | .131 | .066 | | |

| Candidate | | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|
| Butterworth | + | -.012 (133.3%) | .065 (82.3%) | .196** | .039 |
| Rubin | | .003 (-33.3%) | .014 (17.7%) | .102** | .010 |
| | | -.009 | .079 | | |

+   denotes winner
*   Statistically Significant at the .05 level
**  Statistically Significant at the .01 level

## STATE OF FLORIDA

1998 Democratic Primary Election for Commissioner of Education

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| Arnold | .014 (24.6%) | .025 (31.6%) | .173** | .030 |
| Howard + | .023 (40.4%) | .029 (36.7%) | .077** | .006 |
| Wallace + | .020 (35.1%) | .025 (31.6%) | .070** | .005 |
| | .057 | .079 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| Arnold | .039 (30.9%) | .014 (25.9%) | .339** | .115 |
| Howard + | .048 (38.1%) | .021 (38.9%) | .258** | .067 |
| Wallace + | .039 (30.9%) | .019 (35.2%) | .213** | .045 |
| | .126 | .054 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|-----------|------------|------------|-------------|-------|
| Arnold | .001 (-33.3%) | .018 (27.2%) | .165** | .027 |
| Howard + | -.003 (100.0%) | .026 (39.4%) | .209** | .044 |
| Wallace + | .002 (-66.7%) | .022 (33.3%) | .159** | .025 |
| | .000 | .066 | | |

● denotes candidates advancing to the runoff election
** Statistically Significant at the .01 level

362

**STATE OF FLORIDA**

1998 Democratic Primary Election for Commissioner of Education

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Arnold | .015 (25.8%) | .035 (31.3%) |
| Howard    + | .023 (39.7%) | .041 (36.6%) |
| Wallace   + | .020 (34.5%) | .036 (32.1%) |
|  | .058 | .112 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Arnold | .038 (31.7%) | .014 (25.9%) |
| Howard    + | .044 (36.7%) | .021 (38.9%) |
| Wallace   + | .038 (31.7%) | .019 (35.2%) |
|  | .120 | .054 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Arnold | no cases | .017 (26.6%) |
| Howard    + | no cases | .025 (39.1%) |
| Wallace   + |  | .022 (34.4%) |
|  |  | .064 |

+ denotes candidates advancing to the runoff election

**363**

# STATE OF FLORIDA

## 1998 Democratic Primary Election for Commissioner of Education

### Unweighted REG Analysis

#### (as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| Arnold | .017 (25.8%) | .026 (31.3%) | .101** | .010 |
| Howard + | .027 (40.9%) | .030 (36.1%) | .037** | .001 |
| Wallace + | .022 (33.3%) | .027 (32.5%) | .056** | .003 |
| | .066 | .083 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| Arnold | .038 (31.1%) | .017 (27.4%) | .219** | .048 |
| Howard + | .046 (37.7%) | .025 (40.3%) | .174** | .030 |
| Wallace + | .038 (31.1%) | .020 (32.3%) | .167** | .028 |
| | .122 | .062 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|-----------|------------|------------|-------------|-------|
| Arnold | -.020 (76.9%) | .020 (27.0%) | .146** | .021 |
| Howard + | -.007 (26.9%) | .030 (40.5%) | .188** | .035 |
| Wallace + | .001 (-3.8%) | .024 (32.4%) | .143** | .020 |
| | -.026 | .074 | | |

● denotes candidates advancing to the runoff election
  Statistically Significant at the .05 level
** Statistically Significant at the .01 level

**364**

# STATE OF FLORIDA

## 1998 Democratic Runoff Election for Commissioner of Education

### Weighted REG Analysis

#### (as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Howard | .010 (41.7%) | .011 (52.4%) | .011** | .000 |
| Wallace  + | .014 (58.3%) | .010 (47.6%) | .070** | .005 |
|  | .024 | .021 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Howard | .020  (51.3%) | .009 (40.9%) | .127** | .016 |
| Wallace  + | .019  (48.7%) | .013 (39.1%) | .072** | .005 |
|  | .039 | .022 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Howard | -.006 (46.2%) | .011 (42.3%) | .143** | .021 |
| Wallace  + | -.007 (53.8%) | .015 (57.7%) | .199** | .040 |
|  | -.013 | .026 | | |

** Statistically Significant at the .01 level

365

**STATE OF FLORIDA**

1998 Democratic Runoff Election for Commissioner of Education

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Howard | .010 (41.7%) | .015 (50.0%) |
| Wallace  + | .014 (58.3%) | .015 (50.0%) |
| | .024 | .030 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Howard | .019 (50.0%) | .008 (40.0%) |
| Wallace  + | .019 (50.0%) | .012 (60.0%) |
| | .038 | .020 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Howard | no cases | .011 (42.3%) |
| Wallace  + | | .015 (57.7%) |
| | | .026 |

## STATE OF FLORIDA

1998 Democratic Runoff Election for Commissioner of Education

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| Howard | .014 (46.7%) | .012 (52.1%) | .016** | .000 |
| Wallace  + | .016 (53.3%) | .011 (47.9%) | .067** | .005 |
|  | .030 | .023 |  |  |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| Howard | .021 (52.5%) | .012 (44.4%) | .071** | .005 |
| Wallace  + | .019 (47.5%) | .015 (55.6%) | .052** | .003 |
|  | .040 | .027 |  |  |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|-----------|------------|------------|-------------|-------|
| Howard | -.012 (54.5%) | .015 (46.9%) | .128** | .016 |
| Wallace  + | -.010 (45.5%) | .017 (53.1%) | .188** | .035 |
|  | -.022 | .032 |  |  |

\* Statistically Significant at the .05 level
\*\* Statistically Significant at the .01 level

**367**

EXHIBIT E

# STATE OF FLORIDA

## 1992 General Election for President

### Weighted Regression Analysis

### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|------|-----------|---------|-------------|-------|
| Clinton (D) | .243 | (33.4%) | .591 | (92.6%) | .603** | .364 |
| Bush (R) + | .324 | (44.6%) | .031 | ( 4.9%) | .499** | .249 |
| Perot (I) | .160 | (22.0%) | .016 | ( 2.5%) | .502** | .252 |
| | .727 | | .638 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|------|-----------|---------|-------------|-------|
| Clinton (D) | .597 | (95.1%) | .247 | (34.0%) | .604** | .365 |
| Bush (R) + | .018 | ( 2.9%) | .322 | (44.3%) | .515** | .265 |
| Perot (I) | .013 | ( 2.1%) | .158 | (21.7%) | .505** | .255 |
| | .628 | | .727 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**369**

E - 1

**STATE OF FLORIDA**

1992 General Election for President

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|---|---|---|---|---|
| Clinton (D) | .253 | (34.9%) | .347 | (86.1%) |
| Bush (R) + | .316 | (43.6%) | .036 | ( 8.9%) |
| Perot (I) | .155 | (21.4%) | .020 | ( 5.0%) |
| | .724 | | .403 | |

| Candidate | Black % | | Nonblack % | |
|---|---|---|---|---|
| Clinton (D) | .597 | (91.7%) | .254 | (35.0%) |
| Bush (R) + | .034 | ( 5.2%) | .316 | (43.6%) |
| Perot (I) | .020 | ( 3.1%) | .155 | (21.4%) |
| | .651 | | .725 | |

+ denotes winner

**370**

E - 2

**STATE OF FLORIDA**

1992 General Election for President

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Clinton (D) | .252 | (33.5%) | .583 | (93.7%) | .606** | .367 |
| Bush (R) + | .333 | (44.3%) | .022 | ( 3.5%) | .573** | .328 |
| Perot (I) | .167 | (22.2%) | .017 | ( 2.7%) | .521** | .271 |
| | .752 | | .622 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Clinton (D) | .589 | (95.5%) | .255 | (34.0%) | .609** | .371 |
| Bush (R) + | .013 | ( 2.1%) | .330 | (44.0%) | .581** | .338 |
| Perot (I) | .015 | ( 2.4%) | .165 | (22.0%) | .519** | .270 |
| | .617 | | .750 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**371**

E - 3

**STATE OF FLORIDA**

1992 General Election for U.S. Senate

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Graham (D) + | .426 | (62.6%) | .580 | (98.5%) | .296** | .088 |
| Grant (R) | .255 | (37.4%) | .009 | ( 1.5%) | .521** | .272 |
| | .681 | | .589 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Graham (D) + | .576 | (99.8%) | .429 | (63.0%) | .283** | .080 |
| Grant (R) | .001 | ( 0.2%) | .252 | (37.0%) | .531** | .282 |
| | .576 | | .681 | | | |

+ denotes winner
** Statistically Significant at the .01 level

*372*

E - 4

**STATE OF FLORIDA**

1992 General Election for U.S. Senate

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|--|-----------|--|
| Graham (D) + | .428 | (63.3%) | .565 | (96.1%) |
| Grant (R) | .248 | (36.7%) | .023 | ( 3.9%) |
| | .676 | | .588 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|--|-----------|--|
| Graham (D) + | .562 | (96.2%) | .429 | (63.4%) |
| Grant (R) | .022 | ( 3.8%) | .248 | (36.6%) |
| | .584 | | .677 | |

+ denotes winner

**373**

**STATE OF FLORIDA**

1992 General Election for U.S. Senate

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Graham (D) + | .446 | (63.3%) | .566 | (99.0%) | .264** | .070 |
| Grant (R) | .259 | (36.7%) | .006 | ( 1.0%) | .571** | .326 |
| | .705 | | .572 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Graham (D) + | .565 | (99.8%) | .448 | (63.6%) | .258** | .067 |
| Grant (R) | .001 | ( 0.2%) | .256 | (36.7%) | .574** | .330 |
| | .566 | | .704 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**STATE OF FLORIDA**

1994 General Election for U.S. Senate

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Rodham (D) | .154 | (25.2%) | .370 | (89.2%) | .259** | .067 |
| Mack (R) + | .457 | (74.8%) | .045 | (10.8%) | .187** | .035 |
| | .611 | | .415 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Rodham (D) | .373 | (89.4%) | .155 | (25.5%) | .261** | .068 |
| Mack (R) + | .044 | (10.6%) | .454 | (74.5%) | .186** | .035 |
| | .417 | | .609 | | | |

+  denotes winner
** Statistically Significant at the .01 level

375

E - 7

**STATE OF FLORIDA**

1994 General Election for U.S. Senate

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|---------|------------|---------|
| Rodham (D) | .160 | (26.4%) | .369 | (82.7%) |
| Mack (R) + | .447 | (73.6%) | .077 | (17.3%) |
| | .607 | | .446 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|---------|------------|---------|
| Rodham (D) | .370 | (82.8%) | .159 | (26.3%) |
| Mack (R) + | .077 | (17.2%) | .445 | (73.7%) |
| | .447 | | .604 | |

+  denotes winner

**376**

E – 8

**STATE OF FLORIDA**

1994 General Election for U.S. Senate

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|--------|------------|-----------|-------------|-------|
| Rodham (D) | .192 | (25.1%) | .354 | (100.0%) | .019** | .000 |
| Mack (R) + | .573 | (74.9%) | .000 | ( 0.0%) | .021 | .000 |
| | .765 | | .354 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|--------|------------|-----------|-------------|-------|
| Rodham (D) | .358 | (98.6%) | .193 | (25.4%) | .019** | .000 |
| Mack (R) + | .005 | ( 1.4%) | .568 | (74.6%) | .021 | .000 |
| | .363 | | .761 | | | |

+  denotes winner
** Statistically Significant at the .01 level

377

E - 9

**STATE OF FLORIDA**

1994 General Election for Governor

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Chiles (D) + | .294 | (47.3%) | .457 | (100.2%) | .121** | .015 |
| Bush (R) | .328 | (52.7%) | -.001 | (-0.2%) | .192** | .037 |
| | .622 | | .456 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Chiles (D) + | .462 | (100.2%) | .295 | (47.5%) | .124** | .015 |
| Bush (R) | -.001 | (-0.2%) | .326 | (52.5%) | .191** | .036 |
| | .461 | | .621 | | | |

+ denotes winner
** Statistically Significant at the .01 level

*378*

**STATE OF FLORIDA**

1994 General Election for Governor

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|---|---|---|---|---|
| Chiles (D) + | .300 | (48.4%) | .476 | (95.8%) |
| Bush (R) | .320 | (51.6%) | .021 | ( 4.2%) |
| | .620 | | .497 | |

| Candidate | Black % | | Nonblack % | |
|---|---|---|---|---|
| Chiles (D) + | .478 | (95.8%) | .298 | (48.3%) |
| Bush (R) | .021 | ( 4.2%) | .319 | (51.7%) |
| | .499 | | .617 | |

+ denotes winner

**379**

E − 11

**STATE OF FLORIDA**

1994 General Election for Governor

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Chiles (D) + | .372 | (47.6%) | .418 | (106.1%) | .003 | .000 |
| Bush (R) | .410 | (52.4%) | -.024 | (-6.1%) | .023 | .001 |
| | .782 | | .394 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Chiles (D) + | .426 | (105.4%) | .372 | (47.8%) | .003 | .000 |
| Bush (R) | -.022 | (-5.4%) | .406 | (52.2%) | .023 | .001 |
| | .404 | | .778 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**380**

E - 12

### STATE OF FLORIDA

#### 1994 General Election for Secretary of State

#### Weighted Regression Analysis

#### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Saunders (D) | .258 | (43.9%) | .425 | (102.4%) | .129** | .017 |
| Mortham (R) + | .330 | (56.1%) | -.010 | (-2.4%) | .204** | .042 |
| | .588 | | .415 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Saunders (D) | .428 | (102.6%) | .259 | (44.1%) | .131** | .017 |
| Mortham (R) + | -.011 | (-2.6%) | .328 | (55.9%) | .203** | .041 |
| | .417 | | .587 | | | |

\+ denotes winner
** Statistically Significant at the .01 level

**381**

**STATE OF FLORIDA**

1994 General Election for Secretary of State

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|---|---|---|---|---|
| Saunders (D) | .261 | (44.7%) | .422 | (94.8%) |
| Mortham (R) + | .323 | (55.3%) | .023 | ( 5.2%) |
| | .584 | | .445 | |

| Candidate | Black % | | Nonblack % | |
|---|---|---|---|---|
| Saunders (D) | .423 | (94.8%) | .260 | (44.7%) |
| Mortham (R) + | .023 | ( 5.2%) | .322 | (55.3%) |
| | .446 | | .582 | |

+ denotes winner

**382**

E - 14

**STATE OF FLORIDA**

1994 General Election for Secretary of State

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Saunders (D) | .351 | (47.5%) | .375 | (105.6%) | .001 | .000 |
| Mortham (R)  + | .388 | (52.5%) | -.020 | (-5.6%) | .029 | .001 |
| | .739 | | .355 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Saunders (D) | .382 | (105.2%) | .350 | (47.7%) | .002 | .000 |
| Mortham (R)  + | -.019 | (-5.2%) | .384 | (52.3%) | .028 | .001 |
| | .363 | | .734 | | | |

+  denotes winner
**  Statistically Significant at the .01 level

383

## STATE OF FLORIDA

### 1994 General Election for Attorney General

### Weighted Regression Analysis

### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Butterworth (D)+ | .325 | (54.5%) | .439 | (96.9%) | .075** | .006 |
| Ferro (R) | .271 | (45.5%) | .014 | ( 3.1%) | .198** | .039 |
| | .596 | | .453 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Butterworth (D)+ | .443 | (103.5%) | .326 | (54.8%) | .077** | .006 |
| Ferro (R) | -.015 | (-3.5%) | .269 | (45.2%) | .197** | .039 |
| | .428 | | .595 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**384**

E - 16

**STATE OF FLORIDA**

1994 General Election for Attorney General

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|---|-----------|---|
| Butterworth (D) + | .328 | (55.2%) | .445 | (96.7%) |
| Ferro (R) | .266 | (44.8%) | .015 | ( 3.3%) |
| | .594 | | .460 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|---|-----------|---|
| Butterworth (D) + | .446 | (96.7%) | .327 | (55.2%) |
| Ferro (R) | .015 | ( 3.3%) | .265 | (44.8%) |
| | .461 | | .592 | |

+ denotes winner

385

## STATE OF FLORIDA

### 1994 General Election for Attorney General

### Unweighted Regression Analysis

### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | R² |
|---|---|---|---|---|---|---|
| Butterworth (D) + | .428 | (57.1%) | .386 | (94.4%) | .002 | .000 |
| Ferro (R) | .321 | (42.9%) | .023 | ( 5.6%) | .028 | .001 |
| | .749 | | .409 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | R² |
|---|---|---|---|---|---|---|
| Butterworth (D) + | .394 | (105.9%) | .426 | (57.3%) | .001 | .000 |
| Ferro (R) | -.022 | (-5.9%) | .318 | (42.7%) | .028 | .001 |
| | .372 | | .744 | | | |

+ denotes winner
** Statistically Significant at the .01 level

386

**STATE OF FLORIDA**

1994 General Election for Comptroller

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Lewis (D) | .266 | (45.1%) | .440 | (105.0%) | .129** | .017 |
| Milligan (R) + | .324 | (54.9%) | -.021 | (- 5.0%) | .214** | .046 |
| | .590 | | .419 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Lewis (D) | .444 | (105.2%) | .267 | (45.3%) | .131** | .017 |
| Milligan (R) + | -.022 | (-5.2%) | .322 | (54.7%) | .212** | .045 |
| | .422 | | .589 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**387**

**STATE OF FLORIDA**

1994 General Election for Comptroller

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|---|---|---|---|---|
| Lewis (D) | .269 | (45.8%) | .432 | (95.8%) |
| Milligan (R) + | .318 | (54.2%) | .019 | ( 4.2%) |
| | .587 | | .451 | |

| Candidate | Black % | | Nonblack % | |
|---|---|---|---|---|
| Lewis (D) | .433 | (96.0%) | .268 | (45.9%) |
| Milligan (R) + | .018 | ( 4.0%) | .316 | (54.1%) |
| | .451 | | .584 | |

+ denotes winner

**388**

E − 20

**STATE OF FLORIDA**

1994 General Election for Comptroller

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Lewis (D) | .365 | (49.1%) | .388 | (109.0%) | .001 | .000 |
| Milligan (R) + | .378 | (50.9%) | -.032 | (-9.0%) | .029 | .001 |
| | .743 | | .356 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Lewis (D) | .396 | (108.2%) | .365 | (49.3%) | .001 | .000 |
| Milligan (R) + | -.030 | (-8.2%) | .375 | (50.7%) | .029 | .001 |
| | .366 | | .740 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**389**

## STATE OF FLORIDA

### 1994 General Election for Treasurer

### Weighted Regression Analysis

### (as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Nelson (D) + | .288 | (48.3%) | .432 | (103.6%) | .093** | .009 |
| Ireland (R) | .308 | (51.7%) | -.015 | (-3.6%) | .226** | .051 |
| | .596 | | .417 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Nelson (D) + | .436 | (103.8%) | .288 | (48.6%) | .085** | .009 |
| Ireland (R) | -.016 | (-3.8%) | .305 | (51.4%) | .225** | .050 |
| | .420 | | .593 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**390**

E - 22

**STATE OF FLORIDA**

1994 General Election for Treasurer

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|---|------------|---|
| Nelson (D)  + | .291 | (49.2%) | .434 | (96.4%) |
| Ireland (R) | .301 | (50.8%) | .016 | ( 3.6%) |
| | .592 | | .450 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|---|------------|---|
| Nelson (D)  + | .435 | (96.5%) | .290 | (49.2%) |
| Ireland (R) | .016 | ( 3.5%) | .300 | (50.8%) |
| | .451 | | .590 | |

+ denotes winner

**391**

E - 23

**STATE OF FLORIDA**

1994 General Election for Treasurer

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Nelson (D)  + | .395 | (52.6%) | .377 | (106.5%) | .001 | .000 |
| Ireland (R) | .356 | (47.4%) | -.023 | (-6.5%) | .032 | .001 |
| | .751 | | .354 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|---|
| Nelson (D) + | .386 | (106.0%) | .393 | (52.7%) | .000 | .000 |
| Ireland (R) | -.022 | (-6.0%) | .353 | (47.3%) | .032 | .001 |
| | .364 | | .746 | | | |

+  denotes winner
** Statistically Significant at the .01 level

**STATE OF FLORIDA**

1994 General Election for Commissioner of Education

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|---|-----------|---|------|-----|
| Jamerson (D) | .251 | (42.5%) | .454 | (103.7%) | .174** | .030 |
| Brogan (R) + | .339 | (57.5%) | -.016 | (-3.7%) | .203** | .041 |
| | .590 | | .438 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|---|-----------|---|------|-----|
| Jamerson (D) | .458 | (103.9%) | .252 | (42.9%) | .176** | .031 |
| Brogan (R) + | -.017 | (-3.9%) | .336 | (57.1%) | .202** | .041 |
| | .441 | | .588 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**393**

E - 25

**STATE OF FLORIDA**

1994 General Election for Commissioner of Education

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|--------|------------|--------|
| Jamerson (D) | .255 | (43.5%) | .459 | (96.8%) |
| Brogan (R) + | .331 | (56.5%) | .015 | ( 3.2%) |
|  | .586 | | .474 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|--------|------------|--------|
| Jamerson (D) | .460 | (96.8%) | .255 | (43.7%) |
| Brogan (R) + | .015 | ( 3.2%) | .329 | (56.3%) |
|  | .475 | | .584 | |

+ denotes winner

**394**

**STATE OF FLORIDA**

1994 General Election for Commissioner of Education

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|------|-----------|-----------|-------------|-------|
| Jamerson (D) | .323 | (43.9%) | .415 | (109.8%) | .006* | .000 |
| Brogan (R) + | .412 | (56.1%) | -.037 | (-9.8%) | .026 | .001 |
| | .735 | | .378 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|-------|-----------|-----------|-------------|-------|
| Jamerson (D) | .422 | (108.8%) | .323 | (44.2%) | .006* | .000 |
| Brogan (R) + | -.034 | (-8.8%) | .408 | (55.8%) | .025 | .001 |
| | .388 | | .731 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**395**

**STATE OF FLORIDA**

1994 General Election for Commissioner of Agriculture

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|--------|------------|----------|-------------|-------|
| Crawford (D) + | .285 | (47.8%) | .414 | (99.0%) | .098** | .010 |
| Smith (R) | .311 | (52.2%) | .004 | ( 1.0%) | .188** | .035 |
| | .596 | | .418 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|--------|------------|----------|-------------|-------|
| Crawford (D) + | .418 | (99.3%) | .286 | (48.1%) | .100** | .010 |
| Smith (R) | .003 | ( 0.7%) | .309 | (51.9%) | .187** | .035 |
| | .421 | | .595 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**396**

E - 28

**STATE OF FLORIDA**

1994 General Election for Commissioner of Agriculture

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | |
|-----------|---------|--------|------------|--------|
| Crawford (D) + | .288 | (48.6%) | .420 | (92.9%) |
| Smith (R) | .304 | (51.4%) | .032 | ( 7.1%) |
| | .592 | | .452 | |

| Candidate | Black % | | Nonblack % | |
|-----------|---------|--------|------------|--------|
| Crawford (D) + | .421 | (92.9%) | .287 | (48.6%) |
| Smith (R) | .032 | ( 7.1%) | .303 | (51.4%) |
| | .453 | | .590 | |

+ denotes winner

**397**

**STATE OF FLORIDA**

1994 General Election for Commissioner of Agriculture

Unweighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | | NonAnglo % | | Corr. Coef. | $R^2$ |
|-----------|---------|---|-----------|---|-------------|-------|
| Crawford (D) + | .378 | (50.3%) | .365 | (103.1%) | .001 | .000 |
| Smith (R) | .374 | (49.7%) | -.011 | (-3.1%) | .026 | .001 |
| | .752 | | .354 | | | |

| Candidate | Black % | | Nonblack % | | Corr. Coef. | $R^2$ |
|-----------|---------|---|-----------|---|-------------|-------|
| Crawford (D) + | .373 | (102.5%) | .377 | (50.5%) | .000 | .000 |
| Smith (R) | -.009 | (-2.5%) | .370 | (49.5%) | .025 | .001 |
| | .364 | | .747 | | | |

+ denotes winner
** Statistically Significant at the .01 level

**STATE OF FLORIDA**

1996 General Election for President

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Clinton (D) + | .261 (42.5%) | .422 (80.2%) | .064** | .004 |
| Dole (R) | .284 (46.3%) | .098 (18.6%) | .048** | .002 |
| Perot (I) | .069 (11.2%) | .006 ( 1.1%) | .139** | .019 |
| | .614 | .526 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Clinton (D) + | .503 (105.2%) | .266 (43.6%) | .078** | .006 |
| Dole (R) | -.027 (-5.6%) | .281 (46.1%) | .067** | .004 |
| Perot (I) | .002 ( 0.4%) | .063 (10.3%) | .113** | .013 |
| | .478 | .610 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Clinton (D) + | .156 (24.3%) | .461 (79.5%) | .726** | .527 |
| Dole (R) | .467 (72.7%) | .081 (14.0%) | .812** | .660 |
| Perot (I) | .019 ( 3.0%) | .038 ( 6.6%) | .237** | .056 |
| | .642 | .580 | | |

(Hispanic data for Dade and Monroe Counties only)
** Statistically Significant at the .01 level

**399**

E - 31

**STATE OF FLORIDA**

1996 General Election for President

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Clinton (D) + | .271 (44.0%) | .506 (95.3%) |
| Dole (R) | .279 (45.3%) | .019 ( 3.6%) |
| Perot (I) | .066 (10.7%) | .006 ( 1.1%) |
| | .616 | .531 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Clinton (D) + | .514 (97.0%) | .273 (44.8%) |
| Dole (R) | .010 ( 1.9%) | .274 (45.0%) |
| Perot (I) | .006 ( 1.1%) | .062 (10.2%) |
| | .530 | .609 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Clinton (D) + | no cases | .460 (79.6%) |
| Dole (R) | no cases | .085 (14.7%) |
| Perot (I) | no cases | .033 ( 5.7%) |
| | | .578 |

(Hispanic data for Dade and Monroe Counties only)

**400**

E - 32

**STATE OF FLORIDA**

1996 General Election for President

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Clinton (D) + | .599 (39.8%) | .286 ( 325.0%) | .006 | .000 |
| Dole (R) | .764 (50.8%) | -.169 (-192.0%) | .012 | .000 |
| Perot (I) | .141 ( 9.4%) | -.029 (-32.9%) | .017 | .000 |
| | 1.504 | .088 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Clinton (D) + | .256 ( 196.9%) | .576 (40.8%) | .005 | .000 |
| Dole (R) | -.340 (-261.5%) | .707 (50.1%) | .012 | .000 |
| Perot (I) | -.046 (-35.4%) | .128 ( 9.1%) | .015 | .000 |
| | -.130 | 1.411 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Clinton (D) + | .157 (24.5%) | .446 (77.3%) | .635** | .403 |
| Dole (R) | .464 (72.5%) | .092 (15.9%) | .744** | .554 |
| Perot (I) | .019 ( 3.0%) | .039 ( 6.8%) | .220** | .048 |
| | .640 | .577 | | |

(Hispanic data for Dade and Monroe Counties only)
* Statistically Significant at the .05 level
** Statistically Significant at the .01 level

**401**

**STATE OF FLORIDA**

1998 General Election for U.S. Senate

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Graham (D) + | .267 (57.5%) | .317 (97.2%) | .174** | .030 |
| Crist (R) | .197 (42.5%) | .009 ( 2.8%) | .631** | .398 |
| | .464 | .326 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Graham (D) + | .355 (108.6%) | .266 (59.5%) | .261** | .068 |
| Crist (R) | -.028 (-8.6%) | .181 (40.5%) | .589** | .347 |
| | .327 | .447 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Graham (D) + | .272 (85.0%) | .276 (62.2%) | .008** | .000 |
| Crist (R) | .048 (15.0%) | .168 (37.8%) | .245** | .060 |
| | .320 | .444 | | |

** Statistically Significant at the .01 level

**402**

**STATE OF FLORIDA**

1998 General Election for U.S. Senate

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Graham (D) + | .276 (58.5%) | .360 (96.0%) |
| Crist (R) | .196 (41.5%) | .015 ( 4.0%) |
| | .472 | .375 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Graham (D) + | .380 (97.7%) | .270 (60.3%) |
| Crist (R) | .009 ( 2.3%) | .178 (39.7%) |
| | .389 | .448 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Graham (D) + | no cases | .274 (62.0%) |
| Crist (R) | no cases | .168 (38.0%) |
| | | .442 |

**403**

E − 35

**STATE OF FLORIDA**

1998 General Election for U.S. Senate

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Graham (D) + | .270 (58.4%) | .319 (99.1%) | .155** | .024 |
| Crist (R) | .192 (41.6%) | .003 ( 0.9%) | .605** | .366 |
|  | .462 | .322 |  |  |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Graham (D) + | .349 (107.1%) | .268 (60.4%) | .246** | .060 |
| Crist (R) | -.023 ( -7.1%) | .176 (39.6%) | .599** | .359 |
|  | -.326 | .444 |  |  |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Graham (D) + | .268 (87.6%) | .279 (63.3%) | .021** | .000 |
| Crist (R) | .038 (12.4%) | .162 (36.7%) | .228** | .052 |
|  | .306 | .441 |  |  |

\*  Statistically Significant at the .05 level
\*\* Statistically Significant at the .01 level

**404**

E - 36

**STATE OF FLORIDA**

1998 General Election for Governor

Weighted Regression Analysis

(as % of Registration)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| MacKay (D) | .190 (40.7%) | .252 (71.0%) | .188** | .035 |
| Bush (R) + | .277 (59.3%) | .103 (29.0%) | .457** | .209 |
|  | .467 | .355 |  |  |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| MacKay (D) | .354 (99.4%) | .183 (40.2%) | .439** | .193 |
| Bush (R) + | .002 ( 0.6%) | .272 (59.8%) | .641** | .411 |
|  | .356 | .455 |  |  |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| MacKay (D) | .008 ( 2.5%) | .210 (47.0%) | .237** | .056 |
| Bush (R) + | .315 (97.5%) | .237 (53.0%) | .126** | .016 |
|  | .323 | .447 |  |  |

* Statistically Significant at the .01 level

**405**

## STATE OF FLORIDA

1998 General Election for Governor

Extreme Case Analysis

(as % of Registration)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| MacKay (D) | .200 (41.9%) | .347 (88.5%) |
| Bush (R) + | .277 (58.1%) | .045 (11.5%) |
| | .477 | .392 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| MacKay (D) | .380 (94.3%) | .189 (41.4%) |
| Bush (R) + | .023 ( 5.7%) | .267 (58.6%) |
| | .403 | .456 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| MacKay (D) | no cases | .205 (45.8%) |
| Bush (R) + | no cases | .243 (54.2%) |
| | | .448 |

**406**

E - 38

## STATE OF FLORIDA

### 1998 General Election for Governor

### Unweighted Regression Analysis

### (as % of Registration)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| MacKay (D) | .189 (40.6%) | .268 (97.1%) | .230** | .053 |
| Bush (R) + | .276 (59.4%) | .008 ( 2.9%) | .480** | .230 |
|  | .465 | .276 |  |  |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|-----------|---------|------------|-------------|-------|
| MacKay (D) | .345 (99.7%) | .184 (40.7%) | .441** | .194 |
| Bush (R) + | .001 ( 0.3%) | .268 (59.3%) | .646** | .418 |
|  | .346 | .452 |  |  |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|-----------|------------|------------|-------------|-------|
| MacKay (D) | .009 ( 2.9%) | .212 (48.0%) | .209** | .044 |
| Bush (R) + | .298 (97.1%) | .230 (52.0%) | .097** | .009 |
|  | .307 | .442 |  |  |

\* Statistically Significant at the .05 level
\** Statistically Significant at the .01 level

**407**

**STATE OF FLORIDA**

1998 General Election for Secretary of State

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Gievers (D) | .191 (41.6%) | .252 (79.5%) | .198** | .039 |
| Harris (R) + | .268 (58.4%) | .065 (20.5%) | .557** | .311 |
| | .459 | .317 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Gievers (D) | .341 (106.2%) | .185 (42.0%) | .433** | .187 |
| Harris (R) + | -.020 (-6.2%) | .256 (58.0%) | .633** | .401 |
| | .321 | .441 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Gievers (D) | .105 (34.7%) | .209 (47.6%) | .210** | .044 |
| Harris (R) + | .198 (65.3%) | .230 (52.4%) | .054** | .003 |
| | .303 | .439 | | |

+ denotes winner
** Statistically Significant at the .01 level

**408**

E - 40

**STATE OF FLORIDA**

1998 General Election for Secretary of State

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Gievers (D) | .200 (42.8%) | .331 (89.7%) |
| Harris (R)  + | .267 (57.2%) | .038 (10.3%) |
| | .467 | .369 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| ●ievers (D) | .361 (93.8%) | .190 (43.1%) |
| Harris (R)  + | .024 ( 6.2%) | .251 (56.9%) |
| | .385 | .441 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Gievers (D) | no cases | .204 (46.7%) |
| Harris (R)  + | no cases | .233 (53.3%) |
| | | .437 |

● denotes winner

**409**

**STATE OF FLORIDA**

1998 General Election for Secretary of State

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | R² |
|---|---|---|---|---|
| Gievers (D) | .189 (41.4%) | .265 (84.1%) | .237** | .056 |
| Harris (R)  + | .267 (58.6%) | .050 (15.9%) | .546** | .298 |
|  | .456 | .315 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | R² |
|---|---|---|---|---|
| Gievers (D) | .332 (104.1%) | .186 (42.5%) | .432** | .186 |
| Harris (R)  + | -.013 ( -4.1%) | .252 (57.5%) | .631** | .399 |
|  | -.319 | .438 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | R² |
|---|---|---|---|---|
| Gievers (D) | .112 (38.4%) | .210 (48.4%) | .181** | .033 |
| Harris (R)  + | .180 (61.6%) | .224 (51.6%) | .066** | .004 |
|  | .292 | .434 | | |

+ denotes winner
*  Statistically Significant at the .05 level
** Statistically Significant at the .01 level

**410**

**STATE OF FLORIDA**

1998 General Election for Attorney General

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth (D) | + .262 (56.7%) | .265 (84.1%) | .011** | .000 |
| Bludworth (R) | .200 (43.3%) | .050 (15.9%) | .506** | .256 |
| | .462 | .315 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth (D) | + .351 (107.7%) | .250 (56.4%) | .274** | .075 |
| Bludworth (R) | -.025 (-7.7%) | .193 (43.6%) | .613** | .376 |
| | .326 | .443 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth (D) | + .117 (40.8%) | .272 (61.4%) | .307** | .094 |
| Bludworth (R) | .170 (59.2%) | .171 (38.6%) | .000** | .000 |
| | .287 | .443 | | |

+ denotes winner
** Statistically Significant at the .01 level

**411**

**STATE OF FLORIDA**

1998 General Election for Attorney General

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Butterworth (D) + | .269 (57.4%) | .349 (93.8%) |
| Bludworth (R) | .200 (42.6%) | .023 ( 6.2%) |
| | .469 | .372 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Butterworth (D) + | .378 (96.9%) | .255 (57.4%) |
| Bludworth (R) | .012 ( 3.1%) | .189 (42.6%) |
| | .390 | .444 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Butterworth (D) + | no cases | .266 (60.5%) |
| Bludworth (R) | no cases | .174 (39.5%) |
| | | .440 |

+   denotes winner

**412**

E - 44

**STATE OF FLORIDA**

1998 General Election for Attorney General

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth (D) + | .261 (56.9%) | .278 (88.5%) | .050** | .002 |
| Bludworth (R) | .198 (43.1%) | .036 (11.5%) | .510** | .260 |
| | .459 | .314 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth (D) + | .344 (106.5%) | .252 (57.2%) | .266** | .071 |
| Bludworth (R) | -.021 ( -6.5%) | .188 (42.8%) | .621** | .386 |
| | -.323 | .440 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Butterworth (D) + | .119 (43.1%) | .273 (62.3%) | .278** | .077 |
| Bludworth (R) | .157 (56.9%) | .165 (37.7%) | .014** | .000 |
| | .276 | .438 | | |

\* Statistically Significant at the .05 level
\*\* Statistically Significant at the .01 level

**413**

E - 45

**STATE OF FLORIDA**

1998 General Election for Comptroller

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Daughtrey (D) | .151 (33.3%) | .246 (80.7%) | .311** | .097 |
| Milligan (R) + | .302 (66.7%) | .059 (19.3%) | .617** | .381 |
| | .453 | .305 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Daughtrey (D) | .341 (108.6%) | .148 (34.1%) | .543** | .295 |
| Milligan (R) + | -.027 (-8.6%) | .286 (65.9%) | .662** | .439 |
| | .314 | .434 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Daughtrey (D) | .091 (32.7%) | .174 (40.2%) | .170** | .029 |
| Milligan (R) + | .187 (67.3%) | .259 (59.8%) | .111** | .012 |
| | .278 | .433 | | |

+ denotes winner
** Statistically Significant at the .01 level

**414**

E - 46

**STATE OF FLORIDA**

1998 General Election for Comptroller

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Daughtrey (D) | .160 (34.8%) | .325 (90.8%) |
| Milligan (R)  + | .300 (65.2%) | .033 ( 9.2%) |
| | .460 | .358 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Daughtrey (D) | .356 (94.4%) | .154 (35.5%) |
| Milligan (R)  + | .021 ( 5.6%) | .280 (64.5%) |
| | .377 | .434 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Daughtrey (D) | no cases | .170 (39.4%) |
| Milligan (R)  + | no cases | .261 (60.6%) |
| | | .431 |

+ denotes winner

**415**

E - 47

**STATE OF FLORIDA**

1998 General Election for Comptroller

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Daughtrey (D) | .150 (33.3%) | .257 (84.8%) | .341** | .116 |
| Milligan (R) + | .300 (66.7%) | .046 (15.2%) | .594** | .353 |
| | .450 | .303 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Daughtrey (D) | .330 (105.8%) | .149 (34.7%) | .538** | .290 |
| Milligan (R) + | -.018 ( -5.8%) | .281 (65.3%) | .658** | .432 |
| | -.312 | .430 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Daughtrey (D) | .094 (35.2%) | .177 (41.3%) | .154** | .024 |
| Milligan (R) + | .173 (64.8%) | .252 (58.7%) | .108** | .012 |
| | .267 | .429 | | |

+ denotes winner
* Statistically Significant at the .05 level
** Statistically Significant at the .01 level

**416**

**STATE OF FLORIDA**

1998 General Election for Treasurer

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Nelson (D) + | .245 (52.8%) | .268 (84.3%) | .073** | .005 |
| Ireland (R) | .219 (47.2%) | .050 (15.7%) | .540** | .291 |
| | .464 | .318 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Nelson (D) + | .355 (108.9%) | .235 (52.8%) | .324** | .105 |
| Ireland (R) | -.029 (-8.9%) | .210 (47.2%) | .640** | .410 |
| | .326 | .445 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Nelson (D) + | .121 (40.5%) | .258 (58.1%) | .269** | .072 |
| Ireland (R) | .178 (59.5%) | .186 (41.9%) | .017** | .000 |
| | .299 | .444 | | |

\* Statistically Significant at the .01 level

**417**

**STATE OF FLORIDA**

1998 General Election for Treasurer

Extreme Case Analysis

(as % of REG)

| Candidate | | Anglo % | NonAnglo % |
|---|---|---|---|
| Nelson (D) | + | .253 (53.5%) | .350 (93.8%) |
| Ireland (R) | | .220 (46.5%) | .023 ( 6.2%) |
| | | .473 | .373 |

| Candidate | | Black % | Nonblack % |
|---|---|---|---|
| Nelson (D) | + | .380 (97.2%) | .240 (53.8%) |
| Ireland (R) | | .011 ( 2.8%) | .206 (46.2%) |
| | | .391 | .446 |

| Candidate | | Hispanic % | Nonhisp. % |
|---|---|---|---|
| Nelson (D) | + | no cases | .253 (57.1%) |
| Ireland (R) | | no cases | .190 (42.9%) |
| | | | .443 |

**418**

## STATE OF FLORIDA

### 1998 General Election for Treasurer

### Unweighted REG Analysis

#### (as % of REG)

| Candidate | | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|
| Nelson (D) | + | .246 (53.2%) | .280 (88.6%) | .105** | .011 |
| Ireland (R) | | .216 (46.8%) | .036 (11.4%) | .523** | .273 |
| | | .462 | .316 | | |

| Candidate | | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|
| Nelson (D) | + | .347 (107.4%) | .239 (53.8%) | .314** | .099 |
| Ireland (R) | | -.024 ( -7.4%) | .205 (46.2%) | .645** | .416 |
| | | -.323 | .444 | | |

| Candidate | | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|---|
| Nelson (D) | + | .124 (43.2%) | .260 (59.2%) | .245** | .060 |
| Ireland (R) | | .163 (56.8%) | .179 (40.8%) | .030** | .001 |
| | | .287 | .439 | | |

\* Statistically Significant at the .05 level
\*\* Statistically Significant at the .01 level

**419**

**STATE OF FLORIDA**

1998 General Election for Commissioner of Education

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Wallace (D) | .181 (39.2%) | .236 (73.5%) | .177** | .031 |
| Gallagher (R) + | .280 (60.8%) | .085 (26.5%) | .547** | .299 |
| | .461 | .321 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Wallace (D) | .335 (104.1%) | .173 (39.0%) | .450** | .203 |
| Gallagher (R) + | -.014 (-4.4%) | .271 (61.0%) | .665** | .442 |
| | .321 | .444 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Wallace (D) | .068 (21.7%) | .199 (82.2%) | .265** | .070 |
| Gallagher (R) + | .246 (78.3%) | .242 (17.8%) | .006** | .000 |
| | .314 | .441 | | |

+ denotes winner
* Statistically Significant at the .01 level

**420**

E - 52

**STATE OF FLORIDA**

1998 General Election for Commissioner of Education

Extreme Case Analysis

(as % of REG)

| Candidate | | Anglo % | NonAnglo % |
|---|---|---|---|
| Wallace (D) | | .191 (40.7%) | .324 (87.8%) |
| Gallagher (R) | + | .278 (59.3%) | .045 (12.2%) |
| | | .469 | .369 |

| Candidate | | Black % | Nonblack % |
|---|---|---|---|
| Wallace (D) | | .353 (91.2%) | .178 (40.1%) |
| Gallagher (R) | + | .032 ( 8.8%) | .266 (59.9%) |
| | | .387 | .444 |

| Candidate | | Hispanic % | Nonhisp. % |
|---|---|---|---|
| Wallace (D) | | no cases | .195 (44.3%) |
| Gallagher (R) | + | no cases | .245 (55.7%) |
| | | | .440 |

● denotes winner

**421**

E = 53

**State of Florida**

1998 General Election for Commissioner of Education

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Wallace (D) | .180 (39.2%) | .250 (78.9%) | .220** | .048 |
| Gallagher (R)  + | .279 (60.8%) | .067 (21.1%) | .541** | .292 |
|  | .459 | .317 |  |  |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Wallace (D) | .327 (102.8%) | .174 (39.5%) | .435** | .205 |
| Gallagher (R)  + | -.009 ( -2.8%) | .267 (60.5%) | .669** | .448 |
|  | -.318 | .441 |  |  |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Wallace (D) | .069 (22.8%) | .202 (46.2%) | .245** | .060 |
| Gallagher (R) + | .233 (77.2%) | .235 (53.8%) | .003** | .000 |
|  | .302 | .437 |  |  |

+ denotes winner
*  Statistically Significant at the .05 level
** Statistically Significant at the .01 level

**422**

## STATE OF FLORIDA

1998 General Election for Commissioner of Agriculture

Weighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Crawford (D) + | .272 (59.5%) | .257 (83.7%) | .050** | .003 |
| Faircloth (R) | .185 (40.5%) | .050 (16.3%) | .491** | .241 |
| | .457 | .307 | | |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Crawford (D) + | .339 (106.9%) | .258 (59.0%) | .230** | .053 |
| Faircloth (R) | -.022 (-6.9%) | .179 (41.0%) | .615** | .378 |
| | .317 | .437 | | |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Crawford (D) + | .110 (40.9%) | .279 (63.8%) | .350** | .123 |
| Faircloth (R) | .169 (59.1%) | .158 (36.2%) | .027** | .001 |
| | .279 | .437 | | |

** Statistically Significant at the .01 level

**423**

E - 55

**STATE OF FLORIDA**

1998 General Election for Commissioner of Agriculture

Extreme Case Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % |
|---|---|---|
| Crawford (D) + | .278 (60.0%) | .338 (93.9%) |
| Faircloth (R) | .185 (40.0%) | .022 ( 6.1%) |
| | .463 | .360 |

| Candidate | Black % | Nonblack % |
|---|---|---|
| Crawford (D) + | .367 (96.6%) | .262 (60.0%) |
| Faircloth (R) | .013 ( 3.4%) | .175 (40.0%) |
| | .380 | .437 |

| Candidate | Hispanic % | Nonhisp. % |
|---|---|---|
| Crawford (D) + | no cases | .273 (62.9%) |
| Faircloth (R) | no cases | .161 (37.1%) |
| | | .434 |

**424**

**STATE OF FLORIDA**

1998 General Election for Commissioner of Agriculture

Unweighted REG Analysis

(as % of REG)

| Candidate | Anglo % | NonAnglo % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Crawford (D) + | .273 (60.3%) | .269 (88.2%) | .014** | .000 |
| Faircloth (R) | .180 (39.7%) | .036 (11.8%) | .496** | .246 |
|  | .453 | .305 |  |  |

| Candidate | Black % | Nonblack % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Crawford (D) + | .332 (106.1%) | .262 (60.2%) | .215** | .046 |
| Faircloth (R) | -.019 ( -6.1%) | .173 (39.8%) | .622** | .386 |
|  | -.313 | .435 |  |  |

| Candidate | Hispanic % | Nonhisp. % | Corr. Coef. | $R^2$ |
|---|---|---|---|---|
| Crawford (D) + | .111 (41.3%) | .281 (65.0%) | .323** | .105 |
| Faircloth (R) | .158 (58.7%) | .151 (35.0%) | .015** | .000 |
|  | .269 | .432 |  |  |

\* Statistically Significant at the .05 level
\*\* Statistically Significant at the .01 level

**425**

E – 57

Expert Report

By

Professor Jerrell H. Shofner, Ph. D.

Case:     Johnson v. Bush

No. 00–CV–3542

U. S. District Court

Southern District of Florida

Judge James Lawrence King

1. Introduction and Professional Qualifications

I have been retained as an expert by counsel for the Plaintiffs in the above captioned litigation. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

I am Professor Emeritus of History at the University of Central Florida, Orlando, Florida, where I was chairman of the department for the first 20 of my 25 active years here and editor of the Florida Historical Quarterly for the last two. Before coming to UCF in 1972, I also taught at the University of Florida (1967-1968) and Florida State University (1968-1972). All of my formal higher education was at Florida State University from which I received the B. S. in history (1960), the M. S. in history (1961), and the Ph. D. in history (1963). My fields of research and teaching were Civil War and Reconstruction, Florida History, and Race Relations. I have also taught the U. S. Survey courses and Southern History. I have published widely in these fields. I am the author of 10 books, co-author of two, and contributor of chapters to eight others. I have also contributed 60 articles to national, regional, and local journals, and encyclopedias. My Nor Is It Over Yet:  Florida in the Era of Reconstruction, 1863-1877, several of the other books, and many of the journal articles are on the subject of this report. A copy of my curriculum vita is attached.

2. I have reached the following opinions:

Florida's 1865 Constitution, written by representatives of the slave-holding, plantation-owning class pursuant to President Andrew Johnson's plan of Reconstruction, and the so-called "Black Code" passed by the 1865-1866 legislature, discriminated against the black freedmen. That discrimination included the

1

creation of new criminal offenses to the commission of which, according to one prominent legislator, the black freedmen were "addicted."

When President Johnson's program was overturned by Congress in 1867, the Reconstruction Acts required that blacks be included in a new electorate which would elect delegates to a new constitutional convention. As a result of that election, the 1868 Constitution was written by members of a newly formed, but badly divided Republican Party. The first priority of one faction was to protect the newly enfranchised black freedmen and disfranchise ex-Confederates. Another faction was more interested in creating a new government favorable to economic development even if that meant making concessions to the old slave-holding class. Using extra-legal tactics, the latter faction was able to gain control of the convention and write a document that was acceptable to the propertied class which had led Florida out of the Union in 1861. That document, which became Florida's 1868 Constitution, provided a legislative apportionment formula that discriminated against blacks, a provision that the governor appoint nearly all local officials, and the inclusion of ex-Confederates in the new electorate. It also included the criminal offenses of the 1865 Constitution, added larceny which had been defined by the 1865-1866 legislature, and expanded the scope of criminal disfranchisement by including all persons convicted of <u>felony</u> "unless restored to civil rights."

The felony disfranchisement provision of the suffrage article of the 1868 Constitution, dilution of votes by disproportionate representation and the limits on the number of elective officials were intentionally racially discriminatory as is demonstrated by the historical context in which the document was adopted.

My opinion is also that Florida used criminal law to target blacks especially in relation to those new crimes which were added in 1865 and 1868; that is, those crimes which whites believed that blacks were prone to commit. The offenses added in 1865 and 1868, as well as the criminal disfranchisement provision for them became the basis for denying blacks the vote. I further believe that these additions to the criminal laws offered a means of recreating the labor force that had been lost by the abolition of slavery. Blacks were arrested on flimsy charges of vagrancy or even invented crimes. They were then forced to work off their sentences. This use of the criminal law to control blacks and insure a labor force continued in Florida until well into the 20th century.

The racially discriminatory character of the criminal disfranchisement provisions of the 1868 Constitution continued through Reconstruction, through the adoption of the 1885 Constitution, and long afterward.

427

2

3. Basis and Reasons for These Opinions.

That the changes in the suffrage article of the 1868 Constitution, the dilution of black votes by disproportionate representation, and the limits on the number of elective officials were intentionally racially discriminatory is demonstrated by the historical context in which the document was adopted.  Of particular relevance are:

        a.  Florida's Restriction of Black Suffrage in 1865,

        b.  Florida's Enactment of the Black Codes, the Failure of the County Criminal Court System, and Rejection of the 14th Amendment,

        c.  The History of the Adoption of the 1868 Constitution, its Dilution of Black Votes, and its Suffrage Article,

        d.  Florida's Use of Criminal Law to Target Blacks, and

        e.  The Effect of Criminal Disfranchisement on Blacks.

    a.  Florida's Restriction of Black Suffrage in 1865.  President Lincoln's assassination one week after General Lee's surrender in April 1865 created a vacuum at a very critical time.  After taking the oath of office, President Andrew Johnson waited nearly two months before announcing a plan for restoring the former Confederate states to the Union.  In the meantime, those on the scene in Florida were unable to wait. General John Newton, commander of the Florida district, asked planters to explain their new situation to the freedmen and work out a free labor system based---in the absence of money---on shares of the crops. While some freedmen tested their new status by leaving the plantations for the towns, most remained on the land and worked as they had always done.  Headed by Colonel Thomas W. Osborn, the Freedmen's Bureau assisted in keeping the blacks at work and tried to supervise the new labor contracts.

In June 1865, President Johnson finally announced his plan of Reconstruction.  He appointed William Marvin, a former federal judge from Key West and an antebellum Unionist, as provisional governor.  To the dismay of "Radicals" in Congress, all ex-Confederates were allowed to keep their property by taking oaths of future loyalty to the United States.  Governor Marvin was to register those whites who took the oath to vote for delegates to a constitutional convention.  When those delegates wrote a constitution repudiating slavery and secession, abolishing all debts incurred in support of the rebellion, and recognizing all laws passed by Congress since 1861, Johnson would recognize Florida as restored to the Union.  It was up to convention delegates to decide on the future of the freedmen who had only recently been their slaves. And, of course, it was up to Congress to decide whether to seat Florida's representatives.

Even while many Congressmen were vocal in their skepticism of Johnson's plan, Governor Marvin made promises to Floridians that were contingent upon its acceptance by those Congressmen.  In October 1865, Marvin told the constitutional convention delegates what he had been telling audience all over the

state during the preceding two months. He said that slavery was gone and it was necessary to define in the constitution civil rights and political privileges of the freedmen. "The governing power is in the hands of the white race, but the colored race is to be free and the government is to be administered in such a manner as not to infringe on that freedom," he said.[1] After an explanation that freedom did not include political participation, he suggested that if the convention abolished slavery and provided guarantees for protecting the freedmen, Congress would be obliged to seat the state's senators and representatives, thus recognizing its restoration to the Union. He further stated that he could see no good in conferring the vote on freedmen since neither race was prepared for so radical a change.[2]

Having lived in Florida, where racial slavery was both law and custom, for 30 years, the New York-born Marvin believed he was presenting an honest estimate of the freedmen as well as of President Johnson's requirements. But, in doing so he implied promises that, in the long run, could not be kept. Charles E. Dyke, editor of the influential Tallahassee Floridian, applauded Marvin's speech, adding "but as the disability rests on the ground of general incapacity, the more solemn the appeal to the ruling class to see that those whom God has made their inferiors, shall not suffer from the misfortune."[3]

Even as some Radical Republicans were already deploring the unwillingness of Southern states to deal fairly—as they saw it—with the newly freed blacks, President Johnson's provisional governor had just told the Florida convention delegates that it was all right.

The convention quickly annulled the ordinance of secession, and, by a vote of 20 to 14, abolished slavery and involuntary servitude except as a punishment for crime. It reluctantly repudiated all debts incurred in supporting the Confederacy. In other matters, the convention limited suffrage, political office, and jury duty to white men. It also enacted a special ordinance, to be effective until the legislature could act, authorizing the arrest of vagrants who could be fined up to $500 or sold for labor for periods not exceeding one year.[4] Blacks were permitted to testify in cases involving blacks only (italics added). In apportioning legislative representation, the convention retained the antebellum three-fifths formula for counting blacks. Before adjourning, it called upon Governor Marvin to appoint three men to report to the first general assembly the amendments necessary to make the laws conform with the new constitution with special reference to blacks.

---

[1] Florida, Journal of the Constitutional Convention of 1865, p. 9.

[2] Ibid., pp. 9-11.

[3] Tallahassee Weekly Floridian, October 27, 1865.

[4] Constitution of 1865, Ordinance 4.

4

b. Florida's Enactment of the Black Code, the Failure of the County Criminal Court System, and Rejection of the 14th Amendment.

On November 29, 1865, the constitution was ratified and David S. Walker was elected governor. He had opposed secession, but went with his state, serving as a judge throughout the war. He was inaugurated on December 18, at the opening session of the legislature, nearly all of whose members agreed with the work of the recent convention. Addressing that body, Walker noted public reluctance to ratify the 13th Amendment. He thought that ratification of the amendment and "the disposition of the Justices of the Peace, Sheriffs, and Jurors, to do their duty impartially, according to law" would convince Congress to seat Florida's senators and congressman. As for black suffrage, "I am satisfied that this demand will never be made by the President . . . Nor do I think that this unjust demand will ever be made by Congress." Continuing, he said, "Of course we could never accede to the demand for negro suffrage, should it be made. . . . we are willing to yield every thing but honor and our consciences . . ." and "we could not give either an honest or a conscientious assent to negro suffrage." He went on to conclude that it would be better to remain out of the Union than to accede to such a demand.

(1) Enactment of the Black Code. After telling the 1865 legislature that Florida could never accept negro suffrage, Walker reminded those assembled that, as members of a superior race, they had a duty to provide for the freedmen who had been deprived of their peaceful and happy existence through no fault of their own. Walker had no doubt that his position was fair. His outlook had been formed during a lifetime as a member of a slave-holding class that had developed an extensive legal and ideological framework for racial slavery. By the time Florida became a United States territory, racial slavery was justified on the ground that blacks were so inferior to other races that legal servitude was their natural condition. The belief carried over to the free blacks. Florida, like the other slave states, developed a legal slave code and extensive regulation of free blacks as well. The environmental conditions of slavery—prohibition of education, menial labor, lack of opportunity to develop family relations—reinforced the belief in the blacks' inferiority. After emancipation, many Floridians who considered themselves decent people also believed that whites and blacks could not live as free and equal citizens in an open society. Many accepted the end of slavery and were still concerned about how to adjust the state laws to meet the president's demands and at the same time salvage a system under which the whites with their responsibilities to the blacks, and the blacks with their natural limitations, could live.

Walker's address was followed by a report from the committee that Governor Marvin had previously appointed to make changes in the laws "with reference especially to the altered condition of the colored race."[5] The committee members were Charles H. Dupont, Mariano D. Papy, and Anderson J. Peeler.

---

[5] Florida, House Journal, 1865, p. 58.

5

Dupont was an ex-Confederate Supreme Court justice. Papy was a former Confederate with moderate views. Peeler was a prominent ex-Confederate and unreconstructed rebel who denounced the president's Reconstruction plan while praising the institution of slavery.

Speaking for the committee, Peeler lamented the disappearance of that "benign, but much abused and greatly misunderstood institution of slavery" and offered a lengthy defense of the state's powers to discriminate between blacks and whites.[6] According to him the abolition of slavery had removed "that tribunal peculiarly adapted to the . . . punishment of the great majority of the minor offences <u>to the commission of which the great majority of this class of population is addicted</u> (italics added)."[7] To handle "the great increase of minor offences, which may be reasonably anticipated from the emancipation of the former slaves," he recommended "a tribunal, more local in its jurisdiction (than the existing Circuit Courts) and of greater promptness in its administration of the penalties of the law."[8] The legislature complied with "An act to establish and organize a County Criminal Court."[9]

The committee further recommended that an alternative to the customary fines and/or imprisonment for punishment of crime be supplemented by corporal punishment. The reason for this was that "To degrade a white man by punishment, is to make a bad member of society and a dangerous political agent. To fine and imprison a colored man in his present pecuniary condition, is to punish the State instead of the individual.[10]

"An act to prescribe additional penalties for the commission of offences against the State, and for other purposes" "added the alternatives of standing in the pillory for an hour or whipping, not exceeding thirty-nine lashes on the bare back, or both, at the discretion of the jury."[11]

The "other purposes" of the above cited act were to enumerate a lengthy list of crimes—assault of a white female, burglary, house breaking, arson, possession of weapons, and many others—for which the alternative punishments were presumably suitable.

---

[6] <u>Ibid.</u>, pp. 65.

[7] <u>Ibid.</u>, pp. 60-62.

[8] <u>Ibid.</u>, p. 39.

[9] <u>Laws of Florida</u>, 1865, pp. 20-21.

[10] Florida, <u>House Journal</u>, 1865, pp. 60-62.

[11] <u>Laws of Florida</u>, 1865, pp. 23-28.

6

Section Two of that act created a new kind of larceny to clarify the common law with respect to the criminality of "severance from the freehold." Under the existing criminal code, the stealing and sale of loose cotton, corn or other products (previously handled by slave masters) was not a crime and would have been considered a civil matter under the common law. Peeler explained that "In view of the present condition of things, we think that this rule of the common law ought to be altered. . . ."[12] Accordingly, Section Two provided "That severance from the freehold of any agricultural production or fixture, or any part thereof, and the felonious taking and carrying away of the same, shall be deemed and held to be larceny, and be punished as such."[13]

The newly defined crime of larceny, added to others already included in the criminal code, and all those named in "An act prescribing penalties for the commission of offences against the State, and for other purposes" were intended to address "the altered condition of the colored race."[14]

The committee also recommended, and the legislature enacted "An act to Punish Vagrants and Vagabonds." Similar to the temporary ordinance of the recent convention, it provided for the arrest of "able-bodied persons" who had no visible means of support. Those arrested could be sentenced to a year of labor or imprisonment."[15]

These and other acts addressing labor contracts, apprenticeship, marriage, taxation, the judicial system, and crime and punishment, together with the denial of their right to vote or to serve on juries, made blacks second class citizens. The laws were soon collectively referred to as the "Black Code." Together with those of some of the other former Confederate states, the discriminatory laws provided ammunition for the Radicals in Congress who were trying to defeat President Johnson's plan of Reconstruction and replace it with their own.

With Florida and the other former Confederates states demonstrating their reluctance to accept the freedmen as citizens and the president apparently unwilling to intervene, Congress refused to seat the representatives of the seceded states and created a Joint Committee of Fifteen on Reconstruction to investigate and make recommendations. During early 1866, President Johnson vetoed a Civil Rights bill and another intended to extend the life of the Freedmen's Bureau. He further proclaimed the restoration of civil government in the South, thus undercutting the power of military commanders to protect the

---

[12] Florida, House Journal, 1865, p. 63.

[13] Laws of Florida, 1865, p. 23.

[14] Florida, House Journal, 1865, p. 58.

[15] Laws of Florida, 1865, pp. 28-29.

7

freedmen.  His hard line alarmed many moderate Republicans who were still not ready to join the Radicals. Meanwhile, Floridians and other Southerners were providing evidence that something had to be done if the blacks were to be protected in their new freedom.

(2) Failure of the County Criminal Courts.  The county criminal courts were absolutely incapable of dispensing justice in matters involving blacks and whites.  White judges and juries were unwilling to accept the word of blacks and, beyond that, many seemed offended that freedmen would even question the actions of whites with whom they disagreed.  Governor Walker worked with Bureau Assistant Commissioner Thomas Osborn—and later Major General John G. Foster—to provide justice, and there were some judges who tried to cooperate with him, but he was utterly unable to convince most white residents that it was in their interest to administer even-handed justice.

One example involved Elias Earle, a prominent Alachua County planter who came before the court for beating a freedman.  He was found not guilty, and then sued the freedman for trespass.  Testimony showed that the man had attended church on Earle's property.  He was found guilty and sentenced to pay a fine and costs.  Unable to pay, he was held in jail.  The governor intervened and asked for the case record.  It was accompanied by several affidavits alleging that the freedman was a notorious liar while Earle was above reproach.  Walker declined to intervene and the court decision stood.

Alfred Jackson, a 17-year-old freedman, was convicted by the Bradford County criminal court of riding his employer's horse without permission.  He was fined $200 that he did not have and was sold for his labor for three years to pay off the debt.  In Alachua County a black girl accused Charles U. Taylor of striking her with a board.  Three witnesses testified against Taylor, but he was acquitted.  He then accused the girl of contract violation on grounds of insolence.  She was convicted and given ten lashes.

These cases are representative of hundreds which occurred in the county criminal courts in 1866. General Foster, who had succeeded Colonel Osborn as head of the Freedmen's Bureau in Florida was ultimately obliged—despite President Johnson's proclamation—to reimpose martial law in several north Florida counties.  Finally, in November 1866, he resigned his position and left the state in disappointment that he was unable, under existing laws, to protect citizens in the exercise of their rights.[16]

(3) Rejection of the 14th Amendment.  During 1866, relations between the president and Congress continued to worsen.  At the recommendation of the Joint Committee, Congress passed the 14th Amendment to the U. S. Constitution.  Having no choice but to send the amendment to the states for ratification, Johnson recommended that it be rejected.

---

[16] Jerrell H. Shofner, Nor Is It Over Yet, p. 102.

Florida joined other former Confederate states in following the president's advice. The amendment's provisions are too well known to require restatement here, but the provision for reduction of representation in Congress in proportion to the number of adult males denied the right to vote forced Floridians to confront the issue to which they had repeatedly said they could not accede. A legislative committee on "Federal relations" denounced the amendment, complaining that "We must be shorn of our representation or give the inferior and unintelligent race the supremacy in the State government," and that "control of the Southern States by the negro would result either in a war of races or the emigration of one or the other race, ..."[17] Joined by Governor Walker, who said Floridians could never accept black suffrage, the committee recommended rejection of the amendment. The legislature agreed. [18]

c.   History of the Adoption of the 1868 Constitution and the Suffrage Article.

(1)Congressional Reconstruction. Dismayed by President Johnson's refusal to address matters in the Southern states, voters in the Northern states in the 1866 election sent to Congress more than a two-thirds majority of senators and representatives willing to cooperate with the Radical Republicans. In March 1867, legislation was enacted, over the president's vetoes, which divided the former Confederate states—except Tennessee—into military districts to be commanded by major generals. Florida was in the Third Military District commanded by General John Pope. The general was to establish election districts and register voters for election of delegates to a new constitutional convention. All adult males were permitted to vote, except those disqualified for office-holding by the 14th Amendment. The newly elected convention was to write a constitution extending voting rights to all male citizens regardless of race. When it was ratified and the next legislature approved the 14th Amendment, the state could resume its normal relations with the Union.

(2)  Adoption of the 1868 Constitution. While most were appalled at the new legislation, white Floridians reacted in various ways. Some decided to emigrate, some chose to do nothing, but others tried to make the best of the situation. Nearly all, however, were adamantly opposed to black enfranchisement.

While Ossian B. Hart, a former slave owner and adamant Unionist who favored black enfranchisement, worked with the military authorities to register voters for the upcoming election, political associations began to take shape. Although they were divided as to what course to follow and many were unsure as to whether they would be eligible to vote and hold office, white Floridians began calling themselves

---

[17] Florida, House Journal, 1866, p. 77.

[18] Shofner, Nor Is It Over Yet, pp. 102-103.

Conservatives.  Some, such as Governor Walker and David Yulee, a former U. S. Senator and one of only four Floridians incarcerated in 1865 for his role in the rebellion, were anxious to get the state readmitted to the Union so that they could get on with rebuilding and expanding the economy.  This goal made some of them willing to compromise with amenable members of the emerging Republican Party.

Composed of Southern Unionists such as Hart, federal office-holders such as Thomas Osborn, and Harrison Reed of the Post Office Department, as well as thousands of newly enfranchised blacks, the developing party was amorphous, tumultuous, and fluid.  While identifying with his new law partner, McQueen McIntosh, one of the most conservative men in Florida, Osborn was busily attracting black supporters through a secret society called the Lincoln Brotherhood.  He was shortly upstaged in that effort by Daniel Richards of Illinois, a former tax commissioner in Florida, and William U. Saunders, a black from Maryland, who were supported by the Union League, an affiliate of the national Republican Party.  They were joined by Liberty Billings of Fernandina, who had been a chaplain in a black regiment, and Charles H. Pearce, who had come to Florida to organize the African Methodist Episcopal Church.  This so-called Billings-Richards faction, attracted a large majority of the newly enfranchised blacks.  Its priority was black enfranchisement and white disfranchisement.

Another component of the new party was the Jacksonville Union Republican Club, composed of prominent Unionist businessmen and professionals, some of whom were Floridians while others were "carpetbaggers" from the North.  Hart, was one of the native Floridians, while Harrison Reed, who was less committed to black suffrage, was prominent among the "carpetbaggers."  There were a few black members such as Jonathan C. Gibbs who had come from New York solely to assist blacks in becoming citizens.  Whether or not they favored or opposed black suffrage, most of these men were interested in getting Florida back in the Union so they could proceed with their plans to develop the frontier state.  They understood that black suffrage was a condition precedent to that happening.  They were the Republicans most willing to compromise with ex-Confederates with similar economic interests.

A communication between David Yulee and Harrison Reed, who had become acquainted through mutual interests in expanding the Florida railroad system, demonstrates this ordering of priorities and casts light on the ultimate adoption of the 1868 Constitution.  After a discussion of a possible alliance between some native Floridians---"Men of character and influence altho engaged in rebellion" as one observer put it---Reed asked Yulee to furnish a statement upon which he and his Conservative associates were willing to unite with the Union-Republicans.  Yulee's answer was in agreement with the Reconstruction Acts and

promised support of any policy which "can best and soonest heal the wounds of the past." He asked only that a name other than "Radical" or "Republican" be used by the new group.[19]

It almost worked. The Jacksonville Union-Republicans agreed not to use "Radical," but at Ossian Hart's insistence, the group declined to drop the word "Republican" from its name. Thus, the symbolism of a name rather than disagreements over policy ended the fusion efforts between ex-Confederates and moderate Republicans in Jacksonville.[20]

Negotiations of a similar nature in Tallahassee collapsed at about the same time. With views on Reconstruction similar to those of Harrison Reed, Thomas Osborn was working with his law partner, Governor Walker, and Tallahassee Floridian editor, Charles E. Dyke, on a mutually suitable plan of cooperation until Walker found out about Osborn's work with the Lincoln Brotherhood. The furious governor wrote Yulee that "I fear there will be no cooperation," and Dyke castigated Osborn for "proposing to us the most conservative sentiments, . . . while deluding the negroes into joining secret leagues. . . ."[21]

No overt alliance was formed between ex-Confederate Conservatives and moderate Republicans, but there would be important collaboration behind the scenes as will be shown. Meanwhile, native white Conservatives, moderate Republicans, and military officials alike denounced Billings, Richards, and Saunders for their demagogic methods. But, that did not stop the Billings-Richards faction from cementing its relationship with the large majority of blacks.

An election was scheduled for mid-November 1867, for voters to decide whether there should be a constitutional convention and, at the same time, to elect delegates to it. When the Republican Party snubbed them in naming a slate of delegates, the Duval County Radicals named a contesting delegation that included Billings. Just weeks before the election, Richards and Saunders moved to Gadsden County and ran as delegates from there. These maneuvers were to have important consequences for the upcoming convention.

Only 14,503 ballots were cast in November, with all but 203 favoring a convention. That was a majority of the 28,003 registered voters. Many of the Conservatives—more than 10,000—had boycotted the election in hopes of defeating the convention. Their efforts failed and at the same time deprived them

---

[19] Harrison Reed to D. L. Yulee, April 18, 22, 1867, Platform of April 1867, D. L. Yulee to Philip Fraser, May 17, 1867, Yulee Papers, Special Collections, University of Florida Library. See also Canter Brown, Ossian Bingley Hart (Baton Rouge, 1997), p. 103.

[20] J. C. Greeley to Friend Williams, May 7, 1867, Yulee to Philip Fraser. May 8, 1867, Reed to Yulee, May 20, 1867, Yulee Papers; Brown, Ossian Bingley Hart, p. 193.

[21] David S. Walker to D. L. Yulee, May 6, 1867, Charles E. Dyke to Yulee, July 22, 1867, Yulee Papers.

of opportunity for membership in the convention. General Pope issued an order certifying the election of 46 delegates for a convention to begin at Tallahassee on January 20, 1868. Only two of them were Conservatives. Eighteen of the remaining 44 were black. There were 26 white Republicans, including Southern Unionists as well as federal officials—Freedmen's Bureau agents for example—from the North.[22]

An ecstatic Daniel Richards wrote that "The Radical team has triumphed. Billings, Saunders, and myself have created the Republican Party in Florida and made a convention with two-thirds if not three-fourths of our friends. . . . The convention will be extremely Radical."[23]

The situation was not as clear as Richards saw it. The national Republican Party had already cut off his funding and was channeling money to Florida through Harrison Reed, the friend and business associate of former Confederates David Yulee and Governor Walker. Perhaps even more important, shortly after the election, General John Pope, whose policies had favored the Radicals, was removed from command of the Third Military District and replaced by General George C. Meade, who was more interested in preserving order than in political goals. Colonel John T. Sprague, well-acquainted with Governor Walker and other Floridians since his participation in the Seminole War a quarter century earlier, was Meade's subordinate in Florida.

Convinced that Richards, Billings, Saunders, and Charles H. Pearce[24] were ineligible for their seats in the convention on grounds of non-residency, angered by the way General Pope had drawn the election districts, and encouraged by his removal, Conservatives attempted to block the convention. For example, U. S. Marshal Alexander Magruder, a native Florida Unionist, complained to his superiors that Florida whites regardless of party would "do anything and accept every thing, except the doctrine of full and complete equality of the negro with the white race."[25] Despite this and other complaints, General Meade declined to intervene.[26]

Meanwhile, the lines were being drawn between opposing groups of Republicans for control of the convention. Richards and Billings rented a house to provide dwellings for needy black delegates as well as to facilitate caucuses and decrease the possibility of wavering members accepting offers from the

---

[22] Shofner, Nor Is It Over Yet, p. 176.

[23] Daniel Richards to Elihu B. Washburne, November 19, 1867, Washburne Papers, Library of Congress, as quoted in Shofner, Nor Is It Over Yet, p. 176.

[24] Pearce had been elected from Leon County where he resided, but had only recently arrived from Canada.
[25] Alexander Magruder to Attorney General, January 6, 1868, Attorney General's Papers, Record Group 60, National Archives, as quoted in Shofner, Nor Is It Over Yet, p. 177.
[26] Brown, Ossian Bingley Hart, p. 207.

12

opposition. Meeting arriving delegates as the railroad station with a carriage and team of mules, Billings and Richards became known as the "Mule Team." Harrison Reed set up his headquarters at the City Hotel, across the street from the capitol, where he made use of the funds he was receiving from the national Republican Party. He was joined there by Edwin M. Randall, the brother of PresidentJohnson's postmaster general, and William H. Gleason, a longtime acquaintance from Wisconsin, with whom he (Reed) and Governor Walker were business associates. Walker and other ex-Confederate Conservatives participated freely in planning sessions with Reed and Gleason.[27]

When the convention first met in the assembly hall of the state capitol, 26 of the 46 delegates named on General Pope's order were present. Charles Pearce was elected temporary chairman and he appointed Saunders as chairman of a committee on permanent organization. All seemed well for the "mule team" until Saunders reported Daniel Richards for permanent chairman. William J. Purman, a Freedmen's Bureau Agent from Jackson County, opposed the motion on grounds that the nominee was not a resident of the county from which he had been elected. The Radicals replied that General Pope's order was the final authority on the seating of delegates. Richards was allowed to take his seat and promptly named 17 committees to work on the constitution, but Purman, C. R. Mobley, L. W. Rowley, and other moderate Republicans used every dilatory means of delaying action, hoping to gain control of the convention as more delegates arrived. The delay concerned Richards who wrote a friend that "All our delegates are poor, . . .all those of easy virtue soon fall prey to these minions of the devil and A. Johnson who have plenty of money."[28]

By January 31, 41 delegates were seated in the convention and the two factions were generally aligned. Richards, Billings, and 5 other white Radicals were joined by 15 blacks. Four blacks were aligned with 16 white moderate Republicans. In an effort to acquire one more supporter, moderate George J. Alden moved the seating of John W. Butler of Santa Rosa County in place of Conservative George W. Walker who had declined to attend. Richards successfully tabled the motion, leaving the Radicals in control.[29]

At that point, the moderate members abandoned the convention and moved to nearby Monticello where Osborn and his colleagues conferred with Reed and Hart, and several prominent Conservatives, including McQueen McIntosh and Charles Dyke. Their plans were well-known to the military officials. Colonel Sprague, a good friend of Ossian Hart, wrote General Meade that the Billings-Richards faction was so unpopular that nothing they did would be acceptable to the people, including "Southern loyalists." That

---

[27] Shofner, Nor Is It Over Yet, p. 178; Brown, Ossian Bingley Hart, p. 208.

[28] Richards to Washburne, February 2, 1868, Washburne Papers, as quoted in Shofner, Nor Is It Over Yet, p. 179.

[29] Journal of the Constitutional Convention of 1868, pp. 25, 30.

13

assessment included Hart, who despite his support for black suffrage, was working with the moderate Republicans and Conservatives because he thought Billings and Richards were too extreme. He believed that a constitution that enfranchised blacks and disfranchised all those to which section three of the 14th Amendment applied, would not be accepted by white Floridians.[30]

With only 22 delegates present when the convention reconvened on February 4, it was decided that, since only 41 delegates had been seated, they still constituted a quorum. They quickly completed a constitution which provided for equal legislative apportionment based on population, state and local officials to be elected by the people they represented, and disfranchisement of white Floridians prohibited from office-holding by the 14th Amendment. Their suffrage article included no provisions for disfranchising ex-convicts. The document was sent to General Meade in Atlanta, and the convention adjourned until February 15.[31] It was Meade's responsibility according to the Reconstruction Acts to forward the document, with his recommendation, to the Congressional Joint Committee which had to approve it before it could be submitted to the people of Florida for ratification.

Having been joined at Monticello by two delegates---Conservative John Campbell and Republican Washington Rogers---who had not yet attended the convention, the moderates returned to Tallahassee and entered the assembly hall late in the evening of February 10. Charles Hamilton, a former Freedmen's Bureau agent closely associated with Osborn, persuaded two delegates who had previously voted with the Radicals, to get out of bed and join the late night session. Richards, Billings, Saunders, and Pearce were removed from their seats on grounds of non-residency and replaced by Marcellus L. Stearns and J. E. A. Davidson of Gadsden County, Richard Wells of Leon, and Ossian Hart of Duval. Horatio Jenkins, a delegate from Alachua County was named president.[32]

Daniel Richards asked both Colonel Sprague and General Meade to repossess the assembly hall for him, but instead they responded to Governor Walker's request for a guard to protect those who had taken possession during the night. With the moderates meeting in the assembly hall, the Radicals holding sessions in black churches or on the public square, and Liberty Billings speaking to large crowds of freedmen, the streets of Tallahassee were quite chaotic during the week following February 10. With Richards bombarding him with messages that a mob had taken over the assembly hall, General Meade was pleased to receive a recommendation from Horatio Jenkins that both contending presidents resign so that a new election could be held.

---

[30] Brown, Ossian Bingley Hart, p. 211.

[31] U. S. House of Representatives, Document No. 109, 40th Cog., 2nd Sess., pp. 6-21.

[32] Shofner, Nor Is It Over Yet, p. 183.

Arriving in Tallahassee on February 17, Meade accepted the resignations of Jenkins and Richards. Colonel Sprague then presided temporarily over a new election. Jenkins was elected president of the convention, this time by a vote of 32 to 14. The four "ineligible" delegates were again ousted and replaced by the same men as before. In this manner, General Meade, primarily interested in preserving order, had legitimized the unusual methods by which the moderate Republicans had obtained control of the convention.

(3) <u>Dilution of Black Votes</u>. During the next few days, the moderates, frequently consulting with Governor Walker and Charles Dyke—both of whom were in close contact with David Yulee—drafted a constitution which they hoped would meet the requirements of the Joint Committee while appealing to a majority of the ex-Confederate Floridians. They had considerable leeway. After rejecting President Johnson's accomplishments between 1865 and 1867, Congress passed the Reconstruction Acts which reimposed military authority in the state. But, the provisions of the laws were quite limited. They specifically required only a constitution that guaranteed black suffrage. That limited mandate left many of the provisions of the new constitution to be worked out by those on the scene in Florida, subject only to the review of the Joint Committee in Washington.

The Billings-Richards constitution had enfranchised blacks while denying suffrage to as many whites as possible without regard to future consequences. While the moderate Republicans held various views about black suffrage, they realized that its guarantee in the new constitution was essential to Florida's readmission to the Union. But, they also realized that a government based on black suffrage and opposed by the majority of white ex-Confederates would have little chance of surviving. Furthermore, many of them had strong economic interests coinciding with those of such Conservative leaders as Governor Walker, Yulee, Dyke, and others. Wanting a constitution that would meet Congressional requirements while still being acceptable to the native white Conservatives, the moderate Republicans made concessions which intentionally discriminated against the newly enfranchised blacks and severely diluted their votes.

Rather than equal numerical representation, legislative apportionment was based on geography—each county would have one representative in the assembly and no county would have more than four.[33] With most of the blacks concentrated in eight agricultural counties of Middle Florida, plus Duval and Nassau on the Atlantic Coast, that meant a disproportionate representation in favor of the 29 sparsely populated and predominantly white counties. Further, the document called for the governor to appoint his cabinet officers, all court justices, and all local officials except constables.[34] On February 16, Reed wrote Yulee

---

[33] <u>Constitution of 1868, Article I, section 15.</u>

[34] U. S. House, <u>Miscellaneous Document No. 109, pp. 25-44.</u>

that "I think the destructors have effectually been overthrown and the state saved to 'law and order. . . . the Judiciary and State officers will be appointed & the apportionment will prevent a negro legislature.[35]

(4) The Suffrage Article. The suffrage article was the most controversial of all and was adopted only after extensive parliamentary maneuvering. On February 20, an article providing the "Right of Suffrage" was read and ordered printed. Three sections are pertinent. Section Three provided in part "at the first election for State officers, and for the period of one year from the ratification of this Constitution, the registration list prepared by the authority of Congress of the United States shall be used, . . ." Since numerous native white men had not registered in 1867 they would have been ineligible to vote during the first elections. Section Four read: "All electors shall in all cases, except for treason, felony, or breach of the peace, be free from arrest on days of election, during their attendance at said election, going to and returning therefrom." Section Five provided that "No idiot or insane person, or person convicted of infamous crime, shall be entitled to the privileges of an elector, except when such convicted person shall have been pardoned in the manner prescribed in this Constitution."

The article was signed by two Radicals—J. H. Goss and Jonathan C. Gibbs—and three moderates, C. R. Mobley, Thomas W. Osborn, and George J. Alden.[36]

The convention proceeded to wind up its affairs with a series of administrative ordinances. Then, on February 24, just before adjournment, W. K. Cessna, a moderate, moved that the vote adopting the "franchise article" be reconsidered. L. W. Rowley, another moderate, offered a substitute, the pertinent parts of which were sections one, two and four. Section One provided that "Every male citizen of the United States of the age of twenty one years, . . . shall be entitled to vote. . . ." Section Two, after disqualifying insane persons for voting, then added, "nor shall any person convicted of felony be qualified to vote at any election unless restored to civil rights." Section Four provided for the exclusion from the right of suffrage of "all persons convicted of bribery, perjury, larceny, or of infamous crime. . . .[37]

---

[35] Harrison Reed to D. L. Yulee, February 16, 2868, Yulee Papers.

[36] Journal of the Constitutional Convention of 1868, pp. 89-90.

[37] Ibid., p. 124-126; Tallahassee Weekly Floridian, February 25, 1868.

**441**

The substitute was adopted by a vote of 26 to 15.  The majority included all of the moderates and John L. Campbell, the only Conservative, who had begun his convention activities at Monticello.  All of the 15 in opposition were Radicals, including Gibbs and Goss who had been willing to accept the version that had been ordered printed on February 20, but disagreed with the substitute which extended suffrage to all adult males and provided for disfranchisement of felons.

The Radical constitution, which the moderates had replaced, had included no disfranchisement for crime in its suffrage article.  The ambiguous version of the article written by the Goss committee, with two Radicals and three moderate members, did not satisfy the Conservative leaders who were in almost constant communication with the moderate delegates during the closing days of the convention.  The version introduced by Cessna and Rowley, and which was finally adopted, provided for universal manhood suffrage in that no ex-Confederates were disfranchised.  At the same time, it was more proscriptive than the provisions of Florida's three earlier constitutions with regard to ex-convicts.  These last minute changes reflected the new approach to crime and punishment of the 1865 legislature, and was consistent with the other provisions of the 1868 Constitution that diluted the effect of the black enfranchisement mandated by Congress.

Felony disfranchisement was a way of reducing the effect of the despised black suffrage that Conservatives knew they had no alternative but to accept.  Larceny, which included the new category added by the 1865 legislature, was added to the earlier lists of crimes for which convicts could be disfranchised because the Conservatives agreed with Anderson Peeler's admonition about its increase resulting from the abolition of slavery.

On February 24, the same day that the convention reconsidered the suffrage article, Governor Walker wrote Yulee that "Col. Hart showed me an ordinance this moment allowing all white people to vote the same as negroes and asked me if I thought the white people would vote if they had the chance."  He added that, "the constitution, I learn is a good one."[38]

In the Floridian of February 25, Dyke printed both versions of the suffrage article.  "It is printed in the article as originally reported and as adopted yesterday.  Considering that the convention is working under the Reconstruction Acts . . . the suffrage provisions is as liberal as could be expected."[39]  The moderate version of the constitution, with the substitute suffrage article, was approved on February 25 by a vote of 28-16, and sent to General Meade.  He forwarded both versions to the Joint Committee, but recommended the moderate one because it was signed by a majority of the delegates and the Radical one was not.  Both

---

[38] D. S. Walker to D. L. Yulee, February 24, 1868, Yulee Papers.

[39] Tallahassee Weekly Floridian, February 25, 1868.

sides sent representatives to Washington to argue their cases, but Congress ultimately accepted the moderate version and returned it to Florida to be submitted to the people. An election was scheduled for mid-May at which a governor would also be chosen.

The moderates nominated Harrison Reed for governor and campaigned for ratification of the constitution. The Radicals, after considerable confusion, named Liberty Billings as their candidate and opposed the constitution. Billings was soon arrested by Colonel Sprague for making "incendiary" speeches and held at Fort Marion in St. Augustine until after the election. He was hurriedly replaced by Samuel Walker of Tallahassee. Meanwhile, William Saunders, Jonathan Gibbs, and several others deserted to the moderates.

Many Conservatives were still unwilling, despite the many concessions, to vote for any Republican constitution. But, because of the split in Republican ranks some leaders chose to place a candidate in the race. Editor Dyke was furious, "I labored night and day to produce the split in the convention," he wrote, . . . we ought to feel grateful to Reed and Company" for "a constitution so much more liberal than was expected." He was afraid a Conservative ticket might reunite the Republicans.[40] He need not have worried. With George W. Scott as their nominee for governor, the Conservatives ran a lackluster campaign against the constitution.

The May election returns favored the constitution by 14,520 to 9,491. Reed received 14,170 votes to Scott's 7,852 with 2,262 for Walker. The legislature elected Thomas W. Osborn to the long term in the U. S. Senate while William H. Gleason became lieutenant governor on the ticket with Reed. Hart, who had assisted not only by working with the Conservatives but also by cooperating with Colonel Sprague, was appointed to the Supreme Court. He would succeed Reed as governor in 1872.[41]

d. Florida's Use of Criminal Law to Target Blacks and the Effect of Criminal Disfranchisement on Blacks.

The 1865 Constitution continued "infamous crimes" on the list of offenses for which criminals could be disfranchised and the Black Code enacted by the 1865-1866 legislature added larceny and vagrancy to a lengthy list of crimes for which punishment was provided. Although the Congressional Reconstruction Acts of 1867 overturned the 1865 Constitution, the 1868 document included disfranchisement for "infamous crimes: and the 1868 legislature included larceny and vagrancy in a lengthy list of "infamous crimes."

---

[40] As quoted in Shofner, Nor Is It Over Yet, p. 189.

[41] Ibid., pp. 192-193.

(1). The 1868 Criminal Statutes. The 1868 statutes defined felony, the conviction for which led to disfranchisement, as "any crime punishable by death or imprisonment in the State penitentiary."[42] "An act to provide for the Punishment of Crime, . . . enumerated a long list of such crimes. One of them was larceny involving more than 20 dollars in value, the punishment for which was imprisonment in the state prison or the county jail. Larceny involving 20 dollars or less in value was punishable by confinement in the county jail, but convictions for second offenses, or for two separate larcenies at the same time, were subject to "punishment by imprisonment in the State penitentiary not exceeding twenty years, or in the county jail not exceeding one year."[43]

Conviction for misdemeanors also led to disfranchisement if they were "infamous crimes." Those crimes were "offenses against chastity, morality, and decency," such as adultery, polygamy, keeping houses of ill fame, crimes against nature, and 25 others. Vagrancy was included in this section of the statute. "Rogues and vagabonds, idle and dissolute persons . . . , stubborn children, runaways, . . . and all other idle and disorderly persons," are only examples of a lengthy list of persons whose conduct subjected them to punishment as vagrants by confinement in the county jail for terms not exceeding six months.[44]

(2). The End of Reconstruction in 1877. This criminal statute was still in effect when Florida's last Republican governor for nearly a century was defeated by Conservative-Democrat George F. Drew in 1876. With the power to appoint local officials in their hands, Democrats accelerated their efforts to eliminate the Republican Party and the still unwelcome black suffrage from Florida. In a report prepared by ex-Senator Thomas W. Osborn on the 1880 election, the Republican state executive committee described how that was being done and how the disfranchisement provisions of the 1868 Constitution were being used.[45]

Osborn, who had been one of the authors of the suffrage article of the 1868 Constitution, explained that the Bourbon Democrats were using the provision for disfranchisement of those convicted of "infamous crimes" without regard to the "grade of the offense" to reduce the number of black voters. He said that "Hundreds of men in the State have been convicted of offenses for which a fine of fifty cents or a dollar or confinement for three days or a week was imposed, and in consequence of which they are disfranchised for

---

[42] Laws of Florida, 1868, p. 12.

[43] Laws of Florida, 1868, pp. 72-73.

[44] Laws of Florida, 1868 pp. 96-100.

[45] Report of the Republican State Executive Committee of Florida to the Republicans of the State, Upon the Election held November 1, 1880 (Washington, National Republican Publishing Company, 1881).

life.[46] People, he added, were being disfranchised for convictions of petty crimes in the justice of peace courts often on "purely trumped-up" charges.[47]

This is what Florida Convict Camp Captain John C. Powell was referring to when he wrote in 1891 that "In the early days it was possible to send a negro to prison on almost any pretext, but difficult to get a white man there . . ." with the result that in the Florida prison "the proportion of whites to blacks was as one to twenty."[48]

(3). The Penal System and Forced Labor.

(a) Convict Leasing. In his "Shackles in the Sunshine" in 1973, James Bacchus wrote that "The Florida Penal System has long been a sanctuary for cultural and institutional racism. . . . State convicts—almost all of whom were Negroes (italics added) until World War I—were delivered into ersatz slavery as contract labor for turpentine camps, lumber mills, railroad crews, and phosphate mines."[49]

As it developed in the years between 1868 and the 1920s, convict leasing became a heinous institution that subjected convicts to the worst kinds of abuse and all-too-frequent death. The excesses of the convict camps were overlooked because of the system's profitability to the state and the entrepreneurs who operated the camps. Only when exposure of its brutality in the 1920s threatened to damage the image of the Sunshine State was action taken. It is worth noting, however, that the overwhelming majority of those who died in the camps were blacks, while the press only took notice of individual cases when a white man was the victim.

It began with the Republicans, but it was the Bourbon Democrats who turned the convicts over to the lessees to do with them practically as they wished. In his address to the 1868 legislature, Governor Reed said that holding prisoners in jail was bankrupting the cash-strapped state and that pardoning them was not a suitable solution. He thought that "A penitentiary . . . instead of being an expense to the government, . . . can readily maintain itself, and be made a source of income"[50] With the acquisition of the abandoned U. S. arsenal at Chattahoochee, legislation in 1868 as revised in 1871 established a prison and Malachi Martin

---

[46] Ibid., p. 18.

[47] Ibid., p. 19.

[48] John C. Powell, The American Siberia, or, Fourteen Years' Experience in a Southern Convict Camp (Gainesville, 1976), p. 332.

[49] James Bacchus, "Shackles in the Sunshine," Orlando Sentinel Star Sunday Magazine, June 17, 1973.
[50] Florida, Assembly Journal, 1868, p. 69.

was appointed warden.[51]  The Chattahoochee facility was in disrepair and no funds were appropriated for its rehabilitation, but Martin used it to house prisoners while leasing them himself for use on his farm. During the remaining six years of Republican administration he and other lessees worked the prisoners under conditions which were far from pleasant, but as warden, Martin at least remained responsible for their care.

After George Drew, a Bourbon Democrat, became governor in 1877, the legislature abolished the office of warden and turned the prison over to the state adjutant general.  That official could then release custody and control of prisoners, for up to four years, to lessees who put them to work at places usually quite distant from the prison.  "Such contractors . . . shall have full and complete power to control and discipline such prisoners and to maintain order among and enforce obedience from the same, and to . . . prevent escapes and compel performance of labor . . . ," according to the statute.[52]  The law prohibited "cruel or inhuman punishment" or "punishment injurious to mind or body," but those provisions were ignored during the following 45 years.[53]  The same legislature converted the state prison into an asylum for the insane.[54]  The 1879 legislature empowered "the Several Counties of this State to Hire Out the Convicts Sentenced to Confinement in the County Jail.[55]

Pursuant to those statutes, the Bourbon Democrats turned convict leasing into a profit-making enterprise for the state, a source of cheap labor for railroad builders, turpentine operators, and phosphate mine owners, and an institution in which life was brutish, miserable, and very often short for prisoners.

It also had a creative aspect because, as blacks were relegated to second class citizenship, they were increasingly vulnerable to arbitrary arrest for crimes both alleged and real.  Sentencing was done by courts where officials were still very often influenced by the customary attitudes about blacks that the 1865 legislature had demonstrated and the ensuing years had done nothing to abate.  In his American Siberia, John C. Powell, who spent 14 years as a captain in Florida convict camps, estimated that 95 percent of the convicts in the 1870s and 1880s were black, although he thought the ratio had declined by 1891.[56]

---

[51] Laws of Florida, 1871, 17-23.

[52] Laws of Florida, 1877, p. 93; N. Gordon Carper, "The Convict Lease System in Florida, 1866-1923" (Ph. D. Dissertation, Florida State University, 1964), p. 42.

[53] Laws of Florida, 1877, p. 93.

[54] Laws of Florida, 1877, p. 95.

[55] Laws of Florida, 1879, pp. 77-78.

[56] Powell, American Siberia, p. 332.

As late as 1906, however, J. S. Blitch, who subsequently became warden of Florida's "model prison," told an audience that "ninety percent of our Florida convicts are negroes." He added philosophically that "the inaptitude of the negro to acquire a trade or become a skilled artisan was long ago demonstrated in my State at least."[57]

Although he sometimes defended the convict lease, Captain Powell matter-of-factly depicted a vicious system in which brutal guards consistently drove prisoners beyond their endurance and then beat them when they were unable to continue. Beatings with a leather whip attached to a wooden handle were administered for almost every imaginable infraction of the rules, but the most common was failure to work fast enough. Men—and women in the same camps, using the same facilities—already exhausted from over-work were subjected to beatings which left them even more exhausted. When they became ill they frequently died from lack of treatment.[58] Critics of the system repeatedly observed that it was less humane than slavery where the owner had at least had a vested interest in treating his property well. The convict lessee had no such interest. Prisoners who died could easily be replaced by others, as ex-Senator Thomas Osborn explained in 1880.[59]

By the early 1880s, there was criticism. The Jacksonville Florida Times Union declared that "the treatment of our prisoners is such as public opinion would not tolerate for a week if it were exposed."[60] What went on in the convict camps was in isolated places, far away from most of the population. And those involved were mostly black.

One of the people who did notice was Reverend Robert F. Rogers, a Baptist minister from Suwannee County. There, not far from Live Oak, was the turpentine works of C. K. Dutton, a New York capitalist, in whose camps excessive cruelty was becoming notorious in that county. A delegate to the Constitutional Convention of 1885, Rogers proposed that the state end the leasing system and operate its own prison and farm.[61] He was rebutted by proponents of the system on grounds of economy, but the 1885 Constitution did provide for a state prison to be established "as may be prescribed by law."[62]

---

[57] As quoted in Bacchus, "Shackles in the Sunshine," June 17, 1973.

[58] Powell, American Siberia, passim.

[59] Report of the Republican State Executive Committee of Florida to the Republicans of the State, upon the Election Held November 2, 1880, pp. 18-19.

[60] Jacksonville Florida Times Union, July 14, 1883.

[61] Edwin C. Williamson, Florida Politics in the Gilden Age (Gainesville, 1976), p. 136.

[62] Constitution of 1885, Article XIII, section two.

An enabling act was passed in 1889, but by that time phosphate had been discovered in the Peace River Valley and prospects of profits for the state coffers were too great. Convicts continued to be leased with the phosphate companies now competing for their services. By that time lessees of the state convicts were sub-leasing them to others. The system had become a business enterprise.

From the late 1890s there was almost continuous criticism of the leasing system and the atrocities associated with it. All but four of the southern states had ended their lease systems, and the Tampa Tribune was only the most vocal of those demanding that Florida follow suit. Along with other advocates of "good roads," it was calling for convicts to be put to work on a state road system. The controversy came up in every legislative session after 1907.

In 1913, the legislature established a state prison farm that subsequently became known as Raiford Prison. But, only women and disabled men were to be housed there. Able-bodied male, or class one, prisoners continued to be leased. Then, after 1915, leasing to private firms was limited to black males only. In 1919, the state leasing system was abolished and the convicts would henceforth be worked on the public roads.[63] County convicts continued to be leased to turpentine and lumber manufacturers.

By 1921, J. S. Blitch, warden of the state prison farm, was winning praise from the National Prison Association for the "model prison" that prison officials from all over the country were coming to observe. One Northern visitor praised the way the farm was run, saying that it reminded him of "an old semi-feudal plantation." Whether he realized it or not, the Northerner had made a good analogy. Blitch's view of blacks was not much different from those espoused by Governor David Walker and his associates in 1865. In language reminiscent of Anderson Peeler's report to the 1865 legislature, he explained that "We of the South do not blame the Negro for crimes which we understand are natural to his race. . . ."[64]

While the state farm was quite progressive for the time, things had not changed in the convict camps. Balls and chains, "sweat boxes," and flogging, were still taking toll of hapless prisoners. In 1923, the murder of Martin Tabert, a young South Dakota man who had made the mistake of vacationing in Florida, began to make headlines. The New York World revealed how he had been arrested for vagrancy by Leon County Sheriff J. R. (Jim Bob) Jones. Jones was filling a quota of laborers for the Putnam Lumber Company. At the firm's camp in Dixie County, Tabert was beaten to death by a cruel boss who then disguised the cause. Another convict wrote Tabert's family in South Dakota and eventually the truth came out. The resulting scandal brought the leasing of county convicts to an end in 1923. But, as James Bacchus points out in his "Shackles in the Sunshine," Tabert was white. The only individual deaths which became

---

[63] Laws of Florida, 1913, p. 419-425, 1915, pp. 255-257.

[64] Bacchus, "Shackles in the Sunshine."

public issues involved whites: in Orange County in 1906, the Tabert case in 1923, and two in the state road camps in the early 1930s. Individual black deaths from the same causes went largely unnoticed.

The official end of convict leasing really changed little. Bacchus shows how the road gangs were treated just as badly as the convicts who had previously been leased to private firms, and how blacks continued to receive by far the worst treatment. According to him, between 1923 and 1936, 604 prisoners were paroled and only 19 percent of them were black. Of the 1,801 pardons between 1926 and 1936, 660 of them went to blacks. And, throughout those years blacks constituted a large majority of the total prison population.[65]

(b) Peonage. Closely paralleling, often overlapping, and sometimes almost merging with convict leasing, was the pervasive system of debt peonage. The holding of a person to forced labor for payment of debt, a violation of U. S. statutes, was an outgrowth of the disruption of labor resulting from emancipation of the slaves. First developed on the farms where tenants rented land, borrowed to buy provisions to make a crop, failed to "pay out" at the end of the year, and wound up in perpetual debt, it soon spread to other occupations.

Although some whites were affected as in the case of convict leasing, blacks comprised the large majority of those caught up in debt peonage. The racial conditions of post-Civil War Florida shaped and perpetuated the peonage system. Believing that blacks were their natural labor supply and that they would not work without coercion, white employers and local officials, with few exceptions, treated blacks as forced labor. Those officials had little reservation about arresting blacks with or often without cause. When they were unable to pay their fines, those arrested could then be sold to the highest bidder to work off the costs as provided by legislation of 1865 and 1891.[66] At this point there was little difference between debt peonage and convict leasing. But, often, there was no official act involved, and those needing laborers simply handled the matter informally. Once the worker had incurred a debt, which could easily happen in many ways, he was not permitted to leave the employment until it was paid. Paying off a debt was an elusive undertaking, especially in the turpentine and lumber camps that were usually far away from the towns. If the employer provided transportation to the camp, the worker was charged for it. Thus, he was immediately in debt. He was then obliged to buy supplies from the company commissary which increased the indebtedness. It was quite common for a worker to be told on payday that his wages were being applied to his debt and that the remaining unpaid portion would be carried over. If he tried to escape he was brought back by whatever force was required.

---

[65] Ibid.

[66] Laws of Florida, 1865, p. 22, and 1891, p. 55.

449

24

The informal arrangement was given the force of law in 1891 by a statute which provided that anyone who accepted "money or other thing of value" on a promise to perform labor and then failed to do so was guilty of fraud. This legislation was refined in 1907, 1913, and 1919. By the latter date, the same year that state convict leasing ended, the law provided that in prosecutions resulting from such an act the failure to perform or to pay up "shall be prima facie evidence of the intent to injure and defraud."[67] Under this handy statute, turpentine operators and others requiring laborers could recruit individuals, furnish them transportation to the work site, assess an advance charge for the service, and subsequently hold them until the debt was paid. The company commissaries in the isolated areas usually kept that from happening.

The Martin Tabert case and the end of county convict leasing had little effect on the peonage situation. Only because of the persistence of U. S. Attorney Fred Cubberly and Judge William B. Sheppard of the Northern District of Florida did it become public knowledge that it was peonage as usual in the state after 1923. They found and pursued violators of the U. S. peonage law in several northern Florida counties and even obtained a few convictions. But, as late as 1937, the man—T. W. Higgenbotham—who had beaten Martin Tabert to death, was still working in a camp at Shamrock in Dixie County where several hundred workers were still being kept inside a fence with guarded gates. Just a few miles west of Jacksonville in Baker County, according to one investigator, "the entire Negro population of MacClenny . . . are held in . . . virtual peonage and slavery."[68]

Even the United States Sugar Corporation was prosecuted for recruiting laborers from Tennessee and holding them against their will in the marshlands near Lake Okeechobee with the aid of deputy sheriffs who kept watch on the few roads leading from the fields. The charges were dismissed on a technicality at Tampa in 1943.[69]

e. Continued Effort to Restrict Black Voting after 1868 and in the post-Reconstruction Period.

(1) The Reconstruction Years. As time passed after 1877, the eight years during which Republicans were governors of Florida came to be referred to as "Radical Reconstruction." To white ex-Confederate Floridians, those governors—Reed, Hart, and Marcellus L. Stearns—symbolized their recent defeat—"The Lost Cause"—and the recent addition to the electorate—Negro Rule." Those terms made excellent campaign rhetoric for the Bourbon Democrats who gained control of the state in 1877, but in actual

---

[67] Laws of Florida, 1891, pp. 57-58, 1917, p. 182, 1913, p. 417, 1919.

[68] Aron S. Gilmartin to Homer T Cummings, November 13, 1936, as quoted in Jerrell H. Shofner, "Postscript to the Martin Tabert Case: Peonage as Usual in the Florida Turpentine Camps," Florida Historical Quarterly, October, 1981, p. 170.

[69] Jerrell H. Shofner, "The Legacy of Racial Slavery: Free Enterprise and Forced Labor in Florida in the 1940s," Journal of Southern History, August, 1981, p. 416.

practice Reconstruction was not very "Radical" and "Negroes" certainly never "Ruled." Jonathan C. Gibbs, a Princeton-educated minister, was the only black who advanced to high office in the state. He served as secretary of state and then superintendent of public instruction before his death in 1874. Josiah Walls of Gainesville, a U. S. army veteran, was the only black elected to Congress. Several blacks served creditably in the state house and senate, but they never came close to controlling either of those bodies. Reed vetoed a civil rights bill in 1868 and another was not enacted until 1873 when Hart was governor. Hart was more sympathetic to the blacks than Reed, but his illness and eventual death led to his succession by Marcellus L. Stearns who had little regard for the blacks nor they for him. The oft-repeated slogan, "the bottom rail on top" was never true in Florida.

Nor were the Conservatives satisfied with the concessions from the moderate Republicans in 1868. While Hart, Reed, Osborn and others had hoped they were writing a constitution under which all Floridians would be willing to live, the Conservatives regarded those concessions as a departure point from which they could continue to work toward restoring their state to a racial arrangement which they considered proper.

No sooner was the constitution ratified than the Conservatives began a venomous attack on the Republican administration. With an empty treasury, a new government to build, and a hostile population to whom he symbolized "The Lost Cause" and "Negro Rule," Reed had an overwhelming task. He was criticized, satirized, and resisted at every turn. His appointment to his cabinet of two prominent Conservatives as comptroller and attorney general did little to lessen the attack.

The political assault was accompanied by an outbreak of violence ranging from assassinations of prominent Republicans such as John Krimminger, to night-riding vigilantes threatening, beating, and finally murdering white Republicans and blacks who resisted in Alachua, Columbia and other counties. The so-called Jackson County War in 1869-1870 took the lives of an estimated 160 people and eliminated every Republican in the county. That some of the regulator groups called themselves Young Men's Democratic Clubs was indicative of their purposes.[70]

Realizing that they could not police polling places if they were dispersed throughout the counties, election officials consolidated them in the county seats. But, with the resulting large crowds, vigilantes were able to disrupt the elections anyway. Violence and intimidation at the polling places in 1870 enabled the Conservatives to increase their membership in both legislative bodies to near equality with the Republicans.

---

[70] U. S. House of Representatives, Report No. 22, part 13, passim.

451

26

Violence was accompanied by economic pressure. Landowners in some counties rented land first to those who voted Conservative, or Democrat, second two those who did not vote at all, and third to those who voted Republican. David Yulee's Florida Railroad distributed numbered ballots and told the recipients that those who did not cast them need not return to work after the election.

The violence, along with comparable activity in other Southern states, caused Congress to pass the Enforcement Acts—popularly known as the Ku Klux Klan Acts—by which the president was empowered to declare martial law in counties where civil officials could not maintain order. President Ulysses Grant used that power in numerous cases in Florida, and a few convictions resulted. The politically related violence abated by late 1871, but was not eliminated during the Reconstruction years. Paradoxically, Reed received much of the blame for the disorder during this time.

Making matters worse, Senator Osborn was soon heading a Republican faction that tried to wrest control of the state from the embattled governor. Black leaders were caught between them, using their votes to their advantage when possible.

The result was eight years of chaotic government during which Conservatives—soon to be Conservative-Democrats, and, finally, Democrats—had only to use what the Republicans said about each other in their political campaigns. By 1872 Conservative-Democratic representation in the legislature was nearly equal to that of the Republicans. In 1874, they elected Democrat Charles W. Jones to the U. S. Senate. By 1875, they claimed a small majority in both legislative bodies, albeit by virtue of the midnight murder of Republican Senator E. G. Johnson in Columbia County. Then, in the celebrated 1876 election, Florida's four electoral votes were given to Republican Rutherford B. Hayes while Democrat George F. Drew became governor.

This "Compromise of 1877" facilitated "The Restoration of Home Rule" in the South. During negotiations over the compromise, Hayes' spokesmen had agreed to remove the remaining U. S. military forces from the South. Hayes complied with the agreement in April 1877. The U. S. government thus abandoned its effort to assure a place in Southern society for the freedmen. No U. S. soldiers came into the South because of racial matters again until President Eisenhower sent them to Little Rock, Arkansas, in 1957.

(2) Constitution of 1885. By the early 1880s, the Republican party had declined to minority status. An attempt to coalesce with an Independent Party, composed of dissident Democrats, failed in 1884. With the decline of the Republican Party and decreasing likelihood of a return to "Radical Reconstruction,"

Case 1:00-cv-02542-JLK Document 121 Entered on FLSD Docket 01/08/2002 Page 231 of 395

majority voters approved a constitutional convention for 1885. Only seven blacks were among the delegates elected.

Without much opposition, the convention reduced the powers of the governor, making nearly all local officials elective. The exception was the continued appointment of county commissioners, a concession to white Democrats in the Black Belt counties. The lieutenant governor was eliminated and the governor could serve only one term. Not only that, but he would share executive power with an elective cabinet. The "Bourbon Democrats" considered this decentralization safe because of the declining strength of the Republican Party. Representation of the black majority counties was further reduced by requiring a maximum of three legislative members from each county while all counties continued to have at least one.

The suffrage article (Article VI) continued the disfranchisement of "any person convicted of felony by a court of record. . . ."[71] The addition of the phrase "by a court of record" apparently resulted from the creation of a new level of jurisdiction between that of the County Court and the Circuit Court. The judicial article provided that "There shall be established in the county of Escambia, and . . . such other counties as the Legislature may deem expedient, a County Criminal Court of Record, . . ." The new court was to have jurisdiction "of all criminal cases not capital which shall arise in said counties respectively." Although existing County Courts were already "courts of record,"[72] unlike them the new County Criminal Court of Record was empowered to try felony cases, the punishment for which was confinement in the state penitentiary.[73]

The article also continued the disfranchisement of those convicted of "bribery, perjury, larceny, or of infamous crime."[74]

But, there was an important addition. Section eight provided that "The legislature shall have power to make the payment of the capitation tax a prerequisite for voting, and all such taxes received shall go into the school fund.[75] Although some of its proponents insisted that the latter was a school revenue measure, the leading authority on this period of Florida history described that argument as "an example of the subterfuge of the Democrats." He concluded that the new constitution "could well be considered a white supremacy document."[76] It was ratified in November 1886 by a vote of 31,803 to 21,243.

---

[71] Constitution of 1885, Article VI, section four.

[72] Laws of Florida, 1868, p. 12.

[73] Constitution of 1885, Article V, sections 24 and 25.

[74] Ibid., Article VI, section five.

[75] Ibid., Article VI.

[76] Edwin C. Williamson, Florida Politics in the The Gilded Age, (Gainesville, 1976), p. 142.

28

The 1887 legislature quickly addressed the two criminal proscriptions of the suffrage article. Chapter 3704, entitled "An Act to Provide for the Registration of Legally Qualified Voters in the Several Counties of the State, . . ." provided for, among other things, the disfranchisement of "Persons who may have been convicted of felony by any court of record," and "Persons who may have been convicted of bribery, perjury or of larceny or of infamous crime, . . . ." Additionally, Chapter 3705, "An Act in Pursuance of Section 5, Article VI, declared that "all persons convicted of bribery, larceny, perjury, or of infamous crimes, . . ." were excluded "from the right of suffrage; . . . ."[77]

(3) The Poll Tax and Eight-Ballot Box Laws. The 1889 legislature enacted a law requiring a one dollar poll tax, the receipt for which was required to be presented to the supervisor of elections before a potential voter could be registered. Defenders of the law still insisted that it was intended to finance education. But, their argument was undercut by another law requiring separate ballot boxes for each office, making it difficult for those who could not read to place their ballots in the proper box so that they might be counted.[78] The effect was decisive. In the 1888 election, before the poll tax was enacted, V. J. Shipman, the Republican gubernatorial candidate, lost to Democrat Francis P. Fleming by a vote of 26,845 to 40,255. There was no gubernatorial election in 1890, but the Republican candidate that year for comptroller, a statewide office, received fewer than 5,000 votes. There was no Republican candidate for governor in 1892. Florida had joined the "Solid Democratic South."

(4) The Democratic "White Primary." Some counties began nominating candidates through primary elections in the early 1890s. Then, the state Democratic convention, meeting at Jacksonville in 1900, adopted a party rule that only whites could be members of the Democratic Party. The 1901 legislature, in turn, enacted a direct primary law, providing that the political parties could select their candidates through primary elections.[79] The primary was made mandatory in 1913.[80] Since Florida had become a one-party state, the only county, state, and national election which mattered were the Democratic white primaries.

The Democrats were still taking no chances. The 1901 statute also provided that no person could participate in any primary election who had not "paid his poll tax legally due, not less than ten days before such primary election. . . ."[81] That was changed in 1913—and amended in 1915—so that no one could vote

---

[77] Laws of Florida, 1887, pp. 52, 66.
[78] Laws of Florida, 1889, pp. 13-14, 102; Williamson, The Gilded Age, pp. 159-160.

[79] Laws of Florida, 1901, p. 160.

[80] Laws of Florida, 1913, p. 242.

[81] Laws of Florida, 2901, p. 161.

in an election who had not paid "on or before the second Saturday in the month preceding the day of such election his poll taxes for two years next preceding the year in which such primary election shall be held."[82]

In addition to the barriers of the white primary and the poll tax, the white man's party still had the provisions of the 1868 and 1885 Constitutions which provided for the disfranchisement of felons as well as those convicted of bribery, perjury, larceny, or infamous crime.

(5) The Jim Crow System.  The legislation which eliminated blacks from meaningful voting were part of the infamous Jim Crow system which legally separated blacks and whites.  After the 1896 Plessy v. Ferguson "separate but equal" decision, Florida—and other Southern states—enacted legislation requiring the separation of the black and white races.  Segregation had been customary in most circumstances all along, but the 1896 Supreme Court decision led to statutes that enforced custom.  By 1915, Florida had enacted legislation requiring separate facilities for blacks and whites, including ticket counters in railroad terminals, seating in public transportation, schools, and even chain gangs, where it was illegal to chain blacks and whites together.  Floridians thereafter lived in a society where longstanding custom, reinforced by a legal code, not only permitted but compelled a situation in which blacks and whites went about their lives without ever encountering each other except when blacks were employed by whites.  The only other exception was when white convict camp bosses or white prison officials were in charge of black prisoners.

4.  Data and Other Information Considered in Forming Opinions.

In forming my opinions, I have considered the following materials:

Documents

U. S., Congress, Congressional Globe, Senate, June 17, 1868.
U. S., House of Representatives, Miscellaneous Document No. 109, 40th Cong., 2d Sess.
_____, Miscellaneous Document No. 114, 40th Cong., 2d Sess.
_____, Report No. 22, part 13.
Florida, Constitutions of 1865, 1868, and 1885.
_____, Journals of the Constitutional Conventions of 1865, 1868, and 1885.
_____, House and Senate Journals, 1865-1868.
_____, Laws of Florida, 1865-1919.

---

[82] Laws of Florida, 1915, p. 152.

Correspondence of Individuals

David L. Yulee Papers, Special Collections, University of Florida Library.

Books, Pamphlets, Articles, and Dissertations

Bacchus, James, "Shackles in the Sunshine," Orlando Sentinel Star Sunday Magazine, June 17, 1973.

Brown, Canter, Ossian Bingley Hart: Florida's Loyalist Reconstruction Governor. Baton Rouge, 1997.

Carper, N. Gordon, "The Convict Lease System in Florida." Ph. D. Dissertation, Florida State University, 1964.

Daniel, Pete, In the Shadow of Slavery: Peonage in the South, 1901-1969. Urbana, 1972.

Davis, William Watson, Civil War and Reconstruction in Florida. Gainesville, Facsimile Reprint, 1964.

Gannon, Michael, editor, The New History of Florida. Gainesville, 1996.

Powell, John C., The American Siberia, or, Fourteen Years' Experience in a Southern Convict Camp. Gainesville, Facsimile Reprint, 1976.

Report of the Republican State Executive Committee of Florida to the Republicans of the State Upon The Election Held November 2, 1880. Washington, 1881.

Richardson, Joe M., The Negro in the Reconstruction of Florida. Tallahassee, 1968.

Williamson, Edwin C., Florida Politics in the Gilded Age, Gainesville, 1976.

Wallace, John, Carpetbag Rule in Florida. Jacksonville, 1888.

Newspapers

Jacksonville Florida Union (also entitled Florida Times Union), 1868-1883.

Pensacola Commercial, 1868.

Savannah (Georgia) Republican, 1867-1868.

St. Augustine Examiner, 1867-1868.

Tallahassee Weekly Floridian, 1865-1883.

Personal Publications Used

Nor Is It Over Yet: Florida in the Era of Reconstruction, 1863-1877. Gainesville, 1974.

"Custom, Law, and History: The Enduring Influence of the Florida 'Black Code,'" Florida Historical Quarterly, January, 1977. Reprinted in all editions of Leonard Dinnerstein and Kenneth T. Jackson, editors, American Vistas. Oxford University Press.

"The Legacy of Racial Slavery: Free Enterprise and Forced Labor in Florida in the 1940s," <u>Journal of</u> <u>Southern History</u>, August, 1981.

"Mary Grace Quakenbos: A Visitor Florida Did Not Want, <u>Florida Historical Quarterly,</u> January, 1980.

"Postscript to the Martin Tabert Case," <u>Florida Historical Quarterly,</u> October, 1981.

### General Knowledge

In addition to specific use of the above listed books and articles which I have written, I have also drawn on my more general knowledge acquired from over 30 years of studying, writing, and teaching Florida History and the History of the U. S. Civil War and Reconstruction. I taught Florida History at the University of Florida, Florida State University, and the University of Central Florida from 1967 to 1997, Civil War and Reconstruction at Florida State University and the University of Central Florida from 1970 to 1995. I also taught Southern History at the University of Central Florida from 1972 until about 1985.

### 5. Compensation.

I am being compensated $100 per hour for my work in connection with drafting this report and for the time I spend testifying and preparing for testimony at trial and in pre-trial depositions.

### 6. Other Testimony Given in Last Four Years.

<u>Cosentino v. American Tobacco, et al</u>. New Jersey state court. I gave a deposition in this case in the summer of 1998. Its class action status was subsequently decertified and it was never tried.

Date: May 16, 2001

Jerrell H. Shofner

32

10-24-01

## Key Events Leading to the Adoption of the 1868 Florida Constitution

| | |
|---|---|
| May-June 1865 | Johnson (or Presidential) Reconstruction. Florida required to repudiate slavery, secession, and its Confederate debt and to recognize all acts of Congress enacted since 1861. |
| October 1865 | Constitutional convention held. |
| November 1865 | Constitution ratified. Walker elected governor. |
| December 1865 - January 1866 | Legislature enacts Black Codes. |
| | Florida's senators and representative denied seating in Congress. |
| | Congress forms the Joint Committee of Fifteen on Reconstruction to investigate conditions in the South and decide what further action is required. |
| February - March 1866 | Congress passes Civil Rights Act and extension of Freedmen's Bureau. President Johnson vetoes both. Congress enacts both over his veto. |
| April 1866 | President proclaims the insurrection in the South is ended, thus undercutting authority of the military in Reconstruction. |
| August 1866 | Fourteenth Amendment sent to states for ratification. It did not require black suffrage, but provided that states which denied it would have representation in Congress reduced in proportion. |
| October - November 1866 | Johnson's "swing around the circle" caused many voters to lose respect for him. Result was that a two-thirds majority of Republicans were returned to both houses of Congress. At the same time, voters in Kansas, Minnesota, and Ohio rejected proposals for black suffrage in their states. |
| November 1866 | Florida legislature defeated Fourteenth Amendment ratification. |
| January-March 1867 | Congress wrangles over what to do. Finally, by divided votes in both houses, First Reconstruction Act is passed on March 2. Provided for generals to take over military districts in the South and register voters, including blacks, for an election of new delegates to a new constitutional convention which had to provide for black suffrage. In the meantime, Johnson government officials were continued in office but were subject to the general who could remove individuals for cause. |

458

10-24-01

| | |
|---|---|
| Summer 1867 | New registration drawn up. Conservatives discussed what to do while a new Republican party evolved. It was badly divided between Radicals desirous of black enfranchisement and white disenfranchisement and Moderates more interested in writing a constitution which would gain the respect of a majority of Floridians. |
| November 1867 | Forty-six delegates elected to convention. |
| January 20, 1868 | Convention meets. Radicals Richards and Billings organize convention. |
| February 1, 1868 | Crucial vote leaves Billings and Richards in control of convention. Moderates leave convention and hold meetings in another town. In consultation with prominent Conservatives, they write another constitution. |
| February 4-8, 1868 | Twenty-two remaining members in Tallahassee adopt a constitution and send it to General Meade in Atlanta. |
| February 10, 1868 | Moderates return, take over assembly hall at midnight and reorganize the convention. |
| February 11, 1868 | Richards implores governor Walker and the military to help them regain possession of the assembly hall. They refuse. |
| February 17, 1868 | General Meade to Tallahassee, Col. Sprague presides over reorganization of the convention. Moderates are left in control. |
| February 24, 1868 | Suffrage article including felon disenfranchisement adopted by vote of 26 to 15. |
| February 25, 1868 | Moderate constitution completed and sent to Meade. |
| March 1868 | Meade transmits both versions of the constitution to Congress. Recommends moderate version on ground that it is signed by a majority of the delegates. Congress accepts his recommendation. |
| May 1868 | Constitution ratified. |
| July 2, 1868 | Reed sworn as governor, legislature organized, Fourteenth Amendment ratified. |
| July 4, 1868 | Reed administration recognized and troops returned to garrison duty. |

Time Line

May-June 1865---Johnson (or Presidential) Reconstruction.  Florida required to repudiate slavery, secession, and its Confederate debt.  And recognize all acts of Congress enacted since 1861.

October 1865---Constitutional Convention held.

November 1865---Constitution ratified.  Walker elected governor.

December 1865-January 1866---Legislature enacts Black Codes.
Florida's senators and representative denied seating in Congress.
Congress forms the Joint Committee of Fifteen on Reconstruction to investigate conditions in the South and decide what further action is required.

February-March 1866---Congress passes Civil Rights act and extension of Freedmen's Bureau.  President Johnson vetoes both.  Congress enacts both over his veto.

April 1866---President proclaims the insurrection in the South is ended,  thus undercutting authority of the military in Reconstruction.

August 1866---14th Amendment sent to the states for ratification.  It did not require black suffrage, but provided that states which denied it would have representation in Congress reduced in proportion.

October-November 1866---Johnson's "swing around the circle" caused many voters to lose respect for him.  Result was that a two-thirds majority of Republicans were returned to both houses of Congress.  AT THE SAME TIME, VOTERS IN KANSAS, MINNESOTA, AND OHIO REJECTED PROPOSALS FOR BLACK SUFFRAGE IN THEIR STATES.

November 1866---Florida legislator defeated 14th amendment ratification.

January-March 1867---Congress wrangles over what to do. Finally by divided votes in both houses, First Reconstruction Act is passed on March 2.  Provided  for generals to take over military districts in the South and register voters, including blacks, for an election of new delegates to a new constitutional convention which had to provide for black suffrage.   In the meantime, the Johnson government officials were continued in office but were subject to the general who could remove individuals for cause.

Summer 1867---New registration drawn up. Conservatives discussed what to do while a new Republican party evolved.  It was badly divided between Radicals desirous of black enfanchisement and white disfranchisement and Moderates more interested in writing a constitution which would gain the respect of a majority of Floridians.

November 1867---46 delegates elected to convention.

**460**

January 20, 1868---Convention meets. Radicals Richards and Billings organize convention.

February 1, 1868---Crucial vote leaves Billings and Richards in control of convention. Moderates leave convention and hold meetings in another town. In consultation with prominent Conservatives, write another constitution.

February 4, 1868---22 remaining members in Tallahassee adopt a constitution and send it to General Meade in Atlanta.

February 10, 1868---Moderates return, take over assembly hall at midnight and reorganize the convention.

February 11, 1868---Richards implores Governor Walker and the military to help them regain possession of the assembly hall. They refuse.

February 17, 1868---General Meade to Tallahassee, Col. Sprague presides over reorganization of the convention. Moderates are left in control.

February 25, 1868---Moderate constitution completed and sent to Meade.

March 1868---Meade transmits both to Congress. Recommends moderate version on ground that it is signed by a majority of the delegates. Congress accepts his recommendation.

May 1868---Constitution ratified.

July 2, 1868---Reed sworn as governor, legislature organized, 14th Amendment ratified.

July 4, 1868---Reed administration recognized and troops returned to garrison duty.

**DELEGATE VOTING PATTERNS:**
**Constitution of February 8, 1868 versus Suffrage Article of Replacement Constitution**

| NAME | RACE | Vote on Radical Constitution (2.8.1868)[1] | Vote on Suffrage Article of Replacement Constitution (2.24.1868)[2] | | | Change Due to Convention Takeover (2.10.1868 & 2.17.1868) |
|------|------|-----|-----|-----|-----|-----|
| | | | Yes | No | ♪ | |
| ARMSTRONG | African American | Yes | | | • | |
| BASS | White | Yes | | No | | |
| BRADWELL | African American | Yes | | No | | |
| CHANDLER | African American | Yes | | No | | |
| CONE | White | Yes | | No | | |
| DAVIDSON, G. | White | Yes | | No | | |
| GIBBS | African American | Yes | | No | | |
| GOSS | White | Yes | | No | | |
| HILL | African American | Yes | Yes | | | |
| JOHNSON | African American | Yes | | No | | |
| KRIMMINGER | White | Yes | | No | | |
| MEACHAM | African American | Yes | | | • | |
| MILLS | African American | Yes | | No | | |
| OATES | African American | Yes | | No | | |
| SHULER | White | Yes | Yes | | | |
| WALLS | African American | Yes | | No | | |
| WARE | White | Yes | | No | | |
| WYATT | African American | Yes | | No | | |
| **BILLINGS** | **White** | **Yes** | | | | **OUSTED** |
| **RICHARDS** | **White** | **Yes** | | | | **OUSTED** |
| **SAUNDERS** | **African American** | **Yes** | | | | **OUSTED** |
| **PEARCE, C.** | **African American** | **Yes** | | | | **OUSTED** |
| HART | White | | Yes | | | REPLACED BILLINGS |
| DAVIDSON, J. | White | | | | • | REPLACED RICHARDS |
| STEARNS | White | | Yes | | | REPLACED SAUNDERS |
| WELLS | African American | | | No | | REPLACED C. PEARCE |
| ALDEN | White | WALKED OUT | Yes | | | |
| ARMISTEAD | White | WALKED OUT | Yes | | | |
| BRYAN | African American | WALKED OUT | Yes | | | |
| BUTLER | White | SEAT DENIED | Yes | | | |
| CAMPBELL | White | NOT YET SEATED | Yes | | | |
| CESSNA | White | WALKED OUT | Yes | | | |
| CHILDS | White | WALKED OUT | Yes | | | |
| CONOVER | White | WALKED OUT | Yes | | | |
| DENNETT | White | ABSENT | Yes | | | |
| ERWIN | African American | WALKED OUT | Yes | | | |
| FORTUNE | African American | WALKED OUT | Yes | | | |
| HOWSE | White | WALKED OUT | | | • | |
| JENKINS | White | WALKED OUT | Yes | | | |
| MCRAE | White | WALKED OUT | Yes | | | |
| MIZELL | White | WALKED OUT | | | • | |
| MOBLEY | White | WALKED OUT | Yes | | | |
| OSBORN | White | WALKED OUT | Yes | | | |
| PEARCE, S. | White | WALKED OUT | Yes | | | |
| POWELL | White | WALKED OUT | Yes | | | |
| PURMAN | White | WALKED OUT | Yes | | | |
| ROGERS | White | NOT YET SEATED | Yes | | | |
| ROMBAUER | White | WALKED OUT | Yes | | | |
| ROWLEY | White | WALKED OUT | Yes | | | |
| URQUHART | African American | WALKED OUT | Yes | | | |
| WALKER | White | NEVER ATTENDED | | | | |
| **TOTALS** | | | **26** | **15** | **5** | |

[1] Signatories to Constitution, H.R. Misc. Doc. 109, at 21 (40th Cong., 2d. Sess.) (1868).

[2] Roll Call, Journal of 1868 Constitutional Convention, at 126 (Feb. 24, 1868).

[3] • = Vote not on record.

462

Addendum to Expert Report

by

Professor Jerrell H. Shofner

Case:    Johnson v. Bush
         No. 00-CV-3542
         U. S. District Court
         Southern District of Florida
         Judge James Lawrence King

I have been retained as an expert by counsel for the Plaintiffs in the above captioned litigation. This is an addendum to the report I submitted May 16, 2001, pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

See my May 16, 2001, report and attached curriculum vita for my professional qualifications.

For this addendum I was asked to do the following:

1. Describe briefly the culture, economy and politics of the "Old South" in Florida and how they have persisted in modern times.

2. Explain the relationship to the "Old South" of North Florida, specifically the following counties: Alachua, Baker, Bay, Bradford, Calhoun, Clay, Columbia, Dixie, Duval, Escambia, Flagler, Franklin, Gadsden, Gilchrist, Gulf, Hamilton, Holmes, Jackson, Jefferson, Lafayette, Leon, Levy, Liberty, Madison, Nassau, Okaloosa, Putnam, St. Johns, Santa Rosa, Suwannee, Taylor, Union, Wakulla, Walton, Washington.

My response is as follows.

Florida was acquired from Spain in 1819 just as cotton cultivation and its companion slave labor were spreading across the Old South. With land ideally suited to cotton agriculture, northern Florida was settled rapidly by people from the older Southern states, especially South Carolina, Georgia, and, a little later, Alabama. They brought with them their slaves, the plantation system, and the culture of the Old South. During the four decades of the antebellum period, northern Florida was settled southward nearly to Ocala in the upper part of the peninsula. That part of the Florida developed economically, politically, and culturally as an Old South state. Its economic success was based on cotton culture and that was, in turn, based on slave labor. But, slavery was not just a labor system. It was a way of life. Since the 17th century, white Southerners had regarded blacks as inferior beings who were incapable of making their own way. They required the supervision of their masters. They were obliged to work as directed, but the owners were responsible for their well-being. Only in this way could two such different races live together in peace. This was certainly a convenient rationale for the whites who considered themselves the superior race, but it was a belief deeply imbedded in the culture of the Old South. Any threat to this way of life had to be resisted at all cost.

Like their neighbors in other Old South states, Floridians believed in a limited government in which the rights of states were clearly enumerated in the Constitution and were not to be interfered with by the central government.

The Civil War

When the nation divided, largely over the issues of state rights and slavery, in 1860-1861, Florida joined ten other Southern states and fought to exhaustion to defend its way of life. Slavery was abolished, first by presidential proclamation in 1863 and then by a constitutional amendment in 1865. Having lost the war,

1

their slaves, most of their wealth, and many of their citizens, surviving Floridians looked back at the war as "The Lost Cause," and wondered about an uncertain future. One northern Florida woman thought she was speaking for her neighbors when she wrote in her memoir that all they did in the early years following the war was "worship the Confederate dead and hate the Yankee living."[1]

## The Reconstruction Years

After the war ended in 1865, a divided national government struggled for nearly three years over a policy for rebuilding the nation. When "Radical Reconstruction" was finally implemented in 1868, Floridians were obliged to abandon their adamant resistance to the enfranchisement of blacks, something they had repeatedly insisted they could never accept. While many of them refused to cooperate with a government which would include black voters, others worked with members of the newly formed Republican Party to obtain as many concessions as possible in the new constitutional arrangement. But, despite having achieved considerable success in this regard, nearly all Conservative white Floridians set out immediately to discredit the Republicans who gained control of the new government in 1868. The result was eight years during which Republicans sat as governors of Florida, presiding over a badly divided, often violent, society. Conservative white Floridians denounced the era as a period of "Negro Rule" imposed on a defeated and defenseless population against its will. When the Hayes-Tilden election dispute of 1876 resulted in the so-called "Compromise of 1877," Republican Rutherford B. Hayes was seated as president while Democrat George F. Drew became governor of Florida. Drew was applauded as the "Redeemer" who saved Florida from "Negro Rule" and Hayes' withdrawal of federal troops from the South in April 1877 became the "restoration of home rule." During the years that followed, these phrases were used by the Bourbon Democrats to remind white voters that Democratic solidarity was essential to avoid a return to "Negro Rule."

## The Bourbon Years

The Constitution of 1868 had provided for a strong governor who appointed almost every state and local official in the state. With that power now in their hands, Drew and the Bourbon Democrats moved, cautiously at first, to reduce the number of black voters and eliminate the Republican Party from a role in state affairs. Republicans continued to constitute a sizable minority for a while, and even elected a Congressman as late as 1882. But, as it became clearer that the national government was not disposed to interfere further in Southern affairs, the Bourbons increased their efforts to assure control of the state. In 1884, voters approved a constitutional convention for 1885. That convention wrote a document which, among other things, provided for a poll tax as a condition for voting. Its enactment in 1889 reduced the Republican Party to a negligible minority. By 1901, Florida had adopted a direct primary and the Democratic Party had decreed that only whites could be Democrats. Blacks were still able to vote if they wished, but only in Republican primaries and in non-partisan elections. As far as statewide and national elections were concerned, Florida had joined the Solid Democratic South. It retained that status for the first half of the 20th century.

With the federal government no longer involved in Florida's internal affairs, Floridians felt their views of state rights had been vindicated.

## The Jim Crow System

The national government's willingness to accept a segregated South was emphasized in 1896 when the U. S. Supreme Court handed down the "separate but equal" ruling in Plessy v. Ferguson. During the two following decades, Florida enacted a series of laws segregating blacks and whites in almost every conceivable situation. Not only were schools segregated, but there was a law making it a crime for anyone

---

[1] Memoirs of Helen Moore Edwards, 1865, as quoted in my Nor Is It Over Yet: Florida in the Era of Reconstruction, 1863-1877.

to teach blacks and whites together. Public transportation was segregated. That included ticket windows and waiting rooms. It was even against the law to chain black and white prisoners together. Members of the two races might easily go about their lives without ever encountering each other except in master-servant relationships. Segregation by custom had already been in effect to a considerable degree, but these enactments added a legal enforcement to existing custom.

Blacks were left defenseless against the worst elements of white society. They were obliged to go about their business exercising great care not to offend white persons. But, when an offense, real or imagined, occurred, blacks were subject to the whim of whites. By the mid-20th century, nearly three generations of Floridians had lived where segregation was not only customary, but was also required by law.

The Settlement of South Florida

While there was some immigration into the northern Florida counties, they remained mostly populated by residents who had grown up there and whose ancestors had lived there for generations. They had been nourished on the belief that whites were naturally superior to blacks, that the Civil War and Reconstruction were Yankee interruptions of a proper way of life which had been corrected by "the restoration of home rule" and the enactment of legal segregation.

The situation was somewhat different in peninsular Florida. By the 1880s, people were migrating into that sparsely settled part of the state. Some came from northern Florida, but many others migrated from the northeastern and mid-western parts of the nation. Most of them accepted the prevailing customary and legal segregation of blacks and whites, but the beliefs supporting that way of life were not so deeply imbedded in them. They practiced segregation and even resisted the Brown decision and other civil rights measures after mid-century, but they were neither unanimous in their opposition nor as deeply committed to maintaining segregation as their counterparts in northern Florida.

One example of this difference occurred in 1956 when Dr. Deborah Coggins, a white public health officer, sat down at lunch to discuss business with a black public health nurse in Madison County. Her dismissal by the county commissioners for a "breach of social tradition," was strongly approved in northern Florida while angry citizens of southern Florida filled the state newspapers with letters denouncing the action of the county commissioners.[2]

The Civil Rights Era and the End of the Solid Democratic South

Beginning with school desegregation in the 1950s, a series of court decisions and federal laws have gone far toward ending segregation. The Jim Crow system has ended. Legislation for school desegregation, voting, and equal treatment in public accommodations have been implemented. But, the laws often encountered serious resistance. Many people not only opposed desegregation itself, but they also resented what they regarded as another interference by the federal government in the affairs of the state. This was especially true in northern Florida where the Old South culture was still most prevalent.

It is worth noting that northern Florida is now a Republican stronghold where the Solid Democratic South had been uncontested for more than a half century. That transition began when the national Democratic Party included a civil rights plank in its 1948 platform and began advocating national initiatives to end the segregation that its Southern wing had long defended. Although other issues have been involved, northern Florida became increasingly Republican at least partially because that party favored less federal interference in state and local affairs.

---

[2] Jerrell H. Shofner, "The Black Codes," in Leonard Dinnerstein and Kenneth T. Jackson, American Vistas: 1877 to the Present, p. 33.

3

The Limits of Legislation in Effecting Cultural Change

Although overt racial discrimination has been vastly reduced by the array of civil rights legislation of recent years, it still persists in more subtle form throughout the state. Legislation has probably gone about as far as possible in achieving racial equality. Removing the legal support of the Old South culture was a major accomplishment, but what remains is more difficult to address. A change in custom and belief will have to come throughout the state. But, it will come more slowly in northern Florida where racial attitudes are more deeply imbedded and where society remains more homogeneous than in the remainder of the state despite the many changes of the past half century.

   3. In providing the foregoing, in addition to the material cited in my report of May 16, I have considered the following:

Ayers, Edward L. Southern Crossing: A History of the American South, 1877-1906. 1995.

Dinnerstein, Leonard, and Kenneth T. Jackson. American Vistas: 1877 to the Present. 1987.

Frederickson, Kari. The Dixiecrat Revolt and the End of the Solid South, 1932-1968. 2001.

Gannon, Michael, editor. The New History of Florida. 1996.

Jordan, Winthrop. White Over Black: American Attitudes Toward the Negro. 1968.

Rivers, Larry Eugene. Slavery in Florida: Territorial Days to Emancipation. 2000.

   4. I am being compensated $100 per hour for my work in connection with drafting this addendum and for the time I spend testifying and preparing for testimony at trial and in pre-trial depositions.

   5. See my May 16 report for other expert testimony I have given in the last four years.


Date: June 20, 2001

Jerrell Shofner
Jerrell Shofner

4

## Supplemental Expert Report
by
Joseph L. Katz, Ph.D.

Case:  Johnson v. Bush
No. 00-CV-3542
U.S. District Court
Southern District of Florida
Judge James Lawrence King

## I.    INTRODUCTION

### A.    Overview

Cooper & Kirk, PLLC have retained me as an expert consultant in Johnson v. Bush. I am being compensated at the rate of $200 per hour. I have not testified as an expert witness at trial or by deposition in the last four years. I have prepared this supplemental report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).[1]

I have been asked by Cooper & Kirk to evaluate the statistical reliability of Dr. Christopher Uggen's findings described in his expert report of August 8, 2001 as they pertain to racial disparities in the decisions made by the Clemency Board to restore an applicant's civil rights. Dr. Uggen's study is based on a sample of 1,217 cases. I received an electronic copy of the data file that contained the variables that were collected from each of the 1,217 clemency applications selected for the sample. I obtained a copy of Dr. Uggen's book of codes that defines each variable, and a document that shows the computer programs that Dr. Uggen used to generate the statistical results for his report. My analysis of Dr. Uggen's results is based upon these materials. I have not attempted to verify the accuracy of the data that was defined by Dr. Uggen from the Clemency Board's paper files.

---

[1] I have previously submitted an expert report in this case regarding my evaluation of the findings in Dr. Theodore Chiricos' expert report. A copy of my curriculum vita is attached to my expert report dated August 31, 2001.

1

## B.   Principal Findings

After reviewing Dr. Uggen's report and after conducting my own analysis of his data I have reached the following major conclusions:

1.     Overall, the Clemency Board granted restoration of civil rights to the vast majority of eligible whites and blacks who were directly reviewed by the Clemency Board. The sample results indicate that eligible whites were granted restoration of their civil rights at a rate of 96.62% and eligible blacks were granted restoration of their civil rights at a rate of 94.90%. This difference in restoration rates is not statistically significant. Dr. Uggen's seemingly different opinion 8 on page 2 of his report, that "African American applicants are significantly less likely to be granted restoration of voting rights than non-African American applicants," is not actually contrary but appears to be based on a racial comparison that includes *ineligible* applicants and applicants who did *not* complete the application process.

2.     Overall, applicants who were granted restoration of their civil rights by the Clemency Board had a less severe criminal background and were more established in their communities than applicants who were denied restoration of their civil rights by the Clemency Board.

3.     Professor Uggen's *unweighted* logistic regression analyses in Tables 12C and 12D of his report are misleading because they do not account for the fact that the sample of 1,217 cases were *not* selected with equal probability from the population of clemency applications. Dr. Uggen oversampled cases that were denied by the Clemency Board and cases that were considered from mid 1995 to May 2001. The *weighted* logistic regressions are more appropriate for the stratified sample design used by Dr. Uggen. The weighted logistic regressions, for the models in Tables 12C and 12D, produce coefficients for the racial variables that are not statistically significant.

2

**468**

## II.   STUDY OF CLEMENCY BOARD DECISIONS

### A.   Sample Design

The Office of Executive Clemency in Florida made available to Dr. Uggen a list of its case files of applicants who had asked for restoration of their voting rights.[2] Dr. Uggen did not select a simple random sample of cases from this list. Instead, he divided the list of cases into three groups or strata: (1) cases that were eligible to be considered by the Clemency Board, but which the Board denied, (2) recent cases from mid 1995 to May 2001 that were either granted restoration of civil rights by the Clemency Board or were not considered due to ineligibility or an incomplete application, and (3) older cases prior to mid 1995 that were either granted restoration of civil rights by the Clemency Board or were not considered due to ineligibility or an incomplete application. Professor Uggen selected for his sample 259 cases from the stratum in which the Clemency Board denied restoration of voting rights. This amounted to almost all the denials (278 cases) in the entire pool of 12,207 application files. In addition, for those cases in which restoration of civil rights was not denied, he over-sampled the more recent cases (608 cases) and under-sampled the older cases (350 cases).[3] Although this disproportionate stratified random sampling design is an acceptable sampling plan, each sampling unit must be weighted appropriately to properly project the sample result to the universe of cases.[4] To correct for the unequal probability of the selection of the sample of cases from the three strata, Dr. Uggen

---

[2] Dr. Uggen's sampling frame did not include most of the grantees that were eligible for automatic restoration of their voting rights. Dr. Uggen report, page 17.

[3] Dr. Uggen states on page 17 of his report, "From each of these lists, we selected each of the denied cases, and then took a systematic random sample of 1 in 15 of the cases more than five years old and 1 in 5 of the more recent cases."

[4] Dr. Uggen states on page 5 of his report in reference to Table 4 that "[t]he weighted means and percentages provide the best population estimates of characteristics of the average or typical applicant." Nevertheless, he presents *unweighted* results in Tables 11, 12, 12B, 12C, and 12D of his report.

3

assigned a weight to each of the 1,217 cases in proportion to the reciprocal of its probability of being selected into the sample.[5]

Dr. Uggen classified the sample of cases into five categories according to the final disposition of the case: (1) applicant's civil rights restored (719 cases), (2) application withdrawn (52 cases), (3) application returned to applicant (172 cases),[6] (4) application denied (259 cases), and (5) other (15 cases).[7] The Clemency Board rendered a decision for 978 of the 1,217 cases in the sample whose final disposition was either (1) applicant's civil rights restored, or (4) application denied. The Clemency Board did not directly decide the petition for restoration of civil rights for the remaining 239 applicants in the sample because they either did not complete the application process or were ineligible for restoration of their civil rights.

**B.  The Focus of My Analysis is Clemency Board Decisions Either to Grant or Deny Restoration of Civil Rights**

My analysis of Dr. Uggen's database focuses primarily on the subsample of 978 cases whose final disposition was either Dr. Uggen's outcome category (1) applicant's civil rights restored, or outcome category (4) application denied. For these cases the disposition of not denied is equivalent to the disposition of granted restoration of civil rights by the Clemency

---

[5] Dr. Uggen writes on page 17 of his report, "In presenting population estimates for these data, we assign weights to each observation that are proportional to the inverses of the selection probabilities within each stratum." Thus, cases from a stratum that is over-sampled must receive a weight less than one, and cases from a stratum that is under-sampled must receive a weight greater than one. Each denied case received a weight of .14, recent not denied cases each received a weight of .71, and older not denied cases each received a weight of 2.13. Typically, the weights are assigned so that the sum of the weights equal the number of cases sampled. Due to the fact that Dr. Uggen rounded the sample weights to two decimal places, the sum of the weights is 1212.44 instead of 1,217. The weights dramatically alter the distribution of the case outcomes for the sample. For example, the 259 cases that were denied by the Clemency Board represent 21.3% (259/1,217) of the unweighted sample, but only 3.0% (36.26/1,217) of the weighted sample.

[6] These applicants were ineligible for restoration of their civil rights under the rules for executive clemency or were unable to cooperate with examiners. Dr. Uggen Report, page 7.

[7] The number of cases in parentheses for each category is unweighted.

Board. I recalculated the sample weights for each of the 978 cases in the subsample to correct for the unequal probability of the selection of cases from the three strata. The sample weight is .13664998 for each denied case, .75189171 for each application for restoration of civil rights that was granted after mid 1995, and 2.172377629 for each application that was granted before mid 1995.[8] The sample weights for the subsample turn out to be only slightly different from the sample weights Dr. Uggen derived based upon the full sample of 1,217 cases.

C.   There is No Statistically Significant Difference in Rates of Civil Rights Restoration Decisions By the Clemency Board Between White and African American Applicants

Table 1 compares the civil rights restoration rates for white and black applicants who were eligible for clemency and completed their application. Table 1 displays both the weighted and unweighted restoration rates for all years, for the older cases before mid 1995, and for the more recent cases from mid 1995 to May 2001.[9]

The Clemency Board grants a high proportion of applications for restoration of civil rights for both white and black applicants. Overall, whites were granted restoration of their civil rights by the Clemency Board at a slightly higher rate than blacks (white = 96.62%, black = 94.90%, p-value = .3301).[10] This finding is based upon the weighted sample results, which more accurately reflect the universe of cases because Dr. Uggen selected his sample using disproportionate stratified random sampling.

---

[8] The universe list of Clemency Board cases indicates that the Clemency Board denied 278 cases, granted restoration of civil rights in 4,829 cases before mid 1995 and granted restoration of civil rights in 2,575 cases from mid 1995 to May 2001. Overall, the Clemency Board granted 96.38% (7,404/7,682) of Clemency applications.

[9] The analysis in Table 1 focuses on actual decisions by the Clemency Board to grant or deny restoration of civil rights. The analysis is related to Tables 8 and 8B of Dr. Uggen's report where he shows the unweighted and weighted racial percentage of cases that fall into each of the five disposition categories. Table 8 gives the percentages for all cases in the sample for all years, whereas Table 8B restricts the analysis to the more recent cases from mid 1995 to May 2001.

[10] For applicants classified as "other" race, 95.46% were granted restoration of their civil rights.

5

The 1.72% difference in restoration rates between white and black applicants (96.62% - 94.90% = 1.72%) is not statistically significant or statistically different from 0%. The basis for concluding that this is not a statistically significant difference is that the p-value of .3301 exceeds the three standard significance levels of .10, .05, and .01. The significance level is the probability of falsely concluding that the civil rights restoration rates are unequal when in fact they are equal. These three significance levels correspond to different standards of proof before one can conclude that the restoration rates between white and black applicants are unequal. The smaller the significance level, the larger the difference required in restoration rates by race to find a statistically significant difference. The p-value is the strength of the evidence. The p-value of .3301 is the probability of observing a difference in civil rights restoration rates between white and black applicants for the sample of more than 1.72% or less than –1.72% if white and black civil rights restoration rates for the universe of cases are equal. Thus, the p-value becomes smaller as the observed difference in restoration rates for the sample becomes wider. In order for the difference in restoration rates between white and black applicants to be statistically significant, the p-value, or strength of the evidence, must be less than the significance level, the standard of proof. Accordingly, since the p-value of .3301 exceeds all three of the generally accepted significance levels, there is no statistically significant difference in the restoration rates between white and black applicants.

Similarly, for older cases before mid 1995, whites and blacks had their civil rights restored at a virtually equal rate (white = 97.29%, black = 97.30%, p-value = .9965). Whites were granted restoration of their civil rights at a higher rate than blacks for cases from mid 1995 to May 2001 (white = 95.30%, black = 91.43%, p-value = .2520), but the difference is not statistically significant.

6

My finding appears to agree with Dr. Uggen's statement on page 7 of his report "African American applicants appear to be slightly more likely than white applicants to be denied restoration of civil rights, although this difference is not statistically significant." However, my finding seems to be at odds with opinion 8 of Dr. Uggen's report (page 2) that "African American applicants are significantly less likely to be granted restoration of voting rights than non-African American applicants." Dr. Uggen's opinion 8 does not pertain to Clemency Board decisions that were rendered to eligible applicants who had completed the application process.

Table 1 also provides the unweighted restoration rates of civil rights by race to illustrate the difference between the weighted and unweighted results. The unweighted method indicates that whites are granted restoration of their civil rights at a 7.41% higher rate than blacks for all years (white = 74.53%, black = 67.12%, p-value = .0627). For those cases from mid 1995 to May 2001 (white = 78.65%, black = 65.98%, p-value = .0078), the difference in restoration rates is statistically significant. The weighted and unweighted methods produce substantially different results because Dr. Uggen selected 93% (259/278)[11] of the denied cases in his sampling plan, although the number of applications selected for his sample is only 10.0% (1,217/12,207) of the total universe of applications. Consequently, the unweighted method overstates the percentage of cases denied restoration of civil rights in the universe of cases. Overall, the Clemency Board denied restoration of civil rights to 3.62% (278/7,682) of the cases it reviewed. The denied cases represent 26.48% (259/978) of the unweighted cases, but only 3.62% (35.39/978) of the weighted cases. Thus, the unweighted method gives a misleading picture regarding the civil rights restoration rates for white and black applicants.

---

[11] Of the 259 denied cases, 203 were white applicants and 48 were black applicants.

**D.     Clemency Board More Likely To Restore Civil Rights To Applicants With Less Severe Criminal Backgrounds and Who Were Established in Their Communities**

Table 11 of Dr. Uggen's report compares the average value of demographic, socioeconomic, criminal history, and family community and mental health variables for applicants whose civil rights were restored with those of applicants whose civil rights were not restored. I present a similar analysis but with two fundamental changes. First, I compare those applicants to whom the Clemency Board decided to grant restoration of civil rights with those applicants whom the Clemency Board considered but decided to deny restoration of civil rights. My analysis omits ineligible applicants and applicants who had not finished the application process. Second, I report weighted values (means and proportions), rather than unweighted values, because the weighted values are the appropriate estimates for the population of cases.

The results of my analysis, presented in Table 2, indicate that there are seven factors in which the population of applicants granted restoration of their civil rights by the Clemency Board is statistically significantly different, at the .05 level of significance, from the population of applicants whose petitions for restoration of their civil rights was denied by the Clemency Board. Applicants whose civil rights were restored by the Clemency Board were more likely to be married (granted = 60.32%, denied = 44.19%, p-value = .0359) and have a higher average net worth (granted = $181,494, denied = $12,874, p-value = .0435).[12] On the other hand, applicants whose civil rights were not restored by the Clemency Board were more likely to have a prior conviction for a violent offense (denied = 44.19%, granted = 18.76%, p-value = .0002), have a prior conviction for "other" offense (denied = 36.82%, granted = 17.34%, p-value = .0031), have

---

[12] The p-values reported here are based on the test of equal percentages or equal means between the applicants that were granted restoration of civil rights and the applicants that were denied restoration of civil rights. The p-value for the test that the mean or percentage for the applicants

a higher average number of prior felony convictions (denied = 1.91, granted = 1.31, p-value = .00021), have a higher average number of subsequent arrests (denied = 1.17, granted = 0.61, p-value = .0268), and have a higher proportion of mental health treatment (denied = 18.82%, granted = 9.19%, p-value = .0390).[13] Overall, these results suggest that the applicants who were granted restoration of their civil rights had a less severe criminal background and were more established in their communities than applicants who were denied restoration of their civil rights. My finding appears to agree with opinion 10 of Dr. Uggen's report (page 2).

However, I am unable to state that the Clemency Board uses these variables, as defined by Dr. Uggen in his study, to decide requests for restoration of civil rights rather than considering more specific information listed in each individual application. Indeed, many of Dr. Uggen's variables are category variables that are broadly defined and fail to distinguish differential levels of an applicant's background. For example, Dr. Uggen defined the criminal history variable prior conviction for a violent offense. This variable permits applicants that engage in a wide range of violent criminal activities to be classified into the same prior offense conviction category. For example, an applicant convicted of murder would be classified into the same prior violent offense category as an applicant convicted of a minor violent offense.

## III.    ANALYSIS OF RACIAL DIFFERENCES IN CIVIL RIGHTS RESTORATION RATES USING LOGISTIC REGRESSION

### A.    Dr. Uggen's Unweighted Logistic Regression Models

Dr. Uggen used unweighted logistic regression to analyze his sample of cases to examine the impact of race on civil rights restoration outcomes after statistically controlling for certain criminal history and other factors that he defined for his sample of cases. Dr. Uggen presents his

---

granted restoration of rights is higher than the corresponding mean or percentage for the denied applicants is equal to half the p-value for the test for equality of means or percentages.

9

unweighted logistic regression models in Tables 12, 12B, 12C, and 12D of his report. Table 12 provides four unweighted logistic regression models that attempt to predict the relative odds of civil rights restoration based upon applicants in the sample for all years. Table 12B repeats the same four models but limits the pool to recent cases from mid 1995 to May 2001. The models in Tables 12 and 12B include applicants who were ineligible for restoration of civil rights or had not finished the application process. Tables 12C and 12D repeat the same four models from Tables 12 and 12B respectively, but limit the cases to those eligible applicants who had completed the process and whose case was ultimately decided by the Clemency Board. Generally, these unweighted logistic regression models attempt to provide the relative odds of civil rights restoration based upon racial, criminal history, socioeconomic, and other extralegal factors. Dr. Uggen concludes that his models show that "African Americans remain less likely to be granted restoration of their voting rights even when many of the legal and extralegal factors associated with restoration outcomes are statistically controlled."[14]

This conclusion appears to be based on Dr. Uggen's use of unweighted rather than weighted logistic regression models and on his inclusion of ineligible and withdrawn applications that do not reflect a Clemency Board decision. Thus, Dr. Uggen's conclusion is not true to the extent that it pertains to cases decided by the Clemency Board, because the weighted versions of the logistic regression models in Tables 12C and 12D produce racial coefficients that are not statistically significant. Furthermore, even using the unweighted logistic regression methodology, controlling for other sets of predictor variables defined by Dr. Uggen can produce models where the racial variables are not statistically significant. These and other limitations of Dr. Uggen's logistic regression analyses are discussed below.

---

[13] Again, the p-values reported here are based on the test of equal percentages or equal means between the two groups.

10

**B.   Limitations of Dr. Uggen's Unweighted Logistic Regression Models**

**1.   The Logistic Regression Models from Tables 12 and 12B of Dr. Uggen's Report Include Ineligible and Incomplete Cases**

Dr. Uggen's results in Tables 12 and 12B are not limited to those cases in which the Clemency Board actually made a decision whether or not to grant or deny an application for restoration of civil rights.[15] Dr. Uggen included applicants that were ineligible or did not complete the application process. Obviously, ineligible applicants or applicants who did not finish the application process cannot be granted restoration of their civil rights by the Clemency Board. These applicants do not satisfy the minimum requirements necessary to have restoration of their civil rights considered by the Clemency Board regardless of their criminal history, race, socioeconomic or other extralegal factors defined by Dr. Uggen. The logistic regression models developed by Dr. Uggen do not control for this fact. Consequently, the logistic regression models in Tables 12 and 12B should be modified to add a predictor variable that indicates whether or not the applicant was eligible and had completed the application process. This variable would account for the ineligible and incomplete cases and would produce coefficients for the remaining predictor variables in the model as if the pool of cases were limited to those decided by the Clemency Board. Logistic regression models based upon Clemency Board decisions were considered by Dr. Uggen in Tables 12C and 12D of his report.

**2.   The Weighted Version of the Logistic Regression Models from Tables 12C and 12D of Dr. Uggen's Report Produce Racial Coefficients That Are Not Statistically Significant**

The logistic regression models in Tables 12C and 12D of Dr. Uggen's report pertain to the Clemency Board's decision to grant or deny restoration of civil rights for eligible applicants

---

[14] Dr. Uggen's Report, page 10.

who completed the application process. However, the results in Tables 12C and 12D are based on the unweighted logistic model. I have rerun the four models from Tables 12C and 12D using weighted logistic regression by weighting each case by the appropriate sample weight. The results for these four models are shown in Tables 3 and 4 respectively. Unlike the unweighted models, the weighted logistic models have coefficients for the racial variables that are *not* statistically significant for any of the models because the p-values are each greater than .10. The difference in the statistical significance of the racial variables is due to the fact that Dr. Uggen's unweighted logistic regression models do not account for the fact that Dr. Uggen over-sampled the denied cases.

### 3. Explanation of Logistic Regression Coefficient in Terms of the Odds Ratio

The interpretation of the logistic regression coefficients is based upon the concept of odds and the odds ratio. The odds that an event occurs are related to the probability that the event occurs.[16] The "odds ratio" compares the odds that an event occurs for two distinct groups. The significance of the size of the odds ratio can be counterintuitive as shown by a racial comparison of the unweighted and weighted restoration rates in this case.

Table 1 compares the civil rights restoration rates for white and black applicants who were eligible for clemency and completed their application. The weighted results indicate that, overall, 96.62% of whites and 94.90% of blacks were granted restoration of their civil rights by the Clemency Board. Thus, the odds that a white would be granted restoration of civil rights is 28.586 to 1 (.9662/.0338 to 1) and the odds that a black would be granted restoration of civil

---

[15] Dr. Uggen uses unweighted rather than weighted logistic regression to produce the models shown in Tables 12 and 12B. These models include ineligible applicants and cases with incomplete applications.

[16] For example, if the odds that an event occurs are 3 to 1, then there are 3 chances out of 4 that the event occurs, and the probability is .75 or 3/4. If the probability that an event occurs is .75, the odds of the occurrence of the event are .75/(1-.75), which is equivalent to 3 to 1.

12

rights would be 18.608 to 1 (.9490/.0510 to 1). The odds ratio of restoration rates between white and black applicants is 1.536 (28.586/18.608).[17] Thus white applicants have a 1.536 times higher odds of gaining restoration of their civil rights than black applicants. Despite the fact that the odds ratio is 1.536, Table 1 indicates that there is only a 1.72% percent difference in restoration rates between white and black applicants and that this difference is not statistically significant because the p-value is .3301. Consequently, the odds ratio of 1.536 between white and black applicants is also not statistically significant or different from an odds ratio of 1.

However, a similar analysis of the unweighted overall restoration rates from Table 1 shows that the odds ratio between white and black applicants is 1.434 ([.7453/.2547]/[.6712/.3288]). Although this odds ratio of 1.434 for the unweighted sample is lower than the odds ratio of 1.536 for the weighted sample, the difference in restoration rates is 7.41% (74.53% - 67.12%) and the p-value for the percent difference in restoration rates is .0627. Thus, the importance of the magnitude of the odds ratio must be viewed relative to the size of the underlying probabilities of the event.

For example, suppose that we hypothetically select a random sample of 600 white applicants and 600 black applicants that were reviewed by the Clemency Board. If 96% of the whites and 94% of the blacks are granted restoration of civil rights, then the odds ratio is 1.53 ([.96/.04]/[.94/.06]). However, if only 70% of the white applicants and 68% of black applicants are granted restoration of civil rights, the odds ratio is only 1.098 ([.70/.30]/[.68/.32]). In both cases, the difference in restoration rates for whites and blacks is 2%, which is not statistically significant [(white = 96%, black = 94%, p = .1120) and (white = 70%, black = 68%, p = .4539)].

Consider now the first logistic regression model from Table 3. The model is of the form:

---

[17] An odds ratio of 1 would occur if the odds of restoring civil rights were the same for white and black applicants.

log(odds applicant denied)  =   -3.3532  +  .4302*(African American) + .3079*(Other race).
                                          (p-value = .3336)      (p-value = .7576)

For white applicants, the values for the African American and Other race variables are each 0. Therefore, the logarithm of the odds that a white applicant is denied is −3.3532, and the odds that a white applicant is denied is exp(-3.3532) = .03497.[18] Finally, the probability that a white applicant is denied restoration of civil rights is 3.38% (.03497/(1 + .03497)), which equals the denial rate for white applicants that was derived in Table 1.

For black applicants, the value for the African American variable is 1 and the value for the Other race variable is 0. Therefore, the logarithm of the odds that a black applicant is denied is −3.3532 + .4302 = −2.923, and the odds that a black applicant is denied is exp(-2.923) = .05377. Finally, the probability that a black applicant is denied restoration of civil rights is 5.10% (.05377/(1 + .05377)), which again, equals the denial rate for black applicants that was derived in Table 1.

The same method can be used to derive the denial rates by race for the other logistic regression models shown in Tables 3 and 4. However, the log(odds applicant denied) will also vary depending upon an applicant's particular value for each of the other non-racial predictor variables that are included in the model.

## 4.    Other Logistic Regression Models

In order to demonstrate that even Dr. Uggen's *unweighted* logistic regression methodology does not necessarily indicate statistically significant racial differences, Table 5 provides an example of a logistic regression model in which the racial variables are not statistically significant for both the weighted *and* unweighted versions of the model. The dependent variable is the Clemency Board's decision to either grant or deny restoration of civil

rights. The predictor variables are the two racial variables (African American and Other) and five of the criminal history variables defined by Professor Uggen (number of prior felony convictions, violent offense conviction, drug offense conviction, property offense conviction and other offense conviction). The results show that the coefficients for the racial variables for both the weighted and unweighted version of this model are not statistically significant.

Consequently, this example demonstrates that, even for unweighted models, the statistical significance of the racial variables can change according to the set of predictor variables that are included in the logistic regression model. The model in Table 5 contains five criminal history related variables that were defined by Dr. Uggen, and the results of the model appear to conflict with Dr. Uggen's opinion 11 (Dr. Uggen report, page 2) that "Race differences in the likelihood of being granted restoration of voting rights do not appear to be accounted for by race differences in criminal history." The logistic regression model in Table 5 is presented merely as an example to demonstrate the fact that the statistical significance of the racial variables can change from significant to not significant based upon the particular set of predictor variables that are included in the model, and not necessarily as the true model of the Clemency Board's decision-making process.

## IV.   CONCLUSION

Based upon the disproportionate stratified random sample of Clemency Board applications, I conclude that whites were granted restoration of their civil rights by the Clemency Board at a slightly higher rate than blacks (white = 96.62%, black = 94.90%, p-value = .3301), and that the difference is not statistically significant. Furthermore, it appears that applicants who were granted restoration of their civil rights by the Clemency Board had a less severe criminal

---

[18] The exponential function exp(-3.3532) is e raised to the $-3.3532$ power. The number e is an irrational number that is approximately 2.71828.

background and were more established in their communities than applicants who were denied restoration of their civil rights by the Clemency Board. Finally, the weighted version of the four logistic regression models that Dr. Uggen proposed in Tables 12C and 12D of his report contain racial coefficients that are not statistically significant. The unweighted version of the logistic regression methodology, which does not correct for the stratified random sample design, may or may not show statistically significant racial coefficients, depending upon which predictor variables are used.

_Joseph R Katz_
Joseph L. Katz, Ph.D.

_11/9/01_
Date

16

Table 1. A Comparison of Civil Rights Restoration Decisions by the Clemency Board For White and Black Applicants (1)

| | WHITE APPLICANTS % GRANTED RESTORATION OF CIVIL RIGHTS | BLACK APPLICANTS % GRANTED RESTORATION OF CIVIL RIGHTS | PERCENT DIFFERENCE (5) | P-VALUE (6) |
|---|---|---|---|---|
| **ALL YEARS (2)** | | | | |
| **TO MID 1995(3)** | | | | |
| WEIGHTED (7) | 96.62% | 94.90% | 1.72% | 0.3301 |
| UNWEIGHTED (8) | 74.53% | 67.12% | 7.41% | 0.0627 |
| | | | | |
| **OLDER CASES** | | | | |
| **TO MID 1995(3)** | | | | |
| WEIGHTED (7) | 97.29% | 97.30% | -0.01% | 0.9965 |
| UNWEIGHTED (8) | 69.32% | 69.39% | -0.07% | 0.9921 |
| | | | | |
| **RECENT CASES** | | | | |
| **MID 1995 TO MAY 2001 (4)** | | | | |
| WEIGHTED (7) | 95.30% | 91.43% | 3.87% | 0.2520 |
| UNWEIGHTED (8) | 78.65% | 65.98% | 12.67% | 0.0078 |

(1). The analysis in Table 1 considers only those cases which the Clemency Board reviewed and either granted or denied restoration of civil rights.
(2). Comparison of applicants granted or denied restoration of civil rights by the Clemency Board for all years in Dr. Uggen's data file.
(3). Comparison of applicants granted or denied restoration of civil rights by the Clemency Board for recent cases from mid 1995 to May 2001.
(4). Comparison of applicants granted or denied restoration of civil rights by the Clemency Board for older cases to mid 1995.
(5). The percent difference is [% of whites granted restoration of civil rights - % of blacks granted restoration of civil rights].
(6). The p-value is two tailed and based upon the Chi-Square test. The null hypothesis is that the civil rights restoration rates for white and black applicants are equal.
(7). Each case is weighted to correct for the unequal probability of selection due to the the disproportionate stratified random sampling plan.
(8). Each case is weighted equally which ignores the fact that each sample did not have the same probability of being selected into the sample.

483

Table 2. A Comparison of Racial, Demographic, Socioeconomic and Criminal History Factors For Applicants Granted or Denied Restoration of Civil Rights By The Clemency Board (1)

| | GRANTED RESTORATION OF CIVIL RIGHTS (2) | DENIED RESTORATION OF CIVIL RIGHTS (3) | DIFFERENCE | P-VALUE (4) |
|---|---|---|---|---|
| **RACE** | | | | |
| % WHITE | 84.55% | 78.38% | 6.17% | 0.3220 |
| % BLACK | 13.00% | 18.53% | -5.53% | 0.3404 |
| % OTHER | 2.45% | 3.09% | -0.64% | 0.8100 |
| **SEX AND AGE** | | | | |
| % MALE | 85.85% | 91.12% | -5.27% | 0.3753 |
| AGE (MEAN) | 41.91 | 42.44 | -0.53 | 0.8039 |
| **CRIMINAL HISTORY** | | | | |
| SENTENCE LENGTH IN YEARS (MEAN) | 5.19 | 5.25 | -0.06 | 0.9921 |
| # PRIOR FELONY CONVICTIONS (MEAN) | 1.31 | 1.91 | -0.60 | 0.0002 |
| % CONVICTION VIOLENT OFFENSE | 18.76% | 44.19% | -25.43% | 0.0002 |
| % CONVICTION PROPERTY OFFENSE | 49.02% | 49.22% | -0.20% | 0.9809 |
| % CONVICTION DRUG OFFENSE | 35.28% | 37.60% | -2.32% | 0.7771 |
| % CONVICTION OTHER OFFENSE | 17.34% | 36.82% | -19.48% | 0.0031 |
| # SUBSEQUENT ARRESTS (MEAN) | 0.61 | 1.17 | -0.56 | 0.0268 |
| # YEARS SINCE RELEASE FROM PRISON (MEAN) | 7.53 | 5.18 | 2.35 | 0.1835 |
| **MENTAL HEALTH AND DRUG USE** | | | | |
| % PRIOR ILLEGAL DRUG USE | 40.63% | 47.62% | -6.99% | 0.3700 |
| % MENTAL HEALTH TREATMENT | 9.19% | 18.82% | -9.63% | 0.0390 |
| **FAMILY AND COMMUNITY** | | | | |
| % MARRIED | 60.32% | 44.19% | 16.13% | 0.0359 |
| % NEVER MARRIED | 13.52% | 22.09% | -8.57% | 0.1167 |
| % ORDERED CHILD SUPPORT | 18.88% | 25.81% | -6.93% | 0.2696 |
| % MEMBER OF CIVIC ORGANIZATION | 42.32% | 40.47% | 1.85% | 0.8106 |
| % REGULAR CHURCH ATTENDANCE | 30.10% | 34.80% | -4.70% | 0.5211 |
| **SOCIOECONOMIC STATUS** | | | | |
| YEARS OF EDUCATION (MEAN) | 12.30 | 12.57 | -0.27 | 0.4248 |
| % OWN HOME | 61.54% | 47.15% | 14.39% | 0.0657 |
| MONTHLY INCOME CONSTANT 2000 DOLLARS (MEAN) | $3,416.10 | $1,940.40 | $1,475.70 | 0.0836 |
| LIQUID ASSETS CONSTANT 2000 DOLLARS (MEAN) | $16,556.00 | $5,298.30 | $11,257.70 | 0.3115 |
| NET WORTH (MEAN) | $181,494.00 | $12,874.00 | $168,620.00 | 0.0435 |

(1). Analysis is limited to eligible applicants who completed the application process and whose case was reviewed and decided by the Clemency Board. Cases with missing values for a factor are dropped for the analysis of that factor.
Each case is weighted to correct for the unequal probability of selection due to the disproportionate stratified random sampling plan.
(2). This column shows the proportion or mean of the factor for applicants granted restoration of civil rights by the Clemency Board.
(3). This column shows the proportion or mean of the factor for applicants who were denied restoration of civil rights by the Clemency Board.
(4). The p-value is two tailed and based upon the Student t-test for differences of means or proportions.

484

Table 3. Recalculation of Four Logistic Regression Models From Table 12C of Dr. Uggen's Report Using Weighted Logistic Regression (1)

| VARIABLE | MODEL 1 COEFFICIENT | MODEL 1 P-VALUE (2) | MODEL 2 COEFFICIENT | MODEL 2 P-VALUE (2) | MODEL 3 COEFFICIENT | MODEL 3 P-VALUE (2) | MODEL 4 COEFFICIENT | MODEL 4 P-VALUE (2) |
|---|---|---|---|---|---|---|---|---|
| **RACE** | | | | | | | | |
| African American (vs. White) | 0.4302 | 0.3336 | 0.5275 | 0.2780 | 0.7570 | 0.1868 | 0.6599 | 0.2221 |
| Other race (vs. White) | 0.3079 | 0.7576 | 0.2729 | 0.7910 | 0.3806 | 0.7319 | 0.3541 | 0.7493 |
| **CRIMINAL HISTORY** | | | | | | | | |
| Prior felony convictions (#) | | | 0.1799 | 0.0855 | 0.1239 | 0.2774 | 0.1398 | 0.2066 |
| Violent conviction | | | 0.9926 | 0.0088 | 0.9372 | 0.0240 | 0.9276 | 0.0198 |
| Missing violent dummy | | | | | 3.041 | 0.5025 | 3.0411 | 0.5025 |
| Subsequent arrests (#) | | | 0.0982 | 0.2248 | 0.0254 | 0.7759 | 0.0308 | 0.7194 |
| Missing subs arrest dummy | | | | | | | -0.4832 | 0.8257 |
| **EXTRALEGAL FACTORS** | | | | | | | | |
| Monthly income (in thousands) | | | | | -0.0813 | 0.4040 | -0.0895 | 0.3577 |
| Missing income dummy | | | | | 0.6181 | 0.2388 | -1.5882 | 0.0588 |
| Prior mental health treatment | | | | | | | 0.5359 | 0.2931 |
| Missing mental health dummy | | | | | | | -1.3019 | 0.4133 |
| Married | | | | | -0.4490 | 0.2600 | -0.4619 | 0.2300 |
| Missing married dummy | | | | | | | -3.1161 | 0.3798 |
| Age | | | | | -0.0084 | 0.5969 | -0.0029 | 0.8451 |
| Recent period | | | | | 0.6222 | 0.1177 | 0.6240 | 0.1006 |
| **CONSTANT** | -3.3532 | < 0.0001 | -3.4315 | < 0.0001 | -2.3965 | 0.0027 | -2.6029 | 0.0007 |
| **NUMBER OF CASES** | 973.57 | | 544.05 | | 341.18 | | 973.5700 | |
| **LIKELIHOOD RATIO CHI-SQUARE** | 0.9147 | 0.6330 | 15.6419 | 0.0079 | 22.6986 | 0.0119 | 88.0570 | < 0.0001 |

(1). The four models are based upon the ones shown in Tables 12C of Dr. Uggen's report.
The dependent variable is defined as follows: Clemency Board denies application = 1, Clemency Board grants application = 0.
The analysis draws from the sample of cases for all years.
Each case is weighted to correct for the unequal probability of selection due to the disproportionate stratified random sampling plan.
(2). The p-value is based upon a two tail test of the Null Hypothesis that the logistic regression coefficient is equal to 0.

485

Table 4. Recalculation of Four Logistic Regression Models From Table 12D of Dr. Uggen's Report Using Weighted Logistic Regression (1)

| VARIABLE | MODEL 1 COEFFICIENT | P-VALUE (2) | MODEL 2 COEFFICIENT | P-VALUE (2) | MODEL 3 COEFFICIENT | P-VALUE (2) | MODEL 4 COEFFICIENT | P-VALUE (2) |
|---|---|---|---|---|---|---|---|---|
| **RACE** | | | | | | | | |
| African American (vs. White) | 0.6417 | 0.2591 | 0.6749 | 0.3039 | 0.7702 | 0.3037 | 0.6794 | 0.3490 |
| Other race (vs. White) | -0.2541 | 0.8567 | -0.0522 | 0.9721 | 0.2592 | 0.8751 | 0.2217 | 0.8923 |
| **CRIMINAL HISTORY** | | | | | | | | |
| Prior felony convictions (#) | | | 0.2276 | 0.1493 | 0.0838 | 0.6995 | 0.1162 | 0.5800 |
| Violent conviction | | | 1.5581 | 0.0036 | 1.2422 | 0.0307 | 1.3273 | 0.0171 |
| Missing violent dummy | | | | | | | 3.8731 | 0.5160 |
| Subsequent arrests (#) | | | 0.0039 | 0.9794 | -0.0846 | 0.6068 | -0.0847 | 0.6051 |
| Missing subs arrest dummy | | | | | | | -0.0944 | 0.9699 |
| **EXTRALEGAL FACTORS** | | | | | | | | |
| Monthly income (in thousands) | | | | | -0.0707 | 0.6253 | -0.0765 | 0.6010 |
| Missing income dummy | | | | | | | -2.0152 | 0.1320 |
| Prior mental health treatment | | | | | 0.8568 | 0.3037 | 0.6851 | 0.3978 |
| Missing mental health dummy | | | | | | | -0.6718 | 0.8105 |
| Married | | | | | -0.3569 | 0.5602 | -0.3341 | 0.5722 |
| Missing married dummy | | | | | | | -2.7915 | 0.4786 |
| Age | | | | | -0.0087 | 0.7083 | -0.0006 | 0.9777 |
| CONSTANT | -3.0092 | <0.0001 | -3.4246 | <0.0001 | -1.8253 | 0.1353 | -2.2183 | 0.0621 |
| NUMBER OF CASES | 343.61 | | 194.32 | | 112.30 | | 343.61 | |
| LIKELIHOOD RATIO CHI-SQUARE | 1.2410 | 0.5377 | 13.6622 | 0.0179 | 10.9571 | 0.2787 | 47.9269 | <0.0001 |

(1). The four models are based upon the ones used in Tables 12D of Dr. Uggen's report.
The dependent variable is defined as follows: Clemency Board denies application = 1, Clemency Board grants application = 0.
The analysis draws from the sample of cases from mid 1995 to May 2001.
Each case is weighted to correct for the unequal probability of selection due to the disproportionate stratified random sampling plan.
(2). The p-value is based upon a two tail test of the Null Hypothesis that the logistic regression coefficient is equal to 0.

486

Table 5. Example of Unweighted and Weighted Logistic Regression Model Whose Racial Variables Are Not Statistically Significant (1)

| VARIABLE | UNWEIGHTED MODEL | | WEIGHTED MODEL (3) | |
|---|---|---|---|---|
| | COEFFICIENT | P-VALUE (2) | COEFFICIENT | P-VALUE (2) |
| RACE | | | | |
| African American (vs. White) | 0.1566 | 0.4650 | 0.3553 | 0.4471 |
| Other race (vs. White) | 0.1448 | 0.7456 | 0.3682 | 0.7191 |
| CRIMINAL HISTORY | | | | |
| Prior felony convictions (#) | 0.3138 | 0.0002 | 0.0447 | 0.7467 |
| Violent conviction | 1.3846 | < 0.0001 | 1.5010 | 0.0006 |
| Drug conviction | 0.6197 | 0.0021 | 0.8518 | 0.0577 |
| Property conviction | 0.3081 | 0.1046 | 0.6775 | 0.1064 |
| Other conviction | 0.8341 | < 0.0001 | 1.0823 | 0.0062 |
| CONSTANT | -2.5106 | < 0.0001 | -4.7638 | < 0.0001 |
| NUMBER OF CASES | 968.00 | | 963.99 | |
| LIKELIHOOD RATIO CHI-SQUARE | 131.2891 | < 0.0001 | 35.1374 | 0.0007 |

(1). The logistic regression models consider Clemency Board decisions for eligible applicants who completed the application process.
The dependent variable is defined as follows: Clemency Board denies application = 1, Clemency Board grants application = 0.
The analysis draws from the sample of cases for all years.
(2). The p-value is based upon a two tail test of the Null Hypothesis that the logistic regression coefficient is equal to 0.
(3). Each case is weighted to correct for the unequal probability of selection due to the disproportionate stratified random sampling plan.

## Expert Report

by

Christopher Uggen, Ph.D.

Case:       Johnson v. Bush
            No. 00-CV-3542
            U.S. District Court
            Southern District of Florida
            Judge James Lawrence King

1.      Introduction and Professional Qualifications

I have been retained as an expert by counsel for the Plaintiffs in the above captioned litigation. I have prepared this report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B).

I am an Associate Professor of Sociology at the University of Minnesota. I received my Ph.D. in sociology at the University of Wisconsin in 1995. A detailed record of my professional qualifications and scholarly achievements is set forth in the attached curriculum vitae, including a list of all publications I authored within the last ten years, awards, research grants, and professional activities.

This report summarizes my analysis of the number and social characteristics of people who have lost the right to vote in Florida because of a felony conviction, the social characteristics of those who have applied for and been granted restoration of their voting rights in Florida, and the potential political impact of felon disenfranchisement in Florida. Below, I summarize the opinions I have reached, the methodology I used to reach these opinions, the data sources I have examined, and the exhibits I have constructed in conducting this research.

2.      Opinions

Based on my analysis of aggregate criminal justice statistics and a sample of 1,217 applications for restoration of civil rights in Florida, I have reached the following opinions:

1.  Approximately 827,000 felons and ex-felons, or 7 percent of the voting age population, are currently disenfranchised in Florida. Approximately three-fourths of these offenders (over 613,000) are ex-felons, persons who have completed their sentences but have not received restoration of their voting rights.

2.  Approximately 167,000 African American ex-felons and almost 89,000 African American felons are currently disenfranchised in Florida, representing a total of 16 percent of the African American voting age population.

3. In the past 20 years, there has been a dramatic increase in the number and rate of disenfranchised felons and ex-felons in Florida and in the United States as a whole, particularly among African Americans.

4. Prisoners generally come from poor or working-class backgrounds and enter prison with low levels of educational and occupational attainment. Most reenter their communities with little education, few financial resources, limited work histories, and barriers to employment stemming from their felony conviction. Although some go on to success in the legitimate work world, the socioeconomic attainment of felons generally lags behind the socioeconomic attainment of non-felons.

5. According to my analysis of case files provided by the Office of Executive Clemency of the State of Florida, the typical applicant for restoration of civil rights is a white male in his forties, with a high school education or general equivalency diploma, earning about $2000 per month, with less than $1000 in liquid assets. About 16 percent of applicants are African Americans, about 60 percent are married, and about 22 percent have been convicted of a violent crime.

6. African Americans, women, and younger offenders are significantly underrepresented in the pool of applicants for restoration of civil rights in Florida.

7. Voting rights are important to ex-felons, particularly African American ex-felons. Many link voting and other forms of civic participation with their successful rehabilitation and reintegration into their communities, contending that restoration of civil rights is necessary for them to participate as full citizens.

8. African American applicants are significantly less likely to be granted restoration of voting rights than non-African American applicants.

9. Applicants with lower socioeconomic status are significantly less likely to be granted restoration of voting rights than applicants with higher socioeconomic status.

10. Those granted restoration of voting rights have significantly higher rates of marriage and home ownership than those who are not granted restoration of voting rights. Grantees also have significantly fewer felony convictions and are less likely to have a history of mental health treatment than non-grantees.

11. Race differences in the likelihood of being granted restoration of voting rights do not appear to be accounted for by race differences in criminal history.

12. Overall, the existing procedure for restoring voting rights to ex-felons in Florida does not appear to ameliorate existing racial disparities in felon disenfranchisement.

13. Felon disenfranchisement is likely to have affected the outcome of political elections,

489

including at least one U.S. Senate election in Florida and at least one recent presidential election.

3.     Basis and Reasons for Opinion

My opinions are based on the following results and methodology:

## A. DETAILED DESCRIPTION OF RESULTS

### 1. Number of Disenfranchised Felons and Ex-Felons in Florida.

I estimate that over 827,000 felons and ex-felons are currently disenfranchised in Florida. About three-fourths of these offenders (over 613,000) are ex-felons, persons who have completed their sentences but have not received restoration of their voting rights. I report my estimates of the total disenfranchised, current felon, and ex-felon populations as well as race and sex breakdowns of these populations in Table 1.

### 2. Number and Rate of African American Disenfranchised Felons and Ex-Felons in Florida

Figure 1 shows that about 16 percent of voting age African Americans are disenfranchised relative to about 6 percent of non- African Americans. Overall, I calculate that approximately 256,000 African Americans in Florida are disenfranchised due to felony convictions. This total is composed of about 167,000 African American ex-felons and almost 89,000 African American felons currently under supervision. Because males are overrepresented in all criminal justice populations, African American males are particularly likely to be disenfranchised. Overall, I estimate that more than one in four adult African American males in Florida is disenfranchised (about 10 percent due to a current felony conviction and about 18 percent due to a past conviction). The ratio of ex-felons to current felons differs by race, with about 2 African American ex-felons for every African American felon currently under supervision and almost 4 ex-felons of other races for every current felon of other races. This pattern is the result of race differences in recidivism rates (with very high rates specified for African Americans) as well as the smaller proportion of non-African Americans in earlier offender cohorts.

### 3. Historical Changes in Disenfranchised Felon Populations

There has been a significant increase in the disenfranchised felon and ex-felon populations in the past 20 years, particularly among African Americans. Table 2 shows my best estimate of these populations for selected years, suggesting that the overall number disenfranchised rose from approximately 127,000 in 1980 to over 827,000 in 2000. Over this period the disenfranchised percentage of the voting age population rose from 1.7 percent to 7 percent among all groups and from about 4.8 percent to 16 percent among African Americans.

490

Figure 2 shows changes in the disenfranchisement rates of African American and Non-African American Floridians since 1976. The greatest increase in the disenfranchised population occurred between 1984 and 1992. The figure shows a steep rise in the percentage of disenfranchised African Americans beginning in the mid-1980s and continuing through the mid-1990s. The percentage of disenfranchised African Americans has stabilized since 1995, due in part to recent increases in the African American base population. Nevertheless, the absolute *number* of disenfranchised African American felons and ex-felons has continued to rise, reaching an all-time high of over 256,000 in 2000.

The national trends are similar to those for Florida, although the affected percentage of the electorate is smaller because most states no longer disenfranchise ex-felons. Overall, approximately 5 million felons and ex-felons are disenfranchised in the United States, or about 2.4 percent of the voting age population. As Figure 3 and Table 2B shows, African Americans are far more likely to be disenfranchised than non-African Americans, with more than 7 percent of the African American population unable to vote due to a felony conviction.

### 4.   The Socioeconomic Position of Felons and Ex-Felons

Aside from age, race, and gender data, little information has been systematically collected that would allow researchers to evaluate the social position of the current felon population. Even less has been systematically collected to describe the ex-felon population. To provide some basic descriptive information about the disenfranchised felon population in Florida, Table 3 reports characteristics of state prison inmates and characteristics of males aged 25-34 in the general population. The information is taken from my analysis of the 1997 *Survey of State Prison Inmates*, a representative national sample of over 14,000 state prisoners, and from the U.S. Census Bureau's *Statistical Abstract* series and the U.S. Bureau of Labor Statistics' *Current Population Reports* series. As the table shows, inmates generally enter prison with low levels of educational and occupational attainment. Southern inmates averaged about 10.6 years of education, 26 percent had graduated from high school, and only about 2 percent had attained a college degree. At the time of their most recent arrest, only 60 percent reported full-time employment and their inflation-adjusted median income in the year prior to arrest was less than $15,000 (in constant 2000 dollars). In terms of both educational attainment and income, prison inmates lag far behind young men of comparable age in the general population. Nevertheless, most inmates are parents, many with small children. They generally reenter their communities with few financial resources, interrupted work histories, and barriers to employment stemming from their felony conviction. Although some go on to success in the legitimate work world, the socioeconomic attainment of felons generally lags behind the socioeconomic attainment of non-felons.

Most long-term large-scale recidivism studies are based upon official record searches, rather than follow-up interviews with released prisoners, felony probationers, and parolees. Therefore, comparatively little is known about the post-release adjustment and socioeconomic status of ex-felons. Analyses of the *National Longitudinal Survey of Youth* suggest that ex-felons experience significantly lower wage and employment levels than non-felons. Although it is difficult to make broad generalizations based on the scattered longitudinal studies currently

*491*

available, it is fair to say that most ex-felons have attained much less success in the legitimate work world than non-felons. They were generally born into poor or working class families and they enter the criminal justice system with few marketable skills and multiple barriers to employment. By the time they are released from supervision, felons have often fallen further behind their age cohort in terms of credentials and career advancement and now face additional barriers to employment stemming from the stigma of a felony conviction.

### 5. Characteristics of Ex-felon Applicants for Restoration of Civil Rights in Florida

Despite these barriers, many ex-felons are able to rebuild their lives and successfully reintegrate themselves into society. My analysis of case files from the Florida Office of Executive Clemency shows great diversity in the life experiences of ex-felons applying for the restoration of voting rights. As I will detail below, it is important to note that persons who apply for restoration of their voting rights are a relatively small and selective group that is not representative of the overall population of ex-felons in Florida or elsewhere. Table 4 shows characteristics of those applying for restoration of voting rights in Florida, based on my sample of applicant case files maintained by the Office of Executive Clemency. As discussed in the methodology section, I selected a disproportionate stratified sample from a list provided by the Office to examine both the typical applicant for restoration and the relationship between applicant characteristics and case outcomes. The cases are therefore weighted by their probability of selection into the sample. Although both weighted and unweighted statistics are shown in Table 4, the weighted means and percentages provide the best population estimates of characteristics of the average or typical applicant.

According to my analysis, the typical applicant for restoration of voting rights is a white male in his forties, with a high school education or general equivalency diploma. Median income is about $2000 per month, or less than $25,000 per year in constant year 2000 dollars. I adjusted all financial information for inflation so that I could report income and assets in comparable units. Such financial information is typically not available unless a full investigation is conducted by the State. For these cases, I find that the typical applicant holds less than $1000 in liquid assets and possesses a net worth of approximately $40,000, though the large standard deviations for these characteristics suggest great dispersion in financial standing. About 16 percent of applicants are African Americans, about 60 percent are married, and about 22 percent had been convicted of a violent crime.

### 6. Representativeness of Applicants for Restoration of Civil Rights in Florida

To see how applicants compare with other populations of interest on some basic demographic characteristics, I conducted simple one-sample tests of significance. Table 5 and Figure 4 compare applicants for restoration of voting rights with my own estimates of the ex-felon population in Florida (the larger pool from which the applicant population is drawn) as well as the population of Southern prisoners, and the general population of Florida residents. Applicants are significantly less likely to be African American than the ex-felon population or the population of Southern prisoners in 1997. Applicants are also more likely to be male and tend to be older than the ex-felon population. With regard to family status, applicants were as likely to

be married as Florida residents in the general population, but much more likely to be married than the population of Southern prisoners. Although it is difficult to obtain good population estimates to conduct such comparisons, these results suggest that African Americans, women, and younger offenders appear to be underrepresented in the pool of applicants for restoration of civil rights in Florida.

In any given year, only a small percentage of those discharged from supervision have been granted restoration of their voting rights. As Table 6 shows, approximately 50,000 felons successfully complete supervision in Florida each year. This figure is composed of unconditional prison releases, successful parole completions, and successful felony probation completions, less those whose adjudication was withheld. We obtained data on felons leaving supervision from Bureau of Justice Statistics publications (e.g., *Correctional Populations in the United States, Probation and Parole in the United States*) and data on those whose civil rights have been restored from the Florida Office of Executive Clemency. In recent years there has been a dramatic decline in the percentage of new releases receiving restoration of their voting rights, from over 40 percent in 1986 to less than 4 percent in 1997, 1998, and 1999. Because ex-felons may apply for restoration at any time, the annual releases do not neatly correspond to the pool of ex-felons eligible to apply for restoration in any given year. Nevertheless, Table 6 demonstrates that the vast majority of felons successfully completing supervision do not receive restoration of their voting rights. Moreover, the table shows a steep decline in both the rate and absolute number of felons granted restoration of voting rights in the past 15 years.

### 7. Significance of Restoration of Voting Rights to Ex-felons in Florida

Almost every file that I examined contained a one-page "Application for Clemency" form. One item on this form asks applicants to record their "reason(s) for requesting consideration." Some applicants left this part of the form blank or referred readers to an attached letter. To determine the relative salience of voting rights to applicants, I recorded whether voting or the restoration of civil rights was specifically mentioned on this form and whether voting appeared to be the primary reason for seeking clemency. I also assessed whether the applicant mentioned employment or occupational licensing or a need to possess or use firearms as a reason for requesting clemency. Table 7 and Figure 5 report reasons for requesting consideration by race. Most applicants mentioned voting among the reasons for requesting clemency, although African American applicants were significantly more likely to emphasize restoration of voting rights as their primary reason for seeking clemency. African Americans were also significantly less likely than non-African Americans to mention firearms authority.

### 8. Race Differences among Applicants for Civil Rights Restoration

I categorized the outcome of these clemency applications into those granted restoration of their civil rights, those who withdrew their applications without receiving restoration, those whose applications were returned by the clemency board because they were ineligible under the rules of executive clemency, and those whose applications were reviewed but were denied restoration of voting rights. Tables 8 and 8B show application outcomes by race for our entire

sample of files (roughly 1985 to present) and for the recent period from mid-1995 to present.[1] In both cases, there is a statistically significant relationship between race and case outcome. As shown in Table 8 and Figure 6, about three-fourths of the applications overall were granted restoration of their voting rights, with approximately 79 percent of white applicants, 62 percent of African American applicants, and 67 percent of applicants of other races among the grantees. Many applications for clemency are returned as ineligible: about 10 percent of white applicants, 23 percent of African American applicants, and 24 percent of applicants of other races had their applications returned to them because they failed to cooperate with examiners or because they did not meet the formal eligibility criteria set forth in the Florida Rules of Executive Clemency. Denials are comparatively rare, comprising about 3 percent of all files. African American applicants appear to be slightly more likely than white applicants to be denied restoration of civil rights, although this difference is not statistically significant. I present a more detailed multivariate analysis of race effects on the likelihood of denial in Tables 12C and 12D discussed below in section 11 (Race Differences in Civil Rights Restoration after Statistically Controlling for Criminal History and Other Factors).

Table 8B shows application results by race for the period from approximately mid-1995 to present. I oversampled these recent cases (taking 1 in 5 from this period and 1 in 15 from early years, as discussed in the methodology section below) to characterize contemporary practices as accurately as possible. In recent years, the overall proportion of cases granted restoration of voting rights has fallen to approximately 69 percent and the proportion of cases rejected as ineligible has risen to approximately 22 percent. The association between race and case outcomes observed in Table 8 is also evident in the recent period, with African Americans less likely to be granted restoration of voting rights and more likely to have their applications returned as ineligible than whites. In sum, the pattern of race differences observed over the entire period persists when the analysis is limited to the past five years of available data.

Because the "returned to applicant" category makes up a large percentage of those cases not granted restoration of voting rights, I investigated the reasons for ineligibility. In most of the returned cases (61 percent of all files returned as ineligible), ineligible applicants owed court fees, restitution, or pecuniary penalties. Of the 172 files returned as ineligible in our sample, 22 percent of the applicants owed restitution and 50 percent owed other fees (analysis not shown). Overall, African Americans were more likely than whites to be ineligible because of these outstanding financial obligations, as shown in Table 9. The recent waiver of eligibility rules for ex-felons with outstanding court costs and fines (see, e.g., Hiaasen 2001) is likely to reduce but not eliminate these racial disparities. African Americans were also more likely than whites to owe restitution in addition to court costs and fines, though whites tended to owe larger amounts and race differences were not statistically significant in the small sample of cases we examined.

## 9. Socioeconomic Differences in Civil Rights Restoration Outcomes

As the analysis of the ineligible files suggests, socioeconomic status is correlated with the

---

[1] To conserve space, I do not present a separate table for the earlier period from 1985-1995, but report all cell frequencies in Tables 7 and 7B so that this table can easily be constructed.

probability of being granted restoration. Unfortunately, financial information is generally not reported in the file when applications are returned as ineligible. Therefore, these applicants must be excluded from any statistical analysis involving income or assets. For the subset of cases with known financial information, however, there is a statistically significant relationship between income and application outcomes. Table 10 and Figure 7 show that about 20 percent of those below the median income were not granted restoration relative to about 9 percent of those above the median. Because ineligible applicants often owed outstanding pecuniary penalties and may be unable to pay them, it is likely that the relationship between income and outcome would be even stronger if these applicants had been included in my analysis.

### 10. Other Differences in Civil Rights Restoration Outcomes

I conducted two-sample tests of means and proportions to see how those granted restoration of civil rights differed from those who were not granted restoration. In Table 11 and Figure 8 I report unweighted results from the disproportionate sample that includes a greater number of denials and more recent cases than would have been obtained by a simple random sample of all cases.[2] As the preceding analysis showed, those who regained their voting rights were significantly more likely to be white and less likely to be African American than those not granted restoration. I found little relationship between other demographic variables such as age and gender and restoration outcomes. With regard to socioeconomic status, grantees had higher incomes and greater net worth than non-grantees, with home ownership (often a trailer home) accounting for a large proportion of total net worth. The mean dollar figures in Table 11 are higher than the median figures reported in Table 4 because of the skewness of the socioeconomic indicators – a small number of applicants reported very high incomes and sizable assets. Grantees were also more likely to be married, although the number of children and civic and religious participation failed to distinguish grantees from non-grantees. With regard to criminal history, grantees had fewer felonies and were less likely to have been convicted of a violent felony or to have been arrested since their last felony conviction than non-grantees. Those granted restoration were also significantly less likely to have a history of mental health treatment.

### 11. Race Differences in Civil Rights Restoration after Statistically Controlling for Criminal History and Other Factors

I next examined the effects of several of these factors simultaneously to see whether the relationship between race and restoration outcomes remained after statistically controlling for the effects of criminal history and extralegal factors. It is important to caution that a multivariate analysis of this sort may be unable to account for every potentially confounding factor that may affect the relationship. Nevertheless, the logistic regression models in Table 12 allow me to adjust the bivariate race effects observed in Tables 8, 8B, and 11 for some of the most important factors that can be named and measured: felony convictions, subsequent arrests, monthly income, marital status, and other factors. As in the *t*-tests contrasting grantees and non-grantees, unweighted results are presented in Table 12. I began with a simple model of race effects and

---

2 Weighted results are substantively similar to those reported in Table 11, although marital status and the number of prior arrests are no longer statistically significant at the .05 level.

then entered each of the factors that showed a bivariate correlation with restoration outcomes in Table 11. The final model omits some of the non-significant variables with a high proportion of missing data (such as home ownership and net worth) to maximize the number of cases in the final model.

In Table 12, model 1 gives the effect of race on whether restoration of voting rights is granted without any other statistical controls. Model 2 gives the effect of race controlling for the criminal history characteristics that showed a significant bivariate association with restoration outcomes. Models 3 and 4 additionally control for other characteristics related to case outcomes. The logistic regression coefficients in the first model suggest that the odds of an African American being granted restoration are about .54 times as high as for whites ($e^{-.623} = .536$), or put another way, that the odds for whites to be granted restoration of voting rights are about 1.9 times higher than the odds for African Americans ($e^{.623} = 1.865$). After statistically controlling for prior felony convictions, the presence of a violent felony conviction, and the number of subsequent arrests in Model 2 of Table 12, the race effect remains statistically significant. The odds of being granted restoration remain about .59 times as high for African Americans as for whites. Income is statistically significant in models that include only race and criminal history (not shown), so that for each $1000 in monthly income, the odds of being granted restoration increase by about 11 percent. When other factors such as mental health treatment, marital status, age, and period are entered into the model, the income effects are diminished. Each of these variables is at least marginally significant, though none of them reduces the effect of race. The size of the race effects remains comparable across the three models. In model 3, which includes criminal history, income, family status, and other factors, the odds of being granted restoration remain about half as high for African Americans as for whites.

The sample size is reduced from 1204 cases with complete race and case outcome information to 475 cases with full information on each of the other independent variables. To check the robustness of the results in model 3, I imputed the sample means when information is missing on independent variables such as income. I also created missing value indicator variables to see whether those missing data on such variables are more or less likely to be granted restoration. Although such procedures cannot produce reliable estimates of the effects of the imputed variables, they are useful for comparing race effects observed in the subsample of 475 cases in model 3 with those observed for the full sample of 1204 cases in model 4. In the latter model the African American effect is slightly reduced to -.484 but remains statistically significant: the odds of a white person being granted restoration of voting rights are about 1.6 times higher than the odds of an African American person being granted restoration.

Table 12B repeats an identical set of models, but limits the analysis to files examined in the contemporary period from mid-1995 to present. The overall pattern of results holds for the recent period, with a sizable race effect in model 1 only partially explained by criminal history and extralegal factors. In the recent period, the odds of a white person being granted restoration of voting rights are about twice as high as the odds of an African American person being granted restoration in a model without statistical controls and remain about 1.6 times as high after controlling for prior felony convictions, the presence of a violent conviction, the number of subsequent arrests, monthly income, mental health treatment, marital status, and age.

496

The preceding results contrast whether an applicant is granted restoration of voting rights with all other outcomes – including those who were denied restoration, those who withdrew their applications, and those who were ineligible for consideration. Another way to examine race effects on restoration outcomes is to exclude these other categories and limit the analysis to those who were eligible for restoration of voting rights and followed through with their case until a final decision was made. By dropping all ineligible cases and withdrawals, I limit the contrast to those who were granted and those who were denied restoration. I conducted a second logistic regression analysis focusing on this subset of cases and report the results for the full sample in Table 12C and for the recent period in Table 12D. In these models, I use the same strategy and set of predictors to see how race effects change when statistically controlling for criminal history and other factors. Now, however, I predict whether one is *denied* restoration of voting rights.

Model 1 of Table 12C shows that the effect of race on denial is marginally significant ($p$ = .062) over the entire period, with African Americans slightly more likely than White applicants to be denied restoration. After statistically controlling for prior criminal history and other factors, however, the contrast between whites and African Americans is more pronounced. In model 4, which includes all of these predictors, the coefficient of .694 indicates that the odds of an African American person being denied restoration of voting rights are about twice as high as the odds of a White person being denied restoration.

Table 12D examines the same contrast among the cases drawn from our oversample of files from the past five years. In the recent period the race effects are much stronger in the initial model, with African Americans significantly more likely to be denied restoration relative to Whites. Again, the race effects increase in magnitude when criminal history and other characteristics are statistically controlled. In the final model, African Americans are more than twice as likely as Whites to be denied restoration of their voting rights.

To summarize the logistic regression results presented in Tables 12-12D, African Americans remain less likely to be granted restoration of their voting rights even when many of the legal and extralegal factors associated with restoration outcomes are statistically controlled. These results hold regardless of whether the entire period from 1985-2001 is examined or whether the analysis is limited to the past five years. In models that contrast being granted restoration of voting rights against all other outcomes (including ineligibility and withdrawal), African Americans are less likely to be granted restoration. When the contrast is limited to those denied and those granted restoration, African Americans are more likely to be denied in the multivariate models. It is possible that other unmeasured characteristics may be responsible for this correlation or that key indicators such as criminal history are imperfectly measured in this analysis, or that missing data on socioeconomic or family status may have somehow biased the observed race effects. Despite these caveats, the multivariate analysis shows that race remains a strong predictor of civil rights restoration even when statistically controlling for a basic set of criminal history, socioeconomic, and family status indicators.

497

## 12. Summary of Analysis of Racial Disparities in Disenfranchisement and Restoration of Voting Rights

In sum, African Americans are more likely than non-African Americans to be disenfranchised in Florida because of a felony conviction. After analyzing a sample of case files from the Office of Executive Clemency, I conclude that African American ex-felons are less likely to apply for clemency and less likely to have their voting rights restored than non-African American ex-felons. These race differences are due in large part to the greater likelihood that applications by African-Americans will be returned to them as ineligible for restoration as well as a greater likelihood of denial among the eligible African-American applicants. Based on these analyses, the existing process for restoring voting rights to ex-felons in Florida does not appear to ameliorate existing racial disparities in felon disenfranchisement.

## 13. Potential Impact of Felon Disenfranchisement on Political Elections

I am currently working on a project with Jeff Manza of Northwestern University assessing whether felon disenfranchisement is likely to affect political elections. We modeled a counterfactual scenario in which disenfranchised felons and ex-felons were permitted to vote, estimating their political behavior based on data from the non-felon population surveyed in the *National Election Study* (NES) and *Current Population Survey* (CPS). We predicted turnout rates and party preferences for each election based on the gender, race, age, income, labor force status, marital status, education, and region of the prison population, "matching" our disenfranchised felon population to the general population and obtaining an estimate of how many felons would have voted if given the chance.[3] Our results suggest that felon disenfranchisement may have played a decisive role in a number of U.S. Senate and presidential elections.

States vary dramatically in punishment rates as well as the particular correctional populations disenfranchised. Some states disenfranchise only current prisoners, some only current prisoners and parolees or probationers, and some allow even prisoners to vote. Therefore, the political impact of felon disenfranchisement also varies by state. In a state such as Florida, which disenfranchises many felony probationers, parolees, prisoners, and ex-felons, the potential political impact is sizable.

Our analysis suggests that felon disenfranchisement may have played a role in at least one recent U.S. Senate election in Florida. Because felons are drawn disproportionately from the ranks of racial minorities and the poor, disenfranchisement laws tend to draw votes from Democratic candidates who have historically drawn heavy support from these groups. To determine the *net* Democratic votes lost to disenfranchisement, we first multiply the number of lost felon voters by their estimated turnout rate and probability of voting for the Democratic candidate. Since some felons would have chosen Republican candidates, we then deduct from this figure the number of Republican votes lost to disenfranchisement, which we obtain in a

---

[3] After this procedure, we "deflate" our turnout estimates for CPS overreporting. We multiply our turnout estimate by the overall ratio of actual turnout to reported CPS turnout for each election (which reduces the estimate by 25-35%).

similar manner. For the 1988 Florida election detailed in Table 13, we estimate that 71,323 of the state's 293,512 disenfranchised felons would have voted if permitted to do so (24.3 percent). We calculate that 59,127 of these would have selected Buddy MacKay, the Democratic candidate (82.9 percent of 71,324), and that the remaining 17.1 percent (or 12,196) would have chosen Connie Mack, the Republican candidate. This produces a net total of 46,931 Democratic votes lost to felon disenfranchisement, more than enough to overturn the actual Republican victory margin of 34,518 votes. Under the counterfactual scenario, the Democrat MacKay may have defeated the Republican Mack by over 12,000 votes. Table 13 also presents several other closely contested U.S. Senate elections that may have been affected by felon disenfranchisement. Assuming that Democrats who might have been elected in the absence of felon disenfranchisement had held their seats as long as the Republicans who narrowly defeated them, the Democrats may have gained parity in the 1984 Senate and may have maintained majority control of the U.S. Senate from 1986 to the present.

For the 2000 presidential election, we calculated a turnout rate of 21.6 percent and a Democratic preference of 74.5 percent for our hypothetical felon voters. Applying these percentages to the disenfranchised felon population, we find that the Democrat Al Gore would have won the popular vote by approximately one million votes and the state of Florida by over 85,000 votes. If the approximately 827,000 disenfranchised felons and ex-felons in Florida had been allowed to vote, Gore would almost certainly have carried the state and the election, as shown in Table 14. Even if we apply much more conservative turnout and party preference estimates, felon disenfranchisement would likely have affected the outcome. If we assume only 10% turnout, and 60% Democratic preference, the Democrat Gore would have won by over 14,000 votes. If we consider only ex-felons and ignore parolees, probationers, prisoners, and convicted jail inmates, the Democrats would have carried the state (and hence the election) by over 10,000 votes. Therefore, the election appears to have hinged on the narrower question of ex-felon disenfranchisement rather than the broader question of voting restrictions on current felons (prisoners, parolees, and felony probationers).

Although the 2000 presidential election was unusually closely contested, the margin of victory in 4 of the last 10 presidential elections has been 1.1 percent of the voting age population or less. With over 2 percent of the voting age population currently disenfranchised due to a felony conviction, felon disenfranchisement is likely to be an important factor in future elections as well.

## B. SUMMARY OF METHODOLOGY FOR ESTIMATING THE NUMBER AND CHARACTERISTICS OF EX-FELONS.

I estimated the Florida ex-felon population using a technique developed in the course of my National Science Foundation project with Jeff Manza of Northwestern University. I determine the number of disenfranchised ex-felons based on exits from, rather than entry into, correctional supervision. I start with the number of felons released from supervision each year since 1948. I then use demographic life tables to compute the number of these releasees lost to recidivism and mortality annually. Both groups are removed from the disenfranchised population, the recidivists because they would be counted among the "current" felon population,

499

and the deaths because they are no longer at risk of voting. Each existing cohort of disenfranchised releasees is thus successively reduced each year and joined by a new cohort of releasees, allowing me to compute the number of ex-felons no longer under supervision. From the total disenfranchised population, I also deduct the number of felons whose voting rights were restored through restoration of civil rights each year as well as the number of felony probationers whose adjudication was withheld pending successful completion of their conditional sentence.

### 1. Key Assumptions

I briefly note the key assumptions underlying my estimates of the ex-felon population.

**Recidivism.** My analysis assumes that most ex-felons will re-offend and that the hazard of reoffense is greatest in the first years following release from correctional supervision. For prison and parole recidivism I base my race- and sex-specific recidivism rates on a five-year study of new offenses by the Florida Department of Corrections (1999), and a three-year study of re-incarceration for Florida's prisons by the Florida Office of Program Policy Analysis and Government Accountability (1995). I extend these rates beyond five years based on a logarithmic trend line, fitting Florida data to recidivism patterns observed in other longer-term follow-up studies (Hoffman and Stone-Meierhoefer 1980; Broadhurst and Maller 1990), ultimately reaching an average 79 percent lifetime recidivism rate. My race- and sex-specific 5-year recidivism rates are 49 percent for white men and 72 percent for African American men, with lifetime rates ranging from 66 percent for white men to 88 percent for African American men. Applying this very high lifetime recidivism rate to the African American male data produces a very *conservative* estimate of the number of African American ex-felons, since a greater number of African American ex-offenders are subtracted from the ex-felon pool with each successive year. Because Florida-specific probation and jail recidivism rates are generally unavailable, I use the national rate provided by the Bureau of Justice Statistics (*Recidivism of Felons on Probation, 1986-89*), and adjust it upward based on Florida's sex-and race-specific prison and parole recidivism rates. The result is a 5-year probation and jail recidivism rate of 55 percent overall (and 64 percent for African American men), and lifetime rates of 71 percent overall (and 81 percent for African American males).

**Mortality:** My mortality rates are age-, race-, and sex-specific, taken from the *Statistical Abstract of the United States*. I assume that ex-felon mortality is greater than comparable rates for non-felons because of the high rates of mortality observed in earlier recidivism studies. I calculate mortality rates based on the modal age of offenders released in each year and the average mortality rate for persons of comparable age in the general population that year. Each age-adjusted annual rate is multiplied by a constant felon multiplier (approximately 1.46) to adjust for the greater mortality of felons and to match the death rate observed in a three-year national recidivism study (*Recidivism of Prisoners Released in 1983*).

**Mobility:** According to the rules of executive clemency (as revised June 2001), a person who has been convicted of a felony in another state or in a federal court must submit an application for restoration of civil rights in accordance with the application rules for Florida convictions. Because Florida's in-migration exceeds its out-migration over the period of study

(see, e.g., *Statistical Abstract of the United States*) the number of felons entering Florida from other states almost certainly exceeds the number of Florida felons who leave the state. Therefore, the net effect of migration is to increase the total disenfranchised population. I do not attempt to model net mobility in this report, rendering my estimates lower or more conservative than they would be had I incorporated migration. In fact, it is likely that a large number of current Florida residents are disenfranchised due to a felony conviction in another state. Florida birth origin information from the 1990 census indicates that about 55 percent of Florida residents were born in other U.S. states (about 46 percent being born in states that do not permanently disenfranchise ex-felons and about 9 percent being born in states that permanently disenfranchise ex-felons). Whereas over 7 million Florida residents in 1990 were born in another state, only 1.4 million of those born in Florida had moved to another state. To the extent that ex-felon migration mimics these broader patterns observed in the general population, a sizable number of disenfranchised ex-felons could be added to the estimates presented here.

**Civil Rights Restoration**: I obtained the number of felons granted restoration for each year since 1964 directly from the Florida Office of Executive Clemency. I then applied the mortality rate for white male offenders and the recidivism rate for Florida first releasees to this population to reflect the preponderance of first offenders in the clemency population. My analysis of clemency files showed that white ex-felons were more likely to apply for restoration and more likely to be granted restoration of voting rights than African American ex-felons. Based on population estimates obtained from these data, I apportioned the total clemency grantees by race and sex for the periods prior to 1990 (when 13.1 percent of applicants and 11.0 percent of grantees were African American), 1990 to 1995 (when 13.6 percent of applicants and 11.2 percent of grantees were African American), and 1996 to present (when 19.5 percent of applicants and 15.2 percent of grantees were African American).

**Adjudication Withheld**: In Florida, many offenders can avoid formal felony adjudication (and, hence, disenfranchisement) by successfully completing a period of probation. According to the Florida Department of Corrections, as much as 40 percent of the total probation population holds adjudication withheld status. This proportion is likely to be lower among the pool of *felony* probationers than among misdemeanant probationers. Moreover, according to the Bureau of Justice Statistics *Probation and Parole* data series (e.g., 1995, p. 35), approximately 50 percent of Florida probationers successfully complete probation. I therefore estimate that 40 percent of Florida felony probationers are placed in adjudication withheld status and that half of this group successfully completes probation and avoids adjudication and the loss of voting rights. I thus reduce my annual felony probation numbers by 40 percent in computing the disenfranchised current felon population and by 20 percent in calculating the number of disenfranchised ex-felony probationers (.4 * .5 = .20).

## 2. Potential Sources of Error and Compensating Factors

Though I believe these procedures provide an accurate estimate of the disenfranchised felon and ex-felon population, I should note that the resulting figures are estimates rather than precise counts. There are a number of possible sources of error, including:

**Missing Data**. Prior to the mid-1970s, the quality of available data on the number of felony probationers and the race and sex distribution of other correctional populations are problematic. I therefore only report estimates since 1980 in this report. Missing data problems and interpolation procedures are outlined below in the section on data sources.

**Recidivism.** My best estimate uses group-specific five-year Florida recidivism rates and extends these rates to align with longer-term national and international recidivism studies. Without evidence from repeated 50-year longitudinal studies, it would be difficult to verify these lifetime recidivism and mortality rates. To address these concerns, I applied a significantly *higher* recidivism rate than the national average, resulting in a lower, more conservative estimate of the disenfranchised ex-felon population. This is especially the case with the estimates for African American males. Despite these precautions, however, some error may remain in my recidivism estimates.

**Adjudication Withheld:** My best estimate assumes that 40 percent of all felony probationers were given a sentence of adjudication withheld and that half of them successfully completed probation with no loss of voting rights. Because these figures are only approximations, it is possible that my estimates of the current felon population and, to a lesser extent, the ex-felon population may be inaccurate.

**Clemency.** My year-specific clemency estimates are reduced for mortality and recidivism, albeit at lower rates than other felon populations. It is possible, however, that recidivism and mortality rates among those granted clemency are even lower than I have estimated.

**Double Counting.** I have taken pains to avoid counting the same person more than once in a single year. Nevertheless, it is possible that a small number of frequent recidivists, those with multiple prison or probation admissions during a single year, and those cycling rapidly through different stages of the criminal justice system may have been counted twice. For this reason, I use a high lifetime recidivism rate for prisoners and parolees (79 percent overall, 88 percent for African American males) and for probationers and jail inmates (71 percent overall, 81 percent for African American males) to offset the possibility of double counting in any particular year. I also found comparable estimates when validating this technique with alternative estimation procedures based on first release data.

**Noncitizens.** Legal and illegal immigrants are ineligible to vote in Florida. Therefore a small percentage of disfranchised ex-felons in Florida may have been unable to vote regardless of their felony conviction. My estimates of Florida's disfranchisement *rate*, however, are unlikely to be significantly biased since noncitizens are included in the voting age population denominator as well as the disenfranchised felon numerator. Because detailed data on noncitizens in the state criminal justice system are unavailable, I can only crudely estimate the size of this population. From an Urban Institute report on illegal aliens in the criminal justice system (Clark and Anderson, 2000), approximately 1,572 illegal aliens were incarcerated in Florida state prisons in 1995. A Bureau of Justice Statistics special report on *Noncitizens in the Federal Criminal Justice System* (1996) found that approximately 55 percent of all noncitizens in Federal prisons are legal immigrants and 45 percent are illegal immigrants. Applying these percentages to Florida state

prison numbers, it would suggest that approximately 3,493 of the state's 1995 prison population of 63,879 were noncitizens, or approximately 5 percent. If Florida trends mirrored trends in the Federal system, a smaller percentage of inmates would have been noncitizens in years prior to 1995; I estimate less than 3 percent in 1984. Therefore, there are likely to be proportionally fewer noncitizen ex-felons than noncitizens currently under supervision. In sum, my procedure may include a number of noncitizens among the disfranchised felon population. I believe this is unlikely to significantly affect my estimates of the disfranchisment rate, but it may have biased my estimates of the disfranchised population upward. If trends in Florida paralleled trends in the federal system, the magnitude of this bias is likely to be 5 percent or less.

**Compensating Factors.** Though consideration of these factors may have *reduced* my best estimate of the disenfranchised population to some extent, I also excluded several categories that would have *increased* this estimate. For example, I did not include current federal prisoners (11,384 were held in Florida institutions in June, 2001), federal parolees (over 5,000 of whom were supervised in Florida in 1998), federal felony probationers (about 1,800 were supervised in Florida in 1998), or federal ex-felons; I only include 10 percent of the jail population; and, I did not account for the large numbers of felons moving to Florida from other states who would also be barred from voting in Florida.

## C. SUMMARY OF METHODOLOGY FOR ANALYZING THE CHARACTERISTICS OF APPLICANTS AND GRANTEES FOR RESTORATION OF VOTING RIGHTS

I estimated the characteristics of applicants for restoration of voting rights by examining inactive case files provided by the Office of Executive Clemency of the State of Florida. Melissa Thompson, a doctoral student under my supervision, traveled to Florida on May 14, 2001 to sample approximately 1,300 case files for analysis. The State provided a list of all such files to serve as our sampling frame. The Office of Executive Clemency does not typically open a case file for those eligible for automatic restoration of civil rights unless they receive some objection to restoration. Therefore, our sampling frame of applicants did not include many grantees who received restoration without a hearing. We stratified this list by case outcome (whether restoration was denied or not) and period (oversampling files from the past five years). From each of these lists, we selected each of the denied cases, and then took a systematic random sample of 1 in 15 of the cases more than five years old and 1 in 5 of the more recent cases. We used this disproportionate stratification method, oversampling denials and recent cases, to provide sufficient numbers for an analysis of recent case outcomes. In presenting population estimates for these data, we assign weights to each observation that are proportional to the inverses of the selection probabilities within each stratum. Once each of the active cases we selected and older cases that had already been destroyed were removed by the State of Florida, we were left with a sample of 1,217 inactive cases.

I received photocopies of the case files on June 7 and June 14, 2001. We recorded information from each case onto a code sheet and then entered the code sheets into an SPSS data file for analysis. Aside from myself, the only persons with access to the files were my research assistants, who coded the data (Melissa Thompson, Angela Behrens, Amy Blackstone, and

Michelle Lopez). We examined almost 60,000 pages of text in creating the analysis file of 1,217 cases. Although it is possible that some errors may have occurred in reading, coding, and entering so much data in less than one month, we took steps to minimize the likelihood of systematic biases or repeated errors in coding: each of the coders was experienced in social research and specially trained for this study; we worked together around a conference table to share information and develop a set of common coding conventions; all computer data entry was conducted by the two most experienced research assistants; and, I supervised data collection and coded a large number of files alongside the other coders.

### 1. Strategy of Analysis.

The tables first describe the characteristics of applicants for civil rights restoration, presenting my point estimates of population means, percentages, and standard deviations. To determine whether applicants differ from the general pool of ex-felons in Florida, the population of Southern prisoners, and the Florida general population, I use one-sample $t$-tests comparing the sample data against the population values for these groups. I then show bivariate cross-tabulations of case outcomes with race and income to determine whether these factors are associated with voting rights being granted or not granted. Next, I compare characteristics of grantees with non-grantees using two-sample tests of means and proportions. Finally, I present a multivariate logistic regression model predicting whether restoration of voting rights was granted (coded 1 in this analysis) or not granted (coded 0 in this analysis). The multivariate analysis enables me to adjust the estimated effects of race on civil rights restoration after statistically controlling for the effects of criminal history and other factors that may be related to race and crime.

### 2. Coding Conventions

For purposes of our analysis for this report, we adopted the following coding conventions:

*Case Outcome.* The clemency files sometimes included multiple applications for multiple purposes. We recorded data from the most recent application pertaining to voting rights. For example, if voting rights were restored in 1997 but the authority to own firearms was denied in 1999, we recorded information relating to the earlier restoration of civil rights.

*Race and Ethnicity.* We recorded the self-reported race of applicants from the one-page application form. Ethnicity information was generally unavailable, although we coded Hispanic ethnicity by comparing applicants' names with lists of Hispanic surnames prepared by the Census Bureau. Although descriptive statistics are reported for the constructed Hispanic indicator, we relied on applicants' self-reported race in all analyses of race effects on restoration outcomes.

*Socioeconomic Status.* For ease of comparison across years, all dollar amounts have been adjusted for inflation and converted to constant 2000 dollars. For married applicants, we included assets held jointly (such as the equity in a home) in computing assets. In determining liquid assets, we counted savings, checking, and money market accounts, but excluded retirement or

504

pension funds. Net worth refers to the difference between total assets and liabilities. In computing liabilities, we excluded monthly living expenses. In determining years of education, we recorded the highest grade of schooling completed. We counted those who had obtained a general equivalency diploma (GED) as having twelve years of education, those obtaining an Associate's degree as having fourteen years of education, a Bachelor's degree as 16 years, a Master's or Law degree as 17 years, and a Ph.D. as 18 years.

*Family Status.* We recorded the total number of applicant's children, including stepchildren.

*Criminal History.* In computing the number of prior felony convictions, we count all felony convictions up to and including the most recent conviction that resulted in the loss of voting rights. In determining subsequent arrests, we count all new arrests after release from supervision, excluding traffic offenses. To categorize an offense as a violent crime, property crime, drug crime, or other crime, we referred to standard Bureau of Justice Statistics classifications (U.S. Department of Justice, *Correctional Populations in the United States*).

*Mental Health and Substance Use.* In determining mental health treatment, we excluded screening evaluations and self-help groups. To determine substance use history, we counted those with any self-reported history or official conviction for illegal drug use.

4.    Data and Other Information Considered in Forming Opinion

In forming my opinions, I have considered the following materials:

**Prison and Parole Population.** The number of unconditional prison releases and parole entries was obtained from Bureau of Justice Statistics annual data series and publications for the years 1948-1998 (e.g. *Correctional Populations in the United States; Sourcebook of Criminal Justice Statistics (1972-1998); National Prisoner Statistics: Prisoners in State and Federal Institutions (1948-1967); Race of Prisoners Admitted to State and Federal Institutions; National Corrections Reporting Program*). Prison Population data are available on the BJS website for 1977-1998 (*Prisoners under State or Federal Jurisdiction, Federal and State-by-State, 1977-98*"). 1999 and 2000 figures are also available online (*Prisoners in 1999 and Prison and Jail Inmates at Midyear 2000*), although the 2000 figure refers to the population on June 30, 2000 while all other years refer to the population count on December 31st. For years in which data were unavailable (1968-1971; 1980 and 1985), I interpolated estimates based on the immediately preceding and subsequent years. From these sources, we took the unconditional and conditional releases from prison for each year. From the total release figures, we subtracted the number expected to die and recidivate in each of the following years.

**Probation and Jail Population.** The number of felony probationers was also obtained from Bureau of Justice Statistics sources, such as *Probation and Parole in the United States*. These provide the total number of adults entering probation, along with adults on probation by type of offense (felony versus non-felony). Using the percentage of felony probationers, I

505

estimate the number of those entering probation for a felony. For the years 1976-1984, I use the 1985 national percentage of those entering probation (approximately 63%) and apply it to the total felony probation population. When the Florida-specific percent of felony probation figure was unavailable, I used the national felony probation percentage. Jail population data are taken from Bureau of Justice Statistics Sources such as *"Profile of Jail Inmates 1996."* Although few jail inmates are likely to vote from jail, my estimate only counts 10 percent of the mid-year jail population. I adopt this conservative figure to avoid counting misdemeanants and persons who have not yet been convicted of crimes among the disenfranchised, and to avoid double-counting felons who would also appear in other correctional populations (e.g., prison or felony probation).

**Racial Composition.** Historical race breakdowns are most consistently reported for prison populations. Therefore we developed a multiplier using the percentage of African American prisoners in each state in each year as our baseline, and we adjusted probation, parole and jail figures in relation to the state's change in the ratio of African American to non-African American prisoners.

**Voting Age Population.** Voting age population (VAP) data from the U.S. Bureau of Census *Current Population Reports*, reproduced in the *Statistical Abstract* series and online (http://www.census.gov/prod/3/98pubs/p25-1132.pdf).

**Prison and Parole Recidivism.** I use race- and sex-specific recidivism rates, drawn from a five-year study by the Florida Department of Corrections (1999) and a three-year study by the Florida Office of Program Policy Analysis and Government Accountability (1995). I extend these rates beyond the study period based on other long-term follow-up studies (e.g. *Recidivism of Prisoners Released in 1983;* Hoffman and Stone-Meierhoefer 1980; Broadhurst and Mallar 1990).

**Probation and Jail Recidivism.** I use the national rate provided by the Bureau of Justice Statistics (*Recidivism of Felons on Probation, 1986-89*), and adjust it based on Florida's sex-and race-specific recidivism rates. The result is a 5-year probation/jail recidivism rate of 55 percent (64 percent for African American men).

**Political Participation Data.** For my political impact analysis with Jeff Manza, we utilize standard election data sources. To estimate the expected turnout of the disenfranchised population, I use data from the Voting Supplement of the Current Population Survey (CPS). The CPS is a monthly survey of individuals conducted by the Bureau of the Census. Since 1964, in each November of even-numbered (national election) years, the survey includes questions about political participation. All sampled households are asked, "In any election some people are not able to vote because they are sick or busy or have some other reason, and others do not want to vote. Did [you/another household member] vote in the election on November __?" Our estimates of the expected vote choice of disenfranchised voters are based on National Election Study (NES) data, for the period 1972-2000.

**Interview Data.** In addition to my analysis of the Florida case files, I have also conducted 34 intensive interviews with prison inmates, probationers, and parolees in Minnesota. Each

506

interview lasted approximately one hour, with open-ended questions addressing voting rights, citizenship, reentry, and reintegration.

5.     Exhibits

Attached are Tables 1-14 and Figures 1-8 that summarize and support my opinions.

6.     Compensation

I am being compensated $150 per hour for my work in connection with this litigation.

7.     Other Expert Testimony Given in Last Four Years

None.

Date:  August 8, 2001

_____

Christopher Uggen

**Table 1. Disenfranchised Felons and Ex-Felons in Florida, 2000**

| Category | 12/31/2000 Estimate |
| --- | --- |
| Total Disenfranchised | 827,207 |
| Voting age population (VAP) | 11,774,000 |
| As % of VAP | 7.0% |
| Ex-Felons | 613,514 |
| As % of VAP | 5.2% |
| Current Felons | 213,693 |
| As % of VAP | 1.8% |
| | |
| African American Total Disenfranchised | 256,392 |
| Afr.-Am. VAP | 1,600,000 |
| As % of Afr.-Am. VAP | 16.0% |
| Male Afr.-Am. Total | 205,667 |
| Male Afr-Am. VAP | 745,000 |
| As % of Afr.-Am. Male VAP | 27.6% |
| Female Afr.-Am. Total | 50,725 |
| Female Afr.-Am. VAP | 855,000 |
| As % of Afr.-Am. Female VAP | 5.9% |
| | |
| African American Ex-Felons | 167,413 |
| As % of Af.-Am. VAP | 10.5% |
| Male Afr.-Am. Total | 130,789 |
| As % of Afr.-Am. Male VAP | 17.6% |
| Female Afr.-Am. Total | 36,625 |
| As % of Afr.-Am. Female VAP | 4.3% |
| | |
| African American Current Felons | 88,978 |
| As % of Af.-Am. VAP | 5.6% |
| Male Afr.-Am. Total | 74,878 |
| As % of Afr.-Am. Male VAP | 10.1% |
| Female Afr.-Am. Total | 14,100 |
| As % of Afr.-Am. Female VAP | 1.6% |
| | |
| Non-African American Total Disenfranchised | 570,815 |
| Non-African American VAP | 10,174,000 |
| As % of Non-African American VAP | 5.6% |
| Non-African American Ex-Felons | 446,100 |
| As % of Non-African-American VAP | 4.4% |
| Non-African American Current Felons | 124,715 |
| As % of Non-Afr.-Am. VAP | 1.2% |

509

Uggen Report  December 6, 2001 Page 23



**Figure 1. Felon Disenfranchisement as Percentage of Voting Age Population, by Race**

**Table 2. Historical Changes in Florida Disenfranchised Felon and Ex-Felon Populations (Best Estimate for Selected Years)**

| Category | 1976 | 1980 | 1990 | 2000 |
|---|---|---|---|---|
| Total Disenfranchised | 98,011 | 126,878 | 408,780 | 827,207 |
| Voting age population (VAP) | 6,326,000 | 7,578,000 | 10,180,000 | 11,774,000 |
| As % of VAP | 1.5% | 1.7% | 4.0% | 7.0% |
| Ex-Felons | 57,989 | 71,109 | 301,368 | 613,514 |
| As % of VAP | 0.9% | 0.9% | 3.0% | 5.2% |
| Current Felons | 40,022 | 55,769 | 107,412 | 213,693 |
| As % of VAP | 0.6% | 0.7% | 1.1% | 1.8% |
| | | | | |
| Af.-Am. Total Disenfranchised | 31,151 | 40,725 | 165,721 | 256,392 |
| Afr.-Am. VAP | 671,000 | 856,314 | 1,191,800 | 1,600,000 |
| As % of Afr.-Am. VAP | 4.6% | 4.8% | 13.9% | 16.0% |
| Afr.-Am. Ex-Felons | 17,078 | 20,970 | 119,679 | 167,413 |
| As % of Afr.-Am. VAP | 2.5% | 2.4% | 10.0% | 10.5% |
| Afr.-Am. Current Felons | 14,072 | 19,755 | 46,042 | 88,978 |
| As % of Afr.-Am. VAP | 2.1% | 2.3% | 3.9% | 5.6% |



**Figure 2. Trends in the Florida Disenfranchised Felon and Ex-Felon Population**

**Table 2B. Historical Changes in Total U.S. Disenfranchised Felon and Ex-Felon Populations (Best Estimate for Selected Years)**

| Category | 1976 | 1980 | 1990 | 2000 |
|---|---|---|---|---|
| Total Disenfranchised | 1,133,819 | 1,441,320 | 2,928,915 | 4,955,316 |
| Voting age population (VAP) | 152,309,000 | 164,597,000 | 185,722,000 | 205,814,000 |
| As % of VAP | 0.74% | 0.88% | 1.58% | 2.41% |
| Ex-Felons | 576,517 | 687,548 | 1,153,219 | 1,936,670 |
| As % of VAP | 0.38% | 0.42% | 0.62% | 0.94% |
| Current Felons | 557,302 | 753,772 | 1,775,696 | 3,018,646 |
| As % of VAP | 0.37% | 0.46% | 0.96% | 1.47% |
|  |  |  |  |  |
| Af.-Am. Total Disenfranchised | 391,338 | 492,829 | 1,120,255 | 1,915,061 |
| Afr.-Am. VAP | 15,781,775 | 17,282,454 | 20,631,481 | 24,635,000 |
| As % of Afr.-Am. VAP | 2.48% | 2.85% | 5.43% | 7.77% |
| Afr.-Am. Ex-Felons | 184,356 | 224,418 | 383,823 | 618,963 |
| As % of Afr.-Am. VAP | 1.17% | 1.30% | 1.86% | 2.51% |
| Afr.-Am. Current Felons | 206,981 | 268,411 | 736,432 | 1,296,098 |
| As % of Afr.-Am. VAP | 1.31% | 1.55% | 3.57% | 5.26% |



Figure 3. Trends in the United States Disenfranchised Felon and Ex-Felon Population

**Table 3. Characteristics of State Prison Inmates and Males Ages 25-34 in the General Population, 1997.**

| Variables | Southern Inmates | U.S. Total Inmates | U.S. Males Ages 25-34 |
|---|---|---|---|
| *Race, Sex, and Age* | | | |
| % African American | 53.9 | 47.3 | 11.2 |
| % Hispanic | 13.0 | 17.8 | 9.1 |
| % Male | 93.7 | 93.7 | 100 |
| Mean Age in years | 30.1 (10.3) | 30.4 (10.2) | 29.7 |
| *Socioeconomic Status* | | | |
| Median yearly income (2000 dollars) | $14,915 (31,512) | $14,915 (33,489) | $27,891 |
| Mean Years of education | 10.6 (2.4) | 10.7 (2.5) | x |
| % with high school diploma | 26.4 | 27.9 | 87.3 |
| % with college degree | 2.4 | 2.6 | 27.1 |
| % FT employed | 59.8 | 56.0 | 77.0 |
| % PT/occasionally employed | 12.1 | 12.5 | 12.1 |
| % looking for employment | 11.6 | 13.7 | 3.9 |
| % not employed and not looking for work | 16.4 | 17.8 | 7.0 |
| *Family Status* | | | |
| % Never married | 54.2 | 55.9 | 40.4 |
| % Married | 17.8 | 17.7 | 53.0 |
| % With children | 55.2 | 56.0 | x |
| Mean Number of children | 2.5 (1.8) | 2.5 (1.9) | x |

*Note:* Standard deviations for continuous variables in parentheses.
x data not currently available for U.S. males ages 25-34.

**Table 4. Descriptive Statistics: Population Estimates of Applicant Characteristics.**

| Variable | Unweighted Value | Weighted Value |
|---|---|---|
| *Race, Sex, and Age* | | |
| % White | 79.3% | 81.2% |
| % African American | 17.4% | 16.0% |
| % Hispanic Surname | 8.2% | 8.0% |
| % Male | 85.0% | 86.0% |
| Age | 42.05 | 42.00 |
| | (12.29) | (12.45) |
| *Socioeconomic Status[1]* | | |
| Median monthly income (constant 2000 dollars) | $1,725 | $2,041 |
| | (3,798) | (5,350) |
| Median liquid assets (constant 2000 dollars) | $530 | $937 |
| | (44,057) | (69,285) |
| Median net worth (total assets – liabilities) | $22,508 | $39,929 |
| | (640,409) | (528,851) |
| % Own home | 54.0% | 58.0% |
| Years of education | 12.35 | 12.26 |
| | (2.27) | (2.22) |
| *Family, Community, and Health* | | |
| % Married | 53.0% | 59.9% |
| % Never married | 17.1% | 13.8% |
| Number of children | 1.96 | 1.97 |
| | (2.07) | (1.98) |
| % Ordered to pay child support | 22.0% | 19.0% |
| % Members of civic organization | 44.0% | 43.0% |
| % Regularly attending church | 34.0% | 31.0% |
| % With mental health treatment | 15.0% | 11.0% |
| *Criminal history* | | |
| Sentence length (years) | 5.51 | 5.17 |
| | (34.99) | (29.58) |
| # Prior felony convictions | 1.50 | 1.42 |
| | (1.16) | (1.04) |
| % With violent conviction | 26.0% | 22.0% |
| % With property conviction | 50.0% | 50.0% |
| % With drug conviction | 34.0% | 34.0% |
| % With other conviction | 24.0% | 19.0% |
| # Subsequent arrests | 0.81 | 0.65 |
| | (2.03) | (1.55) |
| % With prior illegal drug use | 45.0% | 41.0% |

*Note:* Standard deviations are in parentheses.

**Table 5. Comparison of Applicants with Non-Applicant Population, Weighted.**

| Variable | Applicant Population | Ex-Felon Population[1] | Southern Prisoners[2] | Florida Population[3] |
|---|---|---|---|---|
| *Race, Sex, and Age* | | | | |
| % African American | 16.0 | 25.6* (-9.03) | 53.9* (-35.63) | 15.4 (0.56) |
| % Male | 86.0 | 76.7* (8.79) | 93.7* (-8.04) | 48.5* (36.71) |
| Age | 42.0 | 38.0* (11.02) | 34.0* (22.05) | 38.7* (9.09) |
| *Family Status* | | | | |
| % Married | 59.9 | | 17.7* (18.33) | 56.3 (1.55) |
| % Never Married | 13.8 | | 54.2* (-24.94) | 26.6* (-7.90) |

*Note: t*-values in parentheses.          * p < .05

[1] Population data taken from my life table estimates of ex-felons in Florida.

[2] Population data taken from the 1997 Survey of State Prison Inmates, Southern region.

[3] Population data taken from the U.S. Census Bureau.

517



Figure 4. Comparison of Clemency Applicants with Other Populations

**Table 6. Total Number Granted Restoration of Voting Rights[1] and Felons Leaving Supervision[2] by Year, Florida 1985-1999.**

| Year | ARCR | Total Granted Restoration of Voting Rights | Felons Successfully Completing Supervision | Percentage Granted Restoration |
|------|------|-------------------------------------------|--------------------------------------------|-------------------------------|
| 1985 | 7,063 | 7,609 | 45,619 | 16.7% |
| 1986 | 15,431 | 16,247 | 37,246 | 43.6% |
| 1987 | 13,327 | 14,180 | 55,669 | 25.5% |
| 1988 | 14,258 | 15,267 | 66,945 | 22.8% |
| 1989 | 9,361 | 10,732 | 62,943 | 17.1% |
| 1990 | 7,705 | 8,958 | 58,430 | 15.3% |
| 1991 | 7,642 | 9,170 | 55,257 | 16.6% |
| 1992 | 5,102 | 5,398 | 47,822 | 11.3% |
| 1993 | 2,476 | 2,846 | 55,590 | 5.1% |
| 1994 | 1,419 | 1,748 | 38,319 | 4.6% |
| 1995 | 925 | 1,214 | 49,391 | 2.5% |
| 1996 | 2,514 | 2,901 | 52,429 | 5.5% |
| 1997 | 1,740 | 2,110 | 57,288 | 3.7% |
| 1998 | x | 1,399 | 44,666 | 3.1% |
| 1999 | x | 2,155 | 54,661 | 3.9% |

[1] Granted category includes those receiving a full pardon, Restoration of Civil Rights (RCR) for out-of-state or federal convictions, RCR for Florida convictions, and automatic restoration for Florida Convictions (ARCR). Source: Florida Office of Executive Clemency.

[2] Total number successfully completing supervision includes unconditional prison releases, successful parole completions, and successful felony probation completions, less those whose adjudication was withheld. Sources: *Correctional Populations in the United States, Probation and Parole in the United States*.

x data currently unavailable.

**Table 7. Reasons for Requesting Clemency by Race.**

| Reason | Non-African American | African American |
|---|---|---|
| Percent mentioning voting as *primary* reason | 13.3% | 21.0%* |
| Percent mentioning voting | 51.5% | 54.9% |
| Percent mentioning occupation or licensing | 36.9% | 39.2% |
| Percent mentioning firearms | 17.8% | 5.4%* |
| Number of cases mentioning one or more reasons | 984 | 188 |

*Note:* Results are weighted by probability of selection into the sample. Unweighted results are comparable to those presented, with slightly larger race differences observed in the percentage mentioning voting as the primary reason for applying and the percentage mentioning firearms.
* $p < .05$

Significant Race Differences in Reasons for Requesting Clemency



**Figure 5. Statistically Significant Race Differences in Reasons for Requesting Clemency.**

**Table 8. Application Outcomes by Race (1985-Present)**

| Outcome | White | African American | Other | *Total* |
|---|---|---|---|---|
| Granted | 79.4% | 61.8% | 66.7% | 76.2% |
| | (766/594) | (118/98) | (22/23) | (906/715) |
| Withdrawn | 6.3% | 9.4% | 6.1% | 6.8% |
| | (61/42) | (18/9) | (2/1) | (81/52) |
| Returned to Applicant | 9.6% | 22.5% | 24.2% | 12.1% |
| | (93/106) | (43/49) | (8/8) | (144/163) |
| Denied | 3.0% | 3.7% | 3.0% | 3.1% |
| | (29/203) | (7/48) | (1/8) | (37/259) |
| Other | 1.7% | 2.6% | 0.0% | 1.8% |
| | (16/10) | (5/5) | (0/0) | (21/15) |
| *Total* | 100.0% | 100.0% | 100.0% | 100.0% |
| | (965/955) | (191/209) | (33/40) | (1189/1204) |

*Note:* Column percentages refer to the weighted sample. The first number in parentheses is the number of weighted cases; the second is the number of unweighted cases.
Chi-Square = 36.772 (8 d.f.)*

**Table 8B. Application Outcomes by Race, Recent Cases (mid-1995-present)**

| Outcome | White | African American | Other | *Total* |
|---|---|---|---|---|
| Granted | 72.1% | 53.6% | 72.2% | 68.6% |
| | (248/350) | (45/64) | (13/19) | (306/433) |
| Withdrawn | 4.1% | 1.2% | 0.0% | 3.4% |
| | (14/20) | (1/1) | (0/0) | (15/21) |
| Returned to Applicant | 19.2% | 35.7% | 22.2% | 22.4% |
| | (66/93) | (30/43) | (4/6) | (100/142) |
| Denied | 3.8% | 6.0% | 5.6% | 4.3% |
| | (13/95) | (5/33) | (1/4) | (19/132) |
| Other | 0.9% | 3.6% | 0.0% | 1.3% |
| | (3/4) | (3/4) | (0/0) | (6/8) |
| *Total* | 100.0% | 100.0% | 100.0% | 100.0% |
| | (344/562) | (84/145) | (18/29) | (446/736) |

*Note:* Column percentages refer to the weighted sample. The first number in parentheses is the number of weighted cases; the second is the number of unweighted cases.
Chi-Square = 18.664 (8 d.f.)*



Figure 6. Application Outcomes by Race.

Uggen Report  December 6, 2001 Page 37

**Table 9. Ineligibility Due to Outstanding Financial Obligations by Race.**

|  | White | African American | Other | *Total* |
|---|---|---|---|---|
| Not ineligible due to owing $ | 93.2% (899/888) | 86.8% (165/177) | 85.3% (29/37) | 92.0% (1093/1102) |
| Ineligible due to owing $ | 6.8% (66/67) | 13.2% (25/32) | 14.7% (5/3) | 8.0% (96/102) |
| Total | 100.0% (965/955) | 100.0% (190/209) | 100.0% (34/40) | 100.0% (1189/1204) |

*Note:* Column percentages refer to the weighted sample. The first number in parentheses is the number of weighted cases; the second is the number of unweighted cases.
Chi-Square = 10.613 (2 df)*

**Table 10. Application Outcome by Income Category.**

| Result | Below Median ($0 - $1724) | Above Median ($1724 +) | Total |
|---|---|---|---|
| | **Income Category** | | |
| Not Granted | 20.1% (33/151) | 9.1% (19/109) | 13.9% (52/260) |
| Granted | 79.9% (131/101) | 90.9% (190/139) | 86.1% (321/240) |
| Total | 100.0% (164/252) | 100.0% (209/248) | 100.0% (373/500) |

*Note:* Column percentages refer to the weighted sample. The first number in parentheses is the number of weighted cases; the second is the number of unweighted cases.
Chi-Square = 9.320 (1 df)*  Gamma = .432



Figure 7. Application Outcomes by Income.

  
Uggen Report  December 6, 2001 Page 40

**Table 11. Test for Differences between RCR Grantees and Non-Grantees, Unweighted.**

| Variable | Non-Grantees | Grantees |
|---|---|---|
| *Race, Sex, and Age* | | |
| % White* | 73.8 | 83.1 |
| % African American* | 22.7 | 13.7 |
| % Hispanic Surname | 8.9 | 7.7 |
| % Male | 87.0 | 84.0 |
| Age | 42.36 | 41.94 |
| | (12.18) | (12.43) |
| *Socioeconomic Status* | | |
| Monthly income (constant 2000 dollars)* | $1,908 | $3,124 |
| | (1,975) | (4,983) |
| Liquid assets (constant 2000 dollars)# | $5,467 | $13,147 |
| | (18,330) | (60,868) |
| Net worth (total assets – liabilities)* | $13,400 | $151,591 |
| | (770,851) | (432,330) |
| % Own home* | 45.0 | 62.0 |
| Years of education | 12.45 | 12.27 |
| | (2.37) | (2.16) |
| *Family, Community, and Mental Health* | | |
| % Married* | 45.4 | 59.2 |
| % Never married* | 21.6 | 13.7 |
| Number of children | 1.93 | 1.96 |
| % Ordered child support | 25.0 | 19.0 |
| % Member of civic org. | 42.0 | 45.0 |
| % Regular church attendee | 36.0 | 33.0 |
| % Mental health treatment* | 20.0 | 9.0 |
| *Criminal history* | | |
| Sentence length (years) | 5.21 | 5.71 |
| | (5.47) | (45.03) |
| # Prior felony convictions* | 1.81 | 1.27 |
| | (1.46) | (0.81) |
| % W/ violent conviction* | 38.0 | 18.0 |
| % W/ property conviction | 51.0 | 50.0 |
| % W/ drug conviction | 35.0 | 35.0 |
| % W/ other conviction* | 30.0 | 19.0 |
| # Subsequent arrests* | 1.09 | 0.58 |
| | (2.60) | (1.38) |
| % Prior illegal drug use | 47.0 | 43.0 |
| Years since release from supervision | 7.52 | 8.08 |
| | (10.45) | (13.81) |
| Number of Cases (max.) | 301 | 910 |

*Note:* Numbers in parentheses are standard deviations;    # p < .10    * p < .05    (2-tailed test)

527



Figure 8. Significant Differences in Case Outcomes by Applicant Characteristics

**Table 12. Multivariate Logistic Regression Predicting Granted Outcome, All Years (Granted=1; All Other Outcomes=0).**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | -0.623* | -0.536* | -0.807* | -0.484* |
| | (.154) | (.235) | (.319) | (.171) |
| Other race (vs. White) | -0.196 | -0.200 | -0.643 | -0.424 |
| | (.327) | (.469) | (.605) | (.349) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | -0.282* | -0.135 | -0.389* |
| | | (.077) | (.084) | (.074) |
| Violent conviction | | -0.961* | -1.001* | -0.745* |
| | | (.179) | (.229) | (.147) |
| Missing violent dummy | | | | -0.247 |
| | | | | (.766) |
| Subsequent arrests (#) | | -0.094$^{\#}$ | -0.012 | -0.039 |
| | | (.050) | (.049) | (.048) |
| Missing subs. arrests dummy | | | | -0.634* |
| | | | | (.222) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | 0.080$^{\#}$ | 0.078$^{\#}$ |
| | | | (.042) | (.040) |
| Missing income dummy | | | | 0.977* |
| | | | | (.281) |
| Prior mental health treatment | | | -0.686* | -0.553* |
| | | | (.303) | (.277) |
| Missing mental health dummy | | | | 0.378 |
| | | | | (.403) |
| Married | | | 0.430$^{\#}$ | 0.357$^{\#}$ |
| | | | (.203) | (.185) |
| Missing married dummy | | | | 0.378 |
| | | | | (.403) |
| Age | | | 0.003 | -0.005 |
| | | | (.008) | (.005) |
| Recent period | | | 0.513* | -0.144 |
| | | | (.209) | (.133) |
| *Constant* | .498* | 1.144* | -0.159 | 0.883* |
| | (.067) | (.152) | (.429) | (.313) |
| Number of Cases | 1,204 | 689 | 475 | 1,204 |
| *-2 Log Likelihood* | 1610.0* | 869.6* | 586.9* | 1441.97* |

*Note:* Standard errors in parentheses.       $^{\#}$ p < .10        * p < .05

529

Uggen Report  December 6, 2001 Page 43

**Table 12B. Multivariate Logistic Regression Predicting Granted Outcome, Recent Period (Granted=1; All Other Outcomes=0).**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | -0.737* | -0.812* | -0.930* | -0.486* |
| | (.189) | (.301) | (.395) | (.214) |
| Other race (vs. White) | 0.140 | -0.042 | -0.331 | 0.023 |
| | (.400) | (.625) | (.844) | (.441) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | -0.357* | -0.203 | -0.598* |
| | | (.122) | (.137) | (.117) |
| Violent conviction | | -1.445* | -1.307* | -1.216* |
| | | (.236) | (.293) | (.194) |
| Missing violent dummy | | | | -1.160 |
| | | | | (1.236) |
| Subsequent arrests (#) | | 0.038 | -0.135# | 0.095 |
| | | (.075) | (.079) | (.074) |
| Missing subs. arrests dummy | | | | -0.758* |
| | | | | (.265) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | 0.086 | 0.092 |
| | | | (.067) | (.068) |
| Missing income dummy | | | | 1.193* |
| | | | | (.408) |
| Prior mental health treatment | | | -1.053* | -0.684# |
| | | | (.440) | (.391) |
| Missing mental health treatmt | | | | -0.056 |
| | | | | (.590) |
| Married | | | 0.347 | 0.311 |
| | | | (.287) | (.262) |
| Missing married dummy | | | | -0.401 |
| | | | | (.554) |
| Age | | | 0.004 | -0.006 |
| | | | (.011) | (.007) |
| *Constant* | .501* | 1.553* | 0.513 | 1.411* |
| | (.087) | (.224) | (.593) | (.430) |
| | | | | |
| Number of Cases | 736 | 396 | 256 | 736 |
| *-2 Log Likelihood* | 981.2* | 465.0* | 301.0* | 853.8* |

*Note:* Standard errors in parentheses.      # p < .10      * p < .05

**Table 12C. Multivariate Logistic Regression Predicting Denial Outcome, All Years (Denial=1; Granted=0; Other Outcomes Excluded)**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | 0.360[#] | 0.433[#] | 0.797* | 0.694* |
| | (.194) | (.250) | (.321) | (.294) |
| Other race (vs. White) | 0.018 | 0.212 | 0.691 | 0.631 |
| | (.418) | (.489) | (.606) | (.595) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | 0.294* | 0.136 | 0.171* |
| | | (.080) | (.084) | (.082) |
| Violent conviction | | 0.996* | 1.008* | 0.982* |
| | | (.186) | (.230) | (.214) |
| Missing violent dummy | | | | 2.210 |
| | | | | (2.249) |
| Subsequent arrests (#) | | 0.111* | 0.015 | 0.024 |
| | | (.051) | (.050) | (.048) |
| Missing subs. arrests dummy | | | | -0.511 |
| | | | | (.911) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | -0.074[#] | -0.083* |
| | | | (.041) | (.041) |
| Missing income dummy | | | | -1.528* |
| | | | | (.354) |
| Prior mental health treatment | | | 0.679* | 0.585* |
| | | | (.306) | (.292) |
| Missing mental health dummy | | | | -1.312* |
| | | | | (.664) |
| Married | | | -0.433* | -0.458* |
| | | | (.205) | (.194) |
| Missing married dummy | | | | -2.997* |
| | | | | (1.335) |
| Age | | | -0.007 | 0.001 |
| | | | (.008) | (.008) |
| Recent period | | | -0.489* | -0.488* |
| | | | (.210) | (.198) |
| *Constant* | -1.074* | -1.341* | 0.247 | -0.065 |
| | (.081) | (.161) | (.433) | (.403) |
| Number of Cases | 974 | 644 | 465 | 974 |
| *-2 Log Likelihood* | 1124.8 | 792.6* | 575.5* | 664.5* |

*Note:* Standard errors in parentheses.      [#] p < .10      * p < .05

**Table 12D. Multivariate Logistic Regression Predicting Denied Outcome, Recent Period (Denial=1; Granted=0; Other Outcomes Excluded).**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | 0.642* | 0.674* | 0.889* | 0.783* |
| | (.244) | (.326) | (.398) | (.376) |
| Other race (vs. White) | -0.254 | -0.068 | 0.365 | 0.284 |
| | (.562) | (.689) | (.843) | (.828) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | 0.369* | 0.205 | 0.244$^{\#}$ |
| | | (.130) | (.136) | (.135) |
| Violent conviction | | 1.591* | 1.292* | 1.402* |
| | | (.250) | (.294) | (.280) |
| Missing violent dummy | | | | 3.101 |
| | | | | (3.296) |
| Subsequent arrests (#) | | -0.024 | -0.135$^{\#}$ | -0.131$^{\#}$ |
| | | (.077) | (.050) | (.079) |
| Missing subs. arrests dummy | | | | -0.161 |
| | | | | (.999) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | -0.082 | -0.090 |
| | | | (.066) | (.067) |
| Missing income dummy | | | | -1.984* |
| | | | | (.539) |
| Prior mental health treatment | | | 1.015* | 0.809$^{\#}$ |
| | | | (.447) | (.423) |
| Missing mental health dummy | | | | -0.939 |
| | | | | (1.137) |
| Married | | | -0.322 | -0.313 |
| | | | (.289) | (.277) |
| Missing married dummy | | | | -2.403 |
| | | | | (1.549) |
| Age | | | -0.006 | 0.004 |
| | | | (.011) | (.010) |
| *Constant* | -1.304* | -1.847* | 0.247 | -0.911 |
| | (.116) | (.245) | (.433) | (.568) |
| | | | | |
| Number of Cases | 565 | 364 | 250 | 565 |
| *-2 Log Likelihood* | 607.1* | 405.1* | 296.8* | 341.2* |

*Note:* Standard errors in parentheses.     $^{\#}$ p < .10      * p < .05

Uggen Report  December 6, 2001 Page 46

**Table 13. Potential Impact of Felon Disenfranchisement on U.S. Senate Elections 1978-98.**

| Year | State | Total | Turnout Rate | Percent Dem. | Actual (R) Margin | Counter-factual Margin | Seat Held by Rep. Through | Actual | Counter-factual |
|------|-------|-------|--------------|--------------|-------------------|------------------------|---------------------------|--------|-----------------|
| 1978 | Virginia[2] | 94,475 | 17.2% | 84.3% | 4,721 | -6,416 | 2002+ | 58:41 (D) | 60:39 (D) |
| 1978 | Texas[3] | 190,369 | 17.2% | 84.3% | 12,227 | -10,214 | 2002+ | 58:41 (D) | 60:39 (D) |
| 1982 | - | | | | | | | 54:46 (R) | 52:48 (R) |
| 1984 | Kentucky[4] | 75,064 | 30.2% | 74.2% | 5,269 | -5,719 | 2002+ | 53:47 (R) | 50:50 ( - ) |
| 1986 | - | | | | | | | 55:45 (D) | 58:42 (D) |
| **1988** | **Florida[5]** | **293,512** | **24.3%** | **82.9%** | **34,518** | **-12,466** | **2000+** | **55:45 (D)** | **59:41 (D)** |
| 1988 | Wyoming[6] | 9,982 | 27.5% | 82.9% | 1,322 | -481 | 2000+ | 55:45 (D) | 60:40 (D) |
| 1990 | - | | | | | | | 56:44 (D) | 61:49 (D) |
| 1992 | Georgia[7] | 131,911 | 30.5% | 74.7% | 16,237 | -3,636 | 2004+ | 57:43 (D) | 63:49 (D) |
| 1994 | - | | | | | | | 52:48 (R) | 54:46 (D) |
| 1996 | - | | | | | | | 53:46 (R) | 54:46 (D) |
| 1998 | Kentucky[8] | 126,780 | 14.0% | 69.2% | 6,766 | -38 | 2004+ | 55:45 (R) | 52:48 (D) |

NOTES:

[2] In Virginia, Warner (R) defeated Miller (D) in 1978, Harrison in 1984, Spannaus in 1990, and M. Warner in 1996.

[3] In Texas, Tower (R) defeated Krueger (D) in 1978; Gramm (R) defeated Doggett in 1984, Parmer in 1990, and Morales in 1996.

[4] In Kentucky, McConnell (R) defeated Huddleston (D) in 1984, Sloane in 1990, and Beshear in 1996 (Class 2 election).

[5] **In Florida, Mack (R) defeated MacKay (D) in 1988 and Rodham in 1994.**

[6] In Wyoming, Wallop (R) defeated Vinich (D) in 1988 and Thomas (R) defeated Sullivan (D) in 1994.

[7] In Georgia, Coverdell (R) defeated Fowler (D) in 1992 and Coles in 1998.

[8] In Kentucky, Bunning (R) defeated Baesler (D) in 1998 (Class 3 election).

**Table 14. Potential Impact of Felon Disenfranchisement on U.S. Presidential Election, 2000.**

| Unit | Total Disenfran- chised | Turnout Rate | Percent Dem. | Actual Margin | Lost Dem. Votes | Counter- factual (D) Margin |
|---|---|---|---|---|---|---|
| U.S. total | 4,955,316 | 21.6% | 74.5% | 539,947 (Gore) | 524,471 | 1,064,418 (Gore) |
| Florida | 827,207 | 21.6% | 74.5% | 1,725 | 87,552 | 85,827 |
| *Conservative* | 827,207 | 10% | 60% | 1,725 | 16,544 | 14,819 |
| *Ex-felons only* | 613,514 | 10% | 60% | 1,725 (Bush) | 12,270 | 10,545 (Gore) |

## References

Broadhurst, R.G. and R.A. Maller. 1990. "The Recidivism of Prisoners Released for the First Time: Reconsidering the Effectiveness Question." *Australian and New Zealand Journal of Criminology* 23:105-116.

Clark, Rebecca L. and Scott A. Anderson. 2000. *Illegal Aliens in Federal, State, and Local Criminal Justice Systems.* Washington: The Urban Institute.

Florida Department of Corrections. (1999). "Recidivism Report: Inmates Released from Florida Prisons."

Florida Office of Program Policy Analysis and Government Accountability. (1995). "Policy Review of Reincarceration in Florida's Prisons Administered by the Department of Corrections."

Hiaasen, Scott. 2001. "Cabinet Expands Clemency Eligibility." *Palm Beach Post.* June 15, 2001, Page 7B.

Hoffman, Peter B. and Barbara Stone-Meierhoefer. 1980. "Reporting Recidivism Rates: The Criterion and Follow-Up Issues." *Journal of Criminal Justice* 8:53-60.

U.S. Department of Commerce, U.S. Census Bureau.  1990 Florida birth origin information available at http://www.census.gov/population/socdemo/migration/90pob.txt.

U.S. Department of Commerce, U.S. Census Bureau.  Current Population Reports. 1940-2000.

U.S. Department of Justice, Bureau of Justice Statistics. Correctional Populations in the United States, 1989-1997.

U.S. Department of Justice, Bureau of Justice Statistics. 1991. "Race of Prisoners Admitted to State and Federal Institutions, 1926-1986." Washington, DC: USGPO.

U.S. Department of Justice, Bureau of Justice Statistics. Sourcebook of Criminal Justice Statistics, 1973-1999.

U.S. Department of Justice, Bureau of Justice Statistics. National Corrections Reporting Program, 1983-1996 [CD-ROM]. ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 1998.

U.S. Department of Justice, Bureau of Justice Statistics. "Recidivism of Felons on Probation, 1986-1989." Washington, DC: USGPO.

U.S. Department of Justice, Bureau of Justice Statistics. "Recidivism of Prisoners Released in 1983." Washington, DC: USGPO.

U.S. Department of Justice, Bureau of Justice Statistics. Survey of Inmates of State Correctional Facilities, 1997. Conducted by U.S. Department of Commerce, Bureau of the Census. ICPSR ed. Ann Arbor, MI: Inter-university Consortium for Political and Social Research [producer and distributor], 2000.

U.S. Department of Justice, Bureau of Prisons. National Prisoner Statistics. Prisoners in State and Federal Institutions, 1948-1964.

U.S. Census Bureau, Administrative and Customer Services Division, Statistical Compendia Branch. Statistical Abstract of the United States, 1995-2000.

# MEMO: Race and Automatic Restoration of Civil Rights (ARCR) in Florida

Prepared by Christopher Uggen with the assistance of Melissa Thompson

This memorandum is a supplement to my main expert report, a portion of which analyzed a sample of case files obtained from the Florida Office of Executive Clemency.

## Automatic Restoration and the Expert Report

Based on our conversations with Janet Keels of the Florida Office of Executive Clemency, we know that most of the files examined in our sample of cases from Florida's Office of Executive Clemency concerned applicants who were either ineligible or unsuccessful in applying for Automatic Restoration of Civil Rights (ARCR). Consequently, many felons whose rights were restored through the "automatic" restoration process are not represented in our analysis of Executive Clemency in Florida. To fill this gap in the expert report, this memo addresses race differences in eligibility for the automatic restoration process and the reasons for ineligibility for recent years.

The analysis in this report is based on documents received from Florida's Office of the Governor and Office of Executive Clemency in response to plaintiffs' interrogatories. These include an interrogatory requesting all documents regarding rule 9A, restoration without a hearing, which asked for all documents regarding the number, race, and sex of individuals convicted of a crime who are eligible for restoration, who have applied for restoration, who have received restoration, who have been denied restoration, and who have been determined ineligible for restoration under rule 9A for the period 1/1/1960 through the present. The documents, "Restoration of Civil Rights Granted Without Hearing 1998, 1999, and 2000," Bates number EOG00359, and "Florida Parole Commission: Year 2000 Restoration of Civil Rights Without a Hearing," Bates number OEC-W02048, provide some important information for recent years (1998-2000), although they do not provide a complete picture of the automated restoration procedure over the entire period nor do they provide detailed subgroup breakdowns at each stage of the procedure.  To supplement these data, I also draw on additional materials noted in the expert report.

## Race Differences in ARCR Eligibility for the Year 2000

In the year 2000 (the year for which we have the most detailed data), Florida's Office of Executive Clemency reviewed 9,750 cases for ARCR eligibility, as shown in Table 1. As we discuss below, not every felon released from supervision is reviewed for eligibility for restoration of civil rights. According to the Rules of Executive Clemency, this review of the felon's civil rights status takes place "after completing and satisfying all sentences and all conditions of supervision," if the individual meets certain requirements. Of those, 2,056 (or 21.1 percent) were found to be eligible for ARCR and 7,694 (78.9 percent) were classified as ineligible. Of the 9,750 files reviewed, 47.0 percent were white males, and 37.3 percent were black males. In contrast, 56.7 percent of those found eligible were white males, while only 22.9 percent were black males. Of those who were reviewed for ARCR eligibility, 87.1 percent of all

black males were determined ineligible in 2000. This is 12.5 percent higher than the 74.6 percent ineligibility rate for white males.

Overall, 85.8 percent of all African Americans whose files were reviewed for ARCR eligibility were ineligible for the automatic restoration process, relative to 73.7 percent of non African Americans. We tested whether this race difference was statistically significant using an independent sample test for the difference in proportions. We found a statistically significant difference between the ineligibility rates of African-Americans and non-African Americans, with African Americans significantly more likely to be ineligible for restoration without a hearing (p < .01). This finding is generally in keeping with the race differences observed in our sample of case files from the Florida Office of Executive Clemency and reported in my expert report.

**Reasons for Ineligibility**

Reasons for ineligibility are listed in the State of Florida's Rules of Executive Clemency. Applicants can be ineligible for failing to meet any of 10 different conditions, according to the Rules of Executive Clemency, effective January 1, 2000[1]. According to the Office of Executive Clemency, most of those classified as ineligible for the automatic restoration process were ineligible for more than one reason: over 55 percent of ineligibilities resulted from a failure to meet two or more conditions. Of the 3,004 people disqualified for a single reason, over 82 percent either had more than two felony convictions (47.5 percent) or had been convicted of various disqualifying offenses (34.9 percent).

---

[1] According to Rule 9A of Rule of Executive Clemency (Rules amended October 28, 1999 and effective January 1, 2000), the following requirements must be met to be eligible for restoration of civil rights without a hearing: 1. No outstanding detainers or pending criminal charges (7 disqualified in 2000 based solely on this requirement); 2. No outstanding pecuniary penalties or liabilities that total more than $1,000 and result from a criminal conviction or traffic infraction (231 disqualified); 3. No outstanding pecuniary penalties or liabilities if such penalties or liabilities are attributed to victim restitution (128 disqualified); 4. No conviction for a capital or life felony (1 disqualified); 5. No previous Clemency Board action (90 disqualified); 6. No more than two felony convictions of record (1,428 disqualified); 7. No felony conviction involving various disqualifying offenses (1,049 disqualified); 8. Must be a citizen of the U.S. if requesting RCR (13 disqualified); 9. If convicted in court other than Florida, individual must be a legal resident of Florida if requesting RCR (6 disqualified); 10. Individual must be domiciled in Florida, if requesting Restoration of Alien Status Under Florida Law (0 disqualified in 2000). These rules were amended again, effective June 14, 2001, removing the $1000 pecuniary penalty exclusion for cases not involving restitution to victims, replacing the disqualification for any prior clemency board action to no prior action within the past 10 years, and altering the list of disqualifying offenses and offender categories. All of the cases examined in this report for the years 1998-2000 fall under the rules existing prior to the 2001 amendments.

**Table 1. Race and Sex of ARCR Applicants in 2000, by Eligibility Status.**

| Race/Sex | Total Reviewed Files Number | Total Reviewed Files % | Eligible Files Number | % of Total Number Eligible[1] | % of Group Determined Eligible[2] | Ineligible Files Number | % of Total Number Ineligible[3] | % of Group Determined Ineligible[4] |
|---|---|---|---|---|---|---|---|---|
| White Males | 4,586 | 47.0% | 1,165 | 56.7% | 25.4% | 3,421 | 44.5% | 74.6% |
| Af.Am. Males | 3,637 | 37.3% | 470 | 22.9% | 12.9% | 3,167 | 41.2% | 87.1% |
| White Females | 769 | 7.9% | 247 | 12.0% | 32.1% | 522 | 6.8% | 67.9% |
| Af.Am. Females | 585 | 6.0% | 130 | 6.3% | 22.2% | 455 | 5.9% | 77.8% |
| Other Males | 143 | 1.5% | 38 | 1.8% | 26.6% | 105 | 1.4% | 73.4% |
| Other Females | 30 | 0.3% | 6 | 0.3% | 20.0% | 24 | 0.3% | 80.0% |
| Total Males | 8,366 | 85.8% | 1,673 | 81.4% | 20.0% | 6,693 | 87.0% | 80.0% |
| Total Females | 1,384 | 14.2% | 383 | 18.6% | 27.7% | 1,001 | 13.0% | 72.3% |
| Total Af.Am | 4,222 | 43.3% | 600 | 29.2% | 14.2% | 3,622 | 47.1% | 85.8% |
| Total non-Af.Am. | 5,528 | 56.7% | 1,456 | 70.8% | 26.3% | 4,072 | 52.9% | 73.7% |
| Total | 9,750 | 100% | 2,056 | 100% | 21.1% | 7,694 | 100% | 78.9% |

[1] Calculated as the number in each race/sex category divided by the total number of eligible (2,056) applicants.
[2] Calculated as the number of eligible applicants in each race/sex category divided by the total number of cases reviewed for that race/sex category.
[3] Calculated as the number in each race/sex category divided by the total number of ineligible (7,694) applicants.
[4] Calculated as the number of ineligible applicants in each race/sex category divided by the total number of cases reviewed for that race/sex category.

**Comparison of ARCR Recipients with our Analysis of Case Files**

In the three years from 1998 to 2000, 4,277 applicants have received ARCR in Florida, as shown in Table 2.[2] The number of successful ARCR grantees is much smaller than the number determined eligible after the initial review. For example, Table 1 shows that in the year 2000 2,056 persons were eligible for the automatic restoration process, but Table 2 shows that only 985 persons were actually granted ARCR in 2000. Our data sources do not address why these differences occur, but the Rules of Executive Clemency allow the Clemency Board to object to the restoration of civil rights under Florida law after the initial eligibility determination. If three or more members of the Board object, the individual must pursue restoration through the non-automated procedure. This table indicates the sex and race distribution of successful ARCR grantees taken from these summary statistics relative to successful RCR (Restoration of Civil Rights outside the automated procedure) grantees observed in our analysis of case files from the Office of Executive Clemency. Although our sample of case files includes a relatively small number of cases from 1998-2000, it is instructive to compare the race and sex distribution of these cases with those reported in ARCR summary statistics.

Table 2 shows that whereas 57 percent of those granted restoration through the automatic process (ARCR) were white males, over 65 percent of those granted restoration in the files we examined (RCR) were white males. We therefore observed a greater percentage of white male restorations in our sample of files from the Office of Executive Clemency than were reported in the summary statistics concerning the automatic restoration process. Overall, approximately 25 percent of those actually receiving ARCR were African American, relative to about 17 percent of those receiving restoration of voting rights through the non-automatic (RCR) process in our sample of case files.

In summary, African Americans accounted for 43.3 percent of those whose files were reviewed, 29.2 percent of those determined eligible for the automatic process, 25.3 percent of those granted restoration through the ARCR process, and 17.4 percent of those granted restoration through the non-automatic RCR process in the year 2000. Figure 1 displays the declining share of African Americans represented at each successive stage of the process governing restoration of civil rights.

---

[2] These numbers differ from those reported in Table 6 of my expert report dated 8/8/01. The totals in the expert report were based on summary statistics ("Cases Handled by the Clemency Office," 1964-2000) provided by Janet Keels at the Office of Executive Clemency (faxed June 19, 2000), whereas these are based on summary statistics "Restoration of Civil Rights Granted Without Hearing 1998, 1999, 2000," Bates number EOG00359, which were produced in response to plaintiffs' interrogatories and faxed to me by Brennan Center attorneys on August 8, 2001.

**Table 2. Applicants Restored to Civil Rights, 1998-2000, by Race and Sex.**

| | ARCR Summary Statistics | | | | E.C. File Sample |
|---|---|---|---|---|---|
| | Successful ARCR Applicants | | | | RCR Grantees[3] |
| Category | 1998 | 1999 | 2000 | 1998-2000 | 1998-2000 |
| | 629 | 1,254 | 554 | 2,437 | 79 |
| White Male | 56.2% | 57.7% | 56.2% | 57.0% | 65.3% |
| | 153 | 338 | 158 | 649 | 15 |
| White Female | 13.7% | 15.6% | 16.0% | 15.2% | 12.4% |
| | 216 | 372 | 176 | 764 | 10 |
| Af.Am. Male | 19.3% | 17.1% | 17.9% | 17.9% | 8.3% |
| | 87 | 160 | 71 | 318 | 11 |
| Af.Am. Female | 7.8% | 7.4% | 7.2% | 7.4% | 9.1% |
| | 26 | 35 | 14 | 75 | 4 |
| Hispanic Male | 2.3% | 1.6% | 1.4% | 1.8% | 3.3% |
| | 4 | 7 | 5 | 16 | 1 |
| Hispanic Female | 0.4% | 0.3% | 0.5% | 0.4% | 0.8% |
| | 2 | 6 | 6 | 14 | 1 |
| Other Male | 0.2% | 0.3% | 0.6% | 0.3% | 0.8% |
| | 2 | 1 | 1 | 4 | 0 |
| Other Female | 0.2% | 0.1% | 0.1% | 0.1% | 0.0% |
| | 1,119 | 2,173 | 985 | 4,277 | 121 |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | |
| Percent White | 69.9% | 73.3% | 72.3% | 72.2% | 77.7% |
| Percent Af.Am. | 27.1% | 24.5% | 25.1% | 25.3% | 17.4% |
| Percent Hispanic | 2.7% | 1.9% | 1.9% | 2.1% | 4.1% |
| Percent Other | 0.4% | 0.3% | 0.7% | 0.4% | 0.8% |
| | | | | | |
| Percent Female | 22.0% | 23.3% | 23.9% | 23.1% | 22.3% |
| Percent Male | 78.0% | 76.7% | 76.1% | 76.9% | 77.7% |

---

[3] Sample numbers are weighted, with weights proportional to the inverse of their selection probabilities. See the expert report for more detail on sample weighting procedures. One case with valid sex information was missing data on race.



**African Americans and Non-African Americans in Each Stage of the Restoration of Civil Rights Process, 2000**

## Comparing ARCR with Successful Releases from Supervision.

Based on data from Bureau of Justice Statistics sources, including *Correctional Populations in the United States*, *Probation and Parole in the United States*, and *The Sourcebook of Criminal Justice Statistics* annual series, we estimate that approximately 155,511 felony offenders were successfully released from supervision in Florida in 1998-2000, as shown in Table 3. Although not all of these releases represent a unique case (that is, the same person may have been released more than once over the 3-year period), the totals in Table 3 should approximate the flow of offenders whose eligibility for restoration of civil rights must be determined in a given year. At this time, we do not know why fewer than 10,000 files are reviewed for ARCR each year (e.g., 9,750 in 2000) when the number of unconditional releases from Florida prisons, conditional parole releases, and felony probation releases is much larger.

**Table 3. Successful Releases and Restoration of Civil Rights by Race, 1998-2000.**

| Successful Releases | 1998 | 1999 | 200 | 1998-2000 |
|---|---|---|---|---|
| Total | 44,666 | 54,661 | 56,18 | 155,511 |
| African American | 18,167 | 21,537 | 22,11 | 61,819 |
| Non-African American | 26,499 | 33,124 | 34,06 | 93,692 |
| **ARCR granted** | **1998** | **1999** | **200** | **1998-2000** |
| Total | 1,119 | 2,173 | 98 | 4,277 |
| African American | 303 | 532 | 24 | 1,082 |
| Non-African American | 816 | 1,641 | 73 | 3,195 |
| **ARCR Rate** | **1998** | **1999** | **200** | **1998-2000** |
| Total | 2.5% | 4.0% | 1.8 | 2.8% |
| African American | 1.7% | 2.5% | 1.1 | 1.8% |
| Non-African American | 3.1% | 5.0% | 2.2 | 3.4% |

Based on population reports in Bureau of Justice Statistics publications (e.g., *Correctional Populations in the United States*, *Probation and Parole in the United States*), we estimate that approximately 61,819 of those released from 1998-2000 were African American offenders (or about 39.8 percent). In the same years, 4,277 were automatically restored to civil rights, with 1,082 of these African Americans (25.3 percent). For the three-year period from 1998 to 2000, we find that approximately 2.8 percent of the estimated total successful releasees were automatically restored to civil rights. About 1.8 percent of the estimated African Americans successfully released from supervision received ARCR, compared to 3.4 percent of non-African Americans successfully released from supervision. Although we caution that our estimates of the number of successful releasees are not precise head counts (see the discussion in the expert report for our methodology), the percentage of these releasees that are granted automatic restoration appears to be very small.


**Provisional Conclusions**

These data on eligibility for Automatic Restoration of Civil Rights (ARCR) in Florida are a useful supplement to those presented in my Expert Report. Although I currently only have access to summary statistics for the past few years, I can draw the following provisional conclusions.

First, African Americans are under-represented among those eligible for automatic restoration – only about 14 percent of those reviewed were determined to be eligible for ARCR in comparison to about 26 percent of the non-African Americans reviewed. Moreover, the percentage of African Americans appears to diminish at each stage of the process, from release to eligibility to successful restoration. Second, because most of those who were ineligible for the automatic procedure were disqualified for more than one reason, it is unlikely that changes to a single rule will dramatically increase the numbers of those granted restoration through ARCR. The rules that appear to disqualify the most ex-felons concern the limitation to two or fewer felony convictions and the list of disqualifying offenses. Third, although African Americans are underrepresented among those granted automatic restoration, they are even more underrepresented among those granted restoration through the non-automated procedures in the

case files we examined. Finally, it appears that a very small percentage of felons released from supervision in Florida have their civil rights restored each year and that the restoration rate among African Americans is lower than among non-African Americans.

# BRENNAN █ CENTER FOR JUSTICE
### AT NYU SCHOOL OF LAW

December 6, 2001

By Hand/Tribeca Grand Hotel

Hamish Hume, Esq.
Cooper & Kirk
Suite 200
1500 K Street, NW
Washington, D.C. 20005

     Re:    *Johnson v. Bush*, Docket No. 00-C.V.-3542 (S.D. Fla.)

Dear Hamish:

     Enclosed please find the following documents, which supplement our prior responses on October 11, 2001, October 12, 2001 and October 18, 2001 to Florida Clemency Board Defendants' Second Set of Requests for Production of Documents, dated September 19, 2001 ("Document Requests") to the extent such Document Requests are applicable to Plaintiffs' expert witness, Christopher Uggen:

- Tables 12-w, 12B-w, 12C-w and 12D-w, dated November 19, 2001, reflecting the analyses in Tables 12, 12B, 12C and 12D from Uggen's Expert Report, dated August 8, 2001, using weighted multivariate logistic regression (bates-stamped P003373-P003376);

- Table 12E entitled Multivariate Logistic Regression, with Katz's Controls, dated November 19, 2001 (bates-stamped P003377);

- "Questions about and Responses to Katz's Supplemental Report," dated November 19, 2001 (bates-stamped P003378-P003379);

- A revised Expert Report of Christopher Uggen, dated December 6, 2001, incorporating the updated estimates of Florida's Ex-Felon Population that were produced to Defendants on October 11, 2001 in a memorandum entitled "Data Files Used in Estimating Florida's Ex-Felon Population and Update of Estimates to Include 2000 Numbers," bates-stamped P001161-P001171 ("October 9 Memo"); and

- Christopher Uggen and Jeff Manza, "The Political Consequences of Felon Disfranchisement Laws in the United States," dated August 16, 2001, bates-stamped (P003380-P003433).

**545**

Hamish Hume, Esq.
December 6, 2001
Page 2


  Further, in our review of the documents that we previously produced, we discovered that we inadvertently omitted pages 10, 11 and 13 from the October 9 Memo.  We enclose a complete copy of the October 9 Memo with the missing pages, which are numbered 1161a, 1161b, and 1170a, respectively.

        Sincerely,

        Nancy Northup


Enclosures

*New*

*( Includes [illegible] & withdrawn*

## Table 12. Weighted Multivariate Logistic Regression Predicting Granted Outcome, All Years (Granted=1; All Other Outcomes=0).

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | -0.869* | -0.724* | -0.653 | -0.529* |
| | (.169) | (.321) | (.504) | (.185) |
| Other race (vs. White) | -0.726[#] | 0.063 | -0.069 | -0.610 |
| | (.080) | (.811) | (1.074) | (.390) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | -0.155[#] | -0.116 | -0.367* |
| | | (.083) | (.108) | (.070) |
| Violent conviction | | -0.827* | -0.766* | -0.539* |
| | | (.260) | (.372) | (.170) |
| Missing violent dummy | | | | -0.029 |
| | | | | (.705) |
| Subsequent arrests (#) | | -0.021 | -0.014 | -0.007 |
| | | (.069) | (.082) | (.072) |
| Missing subs. arrests dummy | | | | -0.789* |
| | | | | (.226) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | 0.134 | 0.208[#] |
| | | | (.095) | (.108) |
| Missing income dummy | | | | -0.248 |
| | | | | (.356) |
| Prior mental health treatment | | | -0.478 | -0.453 |
| | | | (.461) | (.399) |
| Missing mental health dummy | | | | -0.013 |
| | | | | (.448) |
| Married | | | 0.276 | -0.044 |
| | | | (.343) | (.294) |
| Missing married dummy | | | | -0.197 |
| | | | | (.443) |
| Age | | | -0.015 | -0.009 |
| | | | (.013) | (.006) |
| Recent period | | | -0.408 | -0.647* |
| | | | (.346) | (.148) |
| *Constant* | 1.350* | 2.330* | 2.762* | 2.981* |
| | (.080) | (.203) | (.711) | (.430) |
| | | | | |
| Number of Cases | 1,204 | 689 | 475 | 1,204 |
| -2 Log Likelihood | 1277.6* | 464.5* | 249.3* | 1156.8* |

*Note.* Standard errors in parentheses.      [#] p < .10      * p < .05

EXHIBIT

16

12-08-01

P 003373

**Table 12B. Weighted Multivariate Logistic Regression Predicting Granted Outcome, Recent Period (Granted=1; All Other Outcomes=0).**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | -0.786* (.250) | -1.007* (.462) | -0.938 (.691) | -0.419 (.283) |
| Other race (vs. White) | 0.082 (.545) | -0.138 (1.032) | -0.057 (1.628) | 0.125 (.588) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | -0.295* (.144) | -0.066 (.209) | -0.620* (.152) |
| Violent conviction | | -1.173* (.387) | -1.354* (.543) | -1.162* (.276) |
| Missing violent dummy | | | | -0.842 (1.544) |
| Subsequent arrests (#) | | 0.042 (.127) | 0.074 (.151) | -0.011 (.132) |
| Missing subs. arrests dummy | | | | -0.783* (.325) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | 0.087 (.150) | 0.096 (.154) |
| Missing income dummy | | | | 0.251 (.601) |
| Prior mental health treatment | | | -1.128 (.735) | -0.732 (.637) |
| Missing mental health treatmt | | | | -0.412 (.779) |
| Married | | | 0.444 (.569) | 0.291 (.491) |
| Missing married dummy | | | | -0.632 (.696) |
| Age | | | 0.001 (.021) | -0.006 (.009) |
| *Constant* | .945* (.120) | 2.402* (.337) | 1.932# (1.155) | 3.011* (.689) |
| Number of Cases | 736 | 396 | 256 | 736 |
| *-2 Log Likelihood* | 544.4* | 184.4* | 91.9* | 469.0* |

*Note:* Standard errors in parentheses.    # p < .10    * p < .05

548

P 003374

**Table 12C. Weighted Multivariate Logistic Regression Predicting Denial Outcome, All Years (Denial=1; Granted=0; Other Outcomes Excluded)**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | 0.433 | 0.529 | 0.761 | 0.664 |
| | (.438) | (.480) | (.569) | (.535) |
| Other race (vs. White) | 0.319 | 0.279 | 0.389 | 0.362 |
| | (.983) | (1.016) | (1.102) | (1.099) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | 0.180[#] | 0.125 | 0.141 |
| | | (.104) | (.113) | (.110) |
| Violent conviction | | 0.995* | 0.936* | 0.925* |
| | | (.374) | (.411) | (.394) |
| Missing violent dummy | | | | 2.989 |
| | | | | (4.505) |
| Subsequent arrests (#) | | 0.098 | 0.025 | 0.031 |
| | | (.080) | (.088) | (.085) |
| Missing subs. arrests dummy | | | | -0.488 |
| | | | | (2.159) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | -0.082 | -0.090 |
| | | | (.096) | (.096) |
| Missing income dummy | | | | -1.586[#] |
| | | | | (.828) |
| Prior mental health treatment | | | 0.620 | 0.538 |
| | | | (.520) | (.505) |
| Missing mental health dummy | | | | -1.303 |
| | | | | (1.566) |
| Married | | | -0.449 | -0.462 |
| | | | (.394) | (.380) |
| Missing married dummy | | | | -3.096 |
| | | | | (3.471) |
| Age | | | -0.008 | -0.003 |
| | | | (.016) | (.015) |
| Recent period | | | 0.661[#] | 0.663[#] |
| | | | (.393) | (.376) |
| *Constant* | -3.284* | -3.362* | -2.345* | -2.552* |
| | (.190) | (.296) | (.790) | (.758) |
| Number of Cases | 974 | 644 | 465 | 974 |
| -2 Log Likelihood | 308.7 | 247.7* | 195.3* | 218.5* |

*Note:* Standard errors in parentheses      [#] p < .10      * p < .05

549

P B003375

**Table 12D. Weighted Multivariate Logistic Regression Predicting Denied Outcome, Recent Period (Denial=1; Granted=0; Other Outcomes Excluded).**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | 0.642 | 0.677 | 0.779 | 0.688 |
| | (.561) | (.652) | (.745) | (.721) |
| Other race (vs. White) | -0.254 | -0.055 | 0.267 | 0.227 |
| | (1.386) | (1.481) | (1.638) | (1.627) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | | 0.280 | 0.089 | 0.122 |
| | | (.193) | (.216) | (.209) |
| Violent conviction | | 1.560* | 1.244* | 1.330* |
| | | (.530) | (.571) | (.552) |
| Missing violent dummy | | | | 3.826 |
| | | | | (5.968) |
| Subsequent arrests (#) | | 0.098 | -0.087 | -0.087 |
| | | (.080) | (.163) | (.162) |
| Missing subs. arrests dummy | | | | -0.097 |
| | | | | (2.460) |
| *Extralegal Factors* | | | | |
| Monthly income (in thousands) | | | -0.071 | -0.077 |
| | | | (.143) | (.145) |
| Missing income dummy | | | | -2.012 |
| | | | | (1.317) |
| Prior mental health treatment | | | 0.863 | 0.691 |
| | | | (.828) | (.805) |
| Missing mental health dummy | | | | -0.682 |
| | | | | (2.758) |
| Married | | | -0.354 | -0.332 |
| | | | (.606) | (.585) |
| Missing married dummy | | | | -2.769 |
| | | | | (3.867) |
| Age | | | -0.009 | 0.000 |
| | | | (.023) | (.022) |
| *Constant* | -2.914* | -3.362* | -1.749 | -2.142# |
| | (.280) | (.296) | (1.210) | (1.177) |
| Number of Cases | 565 | 364 | 250 | 565 |
| *-2 Log Likelihood* | 141.6 | 105.0* | 83.9 | 93.7* |

*Note:* Standard errors in parentheses.        # $p < .10$        * $p < .05$

P 003376

**Table 12E. Multivariate Logistic Regression, with Katz's Controls**

| Variable | Model 1 | Model 2 | Model 3 | Model 4 |
|---|---|---|---|---|
| *Race* | | | | |
| African American (vs. White) | -0.431* | -0.749* | -0.157 | -0.356 |
| | (.165) | (.179) | (.214) | (.461) |
| Other race (vs. White) | -.334 | -0.869* | -0.145 | -0.373 |
| | (.340) | (.378) | (.446) | (1.009) |
| *Criminal History* | | | | |
| Prior felony convictions (#) | -0.349* | -0.207* | -0.314* | -0.045 |
| | (.078) | (.077) | (.085) | (.137) |
| Violent conviction | -1.014* | -0.682* | -1.384* | -1.498* |
| | (.168) | (.196) | (.198) | (.433) |
| Property conviction | -0.240 | -0.428* | -0.308 | -0.679 |
| | (.161) | (.192) | (.190) | (.414) |
| Drug conviction | -0.306# | -0.114 | -0.619* | -0.850# |
| | (.169) | (.199) | (.201) | (.442) |
| Other Conviction | -0.515* | -0.361# | -0.834* | -1.084* |
| | (.155) | (.187) | (.181) | (.390) |
| *Constant* | 1.605* | 2.142* | 2.510* | 4.693* |
| | (.167) | (.190) | (.204) | (.427) |
| Number of Cases | 1,195 | 1,195 | 968 | 968 |
| *-2 Log Likelihood* | 1482.7* | 1219.6* | 991.2* | 282.1* |

*Note:* Standard errors in parentheses.      # $p < .10$      * $p < .05$
Model 1: Unweighted, predicting granted=1; not granted=0.
Model 2: Weighted, predicting granted=1; not granted=0.
Model 3: Unweighted, predicting denied=1; granted=0.
Model 4: Weighted, predicting denied=1; granted=0.

P 003377

Return to Florida's Early Constitutions Main Page

**Constitution of 1838:**

---

**CONSTITUTION, or FORM OF GOVERNMENT, for the PEOPLE OF FLORIDA.**

---

View Original

We, the People of the Territory of Florida, by our Delegates in Convention, assembled at the City of St. Joseph, on Monday the 3d day of December, A.D. 1838, and of the Independence of the United States the sixty-third year, having and claiming the right of admission into the Union, as one of the United States of America, consistent with the principles of the Federal Constitution, and by virtue of the Treaty of Amity, Settlement, and Limits between the United States of America and the King of Spain, ceding the Provinces of East and West Florida to the United States; in order to secure to ourselves and our posterity the enjoyment of all the rights of life, liberty, and property, and the pursuit of happiness, do mutually agree, each with the other, to form ourselves into a Free and Independent State, by the name of the State of Florida.

---

## ARTICLE I.

Declaration of Rights.

That the great and essential principles of liberty and free government may be recognized and established, we declare:

**Section 1.** That all freemen, when they form a social compact, are equal; and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty; of acquiring, possessing, and protecting property and reputation; and of pursuing their own happiness.

**Section 2.** That all political power is inherent in the people, and all free governments are founded on their authority, and established for their benefit; and, therefore, they have, at all times, an inalienable and indefeasible right to alter or abolish their form of government, in such manner as they may deem expedient.

**Section 3.** That all men have a natural and inalienable right to worship Almighty God according to the dictates of their own conscience; and that no preference shall ever be given by law to any religious establishment, or mode of worship in this State.

**Section 4.** That all elections shall be free and equal; and that no property qualification for eligibility to office, or for the right of suffrage, shall ever be required in this State.

**Section 5.** That every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that liberty; and no law shall ever be passed to curtail, abridge, or restrain the liberty of speech or of the press.

**Section 6.** That the right of trial by jury shall forever remain inviolate.

**Section 7.** That the people shall be secure in their persons, houses, papers, and possessions from unreasonable seizures and searches; and that no warrant to search any place, or to seize any person

552

or thing, shall issue without describing the place to be searched, and the person or thing to be seized, as nearly as may be, nor without probable cause, supported by oath or affirmation.

**Section 8.** That no freeman shall be taken, imprisoned, or disseized of his freehold, liberties, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the law of the land.

**Section 9.** That all Courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law; and right and justice administered without sale, denial, or delay.

**Section 10.** That in all criminal prosecutions, the accused hath a right to be heard by himself or counsel, or both; to demand the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and in all prosecutions by indictment or presentment a speedy and public trial, by an impartial jury of the County or District, where the offense was committed; and shall not be compelled to give evidence against himself.

**Section 11.** That all persons shall be bailable, by sufficient securities, unless in capital offenses, where the proof is evident, or the presumption is strong; and the privilege of habeas corpus shall not be suspended, unless when, in case of rebellion or invasion, the public safety may require it.

**Section 12.** That excessive bail shall in no case be required; nor shall excessive fines be imposed; nor shall cruel or unusual punishments be inflicted.

View Original

**Section 13.** That no person shall, for the same offense, be twice put in jeopardy of life or limb.

**Section 14.** That private property shall not be taken or applied to public use, unless just compensation be made therefor.

**Section 15.** That in all prosecutions and indictments for libel, the truth may be given in evidence; and if it shall appear to the jury that the libel is true, and published with good motives and for justifiable ends, the truth shall be a justification; and the jury shall be the judges of the law and facts.

**Section 16.** That no person shall be put to answer any criminal charge, but by presentment, indictment or impeachment.

**Section 17.** That no conviction shall work corruption of blood, or forfeiture of estate.

**Section 18.** That retrospective laws, punishing acts committed before the existence of such laws, and by them only declared penal, or criminal, are oppressive, unjust, and incompatible with liberty; wherefore, no ex post facto law shall ever be made.

**Section 19.** That no law impairing the obligation of contracts shall ever be passed.

**Section 20.** That the people have a right, in a peaceable manner, to assemble together to consult for the common good; and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address, or remonstrance.

**Section 21.** That the free white men of this State shall have the right to keep and to bear arms, for their common defense.

**Section 22.** That no soldier in time of peace, shall be quartered in any house without the consent of the owner; nor in time of war but in a manner prescribed by law.

**Section 23.** That no standing army shall be kept up without the consent of the Legislature: and the

military shall in all cases and at all times, be in strict subordination to the civil power.

**Section 24.** That perpetuities and monopolies are contrary to the genius of a free State, and ought not to be allowed.

**Section 25.** That no hereditary emoluments, privileges, or honors, shall ever be granted or conferred in this State.

**Section 26.** That frequent recurrence to fundamental principles, is absolutely necessary to preserve the blessings of liberty.

**Section 27.** That to guard against transgressions upon the rights of the people, we declare that every thing in this article is excepted out of the general powers of government, and shall forever remain inviolate; and that all laws contrary thereto, or to the following provisions, shall be void.

------

## ARTICLE II.

Distribution of the Powers of Government.

**Section 1.** The powers of the Government of the State of Florida, shall be divided into three distinct departments, and each of them confided to a separate body of Magistracy, to wit: Those which are Legislative to one; those which are Executive to another; and those which are Judicial to another.

**Section 2.** No person, or collection of persons, being one of those departments, shall exercise any power properly belonging to either of the others, except in the instances expressly provided in this Constitution.

------

## ARTICLE III.

Executive Department.

**Section 1.** The Supreme Executive Power shall be vested in a Chief Magistrate, who shall be styled the Governor of the State of Florida.

**Section 2.** The Governor shall be elected for four years, by the qualified electors, at the time and place where they shall vote for Representatives, and shall remain in office until a successor be chosen and qualified, and shall not be eligible to re-election until the expiration of four years thereafter.

**Section 3.** No person shall be eligible to the office of Governor unless he shall have attained the age of thirty years, shall have been a citizen of the United States ten years, or an inhabitant of Florida at the time of the adoption of this Constitution, (being a citizen of the United States,) and shall have been a resident of Florida at least five years next preceding the day of election.

**Section 4.** The returns of every election for Governor shall be sealed up and transmitted to the seat of Government, directed to the Speaker of the House of Representatives, who shall, during the first week of the session, open and publish them in the presence of both Houses of the General Assembly, and the person having the highest number of votes, shall be Governor; but if two or

more shall be equal and highest in votes, one of them shall be chosen Governor by the joint vote of the two Houses; and contested elections for Governor shall be determined by both Houses of the General Assembly, in such manner as shall be prescribed by law.

**Section 5.** He shall, at stated times, receive a compensation for his services, which shall not be increased or diminished during the term for which he shall have been elected.

View Original

**Section 6.** He shall be Commander-in-Chief of the Army and Navy of this State, and of the Militia thereof.

**Section 7.** He may require information in writing from the officers of the Executive Departments, on any subject relating to the duties of their respective offices.

**Section 8.** He may, by proclamation, on extraordinary occasions, convene the General Assembly at the seat of Government, or at a different place, if that shall have become dangerous from an enemy, or from disease; and in case of disagreement between the two Houses with respect to the time of adjournment, he may adjourn them to such time as he shall think proper, not beyond the day of the next meeting designated by this Constitution.

**Section 9.** He shall, from time to time, give to the General Assembly information of the State of the Government, and recommend to their consideration such measures as he may deem expedient.

**Section 10.** He shall take care that the laws be faithfully executed.

**Section 11.** In all criminal and penal cases, (except of treason and impeachment,) after conviction, he shall have power to grant reprieves and pardons, and remit fines and forfeitures under such rules and regulations as shall be prescribed by law; and in cases of treason, he shall have power, by and with the advice and consent of the Senate, to grant reprieves and pardons; and he may, in the recess of the Senate, respite the sentence until the end of the next session of the General Assembly.

**Section 12.** There shall be a seal of the State, which shall be kept by the Governor, and used by him officially, with such device as the Governor first elected may direct, and the present seal of the Territory shall be the seal of the State until otherwise directed by the General Assembly.

**Section 13.** All commissions shall be in the name, and by the authority of the State of Florida, be sealed with the State seal, and signed by the Governor, and attested by the Secretary of State.

**Section 14.** There shall be a Secretary of State appointed by joint vote of both Houses of the General Assembly, who shall continue in office during the term of four years; and he shall keep a fair register of the official acts and proceedings of the Governor, and shall, when required, lay the same and all papers, minutes, and vouchers, relative thereto, before the General Assembly, and shall perform such other duties as may be required of him by law.

**Section 15.** Vacancies that happen in offices, the appointment to which is vested in the General Assembly, or given to the Governor, with the advice and consent of the Senate, shall be filled by the Governor during the recess of the General Assembly, by granting commissions, which shall expire at the end of the next session.

**Section 16.** Every bill, which shall have passed both Houses of the General Assembly, shall be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the House in which it shall have originated, who shall enter the objections at large upon the journals, and proceed to re-consider it; and if, after such re-consideration, a majority of the whole number elected to that House, shall agree to pass the bill, it shall be sent with the objections to the other House, by which it shall likewise be re-considered; and if approved by a majority of the whole number elected to that House, it shall become a law; but in such cases, the

votes of both Houses shall be by yeas and nays, and the names of the members voting for, or against the bill, shall be entered on the journals of each House respectively; and if any bill shall not be returned by the Governor, within five days (Sundays excepted) after it shall have been presented to him the same shall be a law in like manner, as if he had signed it; unless the General Assembly by their adjournment, prevent its return, in which case, it shall not be a law.

**Section 17.** Every order, resolution, or vote, to which concurrence of both Houses may be necessary, except on questions of adjournment, shall be presented to the Governor; and before it shall take effect, be approved by him, or being disapproved, be re-passed by both Houses, according to the rules and limitations prescribed in case of a bill.

**Section 18.** In case of the impeachment of the Governor, his removal from office, death, refusal to qualify, resignation, or absence from the State, the President of the Senate shall exercise all the power and authority appertaining to the office of Governor, during the term for which the Governor was elected; unless the General Assembly shall provide by law for the election of a Governor to fill such vacancy; or, until the Governor absent, or impeached, shall return, or be acquitted.

**Section 19.** If during the vacancy of the office of Governor, the President of the Senate shall be impeached, removed from office, refuse to qualify, resign, die, or be absent from the State, the Speaker of the House of Representatives shall in like manner, administer the Government.

View Original

**Section 20.** The President of the Senate, or Speaker of the House of Representatives, during the time he administers the Government, shall receive the same compensation which the Governor would have received.

**Section 21.** The Governor shall always reside, during the sessions of the General Assembly, at the place where their sessions are held, and at all other times wherever, in their opinion, the public good may require.

**Section 22.** No person shall hold the office of Governor, and any other office or commission, civil or military, either in this State, or under any State, or the United States, or any other power, at one and the same time, except the President of the Senate, or the Speaker of the House of Representatives, when he shall hold the office, as aforesaid.

**Section 23.** A State Treasurer, and Comptroller of Public Accounts, shall be elected by joint vote of both Houses of the General Assembly, at each regular session thereof.

---

## ARTICLE IV.

Legislative Department.

**Section 1.** The Legislative power of this State shall be vested in two distinct branches, the one to be styled the Senate, the other the House of Representatives, and both together, "The General Assembly of the State of Florida," and the style of all the laws shall be "Be it enacted by the Senate and House of Representatives of the State of Florida in General Assembly convened."

**Section 2.** The members of the House of Representatives shall be chosen by the qualified voters, and shall serve for the term of one year from the day of the commencement of the general election and no longer, and the sessions of the General Assembly shall be annual, and commence on the fourth Monday in November in each year, or at such other time, as may be prescribed by law.

**Section 3.** The Representatives shall be chosen every year, on the first Monday in the Month of

October, until otherwise directed by law.

**Section 4.** No person shall be a representative, unless he be a white man, a citizen of the United States, and shall have been an inhabitant of the State, two years next preceding his election, and the last year thereof a resident of the county for which he shall be chosen, and shall have attained the age of twenty-one years.

**Section 5.** The Senators shall be chosen by the qualified electors, for the term of two years, at the same time, in the same manner, and in the same places where they vote for members of the House of Representatives; and no man shall be a Senator, unless he be a white man, a citizen of the United States, and shall have been an inhabitant of this State, two years next preceding his election, and the last year thereof, a resident of the District or County for which he shall be chosen, and shall have attained the age of twenty-five years.

**Section 6.** The Senators after their first election, shall be divided by lot, into two classes, and the seats of the Senators of the first class, shall be vacated at the expiration of the first year, and of the second class, shall be vacated at the expiration of the second year, so that one half thereof, as near as possible, may be chosen for ever thereafter, annually, for the term of two years.

**Section 7.** The House of Representatives, when assembled, shall choose a Speaker and its other officers, and the Senate a President and its other officers, and each House shall be judge of the qualifications, elections, and returns of its members; but a contested election shall be determined in such manner as shall be directed by law.

**Section 8.** A majority of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may compel the attendance of absent members in such manner and under such penalties as each House may prescribe.

**Section 9.** Each House may determine the rules of its own proceedings, punish its members for disorderly behavior, and with the consent of two-thirds, expel a member, but not a second time for the same cause.

**Section 10.** Each House, during the session, may punish by imprisonment any person, not a member, for disrespectful or disorderly behavior in its presence, or for obstructing any of its proceedings, provided such imprisonment shall not extend beyond the end of the session.

**Section 11.** Each House shall keep a Journal of its proceedings, and cause the same to be published immediately after its adjournment, and the yeas and nays of the members of each House shall be taken and entered upon the journals upon the final passage of every bill, and may, by any two members, be required upon any other question, and any member of either House shall have liberty to dissent from or protest against any act or resolution which he may think injurious to the public or an individual, and have the reasons of his dissent entered on the journal.

**Section 12.** Senators and Representatives shall in all cases, except treason, felony or breach of the peace, be privileged from arrest during the session of the General Assembly, and in going to or returning from the same, allowing one day for every twenty miles such member may reside from the place at which the General Assembly is convened, and for any speech or debate in either House they shall not be questioned in any other place.

**Section 13.** The General Assembly shall make provision by law for filling vacancies that may occur in either House by the death, resignation, (or otherwise,) of any of its members.

**Section 14.** The doors of each House shall be open, except on such occasions as, in the opinion of the House, the public safety may imperiously require secrecy.

**Section 15.** Neither House shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which they may be sitting.

557

**Section 16.** Bills may originate in either House of the General Assembly, and all bills passed by one House may be discussed, amended, or rejected by the other, but no bill shall have the force of law until on three several days it be read in each House, and free discussion be allowed thereon, unless in cases of urgency four-fifths of the House in which the same shall be depending may deem it expedient to dispense with the rule; and every bill having passed both Houses shall be signed by the Speaker and President of their respective Houses.

**Section 17.** Each member of the General Assembly shall receive from the public Treasury such compensation for his services as may be fixed by law, but no increase of compensation shall take effect during the term for which the Representatives were elected when such law passed.

**Section 18.** The number of members of the House of Representatives shall never exceed sixty.

---

## ARTICLE V.

Judicial Department.

**Section 1.** The Judicial power of this State, both as to matters of law and equity, shall be vested in a Supreme Court, Courts of Chancery, Circuit Courts and Justices of the Peace, provided the General Assembly may also vest such criminal jurisdiction as may be deemed necessary in Corporation Courts, but such jurisdiction shall not extend to capital offenses.

**Section 2.** The Supreme Court, except in cases otherwise directed in this Constitution, shall have appellate jurisdiction only, which shall be co-extensive with the State, under such restrictions and regulations, not repugnant to this Constitution, as may from time to time be prescribed by law, provided that the said Court shall always have power to issue writs of injunction, mandamus, quo warranto, habeas corpus, and such other remedial and original writs as may be necessary to give it a general superintendence and control of all other Courts.

**Section 3.** For the term of five years from the election of the Judges of the Circuit Courts, and thereafter until the General Assembly shall otherwise provide, the powers of the Supreme Court shall be vested in, and its duties performed by the Judges of the several Circuit Courts within this State, and they, or a majority of them shall hold such sessions of the Supreme Court, and at such times as may be directed by law.

**Section 4.** The Supreme Court, when organized, shall be holden at such times and places as may be provided by law.

**Section 5.** The State shall be divided into at least four convenient Circuits, and until other Circuits shall be provided for by the General Assembly, the arrangement of the Circuits shall be the Western, Middle, Eastern and Southern Circuits, and for each Circuit there shall be appointed a Judge, who shall after his appointment, reside in the Circuit for which he has been appointed, and shall, at stated times, receive for his services a salary of not less than two thousand dollars per annum, which shall not be diminished during the continuance of such Judge in office; but the Judges shall receive no fees or perquisites of office, nor hold any other office of profit under the State, the United States, or of any other power.

**Section 6.** The Circuit Courts shall have original jurisdiction in all matters, civil and criminal, within this State, not otherwise excepted in this Constitution.

**Section 7.** A Circuit Court shall be held in such Counties, and at such times and places therein, as may be prescribed by law, and the Judges of the several Circuit Courts may hold Courts for each other, and shall do so when directed by law.

**Section 8.** The General Assembly shall have power to establish and organize a separate Court or Courts of original equity jurisdiction; but until such Court or Courts shall be established and organized, the Circuit Courts shall exercise such jurisdiction.

**Section 9.** The General Assembly shall provide by law for the appointment, in each County, of an officer to take probate of wills, to grant letters testamentary of administration and guardianship; to attend to the settlement of the estates of decedents and of minors, and to discharge the duties usually appertaining to Courts of Ordinary, subject to the direction and supervision of the Courts of Chancery, as may be provided by law.

**Section 10.** A competent number of Justices of the Peace shall be, from time to time, appointed or elected in and for each County, in such mode, and for such term of office, as the General Assembly may direct; and shall possess such jurisdiction as may be prescribed by law; and in cases tried before a Justice of the Peace, the right of appeal shall be secured under such rules and regulations as may be prescribed by law.

**Section 11.** Justices of the Supreme Court, Chancellors, and Judges of the Circuit Courts, shall be elected by the concurrent vote of a majority of both Houses of the General Assembly.

**Section 12.** The Judges of the Circuit Courts, shall, at the first session of the General Assembly to be holden under this Constitution, be elected for the term of five years, and shall hold their offices for that term, unless sooner removed under the provisions made in this Constitution for removal of Judges by address or impeachment; and at the expiration of five years, the Justices of the Supreme Court and the Judges of the Circuit Courts, shall be elected for the term of and during their good behavior; and for wilful neglect of duty, or other reasonable cause, which shall not be sufficient ground for impeachment, the Governor shall remove any of them, on the address of two-thirds of each House of the General Assembly; provided, however, that the cause or causes shall be stated at length in such address, and entered on the journals of each House; and provided further, that the cause or causes shall be notified to the Judge so intended to be removed, and he shall be admitted to a hearing in his own defense, before any vote for such address shall pass; and in such cases, the vote shall be taken by yeas and nays, and entered on the journals of each House respectively.

**Section 13.** The Clerk of the Supreme Court and the Clerks of the Courts of Chancery, shall be elected by the General Assembly; and the Clerks of the Circuit Courts shall be elected by the qualified electors, in such mode as may be prescribed by law.

**Section 14.** The Justices of the Supreme Court, Chancellors, and Judges of the Circuit Courts, shall, by virtue of their offices, be conservators of the peace throughout the State; and Justices of the Peace in their respective Counties.

**Section 15.** The style of all process shall be "the State of Florida," and all criminal prosecutions shall be carried on in the name of the State of Florida, and all indictments shall conclude, "against the peace and dignity of the same."

**Section 16.** There shall be an Attorney General for the State, who shall reside at the Seat of Government. It shall be his duty to attend all sessions of the General Assembly, and upon the passage of any act, to draft and submit to the General Assembly, at the same session, all necessary forms of proceedings under such laws, which, when approved, shall be published therewith, and he shall perform such other duties at may be prescribed by law. He shall be elected by joint vote of the two Houses of the General Assembly, and shall hold his office for four years; but may be removed by the Governor, on the address of two-thirds of the two Houses **View Original** of the General Assembly, and shall receive for his services a compensation to be fixed by law.

**Section 17.** There shall be one Solicitor for each Circuit, who shall reside therein, to be elected by the joint vote of the General Assembly, who shall hold his office for the term of four years; and shall receive for his services a compensation to be fixed by law.

559

**Section 18.** No Justice of the Supreme Court shall sit as Judge or take part in the Appellate Court on the trial or hearing of any case which shall have been decided by him in the Court below.

**Section 19.** The General Assembly shall have power to establish in each County, a Board of Commissioners for the regulation of the County business therein.

**Section 20.** No duty not Judicial shall be imposed by law upon the Justices of the Supreme Court, Chancellors, or the Judges of the Circuit Courts of this State. _____

_____

## ARTICLE VI.

The Right of Suffrage and Qualifications of Officers; Civil Offices; and Impeachments, and Removals from Office.

**Section 1.** Every free white male person of the age of twenty-one years and upwards, and who shall be at the time of offering to vote a citizen of the United States; and who shall have resided, and had his habitation, domicil, home, and place of permanent abode in Florida for two years next preceding the election at which he shall offer to vote; and who shall have at such time, and for six months immediately preceding said time, shall have had his habitation, domicil, home, and place of permanent abode in the County in which he may offer to vote, and who shall be enrolled in the Militia thereof, (unless by law exempted from serving in the Militia,) shall be deemed a qualified elector at all elections under this Constitution, and none others; except in elections by general ticket in the State or District prescribed by law, in which cases the elector must have been a resident of the State two years next preceding the election, and six months within the election district in which he offers to vote: provided that no soldier, seaman, or marine in the regular Army or Navy of the United States, unless he be a qualified elector of the State previous to his enlistment as such soldier, seaman, or marine in the regular Army or Navy of the United States or of the Revenue Service, shall be considered a resident of the State, in consequence of being stationed within the same.

**Section 2.** The General Assembly shall, at its first session, provide, for the registration of all the qualified electors in each county; and thereafter from time to time, of all who may become such qualified electors.

**Section 3.** No President, Director, Cashier, or other officer of any Banking company in this state, shall be eligible to the office of Governor, Senator or Representative to the General Assembly of this State, so long as he shall be such President, Director, Cashier, or other officer, nor until the lapse of twelve months from the time at which he shall have ceased to be such President, Director, Cashier, or other officer.

**Section 4.** The General Assembly shall have power to exclude from every office of honor, trust or profit, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime.

**Section 5.** No person shall be capable of holding, or of being elected to any post of honor, profit, trust, or emolument, civil or military, legislative, executive, or judicial, under the government of this State, who shall hereafter fight a duel, or send, or accept a challenge to fight a duel, the probable issue of which may be the death of the challenger, or challenged, or who shall be a second to either party, or who shall in any manner aid, or assist in such duel, or shall be knowingly the bearer of such challenge, or acceptance, whether the same occur, or be committed in or out of the State.

**Section 6.** No person who may hereafter be a collector, or holder of public moneys, shall have a seat in either House of the General Assembly, or be eligible to any office of trust, or profit, under this State, until he shall have accounted for, and paid into the Treasury, all sums for which he may be accountable. **View Original**

**Section 7.** No Governor, Member of Congress, or of the General Assembly of this State, shall receive a fee, be engaged as counsel, agent, or attorney, in any civil case, or claim, against this State, or to which this State shall be a party, during the time he shall remain in office.

**Section 8.** No Governor, Justice of the Supreme Court, Chancellor or Judge of this State, shall be eligible to election, or post of honor, or emolument, under this State, or to the station of Senator, or Representative in Congress of the United States, from this State, until one year after he shall have ceased to be such Governor, Justice, Chancellor, or Judge.

**Section 9.** No Senator or Representative shall, during the term for which he shall have been elected, be appointed to any civil office of profit, under this State which shall have been created, or the emoluments of which shall have been increased, during such term, except such offices as may be filled by elections by the people.

**Section 10.** No minister of the Gospel shall be eligible to the office of Governor, Senator, or member of the House of Representatives of this State.

**Section 11.** Members of the General Assembly, and all officers, Civil or Military, before they enter upon the execution of their respective offices, shall take the following oath or affirmation: I do swear (or affirm,) that I am duly qualified, according to the Constitution of this State, to exercise the office to which I have been elected, (or appointed) and will, to the best of my abilities, discharge the duties thereof, and preserve, protect, and defend the Constitution of this State, and of the United States.

**Section 12.** Every person shall be disqualified from serving as Governor, Senator, Representative, or from holding any other office of honor, or profit in this State, for the term for which he shall have been elected, who shall have been convicted of having given or offered any bribe to procure his election.

**Section 13.** Laws shall be made by the General Assembly, to exclude from office, and from suffrage, those who shall have been or may thereafter be convicted of bribery, perjury, forgery, or other high crime, or misdemeanor; and the privilege of suffrage shall be supported by laws regulating elections, and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult, or other improper practices.

**Section 14.** All civil officers of the State at large, shall reside within the State, and all District or county officers within their respective Districts, or counties, and shall keep their respective offices at such places therein as may be required by law.

**Section 15.** It shall be the duty of the General Assembly to regulate by law, in what cases, and what deduction from the salaries of public officers, shall be made, for neglect of duty in their official capacity.

**Section 16.** Returns of elections for members of Congress, and the General Assembly, shall be made to the Secretary of State, in manner to be prescribed by law.

**Section 17.** In all elections by the General Assembly, the vote shall be viva voce, and in all elections by the people, the vote shall be by ballot.

**Section 18.** No member of Congress, or person holding or exercising any office of profit under the United States, or under any foreign power shall be eligible as a member of the General Assembly of this State, or hold, or exercise any office of profit, at the same time, except the office of Justice of the Peace, notary public, constable and militia offices.

**Section 19.** The General Assembly shall by law provide for the appointment, or election, and the removal from office, of all officers, civil, and military, in this State, not provided for in this Constitution.

**Section 20.** The power of impeachment shall be vested in the House of Representatives.

**Section 21.** All impeachments shall be tried by the Senate; and when sitting for that purpose, the Senators shall be upon oath, or affirmation; and no person shall be convicted, without the concurrence of two-thirds of the members present.

**Section 22.** The Governor and all civil officers shall be liable to impeachment for any misdemeanor in office: but judgment in such cases shall not extend further than to removal from office, **View Original** and disqualification to hold any office of honor, trust, or profit under this State; but the parties shall nevertheless be liable to indictment, trial, and punishment according to law.

---

## ARTICLE VII.

### Militia.

**Section 1.** All Militia officers shall be elected by the persons subject to military duty, within the bounds of their several companies, battalions, regiments, brigades, and divisions, under such rules and regulations as the General Assembly may, from time to time, direct and establish.

**Section 2.** The Governor shall appoint all the officers of the executive staff, except the Adjutant General, and Paymaster General, who shall be appointed by the Governor, by, and with the advice and consent of the Senate. The majors general and brigadiers general, and commanding officers of regiments, shall appoint such staff officers as may be prescribed by law; provided, no person shall be eligible to any staff appointment, unless he hold a commission in the line.

---

## ARTICLE VIII.

### Taxation and Revenue.

**Section 1.** The General Assembly shall devise and adopt a system of Revenue having regard to an equal and uniform mode of taxation, to be general throughout the State.

**Section 2.** No other or greater amount of Tax, or Revenue, shall at any time be levied, than may be required for the necessary expenses of Government.

**Section 3.** No money shall be drawn from the Treasury, but in consequence of an appropriation by law and a regular statement of the receipts, and the expenditures of all public moneys shall be published and promulgated annually with the laws of the General Assembly.

**Section 4.** The General Assembly shall have power to authorize the several counties, and incorporated towns in this State, to impose taxes for county and corporation purposes, respectively, and all property shall be taxed upon the principles established in regard to State

taxation.

---

## ARTICLE IX.

Census and Apportionment of Representation.

**Section 1.** The General Assembly shall, in the year one thousand eight hundred and forty-five, and every tenth year thereafter, cause an enumeration to be made of all the inhabitants of the state, and to the whole number of free white inhabitants shall be added three-fifths of the number of slaves, and they shall then proceed to apportion the representation, equally among the different counties, according to such enumeration, giving however one representative to every county, and increasing the number of Representatives on a uniform ratio of population, according to the foregoing basis, and which ratio shall not be changed until a new census shall have been taken.

**Section 2.** The General Assembly shall also, after every such enumeration, proceed to fix by law the number of Senators which shall constitute the Senate of the State of Florida, and which shall never be less than one-fourth nor more than one-half of the whole number of the House of Representatives; and they shall lay off the State into the same number of Senatorial Districts, as nearly equal in the number of inhabitants as may be, according to the ratio of representation established in the preceding section, each of which Districts shall be entitled to one Senator.

**Section 3.** When any Senatorial District shall be composed of two or more counties, the counties, of which such district consists, shall not be entirely separated by any county belonging to another district, and no county shall be divided [View Original] Section 4. No new county shall be entitled to separate representation, until its population equal the ratio of representation, then existing; nor shall any county be reduced in population by division, below the existing ratio.

**Section 5.** Until the apportionment of representation by the General Assembly, as directed in the foregoing section, the several counties shall be entitled to the following Representatives, vis:-- Escambia three, Walton one, Washington one, Jackson three, Franklin two, Calhoun two, Gadsden four, Leon six, Jefferson three, Madison one, Hamilton one, Columbia two, Alachua two, Duval two, Nassau one, St. Johns three, Mosquito one, Dade one, Monroe one, Hillsborough one: And until the apportionment of Senators under the census as aforesaid, there shall be sixteen Senatorial Districts in this State, which shall be as follows: The county of Escambia, shall compose the first District. The counties of Walton and Washington, shall compose the second District. The county of Jackson, shall compose the third District. The county of Calhoun, shall compose the fourth District. The county of Franklin, shall compose the fifth District. The county of Gadsden, shall compose the sixth District. The county of Leon, shall compose the seventh District. The county of Jefferson, shall compose the eighth District The county of Madison, shall compose the ninth District. The county of Hamilton, shall compose the tenth District. The county of Columbia, shall compose the eleventh District. The county of Alachua, shall compose the twelfth District. The county of Duval, shall compose the thirteenth District. The county of Nassau, shall compose the fourteenth District. The counties of St. Johns and Mosquito, shall compose the fifteenth District. The counties of Dade, Monroe, and Hillsborough, shall compose the sixteenth District. And each Senatorial District shall elect one Senator, and the seventh District shall be entitled to two.

---

## ARTICLE X.

Education.

**563**

**Section 1.** The proceeds of all lands that have been or may hereafter be granted by the United States for the use of Schools, and a Seminary or Seminaries, of learning, shall be and remain a perpetual fund, the interest of which, together with all monies derived from any other source applicable to the same object, shall be inviolably appropriated to the use of Schools and Seminaries of learning respectively, and to no other purpose.

**Section 2.** The General Assembly shall take such measures as may be necessary to preserve from waste or damage all land so granted and appropriated to the purposes of Education.

---

## ARTICLE XI.

Public Domain and Internal Improvements.

**Section 1.** It shall be the duty of the General Assembly to provide for the prevention of waste and damage of the public lands now possessed, or that may hereafter be ceded to the Territory or State of Florida, and it may pass laws for the sale of any part or portion thereof; and in such case provide for the safety, security, and appropriation of the proceeds.

**Section 2.** A liberal system of Internal Improvements being essential to the development of the resources of the country, shall be encouraged by the Government of this State, and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law proper objects of improvement in relation to roads, canals and navigable streams, and to provide for a suitable application of such funds as may be appropriated for such improvements.

---

## ARTICLE XII.

Boundaries.

**Section 1.** The jurisdiction of the State of Florida shall extend over the Territories of East and West Florida, which, by the Treaty of Amity, Settlement and Limits, between the United States and his Catholic Majesty, on the 22nd day of February, A. D., 1819, were ceded to the United States.

---

## ARTICLE XIII.

Banks, and other Corporations.

**Section 1.** The General Assembly shall pass a general law for the incorporation of all such churches, and religious or other societies as may accept thereof; but no special act of incorporation thereof shall be passed.

564

**Section 2.** The General Assembly shall pass no act of incorporation, or make any alteration therein, unless with the assent of at least two-thirds of each House, and unless public notice in one or more newspapers in the State shall have been given for at least three months immediately preceding the session at which the same may be applied for.

**Section 3.** No Banking corporation shall be created or continue which is composed of a less number than twenty individuals, a majority of whom at least, shall be residents of the State; and no other corporation shall be created or continue composed of a less number than ten, of whom at least five shall be residents of this State.

**Section 4.** No Bank Charter, or any act of incorporation granting exclusive privileges, shall be granted for a longer period than twenty years, and no Bank Charter shall ever be extended or renewed.

**Section 5.** The Charters of Banks granted by the General Assembly shall restrict such Banks to the business of exchange, discount and deposit, and they shall not speculate or deal in real estate or the stock of other corporations or associations, or in merchandise or chattels, or be concerned in insurance, manufacturing, exportation or importation, except of bullion or specie; shall not act as Trustee in anywise; nor shall they own real estate or chattels, except such as shall be necessary for their actual use in the transaction of business, or which may be pledged as further security, or received towards, or in satisfaction of previously contracted debts, or purchased at legal sales, to satisfy such debts, of which they shall be required to make sale within two years after the acquisition thereof.

**Section 6.** The capital stock of any Bank shall not be less than one hundred thousand dollars, and shall be created only by the actual payment of specie therein, and no Bank shall borrow money to create or add to its capital, or to conduct its business, and no loans shall be made on stock.

**Section 7.** All liabilities of such Banks shall be payable in specie, and the aggregate of the liabilities and issues of a Bank shall at no time exceed double the amount of its capital stock paid in.

**Section 8.** No Bank shall make a note or security of any kind for a smaller sum than five dollars, and the General Assembly may increase such restriction to twenty dollars.

**Section 9.** No dividends of profits exceeding ten per centum per annum on the capital stock paid in shall be made, but all profits over ten per centum per annum shall be set apart and retained as a safety fund.

**Section 10.** Stockholders in a bank, when an act of forfeiture of its Charter is committed, or when it is dissolved or expires, shall be individually and severally liable for the payment of all its debt, in proportion to the stock owned by each.

**Section 11.** Banks shall be open to inspection under such regulations as may be prescribed by law, and it shall be the duty of the Governor to appoint a person or persons, not connected in any manner with any Bank in the State, to examine at least once a year into their state and condition, and the officers of every Bank shall make quarterly returns to the Governor of its state and condition, and the names of the stockholders, and shares held by each.

**Section 12.** Non user for the space of one year, or any act of a corporation, or those having the control and management thereof, or intrusted therewith inconsistent with or in violation of the provisions of this Constitution or of its charters, shall cause its forfeiture, and the General Assembly shall, by ▮View Original▮ general law provide a summary process for the sequestration of its effects and assets, the appointment of officers to settle its affairs, and no forfeited charter shall be restored. The foregoing provision shall not be construed to prevent the General Assembly from imposing other restrictions and provisions in the creation of corporations.

**Section 13.** The General Assembly shall not pledge the faith and credit of the State, to raise funds in aid of any corporation whatsoever.

**Section 14.** The General Assembly shall at its first session, have power to regulate, restrain and control, all associations claiming to exercise corporate privileges in the State, so as to guard, protect, and secure the interests of the people of the State, not violating vested rights, or impairing the obligation of contracts.

---

## ARTICLE XIV.

Amendments and Revision of the Constitution.

**Section 1.** No Convention of the people shall be called, unless by the concurrence of two-thirds of each House of the General Assembly.

**Section 2.** No part of this Constitution shall be altered; unless a bill to alter the same, shall have been read three times in the House of Representatives, and three times in the Senate, and agreed to by two-thirds of each House of the General Assembly; neither shall any alteration take place until the bill so agreed to, be published six months previous to a new election for members to the House of Representatives; and if the alteration proposed by the General Assembly shall be agreed to at their first session by two-thirds of each House of the General Assembly, after the same shall have been read three times on three several days in each House, then and not otherwise, the same shall become a part of the Constitution.

---

## ARTICLE XV.

The Seat of Government.

**Section 1.** The Seat of Government, of the State of Florida, shall be and remain permanent at the city of Tallahassee, for the term and time of five years, from and after the end of the first session of the General Assembly, to be holden under this Constitution; and after the expiration of the said five years, the General Assembly shall have power to remove the Seat of Government, from Tallahassee, and fix the same at any other point; Provided, that the General Assembly shall immediately after the expiration of ten years, from the end of the said first session thereof, fix permanently the Seat of Government.

---

## ARTICLE XVI.

General Provisions.

**Section 1.** The General Assembly shall have no power to pass laws for the emancipation of slaves.

**Section 2.** They shall have no power to prevent emigrants to this State, from bringing with them,

such persons as may be deemed slaves, by the laws of any one of the United States: Provided, they shall have power to enact laws to prevent the introduction of any slaves who may have committed crimes in other States.

**Section 3.** The General Assembly shall have power to pass laws to prevent free negroes, mulattoes, and other persons of color, from emigrating to this State, or from being discharged from on board any vessel, in any of the ports of Florida.

**Section 4.** Treason against the State shall consist only in levying war against it, or in adhering to its enemies, giving them aid and comfort. No person shall be convicted of treason, unless on the testimony of two witnesses to the same overt act, or his confession in open court.

**Section 5.** Divorces from the bonds of matrimony shall not be allowed, but by the judgment of a court, as shall be prescribed by law.

**Section 6.** The General Assembly shall declare by law, what parts of the common law, and what parts of the civil law, not inconsistent with this Constitution, shall be in force in this State.

**View Original**

**Section 7.** The oaths of officers directed to be taken under this Constitution, may be administered by any judge, or justice of the peace, of the Territory, or State of Florida until otherwise prescribed by law.

---

## ARTICLE XVII.

Schedule and Ordinance.

In order that no inconvenience may arise from the organization and establishment of the State Government, it is declared:

**Section 1.** That all laws and parts of laws, now in force, or which may be hereafter passed by the Governor and Legislative Council, of the Territory of Florida, not repugnant to the provisions of this Constitution, shall continue in force, until by operation of their provisions or limitations, the same shall cease to be in force, or until the General Assembly of this State shall alter or repeal the same; and all writs, actions, prosecutions, judgments, and contracts, shall be, and continue unimpaired, and all process which has heretofore issued, or which may be issued, prior to the last day of the first session of the General Assembly of this State, shall be as valid as if issued in the name of the State; and nothing in this Constitution shall impair the obligation of contracts, or violate vested rights, either of individuals or of associations, claiming to exercise corporate privileges in this State.

**Section 2.** All fines, penalties, forfeitures, obligations, and escheats, accruing to the Territory of Florida, shall accrue to the use of the State of Florida.

**Section 3.** All recognizances heretofore taken, or which may be taken before the organization of the Judicial Department under this Constitution, shall remain valid, and shall pass over to, and may be prosecuted in the name of the State; and all bonds, executed to the Governor of the Territory of Florida, or to any other officer in his official capacity, shall pass over to the Governor or other proper State authority, and to their successors in office for the uses therein respectively expressed, and may be sued for, and recovered accordingly; and all criminal prosecutions and penal actions, which have arisen, or which may arise before the organization of the Judicial

Department under this Constitution, and which shall then be depending, may be prosecuted to judgment and execution in the name of the State.

**Section 4.** All officers, civil and military, now holding their offices and appointments in the Territory, under the authority of the United States, or under the authority of the Territory, shall continue to hold and exercise their respective offices and appointments until superseded under this constitution; and all actions at law, or suits in chancery, or any proceeding pending, or which may be pending, in any Court of the Territory of Florida, may be commenced in or transferred to such Court of the State as may have jurisdiction of the subject-matter thereof.

**Section 5.** This Constitution shall be submitted to the people for ratification at the election for Delegate on the first Monday of May next. Each qualified voter shall express his assent or dissent to the Constitution by directing the managers of said election to write opposite to his name on the poll-book, either the word "Constitution," or "No Constitution." And in case the time of election for Delegate be changed to any other day, than the first Monday of May next, then the Judges or Clerks of the County Courts respectively, shall appoint managers to hold an election on the said first Monday of May, for ratification of the Constitution, and said managers shall conduct said election in the manner provided by the laws of the Territory respecting elections, and make return of the result of such vote forthwith, by depositing the original poll-book in the Clerk's Office of their Counties respectively, and by transmitting a certificate of the result to the President of the Convention, who shall forthwith make Proclamation of the same; and in case the Constitution be ratified by the People, and immediately after official information shall have been received that Congress have approved the Constitution, and provided for the admission of Florida, the President of this Convention shall issue writs of election to the proper officers in the different Counties, enjoining them to cause an election to be held for Governor, Representative in Congress, and Members of the General Assembly in each of their respective Counties. The election shall be held on the first Monday after the lapse of sixty days following the day of the date of the President's proclamation, and shall take place on the same day throughout the State. The said election shall be conducted according to the then existing election laws of the Territory of Florida: Provided, however that in case of the absence or disability of the President of the Convention, to cause the said election to be carried into effect, the Secretary of this Convention shall discharge the duties hereby imposed upon the President; and in case of the absence or disability of the Secretary, a committee consisting of five, to wit: Leigh Read, George T. Ward, James D. Westcott, Jr., Thomas Brown, and Leslie A. Thompson, or a majority of them, shall discharge the duties herein imposed on the Secretary of the Convention, and, the Members of the General Assembly, so elected, shall assemble on the fourth Monday thereafter, at the Seat of Government. The Governor, Representative in Congress, and Members of the General Assembly, shall enter upon the duties of their respective offices immediately after their election, under the provisions of this Constitution, and shall continue in office in the same manner, and during the same period, they would have done, had they been elected on the first Monday in October.

**Section 6.** The General Assembly shall have power by the votes of two-thirds of both Houses to accede to such propositions as may be made by the Congress of the United States, upon the admission of the State of Florida into the National confederacy and Union, if they shall be deemed reasonable and just, and to make declaration of such assent by law; and such declaration when made shall be binding upon the people and the State of Florida as a compact; and the Governor of the State of Florida, shall notify the President of the United States of the Acts of the General Assembly relating thereto; and in case of declining to accede to such propositions or any part thereof, the General Assembly shall instruct the Senators and Representative of the State of Florida in Congress, to procure such modification or alteration thereof as may be deemed reasonable and just, and assent thereto, subject to the ratification of the General Assembly by law as aforesaid.

**Section 7.** The Courts of this State shall never entertain jurisdiction of any grants of land, in the Floridas, made by the King of Spain, or by his authority, subsequent to the twenty-fourth day of January, eighteen hundred and eighteen, nor shall the said Courts receive as evidence, in any case, certain grants said to have been made by the said King of Spain, in favor of the Duke of Alagon, the Count Punon Rostro, and Don Pedro de Vargas, or any title derived from either of said Grants, unless with the express assent of the Congress of the United States.

568

Done in Convention, held in pursuance of an act of the Governor and Legislative Council of the Territory of Florida, entitled, "An Act to call a Convention for the purpose of organizing a State Government," passed 30th day of January, 1838, and approved 2nd February, eighteen hundred and thirty-eight. In witness whereof, the undersigned, the President of said Convention and Delegates, representing the people of Florida, do hereunder sign our names, this the eleventh day of January, Anno Domini, eighteen hundred and thirty-nine, and of the Independence of the United States of America, the sixty-third year; and the Secretary of said Convention, doth countersign the same.

ROBERT RAYMOND REID, President.

Walker Anderson, J. McCants, John L. McKinnon, John C. McGehee, Daniel G. McLean, Joseph B. Watts, Stephen J. Roche, William B. Hooker, E. Robbins, Wilson Brooks, Cosam Emir Bartlett, George E. McClellan, Thomas Baltzell, John F. Webb, Saml. C. Bellamy, John M. G. Hunter, Alfred L. Woodward, I. Garrison, Richard H. Long, E. K. White, R. C. Allen, A. W. Crichton, Banks Meacham, Oliver Wood, John W. Malone, Wm. Haddock, George T. Ward, Jose Simeon Sanchez, W. Wyatt, Edwin T. Jenckes, James D. Westcott, Jr., D. Levy, Leigh Read, W. H. Williams, A. Bellamy, William Marvin, John N. Partridge, J. B. Browne, William Bunce, Edmund Bird, E. Carrington Cabell, L. A. Thompson,

JOSHUA KNOWLES, Secretary of the Convention.

Return to Florida's Early Constitutions Main Page

## Constitution of 1865:

---

## CONSTITUTION OR FORM OF GOVERNMENTfor thePEOPLE OF FLORIDA

---

**View Original**

We, the People of the State of Florida, by our delegates in Convention assembled, in the city of Tallahassee, on the 25th day of October, in the year of our Lord 1865, and of the Independence of the United States the 90th year, in order to secure to ourselves and our posterity the enjoyment of all the rights of life, liberty and property, and the pursuit of happiness, do mutually agree, each with the other, to form the following Constitution and form of Government in and for the said State.

---

### ARTICLE I.

### Declaration of Rights.

That the great and essential principles of liberty and free government may be recognized and established, we declare:

**View Original**

**Section 1.** That all freemen when they form a government, have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

**Section 2.** That all political power is inherent in the people, and all free governments are founded on their authority, and established for their benefit; and therefore they have at all times an inalienable and indefeasible right to alter or abolish their form of government in such manner as they may deem expedient.

**Section 3.** That all men have a natural and inalienable right to worship Almighty God according to the dictates of their own conscience, and that no preference shall ever be given by law to any religious establishment or mode of worship in this State.

**Section 4.** That no property qualification for eligibility to office, or for the right of suffrage, shall ever be required in this State.

**Section 5.** That every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty; and no law shall be passed to curtail, abridge or restrain the liberty of speech or of the press.

**Section 6.** That the right of trial by jury shall forever remain inviolate.

**View Original**

**Section 7.** That the people shall be secure in their persons, houses, papers and possessions, from

570

unreasonable seizures and searches; and that no warrant to search any place, or to seize any person or thing, shall issue without describing the place to be searched, and the person or thing to be seized, as nearly as may be, nor without probable cause, supported by oath or affirmation.

**Section 8.** That no freeman shall be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the law of the land.

**Section 9.** That courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law; and right and justice administered without sale, denial or delay.

**Section 10.** That in all criminal prosecutions, the accused hath a right to be heard by himself or counsel, or both; to demand the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and in all prosecutions by indictment or presentment, a speedy and public trial by an impartial jury of the county or district where the offense was committed; and shall not be compelled to give evidence against himself.

**Section 11.** That all persons shall be bailable by sufficient securities, unless in capital offenses, where the proof is evident, or the presumption ▮View Original▮ is strong; and the habeas corpus act shall not be suspended unless, when in case of rebellion or invasion, the public safety may require it.

**Section 12.** That excessive bail shall in no case be required; nor shall excessive fines be imposed; nor shall cruel or unusual punishments be inflicted.

**Section 13.** That no person shall, for the same offense, be twice put in jeopardy of life and limb.

**Section 14.** That private property shall not be taken or applied to public use, unless just compensation be first made therefor.

**Section 15.** That in all prosecutions and indictments for libel, the truth may be given in evidence; and if it shall appear to the jury that the libel is true, and published with good motives, and for justifiable ends, the truth shall be a justification; and the jury shall be the judges of the law and facts.

**Section 16.** That no person shall be put to answer any criminal charge, but by presentment, indictment or impeachment, except in such cases as the Legislature shall otherwise provide: but the Legislature shall pass no law whereby any person shall be required to answer any criminal charge involving the life of the accused, except upon indictment or presentment by a Grand Jury.

**Section 17.** That no conviction shall work corruption of blood or forfeiture of ▮View Original▮ estate.

**Section 18.** That retrospective laws punishing acts committed before the existence of such laws, and by them only declared penal or criminal, are oppressive, unjust and incompatible with liberty; wherefore no *ex post facto* law shall ever be made.

**Section 19.** That no law impairing the obligation of contracts shall be passed.

**Section 20.** That the people shall have a right, in a peaceable manner, to assemble together to consult for the common good; and to apply to those invested with the powers of government for redress of grievances, or other proper purposes, by petition, address or remonstrance.

**Section 21.** That no soldier in time of peace shall be quartered in any house without the consent of

the owner; nor in time of war but in a manner prescribed by law.

**Section 22.** That no standing army shall be kept up without the consent of the Legislature; and the military shall be in strict subordination to the civil power.

**Section 23.** That perpetuities and monopolies are contrary to the genius of a free people, and ought not to be allowed.

**Section 24.** That no hereditary emoluments, privileges, or honors, shall be granted or conferred in this State.

`View Original`

**Section 25.** That a frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty.

**Section 26.** That, to guard against transgressions upon the rights of the people, we declare that everything in this article is excepted out of the general powers of government, and shall forever remain inviolate; and all laws contrary thereto, or to the following provisions, shall be void.

## ARTICLE II.

Distribution of the Powers of Government.

**Section 1.** The powers of the government of the State of Florida shall be divided into three distinct departments, and each of them confided to a separate body of Magistracy, to-wit: those which are Legislative to one, those which are Executive to another, and those which are Judicial to another.

**Section 2.** No person or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except in the instance expressly provided in this Constitution.

## ARTICLE III.

Executive Department.

**Section 1.** The Supreme Executive power shall be vested in a Chief Magistrate `View Original`, who shall be styled the Governor of the State of Florida.

**Section 2.** The Governor shall be elected for four years, by the qualified electors, at the time and place they shall vote for representatives, and shall remain in office until a successor shall be chosen and qualified.

**Section 3.** No person shall be eligible to the office of Governor unless he shall have attained the age of thirty years, shall have been a citizen of the United States ten years, and shall have been a resident of Florida at least five years next preceding his election.

**Section 4.** There shall be elected at the same time, for the same term and with like qualifications as the Governor, a Lieutenant Governor, who shall be *ex-officio* President of the Senate, but shall have no vote except in cases of a tie, and during the session of the General Assembly, he shall receive such compensation as shall be allowed to a Senator.

**Section 5.** The returns of every election for Governor and Lieutenant Governor shall be sealed up and transmitted to the seat of government, directed to the Speaker of the House of Representatives, who shall, during the first week of the session next after their election, open and publish them in the presence of both Houses of the General Assembly; and the persons having the highest number of votes for the respective offices, shall be Governor and Lieutenant Governor; but if two or more shall be equal **View Original** and highest in votes for the office of Governor, one of them shall be chosen Governor by the joint vote of the two Houses and in like manner, if two or more shall be equal and highest in votes for the office of Lieutenant Governor, one of them shall be chosen Lieutenant Governor, by the joint vote of the two Houses. And contested elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly, in such manner as shall be prescribed by law.

**Section 6.** The Governor shall at stated times receive a compensation for his services, which shall not be increased or diminished during the term for which he shall have been elected; but such compensation shall never be less than three thousand dollars per annum.

**Section 7.** He shall be the Commander-in-Chief of the Army and Navy of this State, and of the Militia thereof.

**Section 8.** He may require information in writing from the officers of the Executive Department, on any subject relating to the duties of their respective offices.

**Section 9.** He may by proclamation, on extraordinary occasions, convene the General Assembly at the Seat of Government, or at a different place, if that shall have become dangerous from an enemy or from disease; and in case of disagreement between the two Houses, with respect to the time of adjournment, he may adjourn them to such time as he may think proper, not beyond the day of the next meeting designated by the Constitution. **View Original**

**Section 10.** He shall, from time to time, give to the General Assembly information of the state of the Government, and recommend to their consideration such measures as he may deem expedient.

**Section 11.** He shall take care that the laws be faithfully executed.

**Section 12.** In all criminal and penal cases, (except of impeachment) after conviction, he shall have power to grant reprieves and pardons, and remit fines and forfeitures, under such rules and regulations as shall be prescribed by law.

**Section 13.** The State Seal last heretofore used, (until altered by the General Assembly,) shall continue to be the Great Seal of the State, and be kept by the Governor for the time being, and used by him officially.

**Section 14.** All commissions shall be in the name and by the authority of the State of Florida, be sealed with the State Seal, and signed by the Governor and attested by the Secretary of State.

**Section 15.** There shall be a Secretary of State elected by the qualified electors of the State at the same time, and who shall continue in office for the same term of years as the Governor of the State; and he shall keep a fair register of the official acts and proceedings of the Governor, and shall when required lay the same, and all papers, minutes and vouchers relative thereto, before the General Assembly, and shall perform such other duties as may be required of him by law. **View Original**

**Section 16.** Vacancies that happen in offices, the appointment to which is vested in the General Assembly, or given to the Governor, with the advice and consent of the Senate, shall be filled by the Governor during the recess of the General Assembly, by granting commissions which shall

expire at the end of the next session.

**Section 17.** Every bill which shall have passed both Houses of the General Assembly, shall be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the House in which it shall have originated, who shall enter the objections at large upon the journals, and proceed to reconsider it; and if, after such reconsideration, two-thirds of the whole number voting shall agree to pass the bill, it shall be sent with the objections to the other House, by which it shall be reconsidered; and if approved by two-thirds of the whole number voting, it shall become a law: but in such cases the votes of both Houses shall be by yeas and nays, and the names of the members voting for or against the bill shall be entered on the journals of each House respectively; and if any bill shall not be returned by the Governor within five days (Sundays excepted,) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly by their adjournment prevent its return, in which case it shall not be law.

**Section 18.** Every order, resolution or vote to which the concurrence of both Houses may be necessary, (except on questions of adjournment,) shall ⬛ View Original ⬛ be presented to the Governor, and before it shall take effect, be approved by him, or being disapproved, be re-passed by both Houses, according to the rules and limitations prescribed in case of a bill.

**Section 19.** In case of the impeachment of the Governor, his removal from office, death, refusal to qualify, resignation, or absence from the State, the Lieutenant Governor shall exercise all the power and authority appertaining to the office of Governor until the Governor absent, or impeached, shall return, or be acquitted, or until the Governor next regularly elected shall be duly qualified, as the case may be; and for the time the Lieutenant Governor shall occupy the office of Governor, he shall receive the same compensation as shall be allowed by law to the regularly elected Governor.

**Section 20.** In case of the impeachment of both the Governor and the Lieutenant Governor, their removal from office, death, refusal to qualify, resignation, or absence from the State, the Speaker of the House of Representatives shall in like manner administer the Government, unless the General Assembly shall otherwise provide; and for the time he shall occupy the office of Governor, he shall receive the same compensation as shall be allowed by law to the Governor.

**Section 21.** It shall be the duty of the General Assembly to provide for the purchase or erection of a suitable building for the residence of the Governor, and the Governor shall reside at the seat of government; ⬛ View Original ⬛ but whenever, by reason of danger from an enemy, or from disease, the Governor may deem the capital unsafe, he may, by proclamation, fix the seat of government at some secure place within the State, until such danger shall cease.

**Section 22.** No person shall hold the office of Governor and any other office or commission, civil or military, either in this State, or under any State, or the United States, or any other power, at one and the same time, except the Lieutenant Governor or the Speaker of the House of Representatives, when he shall hold the office as aforesaid.

**Section 23.** A State Treasurer and Comptroller of Public Accounts shall be elected by the qualified electors of the State at the same time, and who shall continue in office for the same term of years as the Governor of the State, and until their successors shall have been duly commissioned and qualified.

## ARTICLE IV.

Legislative Department.

**Section 1.** The Legislative power of this State shall be vested in two distinct branches, the one to

be styled the Senate, the other the House of Representatives, and both together "The General Assembly of the State of Florida," and the style of the laws shall be, "Be it enacted by the Senate and House of Representatives of the State of Florida in General Assembly convened."

**View Original**

**Section 2.** The members of the House of Representatives shall be chosen by the qualified voters, and shall serve for the term of two years from the day of the general election, and no longer: and the sessions of the General Assembly shall be annual, and commence on the second Wednesday in November in each year.

**Section 3.** The Representatives shall be chosen every two years on the first Monday in the month of October, until otherwise directed by law.

**Section 4.** No person shall be a Representative unless he be a white man, a citizen of the United States, and shall have been an inhabitant of the State two years next preceding his election, and the last year thereof a resident of the County for which he shall be chosen, and shall have attained the age of twenty-one years.

**Section 5.** The Senators shall be chosen by the qualified electors for the term of two years, at the same time, in the same manner, and at the same places where they vote for members of the House of Representatives; and no man shall be a Senator unless he be a white man, a citizen of the United States, and shall have been an inhabitant of this State two years next preceding his election, and the last year thereof a resident of the District or County for which he shall be chosen, and shall have attained the age of twenty-five years.

**Section 6.** The House of Representatives, when assembled, shall choose **View Original** a Speaker and its other officers, and the Senate, its other officers, and in the absence of the Lieutenant Governor, a President *pro tempore*, and each House shall be judge of the qualifications, elections, and returns of its members; but a contested election shall be determined in such manner as shall be directed by law.

**Section 7.** A majority of each House shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may compel the attendance of absent members, in such manner and under such penalties as each House may prescribe.

**Section 8.** Each House may determine the rules of its own proceedings, punish its members for disorderly behavior, and with the consent of two-thirds, expel a member, but not a second time for the same cause.

**Section 9.** Each House, during the session, may punish, by imprisonment, any person not a member, for disrespectful or disorderly behavior in its presence, or for obstructing any of its proceedings, provided, such imprisonment shall not extend beyond the end of the session.

**Section 10.** Each House shall keep a Journal of its proceedings, and cause the same to be published immediately after its adjournment; and the yeas and nays of the members of each House shall be taken and entered upon the Journals upon the final passage of every bill, and may, by any two members, be required upon any other question; and any member of either House shall have liberty to dissent from, or protest against, any act or resolution which he may think injurious to the public, or an individual, and have the reasons of **View Original** his dissent entered on the journal.

**Section 11.** Senators and Representatives shall in all cases, except of treason, felony, or breach of the peace, be privileged from arrest during the session of the General Assembly, and in going to, or returning from the same, allowing one day for every twenty miles such member may reside from the place at which the General Assembly is convened, and for any speech or debate in either House they shall not be questioned in any other place.

**Section 12.** The General Assembly shall make provision by law, for filling vacancies that may occur in either House by the death, resignation, (or otherwise) of any of its members.

**Section 13.** The doors of each House shall be open when in legislative session, except on such occasions as, in the opinion of the House, the public safety may imperiously require secrecy.

**Section 14.** Neither House shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which they may be sitting.

**Section 15.** Bills may originate in either House of the General Assembly; and all bills passed by one House may be discussed, amended or rejected by the other; but no bill shall have the force of law, until on three several days it be read in each House and free discussion be allowed thereon, unless in cases of urgency, four-fifths of the House in which the same shall be depending, may deem it expedient **View Original** to dispense with the rule; and every bill having passed both Houses, shall be signed by the Speaker and President of their respective Houses.

**Section 16.** Each member of the General Assembly shall receive from the public Treasury such compensation for his services as may be fixed by law; but no increase of compensation shall take effect during the term for which the Representatives were elected, when such law passed.

**Section 17.** The sessions of the General Assembly shall not extend in duration over thirty days, unless it be deemed expedient by a concurrent majority of two-thirds of the members of each House; and no member shall receive pay from the State for his services after the expiration of sixty days continuously from the commencement of the session.

**Section 18.** The General Assembly shall by law authorize the Circuit Court to grant licenses for building Toll-Bridges, and to establish Ferries, and to regulate the tolls of both; to construct dams across streams not navigable; to ascertain and declare what streams are navigable; but no special law for such purpose shall be made.

**Section 19.** The General Assembly shall pass a general law prescribing the manner in which names of persons may be changed, but no special law for such purpose shall be passed; and no law shall be made allowing minors to contract, or manage their estates.

**View Original**

**Section 20.** The General Assembly shall pass a general law for the incorporation of Towns, Religious, Literary, Scientific, Benevolent, Military and other Associations, not Commercial, Industrial or Financial; but no special act incorporating any such association shall be passed.

**Section 21** . No act incorporating any Railroad, Banking, Insurance, Commercial or Financial corporation shall be introduced into the General Assembly, unless the person or persons applying for such corporation shall have deposited with the Treasurer the sum of one hundred dollars as a bonus to the State.

**Section 22.** Officers shall be removed from office for incapacity, misconduct or neglect of duty, in such manner as may be provided by law, when no mode of trial or removal is provided in this Constitution.

## ARTICLE V.

### Judicial Department.

**Section 1.** The Judicial power of this State, both as to matters of law and equity, shall be vested in

576

a Supreme Court, Courts of Chancery, Circuit Courts, and Justices of the Peace, provided the General Assembly may also vest such civil or criminal jurisdiction as may be necessary in Corporation Courts, and such other courts as the General Assembly may establish; but such jurisdiction shall not extend to capital cases.

**View Original**

**Section 2.** The Supreme Court, except in cases otherwise directed in this Constitution, shall have appellate jurisdiction only, which shall be co-extensive with the State, under such restrictions and regulations, not repugnant to this Constitution, as may from time to time be prescribed by law, provided that the said court shall always have power to issue writs of injunction, mandamus, quo warranto, habeas corpus, and such other original and remedial writs as may be necessary to give it a general superintendence and control of all other courts.

**Section 3.** The Supreme Court shall be holden at such times and places as may be prescribed by law; and two Judges of the Circuit Court may be added to the Supreme Court, when in session, at the discretion of the Legislature; and the court so composed shall constitute the Supreme Court of the State, when the Legislature shall so direct.

**Section 4.** The State shall be divided into convenient Circuits; and for each Circuit there shall be a Judge, who shall, after his election or appointment, reside in the Circuit for which he has been elected or appointed; and shall, as well as Justices of the Supreme Court, receive for his services a salary of not less than twenty-five hundred dollars per annum, which shall not be diminished during his continuance in office; but the Judges shall receive no fees, perquisites of office, nor hold any other office of profit under the State, the United States, or any other power.

**Section 5.** The Circuit Courts shall have original jurisdiction in all matters, civil and criminal, not otherwise excepted in this Constitution.

**View Original**

**Section 6.** A Circuit Court shall be held in such counties and at such times and places therein, as may be prescribed by law; and the Judges of the several Circuit Courts may hold courts for each other, either for the entire Circuit or for a portion thereof, and they shall do so when required, by order of the Governor or Chief Justice of the Supreme Court; and they may exercise jurisdiction in cases of writs of habeas corpus in any Judicial Circuit in which the Judge may happen to be at the time the case arises.

**Section 7.** The General Assembly shall have power to establish and organize a separate court or courts of original equity jurisdiction; but until such court or courts shall be established and organized, the Circuit Courts shall exercise such jurisdiction.

**Section 8.** There shall be elected in each county of this State, by the qualified voters, an officer to be styled the Judge of Probate, to take probate of wills, to grant letters testamentary, of administration and guardianship, to attend to the settlement of the estates of decedents and minors, and to discharge the duties usually appertaining to Courts of Ordinary, and such other duties as may be required by law; subject to the direction and supervision of the Circuit Courts, as may be provided by law.

**Section 9** . A competent number of Justices of the Peace shall be from time to time elected in and for each county, in such mode and for such term of office as the General Assembly may direct, and shall possess such jurisdiction as may be prescribed by law; and in cases tried before a Justice of the Peace, the right of appeal shall **View Original** be secured under such rules and regulations as may be prescribed by law.

**Section 10.** There shall be appointed by the Governor, by and with the advice and consent of the Senate, a Chief Justice and two associate Justices of the Supreme Court of this State, who shall reside in this State, and hold their office for the term of six years from their appointment and

577

confirmation, unless sooner removed under the provisions of this Constitution, for the removal of Judges by address or impeachment: and for wilful neglect of duty or other reasonable cause, which shall not be sufficient ground for impeachment, the Governor shall remove any of them on the address of two-thirds of the General Assembly: *Provided, however,* That the cause or causes shall be notified to the Judge so intended to be removed, and he shall be admitted to a hearing in his own defense, before any vote for such removal shall pass, and in such case, the vote shall be taken by yeas and nays, and entered on the journal of each House respectively, and in case of the appointment to fill a vacancy in said offices, the person so appointed shall only hold the office for the unexpired term of his predecessor.

**Section 11.** There shall be elected, at the time and places prescribed by law, by the qualified electors of each of the respective Judicial Circuits of this State, one Judge of the Circuit Court, who shall reside in the Circuit for which he may be elected, and the said Circuit Judges shall continue in office for the term of six years from the date of their respective elections, unless sooner removed, under the provisions in this Constitution for the removal of Judges by address or impeachment; and for wilful neglect of duty, or other reasonable cause, which shall not be sufficient for impeachment, the Governor shall remove any of them, on the address of two-thirds of the General Assembly: *Provided, however,* That the cause or causes shall be stated at length in such address and entered on the journals of each House: *And provided, further,* That the cause or causes shall be notified to such Judge so intended to be removed, and he shall be admitted to a hearing in his own defense before any vote or votes for such removal shall pass; and in such cases the vote shall be taken by yeas and nays and entered on the journals of each House respectively.

**Section 12.** The appointment of Chief Justice and Associate Justices of the Supreme Court shall be made every sixth year after their first appointment, and the election of Judges of the Circuit Court, and Judges or Chancellors of the Chancery Court, when established, shall be held in every sixth year after their first elections, at the same time and places as the elections for members of the General Assembly.

**Section 13.** That whenever the General Assembly shall create a Chancery Court, under the provisions of this Constitution, the Judges thereof shall be elected in the manner provided in the last two sections of this article, and shall hold their offices and be subject to all the provisions of said sections: *Provided, however,* That the said Judges shall be elected by general ticket or by districts, as the General Assembly may direct.

**Section 14.** That should a vacancy occur either in the Chancery or Circuit Courts, by death, removal, resignation or otherwise, it shall be the duty of the Governor to issue a writ of election to fill such vacancy, and he shall give at least sixty days notice thereof by proclamation: and the Judge so elected to fill said vacancy shall continue in office from the time he qualifies under his commission, until the expiration of the term of his predecessor: *Provided, however,* That should it become necessary to fill any such vacancy before an election can be held under the provisions of this Constitution, the Governor shall have power to fill such vacancy by appointment, and the person so appointed shall hold his office from the date of his commission until his successor shall be duly elected and qualified.

**Section 15.** The Clerks of the Circuit Courts of the several Circuits of this State, shall be elected by the qualified voters in their several counties at such times and places as are now or may be provided by law: *Provided, however,* That the Chief Justice of the Supreme Court and the Chancellors of the Court of Chancery, when such courts shall be established, shall have the power to appoint the Clerks of their respective courts.

**Section 16.** The Justices of the Supreme Court, Chancellors and Judges of the Circuit Courts, shall, by virtue of their offices, be conservators of the peace throughout the State.

**Section 17.** The style of all process shall be "The State of Florida," and all criminal prosecutions

578

shall be carried on in the name of **View Original** 95, the State, and all indictments shall conclude, "against the peace and dignity of the same."

**Section 18.** There shall be an Attorney General for the State, who shall reside at the seat of government, and he shall perform such duties as may be prescribed by law; he shall be elected by the qualified voters of the State, at the same time and in the same manner that the Comptroller, Secretary of State and Treasurer are elected, and his term of office shall be the same; but he may be removed by the Governor, on the address of a majority of the two Houses of the General Assembly, and shall receive for his services a compensation to be fixed by law.

**Section 19.** There shall be one Solicitor for each Circuit, who shall reside therein, to be elected by the qualified electors of the Circuit, who shall hold his office for the term of four years, and shall receive for his services a compensation to be fixed by law.

**Section 20.** No Justice of the Supreme Court shall sit as a Judge, or take part in the Appellate Court on the trial or hearing of any case which shall have been decided by him in the Court below.

**Section 21.** The General Assembly shall have power to establish in each county a Board of Commissioners, for the regulation of the county business therein.

**Section 22.** No duty not judicial shall be imposed by law upon the Justices of the Supreme Court, Chancellors or the Judges of the Circuit **View Original** Courts of this State, except in cases otherwise provided for in this Constitution.

### ARTICLE VI.

The Right of Suffrage and Qualifications of Officers, Civil Officers, and Impeachments, and Removals from Office.

**Section 1.** Every free white male person of the age of twenty-one years and upwards, and who shall be, at the time of offering to vote, a citizen of the United States, and who shall have resided and had his habitation, domicil, home, and place of permanent abode in Florida, for one year next preceding the election at which he shall offer to vote, and who shall, at such time, and for six months immediately preceding said time, have had his habitation, domicil, and place of permanent abode in the county in which he may offer to vote, shall be deemed a qualified elector at all elections under the Constitution, and none others; except in elections by general ticket in the State or District prescribed by law, in which cases the elector must have been a resident of the State one year next preceding the election, and six months within the elective district in which he offers to vote: *Provided,* That no officer, soldier, seaman or marine, in the regular army or navy of the United States, or any other person in the employ or pay of the United States, unless he be a qualified elector of the State previous to his appointment or enlistment as such officer, soldier, seaman or marine, in the regular army or navy of the United States, or of the revenue service, **View Original** shall be considered a resident of the State in consequence of being stationed within the same.

**Section 2.** The General Assembly shall have power to exclude from every office of honor, trust, or profit within the State, and from the right of suffrage, all persons convicted of bribery, perjury or other infamous crime.

**Section 3.** No person shall be capable of holding or being elected to any post of honor, profit, trust or emolument, civil or military, legislative, executive or judicial, under the government of this State, who shall hereafter fight a duel, or send or accept a challenge to fight a duel, the probable issue of which may be the death of the challenger or challenged, or who shall be a

second to either party, or who shall, in any manner aid or assist in such duel, or shall be knowingly the bearer of such challenge or acceptance, whether the same occur or be committed in or out of the State; but the legal disability shall not accrue until after trial and conviction, according to due form of law.

**Section 4.** No person who may hereafter be a collector or holder of public monies shall have a seat in either House of the General Assembly, or be eligible to any office of trust or profit under this State, until he shall have accounted for and paid into the Treasury all sums for which he may be accountable.

**Section 5.** No Governor, member of Congress, or of the General Assembly of this State, shall receive a fee, be engaged as counsel, agent **View Original** or attorney, in any civil case or claim against this State, or to which this State shall be a party, during the time he shall remain in office.

**Section 6.** No Senator or Representative shall, during the term for which he shall have been elected, be appointed to any civil office of profit under this State, which shall have been created, or the emoluments of which shall have been increased, during such term, except such offices as may be filled by elections by the people.

**Section 7.** Members of the General Assembly, and all officers, civil or military, before they enter upon the execution of their respective offices, shall take the following oath or affirmation: "I do swear (or affirm) that I am duly qualified, according to the Constitution of this State, to exercise the office to which I have been elected (or appointed,) and will, to the best of my abilities, discharge the duties thereof, and preserve, protect and defend the Constitution of this State and of the United States of America."

**Section 8.** Every person shall be disqualified from serving as Governor, Senator, Representative, or from holding any other office of honor or profit in this State, for the term for which he shall have been elected, who shall have been convicted of having given or offered any bribe to procure his election.

**Section 9.** Laws shall be made by the General Assembly to exclude from office, and from suffrage, those who shall have been, or **View Original** may hereafter be convicted of bribery, perjury, forgery, or other high crime or misdemeanor; and the privilege of suffrage shall be supported by laws regulating elections and prohibiting, under adequate penalties, all undue influence thereon, from power, bribery, tumult, or other improper practices.

**Section 10.** All civil officers of the State at large shall reside within the State, and all district or county officers within their respective districts or counties, and shall keep their respective offices at such places therein as may be required by law.

**Section 11.** It shall be the duty of the General Assembly to regulate by law in what cases and what deduction from the salaries of public officers shall be made, for any neglect of duty in their official capacity.

**Section 12.** Returns of elections for members of Congress and the General Assembly shall be made to the Secretary of State, in manner to be prescribed by law.

**Section 13.** In all elections by the General Assembly the vote shall be viva voce, and in all elections by the people the vote shall be by ballot.

**Section 14.** No member of Congress or person holding or exercising any office of profit under the United States, or under any foreign power, shall be eligible as a member of the General Assembly of this State, or hold or exercise any office of profit under the State; and **View Original** no person in this State shall ever hold two offices of profit at the same time, except the office of Justice of the Peace, Notary Public, Constable, and Militia offices, except by special act of the Legislature;

but the Legislature shall never unite in the same person two offices, the duties of which are incompatible.

**Section 15.** The General Assembly shall, by law, provide for the appointment or election, and removal from office, of all officers, civil and military, in this state, not provided for in this Constitution.

**Section 16.** The power of impeachment shall be vested in the House of Representatives.

**Section 17.** All impeachments shall be tried by the Senate; when sitting for that purpose the Senators shall be upon oath or affirmation; and no person shall be convicted without the concurrence of two-thirds of the members present.

**Section 18.** The Governor and all civil officers shall be liable to impeachment for any misdemeanor in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of honor, trust or profit under this State; but the parties nevertheless shall be liable to indictment, trial and punishment according to law.

## ARTICLE VII.

Militia.

View Original

**Section 1.** All Militia officers shall be elected or appointed, under such rules and regulations as the General Assembly may from time to time direct and establish.

**Section 2.** All offenses against the Militia laws shall be tried by Court Martial, or before a court and jury, as the General Assembly may direct.

**Section 3.** No commission shall be vacated except by sentence of a Court Martial.

## ARTICLE VIII.

Taxation and Revenue.

**Section 1.** The General Assembly shall devise and adopt a system of revenue, having regard to an equal and uniform mode of taxation, throughout the State.

**Section 2.** No other or greater amount of tax or revenue shall at any time be levied, than may be required for the necessary expenses of the Government.

**Section 3.** No money shall be drawn from the Treasury but in consequence of an appropriation by law, and a regular statement of the receipts and expenditures of all public monies shall be published and promulgated annually with the laws of the General Assembly.

View Original

**Section 4.** The General Assembly shall have power to authorize the several counties and incorporated towns in this state to impose taxes for county and corporation purposes, respectively, and all property shall be taxed upon the principles established in regard to State taxation.

**Section 5.** The General Assembly shall have power to authorize the levying of a capitation tax.

## ARTICLE IX.

### Census and Apportionment of Representation.

**Section 1.** The General Assembly shall, in the year one thousand eight hundred and sixty-seven, and in the year one thousand eight hundred and seventy-five, and every tenth year thereafter, cause an enumeration to be made of all the inhabitants of the State; and to the whole number of white inhabitants shall be added three-fifths of the number of colored people; and they shall then proceed to apportion the representation equally among the different counties, according to such enumeration, giving, however, one representative to every county, and increasing the number of representatives on a uniform ratio of population, according to the foregoing basis, and which ratio shall not be changed until a new census shall have been taken.

**Section 2.** The General Assembly shall also, after every such enumeration, proceed to fix by law the number of Senators which shall constitute the Senate of the State of Florida, and which shall never be less than one-fourth nor more than one-half of the whole number of the House of Representatives; and they shall lay off the State into the same number of Senatorial Districts, as nearly equal in the number of inhabitants as may be, according to the ratio of representation established in the preceding section, each of which districts shall be entitled to one Senator.

**Section 3.** When any Senatorial District shall be composed of two or more counties, the counties of which such district consists shall not be entirely separated by any county belonging to another district, and no county shall be divided in forming a district.

**Section 4.** No county now organized shall be divided into new counties, so as to reduce the inhabitants of either below the ratio of representation.

**Section 5.** The several counties of this State shall be entitled to the following Representatives, viz: Escambia three, Santa Rosa two, Walton two, Holmes one, Washington one, Calhoun one, Franklin one, Jackson four, Gadsden three, Leon four, Wakulla one, Liberty one, Jefferson three, Madison one, Hamilton two, Lafayette one, Taylor one, Suwannee one, Columbia two, Baker one, Bradford one, Alachua two, Nassau one, Duval two, Clay one, St. Johns one, Putnam one, Marion two, Sumter one, Orange one, Volusia one, Brevard one, Levy one, Hernando one,

Hillsborough one, Manatee one, Monroe one, Dade one, and Polk one. There shall be twenty-nine Senatorial Districts in this State, which shall be as follows: The county of Escambia shall compose the First district; the county of Santa Rosa shall compose the Second District; the county of Walton shall compose the Third District; the counties of Washington and Holmes shall compose the Fourth District; the county of Franklin shall compose the Fifth District; the county of Calhoun shall compose the Sixth District; the county of Jackson shall compose the Seventh District; the county of Gadsden shall compose the Eighth District; the county of Liberty shall compose the Ninth District; the county of Leon shall compose the Tenth District; the county of Wakulla shall compose the Eleventh District; the county of Jefferson shall compose the Twelfth District; the county of Madison shall compose the Thirteenth District; the county of Hamilton shall compose the Fourteenth District; the counties of Lafayette and Taylor shall compose the Fifteenth District; the county of Columbia shall compose the Sixteenth District; the county of Suwannee shall compose the Seventeenth District; the counties of Baker and Bradford shall compose the Eighteenth District; the county of Alachua shall compose the Nineteenth District; the county of Nassau shall compose the Twentieth District; the counties of Duval and Clay shall compose the Twenty-First District; the counties of St. Johns and Putnam shall compose the Twenty-Second District; the county of Marion shall compose the Twenty-Third District; the county of Sumter shall compose the Twenty-Fourth District; the counties of Orange and Volusia shall compose the Twenty-Fifth District; the counties of Levy and Hernando shall compose

582

**View Original** the Twenty-Sixth District; the counties of Hillsborough and Manatee shall compose the Twenty-Seventh District; the counties of Polk and Brevard shall compose the Twenty-Eighth District; and the counties of Monroe and Dade shall compose the Twenty-Ninth District; and each Senatorial District shall be entitled to one Senator.

## ARTICLE X.

### Education.

**Section 1.** The proceeds of all lands for the use of Schools and a Seminary or Seminaries of Learning shall be and remain a perpetual fund, the interest of which, together with all monies accrued from any other source, applicable to the same object, shall be inviolably appropriated to the use of Schools and Seminaries of Learning, respectively, and to no other purpose.

**Section 2.** The General Assembly shall take such measures as may be necessary to preserve from waste or damage all lands so granted and appropriated for the purpose of Education.

## ARTICLE XI.

### Public Domain and Internal Improvement.

**Section 1.** It shall be the duty of the General Assembly to provide for the **View Original** prevention of waste and damage of the public lands, that may hereafter be ceded to the State of Florida, and it may pass laws for the sale of any part or portion thereof; and, in such cases, provide for the safety, security and appropriation of the proceeds, but in no wise to affect the purposes for which said lands have heretofore been appropriated.

**Section 2.** A liberal system of Internal Improvements being essential to the development of the resources of the State, shall be encouraged by the government of this State; and it shall be the duty of the General Assembly, as soon as practicable, to ascertain by law proper objects for the extension of Internal Improvements, in relation to roads, canals and navigable streams, and to provide for a suitable application of such funds as may have been, or may hereafter be appropriated by said General Assembly for such improvements.

**Section 3.** That the General Assembly may at any time cede to the United State Government a sufficient parcel or fraction of land for the purpose of coast defense and other national purposes.

## ARTICLE XII.

### Boundaries.

**Section 1.** The boundary of the State of Florida shall be as follows: commencing at the mouth of the river Perdido, from **View Original** thence up the middle of said river to where it intersects the southern boundary line of the State of Alabama, on the thirty-first degree of North latitude; then due East to the Chattahoochee river; thence down the middle of said river to its confluence with the Flint river;

from thence straight to the head of the St. Marys river; thence down the middle of said river to the Atlantic Ocean; thence southwardly to the Gulf of Florida and Gulf of Mexico; thence northwardly and westwardly, including all islands within five leagues of the shore, to the

beginning.

## ARTICLE XIII.

### Banks and Other Corporations.

**Section 1.** The General Assembly shall pass no act of incorporation, nor make any alteration in one, unless with the assent of at least two-thirds of each House, and unless public notice in one or more newspapers in the State shall have been given for at least three months immediately preceding the session at which the same may be applied for.

**Section 2.** No bank charter, nor any act of incorporation granting exclusive privileges, shall be granted for a longer period than twenty years.

**Section 3.** Banks chartered by the General Assembly shall be restricted to the business of exchange, discount and deposit, and [View Original] they shall not deal in real estate, nor in merchandise nor chattels, except as security for loans or discounts, or for debts due to such bank; nor shall they be concerned in insurance, manufacturing, exportation, or importation, except of bullion, or specie; nor shall they own real estate or chattels, except such as shall be necessary for their actual use in the transaction of business, or which may be received in payment of previously contracted debts, or purchased at legal sales to satisfy such debts, of which they shall be required to make sale within three years after the acquisition thereof.

**Section 4.** The capital stock of any bank shall not be less than one hundred thousand dollars, to be paid in suitable instalments, and shall be created only by the payment of specie therein.

**Section 5.** All liabilities of such banks shall be payable in specie, and the circulation of no bank shall exceed three dollars for one of capital actually paid in.

**Section 6.** No dividends or profits exceeding ten per centum per annum on the capital stock paid in shall be made; but all profits over ten per centum per annum shall be set apart and retained as a safety fund.

**Section 7.** Stockholders in a bank, when an act of forfeiture is committed, or when it is dissolved or has expired, shall be individually and severally liable for the redemption of the outstanding circulation, in proportion to the stock owned by each, [View Original] and no transfer of stock shall exonerate such stockholders from this liability, unless such transfer was made at least two years previous to said forfeiture, dissolution or expiration.

**Section 8.** Banks shall be open to inspection under such regulations as may be prescribed by law, and it shall be the duty of the Governor to appoint a person or persons not connected in any manner with any bank in the State, to examine at least once a year into their state and condition; and the officers of every bank shall make quarterly returns under oath, to the Governor, of its state and condition, and the names of the stockholders, and shares held by each.

**Section 9.** *Non user* for the space of one year, or any act of a corporation, or those having the control or management thereof, or intrusted therewith, inconsistent with, or in violation of the provisions of this Constitution, or of its charter, shall cause its forfeiture, and the General Assembly shall by general law provide a summary process for the sequestration of its effects and assets, and the appointment of officers to settle its affairs, and no forfeited charter shall be restored.

**Section 10.** The General Assembly shall not pledge the faith and credit of the State to raise funds in the aid of any corporation whatever.

**View Original**

## ARTICLE XIV.

Amendments and Revisions of the Constitution.

**Section 1.** No part of this Constitution shall be altered except by a Convention duly elected.

**Section 2.** No Convention of the people shall be called unless by the concurrence of two-thirds of all the members of each House of the General Assembly, made known by the passing of a bill, which shall be read three times on three several days in each House.

**Section 3.** Whenever a Convention shall be called, proclamation of an election for Delegates shall be made by the Governor at least thirty days before the day of election. Every County and Senatorial District shall be entitled to as many Delegates as it has representatives in the General Assembly. The same qualifications shall be required in Delegates, and in Electors, that are required in members of the General Assembly, and voters for the same respectively, and the elections for Delegates to a Convention, and the returns of such election, shall be held and made in the manner prescribed by law for regulating elections for members of the General Assembly, but the Convention shall judge of the qualifications of its members.

**View Original**

## ARTICLE XV.

Seat of Government.

The Seat of Government shall be and remain permanent at the City of Tallahassee, until otherwise provided for by the action of a Convention of the people of the State.

## ARTICLE XVI.

General Provisions.

**Section 1.** Whereas, slavery has been destroyed in this State by the Government of the United States; therefore, neither slavery nor involuntary servitude shall in future exist in this State, except as a punishment for crimes, whereof the party shall have been convicted by the courts of the State, and all the inhabitants of the State, without distinction of color, are free, and shall enjoy the rights of person and property without distinction of color.

**Section 2.** In all criminal proceedings founded upon injury to a colored person, and in all cases affecting the rights and remedies of colored persons, no person shall be incompetent to testify as a witness on account of color; in all other cases, the testimony of colored persons shall be excluded, unless made competent by future legislation. The jury shall judge **View Original** the credibility of the testimony.

**Section 3.** The Jurors of this State shall be white men, possessed of such qualifications as may be prescribed by law.

**Section 4.** Treason against the State shall consist only in levying war against it, or in adhering to

its enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or his confession in open court.

**Section 5.** Divorces from the bonds of matrimony shall not be allowed but by the judgment of a court, as shall be prescribed by law.

**Section 6.** The General Assembly shall declare by law what parts of the common law, and what parts of the civil law, not inconsistent with this Constitution, shall be in force in this State.

**Section 7.** The oaths of officers directed to be taken under this Constitution, may be administered by any judge, or justice of the peace, in the State of Florida, until otherwise provided by law.

**View Original**

## ARTICLE XVII.

Schedule and Ordinance.

**Section 1.** All the laws of the State passed during and since the tenth session of the Legislature thereof, in 1860, not repugnant to the Constitution of this State, or of the United States, shall be valid; all writs, actions, prosecutions, judgments and decrees, of the courts of the State, all executions and sales made thereunder, and all acts, orders and proceedings of the Judges of Probate, and of Executors, Administrators, Guardians and Trustees, provided they were in conformity to the laws then in force, and not fraudulent, shall be as valid as if made under the usual and ordinary legislation of the country, provided that the same be not repugnant to the Constitution of the state and of the United States.

**Section 2.** All fines, penalties, forfeitures, obligations and escheats, heretofore accruing to the State of Florida, and not made unlawful by the Constitution or laws of the United States, shall continue to accrue to the use of the State.

**Section 3.** All recognizances heretofore taken shall remain valid, and all bonds executed to the Governor of the State of Florida, either before or since the first day of January, 1861, or to any other officer of the State in his official capacity, shall be of full force and virtue for the uses herein respectively expressed, and may be sued for and recovered accordingly; and all criminal prosecution and penal actions which have arisen may be prosecuted **View Original** to judgment and execution in the name of the State.

**Section 4.** The Provisional Governor of this State is hereby requested to authorize the civil officers of this State who were discharging the duties of their offices prior to, or during the month of May, A. D. 1865, to resume the exercise of the functions of their respective offices, and to make such other appointments to office as may be necessary or proper to reorganize or re-establish the civil government of this State; and all actions at law, or suits in chancery, or any proceeding pending in any of the courts of this State, prior to, or during the said month of May, 1865, and either before or subsequent to the 10th day of January, A. D. 1861, shall continue in all respects valid, and may be prosecuted to judgment and decree: and all judgments and decrees rendered in civil causes in any of the courts in this State during the period of time last above specified, and not repugnant to the constitution of the United States, are hereby declared of full force, validity and effect.

**Section 5.** The Provisional Governor of the State is hereby requested and authorized, at as early a day as practicable, to issue writs of election to the proper officers in the different counties in this State, and make proclamation for an election for Governor, Lieutenant Governor, Secretary of State, Treasurer, Comptroller of Public Accounts, Attorney General, Circuit Judges, Judges of Probate, Sheriffs, Clerks of Circuit Courts, Solicitors, Representative in Congress, Senators and Representatives of the General Assembly, County Commissioners, Coroners, Justices of the Peace, County Surveyors, and all other officers provided for by this Constitution. The said

election shall be held on the 29th day of November, A. D. 1865. The [View Original] said election shall be conducted according to the existing laws of the State of Florida, and shall take place on the same day throughout the State, the returns to be made according to law. The members of the General Assembly so elected shall assemble on the 3d Monday in December, A. D. 1865. The Governor, Lieutenant Governor, Secretary of State, Treasurer, Comptroller of Public Accounts, Attorney General, Circuit Judges, Judges of Probate, Sheriffs, Clerks of Circuit Courts, Solicitors, Representative in Congress, Senators and Representatives of the General Assembly, County Commissioners, Coroners, Justices of the Peace, County Surveyors and all other officers provided for by this Constitution, shall enter upon the duties of their respective offices immediately after their election, and shall continue in office in the same manner and during the same period they would have done had they been elected on the first Monday in October, A. D. 1865. The Representative in Congress shall continue in office in the same manner and during the same period he would have done, had he been elected on the first Monday in October, A. D. 1865.

**Section 6.** The Statutes of Limitation shall not be pleaded upon any claim in the hands of any person whomsoever, not sued upon when such claim was not barred by the Statutes of Limitation on the 10th day of January, A. D. 1861.

**Section 7.** No law of this State providing that claims or demands against the estates of decedents shall be barred if not presented within two years, shall be considered as being in force within this State between the 10th day of January, 1861, and the 25th day of October, 1865.
[View Original]

Done in open Convention. In witness whereof, the undersigned, the President of said Convention, and Delegates present, representing the people of Florida, do hereby sign our names, this the seventh day of November, Anno Domini, Eighteen Hundred and Sixty-five, and of the Independence of the United States of America the ninetieth year, and the Secretary of said Convention doth countersign the same.
[View Original]

E. D. TRACY, President
[View Original]

Thomas Baltzell, James T. Magbee, A. H. Bush, G. Troup Maxwell, F. B. Callaway, Asa May, W. B. Cooper, John McLellan, W. R. Coulter, James A. Mickler, Jr. R. H. M. Davidson, S. L. Niblack, Arthur J. Forman Silas T. Overstreet, Alexander Bell James G. Owens, James Gettis John C. Richard, W. J. J. Duncan, Jackson N. Richards, Jas. D. Green, A. Richardson, Francis A. Hendry, W. Wash. Scott, W. Jas. Hines, Moses Simmons, D. P. Hogue, S. Spencer, J. W. H. Holden, J. L. Taylor, Jas. F. P. Johnston, G. K. Walker, Wm. W. J. Kelly, D. W. Whitehurst, J. M. Landrum, James A. Wiggins, Jesse B. Lassiter, B. D. Wright, Felix Leslie, Wm. Wilson, Dan'l. G. Livingston, Wm. Capers Bird, Thos. T. Long, Wiley W. Whidden, James Love, S. N. Williams,
[View Original]

A. J. PEELER, Secretary.

Return to Florida's Early Constitutions Main Page

Constitution of 1868:

_____

# CONSTITUTION

## of the

## STATE OF FLORIDA

### Adopted February 25, 1868.

_____

View Original

## PREAMBLE

We, the people of the State of Florida, grateful to Almighty God for our freedom, in order to secure its blessings and form a more perfect government, insuring domestic tranquility, maintaining public order, perpetuating liberty and guaranteeing equal civil and political rights to all, do establish this Constitution.

_____

View Original

## DECLARATION OF RIGHTS.

**Section 1.** All men are by nature free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness.

**Section 2.** All political power is inherent in the people. Government is instituted for the protection, security, and benefit of its citizens, and they have the right to alter or amend the same whenever the public good may require it; but the paramount allegiance of every citizen is due to the Federal Government, and no power exists with the people of this State to dissolve its connection therewith.

**Section 3.** The right of trial by jury shall be secured to all and remain inviolate forever; but in all civil cases a jury trial may be waived by the parties in the manner to be prescribed by law.

**Section 4.** The free exercise and enjoyment of religious profession and worship shall forever be allowed in this State, and no person shall be rendered incompetent as a witness on account of his religious opinions; but the liberty of conscience hereby secured shall not be so construed as to justify licentiousness or practices subversive of the peace and safety of the State.

**Section 5.** The privilege of the writ of *habeas corpus* shall not be suspended unless when, in case of invasion or rebellion, the public safety may require its suspension.

**Section 6.** Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment be inflicted, nor shall witnesses be unreasonably detained.

**Section 7.** All persons shall be bailable by sufficient sureties, unless for capital offenses when the proof is evident, or the `View Original` presumption great.

**Section 8.** No person shall be tried for a capital or otherwise infamous crime, except in cases of impeachment, and in cases of the militia when in active service in time of war, or which the State may keep, with the consent of Congress, in time of peace, and in cases of petit larceny, under the regulation of the Legislature, unless on presentment and indictment by a grand jury; and in any trial, by any court, the party accused shall be allowed to appear and defend in person and with counsel, as in civil actions. No person shall be subject to be twice put in jeopardy for the same offense, nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law; nor shall private property be taken without just compensation.

**Section 9.** Every citizen may fully speak and write his sentiments on all subjects, being responsible for the abuse of that right, and no law shall be passed to restrain or abridge the liberty of speech or the press. In all criminal prosecutions and civil actions for libel the truth may be given in evidence to the jury, and if it shall appear that the matter charged as libelous is true, but was published for good motives, the party shall be acquitted or exonerated.

**Section 10.** The people shall have the right to assemble together to consult for the common good, to instruct their representatives, and to petition the Legislature for redress or grievance.

**Section 11.** All laws of a general nature shall have a uniform operation.

**Section 12.** The military shall be subordinate to the civil power.

**Section 13.** No soldier shall, in time of peace, be quartered in any house, except with the consent of the owner, nor in time of war, except in manner prescribed by law.

**Section 14.** Representation shall be apportioned according to population, as well as may be, but no county shall have more then four representatives, or less than one representative, in the Assembly.

`View Original`

**Section 15.** No person shall be imprisoned for debt, except in case of fraud.

**Section 16.** No bill of attainder, or *ex post facto* law, or law impairing the obligations of contracts, shall ever be passed.

**Section 17.** Foreigners who are or who may hereafter become *bona fide* residents of the State, shall enjoy the same rights in respect to the possession, enjoyment, and inheritance of property as native-born citizens.

**Section 18.** Neither slavery nor involuntary servitude, unless for the punishment of crime, shall ever be tolerated in this State.

**Section 19.** The rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches, shall not be violated; and no warrants issued but in probable cause, supported by oath or affirmation, particularly describing the place or places to be searched, and the person or persons, and thing or things to be seized.

**Section 20.** Treason against the State shall consist only in levying war against it, adhering to its

enemies, or giving them aid and comfort; and no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or confession in open court.

**Section 21.** This State shall ever remain a member of the American Union, the people thereof a part of the American nation, and any attempt from whatever source, or upon whatever pretense, to dissolve said Union, or to sever said nation, shall be resisted with the whole power of the State.

**Section 22.** The people shall have the right to bear arms in defense of themselves and of the lawful authority of the State.

**Section 23.** No preference can be given by law to any church, sect, or mode of worship.

**Section 24.** This enunciation of rights shall not be construed to impair or deny others retained by the people.

[ View Original ]

# ARTICLE I.

Boundaries.

The boundaries of the State of Florida shall be as follows: Commencing at the mouth of the river Perdido; from thence up the middle of said river to where it intersects the south boundary line of the State of Alabama, and the thirty-first degree of north latitude; then due east to the Chattahoochee river; then down the middle of said river to its confluence with the Flint river; from thence straight to the head of the St. Marys river; then down the middle of said river to the Atlantic ocean; thence southeastwardly along the coast to the edge of the Gulf Stream; then southwestwardly along the edge of the Gulf Stream and Florida Reefs to and including the Tortugas Islands; thence northeastwardly to a point three leagues from the mainland; thence northwestwardly three leagues from the land, to a point west of the mouth of the Perdido river; thence to the place of beginning.

# ARTICLE II.

Seat of Government.

The seat of government shall be and remain permanent at the city of Tallahassee, in the county of Leon, [ View Original ] until otherwise located by a majority vote of the Legislature, and by a majority vote of the people.

[ View Original ]

# ARTICLE III.

Distribution of Powers.

[ View Original ]

The powers of the government of the State of Florida shall be divided into three departments: Legislative, Executive, and Judicial; and no person properly belonging to one of the departments shall exercise any functions appertaining to either of the others, except in those cases expressly provided for by this Constitution.

## ARTICLE IV.

### Legislative Department.

**Section 1.** The legislative authority of this State shall be vested in a Senate and Assembly, which shall be designated "The Legislature of the State of Florida," and the sessions thereof shall be held at the seat of government of the State.

**Section 2.** The sessions of the Legislature shall be annual, the first session on the second Monday of June, A. D. 1868, and thereafter on the first Tuesday after the first Monday of January, commencing in the year A. D. 1869. The Governor may, in the interim, convene the same in extra session by his proclamation.

**Section 3.** The members of the Assembly shall be chosen biennially, those of the first Legislature on the first Monday, Tuesday, and Wednesday of May, A. D. 1868, and thereafter on the first Tuesday after the first Monday of November, commencing with the year A. D. 1870.

Section 4. Senators shall be chosen for the term of four years, at the same time and place as members of the Assembly; *Provided,* That the Senators elected at the first election from the senatorial districts designated by even numbers shall vacate their seats at the expiration of two years, and thereafter all senators shall be elected for the term of four years, so that one-half of the whole number shall be elected biennially.

Section 5. Senators and members of the Assembly shall be duly qualified electors in the respective counties and districts which they represent.

**Section 6.** Each house shall judge of the qualifications, elections, and returns of its own members; choose its own officers, except the President of the Senate; determine the rules of its proceedings; and may punish its members for disorderly conduct, **View Original** and with the concurrence of two-thirds of all the members present, expel a member.

**Section 7.** Either house, during the session, may punish by imprisonment any person not a member, who shall have been guilty of disorderly or contemptuous conduct in its presence; but such imprisonment shall not extend beyond the final adjournment of the session.

**Section 8.** A majority of each house shall constitute a quorum to do business, but a smaller number may adjourn from day to day, and may compel the presence of absent members in such manner and under such penalties as each house may prescribe.

**Section 9.** Any person who shall be convicted of embezzlement or defalcation of the funds of the State, or of having given or offered a bribe to secure his election or appointment to office, or of having received a bribe to aid in the procurement of office for any other person, shall be disqualified from holding any office of honor, profit, or trust in the State; and the Legislature shall, as soon as practicable, provide by law for the punishment of such embezzlement, defalcation, or bribery as a felony.

**Section 10.** Each house shall keep a journal of its own proceedings, which shall be published, and the yeas and nays of the members of either house on any question shall, at the desire of any three members present, be entered on the journal.

**Section 11.** The doors of each house shall be kept open during its session, except the Senate while sitting in executive session; and neither shall, without the consent of the other, adjourn for more than three days, or to any other town than that in which they may be holding their session.

591

**Section 12.** Any bill may originate in either house of the Legislature, and after being passed in one house may be amended in the other.

**Section 13.** The enacting clause of every law shall be as follows: "The people of the State of Florida, represented in Senate and Assembly, do enact as follows."

View Original

**Section 14.** Each law enacted in the Legislature shall embrace but one subject, and matter properly connected therewith, which subject shall be briefly expressed in the title, and no law shall be amended or revised by reference to its title only; but in such case, the act as revised, or section as amended, shall be re-enacted and published at length.

**Section 15.** Every bill shall be read by sections on three several days in each house, unless in case of emergency two-thirds of the house where such bill may be pending shall deem it expedient to dispense with this rule; but the reading of a bill by sections on its final passage shall in no case be dispensed with; and the vote of the final passage of every bill, or joint resolution, shall be taken by yeas and nays, to be entered in the journal of each house, and a majority of the members present in each house shall be necessary to pass every bill or joint resolution, and all bills or joint resolutions so passed shall be signed by the presiding officers of the respective houses, and by the secretary of the Senate and clerk of the Assembly.

**Section 16.** No money shall be drawn from the Treasury except by appropriation made by law, and accurate statements of the receipts and expenditures of the public money shall be attached to and published with the laws passed at every regular session of the Legislature.

**Section 17.** The Legislature shall not pass special or local laws in any of the following enumerated cases; that is to say, regulating the jurisdiction and duties of any class of officers, or for the punishment of crime or misdemeanor; regulating the practice of courts of justice; providing for changing venue of civil and criminal cases; granting divorces; changing the names of persons; vacating roads, town plats, streets, alleys, and public squares; summoning and empaneling grand and petit juries, and providing for their compensation; regulating county, township, and municipal business; regulating the election of county, township, and municipal officers; for the assessment and collection of taxes for State, county, and municipal purposes; providing for opening and conducting elections for State, county, and municipal officers, and designating the places of voting; providing for the sale of real estate belonging to minors or other persons laboring under legal disabilities; regulating the fees of officers.

**Section 18.** In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State.

View Original

**Section 19.** Provision may be made by general law for bringing suit against the State as to all liabilities now existing or hereafter originating.

**Section 20.** Lotteries are hereby prohibited in this State.

**Section 21.** The Legislature shall establish a uniform system of county, township, and municipal government.

**Section 22.** The Legislature shall provide by general law for incorporating such municipal, educational, agricultural, mechanical, mining, and other useful companies or associations as may be deemed necessary.

**Section 23.** No person who is not a qualified elector of this State, or any person who shall have

been convicted of bribery, forgery, perjury, larceny, or other high crime, unless restored to civil rights, shall be permitted to serve on juries.

**Section 24.** Laws shall be passed regulating elections, and prohibiting, under adequate penalties, all undue influence thereon from power, bribery, tumult, or other improper practice.

**Section 25.** Regular sessions of the Legislature may extend to sixty days, but any special session convened by the Governor shall not exceed twenty days.

**Section 26.** All property, both real and personal, of the wife, owned by her before marriage, or acquired afterward by gift, devise, descent, or purchase, shall be her separate property, and not liable for the debts of her husband.

**Section 27.** The Legislature shall provide for the election by the people, or appointment by the Governor, of all State, county, or municipal officers not otherwise provided for by this Constitution, and fix by law their duties and compensation.

**Section 28.** Every bill which may have passed the Legislature shall, before becoming a law, be presented to the Governor; if [View Original] he approves it he shall sign it, but if not he shall return it with his objections to the house in which it originated, which house shall cause such objections to be entered upon its journal, and proceed to reconsider it; if, after such reconsideration, it shall pass both houses by a two-thirds vote of the members present, which vote shall be entered on the journal of each house, it shall become a law. If any bill shall not be returned within five days after it shall have been presented to the Governor (Sundays excepted,) the same shall be a law, in like manner as if he had signed it. If the Legislature, by its final adjournment, prevent such action, such bill shall be a law unless the Governor, within ten days next after the adjournment, shall file such bill with his objections thereto in the office of the Secretary of State, who shall lay the same before the Legislature at its next session, and if the same shall receive two-thirds of the votes present it shall become a law.

**Section 29.** The Assembly shall have the sole power of impeachment, but a vote of two-thirds of all the members present shall be required to impeach any officer; and all impeachments shall be tried by the Senate. When sitting for that purpose, the senators shall be upon oath or affirmation, and no person shall be convicted without the concurrence of two-thirds of the senators present. The Chief Justice shall preside at all trials by impeachment, except in the trial of the Chief Justice, when the Lieutenant Governor shall preside. The Governor, Lieutenant Governor, members of the Cabinet, justices of the Supreme Court, and judges of the circuit court shall be liable to impeachment for any misdemeanor in office; but judgment in such cases shall extend only to removal from office and disqualification to hold any office of honor, trust, or profit under the State; but the party convicted or acquitted shall nevertheless be liable to indictment, trial, and punishment according to law. All other officers who shall have been appointed to office by the Governor, and by and with the consent of the Senate, may be removed from office upon the recommendation of the Governor and consent of the Senate, but they shall nevertheless be liable to indictment, trial, and punishment according to law for any misdemeanor in office; all other civil officers shall be tried for misdemeanor in office in such manner as the Legislature may provide.

**Section 30.** Laws making appropriation for the salaries of public officers, and other current expenses of the State, shall contain provisions on no other subject.

**Section 31.** The Legislature shall elect United States senators in the manner prescribed by the Congress of the United States and by this Constitution.

[View Original]

**ARTICLE V.**

593

Executive Department.

**Section 1.** The supreme executive power of the State shall be vested in a Chief Magistrate, who shall be styled the Governor of Florida.

**Section 2.** The Governor shall be elected by the qualified electors at the time and places of voting for the members of the Legislature, and shall hold his office for four years from the time of his installation; *Provided,* That the term of the first Governor elected under this Constitution shall expire at the opening of the regular session of the Legislature of A. D. 1873, and until his successor shall be qualified. He shall take the oath of office prescribed for all State officers.

**Section 3.** No person shall be eligible to the office of Governor who is not a qualified elector, and who has not been nine years a citizen of the United States, and three years a citizen of the State of Florida, next preceding the time of his election.

**Section 4.** The Governor shall be Commander-in-chief of the military forces of the State, except when they shall be called into the service of the United States.

**Section 5.** He shall transact all executive business with the officers of the government, civil and military, and may require information in writing from the officers of the administrative department upon any subject relating to the duties of their respective offices.

**Section 6.** He shall see that the laws are faithfully executed.

**Section 7.** When any office, from any cause, shall become vacant, and no mode is provided by this Constitution or by the laws of the State for filling such vacancy, the Governor shall have the power to fill such vacancy by granting a commission, which [View Original] shall expire at the next election.

**Section 8.** The Governor may, on extraordinary occasions, convene the Legislature by proclamation, and shall state to both houses, when organized, the purpose for which they have been convened, and the Legislature then shall transact no legislative business except that for which they are especially convened, or such other legislative business as the Governor may call to the attention of the Legislature while in session, except by the unanimous consent of both houses.

**Section 9.** He shall communicate by message to the Legislature at each regular session the condition of the State, and recommend such measures as he may deem expedient.

**Section 10.** In case of a disagreement between the two houses with respect to the time of adjournment, the Governor shall have power to adjourn the Legislature to such time as he may think proper, provided it is not beyond the time fixed for the meeting of the next Legislature.

**Section 11.** The Governor shall have power to suspend the collection of fines and forfeitures, and grant reprieves for a period not exceeding sixty days, dating from the time of conviction, for all offenses, except in cases of impeachment. Upon conviction for treason he shall have power to suspend the execution of sentence until the case shall be reported to the Legislature at its next session, when the Legislature shall either pardon, direct the execution of the sentence, or grant a further reprieve; and if the Legislature shall fail or refuse to make final disposition of such case, the sentence shall be enforced at such time and place as the Governor may by his order direct. The Governor shall communicate to the Legislature, at the beginning of every session, every case of fine or forfeiture remitted or reprieved, pardon or commutation granted, stating the name of the convict, the crime for which he was convicted, the sentence, its date, and the date of its remission, commutation, pardon, or reprieve.

**Section 12.** The Governor, Justices of the Supreme Court, and Attorney General, or a major part of them, of whom the Governor shall be one, may, upon such conditions and with such limitations and restrictions as they may deem proper, remit fines and forfeitures, commute punishment, and

594

grant pardons after conviction, in all cases, except treason and impeachment, subject to such regulations as may be provided [View Original] by law relative to the manner of applying for pardons.

**Section 13.** All grants and commissions shall be in the name, and under the authority of the State of Florida, sealed by the great seal of the State, signed by the Governor, and countersigned by the Secretary of State.

**Section 14.** A Lieutenant Governor shall be elected at the same time and places, and in the same manner as the Governor, whose term of office and eligibility shall also be the same. He shall be the President of the Senate, but shall only have a casting vote therein. If, during a vacancy of the office of Governor, the Lieutenant Governor shall be impeached, displaced, resign, die, or become incapable of performing the duties of his office, or be absent from the State, the President *pro tem.* of the Senate shall act as Governor until the office be filled or the disability cease.

**Section 15.** In the case of the impeachment of the Governor, or his removal from office, death, inability to discharge his official duties, or resignation, the power and duties of the office shall devolve upon the Lieutenant Governor for the residue of the term, or until the disability shall cease; but the Governor shall not, without the consent of the Legislature, be out of the State in time of war.

**Section 16.** The Governor may at any time require the opinion of the justices of the Supreme Court as to the interpretation of any portion of this Constitution, or upon any point of law, and the Supreme Court shall render such opinion in writing.

**Section 17.** The Governor shall be assisted by a Cabinet of administrative officers, consisting of a Secretary of State, Attorney General, Comptroller, Treasurer, Surveyor General, Superintendent of Public Instruction, Adjutant General, and Commissioner of Immigration. Such officers shall be appointed by the Governor and confirmed by the Senate, and shall hold their offices the same time as the Governor, or until their successors shall be qualified.

**Section 18.** The Governor shall, by and with the consent of the Senate, appoint all commissioned officers of the State militia.

[View Original]

**Section 19.** The Governor shall appoint, by and with the consent of the Senate, in each county an assessor of taxes and a collector of revenue, whose duties shall be prescribed by law, and who shall hold their offices for two years, and be subject to removal upon the recommendation of the Governor and consent of the Senate. The Governor shall appoint in each county a county treasurer, county surveyor, superintendent of common schools, and five county commissioners, each of whom shall hold his office for two years, and the duties of each shall be prescribed by law. Such officers shall be subject to removal by the Governor when in his judgment the public welfare will be advanced thereby; *Provided,* No officer shall be removed except for wilful neglect of duty, or a violation of the criminal laws of the State, or for incompetency.

**Section 20.** The Governor and Cabinet shall constitute a Board of Commissioners of State Institutions, which board shall have supervision of all matters connected therewith, in such manner as shall be prescribed by law.

**Section 21.** The Governor shall have power, in cases of insurrection or rebellion, to suspend the writ of *habeas corpus* within the State.

## ARTICLE VI.

595

Judicial Department.

**Section 1.** The judicial power of the State shall be vested in a Supreme Court, circuit courts, county courts, and justices of the peace.

**Section 2.** The style of all process shall be, "The State of Florida," and all prosecutions shall be conducted in the name and by the authority of the same.

**Section 3.** The Supreme Court shall consist of a chief justice and two associate justices, who shall hold their offices for life or during good behavior. They shall be appointed by the Governor and confirmed by the Senate.

**Section 4.** The majority of the justices of the Supreme Court shall constitute a quorum for the transaction of all business. The Supreme Court shall hold three terms each year at the Supreme Court room at the seat of government. **View Original** Such terms shall commence on the second Tuesday of October, January, and April respectively.

**Section 5.** The Supreme Court shall have appellate jurisdiction in all cases in equity, also in all cases of law in which is involved the title to or right of possession of real estate, or the legality of any tax, impost, assessment, toll, or municipal fine, or in which the demand or the value of the property in controversy exceeds three hundred dollars; also in all other civil cases not included in the general subdivisions of law and equity; also in all questions of law alone; in all criminal cases in which the offense charged amounts to felony. The court shall have power to issue writs of mandamus, certiorari, prohibition, quo warranto, habeas corpus, and also all writs necessary or proper to the complete exercise of its appellate jurisdiction. Each of the justices shall have the power to issue writs of *habeas corpus* to any part of the State upon petition by or on behalf of any person held in actual custody, and may make such writs returnable before himself or the Supreme Court, or before any circuit court in the State, or before any judge of said courts.

**Section 6.** The Supreme Court shall appoint a clerk of the Supreme Court, who shall have his office at the Capitol, and shall be librarian of the Supreme Court library; he shall hold his office until his successor is appointed and qualified.

**Section 7.** There shall be seven circuit judges appointed by the Governor and confirmed by the Senate, who shall hold their office for eight years. The State shall be divided into seven judicial districts, the limits of which are defined in this Constitution, and one judge shall be assigned to each circuit. Such judge shall hold two terms of his court in each county within his circuit, each year, at such times and places as shall be prescribed by law. The chief justice may in his discretion order a temporary exchange of circuits by the respective judges, or any judge, to hold one or more terms in any other circuit than that to which he is assigned. The judge shall reside in the circuit to which he is assigned.

**Section 8.** The circuit courts in the several judicial circuits shall have original jurisdiction in all cases of equity, also in all cases at law which involve the title or the right of possession to, or the possession of, or the boundaries of real property; of the legality of any tax, impost, assessment, toll, or municipal fine, and in all other cases in which the demand or the value of property in controversy exceeds three hundred dollars, and of the action of forcible entry and unlawful detainer, and also in all criminal cases amounting to felony. They shall have final appellate jurisdiction in all civil cases arising in the county court in which the amount in controversy is one hundred dollars and upwards, and in all cases of misdemeanor. The circuit courts and the judges thereof shall have power to issue writs of mandamus, injunction, quo warranto, certiorari, and all other writs proper and necessary to the complete exercise of their jurisdiction, and also shall have power to issue writs of *habeas corpus* on petition by or on behalf of any person held in actual custody in their respective circuits.

**View Original**

596

**Section 9.** There shall be a county court organized in each county. The Governor shall appoint a county judge for each county, who shall be confirmed by the Senate, and such judge shall hold his office for four years from the date of his commission, or until his successor is appointed and qualified.

**Section 10.** The county court shall be a court of Oyer and Terminer.

**Section 11.** The county court shall have jurisdiction of all misdemeanors and all civil cases where the amount in controversy does not exceed three hundred dollars; and its jurisdiction shall be final in all civil cases where the amount in controversy does not exceed one hundred dollars; but in no case shall the county court have jurisdiction when the title or boundaries of real estate is in controversy, or where the jurisdiction will conflict with that of the several courts of record; but they may have co-extensive jurisdiction with the circuit courts in cases of forcible entry and unlawful detention of real estate, subject to appeal to the circuit court. The county court shall have full surrogate or probate powers, but subject to appeal. Provision shall be made by law for all other powers, duties, and responsibilities of the county courts and judges. There shall be a regular trial term of the county courts six times in each year, at such times and places as may be prescribed by law.

**Section 12.** Grand and petit jurors shall be taken from the registered voters of the respective counties.

**Section 13.** In all trials, civil and criminal, in the circuit and county courts, the evidence shall be reduced to writing by the clerk of the court or his deputy, under the control of the court; and every witness, after his examination shall have closed, shall be at liberty to correct the evidence he has given, and afterward shall sign the same; such evidence shall be filed in the office of the clerk with the papers in the case.

**Section 14.** All pleas shall be sworn to either by the parties or their attorneys.

**Section 15.** The Governor shall appoint as many justices of the peace as he may deem necessary. Justices of the peace shall have criminal jurisdiction and civil jurisdiction not to exceed fifty dollars; but this shall not extend to the trial of any person for misdemeanor or crime. The duties of justices of the peace shall be fixed by law. Justices of the peace shall hold their offices during good behavior, subject to removal by the Governor at his own discretion.

**Section 16.** The Legislature may establish courts for municipal purposes only, in incorporated towns and cities. All laws for the organization or government of municipal courts shall be general in their provisions, and be equally applicable to the municipal courts of all incorporated towns and cities.

**Section 17.** Any civil cause may be tried before a practicing attorney as referee, upon the application of the parties, and an order from the court in whose jurisdiction the case may be, authorizing such trial and appointing such referee. View Original Such referee shall keep a complete record of the case, including the evidence taken, and such record shall be filed with the papers in the case in the office of the clerk, and such cause shall be subject to an appeal in the manner prescribed by law.

**Section 18.** No other courts than those herein specified shall be organized in this State.

**Section 19.** The Governor, by and with the advice and consent of the Senate, shall appoint a State Attorney in each judicial circuit, whose duties shall be prescribed by law. He shall hold office for four years from the date of his commission, and until his successor shall be appointed and qualified. The Governor, by and with the advice and consent of the Senate, shall appoint in each county a sheriff and a clerk of the circuit court, who shall also be clerk of the county court and of the board of county commissioners, recorder, and *ex officio* auditor of the county, each of whom

shall hold his office for four years. Their duties shall be prescribed by law.

**Section 20.** A constable shall be elected by the registered voters in each county for every (200) two hundred registered voters; but each county shall be entitled to at least two constables, and no county shall have more than twelve constables. They shall perform such duties, and under such instructions, as shall be prescribed by law.

**Section 21.** Attorneys at law, who have been admitted to practice in any court of record in any State of the Union, or to any United States Court, shall be admitted to practice in any court of this State, on producing evidence of having been so admitted.

**View Original**

# ARTICLE VII.

Administrative Department.

**Section 1.** There shall be a cabinet of administrative officers, consisting of a Secretary of State, Attorney General, Comptroller, Treasurer, Surveyor General, Superintendent of Public Instruction, Adjutant General, and Commissioner of Immigration, who shall assist the Governor in the performance of his duties.

**Section 2.** The Secretary of State shall keep the records of official acts of the Legislative and Executive departments of the Government, and shall, when required, lay the same, and all matters relative thereto, before either branch of the Legislature, and shall be the custodian of the Great Seal of the State.

**Section 3.** The Attorney General shall be the legal adviser of the Governor, and each of the cabinet officers, and shall perform such other legal duties as the Governor may direct, or as may be provided by law. He shall be reporter for the Supreme Court.

**Section 4.** The Treasurer shall receive and keep all funds, bonds, or other securities, in such manner as may be provided by law, and shall disburse no funds, bonds, or other securities, except upon the order of the Comptroller, countersigned by the Governor, in such manner as shall be prescribed by law.

**Section 5.** The duties of the Comptroller shall be prescribed by law.

**Section 6.** The Surveyor General shall have the administrative supervision of all matters pertaining to the public lands, under such regulations as shall be prescribed by law.

**Section 7.** The Superintendent of Public Instruction shall have the administrative supervision of all matters pertaining to public instruction; the supervision of buildings devoted to educational purposes, and the libraries belonging to the university and common schools. He shall organize a historical bureau for the purposes of accumulating such matter and information as may be necessary for compiling and perfecting the history of the State. He shall also establish a cabinet of minerals and other natural productions.

**Section 8.** The Adjutant General shall, under the orders of the Governor, have the administrative supervision of the military department, and the supervision of the State prison, and of the quarantine of the coast, in such manner as shall be prescribed by law.

**Section 9.** The Commissioner of Immigration shall organize a Bureau of Immigration, for the purposes of furnishing information, and for the encouragement of immigration. The office of Commissioner of Immigration shall expire at the end of **View Original** fifteen years from the ratification of this Constitution, but the Legislature shall have the power to continue it by law.

598

**Section 10.** Each officer of the Cabinet shall make a full report of his official acts, of the receipts and expenditures of his office, and of the requirements of the same, to the Governor at the beginning of each regular session of the Legislature, or whenever the Governor shall require it. Such reports shall be laid before the Legislature by the Governor at the beginning of each regular session thereof. Either House of the Legislature may at any time call upon any Cabinet Officer for any information required by it.

`View Original`

# ARTICLE VIII.

Education.

**Section 1.** It is the paramount duty of the State to make ample provision for the education of all the children residing within its borders, without distinction or preference.

**Section 2.** The Legislature shall provide a uniform system of Common Schools, and a University, and shall provide for the liberal maintenance of the same. Instruction in them shall be free.

**Section 3.** There shall be a Superintendent of Public Instruction, whose term of office shall be four years and until the appointment and qualification of his successor. He shall have general supervision of the educational interest of the State. His duties shall be prescribed by law.

**Section 4.** The Common School Fund, the interest of which shall be exclusively applied to the support and maintenance of Common Schools and purchase of suitable libraries and apparatus therefor, shall be derived from the following sources: The proceeds of all lands that have been or may hereafter be granted to the State by the United States for educational purposes; donations by individuals for educational purposes; appropriations by the State; the proceeds of lands or other property which may accrue to the State by escheat or forfeiture; the proceeds of all property granted to the State, when the purpose of such grant shall not be specified; all monies which may be paid as an exemption from military duty; all fines collected under the penal laws of this State; such portion of the per capita tax as may be prescribed by law for educational purposes; twenty-five per centum of the sales of public lands which are now or may hereafter be owned by the State.

**Section 5.** A special tax of not less than one mill on the dollar of all taxable property in the State, in addition to the other means provided, shall be levied and apportioned annually for the support and maintenance of common schools.

**Section 6.** The principal of the Common School Fund shall remain sacred and inviolate.

**Section 7.** Provision shall be made by law for the distribution of the Common School Fund among the several counties of the State in proportion to the number of children residing therein between the ages of four and twenty-one years.

**Section 8.** Each county shall be required to raise annually by tax, for the support of common schools therein, a sum not less than one-half of the amount apportioned to each county for that year from the income of the Common School Fund. `View Original` Any school district neglecting to establish and maintain for at least three months in each year such school or schools as may be provided by law for such district shall forfeit its portion of the Common School Fund during such neglect.

**Section 9.** The Superintendent of Public Instruction, Secretary of State, and Attorney General shall constitute a body corporate, to be known as the Board of Education of Florida. The Superintendent of Public Instruction shall be president thereof. The duties of the Board of

599

Education shall be prescribed by the Legislature

View Original

## ARTICLE IX.

Homestead.

**Section 1.** A homestead to the extent of one hundred and sixty acres of land, or the half of one acre within the limits of any incorporated city or town, owned by the head of a family residing in this State, together with one thousand dollars worth of personal property, and the improvements on the real estate, shall be exempted from forced sale under any process of law, and the real estate shall not be alienable without the joint consent of husband and wife, when that relation exists. But no property shall be exempt from sale for taxes, or for the payment of obligations constructed for the purchase of said premises, or for the erection of improvements thereon, or for house, field, or other labor performed on the same. The exemption herein provided for in a city or town shall not extend to more improvements or buildings than the residence and business house of the owner.

**Section 2.** In addition to the exemption provided for in the first section of this article, there shall be and remain exempt from sale by any legal process in this State, to the head of a family residing in this State, such property as he or she may select, to the amount of one thousand dollars; said exemption in this section shall only prevent the sale of property in cases where the debt was contracted, liability incurred, or judgment obtained before the 10th day of May, A. D. 1865. Nothing herein contained shall be so construed as to exempt any property from sale for the payment of the purchase money of the same, or for the payment of taxes or labor.

**Section 3.** The exemptions provided for in sections 1 and 2 of this article, shall accrue to the heirs of the party having enjoyed or taken the benefit of such exemption, and the exemption provided for in section 1 of this article shall apply to all debts, except as specified in said section, no matter when or where the debt was contracted, or liability incurred.

View Original

## ARTICLE X.

Public Institutions.

**Section 1.** Institutions for the benefit of the insane, blind, and deaf, and such other benevolent institutions as the public good may require, shall be fostered and supported by the State, subject to such regulations as may be provided by law.

**Section 2.** A State Prison shall be established and maintained in such a manner as may be fixed by law. Provision may be made by law for the establishment and maintenance of a House of Refuge for juvenile offenders, and the Legislature shall have power to establish a Home and Workhouse for common vagrants.

**Section 3.** The respective counties of the State shall provide in the manner fixed by law for those of the inhabitants who by reason of age, infirmity, or misfortune may have claims upon the aid and sympathy of society.

## ARTICLE XI.

Militia.

**600**

**Section 1.** All able-bodied male inhabitants of the State between the ages of eighteen and forty-five years, who are citizens of the United States or have declared their intention to become citizens thereof, shall constitute the Militia of the State; but no male citizen of whatever religious creed or opinion shall be exempt from military duty, except upon such conditions as may be prescribed by law.

**Section 2.** The Legislature shall provide by law for organizing and disciplining the Militia of the State, for the encouragement of volunteer corps, the safe keeping of the public arms, and for a guard for the state prison.

**Section 3.** The Adjutant General shall have the grade of Major General. The Governor, by and with the consent of the Senate, shall appoint two Major Generals and four Brigadier Generals of Militia. They shall take rank according to the **View Original** date of their commissions. The officers and soldiers of the State Militia, when uniformed, shall wear the uniform prescribed for the U. S. Army.

**Section 4.** The Governor shall have power to call out the Militia, to preserve the public peace, to execute the laws of the State, to suppress insurrection or repel invasion.

**View Original**

## ARTICLE XII.

Taxation and Finance.

**Section 1.** The Legislature shall provide for a uniform and equal rate of taxation, and shall prescribe such regulations as shall secure a just valuation of all property both real and personal, excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious, or charitable purposes.

**Section 2.** The Legislature shall provide for raising revenue sufficient to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the principal and interest of the existing indebtedness of the State.

Section 3. No tax shall be levied except in pursuance of law.

**Section 4.** No monies shall be drawn from the Treasury except in pursuance of appropriation made by law.

Section 5. An accurate statement of the receipts and expenditures of the public monies shall be published with the laws of each regular session of the Legislature.

**Section 6.** The Legislature shall authorize the several counties and incorporated towns in the State to impose taxes for county and corporation purposes, and for no other purpose, and all property shall be taxed upon the principle established for State taxation. The Legislature may also provide for levying a special capitation tax and tax on licenses. But the capitation tax shall not exceed one dollar per annum for all purposes, either for State, county, or municipal taxes.

**Section 7.** The Legislature shall have power to provide for issuing State bonds bearing interest, for securing the debt [of this State,] and for the erection of State buildings, support of State institutions, and perfecting public works.

**Section 8.** No tax shall be levied upon persons for the benefit of any chartered company of the State, or for paying the interest on any bonds issued by said chartered companies, or by counties or by corporations, for the above-mentioned purposes.

601

**View Original**

## ARTICLE XIII.

Census and Apportionment.

**Section 1.** The Legislature shall, in the year one thousand eight hundred and seventy-five, and every tenth year thereafter, cause an enumeration to be made of all the inhabitants of the State; and they shall then proceed to apportion the representation among the different counties, giving to each county one Representative at large, and one additional to every one thousand registered voters therein, but no county shall be entitled to more than four Representatives. The Legislature shall also, after every such enumeration, proceed to fix by law the number of Senators which shall constitute the Senate of Florida, and which shall never be less than one-fourth nor more than one-half of the whole number of the Assembly.

**Section 2.** When any Senatorial district shall be composed of two or more counties, the counties of which such district consists shall not be entirely separated by any county belonging to another district, and all counties shall remain as now organized, unless changed by a two-thirds vote of both Houses of the Legislature.

## ARTICLE XIV.

Suffrage and Eligibility.

**Section 1.** Every male person of the age of twenty-one years and upwards, of whatever race, color, nationality, or previous condition, who shall, at the time of offering to vote, be a citizen of the United States, or who shall have declared his intention to become such in conformity to the laws of the United States, and who shall have resided and had his habitation, domicil, home, and place of permanent abode in Florida for one year, and in the county for six months, next pre **View Original** ceding the election at which he shall offer to vote, shall in such county be deemed a qualified elector at all elections under this Constitution. Every elector shall at the time of his registration take and subscribe to the following oath:

I, _____, do solemnly swear that I will support, protect, and defend the Constitution and Government of the United States, and the Constitution and Government of the State of Florida, against all enemies, foreign or domestic; that I will bear true faith, loyalty, and allegiance to the same, any ordinances or resolution of any State Convention or Legislature to the contrary notwithstanding. So help me God.

**Section 2.** No person under guardianship *noa compos mentis*, or insane, shall be qualified to vote at any election, nor shall any person convicted of felony be qualified to vote at any election unless restored to civil rights.

**Section 3.** At any election at which a citizen or subject of any foreign country shall offer to vote, under the provisions of this Constitution, he shall present to the persons lawfully authorized to conduct and supervise such elections, a duly sealed and certified copy of his declaration of intention, otherwise he shall not be allowed to vote; and any naturalized citizen offering to vote, shall produce before said persons lawfully authorized to conduct and supervise the election, the certificate of naturalization, or a duly sealed and certified copy thereof; otherwise he shall not be permitted to vote.

**Section 4.** The Legislature shall have power and shall enact the necessary laws to exclude from every office of honor, power, trust, or profit, civil or military, within the State, and from the right of suffrage, all persons convicted of bribery, perjury, larceny, or of infamous crime, or who shall

602

make or become, directly or indirectly, interested in any bet or wager, the result of which shall depend upon any election; or who shall hereafter fight a duel, or send or accept a challenge to fight, or who shall be a second to either party, or be the bearer of such challenge or acceptance; but the legal disability shall not accrue until after trial and conviction by due form of law.

**Section 5.** In all elections by the Legislature the vote shall be *viva voce*, and in all elections by the people the vote shall be by ballot.

**Section 6.** The Legislature, at its first session after the ratification of this Constitution, shall by law provide for the registration, by the Clerk of the Circuit Court in each county, of all the legally qualified ▐ View Original ▌ voters in such county, and for the returns of elections; and shall also provide that after the completion, from time to time, of such registration, no person not duly registered according to law shall be allowed to vote.

**Section 7.** The Legislature shall enact laws requiring educational qualifications for electors after the year one thousand eight hundred and eighty, but no such laws shall be made applicable to any elector who may have registered or voted at any election previous thereto.

▐ View Original ▌

## ARTICLE XV.

### Schedule.

**Section 1.** That all ordinances and resolutions heretofore passed by any Convention of the people, and all acts and resolutions of the Legislature conflicting or inconsistent with the Constitution of the United States and the statutes thereof, and with this Constitution, and in derogation of the existence or position of this State as one of the States of the United States of America, are hereby declared null and void, and of no effect.

**Section 2.** That all acts and resolutions of the General Assembly, and all official acts of the civil officers of the State, not inconsistent with the provisions of the Constitution and statutes of the United States or with this Constitution, or with any ordinance or resolution adopted by this Convention, and which have not been, and are not by this Constitution annulled, are in force, and shall be considered and esteemed as the laws of the State until such acts or resolutions shall be repealed by the Legislature of the State or this Convention.

**Section 3.** All laws of the State passed by the so-called General Assembly since the 10th day of January, A. D. 1861, not conflicting with the word or spirit of the Constitution and laws of the United States, or with this Constitution, shall be valid. All writs, acts, proceedings, judgments, and decrees of the so-called courts of the State, where actual service was made on the defendant, all executions and sales made thereunder, and all acts, orders and proceedings of the judges of probate, and of executors, administrators, guardians, and trustees, provided they were in conformity with the laws then in force, and did not conflict with the Constitution and laws of the United States and this Constitution, shall be valid; the sales of the property or effects of deceased persons shall not prevent the widow from claiming said property in kind, in whosoever hands the same may be found, when the sale had not been made for the purpose of paying the debts of the deceased, and where other than lawful money in the United States was obtained for said property. Nothing herein contained shall be so construed as to make any one who, as an officer of any court, or who acted under the authority of any court, individually liable, provided they acted strictly in accordance with what was then considered the law of the State, and not conflicting with the Constitution and laws of the United States. All fines, ▐ View Original ▌ penalties, forfeitures, obligations, and escheats heretofore accruing to the State of Florida shall continue to accrue to the use of the State. All recognizances heretofore taken shall remain valid, and all bonds executed to the Governor of the State of Florida, either before or since the 10th day of January, A. D. 1861, or to any other officer of the State in his official capacity, shall be of full force and virtue, for the

uses therein respectively expressed, and may be sued for and recovered accordingly, unless they were contrary to the laws of the United States or to this Constitution, or to any ordinance or resolution adopted by this Convention; also all criminal prosecutions which have arisen may be prosecuted to judgment and execution in the name of the State. All actions at law or suits in chancery, or any proceedings pending in the courts of this State, either prior to or subsequent to the 10th day of January, A. D. 1861, shall continue in all respects valid, and may be prosecuted to judgment and decree. All judgments and decrees rendered in civil causes in any of the courts of the State during the period of time above specified, are hereby declared of full force, validity, and effect; *Provided*, That unless otherwise provided in this Constitution, the statute of limitation shall not be pleaded upon any claim in the hands of any person for the period of time between the 10th day of January, A. D. 1861, and the 25th day of October, A. D. 1865, whether proceedings at law had been commenced before the 25th day of October, 1865, or not; *Provided, further*, That all claims of widows, minors, and decedents which were not barred by the statutes of this State on the 10th day of January, A. D. 1861, shall be considered good and valid for the period of two years from the ratification of this Constitution.

**Section 4.** That State treasury notes, all bonds issued, and all other liabilities contracted by the State of Florida or any county or city thereof, on and after the 10th day of January, A. D. 1861, and before the 25th day of October, A. D. 1865, except such liabilities as may be due to the seminary or school fund, be and are declared null and void, and the Legislature shall have no power to provide for the payment of the same or any part thereof; but this shall not be construed so as to invalidate any authorized liabilities of the State contracted prior to the 10th day of January, A. D. 1861, or subsequent to the 25th day of October, A. D. 1865.

**Section 5.** No money shall ever be appropriated by this state to reimburse purchasers of United States land who purchased the same of the State of Florida.

**Section 6.** All proceedings, decisions, or actions accomplished by civil or military officers acting under authority of the United States subsequent to the 10th day of January, A. D. 1861, and prior to the final restoration of the State to the government of the United States, are hereby declared valid, and shall not be subject to adjudication in the courts of this State, nor shall any person acting in the capacity of a soldier or officer of the United States, civil or military, be subject to arrest for any act performed by him pursuant to authorized **View Original** instructions from his superior officers during the period of time above designated.

**Section 7.** That in all cases where judgments have been obtained against citizens of the State after the tenth day of January, eighteen hundred and sixty-one, and previous to the twenty-fifth day of October, eighteen hundred and sixty-five, and where actual service was not made on the person of any defendant, such defendant not served with process may appear in court within one year after the adoption of this Constitution, and make oath that injustice has been done, and that he or she has a good and valid defense, stating the defense, and upon making such oath and filing said defense the proceedings on the judgment shall cease until the defense is heard.

**View Original**

## ARTICLE XVI.

Miscellaneous.

**Section 1.** Any person debarred from holding office in the State of Florida by the third section [Section 3] of the fourteenth Article [Article XIV] of the proposed amendment to the Constitution of the United States, which is as follows: "No person shall be a Senator or Representative in Congress, or elector of President or Vice President, or hold any office, civil or military, under the United States or under any State, who, having previously taken an oath as a member of Congress, or as an officer of the United States, or as a member of any State Legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid and comfort to the enemies thereof. But

Congress may, by a vote of two-thirds [of each House,] remove such disability," is hereby debarred from holding office in this State; *Provided*, That whenever such disability from holding office shall be removed from any person by the Congress of the United States, the removal of such disability shall also apply to this State, and such person shall be restored in all respects to the rights of citizenship as herein provided for electors.

**Section 2.** Any person elected to the Senate of the United States by the Legislature of this State, or any person elected by the people, or appointed to office by the Governor of the State, or by any officer of the State, under the provisions of the Constitution adopted by the Convention of the people convened on the 25th day of October, A. D. 1865, shall not be empowered to hold such office after the same position or office shall have been filled by election or appointment under the provisions of this Constitution; *Provided*, That all officers holding office under the provisions of the Constitution adopted the 25th day of October, A. D. 1865, and not provided for in this Constitution, shall continue to hold their respective offices, and discharge the duties thereof, until the Governor shall, by his proclamation, declare such offices vacant.

**Section 3.** The several Judicial Circuits of the Circuit Courts shall be as follows: The First Judicial Circuit shall be composed of the counties of Escambia, Santa Rosa, Walton, Holmes, Washington, and Jackson; the Second Judicial Circuit shall be composed of the counties of Gadsden, Liberty, Calhoun, Franklin, Leon, Wakulla, and Jefferson; the Third Judicial Circuit shall be composed of the counties of Madison, Taylor, Lafayette, Hamilton, Suwannee, and Columbia; the Fourth Judicial Circuit shall be composed of the counties of Nassau, Duval, Baker, Bradford, Clay, and St. Johns; the Fifth Judicial Circuit shall be composed of the counties of Putnam, Alachua, Levy, Marion, and Sumter; the Sixth Judicial Circuit shall be composed of the counties of Hernando, Hillsborough, Manatee, Polk, and Monroe; the Seventh Judicial Circuit shall be composed of the counties of Volusia, Brevard, Orange, and Dade.

**Section 4.** The salary of the Governor of the State shall be five thousand dollars per annum; that of the Chief Justice shall be four thousand five hundred dollars; that of each Associate Justice shall be four thousand dollars; that of each Judge of the Circuit Court shall be three thousand five hundred dollars; that of the Lieutenant Governor shall be two thousand five hundred dollars; that of each Cabinet Officer shall be three thousand dollars. The pay of the members of the Senate and House of Representatives shall be five hundred dollars per annum, and in addition thereto ten cents per mile for each mile travelled from their respective places of residence to the Capital, and the same to return. But such distances shall be estimated by the shortest general thoroughfare. All other officers of the State shall be paid by fees or per diem fixed by law.

**Section 5.** The Legislature shall appropriate two thousand dollars each year for the purchase of such books for the Supreme Court Library as the said Court shall direct.

**Section 6.** The salary of each officer shall be payable quarterly upon his own requisition.

**Section 7.** The tribe of Indians located in the southern portion of the State, and known as the Seminole Indians, shall be entitled to one member in each House of the Legislature. Such member shall have all the rights, privileges, and remuneration as other members of the Legislature. Such members shall be elected by the members of their tribe, in the manner prescribed for all elections by this Constitution. The tribe shall be represented only by a member of the same, and in no case by a white man; *Provided*, That the Representatives of the Seminole Indians shall not be a bar to the representation of any county by the citizens thereof.

**Section 8.** The Legislature may, at any time, impose such tax on the Indians as it may deem proper; and such imposition of tax shall constitute the Indians citizens, and they shall thenforward be entitled to all the privileges of other citizens, and thereafter be barred of special representation.

**Section 9.** In addition to other crimes and misdemeanors, for which an officer may be impeached and tried, shall be included drunkenness and other dissipations. Incompetency, malfeassance in office, gambling, or any conduct detrimental to good morals, shall be considered sufficient cause for impeachment and conviction. Any officer when impeached by the Assembly shall be deemed

**605**

under arrest, and shall be disqualifed from performing any of the duties of his office until acquittal by the Senate. But any officer so impeached and in arrest may demand his trial by the Senate within one year from the date of his impeachment.

**Section 10.** The following shall be the oath of office for each officer in the State, including members of the Legislature: "I do solemnly swear that I will support, protect, and defend the Constitution and government of the United States, and of the State of Florida, against all enemies, domestic or foreign, and that I will bear true faith, loyalty, and allegiance to the same, and that I am entitled to hold office under this constitution. That I will well and faithfully perform all the duties of the office of _____, on which I am about to enter. So help me God."

**Section 11.** The Legislature may provide for the donation of the public lands to actual settlers. But such donation shall not exceed one hundred and sixty acres to any one person.

**Section 12.** All county officers shall hold their respective offices at the county seats of their counties.

**Section 13.** The Legislature shall provide for the speedy publication of all statutes and laws of a general nature. All decisions of the Supreme Court, and all laws and judicial decisions shall be free for publication by any person. But no judgment of the Supreme Court shall take effect and be operative until the opinion of the court in such case shall be filed with the clerk of said court.

**Section 14.** The Legislature shall not create any office, the term of which shall be longer than four years.

**Section 15.** The Governor, Cabinet, and Supreme Court shall keep their offices at the seat of government. But in case of invasion or violent epidemics, the Governor may direct that the offices of the government shall be removed temporarily to some other place. The session of the Legislature may be adjourned for the same cause to some other place; but in such case of removal all the departments of the government shall be removed to one place. But such removal shall not continue longer than the necessity for the same shall continue.

**Section 16.** A plurality of votes given at any election by the people shall constitute a choice when not otherwise provided by this Constitution.

**Section 17.** The term of the State officers elected at the first election under this Constitution, not otherwise provided for, shall continue until the first Tuesday of January, A. D. 1873, and until the installation of their successors, excepting the members of the Legislature.

**Section 18.** Each county and incorporated city shall make provision for the support of its own officers, subject to such regulations as may be prescribed by law. Each county shall make provision for building a court house and jail, and for keeping the same in good repair.

**Section 19.** If, at the meeting of the senate at any session, the Lieutenant Governor has not been qualified or is not present, the Senate shall elect one of its members as temporary President before proceeding to other business.

**Section 20.** The Legislature shall, at the first session, adopt a seal for the State, and such seal shall be of the size of the American silver dollar. But said seal shall not again be changed after its adoption by the Legislature; and the Governor shall, by his proclamation, announce that said seal has become the Great Seal of the State.

**Section 21.** The Governor, Lieutenant Governor, and all the State officers elected by the people, shall be installed on the first day of the meeting of the Legislature, and immediately assume the duties of their respective offices.

**606**

**Section 22.** The Governor and Lieutenant Governor shall have been, before their election to office, nine years citizens of the United States, and three years citizens of the State. All other officers shall have been one year citizens of the State, and six months citizens of the county from which they are elected or appointed. No person shall be eligible to any office unless he be a registered voter.

**Section 23.** The Governor, or any State officer, is hereby prohibited from giving certificates of election or other credentials to any person as having been elected to the House of Representatives of the United States Congress, or the United States Senate who has not been two years a citizen of the State, and nine years a citizen of the United States, and a registered voter.

**Section 24.** The property of all corporations, whether heretofore or hereafter incorporated, shall be subject to taxation, unless such corporation be for religious, educational, or charitable purposes.

[ View Original ]

**Section 25.** All bills, bonds, notes, or evidences of debt, outstanding and unpaid, given for or in consideration of bonds or treasury notes of the so-called Confederate States, or notes and bonds of this State, paid and redeemable in the bonds or notes of the Confederate States, are hereby declared null and void, and no action shall be maintained thereon in the courts of this State.

**Section 26.** It shall be the duty of the courts to consider that there is a failure of consideration, and it shall be so held by the courts of this State, upon all deeds or bills of sale given for slaves, with covenant or warranty of title or soundness, or both upon all bills, bonds, notes, or other evidences of debt, given for or in consideration of slaves, which are now outstanding and unpaid, and no action shall be maintained thereon; and all judgments and decrees rendered in any of the courts of this State since the 10th day of January, A. D. 1861, upon all deeds or bills of sale, or upon any bond, bill, note, or other evidence of debt based upon the sale or purchase of slaves, are hereby declared set aside, and the plea of failure of consideration shall be held a good defense in all actions to said suit; and when money was due previous to the 10th day of January, A. D. 1861, and slaves were given in consideration for such money, these shall be deemed a failure of consideration for the debt; *Provided,* That settlements and compromises of such transactions made by the parties thereto shall be respected.

**Section 27.** All persons who, as alien enemies under the sequestration act of the so-called Confederate Congress, and now resident of the State, had property sequestered and sold by any person acting under a law of the so-called Confederate States, in the State of Florida, subsequent to the 10th day of January, A. D. 1861, and prior to the first day of May, A. D. 1865, shall be empowered to file a bill in equity in the Circuit Court of the State, and shall be entitled to obtain judgment against the State for all damages sustained by said sale and detention of property. The Court shall estimate the damages upon the assessed valuation of the property in question in the year A. D. 1860, with interest at six per cent. from the time the owner was deprived of the same. But all judgments against the State shall be paid only in certificates of indebtedness, redeemable in State lands. Said certificates shall be issued by the Governor, countersigned by the Secretary of State and by the Comptroller, upon the decree of the court. Oral testimony shall be sufficient to establish the fact of a sale having been made.

**Section 28.** There shall be no civil or political distinction in this State on account of race, color, or previous condition of servitude, and the Legislature shall have no power to prohibit, by law, any class of persons on account of race, color or previous condition of servitude, to vote or hold any office, beyond the conditions prescribed by this Constitution.

**Section 29.** The apportionment for the Assembly shall be as follows: Escambia two, Santa Rosa one, Walton one, Holmes one, Washington one, Jackson three, Calhoun one, Gadsden two, Franklin one, Liberty one, Wakulla one, Leon four, Jefferson three, Madison two, Taylor one, Hamilton one, Suwannee one, Lafayette one, Alachua two, Columbia two, Baker one, Bradford

one, Nassau one, Duval two, Clay one, St. Johns one, Putnam one, Marion two, Levy one, Volusia one, Orange one, Brevard one, Dade one, Hillsborough one, Hernando one, Sumter one, Polk one, Manatee one, and Monroe one. There shall be twenty-four Senatorial districts, which shall be as follows, and shall be known by their respective numbers, from one to twenty-four inclusive:

The first Senatorial District shall be composed of [View Original] Escambia county, the second of Santa Rosa and Walton, the third of Jackson, the fourth of Holmes and Washington, the fifth of Calhoun and Franklin, the sixth of Gadsden, the seventh of Liberty and Wakulla, the eighth of Leon, the ninth of Jefferson, the tenth of Madison, the eleventh of Hamilton and Suwannee, the twelfth of Lafayette and Taylor, the thirteenth of Alachua and Levy, the fourteenth of Columbia, the fifteenth of Bradford and Clay, the sixteenth of Baker and Nassau, the seventeenth of St. Johns and Putnam, the eighteenth of Duval, the nineteenth of Marion, the twentieth of Volusia and Orange, the twenty-first of Dade and Brevard, the twenty-second of Hillsborough and Hernando, the twenty-third of Sumter and Polk, the twenty-fourth of Manatee and Monroe, and each Senatorial District shall be entitled to one Senator.

**Section 30.** No person shall ever be appointed as a judge of the Supreme Court or Circuit Court, who is not twenty-five years of age, and a practicing attorney in this State.

**Section 31.** The Legislature shall, as soon as convenient, adopt a State Emblem having the design of the Great Seal of the State impressed upon a white ground of six feet six inches fly and six feet deep.

## ARTICLE XVII.

### Amendments.

**Section 1.** Any amendment or amendments to this Constitution may be proposed in either branch of the Legislature, and if the same shall be agreed upon by a two-thirds vote of all the members elected to each of the two Houses, such proposed amendment or amendments shall be entered on their respective journals, with the yeas and nays thereon, and referred to the Legislature then next to be chosen, and shall be published for three months next preceding the time of making their choice, and if in the Legislature next chosen, as aforesaid, such proposed amendment or amendments shall be agreed to by a two-thirds vote of all the members elected to each House, then it shall be the duty of the Legislature to submit such proposed amendment or amendments to the people, in such manner and at such time as the Legislature may prescribe, and if the people shall approve and ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the Legislature voting thereon, such amendment or amendments shall become a part of the Constitution.

**Section 2.** If at any time the Legislature, by a vote of a majority of all the members elected to each of the two Houses, shall determine that it is necessary to cause a revision of this entire Constitution, such determination shall be entered upon their respective journals, with the yeas and nays thereon, and referred to the Legislature then next to be chosen, and shall be published for three months next preceding the time of making such choice. And if in the Legislature next chosen aforesaid, such proposed revision shall be agreed to by a majority of all the members elected to each House, then it shall be the duty of the Legislature to recommend to the electors of the next election for members of the Legislature, to vote for or against a Convention; and if it shall appear that a majority of the electors, voting at such election, shall have voted in favor of calling a Convention, the Legislature shall, at its next session, provide by law for a Convention, to be holden within six months after the passage of such law, and such Convention shall consist of a number of members not less than both branches of the Legislature. In determining what is a majority of the electors voting at such election, reference shall be had to the highest number of votes cast at such election for the candidates for any office or [on] any question.

Horatio Jenkins, Jr., *President.*

Sherman Conant, *Secretary.*

View Original

Done in open Convention. In witness whereof, we, the undersigned, President of said Convention and delegates, present, representing the people of the State of Florida, do hereby sign our names, this, the twenty-fifth day of February, Anno Domini one thousand eight hundred and sixty-eight, and of the independence of the United States of America the ninety-second year—and the Secretary of said Convention doth countersign the same.

HORATIO JENKINS, Jr., *President.*

Countersigned by Sherman Conant, Secretary.

Those signing the Constitution were:

Ossian B. Hart, L. C. Armistead, William Bradwell, E. Fortune, J. T. Walls, Homer Bryan, N. C. Dennett, John W. Powell, John Wyatt, A. G. Bass, Green Davidson, R. Meacham, Richard H. Wells, Jesse H. Goss, J. E. Oates, Abram Chandler, Major Johnson, W. Rogers, W. J. Purman, S.B. Conover, J. E. A. Davidson, Auburn Erwin, M. L. Stearns, C. R. Mobley, Fred Hill, Jonathan C. Gibbs, J. W. Childs, John W. Butler, Thos. Urquhart, George J. Alden, Andrew Shuler, Lyman Rowley, David W. Mizell, John. L. Campbell, Anthony Mills, Roland T. Rombauer, T. W. Osborn, W. R. Cone, O. B. Armstrong, B. M. McRae, John N. Krimminger, Samuel J. Pearce, Wm. K. Cessna, Elbridge L. Ware.

## ORDINANCES

View Original

No. 1

An Ordinance declaring the Ordinance of Secession Null and Void.

Be it Ordained by the People of Florida, in Convention assembled, That the Ordinance adopted by the Convention of the people assembled on the 10th day of January, A. D. 1861, and known as the Ordinance of Secession, is hereby declared null and void from the beginning, and of no effect.

Passed in open Convention, February 21, A. D. 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

View Original

No. 2

An Ordinance for the Relief of the People of Florida.

Be it Ordained by the People of Florida in Convention assembled, That from and after the passage of this Ordinance it shall not be lawful for any sheriff or other officer of the State to sell, under execution or other legal process in the State, any property, real or personal, and any sale so made shall be null and void. That the collection of all taxes, State, county, and municipal, shall be suspended; that all persons now in confinement for the non-payment of taxes shall be forthwith released, and any State officer refusing to release such persons now in confinement shall be guilty of felony, and be subject to legal process and punishment therefore. That all constitutional provisions, ordinances, statutes, or parts of statutes, and all laws conflicting with the provision of this Ordinance, are hereby suspended; but nothing in this Ordinance shall be construed so as to prevent the return of property to its rightful
owner upon legal process; Provided, That this Ordinance, or any provision therein, shall not prevent the collection of debts due or to become due as wages for actual labor performed by any house, field, or other laborer; that the Legislature shall be empowered to alter, amend, or abolish

this Ordinance in its discretion.

Passed in open Convention, January 21, A. D. 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

**View Original**

No. 3
An Ordinance for the Compilation of all the Laws of England.

Be it Ordained by the People of the State of Florida in Convention assembled, That the Governor elected under this Constitution is authorized and directed to employ three men learned in the law, and familiar with its practice, to make a complete and accurate Digest of all the laws in Florida in force, of a general nature, embracing the Territorial and State laws inclusive, of the Acts of the Legislature previous to the work being submitted to the Governor as hereinafter provided in this Ordinance. Such Digest shall be in the form and upon the plan of "Brightley's Digest" of the Statutes of the United States, and shall contain the Constitution of the United States and of the State.

2d. Such board shall be directed to review the manuscript work prepared by LESLIE A. THOMPSON, containing the Laws of England, now in force in the State, and if such work shall be found of sufficient value, said board shall correct or abbreviate the same as they may deem proper.

3d. Said board shall be directed to edit all the reports of the Supreme Court of the State since its organization; to prepare a full index of the opinions of said Court, with such notes as may be deemed necessary for the elucidation of the same; also [to] prepare for publication, with the reports, the several Constitutions of the State, and their respective amendments, under which the opinions reported were made.

4th. Said board shall also be directed to compile all the local and private acts and resolutions still in force.

5th. Said board shall be directed to prepare a code of practice for the county courts, defining definitely the rules and power of said courts; the mode and limitation of punishment; all forms necessary for the use of said courts, and any and all other instructions that may be necessary for the complete exercise of the jurisdiction thereof, whether in criminal, civil, or probate capacity.

6th. Said board shall be directed to prepare a code for the practice of justices of the peace, setting forth their power and jurisdiction and defining their duties under the provisions of the Constitution and acts of the Legislature; also all forms necessary for the use thereof.

7th. In the Digest of the general laws, local and private acts and resolutions, all useless verbiage or superfluous matter, and all that has a tendency to mystify and obscure the true meaning of any act or section thereof, shall be carefully omitted; the whole to be accompanied with marginal notes and references and with a suitable index.

8th. Whenever the works above designated, or any one of them, shall have been completed, they or it shall be submitted by the Governor to the justices of the Supreme Court, by whom they shall be reviewed, and if necessary, amended, and thereafter said work shall be [the] law and rules of practice respectively, unless they are afterwards repealed or altered by the Legislature.

9th. The Governor is further authorized and directed to make the necessary contracts for the publication of the aforesaid works. Of the Digest of the laws there shall be printed and bound five hundred copies; of the English Law five hundred; of the Reports of the Supreme Court five hundred; of the Local and Private Acts and Resolutions five hundred; of the Code of Practice of County Courts five hundred; and of the Code of Practice of Justices of the Peace five hundred copies.

10th. The Legislature is hereby authorized and directed to provide the necessary means for the compensation of the members of the aforesaid board, and for defraying all expenses of publication, and provide by law for such distribution of the works aforesaid as may be deemed proper and necessary, to the officers of the State and several counties, and for exchange with other States.

11th. The aforesaid works, until disposed of by action of the Legislature, shall remain in the custody of the State Librarian.

12th. The aforesaid works shall be compiled in accordance with the provisions of this Constitution, except in those cases where there are express provisions to the contrary.

**610**

Passed in open Convention, February 21, A. D. 1868.

**View Original**

No. 4

An Ordinance in relation to certain suits judgments &c., in the civil courts of this State.

Be it ordained by the people of the State of Florida in Convention assembled, That all suits heretofore commenced in any of the civil courts of this State during the war between the United States and the so-called Confederate Sates, and any and all judgments, orders, or decrees of said courts, rendered or entered up against any person or persons, any one of whom at the commencement of said suit, or during the pending thereof, was beyond the reach and jurisdiction of said courts by reason of the war between the United States and the so-called Confederate States, and hereby declared to be null and void, and of no effect whatever, and all writs, executions, and sales founded on said judgments are also hereby declared void; Provided, That nothing in this ordinance shall be construed to prevent the plaintiff in such cases from commencing their suits anew.

Passed in open Convention, February 21, A. D. 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

**View Original**

No. 5

An Ordinance to provide the Means of Defraying the Expenses of this Convention.

Be it ordained by the people of Florida in Convention assembled, That this Convention does hereby levy and assess a tax of one-fifth of one per cent. on all the taxable property of this State for the purpose of defraying the expenses of this Convention, and the compensation of officers and members thereof; and it shall be the duty of the tax collector in the several counties in this State to collect the tax so assessed, on or before the first day of January, A. D. 1869, and to pay the same to the Treasurer of the State immediately upon the collection thereof, and that the collector shall collect the same in accordance with the laws of the State of Florida for the collection of State taxes.

SEC. 2. Be it further ordained, That the Comptroller shall issue to the tax collectors all necessary orders for the collection and payment of the aforesaid tax, which order shall be binding upon said tax collectors.

SEC 3. Be it further ordained, That the tax collectors shall receive the same per cent. as they are now allowed by law for collecting the State tax.

SEC. 4. Be it further ordained, That the Governor of this State is hereby empowered and authorized to issue bonds bearing eight per cent. interest per annum, payable upon the first day of March, A. D. 1869, in such sums as he may deem expedient, not exceeding in amount thirty thousand dollars, which shall be redeemed out of the proceeds of said special tax when collected, and the financial agent, for the purpose of defraying the immediate expenses of this Convention, is hereby empowered to dispose of the said bonds, and to pay from the proceeds thereof such accounts as may be audited by the finance committee, and deposit the balance, if any, with the Treasurer of the State.

SEC 5. Be it further ordained, That the Governor of the State of Florida is hereby requested, authorized, and directed to issue certificates of indebtedness to the full amount of ten thousand dollars, which certificates of indebtedness shall be receivable for the tax levied under this ordinance, and all State dues; such certificates shall bear the impress of the seal of the State Treasurer, and shall be in such amounts as the Governor may deem expedient.

Passed in open Convention, February 21, A. D. 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

**View Original**

611

**No. 6.**

An Ordinance to provide for the Repeal of Unequal Taxation.

WHEREAS, The General Assembly of the Provisional Government of Florida passed an Act entitles "An Act concerning Schools for Freedmen," approved January 16th, 1866, whereby a tax of one dollar each is assessed and levied upon all male persons of color between the ages of twenty-one years and fifty-five, and the proceeds of which are denominated a common school fund for the education of freedmen; AND WHEREAS, The said tax so unequally, discriminatingly, and injuriously levied and collected, has failed to result in any benefit in the least to those for whose education it was claimed to have been enacted, and is imposed in violation of public and impartial justice, and that civil and political equality which is now the inalienable franchise and birthright of every citizen of the State, without regard to race, color, or previous condition; therefore, Be it Ordained by the People of Florida in Convention assembled, That so much of said Act as provides for the assessment and levy of one dollar each upon all male persons of color between the ages of twenty-one and fifty-five, be and the same is hereby repealed, and all further assessment and collection of said tax shall be and the same is hereby estopped and prohibited.

Passed in open Convention, February 22, A. D. 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

**View Original**

**No. 7**

An Ordinance to provide for the Protection and Purity of Elections.

Be it Ordained by the People of Florida in Convention assembled, That no person shall give, or offer to give, directly or indirectly, any bribe, present, or reward, or any private benefit or promise of such benefit whatever, to induce any voter to refrain from casting his vote, or to prevent him in any way from voting, or to procure or attempt to procure him to vote for any particular candidate or candidates at any election in this State, and the person so giving, or offering to give, and the person receiving the same, and any person who gives, or causes to be given, an illegal vote, knowing it to be such, at any election in this State, shall, on conviction in a court of law, be fined not exceeding three hundred dollars for each offense, or be imprisoned not exceeding six months; and either party to such unlawful bargain or agreement may make complaint or commence prosecution, and appear in evidence against the other, and thereby absolve himself from all penalty in said case; And further, No person shall threaten or intimidate in any way, or injure any elector on account of the manner in which he may have voted, or be expected to vote, or to knowingly deceive or mislead any elector in relation to the time or place of holding any election, or in the name or political affiliation of any candidate at any election in the State; and any person violating this provision shall, upon conviction thereof, be fined not less than five hundred dollars for each offense, or be imprisoned for not less than one year; Provided, That the legislature shall have power at any time to change, amend, or repeal this Ordinance.
And be it further ordained, That the President of this Convention immediately furnish fifty printed copies of this Ordinance to the sheriff of each county in the State, who shall publish and post the same throughout his county for four weeks previous to the next election.

Passed in open Convention, February 22d, A. D. 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

**View Original**

**No. 8**

An Ordinance Abolishing County Criminal Courts.

Be it Ordained by the People of Florida in Convention assembled, That from and after the passage of this ordinance, the County Criminal Courts of this State shall be abolished, and all fees, costs, and charges of every kind whatsoever, due or to become due, to any justice of the peace,

constable, clerk of circuit court, or of the county criminal court, sheriff, or any officer of this State, for services, issuing warrants, arresting accused, preparing docket and papers, confining prisoners, or for any service whatever, in and about said county criminal court, are declared illegal and void, and fully satisfied and extinguished; and it shall not be lawful for any Board of County Commissioners of this State, or any Treasurer, State or county, to allow or pay out any money or moneys for any such services; Provided, A small allowance, not to exceed the actual cost of the provisions, shall be allowed for the feeding of accused defendants and prisoners, bound over to or fined in said county criminal courts, and nothing shall be so construed as to deprive judges and solicitors of their fees.

Be it further ordained, That all fines, penalties, and disabilities ordered, entered up, or created in said county criminal courts are hereby rescinded and removed; all prisoners found guilty in said county criminal courts are hereby pardoned and released, and all judgments, executions, bonds, and recognizances, now outstanding and unsatisfied, originating or created in said courts, are hereby declared null, void, and paid off.

Be it further ordained, That all cases now pending in said court shall be transferred to the circuit court, and the officer transferring them to said circuit court shall be allowed the regular fees now allowed for such services.

Passed in open Convention, February 24th, 1868.
HORATIO JENKINS, JR., President.
SHERMAN CONANT, Secretary.

**View Original**

### No. 9

An Ordinance to Provide for submitting the Constitution to the People for Ratification.

Be it Ordained by the people of Florida, in Convention assembled, That the Constitution framed by this Convention, and signed on the 25th day of February, A. D. 1868, be and the same is hereby submitted for ratification to the persons registered and to be registered under the provisions of the several acts of Congress, entitled "An Act to provide for the more efficient government of the rebel States, passed March 2d, 1867; An Act supplementary to An Act entitled An Act to provide for the more efficient government of the rebel States, passed March 2d, 1867, and to facilitate restoration; An Act supplementary to An Act entitled An Act to provide for the more efficient government of the rebel States, passed on the 2d day of March, 1867; and the act supplementary thereto, passed on the 23d day of March," at an election to be conducted according to the provisions of the said acts of Congress.

Be it further ordained, That an election shall be held in various counties of this State, on the first Monday, Tuesday, and Wednesday of May, A. D. 1868, for the purpose of voting on the ratification of the Constitution framed by this Convention, and for the election of a Governor, Lieutenant-Governor, one member of Congress, State Senators and Representatives, and county officers; and that the judges or inspectors of election appointed, or to be appointed, by the Commanding General of the Third Military District, to conduct and supervise the election for ratification, as provided in the several aforesaid acts of Congress, shall also conduct and supervise the election for said officers.

Be it further ordained, That at each place of voting, beside the ballot box provided by the said judges of election to receive the ballots for and against ratification, the said judges shall provide a separate ballot box for the reception of ballots for Governor, Lieutenant-Governor, Member of Congress, State Senators and Representatives, and County officers, and that a separate poll list shall be prepared by said judges of election of all persons qualified to vote for said officers; and all persons qualified to vote under the provisions of the Constitution shall be allowed to vote for said officers.

Be it further ordained, That the vote for Governor, Lieutenant-Governor, Member of Congress, State Senators and Representatives, and County officers, shall be securely enveloped and sealed by the judges of election, and transmitted by prompt and sage conveyance to the city of Tallahassee, and delivered to a Board of Canvassers of three persons herby appointed and authorized, to wit: Hon. Horatio Jenkins, Jr., President of Constitutional Convention; Auburn Erwin, of Columbia County, and O. Morgan, of Leon County, within thirty days after said election; and the said Board of Canvassers shall meet at Tallahassee within ten days after said election and canvass the votes for said officers; and the said Board of Canvassers shall issue the

certificates of election under their hands and seals and the said Board of Canvassers shall make public proclamation of said returns in at least three of the newspapers published in this State, showing what persons shall have been elected to said offices severally; and thereupon the Governor of the State, and the Lieutenant-Governor thereof elected, shall assemble at the Capitol and be sworn into office by the Judge of the District Court of the United States, or in his absence by any person authorized by the laws of the United States to administer oaths.

Be it further ordained, That a public notice containing this ordinance, signed by the President and Secretary of this Convention, shall be issued on the day after the final adjournment of this Convention, and shall be published in at least three of the newspapers in this State.

Be it further ordained, That the persons who shall act as judges or inspectors of election, together with one clerk in each county, to be by them appointed, shall each receive five dollars per day for their services in conducting, supervising, and making out the returns of the election for said officers, and the legislature at its first session shall provide by law for the payment of the expenses to be incurred thereby, and for any and all expenses incurred under any by virtue of the provisions of this ordinance.

Passed in open Convention, February 24th, A. D. 1868.

HORATIO JENKINS, JR., President.

SHERMAN CONANT, Secretary.

**View Original**

**No. 10**

An Ordinance to inquire into the Condition of the Union Bank of Florida.

Be it Ordained by the People of Florida in Convention assembled, That it shall be the duty of the first Governor elected under this Constitution, to appoint a committee of not less than three persons to inquire into the condition, liabilities, and assets of the Union Bank of Florida, and as to the liability of the State of Florida, or of the United States, as security for and upon the bonds of said Union Bank.

Passed in open Convention, February 24th, 1868.

HORATIO JENKINS, JR., President.

S. CONANT, Secretary.

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2002, I caused true copies of the foregoing to be served via facsimile and overnight delivery on the following counsel:

Nancy Northup
Jessie Allen
Brennan Center for Justice
at New York University School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
Phone: 212.998.6735
Facsimile: 212.995.4550

*Lead Counsel for Plaintiffs*

Ron Labasky
General Counsel for Supervisors of
Elections
P.O. Box 669
Tallahassee, FL 32302
Phone: 850.222.3730
Facsimile: 850.224.6422

David Wagner
Robert Livingston
Alachua County Attorney's Office
P.O. Box 2877
Gainesville, FL 32602
Phone: 352.374.5218
Facsimile: 352.374.5216

Robert Buschel
Buschel, Carter, Schwarzreich & Yates
201 S.E. 8th Street
Fort Lauderdale, FL 33316-1013
Phone: 954.525.8000
Facsimile: 954.525.8331

H. Ray Allen II
Mary Helen Campbell, Rebecca M. Kert
Attorneys for Defendant Pam Iorio
P.O. Box 1110
Tampa, FL 33601
Phone: 813.272.5670
Facsimile: 813.272.5846

Robert A. Ginsberg
Jeff Ehrlich
Miami-Dade County Attorney
Stephen P. Clark Center, Suite 2810
111 N.W. 1st Street
Miami, FL 33128-1993
Phone: 305.375.5151
Facsimile: 305.375.5611

Betsy M. Steg
Office of the County Attorney
Pinellas County
315 Court Street
Clearwater, FL 33756
Phone: 727.464.3354
Facsimile: 727.464.4147

Samuel S. Goren
Michael D. Cirullo, Jr.
Josias, Goren, Cheroff, Doody & Ezrol, P.A.
3099 E. Commercial Blvd., Suite 200
Fort Lauderdale, FL 33308
Phone: 954.771.4500
Facsimile: 954.771.4923

James K. Green
Nina Zollo
James K. Green, P.A.
Suite 1630, Esperante'
222 Lakeview Ave.
West Palm Beach, FL 33401
Phone: 561-659-2029
Fasimile: 561-655-1357

Anita Hodgkiss
Lori Outzs Borgen
Lawyers' Committee for Civil Rights Under
Law
1401 New York Ave., NW, Suite 400
Washington, DC 20005-2124
Facsimile: 202-783-5130

*Stephanie Sherman*
Stephanie Sherman