UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

-------------------------------------------------------x

THOMAS JOHNSON, et al.,       )      00-3542-CIV-King
                   )

         Plaintiffs,      )
                   )

     v.                )
                   )

JEB BUSH, et al.,         )
                   )

         Defendants.    )
                   )

-------------------------------------------------------x

**NIGHT BOX
FILED**

**JAN 1 8 2002**

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
## FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANTS CLEMENCY BOARD
## MEMBERS' MOTION FOR SUMMARY JUDGEMENT

Anita Hodgkiss
Lori Outzs Borgen
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER THE LAW
1401 New York Ave., NW, Suite 400
Washington, DC  20005-2124
(202) 662-8600

Nancy Northup
Jessie Allen
Kim Barry
BRENNAN CENTER FOR JUSTICE at
  New York University School of Law
161 Ave. of the Americas, 12th Floor
New York, NY  10013
(212) 998-6730
*Lead Counsel for Plaintiffs*

James K. Green
Nina Zollo
JAMES K. GREEN, P.A.
250 Australian Ave. So. , Suite 1602
West Palm Beach, FL  33401
(561) 659-2029

James E. Johnson
Michelle N. Kim
M. Lorrane Ford
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY  10104
(212) 468-8000

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... iv

Introductory Statement .................................................................................................... 1

Statement of Facts ........................................................................................................... 3

    1.    Florida's Denial of the Vote to Ex-Felons Has Reached Historic Levels, Excluding 5% of the Electorate, Disproportionately Excluding African Americans, and Altering the Outcome of Elections. ................................. 3

    2.    The Racial Disproportionality in Florida's Ex-Felon Population Results from Complex Social and Historical Factors, Including Intentional Race Discrimination. ........................................................................................... 4

        1.    Florida's ban on ex-felon voting was first enacted in 1868 with a racially discriminatory intent that was not confronted or rejected in subsequent constitutions. ........................................................................... 4

        2.    Florida's criminal justice system itself has a long history of race discrimination. .................................................................................. 6

        3.    Today, Florida's criminal justice system has a racially discriminatory impact on African Americans. ................................................................. 7

        4.    African Americans continue to be disproportionately affected by limited education and employment opportunities, poverty, and residency in depressed areas, all of which are positively correlated with criminal convictions and are the effects of past official racial discrimination. ......... 9

        5.    Florida's electoral process reflects past and present race discrimination, including racially polarized voting, racial campaign appeals, limited success in attaining public office, and purging of purported ex-felons..... 10

Argument ........................................................................................................................ 12

1.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIM OF INTENTIONAL RACE DISCRIMINATION. ....................................................................................... 12

    A.    This Court Should Discount All Evidence from Defendants' Expert deHaven-Smith Due to His Serious Errors of Material Fact, His Lack of Qualifications in the Field, and His Reliance on Ghost Writers to Draft Key Sections of His Expert Report ...................................................... 12

1.      Florida's Felon Disenfranchisement Provision Was Adopted with Racially Discriminatory Intent...................................................................................13

2.      Contrary to Defendants' Misstatement of the Law, the Felon Disenfranchisement Clause Adopted in the 1868 Constitution Worked a Dramatic Expansion in the Categories of Crime That Trigger Disenfranchisement...............................................................................15

3.      The Existence of Narrower Criminal Disenfranchisement Provisions in Florida's Early Constitutions Is Irrelevant to the Discriminatory Enactment of the Expanded Felon Disenfranchisement Provision in the 1868 Constitution.....................................................................................17

4.      Defendants Have Failed to Show That the 1968 Reenactment Cleansed Florida's Felon Disenfranchisement Provision of the Taint of Racial Discrimination..................................................................................18

          1.      There is no evidence that the 1968 reenactment created a new felon disenfranchisement policy or substantively reexamined the blanket ban on voting by felons carried over from the 1868 constitution.........................................................................18

          2.      There was no deliberative review of felon disenfranchisement in 1968.....................................................................................19

F.      The Minor Semantic Revisions to the Felon Disenfranchisement Provision in 1968 Do Not Exempt the Provision from the Clear Rule of *Hunter v. Underwood*.....................................................................20

          3.      Courts routinely look to previous versions of a statute to discern the legislative intent of subsequent laws..................................21

          4.      In determining discriminatory legislative intent, the same principle applies of examining the intent of predecessor statutes............22

II.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR VOTING RIGHTS ACT CLAIM.....................................................................................22

1.      Defendants' Brief Obscures the Practical, Comprehensive Standard of Proof in a Vote Denial Claim under Section 2 of the Voting Rights Act.............23

2.      Defendants Have Mischaracterized the Proof on Which Plaintiffs Rest Their Voting Rights Claim............................................................23

1.  Plaintiffs have brought significant, undisputed historical evidence of intentional discrimination. ..................................................................... 24

2.  Plaintiffs' statistical evidence of discriminatory impact is proof of intentional race discrimination and systemic racial bias....................... 25

3.  Plaintiffs Intend to Bring Additional Evidence Linking the Discriminatory Impact of Florida's Felon Disenfranchisement Scheme to Racial Bias. .............. 28

4.  An Analysis of the Totality of Circumstances Shows That Plaintiffs Have Proven a Violation of Section 2. ......................................................... 29

5.  Given All of Plaintiffs' Evidence Linking Felon Disenfranchisement to Racial Bias, No Issue of Congressional Power Under Section 2 Is Raised........... 29

III.  THE ENORMOUS NUMBERS AND SIGNIFICANT PERCENTAGE OF THE FLORIDA ELECTORATE DISENFRANCHISED AS EX-FELONS VIOLATE THE RIGHT TO VOTE UNDER THE FIRST AND FOURTEENTH AMENDMENTS. ................................................................ 31

1.  *Ramirez* Did Not Endorse Every Possible Felon Disenfranchisement Scheme, No Matter What Its Purpose or Effect. ...................................... 31

2.  The Severe Burdens Imposed by Florida's Disenfranchisement Provision Makes It Subject to Heightened Scrutiny, Which It Fails. ..................................... 32

3.  Alternatively, the Supreme Court Should Overrule *Ramirez*. ................................ 33

IV.  THE DISENFRANCHISEMENT OF EX-FELONS VIOLATES THE FOURTEENTH AMENDMENT'S GUARANTEE AGAINST ARBITRARY AND IRRATIONAL LAWS. .................... 34

V.  BY CONDITIONING PLAINTIFFS' RE-ENFRANCHISEMENT ON PAYMENT, DEFENDANTS HAVE IMPOSED A POLL TAX IN VIOLATION OF THE FOURTEENTH AND TWENTY-FOURTH AMENDMENTS AND THE VOTING RIGHTS ACT.................................................................. 37

Conclusion............................................................................................................................... 40

## ADDENDUM

Select Consent Judgments from Voting Rights Litigation Involving Florida Counties

Select Historic Racial Discrimination in Florida:  Post-1864 State Statutory Provisions

# TABLE OF AUTHORITIES

## CASES

*Agostini v. Felton*,
521 U.S. 203 (1997)................................................................................21

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)................................................................................20

*Baker v. Carr*,
369 U.S. 186 (1962)................................................................................35

*Baker v. Pataki*,
85 F.3d 919 (2d Cir. 1996) ...............................................................26, 29, 30

*Bass v. State*,
368 So. 2d 447 (Fla. Dist. Ct. App. 1979) ......................................................7

*Beacham v. Braterman*,
300 F. Supp. 182 (S.D. Fla. 1969) ..............................................................34

*Bearden v. Georgia*,
461 U.S. 660 (1983)............................................................................38, 39

*Bolden v. City of Mobile*,
542 F. Supp. 1050 (S.D. Ala. 1982) .............................................................22

*Bradford County NAACP v. City of Starke*,
712 F. Supp. 1523 (M.D. Fla. 1989)..............................................................10

*Buckley v. Am. Constitutional Law Found.*,
525 U.S. 182 (1999) ...............................................................................33

*Burdick v. Takushi*,
504 U.S. 428 (1992)................................................................................33

*Burton v. City of Belle Glade*,
178 F.3d 1175 (11th Cir. 1999) .............................................................23, 25

*Bush v. Gore*,
531 U.S. 98 (2000)............................................................................32, 33

*Bush v. Vera*,
517 U.S. 952 (1996)................................................................................31

*Bynum v. Conn. Comm'n on Forfeited Rights,*
   410 F.2d 173 (2d Cir. 1969) ..................................................................38

*Chen v. City of Houston,*
   206 F.3d 502 (5th Cir. 2000), *cert. denied,* 121 S. Ct. 2020 (2001)........................20

*Chisom v. Roemer,*
   501 U.S. 3 (1991)..................................................................................23

*Cipriano v. City of Huoma,*
   395 U.S. 701 (1969)..............................................................................38

*City of Boerne v. Flores,*
   521 U.S. 507 (1997)..........................................................................30, 31

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985)..............................................................................35

*City of Rome v. United States,*
   446 U.S. 156 (1980)..............................................................................29

*Conroy v. Aniskoff,*
   507 U.S. 511 (1993)..............................................................................21

*Cotton v. Fordice,*
   157 F.3d 388 (5th Cir. 1998) ..................................................................20

*Davis v. Bandemer,*
   478 U.S. 109 (1986)..............................................................................32

*Davis v. Chiles,*
   139 F.3d 1414 (11th Cir. 1998) ..............................................................10

*DeGrandy v. Wetherell,*
   794 F. Supp. 1076 (N.D. Fla. 1992) ....................................................10, 11

*Dean Witter Reynolds, Inc. v. Byrd,*
   470 U.S. 213 (1985)..............................................................................21

*FDIC v. Philadelphia Gear Corp.,*
   476 U.S. 426 (1986)..............................................................................21

*Farrakhan v. Locke,*
   No. CS-96-76 (E.D. Wash. Dec. 1, 2000) *(appeal pending)*....................................24

*Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,*
  527 U.S. 627 (1999) ........................................................................................... 31

*Furst v. N.Y. City Transit Auth.,*
  631 F. Supp. 1331 (E.D.N.Y. 1986) ................................................................. 36

*Gilmer v. Interstate Johnson Lane Corp.,*
  500 U.S. 20 (1991) ............................................................................................ 21

*Green v. Board of Elections,*
  380 F.2d 445 (2d Cir. 1967) ............................................................................. 37

*Green v. Mortham,*
  155 F.3d 1332 (11th Cir. 1998) ........................................................................ 33

*Harman v. Forssenius,*
  380 U.S. 528 (1965) ...................................................................................... 38, 39

*Harper v. Va. State Bd. of Elections,*
  383 U.S. 663 (1966) ........................................................................ 17, 34, 37, 38

*Harris v. Graddick,*
  593 F. Supp 128 (M.D. Ala. 1984) ................................................................... 23

*Hill v. Stone,*
  421  U.S. 289 (1975) ..................................................................................... 37, 38

*Howard v. Gilmore,*
  No. 99-2285, 2000 WL 203984 (4th Cir. Feb. 23, 2000) ................................. 39

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) .......................................................................................... 25

*Hunter v. Erickson,*
  393 U.S. 385 (1969) ...................................................................................... 20, 32

*Hunter v. Underwood,*
  471 U.S. 222 (1985) ...................................................................................... 20, 32

*In re Employment Discrimination Litig. Against Alabama,*
  198 F.3d 1305 (11th Cir. 1999) ........................................................................ 26

*Irby v. Va. State Bd. of Elections,*
  889 F.2d 1352 (4th Cir. 1989) .......................................................................... 22

*Jimenez v. Weinberger*,
   417 U.S. 628 (1974) ........................................................................................36

*Jones v. City of Lubbock*,
   727 F.2d 364 (5th Cir. 1984) ...........................................................................30

*Jordan v. State*,
   293 So. 2d 131 (Fla. Dist. Cf. App. 1974) ........................................................7

*Kimel v. Florida Bd. of Regents*,
   528 U.S. 62 (2000).............................................................................................31

*King v. State*,
   17 Fla. 183, 1879 WL 2157 (1879) ....................................................................16

*Le Mars Mut. Ins. Co. v. Bonnecroy*,
   304 N.W.2d 422 (Iowa 1981) ............................................................................21

*Lodge v. Buxton*,
   639 F.2d 1358 (5th Cir. Unit B Mar. 1981)........................................................25

*Lubin v. Panish*,
   415 U.S. 709 (1974)............................................................................................38

*M.L.B. v. S.L.J.*,
   519 U.S. 102 (1996) ...........................................................................................39

*McMillan v. Escambia County, Fla.*,
   748 F.2d 1037 (11th Cir. 1984) .........................................................................10

*Meek v. Metro. Dade County*,
   985 F.2d at 1482 ................................................................................................11

*Meek v. Metro. Dade County, Fla.*,
   805 F. Supp. 967 (1992) .............................................................................24, 28

*Mesker Bros. Indus., Inc. v. Leachman*,
   529 S.W. 2d 153 (Mo. 1975) .............................................................................21

*Misle v. Miller*,
   125 N.W.2d 512 (Neb. 1963) ............................................................................21

*Mt. Healthy City Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977)............................................................................................20

*NAACP v. Gadsden County Sch. Bd.,*
   691 F.2d 978 (11th Cir. 1982) ................................................................. 10

*Nipper v. Smith,*
   39 F. 3d 1494 (11th Cir. 1994) ............................................................... 25

*Norman v. Reed,*
   502 U.S. 279 (1992) ................................................................................ 33

*Owens v. Barnes,*
   711 F.2d 25 (3d Cir. 1983) ..................................................................... 34

*Oyama v. California,*
   332 U.S. 633 (1948) ................................................................................ 22

*Pacific Ins. Co. v. Soule,*
   74 U.S. 433 (1868) .................................................................................. 17

*Personnel Admr of Massachusetts v. Feeney,*
   442 U.S. 256 (1979) ................................................................................ 22

*Planned Parenthood v. Casey,*
   505 U.S. 833 (1992) ................................................................................ 33

*Porter v. Sinclair,*
   389 F.2d 277 (5th Cir. 1967) ..................................................................... 7

*Reed v. Reed,*
   404 U.S. 71 (1971) .................................................................................. 35

*Reno v. Bossier Parish Sch. Bd.,*
   520 U.S. 471 (1997) ................................................................................ 25

*Richardson v. Ramirez,*
   418 U.S. 24 (1974) ................................................................. 31, 32, 33, 34

*Romer v. Evans,*
   517 U.S. 620 (1996) ................................................................................ 34

*Secy of Revenue v. John's Vending Corp.,*
   309 A.2d 358 (Pa. 1973) ......................................................................... 36

*Solomon v. Liberty County,*
   899 F.2d 10 (11th Cir. 1990) ................................................................... 10

*State v. Silva,*
   259 So. 2d 153 (Fla. 1972) ...................................................................................6

*Stewart v. Abend,*
   495 U.S. 207 (1990)........................................................................................21

*Thompson v. Gallagher,*
   489 F.2d 443 (5th Cir. 1973) .........................................................................36

*Thornburg v. Gingles,*
   478 U.S. 30 (1986)..........................................................................24, 25, 29

*United States Dep't of Agric. v. Moreno,*
   413 U.S. 528 (1973)........................................................................................36

*United States v. Fordice,*
   505 U.S. 717 (1992)........................................................................................18

*United States v. Marengo County Comm'n,*
   731 F.2d 1546 (11th Cir. 1984) ..........................................................23, 24, 30

*United States v. Morrison,*
   120 S. Ct. 1740 (2000).....................................................................................31

*Uno v. City of Holyoke,*
   72 F.3d 973 (1st Cir. 1995).............................................................................27

*Wesley v. Collins,*
   791 F.2d 1255 (6th Cir. 1986) ........................................................................26

*Williams v. Illinois,*
   399 U.S. 235 (1970).........................................................................................38

## STATUTES

U.S. Const. Amend. 1 ..................................................................................................33

U.S. Const. Amend. 14 ....................................................................................... *passim*

U.S. Const. Amend. 15 .......................................................................................3, 29, 30

U.S. Const. Amend. 24 .......................................................................................3, 37, 39

Improving America's Schools Act, 20 U.S.C. § 6301...................................................21

Voting Rights Act of 1965 § 2, as amended, 42 U.S.C. § 1973 .......................3, 23-26, 29-31, 37

Voting Rights Act of 1965 § 4, 42 U.S.C. § 1973b ...................................................................30

Voting Rights Act of 1965 § 10, 42 U.S.C. § 1973h ..............................................................3, 37

Fla. Const. Art. VI, § 4...........................................................................................................18, 19

Fla. Stat. ch. 104.185 ....................................................................................................................37

Fla. Stat. ch. 104.051 ....................................................................................................................37

Fla. Stat. ch. 948.01 ........................................................................................................................8

Fla. Rule of Executive Clemency 6 ..............................................................................................37

Fla. Rule of Executive Clemency 7 ..............................................................................................37

Fla. Rule of Executive Clemency 9 ...........................................................................................9, 37

Fla. Rule of Executive Clemency 10 .............................................................................................37

Fla. Rule of Executive Clemency 11 .............................................................................................37

Fla. Rule of Executive Clemency 12 .............................................................................................37

## MISCELLANEOUS

Alfred Blumstein, *Racial Disproportionality of U.S. Prison Populations Revisited*
    64 U. Colo. L. Rev. 743, 759 (1993) ...............................................................................27, 35

Am. Jur. 2d *Statutes* § 322 ............................................................................................................21

Fla. Supreme Ct. Racial & Ethnic Bias Study Comm'n.
    *Where the Injured Fly for Justice* 24-25 (1991). ...............................................................7

Fla. Supreme Ct. Racial & Ethnic Bias Study Comm'n.
    *Executive Summary: Where the Injured Fly for Justice* 24-25 (1991). ....................................7

David Joulafian & Mark Rider, *Tax Evasion by Small Business*
    Office of Tax Analysis Paper No. 77, 1998..........................................................................35

James Vorenberg, *Decent Restraint of Prosecutorial Power,*
    94 Harv. L. Rev. 1521, 1525 (1981)..........................................................................................36

U.S. Dep't of Justice, *Sourcebook of Criminal Justice Statistics 2000* (Ann L. Pastore & Kathleen Maguire, eds. 1991)...............................................................................................35

U.S. Commission on Civil Rights, *Voting Irregularities in Florida During the 2000 Presidential Election*, June 2001 ...........................................................................11

**INTRODUCTORY STATEMENT**

Florida deprives more than 600,000 people — over 5% of its voting age population — of the right to vote due to a prior felony conviction. Plaintiffs are ex-offenders who, despite having paid their debt to society, are shut out from electing their representatives. Because of complex social and historical factors, including official and intentional race discrimination, African Americans are more than twice as likely to be disenfranchised. This massive and racially skewed denial of the vote has reached unprecedented levels and is affecting election outcomes, thereby hampering the political choices of Floridians outside the Plaintiff class whose electoral preferences are defeated because of the ex-felon exclusion. What is at stake here is no less than the right of all Floridians to have a fair and equal opportunity to elect representatives of their choice.

The challenged felon disenfranchisement scheme is interwoven with a long history of racial discrimination in Florida's political processes. Since the Civil War, Florida's criminal justice system and voting process have intertwined to reinforce discrimination in both systems. In fact, the State's felon disenfranchisement scheme spins together the last twisted threads of what was once a complex tapestry of criminal justice policies and voting practices that worked together to exclude African Americans from Florida's political life. Over the years most of these discriminatory practices have unraveled. Courts have struck down the convict labor schemes that thinned the ranks of African American voters and the poll taxes, residency requirements, and white primaries that further excluded blacks from the voter rolls that were used, in turn, to assemble the all-white juries that handed down convictions disenfranchising still more of Florida's black citizens. Felon disenfranchisement remains a last vestige of this twisted system.

Florida justifies its disenfranchisement of ex-felons by arguing that it has "a legitimate interest in confining participation in the lawmaking process to those who have obeyed society's laws." (Defs.' Mem. at 20.) In fact, however, those with criminal convictions represent a small percentage of law violators. The criminal justice system is not like a census or a state-wide education test; it does not objectively measure a social fact about Florida's population, separating law breakers from the law abiding. Who ends up disenfranchised is determined by a complex set of variable and discretionary factors, many legitimate and unavoidable, some insidious: Was their crime one that was easily detected or hard to unmask? Had policymakers dedicated resources to investigating the type of crime committed? Was their neighborhood targeted for

arrests? Were they subject to racial profiling? If among the small percentage arrested, were they given leniency, could they afford good defense counsel, did they draw a fair jury? In the end, what separates Florida's ex-felons from the millions of law violators in the rest of the population is not that they are morally inferior, but simply that ex-felons have been held accountable for their transgressions and served full sentences for their offenses.

That is not a defensible basis for disenfranchising more than half a million people. This enormous, racially unbalanced burden on voting rights is harming Florida's democracy and is prohibited by the United States Constitution and federal law.

The State Defendants attempt to distract attention from the alarming reality of Florida's felon disenfranchisement policy with a host of arguments, each of which ultimately fail.

On the issue of discriminatory intent, the leading historian of Florida Reconstruction, Professor Jerrell Shofner, will testify that the state's current felon disenfranchisement policy began in 1868 as part of a multifarious effort to disenfranchise newly freed African American slaves. Contrary to Defendants' contention, the challenged provision significantly expanded the State's pre-existing policy of disenfranchising for "infamous crimes." Using the same sources cited by Defendants, Plaintiffs establish that under Florida law of the period, "infamous crimes" did not include all felonies. Nor does Florida's earlier use of a more limited criminal disenfranchisement policy before blacks could vote necessarily indicate that the State's adoption of felon disenfranchisement was not racially motivated. Many facially neutral voter qualifications, such as poll taxes, predated black suffrage and were only later pressed into discriminatory service.

Defendants maintain that the felon disenfranchisement provision's reenactment as part of the 1968 Florida Constitution cancels its racist past. But courts routinely look to the original purpose of predecessor statutes in determining the meaning and purpose of current laws. Moreover, Defendants have no evidence that the policy's discriminatory intent and effects were ever discussed, let alone rejected, in the constitutional review process, and courts.

Defendants' questioning of the links between Florida's felon disenfranchisement scheme and racial bias should be viewed with skepticism. When at every turn, over the course of more than a hundred years, every contributing policy and practice winds up disenfranchising African Americans, a strong inference of bias arises. Moreover, at each step, the officials who promoted and maintained these policies were aware of their racial impact.

For all these reasons, as detailed below, the 613,000-member Plaintiff class is entitled to summary judgment on its claims that Florida's felon disenfranchisement laws constitute intentional racial discrimination, deny the right to vote on account of race, are arbitrary and irrational, and impose a poll tax and wealth qualification in violation of the First, Fourteenth, Fifteenth, and Twenty-Fourth Amendments of the United States Constitution and §§ 2 and 10 of the Voting Rights Act of 1965. Alternatively, this case should proceed to trial to provide this Court with a fully developed record on which to determine the grave and novel questions about the operation of Florida's democracy.

STATEMENT OF FACTS

**A.      Florida's Denial of the Vote to Ex-Felons Has Reached Historic Levels, Excluding 5% of the Electorate, Disproportionately Excluding African Americans, and Altering the Outcome of Elections.**

In the last twenty-five years, Florida's disenfranchisement of ex-felons has developed from a minor burden on the electorate to a major one, now effecting over 613,000 men and women who have fully served their sentences of incarceration and supervision. (Defs.' App. 488, 490 (Uggen Rep. at 1, 3).)  In the mid-1970s, Florida's denial of the vote to ex-felons excluded less than one percent of Florida's voting age population; by 2000, that number had soared to over 5% (Defs.' App. 491, 511 (Uggen Rep. at 4, 24).)  As a result, one in 20 Floridians cannot vote due to a prior felony conviction.

One of the starkest consequences the denial of the vote to ex-felons has been its mass disenfranchisement of African Americans in Florida, who are more than twice as likely to be denied the vote.   Approximately 10.5% of voting age African Americans (approximately 167,000 men and women) in Florida are disenfranchised as ex-felons, as compared to 4.4% of the non-African American population. (Defs.' App. 488, 490, 509 (Uggen Rep. 1, 3, Table 1).) More than one in six adult African American males in Florida are disenfranchised as ex-felons. (Defs.' App. 490, 509 (Uggen Rep. 3, Table 1).)

As the disenfranchised proportion of Florida's population grows, those communities most affected by the operation of the challenged law — namely those with large African American populations — find their ability to elect representatives of their choice increasingly diminished. Because of racial preferences in voting, Florida's felon disenfranchisement provision has affected and will continue to affect election outcomes, particularly those that are tightly

contested. Plaintiffs' expert Professor Christopher Uggen analyzed the potential consequences of felon disenfranchisement in selected races in Florida, concluding that felon disenfranchisement played a decisive role in the 1988 U.S. senatorial election and the outcome of the 2000 presidential election. (Defs.' App. 499 (Uggen Rep. at 12).) Had ex-felons been allowed to vote, Vice President Gore would have won the state of Florida by over 10,000 votes. (Defs.' App. 499 (Uggen Rep. at 12).)

**B.     The Racial Disproportionality in Florida's Ex-Felon Population Results from Complex Social and Historical Factors, Including Intentional Race Discrimination.**

The undisputed fact that African Americans are vastly overrepresented in the Plaintiff class of ex-felons —they are more than twice as likely as others to be denied the vote — results from complex social and historical factors, including intentional race discrimination. Florida's blanket ban on ex-felon voting was enacted after the Civil War, along with other alterations in Florida's electoral scheme and criminal justice system, to suppress the political power of newly freed slaves. Florida's undisputed history of official and societal race discrimination has left the legacy that blacks in Florida today are disproportionately poor, less educated, and more likely to live in depressed areas — social facts that all are positively correlated with criminal convictions. The criminal justice system itself has been marked by a history of race discrimination. Indeed, in 1990 and 1991, the Florida Supreme Court's Racial and Ethnic Bias Study Commission found that the criminal justice system is mired in racial discrimination, a finding consistent with Plaintiffs statistical evidence. Even absent discrimination, the multitude of discretionary decisions that lead up to felony convictions in Florida, such as the allocation of law enforcement resources in a way that targets poor largely black inner city communities, drives racial differences in felony convictions.

**1.     Florida's ban on ex-felon voting was first enacted in 1868 with a racially discriminatory intent that was not confronted or rejected in subsequent constitutions.**

During Florida's 1868 constitutional convention, two rival political factions battled for control of the proceedings, adopting opposing constitutional alternatives that differed on key issues of suffrage and disfranchisement. The "Radical" Republicans favored full enfranchisement for all black males. (Pls.' App. 368 (Smith Dep. at 127, 128-29); Defs.' App. 437-38 (Shofner Rep. at 12-13); Defs.' App. 870 (Shofner Dep. 62).) The "Moderate" Republicans, primarily concerned with fostering Florida's economic expansion, were willing to

sacrifice the full reach of black suffrage in exchange for the support of well-heeled ex-Confederates. (Defs.' App. 435, 440 (Shofner Rep. at 10, 15); Defs.' App. 780 (SHOFNER, NOR IS IT OVER YET, at 194-95).) The Moderates staged a midnight coup of the convention hall and subsequently forced Florida's adoption of the Moderate Constitution. (Defs.' App. 437-40 (Shofner Rep. at 12-15); Defs.' App. 892-94 (Shofner Dep. at 150-61); Pls.' App. 368-370 (Smith Dep. at 127-39); Pls.' App. 593-596 (H.R. Misc. Doc. 109 (40th Cong., 2d Sess.), at 1-4); Defs.' App. 793-87 (Shofner, *Constitution of 1868*, at 359-67).)

The Radical Constitution contained no felon disenfranchisement clause at all. The Moderate Constitution contained the predecessor felon disenfranchisement provision that plaintiffs challenge today. *Compare* Pls.' App. 606 (Radical Const. art. VI, §3, *reprinted in* H.R. MISC. DOC. 109, at 14) *with* Defs.' App. 602 (1868 Const. art. XIV, § 2). Designed to work in tandem with a racially-targeted criminal justice system that would disproportionately convict African Americans, the felon disenfranchisement provision intentionally discriminated against the newly freed slaves and severely diluted their votes. (Defs.' App. 440 (Shofner Rep. 15).)

The 1868 provision worked a massive expansion in the number of crimes that would trigger disenfranchisement – from a total of nine crimes under the 1865 Constitution (and none but treason under the Radical Constitution) to at least 135 crimes in the adopted Florida Constitution. By widening the disenfranchisement dragnet and gathering in a host of crimes that blacks were believed more "prone" to commit, the provision was intended to maximize black exclusion from the political process. (Defs.' App. 443-50 (Shofner Rep. 18-25); Defs.' App. 867-68, 880-81, 882, 908-09 (Shofner Dep. 53-57, 105-06, 110-11, 217-18).)

In testimony before Congress, Radical leaders Daniel Richards and William Saunders complained of additional discriminatory provisions in the Moderate Constitution, which have been widely cited by historians – and even by Defendants' expert – as discriminatorily intended: (1) a legislative apportionment formula that enhanced representation from sparsely-populated white counties while diminishing representation from densely-populated black counties; and (2) a provision that circumvented local elections by requiring the governor to appoint all county officials except constables. (Pls.' App. 5 (H.R. MISC. DOC. 109, at 5).) *See* Defs.' App. 170, 186 (Smith Rep. 2, 18); Pls.' App. 1730 (Smith Blackline 18). In the same testimony, Richards and Saunders succinctly explain the provision's underlying intent: "It grants suffrage to, and removes

all disabilities from, the vilest rebels and haters of the government . . . and disfranchises thousands of the colored voters." (Pls.' App. 597 (H.R. MISC. DOC. 109, at 5).)

Saunders' and Richards' insight was not unfounded. Despite their vote to purge the official convention record that might have provided direct evidence of their motives, outside the convention hall the Moderates sometimes let slip their true constitutional intent: to keep Florida from becoming – in the words of Moderate leader William J. Purman – "niggerized." (Defs.' App. 791 (Shofner, *Constitution of 1868*, at 374); Defs.' App. 869 (Shofner Dep. 58)) (phrasing more politely). *See also* 180-81 (Smith Rep. 12-13) (noting Purman's leadership role); Pls.' App. 368-69 (Smith Dep. 129-30) (same).

The felon disenfranchisement provision contained in Florida's 1968 Constitution, which Plaintiffs challenge in this lawsuit has remained intact without substantive change, undergoing only minor grammatical modification since its original enactment in 1868. *Compare* Defs.' App. 602 (1868 Const. art. XIV, § 2) *with* Defs.' App. 676 (1968 Const. art. VI, §4(a)); Def. App. 7-8 (Scher Rep. 7-8).

### 2.   Florida's criminal justice system itself has a long history of race discrimination.

Directly following emancipation in Florida, the criminal justice system was used as a tool for the continued subjugation of the newly freed slaves. (Defs.' App. 443-50 (Shofner Rep. 18-35); Defs.' App. 867-68, 878-79, 881-82, 883, 884, 899-900, 908-09 (Shofner Dep. 53-56, 94-101, 109-10, 114-15, 118-22, 180-84, 217-18).) These include Florida's enactment of the Black Codes, the redefinition of larceny to include taking agricultural products (apparently a common practice among indigent ex-slaves), the addition of larceny to the list of crimes mandating disenfranchisement, and the use of convict leasing and debt peonage well into the twentieth century. (Shofner Rep. at 5, 7, 18-25.) Not surprisingly, from 1877 to 1900, the percentage of the prison population that was African Americans was at least 82 percent (Pls.' App. 379 (Smith Dep. 182-83)), vastly disproportionate to the 48% of Florida's black population. (Pls.' App. 377 (Smith Dep. 173) (1870 figure).)

The State officially sanctioned racial discrimination in the criminal justice system, for example, with the systematic exclusion of blacks from juries in criminal cases. For example, many Plaintiffs were convicted during a time when juries systematically excluded blacks. See, e.g., *State v. Silva*, 259 So. 2d 153, 156 (Fla. 1972) (finding that Dade County used quota system

to limit black jury participation to fixed percentage of qualified citizens and allowed Jury Commissioner to scrutinize prospective jurors' race); *Jordan v. State*, 293 So. 2d 131, 133-34 (Fla. Dist. Cf. App. 1974) (reversing criminal conviction because (a) jury commissioners could choose all-white precincts from which to draw jury master lists and (b) less than 12% of eligible non-white jurors were chosen); *Porter v. Sinclair*, 389 F.2d 277, 279 (5th Cir. 1967) (finding that disparity between number of black jurors and black population to be so great as to shift burden of proof regarding discrimination to State); *Bass v. State*, 368 So. 2d 447, 449 (Fla. Dist. Ct. App. 1979) (finding that Escambia County's method of jury selection precluded possibility of selecting black jurors).   Indeed, even in 1990, blacks were still excluded from meaningful participation within the criminal justice system as judges, lawyers, prosecutors, and law enforcement officers. (*See* Pls.' App. 974 (1990 Report of Fla. Supreme Court at 4).)

3.      **Today, Florida's criminal justice system has a racially discriminatory impact on African Americans.**

The criminal justice system in Florida, as elsewhere, is comprised of numerous decision points — from decisions about policing practices, to decisions about whether to arrest and what to charge, to decisions about pretrial detention, to the ultimate disposition — that affect the disposition of an individual suspects case.   *See also* Pls.' App. 21 (Chiricos Dep. at 81 (describing variability and discretion in the arrest process"), 209 (describing the deployment of criminal justice resources in particular types of communities). For example, the fact that minorities are less able to make bail makes them more likely to plead guilty. (Pls.' App. 1087 (Fla. Supreme Ct. Racial & Ethnic Bias Study Comm'n. *Where the Injured Fly for Justice* 24-25 (1991).)

Racial bias within the criminal justice system persists.  In 1989, the Chief Judge of the Florida Supreme Court created a commission to address the question of whether racial or ethnic consideration adversely affect the dispensation of justice to Floridians. (Pls.' App. 1191 (Exec. Summ.: Rep. of Fl. Sup. Ct. at 4).)  The Florida Supreme Court's commission issued a thorough and troubling report, based on its three year study.   Among other startling findings, the Commission concluded that:

> African-Americans are being treated differently at several stages of the [criminal] justice system.  When the object is punishment --detention, formal adjudication, or commitment -- minorities get more; when what is being handed out is informal processing or diversion, minorities get less. This differential treatment results, at least in part, from racial and ethnic

bias on the part of enough individual police officers, prosecutors, and judges to make the system operate as if it intended to discriminate against non-whites. (Pls.' App. 1191 (Exec. Summ.: Rep. of Fl. Sup. Ct. at 4).)

As described above, African American Floridians are disenfranchised as a result of felony convictions at much higher rates than their non-African American counterparts. Examining whether those race differences could be attributed to higher rates of black involvement in crime, Plaintiffs' expert Professor Chiricos analyzed arrest and conviction rates by race for similar types of offenses. (Defs.' App. 22 (Chiricos Rep. at 12).) Overall, he found black conviction rates to range from 11% to 36% higher than whites, depending on the subgroup of arrests used as a point of comparison. (Defs.' App. 60 (Supp. Resp. to Defs.' Second Doc. Req., P003435).) Racial disproportionality in conviction rates is particularly pronounced in those contexts in which prosecutorial discretion is greatest, for example with respect to crimes such as drugs and weapons offenses and for defendants without prior records. (Pls.' App. 25 (Chiricos Dep. at 97).) In contrast, with respect to murder and sex offenses, where one would expect less discretion in prosecutorial decision making, blacks are actually underrepresented among those convicted. (Defs.' App. 12 (Chiricos Rep. at 2).) Defendants' expert found the racial disproportionality Professor Chiricos identified was concentrated among those with no prior felony record (Pls.' App. 287-288 (Katz Dep. at 20-21)), where there is likely to be greater room for prosecutorial discretion. Racial amplification also varies geographically with the largest differences existing in North Florida, the heart of the former Confederacy. (Defs.' App. 26, 56 (Chiricos Rep. at 16, Table 12).)

   a.   *Non-African Americans are more likely than blacks to receive the discretionary and lenient disposition of "adjudication withheld," which does not result in disenfranchisement.*

Prosecutors in Florida have discretion to allow defendants in certain circumstances to plead guilty to a felony offense, with the disposition of "adjudication withheld" if they successfully complete their term of supervision. (Defs.' App. 121 (Katz Rep. at 6) (citing Fla. Stat. § 948.01(2)).) The effect of an adjudication withheld disposition is that the defendant does not have a felony record and does not lose his or her right to vote. White offenders who are sentenced to supervision receive the disposition of adjudication withheld at a higher rate than black offenders. (See Pls.' App. 287 (Katz Dep. at 16).)

   **b.**   *In the clemency process, African Americans fare worse than other applicants.*

The clemency process through which ex-felons may seek to have their voting rights restored does nothing to eliminate or reduce, and indeed appears to enhance the racial disparities in disenfranchisement.  Under Florida's Rules of Executive Clemency, an individual convicted of a felony may have his or her civil rights restored without a hearing ("automatic restoration of civil rights" or "ARCR") after completing and satisfying all sentences and all conditions of supervision if certain additional requirements have been met. (Defs.' App. 721-22 (Rules of Exec. Clem. 9A).)  If ineligible for ARCR, ex-felons can apply for restoration by completing an application that is ultimately reviewed by the Clemency Board. (Defs.' App. 721-22 (Rules of Exec. Clem. 9A).)  Under the current process, whether through automatic restoration or the application process, African American ex-felons are significantly less likely to have their voting rights restored than non-African Americans. (Defs.' App. 539, 541 (Uggen Supp. Rep. 3, 5).)

   **4.**   **African-Americans continue to be disproportionately affected by limited education and employment opportunities, poverty, and residency in depressed areas, all of which are positively correlated with criminal convictions and are the effects of past official racial discrimination.**

Black Floridians continue to bear the effects of past official discrimination, as reflected in their relatively lower levels of education and income.  According to 1990 Census data, in Florida, 43.6% of African Americans age 25 or over had not graduated from high school or achieved the equivalent, compared with 23.4% for non-blacks. (Defs.' App. 67 (Engstrom Rep. at 5).)  Only 9.8% of African Americans age 25 or over had received a college degree or a graduate or professional degree, whereas the percentage among non-African Americans was almost twice as high. (Defs.' App. 67 (Engstrom Rep. at 5).)  African Americans in Florida had the lowest average per capita income for 1989 of all census groups, $7,550, less than half that of whites. (Defs.' App. 67 (Engstrom Rep. at 5).)  The percentage of African Americans age 18 or older determined to be living below the poverty level was 26.3%.  (Defs.' App. 68 (Engstrom Rep. at 6).)  This was close to three times higher than the percentage for non-African Americans, which was 9.1 %. *Id.*

Socio-economic differences resulting from past official discrimination directly disadvantage blacks in Florida's felon disenfranchisement scheme.  Among other things, those differences make African Americans more likely to be arrested for criminal behavior (and thus

more vulnerable than similarly offending whites to felony conviction). They also make blacks less likely to be eligible for restoration of civil rights and less able to pay the costs of the complex restoration process.

> **5. Florida's electoral process reflects past and present race discrimination, including racially polarized voting, racial campaign appeals, limited success in attaining public office, and purging of purported ex-felons.**

The record is replete with evidence of persistent past and present discrimination touching on the right to vote in both Florida's election law regime. *See*, e.g., Defs.' App. 466 (Shofner Rep. Addendum at 4) ("Although overt racial discrimination has been vastly reduced by the array of civil rights legislation of recent years, it still persists in more subtle form throughout the state.").) Dozens of state and federal decisions have recounted the undisputed history of racial discrimination in Florida elections. *See, e.g., Davis v. Chiles*, 139 F.3d 1414, 1416-18 & n.4 (11th Cir. 1998) (discussing discriminatory impact of at-large judicial elections, lack of available remedy under Section 2, the history of racially discriminatory voting practices in Florida); *McMillan v. Escambia County, Fla.*, 748 F.2d 1037, 1044 (11th Cir. 1984) (Escambia County election systems were part of "a concerted state effort to institutionalize white supremacy"); *NAACP v. Gadsden County Sch. Bd.*, 691 F.2d 978 (11th Cir. 1982) (discussing all-white Democratic primary in Florida from 1901 until 1945); *DeGrandy v. Wetherell*, 794 F. Supp. 1076, 1079 (N.D. Fla. 1992) (noting that the "longstanding general history of official discrimination against minorities has influenced Florida's electoral process"); *see also* Addendum (listing Florida statutes and constitutional provisions illustrating official discrimination as well as consent judgments from voting rights litigation describing discriminatory official practices in numerous Florida counties). Plaintiffs' expert on voting patterns, Dr. Engstrom, has shown that voting throughout the state of Florida is racially polarized (Defs.' App. At 64 (Engstrom Rep. at 2)), a finding consistent with judicial determinations. *See also Solomon v. Liberty County, Fla.*, 899 F.2d 10 12, 1020-21 (11th Cir. 1990) (Krovitch, J., Concurring) (Liberty County); *id.* At 1037 (Tjoflat, C.J., concurring); *McMillan*, 748 F.2d at 1043 (Escambia County); *Gadsden County Sch. Bd.*, 691 F.2d at 982-83 (11th Cir. 1982) (Gadsden County); *Bradford County NAACP v. City of Starke*, 712 F. Supp. 1523, 1591 (M.D. Fla. 1989) (Starke, Florida).

Racial appeals are used in Florida campaigns. For example, in a case challenging at-large elections for county commissioners in Miami-Dade County, the court found that individuals

including Defendant Jeb Bush (then-Republican Party Chairman) "generally agreed that effective use of subtle and overt racial and ethnic appeals is a common tactic used during campaigns in the black and hispanic communities." *Meek v. Metro. Dade County* 985 F.2d. 1471, 1482 (1993).

Until the creation of majority black electoral districts in Florida, minorities had "very little success in being elected to either the United States Congress or the Florida Legislature." *DeGrandy*, 794 F.Supp. at 1079. At the time the District Court decided *DeGrandy* in 1992, "[a]n African-American had not represented Florida in the United States Congress in over a century" and "[from 1889 until 1968, African-Americans were unable to elect a single representative to the state house." *Id.* While minorities have had some electoral success in races for state legislative and congressional offices in the 1990s (largely in majority-minority districts) no African American has ever been elected in Florida to the statewide offices of Governor or a Cabinet member.

Current electoral practices interact with felon disenfranchisement laws in ways that enhance the state's opportunity for using those laws in a discriminatory fashion. First, the state's process for administering the restoration of felons' civil rights tends to disadvantage African Americans. Defendants admit that the State's eligibility requirements for restoration of civil rights tend to exclude more African Americans than whites (see Defs.' Mem. at 30), but attempt to explain away the disparity by focusing on recidivism and violent crime convictions. Neither of these factors, however, accounts for the fact that the requirement of paying restitution disfavors blacks in the restoration process, an inequality explained by the lingering socio-economic consequences of discrimination. Even Defendants' expert concludes that black ex-felons are less likely to have their rights restored in part because they are less strongly connected to their communities, have less financial stability, and are less likely to be married - all factors which may be related to socio-economic differences traceable to past discrimination. Second, "[the practice of felon disenfranchisement has resulted in the greater likelihood of people of color, particularly African Americans, appearing erroneously on the Florida felon exclusion list." *See* U.S. Commission on Civil Rights, *Voting Irregularities in Florida During the 2000 Presidential Election*, June 2001, at 77.

ARGUMENT

I.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CLAIM OF
     INTENTIONAL RACE DISCRIMINATION.

Florida's felon disenfranchisement policy was enacted in 1868 to keep blacks from voting and continues to serve that purpose.  Defendants dispute the discriminatory intent of the 1868 framers, but the "expert" evidence supporting their argument is so flawed that Plaintiffs have moved to exclude it.  (*See* Pls.' Mot. Exclude deHaven-Smith.)  Even if not excluded, Defendants' expert historical evidence is so weak this Court should discount it, leaving Plaintiffs' account of the discriminatory origins of Florida's felon disenfranchisement provision unchallenged.  With undisputed proof of its discriminatory intent and effect, the policy violates the guarantee of equal protection, unless Defendants can prove that some intervening legislative action has purged it of its racist purpose.  This they cannot do.  In consequence, Plaintiffs are entitled to summary judgment on their first claim.

A.   **This Court Should Discount All Evidence from Defendants' Expert deHaven-Smith Due to His Serious Errors of Material Fact, His Lack of Qualifications in the Field, and His Reliance on Ghost Writers to Draft Key Sections of His Expert Report.**

Plaintiffs base their claim on comprehensive expert evidence about the historical background of Florida's felon disenfranchisement scheme.  While it is surely not surprising that Defendants would present a competing historical account, that account should be based on an accurate assessment of the historical evidence by a competent historian.  Defendants' expert Lance deHaven-Smith is not up to that task.  Smith made, by his own admission, multiple and serious errors of material fact in the research and writing of his expert report.  (*See* Pls.' Mot. Exclude deHaven-Smith at 7-11.)

Smith's errors are understandable, though no less egregious, when viewed in light of his complete lack of experience and qualifications as an historian of Florida's Reconstruction past.  Professor Smith is a political scientist by discipline.  (Defs.' App. 209-225 (Smith Curriculum Vita 1-17); Pls.' App. 201 (Smith Dep. at 200-01).)  He has no experience in the field of history, no expertise in Reconstruction history or Florida's Reconstruction past, and has neither conducted nor published any prior research on any historical topic relevant to this case.  (Defs.' at App. 209-225 (Smith Curriculum Vita 1-17); (*See* Pls.' Mot. Exclude deHaven-Smith at 5-6, 11-13).)

As if these deficiencies were not enough to completely undermine Smith's credibility, Plaintiffs learned at deposition that key sections of Smith's expert report dealing with the nineteenth century legal definitions of the terms "infamous crime" and "felony" were taken verbatim from a memorandum supplied to him by Defendants' counsel.[1] *See* Pls.' App. 343-348 (Smith Dep. 5-29); Pls.' Mot. Exclude deHaven-Smith 13-15. Defendants' attempt to argue points of law in the guise of an expert report amounts to the worst sort of legal ventriloquism, made all the more disturbing in this case because the expert Smith lacks sufficient expertise to evaluate the accuracy of the words that counsel has placed in his mouth.

Because Defendants offer no other expert on this evidence, if Smith's evidence is discounted, Plaintiffs' careful presentation of the historical evidence of discriminatory intent in the enactment of the 1868 felon disenfranchisement provision must prevail. Alternatively, if the Court does not exclude Smith's evidence, genuine disputes of material fact exist regarding the historical evidence in this case sufficient to necessitate a trial on the merits.

**B.    Florida's Felon Disenfranchisement Provision was Adopted with Racially Discriminatory Intent.**

Plaintiffs' claim of intentional discrimination is based on historical evidence provided by Plaintiffs' historical expert, Professor Jerrell Shofner, Professor Emeritus of History at the University of Central Florida, who is widely acknowledged as the nation's preeminent expert on Florida's reconstruction history.    According to Professor Shofner, Florida's felon disenfranchisement provision was put into the state's 1868 Constitution for deliberately discriminatory reasons. (Defs.' App. 427 (Shofner Rep. 2); Defs.' App. 867, 879 (Shofner Dep. 51-53, 98-100).) He bases that opinion on the historical context in which that document was adopted. (Defs.' App. 428 (Shofner Rep. 3); Defs.' App. 879, 896, 899-900 (Shofner Rep. 98-100, 168, 180-83).)

The history of the 1868 Constitution and the convention at which it was drafted offer particularly important evidence in discerning the discriminatory intent of the felon disenfranchisement clause. As described above, the Constitutional convention was split into two factions – the economically-motivated Moderates and the aggressively pro-freedman Radicals. (Defs.' App. 435 (Shofner Rep. 10); *see generally* Defs.' App. 434-43 (Shofner Rep. 9-18).)

---

[1]  The underlying document from which Smith copied was withheld from discovery until Plaintiffs filed a motion with this Court to compel production of relevant documents. (*See* Pls.'

Compelled by Congress under force of martial law to enfranchise the newly freed slaves, the Moderates aligned with conservative ex-Confederates to circumscribe the black vote even as it was granted. *Id.*

The Moderates withdrew from the convention for the express purpose of preventing the Radicals from obtaining the quorum that would have allowed the Radicals to accomplish their suffrage and civil rights agenda. (Pls.' App. 359-360 (Smith Dep. 85).)  Those Moderates returned one week later to take the convention hall by force in the dead of night, posted guards at the door, refused to admit the Radicals, proceeded to expel the Radical leadership from their delegate seats and replace them with the Moderates hand-picked candidates, and, having seized control, discarded the Radical Constitution and replaced it with the Moderate draft containing the felon disenfranchisement clause. (Defs.' App. 437-40 (Shofner Rep. 12-15); Defs.' App. 892-94 (Shofner Dep. 150-61); Pls.' App. 368-370 (Smith Dep. 127-39); Pls.' App. 593-596 (H.R. Misc. Doc. 109 (40th Cong., 2d Sess.), at 1-4); Defs.' App. 793-87 (Shofner, *Constitution of 1868*, at 359-67).)

Moreover, the Moderate Constitution contained provisions that Defendants concede were enacted with discriminatory intent. (Defs.' App. 170, 186 (Smith Rep. 2, 18), Pls.' App. 730 (Smith Blackline 18).) For example, in contrast to the Radical Constitution's provision for equal apportionment based on population, (Pls.' App. 608 (Radical Const. Art. IX, § 1, reprinted in H.R. Misc. Doc. 109, at 16)), the Moderates adopted a legislative apportionment formula based on geography rather than population, which increased the number of representatives from sparsely-populated white counties, but diminished representation from the densely-populated black counties. (Def. App.  589 (1868 Const. Decl. Rts., §14), Def. App.  Defs.' App. 440 (Shofner Rep. 15); Defs.' App. 889-90 (Shofner Dep. 140-44).)  There is no dispute among historians as to either the discriminatory intent or effect of the Moderates' legislative apportionment provision. (Pls.' App. 890 (Shofner Dep. 144).)

In addition to the discriminatory legislative apportionment formula, the 1868 Constitution empowered the governor to appoint his cabinet officers, all court justices, and all local officials except for constables, preempting local elections that would have permitted the newly freed slaves to elect sympathetic representatives in counties where blacks outnumbered whites. (Defs.' App. 440-41 (Shofner Rep. 15-16); Defs.' App. 890 (Shofner Dep. 144-45).)  The Radical

---

Mot. Compel Prod. Docs.)

Constitution provided for elections for all local offices. (Defs.' App. 890-91 (Shofner Dep. 145-46).) It is hard to believe that the felon disenfranchisement provision, enacted by the same men at the same time as the other discriminatory suffrage-related provisions, was somehow cleansed of the same discriminatory intent.

Indeed, the ousted Radical leader Daniel Richards testifies to Congress about three key differences between the Radical Constitution and the Moderate Constitution: (1) gubernatorial appointment of local officials, (Pls.' App. 596-597 (H.R. MISC. DOC. 109, at 4-5)); (2) dilutive legislative apportionment, (Pls.' App. 597 (H.R. MISC. DOC. 109, at 5)); and (3) the provision which extends suffrage to the "vilest rebels" and "*disfranchises thousands of the colored voters.*" (Pls.' App. 597 (H.R. MISC. DOC. 109, at 5) (emphasis added).) Here, Richards explicitly compares the divergent approaches to disenfranchisement taken in the Radical and Moderate Constitutions. The Radical Constitution disenfranchised rebels, on the basis of participation in treason or rebellion. And the Moderate Constitution disenfranchised "thousands of the colored voters" – *on the basis of felony conviction.* Apparently, Daniel Richards was well aware of the effectiveness of a scheme to tie disfranchisement to a racist criminal justice system. And in his opening comments to Congress, he makes clear that he also understood the underlying purpose of the Moderate coup: "Like hungry wolves around a carcass . . .[they] congregated . . . with a common purpose, and that purpose *to defeat reconstruction* . . . in [Florida]." (Pls.' App. 593 (H.R. MISC. DOC. 109, at 1) (emphasis added).)

**C.     Contrary to Defendants' Misstatement of the Law, the Felon Disenfranchisement Clause Adopted in the 1868 Constitution Worked a Dramatic Expansion in the Categories of Crime that Trigger Disenfranchisement.**

Defendants contend that the 1868 felon disenfranchisement provision did not expand the scope of disenfranchisement, because the previous constitution directed the legislature to disenfranchise "all persons convicted of [an] infamous crime," and "the term 'infamous crime' was understood to include *all* felonies." (Defs.' Mem. at 14.) But the very sources that Defendants cite in support of their proposition unambiguously demonstrate Defendants' error.

It is true that the term "infamous crimes" was understood *at common law* to include all felonies. (Defs.' App. 171-77 (Smith Rep. 3-9); Defs.' Mem. at 14 (citing S.M. PHILLIPS, TREATISE ON THE LAW OF EVIDENCE 22 (1816); ARCHIBALD JOHN STEVENS (*sic*), THE LAW OF NISI PRIUS, EVIDENCE IN CIVIL ACTION, AND ARBITRATION AND AWARDS 1721 (1844) and WILLIAM C. ANDERSON, A DICTIONARY OF LAW 540-41 (1893)); *id.* at 15 ("a felony had always

been considered an infamous crime").) As Defendants explain, "infamous crimes" were defined as those crimes that rendered a witness incompetent to testify at trial. *See* Defs.' Mem. at 14 (citing S.M. PHILLIPS, TREATISE ON THE LAW OF EVIDENCE 22 (1816)); (Defs.' App. 173 (Smith Rep. 5) (citing Phillips treatise "as to what crimes rendered a witness incompetent (*i.e., what crimes were infamous)*" (emphasis added)). But in 1845, the Florida Legislature passed a statute that "confirmed and codified the breadth of the term 'infamous crime'" by specifying a list of crimes. (Defs.' App. 173 (Smith Rep. 5).)

The Act of 1845 states that upon enactment of the statute, "no person shall be excluded from being a witness or from giving evidence" – *i.e.,* no person shall be deemed to have committed an infamous crime – "by reason of having been convicted of *any* criminal offence, *except* the crimes of murder, perjury, piracy, forgery, larceny, robbery, arson, sodomy, or buggery . . . ." (Pls.' App. 776-777 (Act of 1845, Section 6, *reprinted in* LESLIE A. THOMPSON, A MANUAL OR DIGEST OF THE STATUTE LAW OF FLORIDA 335 (1847) (emphasis added).) The statute leaves no room for doubt that it codifies the scope of the term infamous crime by detailing *precise* crimes in a *specific* list of offenses that qualify as infamous according to Florida law. Hence, as of 1845, the common law definition of infamous crimes no longer applied, and the state of Florida recognized no crimes as infamous except the nine crimes listed in the statute, namely, murder, perjury, piracy, forgery, larceny, robbery, arson, sodomy, and buggery.

Florida courts have confirmed that the 1845 statute preempts the common law definition of infamous crimes. In *King v. State*, 17 Fla. 183, 1879 WL 2157 (1879), the Supreme Court of Florida explained "The law (Thomp. Dig., 335,) does name the crimes the conviction for which shall exclude the person from being a witness or giving evidence, *thus establishing the meaning of the term 'Infamous Crimes,'* . . . . The offences thus named are 'the crimes of murder, perjury, piracy, forgery, larceny, robbery, arson, sodomy or buggery.'" *Id.* at *3.

Thus, in 1868, according to applicable Florida law, the common law definition of infamous crime no longer applied, and Florida's constitutions disqualified only those who were convicted of an enumerated list of nine crimes, which expressly did *not* include all felonies. By contrast, the 1868 disenfranchisement provision disenfranchises "any person convicted of felony," (Defs.' App. 602 (1868 Const. art. XIV, § 2)), an unenumerated category capable of ballooning to unlimited numbers of offenses. Defendants have failed to explain the fact that at precisely the moment when the state of Florida was forced to extend the franchise to African

American men, the 1868 constitution expanded the dragnet of disenfranchising crimes that would allow the suffrage so reluctantly extended to Florida's former slaves to be withdrawn.

**D.     The Existence of Narrower Criminal Disenfranchisement Provisions in Florida's Early Constitutions is Irrelevant to the Discriminatory Enactment of the Expanded Felon Disenfranchisement Provision in the 1868 Constitution.**

Defendants contend that the 1868 felon disenfranchisement provision cannot possibly have been enacted with a discriminatory intent because Florida's earlier constitutions contained criminal disenfranchisement provisions at a time when only whites could vote. (*See* Defs.' Mem. at 12-13.)    As demonstrated above, it simply is not the case that the felon disenfranchisement provision at issue in this case, or one comparable to it, was in force before blacks could vote.

But even if the 1868 provision were identical to its predecessors, that would not preclude its being pressed into discriminatory service. The illogic of Defendants' argument – that a law once enacted without discriminatory intent remains forever innocent – is demonstrated by Florida's own history. The 1865 Florida Constitution, as Defendants rightly point out, prohibited African Americans from voting. At the same time, the 1865 Constitution authorized the levying of a capitation tax, (Defs.' App. 582 (1865 Const. art. VIII, § 5)), more popularly known as a poll tax. *See Pacific Ins. Co. v. Soule*, 74 U.S. 433, 440 (1868) (defining capitation tax). The 1865 poll tax authorization cannot have been adopted with the intent to discriminate against African Americans' voting rights. And yet Defendants concede that the poll tax adopted in the 1885 Florida Constitution was without question intended to restrict African American voting rights. (Defs.' App. 170 (Smith Rep. 2).) Like the poll tax, disenfranchisement provisions are neither inherently discriminatory nor innocent. Their harm comes from their discriminatory enactment and application. Defendants' argument that a law once used well can never be used ill defies the well-known history of the use and abuse of facially neutral but potentially discriminatory voting qualifications. *See, e.g., Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 684 (1966) (Harlan, J., dissenting) ("Property qualifications and poll taxes have been a traditional part of our political structure. . . Most of the early Colonies had [property qualifications]; many of the States have had them during much of their histories.").

E.      **Defendants Have Failed to Show That the 1968 Reenactment Cleansed Florida's Felon Disenfranchisement Provision of the Taint of Racial Discrimination.**

A racially neutral law quickly turns discriminatory when used with invidious intent, but that transformation is not readily reversible. The Supreme Court has recognized that once a law has been infected with racist intent, it is not so easy to detoxify it. At the very least, "given an initially tainted policy, it is eminently reasonable to make the State bear the risk of nonpersuasion with respect to intent at some future time, both because the State has created the dispute through its own prior unlawful conduct, and because discriminatory intent does tend to persist through time." *United States v. Fordice*, 505 U.S. 717, 746-47 (1992) (Thomas, J., concurring). Defendants contend that the 1968 reenactment of Florida's felon disenfranchisement provision purged its racist intent. But they lack any evidence that the 1968 constitutional revision did anything to cure the provision's discriminatory purpose. Florida's permanent ban on voting by ex-felons is - for all purposes relevant to Plaintiffs' claims - the same intentionally discriminatory law enacted to disenfranchise Florida's black citizens. And to this day, it continues to carry out its original mission.

1.      **There is no evidence that the 1968 reenactment created a new felon disenfranchisement policy or substantively reexamined the blanket ban on voting by felons carried over from the 1868 constitution.**

To understand the basic identity of the provision enacted in 1868 and the current ban on felons' voting, it is necessary to review the development of criminal disenfranchisement and related provisions in Florida's constitutions from 1838 to the present and the evidentiary record of the 1968 constitutional revision process. Defendants obscure both issues.

Though Florida has had some form of discretionary and mandatory disenfranchisement of criminals since the state's first Constitution, a major break occurred in 1868. Florida's early constitutions authorized disenfranchisement and exclusion from public office for individuals convicted of bribery, perjury or other "infamous crime," and mandated those sanctions for those convicted of bribery, perjury, forgery, "or other high crime, or misdemeanor." But in 1868 a whole new section was added, directly disenfranchising "any person convicted of felony." Thus, the 1868 constitution included the new section directly disenfranchising all felons and a section that both authorized and directed the state legislature to exclude from office and suffrage those convicted of enumerated dishonesty offenses and "infamous crimes," expanded to include larceny. As the commentary to the Florida statutes explains, this dual approach "was originally

taken in the 1868 Constitution." Fla. Stat. Ann. Const. app. Art. VI, §4. Florida's most recent 1968 constitution drops the whole enumerated list,[2] and, indeed, the entire approach of the original 1838 sections. It retains only the direct prohibition on voting by felons and mental incompetents that first appeared in the intentionally discriminatory 1868 section, adding into it the office-holding ban from the discarded enumerated-laws section. Fla. Const. Art. VI, §4(a).

### 2.        There was no deliberative review of felon disenfranchisement in 1968.

Defendants attempt to obfuscate the total lack of evidence of any "deliberative" process engaging the felon disenfranchisement provision during the constitutional revision process of 1965-1968. In particular, the statement that "it is undisputed that the specific substance of the prohibition on voting by felons was debated during the revision process" is hogwash. (Defs.' Mem at 10- 11.) Plaintiffs certainly dispute that proposition. Contrary to Defendants' assertion, there is no record of any debate during the revision process on either the specific terms or the general ideas of the challenged provision; to state otherwise flatly contradicts the record, as well as both Professor Scher's report and his deposition testimony, all of which confirm that no transcript, summary, legislative record, or other account of the revision process records any conversation or discussion, much less debate, regarding the provision. (Defs.' App. 88-89, 94 (Scher Dep. 49, 51, 71, 88-89, 94), Defs.' App. 1, 2, 3 at n.9, 5, 8, 9, 10 (Scher Rep. 1, 2, 3 at n.9, 5, 8,9,10).) What the only expert whose testimony is being offered on the subject actually said was, "A careful review of the available public record on the proceedings and public hearings of the 1965-1967 Constitutional Revision Commission, and subsequent action by the 1967 Florida Legislature reveals no discussion or consideration of the issues involved with felons' voting rights." (Defs.' App. 5 (Scher Rep. at 5).)

Defendants' brief is also misleading on the scope of the revisions to the Constitution overall. It quotes Plaintiffs' expert out of context, saying that the revision commission was "designed to completely overhaul the state constitution." (Defs.' Mem. at 8.) In context, it is clear that what was being "overhauled" was form, not substance.

---

[2] Defendants are mistaken that the removal of larceny indicated an attempt to make the provision less racially discriminatory. In 1868, larceny was considered one of the "'minor offenses' attributed to African-Americans." (Defs.' Mem. at 10, citing Shofner Dep. 17, 6-7). By 1968, however, a different conception of black crime had developed, one that focused on violence. (*See* Scher Dep. at 4, explaining that in 1968 "law and order" was "a code phrase aimed at fanning white fears of black crime and violence.")

F.    **The Minor Semantic Revisions to the Felon Disenfranchisement Provision in 1968 Do Not Exempt the Provision from the Clear Rule of *Hunter v. Underwood*.**

Despite the minor changes in wording made at its reenactment, Florida's felon disenfranchisement provision remains subject to the analysis set out by the Supreme Court in *Hunter v. Underwood*, 471 U.S. 222 (1985). There, the Court rejected the argument that "events occurring in the succeeding 80 years had legitimated" Alabama's felon disenfranchisement provision, which had been enacted in 1901. *Id.* at 233. The provision had been altered substantively, as courts struck down some of the enumerated bases for disenfranchisement. *Id.* Nevertheless, the Court focused on the original enactment, holding that proof of discriminatory intent at that point, triggered the burden-shifting analysis mandated in *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) and *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). 471 U.S. at 277-28. Under *Hunter*, the pro forma reenactment and semantic modernization accomplished in 1968 do not relieve the State of the burden of proving that Florida's disenfranchisement provision is no longer intentionally discriminatory.

Ruling to the contrary would eviscerate modern equal protection law. Under such a theory, a state would be free to pass facially neutral laws for blatantly discriminatory purposes, so long as it followed up some time later with a few cosmetic amendments passed without any comment or record of legislative purpose. If principles of equal protection are ever to reach facially neutral policies, that simply cannot be the standard.

For this reason, the Fifth Circuit's decision on which Defendants' chiefly rely, *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998), is out of step with the extensive caselaw cited herein. In Cotton, a pro se challenge to Mississippi's felon disenfranchisement law, the Court found that subsequent amendments to the challenged law had superseded the previous provision and removed the discriminatory taint from the original version. *Id.* at 391. While the pro se plaintiff in the case had not adduced any evidence regarding the most recent enactment of the provision, *id.* at 392, the Court erred in placing the burden on the plaintiff to adduce such evidence. In any event, Plaintiffs here would prevail even under the Fifth Circuit's *Cotton* decision, which the court held "broadly stands for the important point that when a plan is reenacted -- as opposed to merely remaining on the books like the provision in *Hunter* -- the state of mind of the reenacting body must also be considered." *Chen v. City of Houston*, 206 F.3d 502, 521 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 2020 (2001). Here, Plaintiffs have adduced evidence through the testimony of

Professor Richard Scher of the events surrounding the 1968 reenactment and the fact that the felon disenfranchisement provision's racist roots were not confronted or rejected.

1.  **Courts Routinely Look to Previous Versions of a Statute to Discern the Legislative Intent of Subsequent Laws.**

Where statutes have been reenacted with little change, courts routinely look to the history of prior enactment's in interpreting the meaning or the underlying purpose of the statute. *See FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 433-34 (1986) (looking to history of original enactment of thrice-reenacted statute to find statute's underlying purpose); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985) (identifying "overriding goal of the Arbitration Act" by reference to its 1924 legislative history, without even mentioning its 1947 reenactment and codification); *Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. 20, 24 (1991) (noting 1947 reenactment and reaffirming Dean Witter's reliance on 1924 legislative history as basis for interpreting Act's purpose.) [3] According to a well-established principle of statutory construction, a court should presume that "the re-enactment of a statute in substantially the same words effects no change in the law, but merely continues the original law in force." 73 Am. Jur. 2d *Statutes* §322 (citations omitted); *see Mesker Bros. Indus., Inc. v. Leachman*, 529 S.W.2d 153, 159 (Mo. 1975) ("There is no reason to assume ... that the legislature, in reenacting the Act in a form in all material respects identical with the prior Act, had any different intention as to its meaning."). Where a statute was amended, or where it was reenacted in a revised form after repeal, the presumption is that any provisions that the legislature did not alter did not change in meaning. *See, e.g., Le Mars Mut. Ins. Co. v. Bonnecroy*, 304 N.W.2d 422, 424 (Iowa 1981) ("[m]ere differences in words or arrangement should not generate an inference of legislative intent to change the former rule."); *Misle v. Miller*, 125 N.W.2d 512, 517 (Neb. 1963) (noting "a rule of construction that ordinarily words used in the original act will be presumed to be used in the same sense in an amendment thereof").

---

[3] *See also Agostini v. Felton*, 521 U.S. 203, 209 & n.*. (1997) (locating the purpose of Title I of the Improving America's Schools Act of 1994, 108 Stat. 3518, 20 U.S.C. § 6301 et seq., in the legislative history of its predecessor Elementary and Secondary Education Act of 1965, 79 Stat. 27, as modified); *Conroy v. Aniskoff*, 507 U.S. 511, 514-18 (1993) (relying, in part, on the "long and consistent" history of various versions of a law from the Civil War to WW 11 in interpreting the modern statute); *Stewart v. Abend*, 495 U.S. 207, 218-19 (1990) (interpreting the Copyright Act in reliance on the legislative history of both the 1909 Act and its 1976 reenactment).

2.    **In Determining Discriminatory Legislative Intent, the Same Principle Applies of Examining the Intent of Predecessor Statutes.**

The same statutory construction principle applies in the area of determining whether a reenactment has disturbed a statute's original discriminatory intent.[4] *See Irby v. Va. State Bd. of Elections*, 889 F.2d 1352, 1355-56 (4th Cir. 1989) (rejecting argument that mere fact of reenactment 60 years later could purge the original discriminatory intent and finding such purge based on the state legislature's having commissioned a study which included public hearings throughout the state).

**II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR VOTING RIGHTS ACT CLAIM.**

Plaintiffs are entitled to summary judgment on their vote denial claim because the uncontroverted facts prove that Florida's permanent disenfranchisement of ex-felons violates Section 2 of the Voting Rights Act. Plaintiffs have produced a variety of evidence - statistical and historical, direct and circumstantial - that the state has stripped them of their voting rights on account of race. Nevertheless, Defendants have rehashed the arguments from their failed motion to dismiss that plaintiffs are relying on "unvarnished statistical analysis" (Defs.' Mem. at 31) and a "bare showing" (*Id.* at 30) of disparate impact that is "unconnected to racial discrimination" (*Id.* at 24). A careful review of the record in this case will reveal that Defendants have distorted Plaintiffs' evidence and the standard by which that evidence is to be measured, and therefore cannot prevail on their motion for summary judgment.

---

[4] *See Bolden v. City of Mobile*, 542 F. Supp. 1050, 1074-76 (S.D. Ala. 1982) (on remand from Supreme Court, concluding that at-large election system in Mobile was motivated by unconstitutional discriminatory intent based on evidence from post-Reconstruction period through 1911, notwithstanding absence of evidence of discriminatory intent in regard to more recent amendments to the at-large system); *See also Personnel Admr of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) ("Yet, nothing in the record demonstrates that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service."); *Oyama v. California*, 332 U.S. 633, 650-51 (1948) (Murphy, J., concurring) ("California has disclaimed any implication that the Alien Land Law is racist in its origin, purpose or effect.... However, an examination of the circumstances surrounding the original enactment of this law in 1913, its reenactment in 1920 and its subsequent application reveals quite a different story.").

A.      **Defendants' Brief Obscures the Practical, Comprehensive Standard of Proof in a Vote Denial Claim under Section 2 of the Voting Rights Act.**

Defendants are so concerned to limit the boundaries of the Voting Rights Act to exclude felon disenfranchisement that they obscure the contextual standard courts have developed for Section 2 claims.  To be sure, Section 2 is only violated by practices that deny or abridge the right to vote "on account of race." 42 U.S.C. § 1973.  But it is clear that this "on account of race" requirement can be established by showing that the challenged practice interacts with other circumstances in the jurisdiction to deny minorities equal opportunity to participate in the political process.  Whether a particular practice is sufficiently connected with racial bias to result in vote denial in violation of Section 2 always depends on the "totality of the circumstances" in which the practice operates. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1198 (11th Cir. 1999) (quoting 42 U.S.C. §1973(b).)

As the plain language of the statute makes clear, Section 2 focuses on results, not intent.  In fact in 1982, Congress amended Section 2 specifically to clarify that "practices and procedures that result in the denial or abridgment of the right to vote are forbidden" even without proof of discriminatory intent. *Chisom v. Roemer*, 501 U.S. 380, 383 (1991).  When presented with a Section 2 claim, a court must assess the impact of the challenged practice on minority participation in elections on the basis of "objective factors."  It is clear then that the disparate impact of a practice and the historical background of official discrimination in a jurisdiction may combine to constitute sufficient circumstantial evidence that the practice works its disadvantage to minority voting strength "on account of race." *See, e.g., United States v. Marengo County Comm'n*, 731 F.2d 1546, 1574 (11th Cir. 1984); *see also Harris v. Graddick*, 593 F. Supp. 128, 132 (M.D. Ala. 1984).  In other words, the required nexus between a voter qualification and race is based on the totality of circumstances, which may include many factors not directly causally related to the challenged practice.

B.      **Defendants Have Mischaracterized the Proof on Which Plaintiffs Rest Their Voting Rights Claim**

Besides narrowing the Section 2 proof standard beyond recognition, Defendants' brief writes much of Plaintiffs' proof out of existence.  It is simply not true that Plaintiffs "have not asserted that the allegedly impermissible results of the prohibition on felon voting stem from racial discrimination," Defs.' Mem. at 22, or that Plaintiffs "have not alleged that the

disqualification bears any relation to racial discrimination." *Id.* at 23. Plaintiffs not only have alleged a sufficient connection between felon disenfranchisement and discrimination, they have proved a far stronger connection to discrimination than the 'results test' requires.

### 1.   Plaintiffs have brought significant, undisputed historical evidence of intentional discrimination.

Plaintiffs rely on undisputed facts to prove that Florida's felon disenfranchisement scheme was conceived with racist intent and is part of an ongoing pattern of interactive discrimination played out between Florida's criminal justice system and the state's electoral structures. *See, e.g., Marengo County Comm'n.*, 731 F.2d at 1567 ("A history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination." (citing *Rogers v. Lodge*, 458 U.S. at 613, 624 (1982))); *Meek v. Metro. Dade County, Fla.*, 805 F. Supp. 967, 978-79 (1992) (history of discrimination can severely damage minorities' ability to participate in political process). As argued above, Plaintiffs' expert historian traces the current felon disenfranchisement law to racist origins. Further, Plaintiffs' have detailed the many ways in which Florida has used its criminal laws and law enforcement to restrict blacks' participation in politics and society overall. This is exactly the sort of interactive relationship between a voting qualification and its surrounding social circumstances that the Supreme Court has identified as the basis for a potentially valid Section 2 claim.[5]

---

[5] Plaintiffs' evidence of the history of intentional race discrimination and Florida's felon disenfranchisement provision is the primary difference between this case and the challenge to the State of Washington's felon disenfranchisement law, currently before the Ninth Circuit. *Farrakhan v. Locke,* No. CS-96-76 (E.D. Wash. Dec. 1, 2000), *appeal pending.* The district court in Farrakhan found that there was absolutely no evidence of intentional race discrimination in Washington's original adoption of felon disenfranchisement and no evidence of any general history of discrimination touching minorities' voting rights. Farrakhan Order at *7. The district court's holding, quoted by Defendants (Defs.' Mem. at 27), that a vote denial claim cannot be predicated on discrimination "outside of the challenged mechanism" defies the interactive nature of Section 2 claims. *See Thornburg,* 478 U.S. at 47. Accepting the *Farrakhan* court's standard would effectively read an intent requirement back into Section 2, vitiating the results test. Unless there is proof that a challenged voting qualification was adopted or maintained out of racial animus, its application can only "result" in vote denial on account of race through its interaction with race disparities and bias in the surrounding social circumstances.

**2.      Plaintiffs' Statistical Evidence of Discriminatory Impact Is Proof of Intentional Race Discrimination and Systemic Racial Bias.**

Defendants imply that Plaintiffs' statistical evidence of racial disproportionality in felony conviction, disenfranchisement, and rights restoration cannot serve as proof of underlying racial discrimination. To the contrary, circumstantial evidence, including statistics, is core proof that a challenged voting structure is infected with racial bias." *See Hunt v. Cromartie*, 526 U.S. 541, 547-49, 551 (1999) (holding that a genuine issue existed as to the intent of a redistricting plan even though plaintiffs "offered only circumstantial evidence in support of their claim"); *Lodge v. Buxton*, 639 F.2d 1358, 1363, 1375 (5th Cir. Unit B Mar. 1981) ("A discriminatory purpose may be inferred from the totality of circumstantial evidence."), *affd sub nom. Rogers v. Lodge*, 458 U.S. 613 (1982); *see also, e.g., Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 489 (1997) (treating the effect of a voting plan as probative of intent and listing other "relevant" forms of circumstantial evidence). Unless Defendants can rebut the inference of bias raised by Plaintiffs' evidence of substantial disparate impact, it stands as proof that Florida's felon disenfranchisement scheme hampers African American participation in the political process by importing racial bias from the surrounding social circumstances into the voting process. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) (evaluating "all available direct and circumstantial evidence of intent in determining discriminatory purpose, including evidence of "substantial disparate impact.").

**a.      *A typical Section 2 claim rests on statistical proof.***

The most common type of Section 2 claim-districting challenges -- depends primarily on a showing of statistics offered to prove race bias in the electoral process. As here, the ultimate question in such cases is whether the system prevents minority voters from electing representatives of their choice. The Supreme Court has mandated the evidence plaintiffs must present to prevail on vote dilution claims: statistical proof of racial bloc voting coupled with proof the minority group bringing suit is able to make up a majority in a single member district *Thornburg*, 478 U.S. at 48-49. In the Section 2 context then, not only is statistical proof treated as "circumstantial evidence of racial bias operating through the electoral system to deny minority voter equal access to the political process," *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994); so long as a feasible remedy exists, such statistical evidence alone "generally will be sufficient to warrant relief" *Id.*

    **b.**     *Plaintiffs' expert evidence of racial disparities in Florida's criminal justice system proves a Section 2 violation just as statistical evidence of voter polarization supports a violation in more typical Section 2 challenges.*

Plaintiffs' expert evidence regarding racial disparities in felony convictions raises a strong inference of racial bias, sufficient to prove the requisite connection to racial bias. It is indisputable that convicted felons represent a small subset of all those who engage in felonious behavior. It is also indisputable that a host of discretionary decisions at every level determines who among the law breakers will be arrested, prosecuted, and, ultimately, convicted. There is nothing inherently illegitimate about this situation, reflecting as it does, policy choices by a government with limited resources and a host of problems and goals to attend to. However, when the discretionary decisions that lead to or away from felony convictions intersect with racial bias, then the Voting Rights Act prohibits using those convictions as a voter qualification. *See Baker v. Pataki*, 85 F.3d 919, 934 (2d Cir. 1996) (Feinberg, J., concurring)[6] (dismissal of vote denial claim under Section 2 was inappropriate where plaintiffs alleged racially disparate treatment in sentencing). When racial bias is partly responsible for who is in the convicted felon category, then felon disenfranchisement is a denial of the right to vote on account of race.[7]

    **c.**     *Defendants have failed to rebut the inference of discrimination raised by Plaintiffs' statistical evidence of racial amplification in felony conviction rates.*

Plaintiffs' statistical evidence regarding the racial disparities in felony convictions raises an inference that the disparate impact of felon disenfranchisement results from the interaction of that scheme with race bias in the criminal justice system and the effects of race discrimination in the society at large.[8] Defendants have failed to explain away this inference. While the inference

---

[6] In the voting rights challenge to felon disenfranchisement brought before the Second Circuit, the in banc court split evenly, ultimately affirming the lower court's dismissal of the case but creating no precedent in the circuit. *Id.* at 921 n.2.

[7] Plaintiffs' targeted evidence of racial amplification in Florida's felony conviction rate is one factor that distinguishes their case from the facts underlying *Wesley v. Collins*, 791 F.2d 1255 (6th Cir. 1986). In rejecting that Section 2 challenge to felon disenfranchisement, the Sixth Circuit gave no hint that it received any evidence on the source of the alleged racial disproportionality. *Id.* at 1260.

[8] It is important to distinguish between Plaintiffs' statistical evidence of racial amplification in felony convictions from the point of arrest, and the disproportionate numbers of blacks and whites disenfranchised in comparison with their respective numbers in the population. The

"is not immutable, . . . it is strong; it will endure unless and until the defendant adduces credible evidence" to explain the observed racial disproportions as the result of factors other than race. *Vecinos de Barrio Uno v. City of Holyoke,* 72 F.3d 973, 983 (1st Cir. 1995).

Plaintiffs' evidence shows that when all 1998 Florida arrestees who are identified by the State as having a "felony" charge at arrest are compared with all individuals convicted of felonies in Florida in 1998, excluding those convicted who did not lose their voting rights because adjudication was withheld, a significant racial disproportionality exists. (Katz Dep. Ex. 4). Defendants do not dispute that fact. Nor do defendants dispute that the disproportionality was highest for drug and weapons offenses - 22% and 50%, respectively - where there is generally discretion in arrest and prosecution decisions than for crimes such as murder and rape, which show lower levels of disproportionality. (Pls.' App. 25 (Chiricos Dep. At 97; Defs.' App. 23-24 (Chiricos Rep at 13-14).) *See also* Alfred Blumstein, *Racial Disproportionality of US Prison Populations Revisited,* 64 U. Colo. L. Rev. 743, 759 (1993) ("For the less serious crimes, there is greater disparity between the race ratio at arrest and that in prison, probably because there is more room for the exercise of discretion."). Defendants also do not challenge Plaintiffs' evidence that the existing procedure for restoring voting rights in Florida does not ameliorate racial disparities in felon disenfranchisement. (Defs.' App. 489, 498 (Uggen Revised Rep. 2, 11).) Nor have Defendants established any persuasive alternative explanation for the observed race disparities.

Instead, Defendants raise three methodological objections, none of which even raises a material issue of fact regarding the racial disproportionality at issue.

Defendants first argue that Plaintiffs' figures ignore the role of repeat offending. This is a red herring. Close reading of Defendants' expert's rebuttal report reveals that his conclusion that some of the racial disproportionality in Dr. Chiricos's study was related to arrestees' prior

---

difference between the two kinds of proof is analogous to the requirement in hiring discrimination suits under Title VII that plaintiffs compare the hiring rates of minorities with the percentage of qualified individuals who are eligible for hire, rather than the simple proportion of minorities in the general population. *See, e.g., In re Employment Discrimination Litig. Against Alabama,* 198 F.3d 1305, 1312 & n.1 (11th Cir. 1999) (noting that qualified applicant pool must be tailored "to reflect only those potential applicants who are actually qualified for the job or job benefit at issue.") By comparing blacks and whites convicted of felonies with the numbers of those arrested, rather than with the general population, Plaintiffs' have met an analogous standard of relevance and have gone far beyond a "bare showing" of disparate impact.

felony record is not premised on a regression analysis that controls for prior felon record. (Pls.' App. 306 (Katz Dep. 113 -14); Defs.' App. (Katz Rep. 20-21).) Instead, Defendants' expert merely hypothesizes, without testing his hypothesis, that such higher percentages could potentially serve as an explanation for the racial disparity. (Pls.' App. 294-95 (Katz Dep. 56-58).) Nor can Defendants explain why a study of Florida's arrest and conviction figures for 1998 shows that even blacks with no prior felony record are approximately 37% more likely to be convicted of a felony than whites with no prior record.

Equally bogus is defendants' contention that plaintiffs' expert erroneously excluded from his count, the "convictions" of people who received a disposition of "adjudication withheld." Under Florida law, individuals convicted of felonies who receive a disposition of adjudication withheld do not lose their right to vote. Individuals who receive adjudication withheld dispositions and keep their right to vote were thus properly excluded from the expert's calculus.

Finally, Defendants complain that the count of arrests in Dr. Chiricos' initial study includes individuals whose charge level at arrest is coded "misdemeanor" and "unknown" as well as "felony." However Defendants do not dispute Dr. Chiricos' finding that racial disproportions exist when felony conviction rates are compared against all arrests, and against only arrests coded as "felony" in the state's database. While the amount of racial disproportionality varies with the method chosen to examine it, a significant level of disparity appears in all analyses.

## C.   Plaintiffs Intend to Bring Additional Evidence Linking the Discriminatory Impact of Florida's Felon Disenfranchisement Scheme to Racial Bias.

Discovery is still open. Plaintiffs intend to bring evidence at trial on how past and present law enforcement policies and practices result in disproportionate numbers of African Americans being arrested for criminal behavior. We intend to call as an expert witnesses an ex-law enforcement executive familiar with Florida's police policies.

Some of the increased vulnerability of African Americans to arrest, and thus, ultimately to felony conviction and disenfranchisement, results from socio-economic differences between races. *See, e.g., Meek v. Metro. Dade County, Fla.*, 805 F. Supp. 967, 979 (S.D. Fla. 1992), *aff'd in relevant part per curiam*, 985 F.2d 1471 (11th Cir. 1993) (noting disparities). Plaintiffs intend to develop still more examples of the felon disenfranchisement laws interacting with historic and

systemic racial bias to deprive African Americans of their right to equal participation in the political process.

**D.    An Analysis of the Totality of Circumstances Shows That Plaintiffs Have Proven a Violation of Section 2.**

Applying objective factors identified by the Senate Judiciary Committee during the 1982 Voting Rights Act amendment process, it is clear that Plaintiffs are entitled to summary judgment on their vote denial claim, or at least have raised issues of material fact that can only be resolved at trial.  In its final Report, the Committee set out nine factors that should guide this court's inquiry into Florida's violation of Section 2.  A violation may be predicated on any combination of the various factors and any other relevant social circumstances.  The enumerated factors are "neither comprehensive nor exhaustive," and "other factors may also be relevant and may be considered."  *Thornburg v. Gingles,* 478 U.S. 30, 45 (1986).  Moreover, there is no requirement that any particular factor be proved or that most of the factors point in the direction of a violation.  *Id.*

As detailed above in the Statement of Facts, Plaintiffs have persuasive evidence on seven of the nine Senate factors, amply supporting a Section 2 claim: (1) history of official discrimination touching on the right to vote; (2) racially polarized voting; (3) practices that may enhance the opportunity for discrimination, such as the clemency process and the 2000 felon purge process; (4) whether members of minority group bear effects of past discrimination; (5) racial appeals in campaigns; (6) the extent to which members of the minority have been elected to public office; and (7) the tenuous policy underlying the contested practice.

**E.    Given All of Plaintiffs' Evidence Linking Felon Disenfranchisement to Racial Bias, No Issue of Congressional Power Under Section 2 is Raised.**

Defendants' arguments that Section 2 does not apply to felon disenfranchisement provisions and that such a prohibition would exceed Congress' power under the Fourteenth and Fifteenth Amendments are without support in Voting Rights Act jurisprudence.  There is nothing in the text of amended § 2 which indicates that it does not protect African-Americans from racial discrimination by a state's felon disenfranchisement regime.  As long as Congress' action constitutes a remedy at all appropriate for prohibiting conduct that violates the Fourteenth or Fifteenth Amendment, its within their power.  *See City of Rome v. United States,* 446 U.S. 156, 173-77 (1980); *see also Baker v. Pataki,* 85 F.3d 919, 937 (2d Cir. 1996) (Feinberg, J.,

concurring) ("States ... do not have the right to disenfranchise felons on the basis of race.... I see no persuasive reason, in view of Hunter, why Congress may not use its enforcing power . . . to bar racially discriminatory results" in regard to felon disenfranchisement).

Defendants have it backwards by insisting that if Congress had intended to invalidate state felon disenfranchisement provisions, there would be some record of that in the Act's legislative history.[9]  The text of § 2, as amended in 1982, is written in broad terms and plainly shows that Congress intended it to cover all elections, all offices, and all voting practices.  No evidence whatsoever suggests that this language was intended to proscribe all discriminatory "voting qualifications or prerequisites to voting" except felon disenfranchisement provisions.

Defendants echo the county defendants in *Marengo County Commission*, who argued that § 2's results test exceeded Congress's enforcement powers under the Fourteenth and Fifteenth Amendments.  *See* 731 F.2d at 1556, 1559.  The Eleventh Circuit rejected this argument outright. Noting that "Congress may invalidate the perpetuation of earlier purposeful discrimination, and act to eradicate the continuing effects of that discrimination," the court concluded that "[t]he 1982 amendment to section 2 of the Voting Rights Act is clearly within the enforcement power." *Id.* at 1557.  The court emphasized that in enacting the 1982 amendments, Congress had before it evidence of the obstacles to proving intentional discrimination and of substantial voting discrimination even outside jurisdictions subject to preclearance.  *Id.* at 15 5 8-60.  As a result, "Congress could justifiably conclude that a nationwide prohibition of voting practices with discriminatory results was necessary to remedy the effects of purposeful discrimination throughout the country." *Id.* at 1560; *see also Jones v. City of Lubbock*, 727 F.2d 364, 373-75 (5th Cir. 1984).

The Eleventh Circuit's holding in Marengo is completely consistent with recent Supreme Court decisions on the scope of Congress's enforcement powers.  In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court ruled that "[legislation which deters or remedies constitutional

---

[9]  In arguing that the legislative history of the Voting Rights Act suggest that felon disenfranchisement is outside of the scope of § 2, *see* Defs.' Mem. at 35-36, Defendants rely on a snippet of the 1965 Senate Report referring to the definition found in § 4(c) of the Act for the phrase "test or device." But this legislative history is not relevant here, as no claim is being brought under § 4 and § 4 is notably different from § 2. *See Baker*, 85 F.3d at 939 (Feinberg, J., concurring).  The scope of § 2 is much broader than that of § 4: Section 2 applies in every state, not just the ones defined in § 4(b); and it applies to every "voting qualification or prerequisite to voting or standard, practice, or procedure," not just a "test or device" as defined in § 4(c).

violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." *Id.* at 518; *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000) (same). In fact, the *City of Boerne* Court used the Voting Rights Act as its prime example of an acceptable remedial measure in light of the evidence before Congress of "widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination." *Id.* at 525-27, 530, 532; *see also Bush v. Vera*, 517 U.S. 952, 991-92 (1996) (O'Connor, J., concurring) (stating that a strong presumption exists that § 2 is constitutional).[10]

### III.   THE ENORMOUS NUMBERS AND SIGNIFICANT PERCENTAGE OF THE FLORIDA ELECTORATE DISENFRANCHISED AS EX-FELONS VIOLATE THE RIGHT TO VOTE UNDER THE FIRST AND FOURTEENTH AMENDMENTS.

Defendants contend that the Supreme Court's 1974 decision in *Richardson v. Ramirez*, 418 U.S. 24 (1974), bars Plaintiffs' claim that Florida's extensive disenfranchisement of ex-felons today violates their fundamental right to vote. But in *Ramirez*, the Court never addressed Plaintiffs' claim: that the extent of disenfranchisement created by Florida's permanent exclusion of ex-felons from the electorate is so severe that it constitutes a violation of the fundamental right. *Ramirez* did not hold that felon disenfranchisement could never place an unconstitutional burden on the right to vote. The facts here prove a burden severe enough to distinguish *Ramirez* and to make clear that Florida's lifelong ban on voting by ex-felons cannot survive constitutional review.

### A.   *Ramirez* Did Not Endorse Every Possible Felon Disenfranchisement Scheme, No Matter What Its Purpose or Effect.

The Supreme Court has never addressed how severely a state may burden the voting rights of its citizens through the application of a felon disenfranchisement scheme. In *Ramirez*, the Court considered the more limited question whether a state was ever authorized to disenfranchise otherwise qualified voters based on past criminal conviction. It held that the Fourteenth Amendment did not "prohibit outright" such disenfranchisement. *Id.* at 43 (emphasis

---

[10] Subsequent limitations on Congress' enforcement powers have, like *City of Boerne*, involved measures that are distinguishable from the Voting Rights Act and/or instances where Congress lacked evidence that unconstitutional conduct was occurring. *See, e.g., United States v. Morrison*, 120 S. Ct. 1740, 1758 (2000) (Violence Against Women Act); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 640 (1999) (Patent Remedy Act").

added).  The fact that a policy does not in and of itself violate constitutional principles does not mean that it can never be prohibited, no matter what its purpose or effects.  *See Hunter v. Erickson*, 393 U.S. 385, 392-93 (1969).  Indeed, years after *Ramirez*, in *Hunter v. Underwood*, 471 U.S. 222 (1985), the Court found that adopting a felon disenfranchisement provision for racially discriminatory reasons would invalidate the provision.  Here, the vast expansion of the portion of the electorate kept from voting because of Florida's disenfranchisement scheme makes this case an exception *Ramirez.*

Today in Florida over 600,000 people, over 5% of the voting age population (and 10% of the African American voting population) are disenfranchised because of prior convictions.  In contrast, under the provisions upheld in *Ramirez*, only about 100,000 ex-felons had been disenfranchised, *see* Appendix at 21, *Ramirez*, (No. 72-1589), out of a voting-age population of close to 14 million.  *See* State of California, Department of Finance, Race/Ethnic Population with Age and Sex Detail, 19702040.  Thus less than 0.75% of the population was disenfranchised by the provisions *Ramirez* considered.  As a proportion of the voting-age population, more than seven times as many ex-felons are disenfranchised in Florida today.

Because the effects of Florida's disenfranchisement scheme are so grossly antidemocratic, and because *Ramirez's* upholding of the moderate disenfranchisement laws of California in the early-1970's bears scant relevance to the constitutional inquiry mandated by those effects, *Ramirez* does not control this case.  *Ramirez* did not address the limits of a state's power to disenfranchise ex-felons.  The extreme burdens Florida's criminal disenfranchisement scheme places on the integrity of the state's electoral process calls those limits into question.  *See Davis v. Bandemer*, 478 U.S. 109, 132 (1986) (White, J., plurality opinion) (holding that even a race-neutral redistricting plan is unconstitutional if they "consistently degrade a voter's or a group of voters' influence on the political process as a whole"); *id.* at 161 (Powell, J., concurring in part).

**B.      The Severe Burdens Imposed by Florida's Disenfranchisement Provision Makes It Subject to Heightened Scrutiny, Which It Fails.**

Florida's disenfranchisement scheme so severely depletes the voting power of its citizens that it exceeds the scope of disenfranchisement permissible under *Ramirez* and must instead be considered under the line of cases protecting the fundamental right to vote, whose continuing vitality was confirmed last Term in *Bush v. Gore*, 531 U.S. 98 (2000).  As the *Bush v. Gore*

Court reiterated, the Constitution demands that a state provide all its citizens with equal voting rights, except where the state has a powerful justification for not doing so. *Id.* at 104-05. Furthermore, unequal burdens on the right to vote elicit heightened scrutiny, and the burden is on the state to show that its vote-burdening action is justified. *Id.*

Extreme burdens on the right to vote elicit exacting judicial scrutiny. This proposition, reiterated most recently and emphatically by the Court in *Bush v. Gore*, is a core postulate of constitutional scrutiny of political process regulations. "[T]he rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Under this sliding scale approach, "severe" restrictions are subject to strict scrutiny and they must be "narrowly drawn to advance a state interest of compelling importance" while "reasonable, nondiscriminatory" burdens are subject to less exacting scrutiny. *Id.* at 434 (internal quotation marks omitted); *see Green v. Mortham*, 155 F.3d 1332, 1338-39 (11th Cir. 1998); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 192 & n.12, 194-97 (1999); *Norman v. Reed*, 502 U.S. 279, 289 (1992).

By disenfranchising 5.2% of its voting-age population and 10.5% of its African American voting-age population for their ex-felon status, Florida's felon disenfranchisement scheme places an extremely severe burden on its citizens' right to vote. Hence, in contrast to the comparatively moderate California disenfranchisement laws that were upheld in *Ramirez*, Florida's scheme is subject to strict scrutiny under the Court's variable approach. Florida thus bears the burden of showing that there is a compelling state interest that can be achieved only by this severely burdensome means. As argued in Section VI below, the interests Florida advances for its felon disenfranchisement scheme are not even rationally related to the state's policy. They certainly cannot withstand strict scrutiny.

## C.    Alternatively, the Supreme Court Should Overrule *Ramirez*.

In the alternative, *Ramirez* should be overruled, because, as demonstrated by the circumstances in Florida today and the increasing impact of disenfranchisement laws during the twenty-seven years since *Ramirez* was decided, the disenfranchisement of ex-felons places too great a burden on voting rights to survive modern equal protection analysis. *See Planned Parenthood v. Casey*, 505 U.S. 833, 855 (1992) (noting that precedent may be overturned if "facts have so changed . . . as to have robbed the old rule of significant . . . justification"). This

Court, although it may not itself overrule *Ramirez*, should take notice of the need for the Supreme Court to do so.

## IV.   THE DISENFRANCHISEMENT OF EX-FELONS VIOLATES THE FOURTEENTH AMENDMENT'S GUARANTEE AGAINST ARBITRARY AND IRRATIONAL LAWS.

Florida's asserted justifications for its disenfranchisement of ex-felons rest upon the assumption that ex-felons can be distinguished from the rest of the population because they have broken the law.  (See Defs.' Mem. at 20 (asserting Florida's "legitimate interest in confining participation in the lawmaking process to those who have obeyed society's laws" and that ex-felons "have shown an unwillingness to abide by [society's] rules"); *id.* at 21 (arguing ex-felons "do not deserve to vote").)  In fact, however, ex-felons are a fraction of the state's lawbreakers.  That fraction is determined by variable and discretionary factors, including law enforcement priorities and resources, the ease of detection of the crime, the extent of police presence in a neighborhood, racial profiling, the exercise of prosecutorial leniency, and the quality of defense counsel.  Ex-felons are a small percentage of law violators in Florida selected by discretionary factors that are wholly unrelated to voting.  Accordingly, Florida's disenfranchisement of ex-felons fails the Constitution's basic guarantee that laws bear a rational relation to their asserted justifications - a guarantee that must be given real form when democratic participation is at stake.

Under rational basis review, a law must be invalidated if its "breadth . . . is so far removed from [any] justifications that [a court] finds it impossible to credit them." *Romer v. Evans*, 517 U.S. 620, 631, 635 (1996).[11]  A statute "must be reasonable, not arbitrary, and must

---

[11] The Supreme Court in *Richardson v. Ramirez*, 418 U.S. 24 (1974), remanded the case so the state court could "consider" whether California's disenfranchisement provision was so arbitrarily applied as to violate the Equal Protection Clause. *Id.* at 56; *see also Owens v. Barnes*, 711 F.2d 25, 26-27 (3d Cir. 1983). *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla.), *aff'd mem.*, 396 U.S. 12 (1969), a 30 year old challenge to Florida's felon disenfranchisement law, does not preclude rational-basis review. "In determining what lines are unconstitutionally discriminatory, [courts] have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalog of what was at a given time deemed to be the limits of fundamental rights." *Harper v. Va. State Bd of Elections*, 383 U.S. 663, 669 (1966).  The *Beacham* court, which devoted just two paragraphs to the issue, did not have the information about the impact of Florida's laws that this Court does – information which, demonstrates that the Florida statutes do not advance any legitimate interest.  Even if the *Beacham* court had been presented with a fully developed record, changes since 1969 (especially the increase in

rest upon some ground of difference having a fair and substantial relation to the object of the legislation," rather than upon "criteria wholly unrelated to the objective of that statute." *Reed v. Reed*, 404 U.S. 71, 75-76 (1971). Such deferential review is predicated on the notion that "even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *cf. Baker v. Carr*, 369 U.S. 186, 193 & n. 14 (1962) (holding a districting claim justiciable when redress from the legislature appeared "difficult or impossible"). That argument is undercut here because Plaintiffs have no access to the democratic processes by which the discrimination against them might be rectified. The purpose of Florida's electoral system is democratic self-governance and that critical function is irrationally undermined for all Floridians when an arbitrary and racially skewed proportion of the electorate is barred from voting.

As noted above, the people whom Defendants disenfranchise constitute a small subset of the people who violate Florida and Federal law. Most crime is not brought to the attention of law enforcement officials. For example, 64% of personal and property crimes go unreported. *See* U.S. Dep't of Justice, *Sourcebook of Criminal Justice Statistics 2000* [hereinafter *Sourcebook*] 208 tbl. 3.3 8 (Ann L. Pastore & Kathleen Maguire, eds. 1991). In the most recent years for which data are available, 10.8% of the nation's population - over 25 million people - admitted using illicit drugs, but only 372,049 - fewer than one seventieth of that number - were convicted of drug felonies. *Id.* at 259 tbl. 3.90, 426 tbl. 5.16, 456 tbl. 5.40. Almost two-thirds of all small businesses underreport their income to the IRS, David Joulafian & Mark Rider, *Tax Evasion by Small Business* tbl. 2 (Office of Tax Analysis Paper No. 77, 1998), but only about 600 taxpayers a year in the entire country are convicted each year of tax felonies, *Sourcebook* at 426 tbl. 5.16. And some who engage in felonious behavior are less likely to be arrested than others because of characteristics reflecting not the seriousness of the crime, but the socio-economic position of the offenders, including the neighborhoods in which they live. *See, e.g.*, Alfred Blumstein, *Racial Disproportionality of U.S. Prison Populations Revisited*, 64 U. Colo. L. Rev. 743, 753 (1993).

The most irrational of the arbitrary distinctions on which disenfranchisement turns under the Florida system are those created by the vast discretion in the criminal justice system.

---

disenfranchisements due to the drug war) would require this Court's reexamination of the challenged provision.

Nationwide studies show that discretion plays a key role in criminal justice outcomes, and results in Florida are relatively consistent" with such discretion. (Pls.' App. 25-26 (Chiricos Dep. At 97, 99).)  In particular, "a substantial research literature suggest[s] that . . . arrests[] and police department funding may be more frequently mobilized" under certain circumstances. (Defs.' App. 37 (Chiricos Report at 27).)  Law enforcement agencies exercise their discretion so as to "police certain neighborhoods and certain crimes a little more heavily than others" (Pls.' App. 53 (Chiricos Dep. at 209)), which affects the probability of arrest.  "[P]rosecutors' virtually unlimited control over charging," James Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 Harv. L. Rev. 1521, 1525 (1981), includes wide discretion to dismiss cases, take a misdemeanor plea on a felony charge, offer a defendant leniency (including immunity), or agree to a "deferred prosecution" that does not create a felony record.[12]

It is unavoidable, appropriate, and necessary to accept within the criminal justice system itself the fact that the vast majority of law violators will go unprosecuted.  The purpose of the criminal justice system is to protect the public, both by restraining identified lawbreakers and deterring others. It does not follow, however, that the state can subject a small and arbitrary group of lawbreakers to denial of the franchise. Florida's ex-felons are not less deserving of the vote than the large population of law breakers who have escaped prosecution for the reasons described above. *Cf. Furst v. N.Y. City Transit Auth.*, 631 F. Supp. 1331, 1337-38 (E.D.N.Y. 1986) (no rational basis for a municipality to fire all ex-felons); *Secy of Revenue v. John's Vending Corp.*, 309 A.2d 358, 362 (Pa. 1973) (irrational to deny an occupational license based on a former conviction; "it is ludicrous to contend that [the instant ex-felon's] prior acts provide any basis to evaluate his present character."); *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 536-37 (1973) ("considerable doubt" about the rationality of further regulation designed to prevent fraud if the state can and does deter that fraud with criminal violations); *Jimenez v. Weinberger*, 417 U.S. 628, 637 (1974) (finding a blanket denial of disability benefits irrational); *Thompson v. Gallagher*, 489 F.2d 443, 449 (5th Cir. 1973) (finding a blanket denial of municipal employment irrational).

---

[12] That few lawbreakers are ultimately convicted and that police and prosecutors wield great discretion are facts that sufficiently settled should be so familiar to the Court that they are subject to judicial notice. Alternatively, Plaintiffs will submit such evidence at trial.

Defendants' other rationales for Florida's lifetime felon disenfranchisement are equally unpersuasive.  Defendants assert that felon disenfranchisement helps prevent voting fraud. (Defs.' Mem. at 20.)  Florida does not disenfranchise people convicted of various election law offenses, including those who sign another's name to a petition, Fla. Stat. ch. 104.185(2), or willfully refuse to perform their duties as election officers, ch. 104.051(2).

Finally, Defendants argue that no ex-felons can be trusted with the vote, relying heavily on *Green v. Board of Elections*, 380 F.2d 445 (2d Cir. 1967), for the proposition that the state need not allow criminals to help select, *inter alia*, "the prosecutors who must try them for further violations." (Defs.' Mem. at 20 (quoting *Green*, 380 F.2d at 451-52).)  The Second Circuit apparently theorized that ex-felons would vote to weaken the criminal laws or to have them maladministered.  Defendants, however, disavow that theory.  *See id.* at 21 ("Florida's disenfranchisement of felons is not based on a prediction about how they will vote." (emphasis in original)).  Defendants are left with no reason why ex-felons should not vote for those who enact the laws to which they, like all citizens, remain subject.

## V.   BY CONDITIONING PLAINTIFFS' RE-ENFRANCHISEMENT ON PAYMENT, DEFENDANTS HAVE IMPOSED A POLL TAX IN VIOLATION OF THE FOURTEENTH AND TWENTY-FOURTH AMENDMENTS AND THE VOTING RIGHTS ACT.

Florida's automatic restoration scheme violates constitutional and statutory prohibitions on poll taxes. The question of whether Florida may relegate its ex-felon citizens to a political debtors' prison is a purely legal one.  Once the state has disenfranchised certain citizens it may not selectively re-enfranchise some of them based on their ability to pay.  The Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Twenty-fourth Amendment, and § 10 of the Voting Rights Act do not permit Defendants to use ex-felons' financial status to deny them the right to vote, whatever other conditions a state may require before granting restoration of civil rights.  Yet Florida's Rule of Executive Clemency 9(A)(2) attempts to do just that by deeming ineligible for civil rights restoration without a hearing ex-felons who have not paid restitution, and requiring them to follow the more burdensome procedures of Rules 6, 7, 10, 11, and 12.

Access to the franchise cannot be made to depend on an individual's financial resources. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, (1966). The Court has struck down numerous voting qualifications that conditioned voting or other political participation on payment or on a financial surrogate, such as property ownership. *See, e.g., Hill v. Stone*, 421

U.S. 289, 298 (1975) (property available for taxation); *Lubin v. Panish*, 415 U.S. 709, 718 (1974) (candidate filing fee); *Harper*, 383 U.S. at 668 ($1.50 poll tax); *Harman v. Forssenius*, 380 U.S. 528, 538 (1965) (certificate of residence or poll tax). Like other restrictions on the right to vote, financial prerequisites cannot stand unless . . . necessary to serve a compelling state interest.'" *Cipriano v. City of Houma*, 395 U.S. 701, 706 (1969) (striking property ownership requirement for utility bond election).

Defendants fail to identify a compelling state interest served by making it harder for ex-felons who are unable to pay restitution to regain the right to vote. Instead, they advance three arguments at odds with precedent: (1) Florida does not have to allow ex-felons to vote or grant restoration at all, (2) the rule is is not a "special fee" or "classic poll tax", and (3) the payment requirement is punishment for Plaintiffs' criminal behavior unrelated to the right to vote. (*See* Defs.' Mem. at 37, 39-40.).

Even if Florida could permanently deny ex-felons the right to vote with constitutional impunity, it cannot condition restoration of the right to vote on an ex-felon's financial resources. *See Harman*, 380 U.S. at 538, 543. As the Second Circuit has put it, "[t]he focal question is whether [a state], once having agreed to permit ex-felons to regain their vote and having established administrative machinery for this purpose, can then deny access to this relief, solely because one is too poor to pay the required fee." *Bynum v. Conn. Comm'n on Forfeited Rights*, 410 F.2d 173, 175-76 (2d Cir. 1969).

The Court's wealth discrimination and poll tax decisions apply even though the payments being demanded by Florida stem from Plaintiffs' criminal actions. "The use of the franchise to compel compliance with other, independent state objectives is questionable in any context." *Hill*, 421 U.S. at 299. The Supreme Court has held that a state cannot require criminal offenders to spend additional time in jail to payoff fines connected to their conviction. *Williams v. Illinois*, 399 U.S. 235, 241-42 (1970). *Williams* held that the state's legitimate interest in enforcing its punishments does not allow it to subject poor offenders to greater punishment than others. *See* 399 U.S. at 244. The Court has invalidated payment-based distinctions among probationers despite asserted state interests in restitution and punishment. *See Bearden v. Georgia*, 461 U.S. 660, 665-66, 670-72 (1983). Moreover, Florida could pursue alternative measures, such as the imposition of liens, to ensure that ex-felons pay outstanding fines. There is no basis to conclude

that denying restoration of the right to vote is necessary to serve Florida's penal interests. *See id.* at 671-72.

Defendants' claim that the repayment obligation relates solely to restoration and not to voting and does not fit within the "classic poll tax" model (Defs.' Mem. at 37) reflects a narrow formalism at odds with the broad and pragmatic analysis characteristic of the Court's poll tax cases, where the Court has struck even requirements that did not directly require financial payment. *See Harman*, 380 U.S. at 538 (invalidating certificate of residence requirement as alternative to poll tax).[13]

---

[13] Given its failure to consider this precedent, the Fourth Circuit's cursory and unpublished conclusion in a *pro-se* case that restoration filing fee requirements do not relate to voting and thus do not violate the Twenty-fourth Amendment deserves little weight. *See Howard v. Gilmore*, No. 99-2285, 2000 WL 203984 at *2 (4th Cir. Feb. 23, 2000). In any event, *Howard* leaves open the possibility that financial requirements associated with restoration represent unconstitutional wealth discrimination because it conditions access to important rights on financial resources, even if not such requirements do not constitute a poll tax. *See, e.g, M.L.B. v. S.L.J,* 519 U.S. 102, 107 (1996) (holding that state cannot condition right of indigent parent to appeal termination of her parental rights upon her ability to pay a fee).

CONCLUSION

For the forgoing reasons, Plaintiffs respectfully submit that they are entitled to summary judgment on all claims raised in the Complaint, and that Defendants' Motion for Summary Judgment should be denied.

**Dated:  January 18, 2002**

**Respectfully submitted,**

Nancy Northup
Jessie Allen
Kim Barry
**BRENNAN CENTER FOR JUSTICE**
 at N.Y.U. School of Law
**161 Avenue of the Americas, 12th Floor**
**New York, NY  10013**
**(212) 998-6730**
*Lead Counsel for Plaintiffs*

**Anita Hodgkiss**
**Lori Outzs Borgen**
**LAWYERS☐ COMMITTEE FOR CIVIL**
**RIGHTS UNDER LAW**
**1401 New York Ave., NW, Suite 400**
**Washington, DC 20005-2124**
**(202) 662-8600**

**James K. Green**
**Florida Bar Number: 229466**
**Nina Zollo**
**Florida Bar Number: 779570**
**JAMES K. GREEN, P.A.**
**Suite 1630, Esperante'**
**222 Lakeview Ave.**
**West Palm Beach, FL 33401**
**(561) 659-2029**

**James E. Johnson**
**Michelle N. Kim**
**M. Lorrane Ford**
**MORRISON & FOERSTER LLP**
**1290 Avenue of the Americas**
**New York, NY  10104**
**(212) 468-8000**

## SELECT CONSENT JUDGMENTS FROM VOTING RIGHTS LITIGATION INVOLVING FLORIDA COUNTIES

| Case Name | Final Judgment Date | District/Challenge | Racial Polarization or other VRA Finding in Approving Settlement |
|---|---|---|---|
| *Bellamy v. City of Perry*, No. TCA 83-7125-MMP | 12/05/83, N.D. Fl. | City of Perry in Taylor County; at-large city council | The Court found racial polarization and history of official racial discrimination in both the city and the state. |
| *Bellamy v. Taylor County Sch. Bd.*, No. TCA 83-7124-MMP | 12/07/83, N.D. Fl. | Taylor County; at-large county commission | The Court found racial polarization and history of official racial discrimination in both the county and the state. |
| *Bradford County Branch of the NAACP v. Bradford County Sch. Bd.*, No. 86-4-CIV-J-12 | 07/18/84, N.D. Fl. | Taylor County; at-large school board | The Court found racial polarization and history of official racial discrimination in both the county and the state. |
| *Bradford County Branch of the NAACP v. Bradford County Comm'rs*, No. 86-6-CIV-J-14 | 07/11/86, M.D. Fl. | Bradford County; at-large school board | The Court found vote dilution in violation of §2 due to a series of factors though not racial polarization. |
| *Columbia County Branch of the NAACP v. Columbia County*, No. 84-609-CIV-J-12 | 12/19/85, M.D. Fl. | Columbia County; at-large county commission | The Court found racial polarization, history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |



ATTACHMENT / EXHIBIT A

| | | | |
|---|---|---|---|
| *Columbia County Branch of the NAACP v. Columbia County Sch. Bd.*, No. 84-610-CIV-J-12 | 03/20/86, M.D. Fl. | Columbia County; at-large school board | The Court found racial polarization, history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| *Hamilton County Branch of the NAACP v. Hamilton County*, No. 840644-CIV-J-14 | 06/25/85, M.D. Fl. | Hamilton County; at-large county commission | The Court found racial polarization, history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| *Hamilton County Branch of the NAACP v. City of Jasper*, No. 84-645-CIV-J-16 | 12/24/85, M.D. Fl. | City of Jasper; at-large city council | The Court found racial polarization and history of official racial discrimination in both the city and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| *Madison County Chapter of the NAACP v. City of Madison*, No. TCA-84-7232-WS | 06/10/85, N.D. Fl. | City of Madison; at-large county commission | The Court found racial polarization in the city and lingering effects of official racial discrimination in the city and state. |
| *Madison County Chapter of the NAACP v. Madison County*, No. TCA-84-7234-WS | 05/30/85, N.D. Fl. | Madison County; at-large county commission | The Court found racial polarization in the county and lingering effects of official racial discrimination in the county and state. |

| | | |
|---|---|---|
| *Mayhue v. Suwanee County*, No. 84-1103-Civ-J-16 | 09/09/85, M.D. Fl. | Suwanee County; at-large county commission | The Court found vote dilution in violation of §2 due to a series of factors but does not specify racial polarization. |
| *Parrish v. Jefferson County*, No. TCA-83-7481-MMP | 12/18/85, N.D. Fl. | Jefferson County; at-large county commission | The Court found history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |
| *Parrish v. Jefferson County Sch. Bd.*, No. TCA-84-7351-MMP | 02/28/86, N.D. Fl. | Jefferson County; at-large school board | The Court found history of official racial discrimination in both the county and the state, and socio-economic conditions preventing African Americans from participating fully in the political process. |

## SELECT HISTORIC RACIAL DISCRIMINATION IN FLORIDA
### Post-1864 State Statutory Provisions

Plaintiffs request that the Court take judicial notice of the following evidence[1] pursuant to Rule 201, F.R.E.:

1.     1865 Fla. Laws ch. 1466, sec. 12, pp. 23, 25 (making it a crime for "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind").

2.     1865 Fla. Laws ch. 1468, p. 30 (making it a crime for a white female to "intermarry [or] live in a state of adultery, or fornication with any negro, mulatto, or other person of color," defining "person of color" as any person having "one-eighth or more of negro blood", and setting out the penalty for both white women and "person of color" convicted of crime).

3.     1865 Fla. Laws ch. 1469, p. 31 (requiring all "colored inhabitants of this State claiming to be living together in the relation of husband and wife, and who have not been joined as such . . . be regularly joined in the bonds of matrimony").

4.     1865 Fla. Laws ch. 1470, p. 32 (requiring all contracts with "persons of color" to be in writing and fully explained before two credible witnesses).

5.     1865 Fla. Laws ch. 1474, p. 37 (repealing all laws previously passed referring to "slaves, free negroes and mulattoes, except the law to prevent their migration into the State, and the act prohibiting the sale of fire-arms and ammunition to them" and making all criminal laws previously applicable to white persons applicable to "all

---

[1]Copies of these statutes are available from Plaintiffs' counsel upon request.

-1-

 ATTACHMENT / EXHIBIT

inhabitants . . . without distinction of color").

6.   1865 Fla. Laws ch. 1475, p. 37 (establishing "schools for freedmen" and providing for

a tax "upon all male persons of color between the ages of twenty-one years and fifty-

five" to fund such schools).

7.   1865 Fla. Laws, Res. No. 18, p. 113 (requesting that "the colored troops [be] removed

from the State of Florida, at the earliest date possible").

8.   1865 Fla. Laws, Res. No. 20, p. 114 (requesting "to have removed if possible the

colored troops from the State and at any rate from the interior" and noting that "[t]he

experience of the people of Florida has been that the demoralization of labor has been

in almost exact proportion to the proximity of the freedmen to the colored troops").

9.   1865 Fla. Laws, Res. No. 1, p. 101 (Joint Resolution ratifying the Thirteenth

Amendment abolishing slavery but with the caveat that the amendment does not

authorize Congress to legislate regarding "Freedmen in this state").

10.   1866 Fla. Laws, ch. 1468, sec. 5 (holding marriages between white persons and

persons of color, contracted and solemnized prior to January 12, 1866 valid).

Codified at 1892 Rev. St. sec. 2062; 1906 Gen. St. sec. 2585; 1920 Rev. Gen. St. sec.

3944; 1927 Comp. Gen. Laws sec. 5863; 1941 Fla. Stats. sec. 741.19.

11.   1866 Fla. Laws, ch. 1469 (laws regulating marriages for white persons are to apply to

"colored persons").  Codified at 1892 Rev. St. sec. 2067; 1906 Gen. St. sec. 2583;

1920 Rev. Gen. St. sec. 3942; 1927 Comp. Gen. Laws sec. 5861; 1941 Fla. Stat. sec.

741.17.  Repealed by 1969 Fla. Laws ch. 69-195.

12.   1866 Fla. Laws ch. 1551, p. 21 (extending requirement that contracts with persons of

color be in writing to contracts between all persons).

13.     1866 Fla. Laws ch. 1552, p. 22 ("An Act Legalizing the Marriage of Persons of

        Color").  Codified at 1892 Rev. St. sec. 2068.

14.     1866 Fla. Laws ch. 1537, p. 12 (qualifications for jurors being limited to "all white

        males...").

15.     1866 Fla. Laws ch. 1566, p. 30 (providing that persons of color previously unable to

        inherit property due to legal incapacity to contract marriage in a state of slavery are

        allowed to inherit).  Codified at 1892 Rev. St. sec. 1829; 1906 Gen. St. sec. 2305;

        1920 Rev. St. sec. 3628; and 1927 Gen. St. sec. 5492.

16.     1868 Fla. Laws ch. 1628, p. 16 (providing that all qualified electors of state are liable

        to be drawn as jurors, requiring board of county commissioners to make a list every

        year from list of registered voters, and imposing an "integrity, fair character, sound

        judgment and intelligence" test).

17.     1873 Fla. Laws ch. 1947, p. 25 (anti-discrimination statute for public

        accommodations, removes race qualification for jury duty).

18.     1881 Fla. Laws ch. 3282, p. 85 (making it a misdemeanor for any white woman and

        "colored" man or white man and "colored" woman, who are not married to each other,

        to habitually occupy the same room in the nighttime).  Codified at 1892 Rev. St. secs.

        2612, 2613; 1906 Gen. St. sec. 3533; 1920 Rev. St. sec. 5423; 1927 Gen. Laws sec.

        7566; 1941 Fla. Stats. sec. 798.05.  Repealed by 1969 Fla. Laws ch. 69-195.

19.     1881 Fla. Laws ch. 3283, p. 86 (making it a felony for "any white man . . . [to]

        intermarry with a negro, mulatto or any person who has one-eighth of negro blood in

her, or . . . any white woman . . . [to] intermarry with a negro, mulatto or any person who has one-eighth negro blood in him" and making it a felony for anyone to perform the marriage ceremony for such couples).  Codified at 1892 Rev. St. secs. 2606, 2607, 2608; 1906 Gen. St. secs. 3529, 3530, 3531; 1920 Rev. St. secs. 5419, 5420, 5421; 1927 Gen. Laws secs. 7562, 7563, 7564; 1941 Fla. Stat. secs. 741.12, 741.14, 741.16. Repealed by 1969 Fla. Laws ch. 69-195.

20.    1887 Fla. Laws ch. 3743, p. 116 (requiring railroad companies to provide a separate car for "persons of color" who buy a first class ticket).  Codified at 1892 Rev. St. secs. 2268, 2686; 1906 Gen. secs. 2860, 3632; 1920 Rev. Gen. St. secs. 4554, 5565; 1927 Gen. Comp. Laws secs. 6617, 7751; 1941 Fla. Stat. secs. 352.03, 352.18.  Repealed by 1969 Fla. Laws ch. 69-195.

21.    1887 Fla. Laws ch. 3809, sec. 7, p. 256 (limiting enrollment at the "Normal School and Business Institute" to whites).

22.    1887 Fla. Laws ch. 3692, p. 36 (establishing separate schools for white and "colored" teachers).

23.    1889 Fla. Laws ch. 3883, sec. 32, pp. 116, 122 (requiring separate apartments for white and "colored" prisoners).

24.    1889 Fla. Laws ch. 3872, sec. 19, pp. 73, 76 (limiting voting in school bond elections to freeholders).

25.    1889 Fla. Laws ch. 3879, secs. 22, 25 & 26, pp. 88, 101-102 (requiring federal offices to be voted for at a polling place separate from state and local offices, requiring separate ballots and ballot boxes for each state and local office at the polls, requiring

-4-

voter to place ballot for each office in correct box, and prohibiting anyone but

Inspectors of Election from talking to voter while in polling place).

26.   1889 Fla. Laws ch. 3850, p. 13 ("An Act to Provide for the Payment of a Capitation

or Poll Tax as a Prerequisite for Voting and Prescribing the Duties of Tax Collectors

and Supervisors of Registration in Relation Thereto").

27.   1891 Fla. Laws ch. 4072, p. 114 ("An Act to Confer Police Powers on all Conductors

in Charge of Passenger Trains on the Railroads in this State").

28.   1892 Rev. St. sec. 1 (defining "'negro' [to] include[] every person having one-eighth

or more negro blood" and providing that "the terms 'colored person', or 'person of

color', or 'colored', as applied to any person, have the same signification as is herein

attached to 'negro', as aforesaid").  Recodified, 1941 Fla. Stat. sec. 1.01(6).

29.   1892 Rev. St. sec. 2064 (defining "colored person" as "every person who shall have

one-eighth or more of negro blood...").  Recodified at 1906 Gen. St. sec. 2580, p.

1019; 1920 Rev. Gen. St. sec. 3939; 1927 Comp. Gen. Laws sec. 5858.

30.   1892 Rev. St. sec. 2609 (providing that "[a]ny white person who shall hereafter live in

a state of adultery or fornication with any negro, mulatto, or other person of color,

shall be punished by imprisonment not exceeding twelve months, or by fine not

exceeding one thousand dollars").  Recodified at 1906 Gen. St. sec. 3532; 1920 Rev.

Gen. St. sec. 5422; 1927 Comp. Gen. Laws sec. 7565; 1941 Fla. Stat. sec. 798.04.

Repealed by 1969 Fla. Laws ch. 69-195.

31.   1892 Rev. St. sec. 2610 (providing that "[a]ny negro, mulatto, or other person of color

who shall hereafter live in a state of adultery or fornication with any white person,

shall be punished by imprisonment not exceeding twelve months, or by fine not exceeding one thousand dollars"). Recodified at 1906 Gen. St. sec. 3532; 1920 Rev. Gen. St. sec. 5422; 1927 Comp. Gen. Laws sec. 7565; 1941 Fla. Stat. sec. 798.04.

32. 1892 Rev. St. sec. 2611 (defining "a person of color" as "[e]very person who shall have one-eighth or more of negro blood"). Recodified at 1906 Gen. St. sec. 3532; 1920 Rev. Gen. St. sec. 5422; 1927 Comp. Gen. Laws sec. 7565.

33. 1895 Fla. Laws ch. 4328, secs. 1, 44, pp. 56, 77 (establishing the qualifications for voters, including payment of a poll tax for two years prior to election, and providing that "[n]o elector while receiving, preparing and casting his ballot, shall occupy a booth or compartment for a longer time than five minutes"). Codified at 1906 Gen. St. secs. 170, 208, 226, 228, 229, 231; 1920 Rev. Gen. St. secs. 215, 252, 271, 273, 274, 276; 1927 Comp. Gen. Laws secs. 248, 308, 327, 329, 330, 332; 1941 Fla. Stat. secs. 99.06, 99.25, 99.27, 99.28, 99.30.

34. 1895 Fla. Laws ch. 4335, p. 96 (making it a crime for any "individual, body of individuals, corporation or association to conduct within this State any school of any grade, public, private or parochial wherein white persons and negroes shall be instructed or boarded within the same building, or taught in the same class, or at the same time by the same teachers.") Codified at 1920 Rev. Gen. St. sec. 5866; 1927 Comp. Gen. Laws sec. 8107; 1941 Fla. Stat. sec. 242.25. Repealed by 1943 Fla. Laws ch. 21989.

35. 1895 Fla. Laws ch. 4336, p. 97 (limiting who may petition for referendum election on establishing school sub-districts to "tax payers on real or personal property").

36.    1897 Fla. Laws ch. 4565, sec, 3, p. 107 (providing for the construction of a state

reform school and requiring construction of "two separate buildings, not nearer than

one-half mile to each other, one for white and one for colored; and provided further,

that the colored and white convicts shall not be in any manner associated together, or

worked together, or instructed in same building").  Codified at 1906 Gen. St. sec.

4169; 1920 Rev. Gen. St. sec. 6310; 1927 Comp. Gen. Laws sec. 8636; 1941 Fla.

Stat. sec. 955.12.  Repealed by 1969 Fla. Laws ch. 69-195 and 69-365.

37.    1897 Fla. Laws ch. 4536, p. 65 (limiting amount of time a voter may stay in voting

booth).

38.    1897 Fla. Laws ch. 4535, p. 62 (requiring poll tax for voting in primaries).

39.    1897 Fla. Laws ch. 4565, sec. 3, pp. 107-108 (providing for different buildings

separated by one-half mile for white and "colored" convicts and prohibiting convicts

of different races from associating or being worked together).  Codified at 1941 Fla.

Stat. sec. 955.12.  Repealed by 1969 Fla. Laws ch. 69-195 and 69-365.

40.    1899 Fla. Laws ch. 4749, sec. 1, p. 135 ("An Act to legalize the Marriages and

Offspring of Persons of African Descent").  Codified at 1906 Gen. St. sec. 2586; 1920

Rev. Gen. St. sec. 3945; 1927 Comp. Gen. Laws sec. 5864; 1941 Fla. Stat. sec.

741.20.  Repealed by 1969 Fla. Laws ch. 69-195.

41.    1901 Fla. Laws ch. 5014, secs. 2, 3, p. 160 (regulating holding of primary elections;

authorizing Executive Committee to "declare terms and conditions" of voting; making

payment of poll tax a qualification of voting).

42.    1902 Fla. Laws ch. 4997, p. 147 (establishing scholarships at the white "State Normal

School").

42.    1903 Fla. Laws ch. 5140,  p. 76 (prohibiting marriages between white person and any

person with "one-eighth negro blood").

43.    1905 Fla. Laws ch. 5384, secs. 11, 21, 23, p. 37 (creating the University of the State

of Florida and consolidating institutions within new system but maintaining racial

segregation).  Codified at 1920 Rev. Gen. St. sec. 606-610, 622-623, 632, 642; 1927

Comp. Gen. Laws sec. 762-766, 789-790, 804, 814; 1941 Fla. Stat. secs. 241.01,

241.03, 241.39, 241.41.  Repealed by 1965 Fla. Laws ch. 65-130.

44.    1905 Fla. Laws ch. 5420, p. 99 (requiring street car companies to separate white and

"colored" passengers).

45.    1905 Fla. Laws ch. 5447, p. 133 (prohibiting the chaining or handcuffing of white

prisoners to "colored" prisoners).  Codified at 1920 Rev. Gen. St. sec. 5369; 1927

Comp. Gen. Laws sec. 7503; 1941 Fla. Stat. sec. 952.15.  Repealed by 1957 Fla.

Laws ch. 57-121.

46.    1907 Fla. Laws ch. 5602, p. 79 (appropriating money for schools, including the

"Colored Normal School").

47.    1907 Fla. Laws ch. 5617, p. 99 (requiring separate accommodations for white and

"negro" passengers).  Codified at 1920 Rev. Gen. St. secs. 4557-4561, 5600-5603;

1927 Comp. Gen. Laws secs. 6620-6624, 7787-7790; 1941 Fla. Stat. secs. 352.07,

352.08, 352.09, 352.10, 352.11, 352.12, 352.13, 352.14, 352.15.  Repealed by 1969

Fla. Laws ch. 69-195.

48.    1907 Fla. Laws ch. 5619, p. 103 (requiring railroad and terminal companies to

provide separate waiting rooms and ticket windows for white and "colored" passengers).  Codified at 1920 Rev. Gen. St. secs. 4562-4563, 4626; 1927 Comp. Gen. Laws secs. 6625-6626, 6712; 1941 Fla. Stat. secs. 350.21, 352.16, 352.17. Repealed by 1969 Fla. Laws ch. 69-195.

49.     1907 Fla. Laws Res. No. 2, p. 767 (proposing constitutional amendment providing for a special tax for the support and maintenance of the University of the State of Florida, the Florida Female College, the Institute for the Blind, Deaf and Dumb, and the "Colored Normal School").

50.     1909 Fla. Laws ch. 5893, p. 39 (requiring railroad companies and common carriers to provide separate accommodations for white and "colored" passengers).  Codified at 1920 Rev. Gen. St. secs. 4555-4556, 4625, 5566; 1927 Comp. Gen. Laws secs. 6618-6619, 6711, 7752; 1941 Fla. Stat. secs. 350.20, 352.04, 352.05, 352.06.  Repealed by 1969 Fla. Laws ch. 69-195, and 1971 Fla. Laws ch. 71-355, sec. 102, p. 1643.

51.     1909 Fla. Laws ch. 5925, p. 69 (changing the name of the "Colored Normal School" to the "Florida Agricultural and Mechanical College for Negroes").  Codified at 1920 Rev. Gen. St. sec. 643; 1927 Comp. Gen. Laws sec. 815; 1941 Fla. Stat. sec. 241.41. Repealed by 1965 Fla. Laws, ch. 65-130.

52.     1909 Fla. Laws ch. 5928, p. 70 (making it unlawful for "any person or corporation in this State to pay the poll tax for any other person, or furnish the money to any other person's poll tax").

53.     1909 Fla. Laws ch. 5961, p. 161 (appropriating funds to state universities, including "Florida Agricultural and Mechanical College for Negroes").

-9-

54.   1909 Fla. Laws ch. 5967, p. 171 (requiring the separation of white and "negro" prisoners).  Codified at 1920 Rev. Gen. St. secs. 6213-6216; 1927 Comp. Gen. Laws secs. 8545-8548; 1941 Fla. Stats. secs. 950.05, 950.06, 950.07, 950.08.  Repealed by 1965 Fla. Laws, ch. 65-172, sec. 2.

55.   1909 Fla. Laws Res. No. 26, p. 704 (requesting "Senators and Representatives in the Congress of the United States to exert their influence at Washington against the appointment, and the confirmation of any such appointment, of negroes to Federal offices and appointments in the State of Florida").

56.   1911 Fla. Laws ch. 6125, p. 31 (appropriating funds for segregated universities).

57.   1913 Fla. Laws ch. 6438, p. 106 (appropriating funds for segregated universities).

58.   1913 Fla. Laws ch. 6469, sec. 11, pp. 242, 246 (requiriing poll tax for voting in primary).  Codified at 1920 Rev. Gen. St. sec. 314; 1927 Comp. Gen. Laws sec. 371.

59.   1913 Fla. Laws ch. 6490, p. 311 ("An Act Prohibiting White Persons From Teaching Negroes in Negro Schools, and Prohibiting Negro Teachers From Teaching White Children in White Schools in the State of Florida, and Providing for the Penalty Therefor").  Codified at 1920 Rev. Gen. St. sec. 5870; 1927 Comp. Gen. Laws sec. 8112; 1941 Fla. Stat. sec. 242.26.  Repealed by 1943 Fla. Laws ch. 21989, sec. 17.

60.   1915 Fla. Laws ch. 6827, p. 55 (appropriating funds for segregated universities).

61.   1915 Fla. Laws ch. 6830, p. 60 (providing for a teacher training department in one high school in each county).  Codified at 1920 Rev. Gen. St. sec. 604; 1927 Comp. Gen. Laws sec. 759 (providing for segregated programs).

62.   1915 Fla. Laws ch. 6835, p. 72 (providing for maintenance of three segregated

summer schools for teachers).  Codified at 1920 Rev. Gen. St. sec. 634, 637; 1927

Comp. Gen. Laws sec. 806, 809; 1941 Fla. Stat. secs. 239.11 & 239.14.  Repealed by

1963 Fla. Laws ch. 63-572, sec. 20.

63.     1915 Fla. Laws, ch. 6840, p. 79 (providing that school for girls operate in same

manner as school for boys, which requires segregated facilities).  Codified at 1920

Rev. Gen. St. sec. 6326; 1927 Comp. Gen. Laws sec. 8652; 1941 Fla. Stat. sec.

956.02.  Repealed by 1969 Fla. Laws ch. 69-365.

64.     1915 Fla. Laws ch. 6874, secs. 3, 8, p. 149, 152, 158 (requiring poll tax for voting in

primary elections and requiring that candidates be nominated from groups when

"more than one candidate is to be nominated for the same office and there are more

candidates than should be nominated therefor").  Codified at 1920 Rev. Gen. St. secs.

314, 344, 348, 356; 1927 Comp. Gen. Laws secs. 371, 405, 413; 1941 Fla. Stat. sec.

102.49.

65.     1915 Fla. Laws Res. 82, p. 497 (proposing amendment to the state constitution

providing for literacy test and freeholder requirement for voting and making an

exception for any "person or lineal descendants of any such persons who was on

January first, 1867, or prior thereto, entitled to vote").

66.     1917 Fla. Laws ch. 7279, p. 60 (appropriating funds for segregated universities).  See

also 1919 Fla. Laws ch. 7797.

67.     1921 Fla. Laws ch. 8583, p. 401 (requiring poll tax for voting).  Codified at 1927

Comp. Gen. Laws sec. 371.

68.     1923 Fla. Laws ch. 9134, p. 130 (providing for the annual appropriation of funds for

scholarships for students to attend the two state white universities).  Codified at 1927 Comp. Gen. Laws secs. 769, 771-774; 1941 Fla. Stat. sec. 239.19.

69.     1923 Fla. Laws ch. 9294, p. 326 (freeholder requirement for voting in all bond elections).  Codified at 1927 Gen. Comp. Laws sec. 250; 1941 Fla. Stat. sec. 98.03.

70.     1925 Fla. Laws ch. 10248, p. 467 (providing for the maintenance of three segregated summer schools for teachers).  Codified at 1927 Comp. Gen. Laws secs. 806-808, 810, 813; 1941 Fla. Stat. secs. 239.11 & 239.14.  Repealed by 1963 Fla. Laws ch. 63-572, sec. 20.

71.     1927 Fla. Laws ch. 12261, p. 1153 (providing for scholarships for attendance at the two state white universities).  Codified at 1927 Comp. Gen. Laws secs. 769-770; 1941 Fla. Stat. sec. 239.19.

72.     1927 Fla. Laws ch. 12416, p. 1339 (providing for separate teacher-training departments for whites and "negroes").  Codified at 1927 Comp. Gen. Laws secs. 759-760.

73.     1927 Fla. Laws Res. 27, p. 1599 (authorizing levying of a school tax "whenever a majority of the qualified electors thereof that pay a tax on real or personal property, shall vote in favor of such levy").

74.     1929 Fla. Laws ch. 13761, secs. 9, 14, 16, pp. 480, 485, 488, 491 (abolishing second choice voting and requiring poll tax for voting).

75.     1929 Fla. Laws ch. 14567, p. 1090 (providing for separate teacher-training departments for whites and "negroes").

76.     1933 Fla. Laws ch. 16181, p. 744 (providing that "[w]hite and negro convicts worked

-12-

upon the public roads of the State, or of any County of this State, shall be worked in separate squads and confined in separate vans, stockades or other structures"). Repealed, 1957 Fla. Laws ch. 121.

77. 1933 Fla. Laws ch. 16013, p. 300 (limiting voting in special tax school districts to those who "paid a tax on real or personal property and voted in the General Election next preceding the date of holding any election pertaining to such Special Tax School District"). Codified at 1941 Fla. Stat. secs. 227.13, 236.32. Fla. Stat. sec. 227.13. Repealed by 1955 Fla. Laws, ch. 29764, sec. 1.

78. 1933 Fla. Laws ch. 16103, sec. 33, pp. 544, 552 (regarding "inheritance from persons of color"). Codified at 1941 Fla. Stat. sec. 731.32. Repealed by 1969 Fla. Laws ch. 69-195.

79. 1939 Fla. Laws ch. 19355, secs. 118, 209, 210, pp. 730, 734-735, 741 (limiting school bond elections to freeholders; providing for segregated schools; prohibiting white teachers from teaching at "negro schools"; and prohibiting "negro teacher" from teaching in white schools). Codified at 1941 Fla. Stat. secs. 227.13, 228.09, 228.10. Fla. Stat. sec. 227.13 repealed by 1955 Fla. Laws ch. 29764. Fla. Stat. sec. 228.09 repealed by 1965 Fla. Laws ch. 65-239. Fla. Stat. sec. 228.10 repealed by 1941 Fla. Laws ch. 20970.

80. 1941 Fla. Stat. sec. 239.10 (providing for the salaries of the Presidents of the state segregated universities). Repealed by 1965 Fla. Laws ch. 65-130.

81. 1941 Fla. Laws ch. 20986, sec. 1 (abolishing poll tax requirement for voting). Codified at 1941 Fla. Stat. sec. 193.75.

-13-

82.   1945 Fla. Laws ch. 22944, p. 1055 (appropriating funds for scholarships and providing for attendance at segregated universities).

83.   1947 Fla. Laws ch. 23669, p. 112 (providing for a segregated university system). Codified at 1963 Fla. Stat. sec. 239.01.  Repealed by 1965 Fla. Laws ch. 65-130.

84.   1947 Fla. Laws ch. 23726, secs. 7, 9, pp. 185, 189 and 190 (providing that nominations in primary elections for school board are to be at-large from residency districts).  Currently codified at Fla. Stat. secs. 230.08, 230.10.

85.   1947 Fla. Laws ch. 23957, p. 704 (requiring candidates to run in groups whenever there are two or more similar offices are to be filled).  Amended, 1977 Fla. Laws ch. 77-175.  Currently codified at Fla. Stat. sec. 100.071.

86.   1951 Fla. Laws ch. 26906, p. 1052 (defining persons entitled to pensions for "military or naval service of the confederate states during the war between the states of the United States").  Codified at 1989 Fla. Stat. ch. 291.  Repealed by 1991 Fla. Laws ch. 91-50.

87.   1955 Fla. Laws ch. 29746, p. 302 (granting county boards of public instruction "full and complete" authority regarding the enrollment of pupils in public schools.  "[T]he purpose of this act [is] to ease the impact of [the United States Supreme Court desegregation] decisions and to avoid tensions and disruptions in the public school system").

88.   1955 Fla. Laws ch. 29937, p. 905 (requiring the grouping of candidates to numbered posts whenever two or more similar offices to be filled in one election).  Currently codified at Fla. Stat. sec. 100.071.

89.    1956 Fla. Laws ch. 31404, p. 62 (authorizing county commissioners to call for a reregistration of freeholder electors for county elections).

90.    1957 Fla. Laws ch. 57-315, p. 617 (establishing the "Governor's Advisory Commission on Race Relations" to render assistance to the governor because "as a result of certain decisions of the supreme court [sic] of the United States relating to segregation of the white and colored races [] serious social tensions have developed").

91.    1959 Fla. Laws, ch. 59-158, p. 291 (authorizing county commissioners, or governing body of any municipality, to call for a reregistration of freeholder electors).

92.    1959 Fla. Laws, ch. 59-412, p. 1402 (providing for the withdrawal of a child from a school where the races are "commingled" upon a parent's request).

93.    1961 Fla. Laws ch. 61-115, p. 181 ("prohibiting any person from mutilating, defacing, defying, trampling upon, defiling or casting contempt upon the flags of the Confederacy or replicas thereof").  Currently codified at Fla. Stat. sec. 256.10.

94.    1961 Fla. Laws, ch. 61-332, p. 648 (defining "freeholder" as it relates to elections).

95.    1965 Fla. Laws, ch. 65-130, secs. 1 & 4, pp. 238-240 (changing the name of the "Florida Agricultural & Mechanical College for Negroes" to "Florida Agricultural & Mechanical University," amending sec. 239.34 of the Fla. Statutes relating to scholarship funds for lineal descendants of confederate soldiers or sailors, and providing further for the erection of "a permanent memorial to the confederate soldiers and sailors").

96.    1965 Fla. Laws, ch. 65-131, p. 245 (authorizing owners of public accommodations to refuse service to patrons with undesirable conduct).

-15-

97.   1969 Fla. Laws, ch. 69-117, p. 604 (prohibiting district school boards from prohibiting school band to play "Dixie").  Codified at 1989 Fla. Stat. sec. 230.222. Repealed by 1991 Fla. Laws ch. 91-105, sec. 81.

98.   1969 Fla. Laws, ch. 69-377, p. 1328 (redefining "freeholder"; requiring voters in all county and municipal bond elections to be "freeholders" and making it unlawful for non-freeholders to vote in bond elections; and establishing a permanent single registration system).

99.   1970 Fla. Laws, ch. 70-95, sec. 30, p. 226, 346 (requiring that "[n]o moneys appropriated in this act or by any county shall be used, directly or indirectly, to assign, transport or compel attendance of any student to any school based solely upon considerations of race, creed, color, or national origin, or for the purpose of achieving equality in attendance or increased attendance or reduced attendance at any school at which persons of one or more particular races, creeds, colors or national origins are enrolled").

100.   1972 Fla. Laws, ch. 72-3, p. 114 (providing for a straw ballot referendum on whether, *inter alia*, voters are in favor of an amendment to the U.S. Constitution that would prohibit forced busing).